1 | ERIC R. HAVIAN (State Bar No. 102295)
2 | MARY A. INMAN (State Bar No. 176059)
  | PHILLIPS & COHEN LLP
3 | 131 Steuart Street, Suite 501
  | San Francisco, California 94105
4 | Tel: (415) 836-9000
  | Fax: (415) 836-9001
5 |
  | Attorneys for Qui Tam Plaintiff [Under Seal]
6 |
7 |

FILED
CLERK, U.S. DISTRICT COURT

JAN 1 7 2006

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

8 | UNITED STATES DISTRICT COURT

9 | FOR THE CENTRAL DISTRICT OF CALIFORNIA

10 |

EDCV06 0055 SGL

| | |
|---|---|
| 11 UNITED STATES, THE STATES OF<br>12 CALIFORNIA, DELAWARE, FLORIDA,<br>NEVADA and TENNESSEE and THE<br>13 COMMONWEALTHS OF<br>MASSACHUSETTS AND VIRGINIA ex rel.<br>14 [UNDER SEAL]<br><br>15    Plaintiffs,<br><br>16 vs.<br><br>17 [UNDER SEAL]<br><br>18    Defendant. | Civil No.:<br><br>COMPLAINT FOR VIOLATION OF<br>FEDERAL AND STATE FALSE CLAIMS<br>ACTS<br><br>JURY TRIAL DEMANDED<br><br>**FILED IN CAMERA & UNDER SEAL<br>(AS REQUIRED BY 31 U.S.C. §<br>3730(b)(2))** |

19
20
21
22
23
24
25
26
27
28

DOCKETED ON CM

JAN 20 2006

BY _____ 044

NIS

---

1/18/2006 9:52:22 AM  Receipt #: 81721
        Cashier : ABELLAMY [LA 1-1]
Paid by: PHILLIPS AND COHEN
5:CV06-00055
2006-086900        5 - Civil Filing Fee(1)
Amount :                              $60.00
5:CV06-00055
2006-510000       11 - Special Fund F/F(1)
Amount :                             $190.00
Check Payment : 1044 /               250.00
Total Payment :                      250.00

1  ERIC R. HAVIAN (State Bar No. 102295)
   MARY A. INMAN (State Bar No. 176059)
2  PHILLIPS & COHEN LLP
   131 Steuart Street, Suite 501
3  San Francisco, California  94105
   Tel: (415) 836-9000
4  Fax: (415) 836-9001

5  Attorneys for Qui Tam Plaintiff John Hendrix

6

7

8                 UNITED STATES DISTRICT COURT

9           FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  UNITED STATES, THE STATES OF | Civil No.: |
| 12  CALIFORNIA, DELAWARE, FLORIDA, NEVADA and TENNESSEE and THE | |
| 13  COMMONWEALTHS OF | COMPLAINT FOR VIOLATION OF FEDERAL AND STATE FALSE CLAIMS |
| 14  MASSACHUSETTS AND VIRGINIA ex rel. JOHN HENDRIX, | ACTS |
| 15       Plaintiffs, | JURY TRIAL DEMANDED |
| 16  vs. | **FILED IN CAMERA & UNDER SEAL** |
| 17  J-M MANUFACTURING COMPANY, INC., | **(AS REQUIRED BY 31 U.S.C. § 3730(b)(2))** |
| 18  a Delaware corporation, | |
| 19       Defendant. | |

20

21

22

23

24

25

26

27

28

# I. INTRODUCTION

1.  This is an action to recover damages and civil penalties on behalf of the United States, the States of California, Delaware, Florida, Nevada and Tennessee, the Commonwealths of Massachusetts and Virginia and numerous cities and public water agencies located within these States/Commonwealths (collectively the "real parties in interest" or "Real Parties") arising from false statements and claims made by defendant J-M Manufacturing Company, Inc. ("J-M") in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq., and the following State False Claims Acts:  California False Claims Act, Cal. Gov't Code §§ 12650 et seq., Delaware False Claims And Reporting Act, 6 Del. C. §§ 1201 et seq., Florida False Claims Act, Fla. Stat. Ann. §§ 68.081 et seq., Massachusetts False Claims Law, Mass. Gen. Laws ch. 12 §§ 5A et seq., Nevada False Claims Act, Nev. Rev. Stat. Ann. §§ 357.010 et seq., Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 et seq., and Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 et seq. (collectively the "Acts").  The Real Parties defrauded by Defendant J-M include without limitation, the United States, the States of California, Delaware, Florida, Nevada and Tennessee, the Commonwealths of Massachusetts and Virginia, the cities and public water agencies listed on Exhibit 1, all other cities, public water agencies and political subdivisions within the States of California, Delaware, Nevada, Illinois and Tennessee and the Commonwealths of Massachusetts and Virginia that purchased J-M's Polyvinyl Chloride ("PVC") pipe between 1997 and present, all state agencies and departments in the States of Illinois and Indiana that purchased J-M's PVC pipe between 1997 and present, and all state and county agencies and departments in the State of Hawaii that purchased J-M's PVC pipe between 1997 and present.

2.  For the past 22 years, J-M has been in the business of manufacturing and selling PVC pipe for the transmission and distribution of water.  Federal military bases, State Roads and Highway Projects, cities and public water distribution agencies are the primary purchasers of J-M's PVC pipe.  J-M sells to these entities by enlisting water works parts distributors to act as middlemen between J-M and its customers.  J-M's PVC pipe products are designed almost exclusively for use in water distribution systems so that even parts sold to distributors are

1  eventually installed in these systems. J-M's PVC pipe products are used primarily in the "water

2  main," the artery that typically runs down the middle of the street and carries water to the service

3  laterals that branch off from the main and supply the individual homes and businesses, and the

4  "transmission line," the trunk line that transports water from the water treatment plant to the

5  water mains. PVC pipe for use in water mains is between four and 12 inches in diameter,

6  whereas PVC pipe for use in the transmission line is between 14 and 48 inches in diameter.

7      3. To encourage and enable Real Parties to purchase J-M pipe, J-M provided Real Parties

8  with copies of J-M's catalogs describing J-M's PVC pipe products. J-M's outside salespeople

9  visited Real Parties regularly and brought new catalogs or updates to existing catalogs. J-M also

10  provided Real Parties with copies of "new product bulletins" and other sales literature describing

11  J-M's products. J-M also provided copies of its catalogs and sales literature to distributors, who

12  in turn provided these materials to end-users, including Real Parties, to enable them to order J-M

13  products through the distributor. In each of its sales documents, J-M made repeated

14  representations that its PVC pipe products conform to applicable industry standards for PVC

15  pipe.

16      4. Starting in at least 1997, J-M began knowingly to manufacture substandard PVC

17  pipes, selling them through distributors to military bases, State Roads and Highway Projects, and

18  public water distribution agencies as well as to contractors installing portions of the water

19  distribution systems. J-M falsely represented to its customers, including Real Parties, that the

20  PVC pipe products sold to them conformed to applicable industry standards for water works

21  parts, when in fact the products were made using inferior materials, processing and tooling which

22  resulted in their having substandard tensile strength. As a result, Real Parties have suffered, and

23  will continue to suffer, substantial damage. Starting in at least 1997, more than half of the PVC

24  pipe J-M supplied had tensile strengths below the minimum required by applicable industry

25  standards and Real Parties' contracts and specifications. As a result of the diminished tensile

26  strength, J-M's PVC pipe will have a shorter life span, is more likely to swell and leak, and will

27  need to be replaced more quickly than pipe manufactured to specification.

28      5. The Federal and State False Claims Acts provide that any person who knowingly

1  submits or causes to be submitted a false or fraudulent claim to a governmental entity for

2  payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three

3  times the amount of the damages sustained by the government.  The Acts allow any person

4  having information regarding a false or fraudulent claim against the government to bring an

5  action on behalf of himself (the "qui tam plaintiff" or "relator") and the government and to share

6  in any recovery.

7      6.  Based on these provisions, qui tam plaintiff John Hendrix seeks to recover damages

8  and civil penalties arising from Defendant J-M's actions in presenting false records and

9  statements to its federal, state and local governmental customers and causing its distributors to

10  submit false records, claims and statements to its federal, state and local governmental customers.

11                          **II. PARTIES**

12      7.  Qui tam plaintiff John Hendrix ("Relator") is a resident of Clifton, New Jersey.  After

13  graduating from college in December 2001, Relator began working for Defendant J-M on July 8,

14  2002 in its corporate headquarters in Livingston, New Jersey as an engineer in J-M's Product

15  Assurance Division.  Throughout his employment at J-M, the majority of Relator's job duties

16  involved advising J-M on the technical aspects of claims brought by J-M's customers for failing

17  or non-conforming product.  To a lesser degree, Relator's job also involved sales and customer

18  service work, including advising current and prospective customers (primarily fellow engineers)

19  on technical aspects of J-M's products.  On November 9, 2005, a little over a week after Relator

20  wrote a memo to J-M management highlighting the fact that the tensile strength of J-M's PVC

21  pipe was below that required by Underwriters Laboratories ("UL") to qualify for the UL Mark

22  stamped on its pipes, J-M terminated Relator's employment.

23      8.  Real Parties, on whose behalf Relator brings this suit, are the United States, the States

24  of California, Delaware, Florida, Nevada and Tennessee, the Commonwealths of Massachusetts

25  and Virginia, the cities and public water agencies listed on Exhibit 1, all of whom purchased

26  J-M's PVC pipe between July 3, 2003 and August 31, 2005, all cities, public water agencies and

27  political subdivisions within the States of California, Delaware, Illinois, Nevada and Tennessee

28  and the Commonwealths of Massachusetts and Virginia who purchased J-M PVC pipe products

1  between at least 1997 and present, all agencies or departments of the State of Indiana who

2  purchased J-M PVC pipe products between at least 1997 and present, and all state and county

3  agencies and departments within the State of Hawaii who purchased J-M PVC pipe products

4  between at least 1997 and present. Exhibit 2, incorporated herein, contains a partial list of federal

5  projects for which the United States Armed Forces purchased J-M PVC pipe during the period

6  between July 3, 2003 and August 31, 2005. Exhibit 3, incorporated herein, contains a partial list

7  of projects for which the State of Florida purchased J-M PVC pipe during the period between

8  July 3, 2003 and August 31, 2005.

9      9. At all times relevant to this Complaint, Defendant J-M Manufacturing Company, Inc.

10  ("J-M") was a Delaware corporation with its headquarters at 9 Peach Tree Hill Road in

11  Livingston, New Jersey. With $800 million in annual sales, J-M is the largest manufacturer of

12  PVC pipe in the United States and the world. J-M manufactures its PVC pipe at 11 plants in the

13  following locations: Fontana and Stockton, California; Pueblo, Colorado; Adel, Georgia; Wilton,

14  Iowa; Batchelor, Louisiana; Winnebago, Minnesota; Butner, North Carolina; McNary, Oregon;

15  Meadville, Pennsylvania; and Wharton, Texas. From its inception in 1982 until November 1,

16  2005, J-M was a wholly-owned subsidiary of Formosa Plastics Corporation, U.S.A. ("Formosa").

17  Formosa is largely controlled by the Wang family of Taiwan. Yung-ching Wang, known as

18  "Y.C. Wang," is Formosa's Founder and Chairman of the Board. Each of Mr. Wang's ten

19  children has served as an executive at either Formosa or one of its subsidiaries. Walter Wang,

20  Y.C. Wang's youngest son, is the President of J-M.

21                      **III. JURISDICTION AND VENUE**

22      10. This Court has jurisdiction over the subject matter of the Federal False Claims Act

23  ("FCA") action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers

24  jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. This

25  Court has jurisdiction over the subject matter of the State False Claims actions pursuant to 28

26  U.S.C. § 1367 and 31 U.S.C. § 3732(b) because the State False Claims actions arise from the

27  same transactions or occurrences as the Federal FCA action.

28      11. This Court has personal jurisdiction over Defendant J-M pursuant to 31 U.S.C. §

1    3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial

2    district in which the defendant, or in the case of multiple defendants, any one defendant can be

3    found, resides, transacts business or in which any act proscribed by section 3729 occurred."

4    Section 3732(a) also authorizes nationwide service of process.  During the relevant period, J-M

5    operated a foundry in Fontana, California, at which many of the fraudulent practices occurred,

6    and thereby transacted business in the Central District of California.

7         12.  Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because J-M can be

8    found in, resides in, and/or transacts business in the Central District of California and because

9    many of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

10                        **IV.  FRAUD AGAINST REAL PARTIES**

11   **A.  Turnover in J-M's Upper Management**

12        13.  J-M was founded in 1982 when Formosa acquired the Pipe Division of Johns-

13   Manville Corporation and created J-M.  For its first 10 years, J-M's management was populated

14   largely by former Johns-Manville employees.  However, by the mid 1990s, most of the old Johns-

15   Manville employees had either retired or left.  In 1990, J-M's former parent company, Formosa

16   Plastics Corporation, U.S.A. ("Formosa"), installed Walter Wang, the son of Formosa's Founder

17   and Chairman of the Board, Y.C. Wang, as J-M's President.  At the time he assumed this post,

18   Mr. Wang was only 25 years old.  Having just graduated from college, he had little to no practical

19   experience in managing a company, let alone the world's largest manufacturer of PVC pipe.

20   Shortly after naming Mr. Wang President, J-M moved its corporate headquarters from Stockton,

21   California to Livingston, New Jersey, where it occupies the same office building in which

22   Formosa and several other Formosa subsidiaries also have corporate offices.

23        14.  Under Mr. Wang's leadership, J-M implemented a series of "cost-cutting" measures

24   that undermined the quality of J-M's PVC pipe products.  At Mr. Wang's direction, the outgoing

25   former Johns-Manville managers were replaced by individuals with significantly less experience

26   and fewer credentials.  For instance, the Director of Production, who formerly had been a senior

27   engineer, was replaced by Barry Lin, an accountant from Formosa's management center in Taiwan

28   with no engineering background.  The new Director of Engineering, Kaider Liao, did not have an

1  engineering degree.  The new Quality Control Manager, Jack Hwang, was an electrical engineer

2  with no experience or formal training in failure analysis.  After Hwang left the Quality Control

3  Manager post in 2004, the position was later filled in 2005 by a recent college graduate.

4       15. In filling these and other supervisory positions, J-M drew almost exclusively from

5  two sources – Taiwanese nationals and recent college graduates (like Relator) – both of which

6  garnered smaller salaries.  Up until three years ago, Formosa owned and operated a boarding

7  house near its Livingston, New Jersey headquarters to accommodate the large number of

8  Taiwanese employees at J-M and its other subsidiaries who could not otherwise afford to live in

9  the greater New York Metropolitan area on their modest J-M salaries.

10       16. Backed by this new crop of inexperienced managers, Mr. Wang shifted J-M's focus

11  away from product quality to a single-minded mission of gaining market share and improving the

12  bottom line irrespective of quality.  Under the direction of Mr. Wang and his new managers, J-M

13  implemented three "cost-cutting" measures that have seriously compromised the tensile strength

14  of the majority of its PVC pipe.

15  **B. Substituting Inferior Ingredients in PVC Compound**

16       17. First, J-M began to substitute cheaper and lower quality ingredients in its PVC

17  compound.  While most PVC pipe manufacturers use for their compound a more expensive, pre-

18  prepared stock formula published by the Plastic Pipe Institute, J-M uses a proprietary compound

19  called "J-M 90" that it mixes itself.  By making the compound itself, J-M can control the type of

20  ingredients that go into it.

21       18. To save money, J-M replaced two primary ingredients – resin and additives (like wax

22  and stabilizers) – with cheaper, lower grade brands.  J-M replaced its more expensive, higher

23  viscosity resin with a cheaper, lower viscosity resin.  While J-M's previous resin had a viscosity

24  rating of .92, the new resin had a rating of .88.  In addition to being cheaper, the lower viscosity

25  resin could be formed into pipe more quickly and with less processing, thereby allowing J-M to

26  increase its production rates and output (as described in more detail below).

27       19. However, the effect of the lower viscosity resin and increased production rates was to

28  decrease the compound's overall tensile strength.  Because the lower viscosity resin was a more

1  ductile material, it required more processing to achieve the required tensile strength. However,

2  instead of slowing its production rates to account for the lower viscosity resin, J-M increased its

3  production rates to increase its output of PVC pipe. By switching other additives such as waxes

4  and stabilizers to lower grade brands, J-M also decreased the tensile strength of its J-M 90

5  compound. Taken together, these substitutions accounted for a decrease in the tensile strength of

6  the J-M 90 compound from nearly 8,000 pounds per square inch ("psi") to just above the

7  minimum required tensile strength of 7,000 psi.

8  **C. Accelerating Production Rates**

9      20. With its J-M 90 compound hovering so close to the minimum tensile strength, J-M

10  could not afford to make any mistakes in its manufacturing process. However, rather than use

11  good manufacturing techniques, J-M began to make changes to its manufacturing process that

12  further eroded the tensile strength and caused the finished PVC pipe to be out-of-specification.

13      21. PVC pipe is manufactured by extrusion. Broadly described, extrusion involves the

14  following steps. The ingredients that comprise the PVC compound (e.g., base resin and additives

15  like paraffin wax and calcium sterate) are weight-measured out of silos and poured into a hopper

16  where they are mixed. The mixed PVC compound is then poured into the extruder where it is

17  melted and formed by being forced (by a barrel and screw acting as an auger) through an orifice

18  known as the die that creates the shape and dimensions of a pipe. Once out of the extruder and

19  die, the hot PVC pipe is then cooled in a series of water cooling tanks.

20      22. To meet an ever increasing demand for PVC pipe, J-M began to increase production

21  rates in each of its 11 plants that produce PVC pipe. Instead of investing in more extruders,

22  replacing outdated extruders or building more plants, J-M started running its existing extruders

23  (many of which are over 30 years old) at speeds that exceed the extruders' rated capacity. Each

24  extruder has a recommended maximum output measured typically in pounds per hour, and J-M

25  began running its extruders at 20 percent above the rated capacity.

26      23. As a result of the increased speed of J-M's production line, more torque and higher

27  temperatures were needed to melt the J-M 90 compound and, once melted, the PVC material

28  received less processing time in the extruder and die as it was being formed into pipe. The

1  temperature of the water being sprayed on the pipe in the cooling baths had to be lowered to

2  counteract both the increased temperature of the pipe emerging from the extruder and the fact that

3  the pipe was spending less time in the cooling baths. (Since the cooling baths occupy a fixed

4  distance on the production line, the increased production rates had the pipe moving more quickly

5  over this and all other parts of the production line.)

6      24. Not surprisingly, the effect of this accelerated manufacturing process (in addition to

7  increased output) was to further decrease the tensile strength of J-M's PVC pipe. Like a cake

8  baked for eight minutes at 800 degrees and then quickly cooled in a freezer, the PVC pipe being

9  produced at the accelerated production rate was not as strong as pipe that was afforded proper

10  processing time and conditions. Having been subjected to a quick burst of cooling, the surface of

11  the outside of the pipe was hard whereas the portion of pipe below the surface, not having had

12  adequate time to cool and form, was soft. The accelerated manufacturing process also created

13  huge variations in the temperatures of the inside and outside diameter of the pipe and the rate at

14  which each cooled. The effect of these differential temperatures and cooling rates was to further

15  weaken the pipe and create locked-in stresses in the pipe that increase the likelihood the pipe will

16  catastrophically rupture when it is tapped.

17  **D. Improper Tooling and Maintenance of Extruders**

18      25. With the exception of its newer plants in Adel, Georgia and Meadville, Pennsylvania,

19  in each of its nine remaining PVC plants, J-M has many extruders that are over 30 years old.

20  Rather than invest in new extruders, J-M placed a new, high-output die on the end of the older

21  extruders to keep up with the accelerated production schedule set by President Wang. However,

22  because J-M's lower quality PVC compound required more processing time and the older

23  extruders were not able to work the PVC compound enough for the high-output die, the tensile

24  strength of the pipe produced by the combination of older extruder and high-output die was

25  further diminished.

26      26. In late 2004, J-M began receiving complaints from customers regarding a certain type

27  of PVC pipe (IPS white pipe) produced at its plant in Stockton, California. Instead of the white

28  color characteristic of this particular type of pipe, the combination of increased production rates,

1   higher temperatures and high-output dies on older extruders had caused the pipe to burn, turning

2   it yellow in color.  To remedy the problem, K.C. Yang, J-M's Corporate Quality Control

3   Supervisor, instructed the Stockton plant to use a regular die for this product.  In an email dated

4   January 4, 2005, K.C Yang instructed Stockton's Superintendent of Production, Jim Reichert,

5   that "PST [Plant Stockton] should use regular die for IPS white products when high-output die

6   cause burning.  If necessary, PST should request new IPS die."  See Exhibit 4, incorporated

7   herein.

8       27.  By increasing its production rates to speeds exceeding the extruders' rated capacity,

9   J-M accelerated the wear on its extruders.  Moving parts like the extruders' screw and barrel were

10  most affected by the added wear.  However, rather than increase the amount of maintenance to

11  account for more wear, J-M abandoned its former practice of regularly monitoring and replacing

12  the screw and barrel unit when it fell below a certain tolerance and decided instead to amortize

13  the unit over a one-year period and only replace it at the end of the 12 months.

14      28.  J-M managers like Will Fassler, a senior engineer in J-M's Research and

15  Development Department, began to observe that, under the increased production rates, the screw

16  and barrel unit was exceeding the old tolerances and needing replacement after only six months.

17  Nevertheless, under its new amortization policy, J-M continued to use the screw and barrel unit

18  for another six months before it was replaced.  Experienced J-M engineers like Will Fassler were

19  well aware that the PVC material extruded in the second half of the unit's amortized life with the

20  underperforming screw and barrel unit had reduced tensile strength.  See Exhibit 5 (Relator's

21  notes dated 11/3/05), incorporated herein.

22      29.  In a discussion with Relator on November 3, 2005, Will Fassler explained that the

23  reason for the decrease in tensile strength stems from the proximity of the screw and barrel.  For

24  instance, a new screw and barrel unit, which fits closely together, will generate more shear and

25  yield better mechanical properties in the finished pipe.  See Exhibit 5.  However, as the unit

26  wears, the fit loosens and the shear decreases, which compromises the processing and decreases

27  the tensile strength of the PVC material.  Id.  Despite this knowledge, J-M failed to replace its

28  underperforming screw and barrel units after the first six months of use and allowed them to be

1  used for an additional six months in spite of the detrimental effect on the pipe's tensile strength.

2      30.  While none of these practices alone would have proven fatal, the combined effect of

3  J-M's substitution of inferior ingredients, increased production rates and improper tooling and

4  maintenance of its extruders caused J-M to produce PVC pipe that fails to meet the tensile

5  strength requirements set forth by Underwriters Laboratories Inc. ("UL"), the American Water

6  Works Association ("AWWA"), and ASTM International.

7

8  **V.  J-M'S SALE OF SUBSTANDARD PVC PIPE BEARING UL MARK DESPITE KNOWLEDGE THAT PIPE DOES NOT QUALIFY FOR UL LISTING**

9  **A.  J-M PVC Pipe Does Not Meet UL's Longitudinal Tensile-Strength Requirement**

10      31.  Underwriters Laboratories Inc. ("UL") is a not-for-profit corporation that tests and

11  certifies a wide range of products for public safety.  Once a product is tested and found to

12  conform to UL's safety requirements, that product becomes UL certified and is eligible to bear

13  the UL Mark.  The UL Mark has become synonymous with safety and a product bearing a UL

14  Mark is universally accepted as being safe.

15      32.  UL has promulgated a safety standard governing PVC pipe for use in underground,

16  nonpotable fire service systems.  UL Standard 1285 ("UL 1285") lists a variety of requirements

17  that must be met for PVC pipe to be UL certified and bear the UL Mark.  Specifically, UL 1285

18  requires that "[r]epresentative samples of each class, pressure rating and size of PVC pipe . . .

19  shall be subjected to the tests described in Sections 11 – 20."  Exhibit 6, incorporated herein.

20  One of those tests, Section 17, is the Longitudinal Tensile-Strength Test which provides that

21  "[m]achined specimens from the pipe shall have a minimum tensile strength of 7,000 psi."  Id.

22      33.  J-M has only undergone two rounds of Longitudinal Tensile-Strength Tests for UL on

23  its PVC pipe products.  The first round was on its founding in 1982 when J-M had to initially

24  qualify its PVC pipe products for UL listing.  The second round was in the mid-1990s when J-M

25  sought to change its PVC pipe compound and begin making pipe out of its newly created J-M 90

26  compound.  J-M passed both of these tests and received UL listing for its PVC pipe products.

27      34.  Once it has certified a product, UL does not require that the product undergo the

28  Performance Tests listed in Sections 11 through 20 of UL 1285, including the Longitudinal

1  Tensile-Strength Test, unless and until there has been a material change in the product's

2  materials, design or processing.  While UL requires manufacturers to "conduct the necessary

3  production control, inspection, and tests" as they produce the pipe, these routine Manufacturing

4  Tests are much less stringent than the Performance Tests UL 1285 requires to initially qualify the

5  PVC pipe.  Exhibit 6.

6      35. UL operates on an honor system.  Once a product is UL listed, UL relies on

7  manufacturers to notify it of any material changes to the product's materials, design or

8  processing.  In the absence of such notification, UL presumes the manufacturer is continuing to

9  use the same materials, design and processing it used in preparing the samples UL tested as part

10  of the Performance Testing to qualify the pipe.  By requiring "***representative*** samples of each

11  type of PVC pipe" for qualification testing, UL conditions its ongoing certification of the product

12  on the understanding that all future pipe will be made in the same manner as the samples

13  submitted to UL to qualify the pipe.  Exhibit 6 (emphasis added).  In the Foreword, UL 1285

14  specifically states that "[t]he observance of the requirements of this Standard by a manufacturer is

15  one of the conditions of the continued coverage of the manufacturer's product."  Id.

16      36. By at least 1997, J-M's "cost-cutting" practices of substituting inferior ingredients in

17  its compound, accelerating production rates and improperly tooling its extruders were well-

18  established and had seriously degraded the tensile strength of J-M's PVC pipe.  By this time, J-M

19  had begun to receive test results (from J-M's internal testing and testing performed by customers

20  in connection with claims for failing pipe) showing that more than 50 percent of the time J-M's

21  PVC pipe failed to meet the minimum longitudinal tensile-strength requirements set forth in UL

22  1285.

23      **1.   Results of Internal Testing Performed by CRT Laboratories**

24      37. A couple of times a year, Will Fassler, a senior engineer in J-M's Research and

25  Development Division in the Stockton, California plant, sends samples taken from J-M's

26  finished PVC pipe to CRT Laboratories, Inc. in Orange, California for longitudinal tensile-

27  strength testing.  These tests are conducted for internal purposes only to allow J-M to monitor the

28  longitudinal tensile strength of its PVC pipe.  The results are not shared with anyone outside J-M.

1    38. By 1997, the test results from CRT Laboratories began to show that more than half of

2    the samples taken from J-M's PVC pipe failed to meet 7,000 psi, the minimum longitudinal

3    tensile strength required by UL 1285. From 1997 to present, the failure rate has continued to

4    exceed 50 percent. Will Fassler, who has ordered and reviewed all of CRT's test reports over the

5    past nine years, calculates that J-M's PVC pipe has failed tensile strength 70 percent of the time.

6    See Exhibit 7 (Relator's notes dated 9/12/05), incorporated herein.

7    39. In 2002, while working on two large claims against J-M for failed PVC pipe, Relator

8    was asked to review the results of all internal tests J-M had performed on PVC pipe manufactured

9    between 1998 and 1999, the time period when the failed pipe was produced. In so doing, Relator

10    was able to review the results from six of the longitudinal tensile-strength tests CRT Laboratories

11    performed on J-M's PVC pipe. Of the six tests, Relator observed that four failed the tensile

12    strength requirements and only two passed.

13    40. At various times, together and separately, Will Fassler, K.C. Yang, J-M's former

14    Corporate Quality Control Supervisor, and Relator each have expressed concern to Barry Lin,

15    J-M's Director of Production, about the large percentage of failing tensile strength results on

16    J-M's PVC pipe. Each time, Mr. Lin has responded by saying that the failures were "an

17    acceptable business risk" to meet company production goals, failures were normal, and not every

18    piece of pipe would always meet specification. Exhibit 7 (Relator's notes dated 9/12/05),

19    incorporated herein.

20    41. After seeing a subset of the results of CRT's longitudinal tensile-strength testing in

21    which 60 percent of the samples failed and learning from Will Fassler that the collective results

22    of the past nine years showed an overall failure rate of 70 percent, Relator was no longer

23    comfortable signing his name to customer certifications and letters to claimants representing that

24    J-M's pipe complies with the UL Standard. On August 23, 2005, Relator told Barry Lin about his

25    concerns and said he would not sign any more letters without first seeing copies of all of the

26    results of J-M's internal testing performed by CRT Laboratories.

27    42. Mr. Lin refused to provide Relator with the CRT results. Instead, he simply assured

28    Relator that J-M's UL listed products meet all the requirements of UL and directed him to

1  continue to certify this to J-M's customers. Exhibit 8, incorporated herein, is a copy of Relator's

2  August 25, 2005, email to Barry Lin asking him to acknowledge in writing his statements

3  regarding J-M's compliance with the UL tensile-strength requirement despite CRT test results to

4  the contrary. After having similar conversations with K.C. Yang, Kai Cheng, J-M's Director of

5  Product Assurance, and Mai Huynh, J-M's Product Assurance Manager, Relator sent similar

6  emails to each of them. See id. None of the recipients provided Relator a written

7  acknowledgment.

8        **2. Results of Testing Performed in Conjunction with Claims Against J-M**

9        43. By at least 1997, J-M was also beginning to get test results for failing longitudinal

10  tensile strength from its Product Assurance Department. J-M's Product Assurance Department

11  handles all claims and complaints brought by J-M customers for failing pipe. Because

12  longitudinal tensile-strength testing can only be performed by a certified independent laboratory

13  and is expensive ($2,500 per specimen for the series of tests with which this test is packaged), it

14  is typically only requested in the case of larger claims involving significant damages.

15        44. During Relator's three years in J-M's Product Assurance Department, longitudinal

16  tensile-strength testing was only performed in 14 of the claims. Of those 14 claims, Relator saw

17  12 instances in which the tensile strength of J-M's PVC pipe was below the 7,000 psi minimum

18  requirement and only two instances in which the PVC pipe met tensile strength. Exhibit 9,

19  incorporated herein, contains copies of some of the test results documenting the following failing

20  tensile strengths measured in pipe from four of the 14 claims:

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

| Number & Name of Claim | Longitudinal Tensile Strength Required by UL 1285 | Longitudinal Tensile Strength Measured in Sample of J-M PVC Pipe | Independent Laboratory That Performed the Test | Test Date |
|---|---|---|---|---|
| Q00-H-41 Ferguson Cities Supply Brigman Construction | 7,000 psi | Hobbs B:  6,600 psi | Law Engineering and Environmental Services, Inc. | 09/28/00 |
| Q00-H-14 Tec Utilities | 7,000 psi | Sample 2:  6,680 psi Sample 3:  6,750 psi Sample 4:  6,940 psi | Modern Industries, Inc. | 10/31/00 |
| Q02-J-40 Westgate Resorts | 7,000 psi | 6,833 psi | Bodycote Broutman, Inc. | 10/01/02 |
| Q05-C-08 Sheldon | 7,000 psi | Sample 1:  6,777 psi Sample 2:  6,775 psi | CRT Laboratories | 6/9/05 |

45. In his Internal Recommendation and/or Authorization ("IRA") advising J-M on how it should handle the Sheldon claim referenced above, Relator noted that "CRT conducted testing on the pipe and found that the tensile strength of the pipe was below that required by the UL Listing Mark on the pipe on all samples tested." Exhibit 10, incorporated herein. Because of the pipe's substandard tensile strength, Relator recommended that J-M offer the customer a settlement of $30,000. Id.

46. Kai Cheng, J-M's Director of Product Assurance, disagreed with Relator's recommendation and instructed Relator to "find a way to deny the claim and follow his thoughts, that JM is not responsible even if we fail the test, and offer alternative theories as to the cause of failure for this case." Exhibit 11 (Relator's notes dated 11/1/05), incorporated herein. In his conversation with Relator, Mr. Cheng also stated that he "knew that probably half of our pipe did not meet this requirement of UL [UL 1285 longitudinal tensile strength] and for all of our pipe to meet the standard we would have to be perfect in production and we could not always do that." Id.

### 3. **Results of Internal Testing of J-M's 30- and 36-Inch Big Blue Pipe**

47. Beginning in approximately 1999 with the opening of its new plant in Adel, Georgia, J-M added two new products to its Big Blue PVC pipe product line. J-M began manufacturing Big Blue PVC pipe with a pressure rating of 165 psi in both the 30- and 36-inch sizes in its Adel, Georgia and Fontana, California plants. Shortly after starting to manufacture these two products, J-M sent specimens from both pipes to an outside laboratory for longitudinal tensile-strength testing to see if they could qualify for UL listing. However, all of the specimens failed to meet the minimum tensile strength of 7,000 psi required by UL 1285.

48. Once it established a customer base for these two products, J-M introduced a second pressure class – one with a pressure rating of 125 psi – in both its 30- and 36-inch Big Blue PVC pipe. Again, J-M subjected samples from these two new products as well (as the original two products) to longitudinal tensile-strength testing at an outside laboratory, and all of the samples had tensile strengths below 7,000 psi. Since that time, J-M has continued to test the longitudinal tensile strength of its 30- and 36-inch Big Blue PVC pipe and has received nothing but failing results. Without a passing result, J-M has been unable to approach UL about qualifying these products and they do not have a UL Mark.

49. Since J-M's 30- and 36-inch Big Blue PVC pipe is made using the same materials, equipment and processing as all of J-M's UL-listed Big Blue and Blue Brute pipe, the substandard tensile strengths reported on the 30- and 36-inch Big Blue pipes are representative of the tensile strengths of all J-M UL-listed pipe. Like the results of J-M's internal CRT testing and its claims testing, the failing results for its 30- and 36-inch Big Blue pipe are further proof that J-M's "cost-cutting" measures of substituting inferior ingredients in its J-M 90 compound, accelerating its production rates, and improperly tooling its extruders have had a negative effect on the longitudinal tensile strength of its PVC pipe.

### B. **J-M PVC Pipe Does Not Meet UL's Radial Tensile Strength Requirement**

50. In August 2003, Relator proposed a change to the bell design of J-M's Blue Brute and Big Blue PVC pipe. The two ends on a length of PVC pipe are called alternately the barrell end and the bell end. Under J-M's existing design, the bell end had a greater wall thickness than the

remainder of the pipe.  To make the bell walls, the extruder had to be slowed down and additional material added to increase the wall thickness.  Under Relator's proposal, dubbed the "No Thickened Section" Project, the bell wall would not be thickened and would have the same dimensions as the remainder of the pipe, thereby allowing the extruder to run at a nearly continuous speed, increasing output and reducing the amount of material needed per length of pipe.

51. Relator found support for his proposed design change in the American Water Works Association ("AWWA") standards governing PVC Pipe for Water Transmission and Distribution, AWWA C900 and C905.  Under Section 4.3.2.2 of both AWWA C900 and C905, the pipe's bell end must meet one of two requirements.  It must have the same wall thickness as the barrel of the pipe, or it must be tested to ensure that the joint assembly qualifies for a hydrostatic design basis ("HDB") category of 4,000 psi.  See Exhibit 12, incorporated herein.  Whereas longitudinal tensile-strength testing measures the tensile strength of the lengthwise portion of the pipe from end to end, HDB testing is one of several ways of measuring the tensile strength of the radial, circular or hoop section of the pipe.  From this Section, Relator concluded that the thickened bell could be omitted from the pipe design so long as a joint manufactured from the thinner bell could meet the required HDB category of 4,000 psi.

52. In his Project Initiation Form dated October 28, 2003, Relator estimated that by omitting the thickened bell section of its two most popular products, Blue Brute and Big Blue, J-M would save $3,000,000 a year in materials costs alone, not to mention the additional efficiencies to be gained from not having to slow down its extruders and running them at a continuous speed.  See Exhibit 13, incorporated herein.  Other managers, including Will Fassler, extolled the potential benefits of a "No Thickened Section" pipe.  In an email to Jack Hwang, J-M's Quality Control Manager, dated September 3, 2003, Mr. Fassler wrote "The potential benefits are large:  significantly reduced material usage; greatly reduced bell-end forming scrap; easier bell-end forming; better bell-end appearance."  Exhibit 14, incorporated herein.  On December 8, 2003, Walter Wang, J-M's President, approved the "No Thickened Section" Project with a budget of $65,000 to cover the costs of designing and developing the new bell end and

1  performing the various tests needed to gain UL listing.  See Exhibit 13.

2      53. Since the thinner bell wall only involved a change in the pipe's design, as opposed to
3  its materials or processing, J-M did not have to undergo many of the Performance Tests in UL
4  1285, including the Longitudinal Tensile-Strength Test, to qualify the newly designed pipe for
5  UL listing.  Instead, to qualify the new design, UL required J-M to pass the following three
6  strength tests, each of which measures the radial tensile strength of the newly designed bell end
7  of the pipe:  (1) HDB Test (2,000 hour test); (2) Sustained Pressure Test (1,000 hour test); and (3)
8  Quick Burst Test (60 second test).

9      54. Since the newly designed, no-thickened-section pipe was made from the same
10  materials and process as the existing thickened-section pipe, J-M experienced many of the same
11  problems with the new pipe as it had with the existing pipe.  For instance, J-M's three "cost-
12  cutting" practices (substitution of inferior materials, accelerated production rates and improper
13  tooling of its extruders), which caused J-M's existing pipe to fail the Longitudinal Tensile-
14  Strength Tests a majority of the time, also caused J-M to fail many of the above-referenced radial
15  strength tests on the newly designed, no-thickened-section pipe.

16      55. To gain UL listing for the new pipe design in the face of such failures, J-M resorted to
17  a number of fraudulent practices, including without limitation (1) specially producing the UL
18  specimens using higher quality ingredients and reduced production rates that are not
19  representative of J-M's actual materials and process; (2) concealing failing test results from UL;
20  (3) where early results indicated a specimen ultimately would fail, stopping long-term tests before
21  they were completed and substituting new specimens; and (4) making multiple specimens from
22  one lot, testing a subset of the specimens in advance to ensure that when the remaining specimens
23  are tested for UL, they will pass the tests.

24      **1.  HDB Testing**

25      56. As discussed above, the two AWWA standards governing PVC pressure pipe –
26  AWWA C900 and AWWA C905 – both state at Section 4.3.2.2(b) that the joint assemblies of the
27  pipe's bell must "qualify for a hydrostatic design basis (HDB) category of 4,000 psi (27.58MPa)
28  when tested in accordance with ASTM D2837 as modified in ASTM D3139." Exhibit 12.

1  ASTM D2837, in turn, provides the test method for obtaining the pipe's HDB. See Exhibit 15,

2  incorporated herein.

3      57. The purpose of HDB testing is to determine the long-term radial strength

4  characteristics of PVC pipe. Broadly described, HDB testing is performed by placing 10

5  specimens under varying degrees of pressure and recording the point in time, up to a maximum of

6  2,000 hours, when the joint fails. In a November 14, 2003, email to Jack Hwang, Will Fassler

7  described the HDB test as "the most stringent test of PVC pressure pipe quality." Exhibit 16,

8  incorporated herein. Because HDB testing lasts 83.3 days and requires special equipment, it must

9  be performed at an independent, certified testing laboratory. Given the length of the test, UL

10  does not require that a UL representative be present to observe the testing.

11      58. Once the testing is complete, Section 5.4 of ASTM D2837 requires that the following

12  three calculations be performed to determine a pipe's HDB: (1) the hydrostatic strength at

13  100,000 hours; (2) the hydrostatic strength at 50 years; and (3) the percent of circumferential

14  expansion. Each of these calculations measures the pipe's long-term hydrostatic strength. To

15  obtain an HDB category of 4,000 psi, the smallest of these three values must have a long-term

16  hydrostatic strength between 3,830 and 4,800 psi. Exhibit 15 (at Table 1). However, in Note 7,

17  ASTM D2837 notes that the expansion measurement is not required in North America because

18  expansion strengths taken from North American stress rated PVC materials have not been found

19  to be "the limiting factor," i.e., the lowest of the three values described above.

20      59. From the beginning of the "No Thickened Section" Project, many of J-M's Quality

21  Control managers expressed concern about the ability of J-M's pipe, thickened or no, to pass the

22  required HDB category of 4,000 psi. In a November 14, 2003, email to Jack Hwang, Will Fassler

23  listed first among the challenges J-M needed to overcome for the Project to succeed J-M's

24  "increasing failure rates in long-term pressure tests." Exhibit 16. Mr. Fassler also cited three

25  other obstacles: (1) the recent failure of J-M's pipe to pass sustained pressure tests at NSF

26  International (formerly known as the National Sanitation Foundation), which provides product

27  testing and certification services for products in contact with potable water, (2) failing HDB

28  testing and (3) numerous joint specimen failures "where the pipe burst before the joint leaked."

1  Id.

2       60. Given its history of problems with the tensile strength of its PVC pipe, J-M was

3  skeptical that no-thickened-section pipe produced at random on the same machinery using the

4  same materials and process as its existing pipe would pass the HDB testing. To increase its odds

5  of passing, J-M directed the Plant Managers preparing the no-thickened-section specimens to

6  monitor the results of the daily Quick Burst tests being performed on its existing pipe and only

7  produce the specimens when those results were favorable.

8       61. In a December 9, 2003, email, Will Fassler, who was heading up specimen

9  preparation for the Project, informed Stephen Yang, the Plant Manager at J-M's Fontana,

10  California plant, that the Quick Burst test data "is very useful in identifying pipe that has an

11  elevated chance of failing HDB." Exhibit 17, incorporated herein. Mr. Fassler instructed Mr.

12  Yang to consult that data in choosing when to produce the specimens. Id. ("We need to test the

13  pipe before testing the joint because the pipe will limit the strength of the joint.") Similarly, in

14  another email of the same date, Jack Hwang notified Mr. Yang that "We have to have a good test

15  result within JM before we send out for HDB test." Id.

16       62. Once the initial specimens were produced (using the Quick Burst data to increase its

17  odds of passing HDB), J-M sent specimens of its no-thickened-section Blue Brute pipe (in size 4-

18  inch Dimension Ratio ("DR") 18) to Charles Stanley, the Director of Universal Laboratory, Inc.

19  in Garland, Texas, for preliminary testing. Before incurring the cost of 2,000 hours of testing as

20  required by full-scale HDB testing, J-M instructed Mr. Stanley to first subject 10 specimens to a

21  shortened HDB test of only 100 hours to give J-M a preview of how the pipe would likely

22  perform.

23       63. The results of this testing, which J-M managers dubbed "Accelerated HDB Testing,"

24  were mixed. Approximately half of the 10 specimens had hydrostatic strengths that were well

25  below the confidence limit and caused the entire lot to fail the HDB test. Exhibit 18,

26  incorporated herein, is a copy of the notes Relator took as Mr. Stanley reported on the results of

27  the HDB testing. Under item number three, Relator notes that the Blue Brute specimen in size 4-

28  inch DR 18 failed the confidence limit under the Accelerated HDB testing. Id.

1    64. Undeterred by these results, J-M instructed Mr. Stanley to begin the full-scale HDB

2    testing. Early in the testing, J-M began to receive reports from Mr. Stanley that many of the

3    specimens were exhibiting excessive swelling. While ASTM D2837 allows specimens to expand

4    a maximum of five percent during HDB testing, several of J-M's specimens had swelled by as

5    much as 33 percent. Having never seen such swelling before, Mr. Stanley sent several of the

6    swollen specimens to Will Fassler and Relator for their review. (At the time Relator left J-M in

7    November 2005, one of the swollen pipe specimens – a Blue Brute pipe in size 4-inch DR 18 --

8    was still in J-M's literature room.)

9    65. Despite the fact these specimens clearly showed a serious problem with excessive

10   swelling, J-M continued to rely on Note 7 of ASTM D2837 (which provides that the expansion

11   measurement is not required where the five percent expansion strengths are not the limiting

12   factor) and refused to consider the expansion measurement in determining HDB. From the

13   degree of swelling, J-M was aware that if Universal Laboratories had calculated it, the expansion

14   measurement would have been the lowest value of the three calculations for determining long-

15   term hydrostatic strength and would have caused the pipe to fail HDB. Instead, J-M continued to

16   take only the lower of the first two calculations (hydrostatic strength at 100,000 hours and

17   hydrostatic strength at 50 years) when calculating HDB.

18   66. Even with the advantage gained by omitting the expansion measurement, J-M

19   repeatedly failed the HDB test when using the lower of the hydrostatic strength at 100,000 hours

20   and at 50 years. Relator recalls four instances in which Blue Brute specimens failed HDB testing.

21   Of the four sets of failing specimens, two were in size 8-inch DR 18, one was 4-inch DR 18, and

22   one was 8-inch DR 14. See Exhibit 18. J-M had no reports documenting the failing results

23   because it had instructed Mr. Stanley only to prepare reports for the passing results and to report

24   the failing results orally. Relator recorded many of these failing results on a piece of paper as Mr.

25   Stanley reported them to him. Id.

26   67. As discussed above, per ASTM D2837 (as modified by ASTM D3139), HDB testing

27   is performed using 10 specimens that are subjected to varying pressures for varying lengths of

28   time up to 2,000 hours. During its HDB testing at Universal Laboratories, J-M asked Mr. Stanley

1   to notify it when early indications revealed that one or more of the 10 specimens, if tested to

2   completion, would cause the overall HDB test to fail. In such instances, J-M instructed Mr.

3   Stanley to stop the testing of those particular specimens (in order to avoid getting any bad data

4   points) and substitute in a new specimen for the continuation of the HDB testing.

5   68. If the substitutions were unable to produce a passing result and the 10 specimens

6   produced a failing HDB, J-M instructed its managers at the plants preparing the specimens to

7   destroy all other specimens made from the failing lot. As was the case with the initial set of

8   specimens, J-M had its Quality Control staff, including Will Fassler and Armondo Martinez,

9   oversee the production of additional specimens. To increase the odds of getting a passing result,

10  J-M slowed its regular production rates and adjusted its typical temperatures and torque to allow

11  for optimum processing of the specimens. To reduce the excessive swelling, J-M replaced the

12  lower grade multiwax ordinarily used in its J-M 90 compound with a high quality calcium sterate.

13  69. On July 5, 2004, after seven months of testing, J-M got its first passing result for

14  HDB with tests performed on Blue Brute specimens in size 8-inch DR 18. However, one month

15  later on August 31, Will Fassler wrote an email to Relator stating that "The HDB testing so far

16  has revealed material issues (excessive swelling) and workmanship issues (mid-wall void). The

17  chances of two consecutive samplings passing HDB appear to be less than 50%." Exhibit 19,

18  incorporated herein. Eight months later, in an Internal Recommendation and/or Authorization

19  ("IRA") recommending that J-M proceed with the production of no-thickened-section pipe, Mr.

20  Fassler summarized the HDB testing as follows: "J-M submitted DR 14 & DR 18 joint

21  samplings to Universal Laboratories for HDB tests per ASTM D3139-98. Some early samplings

22  failed. Later submittals passed – confirming that with suitable materials and workmanship the

23  design meets the requirements." Exhibit 20, incorporated herein.

24  70. By January 2005, after many intermittent failures, J-M had achieved passing HDB

25  results in all of the three pipe sizes that UL required for its qualification of the new pipe design.

26  J-M provided the passing results to UL. In so doing, however, J-M concealed from UL the

27  following material facts: (1) J-M had conducted other HDB tests on each of these pipe sizes, all

28  of which had failed; (2) to achieve the passing results, J-M had consulted Quick Burst test results

1    in deciding when to produce the specimens, altered its regular materials and process, and

2    prematurely stopped testing of specimens that would have produced failing results and substituted

3    new specimens in their place.

4    **2. Sustained Pressure Test**

5    71. The Long-Term Hydrostatic-Pressure Test, also referred to within J-M as the

6    "Sustained Pressure Test" or "1,000 Hour Test," is another test that measures the long-term radial

7    tensile strength of PVC pipe. Unlike HDB testing, which measures 10 specimens at varying

8    pressures for varying lengths of time up to 2,000 hours, the Sustained Pressure Test measures five

9    specimens at the same test pressure for 1,000 hours. To pass, the specimens must not "rupture,

10   permanently distort, or weep" when subjected to the specified pressure for 1,000 hours. Exhibit

11   6.

12   72. As described above, Sustained Pressure Testing is one of the three strength tests UL

13   required J-M to perform to qualify its no-thickened-section pipe for UL listing. The requirements

14   for Sustained Pressure Testing appear in Section 18 of the UL 1285 Standard. Like Longitudinal

15   Tensile-Strength Testing, Sustained Pressure Testing is one of UL's Performance Tests and UL

16   requires that the specimens tested must be representative of the manufacturer's materials, design

17   and processing. Like HDB Testing, Sustained Pressure Testing requires special equipment and is

18   typically performed by an independent, certified laboratory.

19   73. In outlining its requirements for qualifying the no-thickened-section pipe, UL

20   informed J-M that it would observe J-M's Sustained Pressure Testing. Because of the length of

21   the test, which lasts 1,000 hours/41.6 days, UL only required a UL observer to be present at the

22   beginning, middle and end of the testing.

23   74. Because UL would be observing portions of the Sustained Pressure Tests, J-M wanted

24   to ensure that the specimens it sent Charles Stanley at Universal Laboratories for testing would

25   actually pass the test. To accomplish this, J-M made multiple specimens from each 20 foot

26   section of no-thickened-section pipe it specially produced. J-M subjected the first 10 specimens

27   from each lot to the HDB testing described above. If the specimens produced a passing HDB

28   result, J-M would then send other specimens from that same lot to Universal Laboratories for the

1  Sustained Pressure Testing. Since the specimens had passed HDB testing, which is the most

2  demanding of pipe quality, J-M could be confident that other specimens from that lot would also

3  pass the less onerous Sustained Pressure Testing.

4        75. Once it had passed HDB testing for a particular size of non-thickened-section pipe,

5  J-M sent Universal Laboratories for Sustained Pressure Testing additional specimens from the

6  same lot as the passing HDB specimens. In that way, J-M was able to pass all of the Sustained

7  Pressure Tests witnessed by UL observers for the two pipe sizes UL required – Blue Brute 4-inch

8  DR 14 and 4-inch DR 18.

9        76. At no time during the course of these Sustained Pressure Tests did J-M disclose to the

10  UL observer that J-M had specially produced each of the test specimens using materials and

11  processing that were not representative of J-M's actual manufacturing process. J-M also

12  concealed from UL the fact that the test specimens had not been chosen at random but instead

13  were selected from lots that had produced passing HDB test results.

14        **3. Quick Burst Test**

15        77. The third and final strength test that UL required for J-M to qualify its no-thickened-

16  section pipe was the Quick Burst Test. The Quick Burst Test is designed to measure the short-

17  term radial strength characteristics of the pipe. The requirements for the Quick Burst Test are

18  contained in Section 4.3.3.2 of the AWWA C900 Standard. Broadly described, Section 4.3.3.2

19  provides that a pipe specimen must be able to attain a hydrostatic stress of 6,400 psi within 60 to

20  70 seconds of being pressurized. See Exhibit 12.

21        78. The Quick Burst Test is a routine quality control test that J-M is required to perform

22  daily at each of its plants at the start-up of the extruder and following any change in operating

23  conditions. Given the frequency with which this test is required to be performed, J-M has test

24  equipment in each of its plants and performs the tests itself.

25        79. In outlining the requirements needed to qualify J-M's no-thickened-section pipe, UL

26  informed J-M that it would come to J-M's plant to observe each of the Quick Burst Tests on the

27  various sizes of its Blue Brute DR 14 and DR 18 no-thickened-section pipe. Because a UL

28  representative would be observing the tests, J-M again took steps to try and ensure that the

1  specimens would pass while UL was watching.

2       80. Because the Quick Burst Tests were the last of the three strength tests required for UL

3  listing, at the time it performed the Quick Burst Tests, J-M had already received passing results in

4  both the HDB and Sustained Pressure Testing. In choosing specimens for the Quick Burst

5  Testing, J-M selected specimens from the same lots as the specimens that had produced the

6  passing results on the HDB and Sustained Pressure Tests.

7       81. For added insurance, J-M also ran some internal Quick Burst Tests on a few of the

8  specimens from the selected lots to be doubly certain that the specimens would pass while UL

9  watched. Using this approach, J-M passed the Quick Burst Tests for all but one of the sizes of its

10 Blue Brute DR 14 and DR 18 no-thickened-section pipe. In the case of the Blue Brute specimens

11 in size 12-inch DR 14, however, J-M failed four consecutive Quick Burst Tests while UL

12 observed before ultimately getting a passing result. On October 26, 2005, Will Fassler told

13 Relator that J-M had only obtained the passing result using a thickened-, instead of a no-

14 thickened-, section pipe. See Exhibit 21, incorporated herein. According to Mr. Fassler, the pipe

15 was measured "while UL wasn't really paying attention and the test pressure calc[ulation] wasn't

16 properly computed on the accurate measurements." Id. In short, J-M gained UL listing for the

17 new design in size 12-inch DR 14 using a specimen from the old design.

18      82. To prevent UL from investigating the real source of these four failures (i.e., the three

19 "cost-cutting" measures and their negative effect on tensile strength), J-M blamed the four

20 failures on illusory problems with the test equipment. Specifically, J-M attributed the failures to

21 the end caps that are inserted into either end of the specimen to create a seal so it can be

22 pressurized. J-M told Jerry Kirkpatrick, UL's representative observing the tests, that the end caps

23 had not sealed properly, were too old and were not good for the new pipe design. All of these

24 statements were false.

25      83. At no time during the Quick Burst Testing did J-M inform UL's Jerry Kirkpatrick that

26 it had prepared the specimens using materials and production rates that are not representative of

27 J-M's manufacturing process or that it had not chosen the specimens at random but instead

28 selected them based on the fact that they came from lots that had already passed the HDB and

Sustained Pressure Testing. Nor did J-M inform UL that it only passed the fifth test using the original thickened-section pipe design (and an improperly calculated test pressure) as opposed to the new design. J-M also concealed from UL the real reason for the four tensile strength failures, i.e., that J-M's "cost-cutting" measures had decreased the tensile strength of its pipe.

### 4. J-M Authorizes Production of No-Thickened-Section Pipe

84. In early 2005, shortly after he began raising concerns with J-M management about the excessive swelling and failing HDB test results of the no-thickened-section pipe and expressed doubts about the tensile strength of J-M's existing PVC pipe (which was made from the same process and compound), Relator was removed from the No-Thickened-Section Project. Over the intervening year before the Project was completed, Will Fassler and K.C. Yang continued to keep Relator apprised of the status of the Project, including the results of all of the testing performed since Relator was removed.

85. In the Spring of 2005, upon learning that J-M managers were about to recommend that J-M start to produce the no-thickened-section pipe in spite of all the failing results, Relator raised a series of objections to J-M management. Among other things, Relator cautioned that, at a minimum, the newly designed pipe should only be produced at the two plants that produced the passing results for UL and those two plants should use the same slow production rates and higher quality materials that they had used to specially produce the passing samples. Relator also insisted that, once it was produced and before it shipped, the new pipe must be subjected to a series of quality control tests to ensure its conformance to the tensile strength requirements. Given the force and strength of Relator's objections, some of Relator's managers ultimately were persuaded to include Relator's precautions in their recommendations for the production of the new no-thickened-section pipe.

86. On April 29, 2005, Will Fassler prepared an Internal Recommendation and/or Authorization ("IRA") recommending that J-M begin preparations to produce the no-thickened-section pipe starting May 16. See Exhibit 20. By April 29, UL had given J-M oral approval to start producing the no-thickened-section pipe in all sizes of Blue Brute DR 14 and DR 18, except for 12-inch DR 14, on May 16. Because J-M had received so many failing test results in the

1   process of obtaining the UL listing, Mr. Fassler was careful to point out that the no-thickened-

2   section pipe only passed the tests because of "suitable materials and workmanship" and therefore

3   those same materials and level of workmanship must be used as J-M begins to produce the newly

4   designed pipe.

5       87. Barry Lin and Kaushal Rao, J-M's Director and Assistant Director of Production,

6   were equally cautious in their approvals of the new pipe. Both men gave their approval on the

7   condition that J-M would take certain precautions to protect against the tensile strength failures

8   that the UL qualification testing had revealed. In the block provided on the IRA for his

9   authorization and signature, Mr. Lin wrote "In consideration of several test failures to non-thick-

10  section project do propose to have PWI [J-M's Wilton, Iowa plant] & PFO [J-M's Fontana,

11  California plant] to produce non-thick-section product first. After both plants successfully

12  produce C-900 product, then do will apply to all plants." Exhibit 20. Similarly, in his

13  signature/authorization block, Mr. Rao wrote "R&D should also concentrate on one plant & test

14  the pipe produced under different conditions such as regrind material used in prod.; various

15  speeds & production rates for production & test the pipe on a continuous basis." Id.

16      88. On May 16, 2005, ignoring the reservations expressed by the three managers, J-M's

17  President Walter Wang authorized production of no-thickened-section pipe for J-M's Blue Brute

18  PVC pipe in size DR 18 at all of J-M's 11 PVC producing plants starting June 1, 2005. See

19  Exhibit 20. Despite explicit advice from Will Fassler, Barry Lin and Kaushal Rao, President

20  Wang did not limit the production to the two plants that had successfully produced the passing

21  specimens. Nor did he seek to ensure that the pipe is produced using the same materials and

22  processing that J-M had used in producing the qualifying specimens or make any provision for

23  testing the new pipe as it is being produced to monitor quality. Despite the fact that its new pipe

24  had failed many of the qualifying tensile strength tests, J-M began manufacturing the new pipe

25  without implementing a single safeguard.

26      **5. UL's Qualification of J-M's No-Thickened-Section Pipe**

27      89. On May 19, 2005, UL issued J-M its formal written "Notice of Authorization to

28  Apply the UL Mark." Exhibit 22, incorporated herein. In this authorization, UL expressly states

1  that its authorization to apply the UL Listing Mark only extends to those products that are

2  constructed in an identical manner to the subject models that were submitted to UL for this

3  investigation. Id. The letter goes on to say "Products that bear the UL Mark shall be identical to

4  those that were evaluated by UL and found to comply with UL's requirements. If changes in

5  construction are discovered, appropriate action will be taken for products not in conformance

6  with UL's requirements and continued use of the UL Mark may be withdrawn." Id.

7       90. J-M began producing its Blue Brute DR 18 pipe on June 1, 2005. Although UL also

8  had authorized J-M to apply the UL Mark to its Blue Brute PVC pipe in all sizes of DR 14 except

9  for 12-inch, J-M decided to wait until it received UL authorization for the remaining size before it

10  commenced production of any DR 14 pipe. In October 2005, UL provided J-M with its

11  authorization for 12-inch DR 14 pipe and J-M began producing all sizes of no-thickened-section

12  DR 14 immediately thereafter.

13       91. Having refused to adopt any of the precautions recommended by its managers, J-M

14  began producing the new pipe using the same "cost cutting" measures it had employed with its

15  existing pipe. As the various test results revealed, pipe created using inferior ingredients,

16  accelerated production rates and improper tooling fails tensile strength testing more than 50

17  percent of the time. Had it been aware of the failing test results and J-M's tampering with the

18  testing, UL would not have given the pipe UL listing in the first place and would have withdrawn

19  any UL listing had it known that the precautions that had been taken to produce the passing

20  results (slowing production rates and substituting higher quality ingredients) were not being taken

21  with the everyday production of the pipe.

22  **C. J-M's False Representations Regarding UL Listing and UL Compliance**

23       92. Despite its knowledge (beginning at least in 1997) that well over half of its PVC pipe

24  failed to meet the longitudinal tensile-strength requirements of UL 1285 and its knowledge (as of

25  at least June 1, 2005) that its new no-thickened-section pipe had a similar failure rate, J-M

26  continued to represent to its distributors and customers, including Real Parties, that its PVC pipe

27  is UL listed. In its catalogs, J-M states for both its Blue Brute and Big Blue PVC Pipe that it "is

28  Underwriters Laboratories Listed" and has a tensile strength of 7,000 psi. Exhibit 23,

incorporated herein.  In the previous version of its website (dated 9/8/05), J-M stated that all

classes of both its Blue Brute and Big Blue pressure pipe "are UL listed for water mains."

Exhibit 24, incorporated herein.  Except for those pipes painted purple for Reclaimed Water or

green for Sewer, J-M has continued to mark the outside surface of each length of its Blue Brute

and Big Blue pipe with the UL Mark.  See Exhibit 25, incorporated herein.

93. J-M also has continued to provide certifications to its individual customers that its

Blue Brute and Big Blue PVC pipe has been manufactured in accordance with the requirements

of UL 1285.  Exhibit 26, incorporated herein, contains examples of certification letters J-M

provided its customers regarding Blue Brute's and Big Blue's compliance with the UL Standard

and listing.

94. At all times relevant to this Complaint, Real Parties, like other governmental entities

and water distribution systems, have required that all pipes for use in underground fire service

systems be UL 1285 listed.  Exhibit 27, incorporated herein, contains examples of specifications

from various government entities in which UL listing is required for pipe used in fire services.  In

addition to requiring UL listing for PVC pipe used in fire services, many of the Real Parties, like

other governmental entities and water distribution systems, also require that all PVC pipe for use

in their water distribution mains or water transmission lines shall be approved by Underwriters

Laboratories, Inc. and marked with the UL logo.  Exhibit 28, incorporated herein, contains

examples of specifications from governmental entities, including some Real Parties, for UL

listing of PVC pipe used in water mains and transmission lines.

## VI.   J-M'S SALE OF SUBSTANDARD PVC PIPE THAT DOES NOT MEET AWWA REQUIREMENTS

95. The American Water Works Association ("AWWA"), an organization in which J-M

has always been a member, has promulgated standards governing the physical and chemical

properties, including required tensile strength, of PVC Pressure Pipe for water transmission and

distribution.  AWWA Standard C900 applies to 4-inch through 12-inch diameter PVC Pressure

Pipe used for water distribution, and AWWA C905 applies to 14-inch through 48-inch diameter

PVC Pressure Pipe used for water transmission and distribution.  See Exhibit 12.

96. At all times relevant to this Complaint, Real Parties, like other governmental entities with water distribution systems, have required that all PVC pressure pipe for use in their water distribution systems comply with or exceed the standards described in AWWA Standards C900 and C905. See Exhibit 29, incorporated herein. AWWA Standards are the universal standard applied in the water distribution system industry. Compliance with AWWA requirements is so consistent and widespread in this country that the requirement of AWWA compliance is understood by domestic purchasers and sellers of water works products regardless of whether it is stated expressly.

97. Relator is unaware of any domestic PVC pipe manufacturer or distributor who openly offers to sell PVC pipe in sizes DR14, DR18, DR25, DR32.5, DR41 and DR51 for use in a water distribution system that does not comply with AWWA Standard C900 or C905. Nor is Relator aware of any domestic water distribution system that knowingly permits the purchase of PVC pipe for water transmission or distribution that does not comply with the tensile strength requirements of AWWA C900 or C905. Real Parties would never have knowingly purchased PVC pipe for use in their water distribution systems that did not comply with AWWA standards.

98. To be AWWA compliant, PVC pipe used for water distribution or transmission must satisfy certain strength and extrusion-quality tests set forth in AWWA C900 and C905, including without limitation (1) Cell Class Testing, (2) HDB Testing, (3) Sustained Pressure Testing, (4) Quick Burst Testing and (5) Acetone-Immersion Testing. Broadly described, the purpose of these tests is to ensure PVC pipe will withstand varying pressures over both short and long periods without leaking. However, because of its "cost cutting" and "productivity" measures described in section IV above, J-M has repeatedly failed each of these tensile strength tests from at least 1997 to the present.

## A. Cell Class Testing

99. PVC compounds are identified by a numerical classification system in which each number corresponds to a cell in a Table that identifies the particular property and the minimum required value for that property. AWWA Standards C900 and C905 both require that the compound from which PVC pipe is made shall "equal or exceed cell class 12454-B as defined in

ASTM D1784." Exhibit 12. In describing the classification system, ASTM D1784 states that the third number in the designation corresponds to the compound's tensile strength requirements. See Exhibit 30, incorporated herein. For cell class 12454-B, the third number of the designation is 4, which translates to a required tensile strength of 7,000 psi. Id.

100.    In addition to providing the physical properties that each cell class must have, ASTM D1784 also prescribes the method by which the specimens for testing compliance with these requirements shall be prepared. Until February 1997, ASTM D1784 only provided one way of preparing the specimens and that was by compression molding. See Exhibit 31, incorporated herein. To prepare a sample by compression molding, separate sheets of PVC compound or pipe are pressed together between two metal drums to form a laminate.

101.    However, beginning in February 1997, ASTM D1784 was revised to include two additional specimen preparation methods. Instead of just compression-molded specimens, ASTM D1784 provided that compliance with the cell classification requirements "shall be determined with compression-molded, extruded, or injection-molded test specimens for . . . tensile strength." Exhibit 32 at Section 10, incorporated herein.

102.    In the Spring of 1997, Doug Boitz, J-M's former Product Assurance Manager, contacted members of ASTM D20.15, the Committee responsible for amending ASTM D1784, for guidance regarding the proper interpretation of the amendments to Section 10, the section on specimen preparation. Following his consultation with the Committee members, Mr. Boitz wrote an internal memorandum to Barry Lin, J-M's Director of Production, discussing what he had learned. See Exhibit 33, incorporated herein.

103.    In this memo, dated May 5, 1997, Mr. Boitz states that the Committee's intent for the change is "to create the ability for manufacturers of extruded or injection molded products to have samples of materials for testing that are representative of the products, which they are producing." Exhibit 33. In other words, the Committee intended that manufacturers of extruded products use an extruded sample for testing, while manufacturers of compression-molded products use a compression-molded test sample. The Committee's reasoning, Mr. Boitz said, was "that the processing can greatly affect the properties and quality of the material or

1  compound." Id. Since J-M produces its PVC pipe by extrusion, Boitz concluded that ASTM

2  D1784 now required J-M also to prepare its specimens by extrusion "so that the results obtained

3  from finished products are not significantly different than the tested specimens." Id. At the end

4  of the memo, Mr. Boitz recommends to Mr. Lin that J-M's Research and Development Division

5  be notified of this issue so that it can amend J-M's sample preparation methods to include

6  extruded samples. Id.

7      104.    Despite this clear statement from the ASTM Committee Members that J-M, as a

8  manufacturer of extruded pipe, must use extruded specimens for purposes of cell class testing,

9  Relator has information and believes that J-M has continued to use compression molding as the

10  exclusive means of sample preparation for its cell class testing from February 1997 through the

11  present. The reason for J-M's allegiance to the compression-molded specimens is that its J-M 90

12  compound performs better and yields higher tensile strength results under the compression-

13  molding process than can be obtained via extrusion. With the use of compression-molded

14  samples, J-M was able to artificially boost its tensile strength results and thereby conceal the fact

15  that its actual tensile strengths are below the minimum 7,000 psi required by AWWA C900 and

16  C905.

17      105.    Two third-party certifiers, International Association of Plumbing and Mechanical

18  Officials ("IAPMO") and NSF International ("NSF"), require J-M to submit to annual cell class

19  testing, which includes tests to confirm that J-M's PVC pipe meets a minimum tensile strength of

20  7,000 psi. By contrast, AWWA, which operates on an honor system, does not require

21  manufacturers to submit to testing or audits. Relying on the good faith of the manufacturers,

22  AWWA operates on the assumption that a manufacturer that represents its parts as being

23  AWWA-compliant will have regularly performed the necessary tests listed in AWWA C900 and

24  C905 to ensure that its parts comply and will only sell compliant parts.

25      106.    In preparing its samples for the annual IAPMO and NSF cell class testing, J-M

26  followed many of the same practices it had used in preparing samples for UL qualification of its

27  no-thickened-section pipe. That is, J-M followed a manufacturing process that was not

28  representative of the actual conditions under which its PVC pipe is ordinarily made. J-M had

1   Will Fassler, a senior engineer in its Research and Development Department, specially prepare

2   the samples using compression molding, as opposed to extrusion, with an extraordinary degree of

3   care and precision. As with its UL qualification testing of the no-thickened-section pipe, J-M

4   prepared multiple specimens from each lot and sent a subset of these samples to outside

5   laboratories to confirm that when IAPMO or NSF tested the other samples they would meet the

6   required minimum tensile strength of 7,000 psi.

7        107.   Even with the advantages gained by special preparation and use of compression-

8   molded samples, J-M only barely met the minimum requirement of 7,000 psi in the 2005 annual

9   cell class test performed for IAMPO and had failed tensile strength in previous years' annual

10   IAMPO and NSF testing. Exhibit 34, incorporated herein, is a copy of a test report from CRT

11   Laboratories, Inc. describing cell class testing performed for IAPMO in June 2005 on J-M

12   compression-molded samples. While the samples were found to meet the minimum cell class

13   requirements of cell class 12464, the tensile strength results of 7,081 psi were only slightly above

14   the minimum requirement of 7,000 psi. Exhibit 34.

15        108.   On multiple occasions, including as recently as September 13, 2005, K.C. Yang,

16   J-M's former Corporate Quality Control Supervisor, told Relator that, without the benefit of

17   compression molding and special preparation, J-M's PVC pipe compound actually has a

18   maximum tensile strength of approximately 6,700 psi. Yang cited "extrusion conditions" (i.e.,

19   J-M's accelerated production rate and improper tooling and maintenance of its extruders) as the

20   reason for J-M's inability to satisfy the tensile strength requirements of cell class 12454. Exhibit

21   35 (Relator's notes dated 9/13/05), incorporated herein.

22   **B. HDB Testing**

23        109.   As described herein at section V.B. (¶¶ 50-58), to qualify J-M's new, no-thickened-

24   section pipe for UL listing, UL required J-M to satisfy the hydrostatic design basis ("HDB")

25   requirements specified in Section 4.3.2.2(b) of AWWA C900 and C905. As described herein at

26   section V.B.1. (¶¶ 50-70) and section V.B.4 (¶¶ 84-88), J-M began producing no-thickened-

27   section pipe on June 1, 2005 despite the fact that it had test results showing that the pipe failed

28   the HDB testing required by AWWA C900 and C905 more than 50 percent of the time. As a

1  result, it is more likely than not purchasers of J-M's no-thickened-section Blue Brute PVC pipe,

2  including Real Parties, have received pipe that fails to comply with the HDB requirements of

3  AWWA C900 and C905.

4      110.    J-M's difficulties with satisfying the HDB requirements predate the production of

5  its no-thickened-section pipe.  J-M also has had difficulty satisfying the HDB requirements of

6  AWWA C900 and C905 under its original pipe design (i.e., J-M's thickened-section Blue Brute

7  and Big Blue PVC pipe).  For instance, as discussed in paragraph 59, on November 14, 2003,

8  Will Fassler cited as one of the impediments to the success of the No-Thickened-Section Project

9  the fact that J-M had been experiencing failures in the HDB testing on its existing (i.e.,

10  thickened-section) pipe.  See Exhibit 16.  Relator has information and believes that despite these

11  failing test results, J-M has never rejected or scrapped a PVC pipe for having failed HDB testing.

12     111.    In the 1980s, the Plastic Pipe Section of Johns-Manville, the predecessor company

13  to J-M, promulgated a series of product specifications, many of which were more stringent than

14  applicable industry standards and customer specifications.  Johns-Manville included assurances

15  of adherence to these company specifications in its express warranty.  When it was founded in

16  1982, J-M continued to maintain the company specifications Johns-Manville had created and

17  included them in its warranty.

18     112.    One of these product specifications, J-M Specification No. PL-25 for 4-inch

19  through 12-inch PVC Plastic Blue Brute pipe, required the pipe to meet a minimum quick burst

20  stress of 7,200 psi, which was significantly higher than AWWA C900's requirement of 6,400 psi.

21  One of the primary reasons for the more stringent requirement was to ensure that J-M's PVC pipe

22  would meet the required HDB tensile strength category.  In other words, if the PVC pipe

23  withstood a stress of 7,200 psi during the 60-second Quick Burst Test, it would be more likely to

24  pass the required HDB category of 4,000 psi during the subsequent HDB testing.  As described in

25  paragraphs 60 through 61 above, since the Quick Burst testing always precedes the HDB testing,

26  the Quick Burst results can provide an early indication of whether the pipe will pass HDB.

27     113.    However, on November 19, 2004, J-M revised Specification No. PL-25 to lower

28  the short-term burst pressure requirement to the 6,400 psi required by AWWA C900 because it

1    could no longer meet the higher J-M pressure requirement of 7,200 psi. Exhibit 36, incorporated

2    herein, is a red-lined copy of Specification No. PL-25 reflecting the revision to the lower 6,400

3    psi requirement. J-M made this revision knowing that by lowering the quick burst pressure

4    requirement it would no longer be able to meet the HDB test requirements of AWWA C900 and

5    C905. Despite this knowledge, before making this revision, J-M did not perform any testing to

6    determine its effect on HDB.

7    **C. Sustained Pressure Testing**

8        114.    As described herein at section V.B.2. (¶¶ 71-76), to qualify J-M's new, no-

9    thickened-section pipe for UL listing, UL required J-M to demonstrate the pipe could pass the

10   Sustained Pressure Test specified in Section 18 of UL 1285. As further described in section

11   V.B.2. ((¶¶ 71-76), J-M was only able to pass this test by resorting to the following fraudulent

12   practices: (1) preparing its samples using materials and processing conditions that were vastly

13   superior to those J-M actually used in its day-to-day manufacturing of pipe; (2) cherry picking

14   samples from lots that had produced passing HDB test results to increase the likelihood they will

15   pass in front of UL; and (3) concealing these facts from UL, other standards and certifying

16   organizations and J-M's distributors and customers. Despite the fact it had improperly

17   manipulated the test materials and conditions of the Sustained Pressure Testing to mask the

18   underlying tensile strength problems with the pipe, J-M began producing no-thickened-section

19   pipe on June 1, 2005.

20       115.    The Sustained Pressure Test contained in Section 18 of UL 1285 is substantively

21   identical to the Sustained Pressure Test required by sections 4.3.3.1 and 5.1.3 of AWWA C900.

22   See Exhibits 6 & 12. Accordingly, in addition to violating UL 1285, J-M also violated AWWA

23   C900 when it engaged in the three fraudulent practices described above while performing the

24   Sustained Pressure Test on its new, no-thickened-section pipe. As a result of these practices,

25   since June 1, 2005 (the date J-M began producing no-thickened-section pipe), it is more likely

26   than not purchasers of J-M's no-thickened-section Blue Brute PVC pipe, including Real Parties,

27   have received pipe that (when tested properly with representative samples) fails to comply with

28   the Sustained Pressure Test requirements of AWWA C900.

1    116.   Over a year before it performed the Sustained Pressure Tests described above on its

2  no-thickened-section pipe, J-M had received reports of its existing (i.e., thickened-section) PVC

3  pipe failing AWWA C900 Sustained Pressure Testing performed for NSF.  As discussed in

4  paragraph 59, on November 14, 2003, Will Fassler cited as one of the impediments to the success

5  of the No-Thickened-Section Project the fact that "[r]ecently, pipe from some facilities has failed

6  sustained pressure testing at NSF."  Exhibit 16.  Relator has information and believes that despite

7  these failing test results, J-M has never rejected or scrapped a PVC pipe for having failed

8  Sustained Pressure Testing.

9  **D.  Quick Burst Testing**

10    117.   As described herein at section V.B.3. (¶¶ 77-83), to qualify J-M's new, no-

11  thickened-section pipe for UL listing, UL required J-M to demonstrate the pipe could pass the

12  Quick Burst Test specified in Section 4.3.3.2 of AWWA C900.  As further described in section

13  V.B.2. ((¶¶ 71-76), J-M failed several of the Quick Burst Tests and ultimately was only able to

14  pass this test by resorting to the following fraudulent practices:  (1) preparing its samples using

15  materials and processing conditions that were vastly superior to those J-M actually used in its

16  day-to-day manufacturing of pipe; (2) cherry picking samples from lots that had produced

17  passing HDB and Sustained-Pressure-Testing test results to increase the likelihood they will pass

18  in front of UL; and (3) concealing these facts from UL, other standards and certifying

19  organizations and J-M's distributors and customers.  Despite the fact it had improperly

20  manipulated the test materials and conditions of the Quick Burst Test to mask the underlying

21  tensile-strength problems with the pipe, J-M began producing no-thickened-section pipe on June

22  1, 2005.  As a result, it is more likely than not purchasers of J-M's no-thickened-section Blue

23  Brute PVC pipe, including Real Parties, have received pipe that fails to comply with the Quick

24  Burst requirements of AWWA C900.

25    118.   Well over a year before it performed the Quick Burst Tests described above on its

26  no-thickened-section pipe, J-M had knowledge that its existing (i.e., thickened-section) PVC pipe

27  was failing the Quick Burst Tests performed daily for purposes of AWWA C900 at each of its 11

28  PVC pipe plants.  By at least early 2004, Relator, K.C. Yang, and Will Fassler began to receive

1   word from the Quality Control Supervisors at J-M's 11 Plants producing PVC pipe that their

2   respective Plant Managers were overriding reject tags and sending out PVC pipe that the Quality

3   Control Supervisors had rejected for failing the daily Quick Burst tests required by AWWA

4   C900. Relator personally had received three such complaints from Michael Henderson, the

5   Quality Control Supervisor at the Butner, North Carolina Plant, Armondo Martinez, the Quality

6   Control Supervisor at the Fontana, California Plant, and Joe Soliz, the Quality Control Supervisor

7   at the Wharton, Texas Plant.

8        119.   To try and address this and other burgeoning quality-control problems, K.C. Yang,

9   at that time J-M's newly appointed Corporate Quality Control Supervisor, called a meeting of all

10  of the Quality Control Supervisors from each of J-M's 11 PVC-pipe Plants. In addition to K.C.

11  Yang and the 11 Quality Control Supervisors, the other attendees were Relator, Kaushal Rao,

12  Will Fassler, and Beryl Nadia and Lenor Chang, both of whom worked for Fassler. At this

13  meeting, which was held at J-M's Pueblo, Colorado Plant in the Spring of 2004, the Quality

14  Control Supervisors told stories of having rejected PVC pipe for failing daily Quick Burst Tests

15  and then being instructed by their respective Plant Managers to continue to test the pipe until they

16  get a passing result. Since a pipe's tensile strength and other properties gradually increase or

17  stabilize as it is allowed to cool and harden, it often took the Quality Control Supervisors several

18  days and repeated testing to achieve a passing result. However, such repeated testing of

19  individual samples is expressly prohibited by Section 5.1.4 of AWWA C900, which provides that

20  specimens are to be tested "at the beginning of production of each specific material and each

21  size" and thereafter every 24 hours. Exhibit 12.

22       120.   Once a passing result was obtained, the Quality Control Supervisors said the Plant

23  Managers would instruct them to release and ship the pipe despite the fact that it may have failed

24  four out of five Quick Burst Tests. J-M Plant Managers, whose bonuses are based on the amount

25  of pipe the plant produces, are loath to reject pipe since rejected pipe cannot be included in the

26  plant's production figures and thereby has the effect of taking money out of their pockets.

27       121.   At the Pueblo meeting, K.C. Yang and Frank Padilla provided the Quality Control

28  Supervisors with a review of the proper test methods to be followed when performing the daily

1  Quick Burst Test contained in AWWA C900.  (AWWA C900, in turn, states that the testing must

2  be performed in accordance with ASTM D1599.)  This presentation focused on the method

3  prescribed in ASTM D1599 for determining the amount of test pressure to apply to the pipe

4  sample in order to achieve the required 6,400 psi of quick-burst stress in the pipe wall (hereafter

5  "Calculated Test Pressure").  To determine the Calculated Test Pressure, Yang emphasized that

6  ASTM D1599 required the Quality Control Supervisors to measure the minimum wall thickness

7  of the actual pipe sample.  See Exhibit 37, incorporated herein.

8       122.   After setting out these requirements, Yang quickly learned that except for Frank

9  Padilla, Quality Control Supervisor at the Pueblo, Colorado Plant, the Quality Control

10  Supervisors at the remaining 10 Plants were all doing the calculation wrong.  Instead of

11  measuring the wall thickness of the actual pipe sample, the Quality Control Supervisors at the

12  other 10 plants were simply relying on the minimum wall thicknesses listed in Table 1 of AWWA

13  C900 for a generic pipe of the same size and pressure class as the sample.  However, the wall of

14  the pipe J-M produces invariably is thicker than that of a generic pipe listed in Table 1.

15  Therefore, by relying on the measurement supplied in Table 1 instead of actually measuring the

16  wall thickness of the pipe sample, the Quality Control Supervisors of the 10 plants were

17  subjecting the samples to a smaller Calculated Test Pressure than what is required by ASTM

18  D1599.

19       123.   When K.C. Yang informed the Quality Control Supervisors that they could no

20  longer rely on the minimum wall thicknesses supplied in Table 1 and had to measure the actual

21  pipe samples being tested, they strenuously objected.  The Quality Control Supervisors admitted

22  they had enough trouble achieving the required 6,400 psi of stress in the pipe wall even with the

23  benefit gained from the smaller Calculated Test Pressure.  If they performed the tests correctly

24  (i.e., and measured the minimum wall thickness of the actual pipe samples), the Quality Control

25  Supervisors complained, they would stand little to no chance of achieving 6,400 psi and passing

26  the Quick Burst Tests.  As the comments of the Quality Control Supervisors make clear, J-M

27  routinely caused PVC pipe to be shipped to its customers, including Real Parties, that failed to

28  meet the requirements of the Quick Burst Testing specified in AWWA C900.

1    124.   Following this meeting, K.C. Yang sought to change the management structure to

2  have the Quality Control Supervisors report to the Corporate Quality Control Supervisor instead

3  of their respective Plant Managers.  By so doing, Yang hoped to make it less likely that the Plant

4  Managers would be able to override decisions by the Quality Control Supervisors to reject non-

5  conforming pipe.  Yang's request was denied.  Despite the considerable problems raised by the

6  Quality Control Supervisors at the Pueblo meeting regarding the short-term tensile strength of its

7  PVC pipe, J-M did not take any steps to address the root cause of the problem and curb the "cost

8  cutting" measures described herein at section IV.  Yang left J-M in October 2005 out of

9  frustration for repeatedly being stymied in his efforts to improve the quality of J-M's products.

10  **E.  Acetone Immersion Testing**

11    125.   AWWA C900 and C905 both require manufacturers to subject their PVC pipe to

12  routine acetone-immersion testing as specified in ASTM D2152.  Exhibit 12.  Broadly described,

13  Acetone-Immersion Testing measures "extrusion quality," i.e., how well the extruder processed

14  the PVC compound in forming the pipe.  Id.  Under ASTM D2152, the pipe sample is required to

15  be immersed in acetone that is at least 99.8 percent pure.  See Exhibit 38, incorporated herein.  If

16  the sample has been processed well, the acetone will not attack it.  However, if the sample has

17  been processed poorly, the acetone will cause it to flake.  A sample that shows at least 50 percent

18  attack of the inside, outside, or mid-wall surface of the sample or at least 10 percent attack on

19  more than one surface of the sample has failed the test.  Id.

20    126.   Because it rapidly absorbs moisture from the air, acetone can quickly become

21  diluted if it is left out in an unsealed container and exposed to air.  As acetone is diluted, its

22  ability to attack pipe samples decreases.  ASTM D2152 requires that the acetone used for testing

23  contains no more than 0.2 percent water by mass.  Exhibit 38.  If a particular container of acetone

24  has more than two percent water, the excess water can be removed with a drying agent.

25    127.   J-M did not take adequate safeguards to ensure the integrity of the acetone used in

26  its routine Acetone-Immersion Tests.  For instance, J-M regularly stored its acetone in drums

27  with the lids off.  Instead of having no more than two percent water, the acetone J-M regularly

28  used for its testing contained an excessive percentage of water.  Although J-M easily could have

1   used a drying agent to remove the excess water, the Plant Managers typically did not want to

2   spend the money for such reagents.  Instead, by testing with diluted acetone, J-M was able to

3   obtain passing test results for specimens that would have failed had they been tested using

4   undiluted acetone.

5         128.   Even with the benefit gained by using diluted acetone, J-M routinely failed its

6   Acetone-Immersion Tests.  At the Pueblo meeting described above, many of the Quality Control

7   Supervisors reported repeated instances of their Plant Managers overriding reject tags and

8   sending out PVC pipe that the Quality Control Supervisors had rejected for failing the routine

9   Acetone-Immersion Tests required by AWWA C900 and C905.  Relator has information and

10  believes that despite these failing test results, J-M has never rejected or scrapped a PVC pipe for

11  having failed Acetone Immersion Testing.

12  **F.  J-M's False Representations Regarding AWWA Compliance**

13        129.   As the world's leading supplier of PVC pipe, J-M is acutely aware of the

14  importance of AWWA compliance to its customers, including Real Parties.  In its product

15  catalogs and sales literature and on its website, J-M repeatedly describes its PVC pipe as meeting

16  AWWA requirements and a longitudinal tensile strength of 7,000 psi.  In the section of its catalog

17  dedicated to its Blue Brute PVC pipe, J-M references Blue Brute's compliance with AWWA

18  C900 four times.  On the cover page for this section, beside the words Blue Brute, J-M states

19  "Meets AWWA C900." Exhibit 23.  The first line of the first page states "J-M's Blue Brute Pipe

20  conforms to the AWWA C900 specification . . ."  Id.  That same page has a box that prominently

21  states "MEETS AWWA C900."  Finally, in a table entitled "Typical Physical and Chemical

22  Properties and Capacities," J-M cites AWWA C900 as the standard governing its Blue Brute

23  PVC Pipe and notes AWWA C900's tensile strength requirement of 7,000 psi.  The section of

24  J-M's catalog relating to its Big Blue PVC pipe follow an identical format to Blue Brute's except

25  that it references Big Blue's conformance with AWWA C905 as opposed to C900.

26        130.   As alleged in detail above, the statements in J-M's catalogs, websites and sales

27  literature regarding compliance with AWWA standards and the tensile strength requirement of

28  7,000 psi were patently false.  At no time did J-M ever distribute a catalog or sales or advertising

1   literature that revealed its substandard tensile strength results in over half of the tensile strength

2   tests performed since 1997.  Nor did J-M otherwise inform its customers, including Real Parties,

3   of its substandard tensile strength.

## VII. EMPLOYMENT DISCRIMINATION FOR ACTS IN FURTHERANCE OF FALSE CLAIMS ACT ACTION

6   131.   Relator began working for J-M on July 8, 2002 as an engineer in its Product

7   Assurance Department with an annual salary of $45,000.  From July 2002 until he started

8   complaining to his superiors about the impropriety of the fraudulent practices described above,

9   Relator was regularly commended by his superiors on his job performance and received regular

10   pay raises and good performance reviews.

11   132.   For instance, in the Summer and Fall of 2003, Relator received considerable

12   praise and notice from his superiors, including J-M's President Walter Wang, for his work in

13   proposing a design change to J-M's two most popular products, Blue Brute and Big Blue, that

14   would save J-M $3,000,000 a year in materials costs and allow J-M to increase its efficiency and

15   output.  Throughout the early stages of his work on the design change, dubbed the "No Thickened

16   Section Project," Relator's currency within J-M as a rising star continued to grow.

17   133.   However, by 2004, as J-M received results from the first round of full-blown

18   HDB testing on the no-thickened-section pipe, Relator began to raise concerns with his superiors

19   about the pipe's excessive swelling and inability to pass the HDB testing more than 50 percent of

20   the time.  After questioning what these results meant for the tensile strength of J-M's thickened-

21   section pipe, which was made from the same materials and process, Relator was removed from

22   the Project in early 2005 and began to experience a dramatic change in his employment

23   conditions.  Where previously he had been treated as part of the team, Relator suddenly was

24   being shunned by his co-workers.  For instance, Relator's access to testing and other sensitive

25   information was severely restricted.  Barry Lin instructed staff in J-M's Research and

26   Development and Corporate Quality Control Departments not to provide Relator any documents

27   without first getting approval from Lin.

28   134.   Over the intervening months, Relator became increasingly aware that J-M's

tensile strength problems were not the result of inadvertence but rather were part of a larger scheme to defraud its customers by implementing cost-cutting measures that decreased its pipe's tensile strength and then manipulating test methods, specimens and data to conceal these strength problems from its customers and third-party certifiers and standards organizations like UL, NSF, IAPMO, AWWA and ASTM. Throughout this time, Relator continued to raise concerns with his superiors about the propriety of J-M's fraudulent practices. As the strength of his objections grew, Relator was met by J-M with increasingly adverse employment action.

135. For instance, in December 2004, at the same time Relator was raising concerns with his superiors about the tensile strength of J-M's UL-listed products, an opening became available in Relator's Department for the position of Product Assurance Manager. This position, which involved overseeing the handling of claims and lawsuits against J-M for non-conforming PVC pipe, had greater pay and responsibilities than Relator's current position. With a masters degree in structural engineering, associates and bachelors degrees in civil engineering, bachelors degree in management and two years of experience handling PVC pipe claims and lawsuits for J-M, Relator was well-qualified for the job.

136. Relator was only one of two internal J-M candidates being considered for the job. The other candidate, Mai Huynh, had no engineering degrees or other formal training relevant to the job description and no experience with claims and lawsuits or PVC pipe. At the time he was being considered for the position, Mr. Huynh had only worked one year at J-M on tooling issues relating to J-M's high density polyethylene ("HDPE") pipe, the sales of which represent a small fraction of J-M's business. Despite his short tenure at J-M and complete lack of experience, J-M gave the position of Product Assurance Manager to Mr. Huynh.

137. In the Summer of 2005, Relator objected strongly to his managers' instructions that he deny a claim brought by customer Sheldon Site Utilities ("Sheldon") for defective Blue Brute pipe that had pinhole leaks and failed when it was pressurized. After sending samples from the two problem pipes to CRT Laboratories for testing, Sheldon presented J-M with test results showing that both samples had tensile strengths below the minimum requirement of 7,000 psi. See Exhibit 9. Despite Relator's recommendation that it should pay the Sheldon claim, Kai

1  Cheng, J-M's Director of Product Assurance, and Barry Lin, J-M's Director of Production,

2  instructed Relator to deny the claim on the grounds that the test results did not show that the pipe

3  failed to comply with AWWA C900. Cheng and Lin argued that the CRT test results showing

4  substandard tensile strengths were not valid because, as they interpreted it, AWWA C900

5  required that tensile strength testing be performed on specimens prepared from PVC compound,

6  not finished PVC pipe, and the CRT testing had been performed on finished pipe. On July 19,

7  2005, Relator sent Sheldon a letter stating that "Since no manufacturing defect or non-

8  conformance with the AWWA C900 standard was found within the samples sent to us or to CRT

9  Labs we are regretfully denying your claim." Exhibit 39, incorporated herein.

10      138.    Sheldon responded to J-M's denial by threatening to sue J-M for supplying

11  defective product if it did not reconsider and agree to pay Sheldon's claim for $36,707.61. In

12  discussing how to handle Sheldon's renewed claim, Kai Cheng and Barry Lin again sought to

13  minimize J-M's responsibility by interpreting AWWA C900 as requiring that tensile strength

14  testing be performed on samples prepared from PVC compound and declaring the CRT tests

15  invalid because they were performed on finished PVC pipe. Stating that the CRT results were

16  "not sufficient enough to conclude the failure of pipe sample reason to be 100% fall on J-M," Mr.

17  Cheng recommended offering Sheldon a maximum of $10,000. See Exhibit 10.

18      139.    Relator, however, recommended that J-M settle the claim for $30,000 based on

19  the findings of CRT. Relator argued that even if Cheng and Lin's interpretation of AWWA C900

20  was correct, J-M could not ignore the fact that UL 1285 expressly states that tensile strength

21  testing is to be performed on finished pipe. At a minimum, Relator concluded, the CRT test

22  results show that J-M's Blue Brute pipe failed to meet the tensile strength requirements of UL

23  1285. In his Internal Recommendation and/or Authorization ("IRA") discussing his

24  recommendation for how to handle the Sheldon claim, dated October 28, 2005, Relator listed as

25  his basis for settling the claim for $30,000 that "CRT conducted testing on the pipe and found

26  that the tensile strength of the pipe was below that required by the UL Listing Mark on the pipe

27  on all samples tested." Exhibit 10.

28      140.    On November 1, 2005, two business days after Relator distributed his IRA, Kai

Cheng called Relator into his office and reprimanded Relator for portraying J-M's liability for the Sheldon claim in his IRA as being "black and white" instead of trying to find a way to deny the claim or pass the blame to Sheldon. See Exhibit 11. Mr. Cheng faulted Relator for not supporting Barry Lin's argument that the CRT testing was invalid under AWWA C900 because it was performed on samples prepared from finished PVC pipe as opposed to PVC compound. Id. When Relator tried to defend his position, Mr. Cheng told Relator that if he "could not find a way to deny the claim and follow his [Cheng's] thoughts that J-M is not responsible even if we fail the test, and offer alternative theories as to the cause of failure for this case, then you need to find another position in J-M where you will listen and follow instructions given and not disagree." Id.

141.    The next day, Mr. Cheng again called Relator into his office to follow up on the previous day's discussion. See Exhibit 40 (Relator's contemporaneous notes dated 11/2/05), incorporated herein. Mr. Cheng advised Relator that he needed to be "more political" and to try harder to make more friends at J-M "by avoiding sensitive issues where conflict may occur such as was the case yesterday." Id. Mr. Cheng warned Relator that taking a close-minded position on issues, as he had done in the IRA on the Sheldon claim, was not appropriate and to be successful in J-M and in life Relator needed to "open his mind to all the possibilities, listen to others in the company more, regardless if he thinks they are right or wrong, and avoid conflicts by not questioning their judgments and actions." Id.

142.    Two days later, on November 4, when Relator refused to follow Mr. Cheng's advice and change his recommendation on the Sheldon claim, Mr. Cheng informed Relator that J-M was conducting an investigation into purported allegations that Relator had accepted kickbacks from Billy Sheldon, the owner of Sheldon Site Utilities, in exchange for Relator's increasing the amount he recommended J-M should pay Sheldon for his claim. Mr. Cheng sent Relator home and instructed him not to report to work until the investigation was complete. That same day, in response to these charges, Relator provided J-M with a four-page statement denying his involvement in any such improprieties. See Exhibit 41, incorporated herein. However, three business days later, on November 9, J-M terminated Relator for the stated reason that it had concluded that the allegations against Relator were "credible, sustainable and substantiated."

1 | Exhibit 42, incorporated herein.

2 |     143.    As these circumstances clearly demonstrate, the reason J-M gave for terminating

3 | Relator – that Relator had increased the amount he recommended J-M pay to settle a claim as a

4 | result of having received a bribe from the claimant -- was a pretext.  The real reason J-M fired

5 | Relator – as is belied by the close proximity between Relator's IRA stating that the J-M PVC

6 | pipe involved in the Sheldon claim had a tensile strength below that required by the UL Listing

7 | Mark on the pipe and J-M's charges of Relator accepting bribes from a claimant – was in

8 | retaliation for his investigating and raising concerns about J-M's fraudulent practices of

9 | knowingly selling PVC pipe with substandard tensile strength while falsely representing that it

10 | complies with industry standards.

11
                                                                           **COUNT I**

**Substantive Violations of Federal False Claims Act**

12 |                                   **31 U.S.C. §§ 3729(a)(1), (a)(2) and 3732(b)**

13 |     144.    Relator realleges and incorporates by reference the allegations made in Paragraphs

14 | 1 through 143 of this Complaint.

15 |     145.    This is a claim for treble damages and forfeitures under the Federal False Claims

16 | Act, 31 U.S.C. §§ 3729 et seq., as amended.

17 |     146.    Through the acts described above, defendant J-M, its agents, employees and co-

18 | conspirators, knowingly presented and caused to be presented to the United States, including

19 | without limitation the Armed Forces of the United States and the federal military entities listed on

20 | Exhibit 2, (collectively "United States") and its officials false and fraudulent claims, and

21 | knowingly failed to disclose material facts, in order to obtain payment and approval from the

22 | United States and its contractors, grantees, and other recipients of its funds.

23 |     147.    Through the acts described above, defendant J-M, its agents, employees and co-

24 | conspirators, knowingly made, used and caused to be made and used false records and

25 | statements, which also omitted material facts, in order to induce the United States and its

26 | contractors and grantees to approve and pay false and fraudulent claims.

27 |     148.    The United States, unaware of the falsity of the records, statements, and claims

28 | made and submitted by defendant J-M, its agents, employees, and co-conspirators, and as a result

COMPLAINT FOR VIOLATION OF FEDERAL & STATE FALSE
CLAIMS ACTS

1    thereof, paid money that it otherwise would not have paid.

2        149.   By reason of the payment made by the United States, as a result of defendant J-M's

3    fraud, the United States has suffered millions of dollars in damages and continues to be damaged.

**COUNT II**

4    **Substantive Violations of California False Claims Act**
**Cal. Gov't Code §§ 12651(a)(1) and (a)(2)**

5

6        150.   Relator realleges and incorporates by reference the allegations made in Paragraphs

7    1 through 149 of this Complaint.

        151.   This is a claim for treble damages and forfeitures under the California False Claims

8    Act, Cal. Gov't Code §§ 12650 et seq.

9

10       152.   Through the acts described above, defendant J-M, its agents, employees and co-

11   conspirators, knowingly presented and caused to be presented to the State of California and any

     political subdivision thereof that purchased J-M PVC pipe between 1997 and present, including

12   without limitation the California political subdivisions listed on Exhibit 1, (collectively the

13   "California Real Parties") and their officials false and fraudulent claims, and knowingly failed to

14   disclose material facts, in order to obtain payment and approval from those California Real

15   Parties and their contractors, grantees, and other recipients of their funds.

16

17       153.   Through the acts described above, defendant J-M, its agents, employees and co-

     conspirators, knowingly made, used, and caused to be made and used false records and

18   statements, which also omitted material facts, in order to induce the California Real Parties (and

19   each of them) and their contractors, and grantees to approve and pay false and fraudulent claims.

20

21       154.   The California Real Parties, unaware of the falsity of the records, statements, and

     claims made and submitted by defendant J-M, its agents, employees, and co-conspirators, and as

22   a result thereof, paid money that they otherwise would not have paid.

23

24       155.   By reason of the payment made by the California Real Parties, and each of them, as

     a result of defendant J-M's fraud, the California Real Parties, and each of them, have suffered

25   hundreds of millions of dollars in damages and continue to be damaged.

26

27       156.   The California Real Parties, and each of them, are entitled to the maximum penalty

     of $10,000 for each and every false or fraudulent claim made, used, presented or caused to be

28

COMPLAINT FOR VIOLATION OF FEDERAL & STATE FALSE
CLAIMS ACTS

1    made used or presented by defendant J-M.

2

3

4                                    **COUNT III**
                    **Substantive Violations of California False Claims Act**
5                                **Cal. Gov't Code § 12651(a)(8)**

6           157.   Relator realleges and incorporates by reference the allegations made in Paragraphs

7    1 through 156 of this Complaint.

8           158.   This is a claim for treble damages and forfeitures under the California False Claims

9    Act, Cal. Gov't Code §§ 12650 et seq.

10          159.   Through the acts described above, defendant J-M, its agents, employees and co-

11   conspirators became the beneficiaries of the inadvertent submission of false claims to California

12   Real Parties and subsequently discovered the falsity of the claims.

13          160.   Defendant J-M failed to disclose the false claims to California Real Parties, or any

14   of them, within a reasonable time after discovery that the claims were false.

15          161.   By reason of defendant J-M's failure to disclose the false claims to California Real

16   Parties, those Real Parties, and each of them, have suffered hundreds of millions of dollars in

17   damages and continue to be damaged.

18          162.   The California Real Parties, and each of them, are entitled to the maximum penalty

19   of $10,000 for each and every false or fraudulent claim made, used, presented or caused to be

20   made used or presented by defendant J-M.

21                                   **COUNT IV**
                 **Substantive Violations of Delaware False Claims And Reporting Act**
22                          **6 Del. C. §§ 1201(a)(1) and (a)(2)**

23          163.   Relator realleges and incorporates by reference the allegations made in Paragraphs

24   1 through 162 of this Complaint.

25          164.   This is a claim for treble damages and penalties under the Delaware False Claims

26   And Reporting Act, 6 Del. C. §§ 1201 et seq.

27          165.   Through the acts described above, defendant J-M, its agents, employees and co-

28   conspirators, knowingly presented and caused to be presented to the State of Delaware and any

1    political subdivision thereof that purchased J-M PVC pipe between 1997 and present, including

2    without limitation the Delaware political subdivisions listed on Exhibit 1, (collectively the

3    "Delaware Real Parties") and their officials false and fraudulent claims, and knowingly failed to

4    disclose material facts, in order to obtain payment and approval from those Delaware Real Parties

5    and their contractors, grantees, and other recipients of their funds.

6      166.   Through the acts described above, defendant J-M, its agents, employees and co-

7    conspirators, knowingly made, used, and caused to be made and used false records and

8    statements, which also omitted material facts, in order to induce the Delaware Real Parties (and

9    each of them) and their contractors, and grantees to approve and pay false and fraudulent claims.

10      167.   The Delaware Real Parties, unaware of the falsity of the records, statements, and

11    claims made and submitted by defendant J-M, its agents, employees, and co-conspirators, and as

12    a result thereof, paid money that they otherwise would not have paid.

13      168.   By reason of the payment made by the Delaware Real Parties, and each of them, as

14    a result of defendant J-M's fraud, the Delaware Real Parties, and each of them, have suffered

15    millions of dollars in damages and continue to be damaged.

16      169.   The Delaware Real Parties, and each of them, are entitled to the maximum penalty

17    of $11,000 for each and every violation of 6 Del. C. § 1201 alleged herein.

18
19

**COUNT V**
**Substantive Violations of Florida False Claims Act**
**Fla. Stat. Ann. § 68.082(2)(a) and (2)(b)**

20      170.   Relator realleges and incorporates by reference the allegations made in Paragraphs

21    1 through 169 of this Complaint.

22      171.   This is a claim for treble damages and penalties under the Florida False Claims Act,

23    Fla. Stat. Ann. §§ 68.081 et seq.

24      172.   Through the acts described above, defendant J-M, its agents, employees and co-

25    conspirators, knowingly presented and caused to be presented to the Florida State Government,

26    including without limitation the Florida State governmental entities listed on Exhibit 3,

27    (collectively "Florida State Government") and its officials false and fraudulent claims, and

28    knowingly failed to disclose material facts, in order to obtain payment and approval from the

47
COMPLAINT FOR VIOLATION OF FEDERAL & STATE FALSE
CLAIMS ACTS
