1  ERIC R. HAVIAN (State Bar No. 102295)
   HARRY P. LITMAN (State Bar No. 127202)
2  MARY A. INMAN (State Bar No. 176059)
   JESSICA T. MOORE (State Bar No. 183431)
3  PHILLIPS & COHEN LLP
   131 Steuart Street, Suite 501
4  San Francisco, California 94105
   Tel: (415) 836-9000
5  Fax: (415) 836-9001

6  Attorneys for Qui Tam Plaintiff [Under Seal]

```
            FILED
CLERK, U.S. DISTRICT COURT

   OCT  1 0 2008
       2:20

```

7

8              UNITED STATES DISTRICT COURT

9           FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11 | UNITED STATES, THE STATES OF          Case No.: ED CV06-0055-GW
   | CALIFORNIA, DELAWARE, FLORIDA,
12 | NEVADA, and TENNESSEE and THE         FIRST AMENDED COMPLAINT FOR
   | COMMONWEALTHS OF                      VIOLATION OF FEDERAL AND STATE
13 | MASSACHUSETTS AND VIRGINIA ex rel.    FALSE CLAIMS ACTS
14 | [UNDER SEAL]
   |                                       JURY TRIAL DEMANDED
15 |     Plaintiffs,
   |                                       **FILED IN CAMERA & UNDER SEAL**
16 | vs.                                   **(AS REQUIRED BY 31 U.S.C. § 3730(b)(2))**

17 | [UNDER SEAL]

18 |     Defendants.

19

20

21

22

23

24              ORIGINAL

25

26

27

28

{00004910; 8}

1 | ERIC R. HAVIAN (State Bar No. 102295)
HARRY P. LITMAN (State Bar No. 127202)
2 | MARY A. INMAN (State Bar No. 176059)
JESSICA T. MOORE (State Bar No. 183431)
3 | PHILLIPS & COHEN LLP
131 Steuart Street, Suite 501
4 | San Francisco, California  94105
Tel: (415) 836-9000
5 | Fax: (415) 836-9001

6 | Attorneys for <u>Qui Tam</u> Plaintiff John Hendrix

7

8 | UNITED STATES DISTRICT COURT

9 | FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  UNITED STATES, THE STATES OF<br>CALIFORNIA, DELAWARE, FLORIDA,<br>12  NEVADA, and TENNESSEE and THE<br>COMMONWEALTHS OF<br>13  MASSACHUSETTS AND VIRGINIA <u>ex rel.</u><br>14  JOHN HENDRIX,<br><br>15  Plaintiffs,<br><br>16  vs.<br><br>17  J-M MANUFACTURING COMPANY, INC.,<br>a Delaware corporation, and FORMOSA<br>18  PLASTICS CORPORATION, U.S.A., a<br>19  Delaware corporation,<br><br>20  Defendants. | Case No.: ED CV06-0055-GW<br><br>FIRST AMENDED COMPLAINT FOR<br>VIOLATION OF FEDERAL AND STATE<br>FALSE CLAIMS ACTS<br><br>JURY TRIAL DEMANDED<br><br><u>**FILED IN CAMERA & UNDER SEAL**</u><br><u>**(AS REQUIRED BY 31 U.S.C. § 3730(b)(2))**</u> |

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

# I. INTRODUCTION

1.     This is an action to recover damages and civil penalties on behalf of the United States, the States of California, Delaware, Florida, Nevada, and Tennessee, the Commonwealths of Massachusetts and Virginia and numerous cities and public water and sewer agencies located within these States/Commonwealths (collectively the "real parties in interest" or "Real Parties") arising from false statements and claims made by defendant J-M Manufacturing Company, Inc. ("J-M") in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq., and the following State False Claims Acts:  California False Claims Act, Cal. Gov't Code §§ 12650 et seq., Delaware False Claims And Reporting Act, 6 Del. C. §§ 1201 et seq., Florida False Claims Act, Fla. Stat. Ann. §§ 68.081 et seq., Massachusetts False Claims Law, Mass. Gen. Laws Ch. 12 §§ 5A et seq., Nevada False Claims Act, Nev. Rev. Stat. Ann. §§ 357.010 et seq., Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 et seq., and Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 et seq. (collectively the "Acts").  The Real Parties defrauded by Defendant J-M include without limitation, the United States, the States of California, Delaware, Florida, Nevada, and Tennessee, the Commonwealths of Massachusetts and Virginia, the cities and public water agencies listed on Exhibit 1, all other cities, public water agencies and political subdivisions within the States of California, Delaware, Nevada, and Tennessee, and the Commonwealths of Massachusetts and Virginia that purchased J-M's Polyvinyl Chloride ("PVC") pipe between 1997 and present.

2.     For the past 25 years, J-M has been in the business of manufacturing and selling PVC pipe for the transmission and distribution of water (potable and reclaimed) and for use in sewer systems.  Federal military bases, State Roads and Highway Projects, cities, public water distribution and sewer collection agencies are the primary purchasers of J-M's PVC pipe.  J-M sells to these entities by enlisting distributors to act as middlemen between J-M and its customers.  J-M's PVC pipe products are designed almost exclusively for use in water or sewer transport systems so that even parts sold to distributors are eventually installed in these systems. J-M's PVC water pipe products are used primarily in the "water main," the artery that typically runs down the middle of the street and carries water to the service laterals that branch off from

{00004910; 8}

the main and supply the individual homes and businesses, and the "transmission line," the trunk line that transports water from the water treatment plant to the water mains. PVC pipe for use in water mains is between four and 12 inches in diameter, whereas PVC pipe for use in the transmission line is between 14 and 48 inches in diameter. J-M's PVC pressure pipe products for "reclaimed water" applications are used primarily to transport untreated water to or from water treatment plants. Unlike J-M's potable water pipe, which is blue in color, reclaimed water pipe is generally purple in color. J-M's PVC sewer pipe, which is green in color, is sold in a similar range of sizes to the range for water pipe. J-M sells two general types of sewer pipe: "forced-sewer" pipe designed for use in pressurized applications, and "gravity" sewer pipe for gravity-flow transport of wastewater.

3. To encourage and enable Real Parties to purchase J-M pipe, J-M provided Real Parties with copies of J-M's catalogs describing J-M's PVC pipe products. J-M's outside salespeople visited Real Parties regularly and brought new catalogs or updates to existing catalogs. J-M also provided Real Parties with copies of "new product bulletins" and other sales literature describing J-M's products. J-M also provided copies of its catalogs and sales literature to distributors, who in turn provided these materials to end-users, including Real Parties, to enable them to order J-M products through the distributor. In each of its sales documents, J-M made repeated representations that its PVC pipe products conform to applicable industry standards for PVC pipe.

4. Starting in at least 1997, J-M began knowingly to manufacture substandard PVC pipes, selling them through distributors to military bases, State Roads and Highway Projects, and public agencies as well as to contractors installing portions of the water distribution and sewer systems. J-M falsely represented to its customers, including Real Parties, that the PVC pipe products sold to them conformed to applicable industry standards, when in fact the products were made using inferior materials, processing and tooling which resulted in their having substandard tensile strength, as measured by various tests. In making its false representations to its distributors, contractors, and ultimate end-users, J-M intended that its false representations be used to get Real Parties to purchase its products. As a result, Real Parties

{00004910; 8}

1  have suffered, and will continue to suffer, substantial damage. Starting in at least 1997, more
2  than half of the PVC pipe J-M supplied had tensile strengths below the minimum required by
3  applicable industry standards and Real Parties' contracts and specifications. As a result of the
4  diminished tensile strength, J-M's PVC pipe will have a shorter life span, is more likely to swell
5  and leak, and will need to be replaced more quickly than pipe manufactured to specification.

6      5.    The Federal and State False Claims Acts provide that any person who knowingly
7  submits or causes to be submitted a false or fraudulent claim to a governmental entity for
8  payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three
9  times the amount of the damages sustained by the government. The Acts allow any person
10  having information regarding a false or fraudulent claim against the government to bring an
11  action on behalf of himself (the "qui tam plaintiff" or "relator") and the government and to share
12  in any recovery.

13      6.    Based on these provisions, qui tam plaintiff John Hendrix seeks to recover damages
14  and civil penalties arising from Defendant J-M's actions in presenting false records and
15  statements to its federal, state and local governmental customers and causing its distributors to
16  submit false records, claims and statements to its federal, state and local governmental
17  customers.

18            **II. PARTIES**

19      7.    Qui tam plaintiff John Hendrix ("Relator") is a resident of Clifton, New Jersey.
20  After graduating from college in December 2001, Relator began working for Defendant J-M on
21  July 8, 2002 in its corporate headquarters in Livingston, New Jersey as an engineer in J-M's
22  Product Assurance Division. Throughout his employment at J-M, the majority of Relator's job
23  duties involved advising J-M on the technical aspects of claims brought by J-M's customers for
24  failing or non-conforming product. To a lesser degree, Relator's job also involved sales and
25  customer service work, including advising current and prospective customers (primarily fellow
26  engineers) on technical aspects of J-M's products. On November 9, 2005, a little over a week
27  after Relator wrote a memo to J-M management highlighting the fact that the tensile strength of
28

1    J-M's PVC pipe was below that required by Underwriters Laboratories ("UL") to qualify for the

2    UL Mark stamped on its pipes, J-M terminated Relator's employment.

3        8.    Real Parties, on whose behalf Relator brings this suit, are the United States, the

4    States of California, Delaware, Florida, Nevada, and Tennessee, the Commonwealths of

5    Massachusetts and Virginia, the cities and public agencies listed on Exhibit 1, all of whom

6    purchased J-M's PVC pipe between July 3, 2003 and August 31, 2005, all cities, public agencies

7    and political subdivisions within the States of California, Delaware, Nevada, and Tennessee and

8    the Commonwealths of Massachusetts and Virginia who purchased J-M PVC pipe products

9    between at least 1997 and present. Exhibit 2, incorporated herein, contains a partial list of

10    federal projects for which the United States Armed Forces purchased J-M PVC pipe during the

11    period between July 3, 2003 and August 31, 2005. Exhibit 3, incorporated herein, contains a

12    partial list of projects for which the State of Florida purchased J-M PVC pipe during the period

13    between July 3, 2003 and August 31, 2005.

14        9.    At all times relevant to this Complaint, Defendant J-M Manufacturing Company,

15    Inc. ("J-M") was a Delaware corporation with its headquarters at 9 Peach Tree Hill Road in

16    Livingston, New Jersey. With at least $800 million in annual sales, J-M is the largest

17    manufacturer of PVC pipe in the United States and the world. J-M manufactures its PVC pipe

18    at a minimum of 11 plants in the following locations: Fontana and Stockton, California; Pueblo,

19    Colorado; Adel, Georgia; Wilton, Iowa; Batchelor, Louisiana; Winnebago, Minnesota; Butner,

20    North Carolina; McNary, Oregon; Meadville, Pennsylvania; and Wharton, Texas.

21        10.   From its inception in 1982 until at least November 1, 2005, J-M was a wholly-

22    owned subsidiary of Defendant Formosa Plastics Corporation, U.S.A. ("Formosa"). In some

23    industry publications, J-M is referred to as a unit or operating division of Formosa. At all times

24    relevant to this Complaint, Defendant Formosa was a Delaware corporation with its

25    headquarters at 9 Peach Tree Hill Road in Livingston, New Jersey. Formosa is part of Taiwan's

26    Formosa Plastics Corporation, one of the world's largest PVC suppliers. Formosa is largely

27    controlled by the Wang family of Taiwan. Yung-ching Wang, known as "Y.C. Wang," is

28    Formosa's Founder and Chairman of the Board. Each of Mr. Wang's ten children has served as

1   an executive at either Formosa or one of its subsidiaries.  Walter Wang, Y.C. Wang's youngest

2   son, is the President and current CEO of J-M.

3       Formosa (USA) was formed in 1978 and is a privately held company.  Formosa's

4   annual revenues are more than $4 billion, and one of Formosa's core business functions is to

5   produce plastic resins.  Formosa requires J-M to use its resins and compounds for most of the

6   PVC pipe at issue in this case.

7                          **III. JURISDICTION AND VENUE**

8      11.    This Court has jurisdiction over the subject matter of the Federal False Claims Act

9   ("FCA") action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers

10   jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  This

11   Court has jurisdiction over the subject matter of the State False Claims actions pursuant to 28

12   U.S.C. § 1367 and 31 U.S.C. § 3732(b) because the State False Claims actions arise from the

13   same transactions or occurrences as the Federal FCA action.

14      12.    This Court has personal jurisdiction over Defendants J-M and Formosa pursuant to

15   31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in

16   any judicial district in which the defendant, or in the case of multiple defendants, any one

17   defendant can be found, resides, transacts business or in which any act proscribed by section

18   3729 occurred."  Section 3732(a) also authorizes nationwide service of process.  During the

19   relevant period, J-M operated a foundry in Fontana, California, at which many of the fraudulent

20   practices occurred, and thereby transacted business in the Central District of California.

21      13.    Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because J-M can be

22   found in, resides in, and/or transacts business in the Central District of California and because

23   many of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial

24   district.

25                        **IV. FRAUD AGAINST REAL PARTIES**

26   **A.   Turnover in J-M's Upper Management**

27      14.    J-M was founded in 1982 when Formosa acquired the Pipe Division of Johns-

28   Manville Corporation and created J-M.  For its first 10 years, J-M's management was populated

largely by former Johns-Manville employees. However, by the mid 1990s, most of the old Johns-Manville employees had either retired or left. In 1990, J-M's former parent company, Formosa Plastics Corporation, U.S.A. ("Formosa"), installed Walter Wang, the son of Formosa's Founder and Chairman of the Board, Y.C. Wang, as J-M's President. At the time he assumed this post, Mr. Wang was only 25 years old. Having just graduated from college, he had little to no practical experience in managing a company, let alone the world's largest manufacturer of PVC pipe. Shortly after naming Mr. Wang President, J-M moved its corporate headquarters from Stockton, California to Livingston, New Jersey, where until approximately October 2008 it occupied the same office building in which Formosa and several other Formosa subsidiaries also have corporate offices.

15. Under Mr. Wang's leadership, J-M implemented a series of "cost-cutting" measures that undermined the quality of J-M's PVC pipe products. At Mr. Wang's direction, the outgoing former Johns-Manville managers were replaced by individuals with significantly less experience and fewer credentials. For instance, the Director of Production, who formerly had been a senior engineer, was replaced by Barry Lin, an accountant from Formosa's management center in Taiwan with no engineering background. The new Director of Engineering, Kaider Liao, did not have an engineering degree. The new Quality Control Manager, Jack Hwang, was an electrical engineer with no experience or formal training in failure analysis. After Hwang left the Quality Control Manager post in 2004, the position was later filled in 2005 by a recent college graduate.

16. In filling these and other supervisory positions, J-M drew almost exclusively from two sources – Taiwanese nationals and recent college graduates (like Relator) – both of which garnered smaller salaries. Up until three years ago, Formosa owned and operated a boarding house near its Livingston, New Jersey headquarters to accommodate the large number of Taiwanese employees at J-M and its other subsidiaries who could not otherwise afford to live in the greater New York Metropolitan area on their modest J-M salaries.

17. Backed by this new crop of inexperienced managers, Mr. Wang shifted J-M's focus away from product quality to a single-minded mission of gaining market share and improving

1    the bottom line irrespective of quality. Under the direction of Mr. Wang and his new managers,

2    J-M implemented three "cost-cutting" measures that have seriously compromised the tensile

3    strength of the majority of its PVC pipe.

4    **B. Substituting Inferior Ingredients in PVC Compound**

5              18.   First, J-M began to substitute cheaper and lower quality ingredients in its PVC

6    compound. While most PVC pipe manufacturers use for their compound a more expensive, pre-

7    prepared stock formula published by the Plastic Pipe Institute, J-M uses a proprietary compound

8    called "J-M 90" that it mixes itself. By making the compound itself, J-M can control the type of

9    ingredients that go into it.

10             19.   To save money, J-M replaced two primary ingredients – resin and additives (like

11   wax and stabilizers) – with cheaper, lower grade brands. J-M replaced its more expensive,

12   higher viscosity resin with a cheaper, lower viscosity resin. Because Formosa required J-M to

13   use Formosa as its primary resin supplier, most of the resin at issue was manufactured by

14   Formosa. While J-M's previous resin had a viscosity rating of .92, the new resin had a rating of

15   .88. In addition to being cheaper, the lower viscosity resin could be formed into pipe more

16   quickly and with less processing, thereby allowing J-M to increase its production rates and

17   output (as described in more detail below).

18             20.   However, the effect of the lower viscosity resin and increased production rates was

19   to decrease the compound's overall tensile strength. Because the lower viscosity resin was a

20   more ductile material, it required more processing to achieve the required tensile strength.

21   However, instead of slowing its production rates to account for the lower viscosity resin, J-M

22   increased its production rates to increase its output of PVC pipe. By switching other additives

23   such as waxes and stabilizers to lower grade brands, J-M also decreased the tensile strength of

24   its J-M 90 compound.

25   **C. Accelerating Production Rates**

26             21.   In addition to degrading the ingredients that comprise its J-M 90 compound, J-M

27   began to make changes to its manufacturing process that further eroded the tensile strength and

28   caused the finished PVC pipe to be out-of-specification.

22.   PVC pipe is manufactured by extrusion. Broadly described, extrusion involves the following steps. The ingredients that comprise the PVC compound (e.g., base resin and additives like paraffin wax and calcium stearate) are weight-measured out of silos and poured into a hopper where they are mixed. The mixed PVC compound is then poured into the extruder where it is melted and formed by being forced (by a barrel and screw acting as an auger) through an orifice known as the die that creates the shape and dimensions of a pipe. Once out of the extruder and die, the hot PVC pipe is then cooled in a series of water cooling tanks.

23.   To meet an ever increasing demand for PVC pipe, J-M began to increase production rates in each of its 11 plants that produce PVC pipe. Instead of investing in more extruders, replacing outdated extruders or building more plants, J-M started running its existing extruders (many of which are over 30 years old) at speeds that exceed the extruders' rated capacity. Each extruder has a recommended maximum output measured typically in pounds per hour, and J-M began running its extruders at 20 percent above the rated capacity.

24.   As a result of the increased speed of J-M's production line, more torque and higher temperatures were needed to melt the J-M 90 compound and, once melted, the PVC material received less processing time in the extruder and die as it was being formed into pipe. The temperature of the water being sprayed on the pipe in the cooling baths had to be lowered to counteract both the increased temperature of the pipe emerging from the extruder and the fact that the pipe was spending less time in the cooling baths. (Since the cooling baths occupy a fixed distance on the production line, the increased production rates had the pipe moving more quickly over this and all other parts of the production line.)

25.   Not surprisingly, the effect of this accelerated manufacturing process (in addition to increased output) was to further decrease the tensile strength of J-M's PVC pipe. Like a cake baked for eight minutes at 800 degrees and then quickly cooled in a freezer, the PVC pipe being produced at the accelerated production rate was not as strong as pipe that was afforded proper processing time and conditions. Having been subjected to a quick burst of cooling, the surface of the outside of the pipe was hard whereas the portion of pipe below the surface, not having had adequate time to cool and form, was soft. The accelerated manufacturing process also

{00004910; 8}

1 created huge variations in the temperatures of the inside and outside diameter of the pipe and the

2 rate at which each cooled. The effect of these differential temperatures and cooling rates was to

3 further weaken the pipe and create locked-in stresses in the pipe that increase the likelihood the

4 pipe will catastrophically rupture when it is tapped.

5 **D. Improper Tooling and Maintenance of Extruders**

6     26. With the exception of its newer plants in Adel, Georgia and Meadville,

7 Pennsylvania, in each of its nine remaining PVC plants, J-M has many extruders that are over

8 30 years old. Rather than invest in new extruders, J-M placed a new, high-output die on the end

9 of the older extruders to keep up with the accelerated production schedule set by President

10 Wang. However, because J-M's lower quality PVC compound required more processing time

11 and the older extruders were not able to work the PVC compound enough for the high-output

12 die, the tensile strength of the pipe produced by the combination of older extruder and high-

13 output die was further diminished.

14     27. In late 2004, J-M began receiving complaints from customers regarding a certain

15 type of PVC pipe (IPS white pipe) produced at its plant in Stockton, California. Instead of the

16 white color characteristic of this particular type of pipe, the combination of increased production

17 rates, higher temperatures and high-output dies on older extruders had caused the pipe to burn,

18 turning it yellow in color. To remedy the problem, K.C. Yang, J-M's Corporate Quality Control

19 Supervisor, instructed the Stockton plant to use a regular die for this product. In an email dated

20 January 4, 2005, K.C Yang instructed Stockton's Superintendent of Production, Jim Reichert,

21 that "PST [Plant Stockton] should use regular die for IPS white products when high-output die

22 cause burning. If necessary, PST should request new IPS die." <u>See</u> Exhibit 4, incorporated

23 herein.

24     28. By increasing its production rates to speeds exceeding the extruders' rated capacity,

25 J-M accelerated the wear on its extruders. Moving parts like the extruders' screw and barrel

26 were most affected by the added wear. However, rather than increase the amount of

27 maintenance to account for more wear, J-M abandoned its former practice of regularly

28 monitoring and replacing the screw and barrel unit when it fell below a certain tolerance and

1  decided instead to amortize the unit over a given time period (such as one-year) and only

2  replace it at the end of that time period.

3      29.   J-M managers like Will Fassler, a senior engineer in J-M's Research and

4  Development Department, began to observe that, under the increased production rates, the screw

5  and barrel unit was exceeding the old tolerances and needing replacement after only six months.

6  Nevertheless, under its new amortization policy, J-M continued to use the screw and barrel unit

7  for another six months before it was replaced. Experienced J-M engineers like Will Fassler

8  were well aware that the PVC material extruded in the second half of the unit's amortized life

9  with the underperforming screw and barrel unit had reduced tensile strength. See Exhibit 5

10  (Relator's notes dated 11/3/05), incorporated herein.

11      30.   In a discussion with Relator on November 3, 2005, Will Fassler explained that the

12  reason for the decrease in tensile strength stems from the proximity of the screw and barrel. For

13  instance, a new screw and barrel unit, which fits closely together, will generate more shear and

14  yield better mechanical properties in the finished pipe. See Exhibit 5. However, as the unit

15  wears, the fit loosens and the shear decreases, which compromises the processing and decreases

16  the tensile strength of the PVC material. Id. Despite this knowledge, J-M failed to replace its

17  underperforming screw and barrel units after the first six months of use and allowed them to be

18  used for an additional six months in spite of the detrimental effect on the pipe's tensile strength.

19      31.   While none of these practices alone necessarily would have proven fatal, the

20  combined effect of J-M's substitution of inferior ingredients, increased production rates and

21  improper tooling and maintenance of its extruders caused J-M to produce PVC pipe that fails to

22  meet the tensile strength requirements set forth by Underwriters Laboratories Inc. ("UL"), the

23  American Water Works Association ("AWWA"), ASTM International ("ASTM"), and Factory

24  Mutual ("FM").

25  **V.  J-M'S SALE OF SUBSTANDARD PVC PIPE BEARING UL MARK DESPITE KNOWLEDGE THAT PIPE DOES NOT QUALIFY FOR UL LISTING**

26  **A.  J-M PVC Pipe Does Not Meet UL's Longitudinal Tensile-Strength Requirement**

27      32.   Underwriters Laboratories Inc. ("UL") is a not-for-profit corporation that tests and

28

{00004910; 8}

1  certifies a wide range of products for public safety.  Once a product is tested and found to

2  conform to UL's safety requirements, that product becomes UL certified and is eligible to bear

3  the UL Mark.  The UL Mark has become synonymous with safety and a product bearing a UL

4  Mark is universally accepted as being safe.

5      33.  UL has promulgated a safety standard governing PVC pipe for use in underground,

6  fire service systems.  UL Standard 1285 ("UL 1285") lists a variety of requirements that must be

7  met for PVC pipe to be UL certified and bear the UL Mark.  Specifically, UL 1285 requires that

8  "[r]epresentative samples of each class, pressure rating and size of PVC pipe . . . shall be

9  subjected to the tests described in Sections 11 – 20."  Exhibit 6, incorporated herein.  One of

10  those tests, Section 17, is the Longitudinal Tensile-Strength ("LTS") Test which provides that

11  "[m]achined specimens from the pipe shall have a minimum tensile strength of 7,000 psi."  Id.

12      34.  J-M has only undergone two rounds of LTS Tests for UL on its PVC pipe products.

13  The first round was on its founding in 1982 when J-M had to initially qualify its PVC pipe

14  products for UL listing.  The second round was in the mid-1990s when J-M sought to change its

15  PVC pipe compound and begin making pipe out of its newly created J-M 90 compound.  J-M

16  passed both of these tests and received UL listing for its PVC pipe products.

17      35.  Once it has certified a product, UL does not require that the product undergo the

18  Performance Tests listed in Sections 11 through 20 of UL 1285, including the LTS Test, unless

19  and until there has been a material change in the product's materials, design or processing.

20  While UL requires manufacturers to "conduct the necessary production control, inspection, and

21  tests" as they produce the pipe, these routine Manufacturing Tests are much less stringent than

22  the Performance Tests UL 1285 requires to initially qualify the PVC pipe.  Exhibit 6.

23      36.  UL operates on an honor system.  Once a product is UL listed, UL relies on

24  manufacturers to notify it of any material changes to the product's materials, design or

25  processing.  In the absence of such notification, UL presumes the manufacturer is continuing to

26  use the same materials, design and processing it used in preparing the samples UL tested as part

27  of the Performance Testing to qualify the pipe.  By requiring "***representative*** samples of each

28  type of PVC pipe" for qualification testing, UL conditions its ongoing certification of the

11

{00004910; 8}

1   product on the understanding that all future pipe will be made in the same manner as the

2   samples submitted to UL to qualify the pipe. Exhibit 6 (emphasis added). In the Foreword, UL

3   1285 specifically states that "[t]he observance of the requirements of this Standard by a

4   manufacturer is one of the conditions of the continued coverage of the manufacturer's product."

5   Id.

6          37.    By at least 1997, J-M's "cost-cutting" practices of substituting inferior ingredients

7   in its compound, accelerating production rates and improperly tooling its extruders were well-

8   established and had seriously degraded the tensile strength of J-M's PVC pipe. By this time, J-

9   M had begun to receive LTS test results (from J-M's internal testing and testing performed by

10  customers in connection with claims for failing pipe) showing that more than 50 percent of the

11  time J-M's PVC pipe failed to meet the minimum LTS requirements set forth in UL 1285.

12         **1.   Results of Internal LTS Testing Troubles Relator**

13         38.    Will Fassler, a senior engineer in J-M's Research and Development Division in the

14  Stockton, California plant, ordered all of the LTS testing J-M requested over the past nine years.

15  Based on his review of these test results, Fassler estimated that J-M's PVC pipe has failed LTS

16  requirements 70 percent of the time. See Exhibit 7 (Relator's notes dated 9/12/05), incorporated

17  herein.

18         39.    In 2002, while working on two large claims against J-M for failed PVC pipe,

19  Relator was asked to review the results of all internal LTS tests J-M had performed on PVC pipe

20  manufactured between 1998 and 1999, the time period when the failed pipe was produced. In

21  so doing, Relator was able to review the results from six LTS tests that had been performed on

22  J-M's PVC pipe. Of the six tests, Relator observed that four failed the LTS requirements and

23  only two passed.

24         40.    At various times, together and separately, Will Fassler, K.C. Yang, J-M's former

25  Corporate Quality Control Supervisor, and Relator each have expressed concern to Barry Lin,

26  J-M's Director of Production, about the large percentage of failing LTS test results on J-M's

27  PVC pipe. Each time, Mr. Lin has responded by saying that the failures were "an acceptable

28  business risk" to meet company production goals, failures were normal, and not every piece of

{00004910; 8}

1   pipe would always meet specification. Exhibit 7 (Relator's notes dated 9/12/05), incorporated

2   herein.

3        41.   After seeing a subset of the results of J-M's LTS testing in which 60 percent of the

4   samples failed and learning from Will Fassler that the collective results of the past nine years

5   showed an overall failure rate of 70 percent, Relator was no longer comfortable signing his

6   name to customer certifications and letters to claimants representing that J-M's pipe complies

7   with the UL Standard. On August 23, 2005, Relator told Barry Lin about his concerns and said

8   he would not sign any more letters without first seeing copies of all of the results of J-M's LTS

9   testing.

10       42.   Mr. Lin refused to provide Relator with the LTS test results.  Instead, he simply

11  assured Relator that J-M's UL listed products meet all the requirements of UL and directed him

12  to continue to certify this to J-M's customers. Exhibit 8, incorporated herein, is a copy of

13  Relator's August 25, 2005, email to Barry Lin asking him to acknowledge in writing his

14  statements regarding J-M's compliance with the UL tensile-strength requirement despite

15  internal test results to the contrary. After having similar conversations with K.C. Yang, Kai

16  Cheng, J-M's Director of Product Assurance, and Mai Huynh, J-M's Product Assurance

17  Manager, Relator sent similar emails to each of them. See id.  None of the recipients provided

18  Relator a written acknowledgment.

19       **2.  Results of Testing Performed in Conjunction with Claims Against J-M**

20       43.   By at least 1997, J-M was beginning to get test results for failing longitudinal

21  tensile strength from its Product Assurance Department. J-M's Product Assurance Department

22  handles all claims and complaints brought by J-M customers for failing pipe.  Because LTS

23  testing can only be performed by a certified independent laboratory and is expensive ($2,500 per

24  specimen for the series of tests with which this test is packaged), it is typically only requested in

25  the case of larger claims involving significant damages.

26       44.   During Relator's three years in J-M's Product Assurance Department, LTS testing

27  was only performed in 14 of the claims.  Of those 14 claims, Relator saw 12 instances in which

28  the longitudinal tensile strength of J-M's PVC pipe was below the 7,000 psi minimum

FIRST AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

{00004910; 8}

1   requirement and only two instances in which the PVC pipe met LTS requirements.  Exhibit 9,

2   incorporated herein, contains copies of some of the test results documenting the following

3   failing longitudinal tensile strengths measured in pipe from four of the 14 claims:

4

| Number & Name of Claim | Longitudinal Tensile Strength Required by UL 1285 | Longitudinal Tensile Strength Measured in Sample of J-M PVC Pipe | Independent Laboratory That Performed the Test | Test Date |
|---|---|---|---|---|
| Q00-H-41 Ferguson Cities Supply Brigman Construction | 7,000 psi | Hobbs B:  6,600 psi | Law Engineering and Environmental Services, Inc. | 09/28/00 |
| Q00-H-14 Tec Utilities | 7,000 psi | Sample 2:  6,680 psi<br>Sample 3:  6,750 psi<br>Sample 4:  6,940 psi | Modern Industries, Inc. | 10/31/00 |
| Q02-J-40 Westgate Resorts | 7,000 psi | 6,833 psi | Bodycote Broutman, Inc. | 10/01/02 |
| Q05-C-08 Sheldon | 7,000 psi | Sample 1:  6,777 psi<br>Sample 2:  6,775 psi | CRT Laboratories | 6/9/05 |

18       45.    In his Internal Recommendation and/or Authorization ("IRA") advising J-M on

19   how it should handle the Sheldon claim referenced above, Relator noted that "CRT conducted

20   testing on the pipe and found that the tensile strength of the pipe was below that required by the

21   UL Listing Mark on the pipe on all samples tested."  Exhibit 10, incorporated herein.  Because

22   of the pipe's substandard longitudinal tensile strength, Relator recommended that J-M offer the

23   customer a settlement of $30,000.  Id.

24       46.    Kai Cheng, J-M's Director of Product Assurance, disagreed with Relator's

25   recommendation and instructed Relator to "find a way to deny the claim and follow his

26   thoughts, that J-M is not responsible even if we fail the test, and offer alternative theories as to

27   the cause of failure for this case."  Exhibit 11 (Relator's notes dated 11/1/05), incorporated

28   herein.  In his conversation with Relator, Mr. Cheng also stated that he "knew that probably half

{00004910; 8}

1    of our pipe did not meet this requirement of UL [UL 1285 longitudinal tensile strength] and for

2    all of our pipe to meet the standard we would have to be perfect in production and we could not

3    always do that." Id.

4    ### 3. Results of Internal LTS Testing of J-M's 30- and 36-Inch Big Blue Pipe

5        47.    Beginning in approximately 1999 with the opening of its new plant in Adel,

6    Georgia, J-M added two new products to its Big Blue PVC pipe product line. J-M began

7    manufacturing Big Blue PVC pipe with a pressure rating of 165 psi in both the 30- and 36-inch

8    sizes in its Adel, Georgia and Fontana, California plants. Shortly after starting to manufacture

9    these two products, J-M sent specimens from both pipes to an outside laboratory for LTS testing

10   to see if they could qualify for UL listing. However, all of the specimens failed to meet the

11   minimum longitudinal tensile strength of 7,000 psi required by UL 1285.

12       48.  Once it established a customer base for these two products, J-M introduced a

13   second pressure class – one with a pressure rating of 125 psi – in both its 30- and 36-inch Big

14   Blue PVC pipe. Again, J-M subjected samples from these two new products as well (as the

15   original two products) to longitudinal tensile-strength testing at an outside laboratory, and all of

16   the samples had tensile strengths below 7,000 psi. Since that time, J-M has continued to test the

17   longitudinal tensile strength of its 30- and 36-inch Big Blue PVC pipe and has received nothing

18   but failing results. Without a passing result, J-M has been unable to approach UL about

19   qualifying these products and they do not have a UL Mark.

20       49.  Since J-M's 30- and 36-inch Big Blue PVC pipe is made using the same materials,

21   equipment and processing as all of J-M's UL-listed Big Blue and Blue Brute pipe, the

22   substandard longitudinal tensile strengths reported on the 30- and 36-inch Big Blue pipes are

23   representative of the longitudinal tensile strengths of all J-M UL-listed pipe. Like the results of

24   other J-M's internal LTS testing and its claims testing, the failing results for its 30- and 36-inch

25   Big Blue pipe are further proof that J-M's "cost-cutting" measures of substituting inferior

26   ingredients in its J-M 90 compound, accelerating its production rates, and improperly tooling its

27   extruders have had a negative effect on the longitudinal tensile strength of its PVC pipe.

28   //

**B.   J-M PVC Pipe Does Not Meet UL's Radial Tensile Strength Requirement**

50.   In August 2003, Relator proposed a change to the bell design of J-M's Blue Brute and Big Blue PVC pipe. The two ends on a length of PVC pipe are called alternately the barrell end and the bell end. Under J-M's existing design, the bell end had a greater wall thickness than the remainder of the pipe. To make the bell walls, the extruder had to be slowed down and additional material added to increase the wall thickness. Under Relator's proposal, dubbed the "No Thickened Section" Project, the bell wall would not be thickened and would have the same dimensions as the remainder of the pipe, thereby allowing the extruder to run at a nearly continuous speed, increasing output and reducing the amount of material needed per length of pipe.

51.   Relator found support for his proposed design change in the American Water Works Association ("AWWA") standards governing PVC Pipe for Water Transmission and Distribution, AWWA C900 and C905. Under Section 4.3.2.2 of both AWWA C900 and C905, the pipe's bell end must meet one of two requirements. It must have the same wall thickness ratio as the barrel of the pipe, or it must be tested to ensure that the joint assembly qualifies for a hydrostatic design basis ("HDB") category of 4,000 psi. See Exhibit 12, incorporated herein. Whereas longitudinal tensile-strength testing measures the tensile strength of the lengthwise portion of the pipe from end to end, HDB testing is one of several ways of measuring the tensile strength of the radial, circular or hoop section of the pipe. From this Section, Relator concluded that the thickened bell could be omitted from the pipe design so long as a joint manufactured from the thinner bell could meet the required HDB category of 4,000 psi.

52.   In his Project Initiation Form dated October 28, 2003, Relator estimated that by omitting the thickened bell section of its two most popular products, Blue Brute and Big Blue, J-M would save $3,000,000 a year in materials costs alone, not to mention the additional efficiencies to be gained from not having to slow down its extruders and running them at a continuous speed. See Exhibit 13, incorporated herein. Other managers, including Will Fassler, extolled the potential benefits of a "No Thickened Section" pipe. In an email to Jack Hwang, J-M's Quality Control Manager, dated September 3, 2003, Mr. Fassler wrote "The potential

{00004910; 8}

1   benefits are large:  significantly reduced material usage; greatly reduced bell-end forming scrap;

2   easier bell-end forming; better bell-end appearance."  Exhibit 14, incorporated herein.  On

3   December 8, 2003, Walter Wang, J-M's President, approved the "No Thickened Section"

4   Project with a budget of $65,000 to cover the costs of designing and developing the new bell

5   end and performing the various tests needed to gain UL listing.  See Exhibit 13.

6        53.   Since the thinner bell wall only involved a change in the pipe's design, as opposed

7   to its materials or processing, J-M did not have to undergo many of the Performance Tests in

8   UL 1285, including the Longitudinal Tensile-Strength Test, to qualify the newly designed pipe

9   for UL listing.  Instead, to qualify the new design, UL required J-M to pass the following three

10  strength tests, each of which measures the radial tensile strength of the newly designed bell end

11  of the pipe:  (1) a shortened HDB Test (2,000 hour test); (2) Sustained Pressure Test (1,000 hour

12  test); and (3) Quick Burst Test (60 second test).

13       54.   Since the newly designed, no-thickened-section pipe was made from the same

14  materials and process as the existing thickened-section pipe, J-M experienced many of the same

15  problems with the new pipe as it had with the existing pipe.  For instance, J-M's three "cost-

16  cutting" practices (substitution of inferior materials, accelerated production rates and improper

17  maintenance and tooling of its extruders), which caused J-M's existing pipe to fail the

18  Longitudinal Tensile-Strength Tests a majority of the time, also caused J-M to fail many of the

19  above-referenced radial strength tests on the newly designed, no-thickened-section pipe.

20       55.   To gain UL listing for the new pipe design in the face of such failures, J-M resorted

21  to a number of fraudulent practices, including without limitation (1) specially producing the UL

22  specimens using higher quality ingredients and reduced production rates that are not

23  representative of J-M's actual materials and process; (2) concealing failing test results from UL;

24  (3) where early results indicated a specimen ultimately would fail, stopping long-term tests

25  before they were completed and substituting new specimens; and (4) making multiple

26  specimens from one lot, testing a subset of the specimens in advance to ensure that when the

27  remaining specimens are tested for UL, they will pass the tests.

28  //

17

{00004910; 8}

**1. HDB Testing**

56.   As discussed above, the two AWWA standards governing PVC pressure pipe –
AWWA C900 and AWWA C905 – both state at Section 4.3.2.2(b) that the joint assemblies of
the pipe's bell must "qualify for a hydrostatic design basis (HDB) category of 4,000 psi
(27.58MPa) when tested in accordance with ASTM D2837 as modified in ASTM D3139."
Exhibit 12. ASTM D2837, in turn, provides the test method for obtaining the pipe's HDB. <u>See</u>
Exhibit 15, incorporated herein.

57.   The purpose of HDB testing is to determine the long-term radial strength
characteristics of PVC pipe.  Broadly described, HDB testing is performed by placing 10
specimens under varying degrees of pressure and recording the point in time, up to a maximum
of 2,000 hours, when the joint fails.  In a November 14, 2003, email to Jack Hwang, Will
Fassler described the HDB test as "the most stringent test of PVC pressure pipe quality."
Exhibit 16, incorporated herein.  Because HDB testing lasts 83.3 days and requires special
equipment, it must be performed at an independent, certified testing laboratory.  Given the
length of the test, UL does not require that a UL representative be present to observe the testing.

58.   Once the testing is complete, Section 5.4 of ASTM D2837 requires that the
following three calculations be performed to determine a pipe's HDB:  (1) the hydrostatic
strength at 100,000 hours; (2) the hydrostatic strength at 50 years; and (3) the percent of
circumferential expansion.  Each of these calculations measures the pipe's long-term hydrostatic
strength.  To obtain an HDB category of 4,000 psi, the smallest of these three values must have
a long-term hydrostatic strength between 3,830 and 4,800 psi.  Exhibit 15 (at Table 1).
However, in Note 7, ASTM D2837 notes that the expansion measurement is not required in
North America because expansion strengths taken from North American stress rated PVC
materials have not been found to be "the limiting factor," <u>i.e.,</u> the lowest of the three values
described above.

59.   From the beginning of the "No Thickened Section" Project, many of J-M's Quality
Control managers expressed concern about the ability of J-M's pipe, thickened or no, to pass the
required HDB category of 4,000 psi.  In a November 14, 2003, email to Jack Hwang, Will

18

{00004910; 8}

1    Fassler listed first among the challenges J-M needed to overcome for the Project to succeed J-

2    M's "increasing failure rates in long-term pressure tests." Exhibit 16. Mr. Fassler also cited

3    three other obstacles: (1) the recent failure of J-M's pipe to pass sustained pressure tests at NSF

4    International (formerly known as the National Sanitation Foundation), which provides product

5    testing and certification services for products in contact with potable water, (2) failing HDB

6    testing and (3) numerous joint specimen failures "where the pipe burst before the joint leaked."

7    Id.

8        60.   Given its history of problems with the tensile strength of its PVC pipe, J-M was

9    skeptical that no-thickened-section pipe produced at random on the same machinery using the

10   same materials and process as its existing pipe would pass the HDB testing. To increase its

11   odds of passing, J-M directed the Plant Managers preparing the no-thickened-section specimens

12   to monitor the results of the daily Quick Burst tests being performed on its existing pipe and

13   only produce the specimens when those results were favorable.

14       61.   In a December 9, 2003, email, Will Fassler, who was heading up specimen

15   preparation for the Project, informed Stephen Yang, the Plant Manager at J-M's Fontana,

16   California plant, that the Quick Burst test data "is very useful in identifying pipe that has an

17   elevated chance of failing HDB." Exhibit 17, incorporated herein. Mr. Fassler instructed Mr.

18   Yang to consult that data in choosing when to produce the specimens. Id. ("We need to test the

19   pipe before testing the joint because the pipe will limit the strength of the joint.") Similarly, in

20   another email of the same date, Jack Hwang notified Mr. Yang that "We have to have a good

21   test result within J-M before we send out for HDB test." Id.

22       62.   Once the initial specimens were produced (using the Quick Burst data to increase

23   its odds of passing HDB), J-M sent specimens of its no-thickened-section Blue Brute pipe (in

24   size 4-inch Dimension Ratio ("DR") 18) to Charles Stanley, the Director of Universal

25   Laboratory, Inc. in Garland, Texas, for preliminary testing. Before incurring the cost of 2,000

26   hours of testing as required by full-scale HDB testing, J-M instructed Mr. Stanley to first subject

27   10 specimens to a shortened HDB test of only 100 hours to give J-M a preview of how the pipe

28   would likely perform.

FIRST AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

{00004910; 8}

1       63.   The results of this testing, which J-M managers dubbed "Accelerated HDB

2   Testing," were mixed. Approximately half of the 10 specimens had hydrostatic strengths that

3   were well below the confidence limit and caused the entire lot to fail the HDB test. Exhibit 18,

4   incorporated herein, is a copy of the notes Relator took as Mr. Stanley reported on the results of

5   the HDB testing. Under item number three, Relator notes that the Blue Brute specimen in size

6   4-inch DR 18 failed the confidence limit under the Accelerated HDB testing. Id.

7       64.   Undeterred by these results, J-M instructed Mr. Stanley to begin the full-scale HDB

8   testing. Early in the testing, J-M began to receive reports from Mr. Stanley that many of the

9   specimens were exhibiting excessive swelling. While ASTM D2837 allows specimens to

10  expand a maximum of five percent during HDB testing, several of J-M's specimens had swelled

11  by as much as 33 percent. Having never seen such swelling before, Mr. Stanley sent several of

12  the swollen specimens to Will Fassler and Relator for their review. (At the time Relator left J-

13  M in November 2005, one of the swollen pipe specimens – a Blue Brute pipe in size 4-inch DR

14  18 -- was still in J-M's literature room.)

15      65.   Despite the fact these specimens clearly showed a serious problem with excessive

16  swelling, J-M continued to rely on Note 7 of ASTM D2837 (which provides that the expansion

17  measurement is not required where the five percent expansion strengths are not the limiting

18  factor) and refused to consider the expansion measurement in determining HDB. From the

19  degree of swelling, J-M was aware that if Universal Laboratories had calculated it, the

20  expansion measurement would have been the lowest value of the three calculations for

21  determining long-term hydrostatic strength and would have caused the pipe to fail HDB.

22  Instead, J-M continued to take only the lower of the first two calculations (hydrostatic strength

23  at 100,000 hours and hydrostatic strength at 50 years) when calculating HDB.

24      66.   Even with the advantage gained by omitting the expansion measurement, J-M

25  repeatedly failed the HDB test when using the lower of the hydrostatic strength at 100,000 hours

26  and at 50 years. Relator recalls four instances in which Blue Brute specimens failed HDB

27  testing. Of the four sets of failing specimens, two were in size 8-inch DR 18, one was 4-inch

28  DR 18, and one was 8-inch DR 14. See Exhibit 18. J-M had no reports documenting the failing

{00004910; 8}

results because it had instructed Mr. Stanley only to prepare reports for the passing results and to report the failing results orally. Relator recorded many of these failing results on a piece of paper as Mr. Stanley reported them to him. Id.

67.   As discussed above, per ASTM D2837 (as modified by ASTM D3139), HDB testing is performed using 10 specimens that are subjected to varying pressures for varying lengths of time up to 2,000 hours. During its HDB testing at Universal Laboratories, J-M asked Mr. Stanley to notify it when early indications revealed that one or more of the 10 specimens, if tested to completion, would cause the overall HDB test to fail. In such instances, J-M instructed Mr. Stanley to stop the testing of those particular specimens (in order to avoid getting any bad data points) and substitute in a new specimen for the continuation of the HDB testing.

68.   If the substitutions were unable to produce a passing result and the 10 specimens produced a failing HDB, J-M instructed its managers at the plants preparing the specimens to destroy all other specimens made from the failing lot. As was the case with the initial set of specimens, J-M had its Quality Control staff, including Will Fassler and Armondo Martinez, oversee the production of additional specimens. To increase the odds of getting a passing result, J-M slowed its regular production rates and adjusted its typical temperatures and torque to allow for optimum processing of the specimens. To reduce the excessive swelling, J-M replaced the lower grade multiwax ordinarily used in its J-M 90 compound with a high quality calcium stearate.

69.   On July 5, 2004, after seven months of testing, J-M got its first passing result for HDB with tests performed on Blue Brute specimens in size 8-inch DR 18. However, one month later on August 31, Will Fassler wrote an email to Relator stating that "The HDB testing so far has revealed material issues (excessive swelling) and workmanship issues (mid-wall void). The chances of two consecutive samplings passing HDB appear to be less than 50%." Exhibit 19, incorporated herein. Eight months later, in an Internal Recommendation and/or Authorization ("IRA") recommending that J-M proceed with the production of no-thickened-section pipe, Mr. Fassler summarized the HDB testing as follows: "J-M submitted DR 14 & DR 18 joint samplings to Universal Laboratories for HDB tests per ASTM D3139-98. Some early

1   samplings failed.  Later submittals passed – confirming that with suitable materials and

2   workmanship the design meets the requirements." Exhibit 20, incorporated herein.

3          70.  By January 2005, after many intermittent failures, J-M had achieved passing HDB

4   results in all of the three pipe sizes that UL required for its qualification of the new pipe design.

5   J-M provided the passing results to UL.  In so doing, however, J-M concealed from UL the

6   following material facts: (1) J-M had conducted other HDB tests on each of these pipe sizes, all

7   of which had failed; (2) to achieve the passing results, J-M had consulted Quick Burst test

8   results in deciding when to produce the specimens, altered its regular materials and process, and

9   prematurely stopped testing of specimens that would have produced failing results and

10  substituted new specimens in their place.

11         **2. <u>Sustained Pressure Test</u>**

12         71.  Another Test that measures the long-term radial tensile strength of PVC pipe is the

13  "Sustained Pressure Test" or "1,000 Hour Test."  Unlike HDB testing which measures 10

14  specimens at varying pressures for varying lengths of time up to 2,000 hours, the Sustained

15  Pressure Test measures five specimens at the same test pressure for 1,000 hours.  To pass, the

16  specimens must not "rupture, permanently distort, or weep" when subjected to the specified

17  pressure for 1,000 hours.  Exhibit 6.

18         72.  As described above, Sustained Pressure Testing is one of the three strength tests

19  UL required J-M to perform to qualify its no-thickened-section pipe for UL listing.  The

20  requirements for Sustained Pressure Testing appear in Section 18 of the UL 1285 Standard.

21  Like Longitudinal Tensile-Strength Testing, Sustained Pressure Testing is one of UL's

22  Performance Tests and UL requires that the specimens tested must be representative of the

23  manufacturer's materials, design and processing.  Like HDB Testing, Sustained Pressure

24  Testing requires special equipment and is typically performed by an independent, certified

25  laboratory.

26         73.  In outlining its requirements for qualifying the no-thickened-section pipe, UL

27  informed J-M that it would observe J-M's Sustained Pressure Testing.  Because of the length of

28  the test, which lasts 1,000 hours/41.6 days, UL only required a UL observer to be present at the

{00004910; 8}

1  beginning, middle and end of the testing.

2      74.   Because UL would be observing portions of the Sustained Pressure Tests, J-M

3  wanted to ensure that the specimens it sent Charles Stanley at Universal Laboratories for testing

4  would actually pass the test.  To accomplish this, J-M made multiple specimens from each 20

5  foot section of no-thickened-section pipe it specially produced.  J-M subjected the first 10

6  specimens from each lot to the HDB testing described above.  If the specimens produced a

7  passing HDB result, J-M would then send other specimens from that same lot to Universal

8  Laboratories for the Sustained Pressure Testing.  Since the specimens had passed HDB testing,

9  which is the most demanding of pipe quality, J-M could be confident that other specimens from

10  that lot would also pass the less onerous Sustained Pressure Testing.

11      75.   Once it had passed HDB testing for a particular size of non-thickened-section pipe,

12  J-M sent Universal Laboratories for Sustained Pressure Testing additional specimens from the

13  same lot as the passing HDB specimens.  In that way, J-M was able to pass all of the Sustained

14  Pressure Tests witnessed by UL observers for the two pipe sizes UL required – Blue Brute 4-

15  inch DR 14 and 4-inch DR 18.

16      76.   At no time during the course of these Sustained Pressure Tests did J-M disclose to

17  the UL observer that J-M had specially produced each of the test specimens using materials and

18  processing that were not representative of J-M's actual manufacturing process.  J-M also

19  concealed from UL the fact that the test specimens had not been chosen at random but instead

20  were selected from lots that had produced passing HDB test results.

21      **3. Quick Burst Test**

22      77.   The third and final strength test that UL required for J-M to qualify its no-

23  thickened-section pipe was the Quick Burst Test.  The Quick Burst Test is designed to measure

24  the short-term radial strength characteristics of the pipe.  The requirements for the Quick Burst

25  Test are contained in Section 4.3.3.2 of the AWWA C900 Standard.  Broadly described, Section

26  4.3.3.2 provides that a pipe specimen must be able to attain a hydrostatic stress of 6,400 psi

27  within 60 to 70 seconds of being pressurized.  See Exhibit 12.

28      78.   The Quick Burst Test is a routine quality control test that J-M is required to

FIRST AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

{00004910; 8}

1  perform daily at each of its plants at the start-up of the extruder and following any change in

2  operating conditions. Given the frequency with which this test is required to be performed, J-M

3  has test equipment in each of its plants and performs the tests itself.

4      79.  In outlining the requirements needed to qualify J-M's no-thickened-section pipe,

5  UL informed J-M that it would come to J-M's plant to observe each of the Quick Burst Tests on

6  the various sizes of its Blue Brute DR 14 and DR 18 no-thickened-section pipe. Because a UL

7  representative would be observing the tests, J-M again took steps to try and ensure that the

8  specimens would pass while UL was watching.

9      80.  Because the Quick Burst Tests were the last of the three strength tests required for

10  UL listing, at the time it performed the Quick Burst Tests, J-M had already received passing

11  results in both the HDB and Sustained Pressure Testing. In choosing specimens for the Quick

12  Burst Testing, J-M selected specimens from the same lots as the specimens that had produced

13  the passing results on the HDB and Sustained Pressure Tests.

14      81.  For added insurance, J-M also ran some internal Quick Burst Tests on a few of the

15  specimens from the selected lots to be doubly certain that the specimens would pass while UL

16  watched. Using this approach, J-M passed the Quick Burst Tests for all but one of the sizes of

17  its Blue Brute DR 14 and DR 18 no-thickened-section pipe. In the case of the Blue Brute

18  specimens in size 12-inch DR 14, however, J-M failed four consecutive Quick Burst Tests while

19  UL observed before ultimately getting a passing result. On October 26, 2005, Will Fassler told

20  Relator that J-M had only obtained the passing result using a thickened-, instead of a no-

21  thickened-, section pipe. See Exhibit 21, incorporated herein. According to Mr. Fassler, the

22  pipe was measured "while UL wasn't really paying attention and the test pressure calc[ulation]

23  wasn't properly computed on the accurate measurements." Id. In short, J-M gained UL listing

24  for the new design in size 12-inch DR 14 using a specimen from the old design.

25      82.  To prevent UL from investigating the real source of these four failures (i.e., the

26  three "cost-cutting" measures and their negative effect on tensile strength), J-M blamed the four

27  failures on illusory problems with the test equipment. Specifically, J-M attributed the failures to

28  the end caps that are inserted into either end of the specimen to create a seal so it can be

{00004910; 8}

1  pressurized. J-M told Jerry Kirkpatrick, UL's representative observing the tests, that the end

2  caps had not sealed properly, were too old and were not good for the new pipe design. All of

3  these statements were false.

4      83.  At no time during the Quick Burst Testing did J-M inform UL's Jerry Kirkpatrick

5  that it had prepared the specimens using materials and production rates that are not

6  representative of J-M's manufacturing process or that it had not chosen the specimens at random

7  but instead selected them based on the fact that they came from lots that had already passed the

8  HDB and Sustained Pressure Testing. Nor did J-M inform UL that it only passed the fifth test

9  using the original thickened-section pipe design (and an improperly calculated test pressure) as

10  opposed to the new design. J-M also concealed from UL the real reason for the four tensile

11  strength failures, i.e., that J-M's "cost-cutting" measures had decreased the tensile strength of its

12  pipe.

13      **4. J-M Authorizes Production of No-Thickened-Section Pipe**

14      84.  In early 2005, shortly after he began raising concerns with J-M management about

15  the excessive swelling and failing HDB test results of the no-thickened-section pipe and

16  expressed doubts about the tensile strength of J-M's existing PVC pipe (which was made from

17  the same process and compound), Relator was removed from the No-Thickened-Section Project.

18  Over the intervening year before the Project was completed, Will Fassler and K.C. Yang

19  continued to keep Relator apprised of the status of the Project, including the results of all of the

20  testing performed since Relator was removed.

21      85.  In the Spring of 2005, upon learning that J-M managers were about to recommend

22  that J-M start to produce the no-thickened-section pipe in spite of all the failing results, Relator

23  raised a series of objections to J-M management. Among other things, Relator cautioned that, at

24  a minimum, the newly designed pipe should only be produced at the two plants that produced

25  the passing results for UL and those two plants should use the same slow production rates and

26  higher quality materials that they had used to specially produce the passing samples. Relator

27  also insisted that, once it was produced and before it shipped, the new pipe must be subjected to

28  a series of quality control tests to ensure its conformance to the tensile strength requirements.

25

{00004910; 8}

1   Given the force and strength of Relator's objections, some of Relator's managers ultimately

2   were persuaded to include Relator's precautions in their recommendations for the production of

3   the new no-thickened-section pipe.

4        86.   On April 29, 2005, Will Fassler prepared an Internal Recommendation and/or

5   Authorization ("IRA") recommending that J-M begin preparations to produce the no-thickened-

6   section pipe starting May 16. See Exhibit 20. By April 29, UL had given J-M oral approval to

7   start producing the no-thickened-section pipe in all sizes of Blue Brute DR 14 and DR 18,

8   except for 12-inch DR 14, on May 16. Because J-M had received so many failing test results in

9   the process of obtaining the UL listing, Mr. Fassler was careful to point out that the no-

10  thickened-section pipe only passed the tests because of "suitable materials and workmanship"

11  and therefore those same materials and level of workmanship must be used as J-M begins to

12  produce the newly designed pipe.

13       87.   Barry Lin and Kaushal Rao, J-M's Director and Assistant Director of Production,

14  were equally cautious in their approvals of the new pipe. Both men gave their approval on the

15  condition that J-M would take certain precautions to protect against the tensile strength failures

16  that the UL qualification testing had revealed. In the block provided on the IRA for his

17  authorization and signature, Mr. Lin wrote "In consideration of several test failures to non-thick-

18  section project do propose to have PWI [J-M's Wilton, Iowa plant] & PFO [J-M's Fontana,

19  California plant] to produce non-thick-section product first. After both plants successfully

20  produce C-900 product, then do will apply to all plants." Exhibit 20. Similarly, in his

21  signature/authorization block, Mr. Rao wrote "R&D should also concentrate on one plant & test

22  the pipe produced under different conditions such as regrind material used in prod.; various

23  speeds & production rates for production & test the pipe on a continuous basis." Id.

24       88.   On May 16, 2005, ignoring the reservations expressed by the three managers, J-M's

25  President Walter Wang authorized production of no-thickened-section pipe for J-M's Blue Brute

26  PVC pipe in size DR 18 at all of J-M's 11 PVC producing plants starting June 1, 2005. See

27  Exhibit 20. Despite explicit advice from Will Fassler, Barry Lin and Kaushal Rao, President

28  Wang did not limit the production to the two plants that had successfully produced the passing

26

{00004910; 8}

1   specimens.  Nor did he seek to ensure that the pipe is produced using the same materials and

2   processing that J-M had used in producing the qualifying specimens or make any provision for

3   testing the new pipe as it is being produced to monitor quality.  Despite the fact that its new pipe

4   had failed many of the qualifying tensile strength tests, J-M began manufacturing the new pipe

5   without implementing a single safeguard.

6   ### 5. UL's Qualification of J-M's No-Thickened-Section Pipe

7       89.   On May 19, 2005, UL issued J-M its formal written "Notice of Authorization to

8   Apply the UL Mark."  Exhibit 22, incorporated herein.  In this authorization, UL expressly

9   states that its authorization to apply the UL Listing Mark only extends to those products that are

10  constructed in an identical manner to the subject models that were submitted to UL for this

11  investigation.  Id.  The letter goes on to say "Products that bear the UL Mark shall be identical

12  to those that were evaluated by UL and found to comply with UL's requirements.  If changes in

13  construction are discovered, appropriate action will be taken for products not in conformance

14  with UL's requirements and continued use of the UL Mark may be withdrawn."  Id.

15      90.   J-M began producing its Blue Brute DR 18 pipe on June 1, 2005.  Although UL

16  also had authorized J-M to apply the UL Mark to its Blue Brute PVC pipe in all sizes of DR 14

17  except for 12-inch, J-M decided to wait until it received UL authorization for the remaining size

18  before it commenced production of any DR 14 pipe.  In October 2005, UL provided J-M with its

19  authorization for 12-inch DR 14 pipe and J-M began producing all sizes of no-thickened-section

20  DR 14 immediately thereafter.

21      91.   Having refused to adopt any of the precautions recommended by its managers, J-M

22  began producing the new pipe using the same "cost cutting" measures it had employed with its

23  existing pipe.  As the various test results revealed, pipe created using inferior ingredients,

24  accelerated production rates and improper tooling fails tensile strength testing more than 50

25  percent of the time.  Had it been aware of the failing test results and J-M's tampering with the

26  testing, UL would not have given the pipe UL listing in the first place and would have

27  withdrawn any UL listing had it known that the precautions that had been taken to produce the

28  passing results (slowing production rates and substituting higher quality ingredients) were not

27

{00004910; 8}

1    being taken with the everyday production of the pipe.

2    C.   **J-M's False Representations Regarding UL Listing and UL Compliance**

3         92.   Despite its knowledge (beginning at least in 1997) that well over half of its PVC

4    pipe failed to meet the longitudinal tensile-strength requirements of UL 1285 and its knowledge

5    (as of at least June 1, 2005) that its new no-thickened-section pipe had a similar failure rate, J-M

6    continued to represent to its distributors and customers, including Real Parties, that its PVC pipe

7    is UL listed. In its catalogs, J-M states for both its Blue Brute and Big Blue PVC Pipe that it "is

8    Underwriters Laboratories Listed" and has a tensile strength of 7,000 psi. Exhibit 23,

9    incorporated herein. In the previous version of its website (dated 9/8/05), J-M stated that all

10   classes of both its Blue Brute and Big Blue pressure pipe "are UL listed for water mains."

11   Exhibit 24, incorporated herein. Except for those pipes painted purple for Reclaimed Water or

12   green for Sewer, J-M has continued to mark the outside surface of each length of its Blue Brute

13   and Big Blue pipe with the UL Mark. See Exhibit 25, incorporated herein.

14        93.   J-M also has continued to provide certifications to its individual customers that its

15   Blue Brute and Big Blue PVC pipe has been manufactured in accordance with the requirements

16   of UL 1285. Exhibit 26, incorporated herein, contains examples of certification letters J-M

17   provided its customers regarding Blue Brute's and Big Blue's compliance with the UL Standard

18   and listing.

19        94.   At all times relevant to this Complaint, Real Parties, like other governmental

20   entities and water distribution systems, have required that all pipes for use in underground fire

21   service systems be UL 1285 listed. Exhibit 27, incorporated herein, contains examples of

22   specifications from various government entities in which UL listing is required for pipe used in

23   fire services. In addition to requiring UL listing for PVC pipe used in fire services, many of the

24   Real Parties, like other governmental entities and water distribution systems, also require that all

25   PVC pipe for use in their water distribution mains or water transmission lines shall be approved

26   by Underwriters Laboratories, Inc. and marked with the UL logo. Exhibit 28, incorporated

27   herein, contains examples of specifications from governmental entities, including some Real

28   Parties, for UL listing of PVC pipe used in water mains and transmission lines Governmental

{00004910; 8}

entities, including Real Parties, often require UL listing of J-M PVC pipe by requiring projects to comply with National Fire Protection Association ("NFPA") Standard 24, excerpts of which are attached hereto and incorporated herein as Exhibit 43. For example, the federal Department of Defense global specifications for Fire Protection Engineering for Facilities require that water distribution systems be designed in accordance with "NFPA 24, Installation of Private Fire Service Mains and Their Appurtenances." Ex. 44 (Unified Facilities Criteria (UFC): Fire Protection Engineering For Facilities, Sept. 26, 2006, Section 3-7, "Water Distribution Systems," paragraph 3-7.1, "Distribution Mains"). NFPA 24 applies to "combined service mains used to carry water for fire service and other uses." Ex. 43 (NFPA 24 at § 1.1.2.). NFPA 24 requires that PVC pipe be "listed" for fire protection service and comply with certain standards, such as AWWA C900. See Ex. 43, NFPA 24 at § 3.2.4, § 10.1.1 & Annex A § A.10.1.1. The requirement to be "listed" in this context encompasses UL and FM listings for fire protection because UL and FM are capable of inspecting and testing pipe for fire protection services. See Ex. 43, NFPA 24 at § 3.2.4 & Annex A § A.3.2.4; Ex. 6, UL 1285 § 10.1 & § 21.1; Ex. 49, FM 1612 §§ 1.1.1 & 1.1.2. Many cities and governmental localities, including Real Parties, require NFPA 24 compliance for fire protection service. See e.g., Exs. 27 & 52. The only means by which J-M can claim compliance with NFPA 24's "fire listing" requirement are through its claims of UL listing and/or FM approval (discussed infra ¶ 151).

## VI.  J-M'S SALE OF SUBSTANDARD PVC PIPE THAT DOES NOT MEET AWWA AND ASTM D2241 REQUIREMENTS

95.   The American Water Works Association ("AWWA"), an organization in which J-M has always been a member, has promulgated standards governing the physical and chemical properties, including required tensile strength, of PVC Pressure Pipe for water (potable and reclaimed) and forced-sewer transport. AWWA Standard C900 applies to 4-inch through 12-inch diameter PVC Pressure Pipe for distribution, and AWWA C905 applies to 14-inch through 48-inch diameter PVC Pressure Pipe used for transmission and distribution. See Exhibit 12.

96.   Before AWWA standards for modern urban projects came into prominence, the prevailing industry standard governing PVC pressure pipe was ASTM D2241. See Exhibit 45,

{00004910; 8}

incorporated herein. ASTM International (originally known as the American Society for Testing and Materials) ("ASTM") is one of the largest standards organizations in the world. ASTM's mission statement includes the development of standards to "promote public health and safety" and to "contribute to the reliability of materials, products, systems and services." ASTM standards are widely used and incorporated into other industry standards as well as government contracts and specifications. Many manufacturers, including J-M, represent that their products have been manufactured and tested in conformance with ASTM standards by so indicating on the product itself, or in marketing or other labeling materials. J-M markets and sells its ASTM D2241 pipe both as "IPS" pipe (IPS refers to Iron Pipe Size), and "PIP" pipe (referring to Plastic Irrigation Pipe). This complaint refers to IPS pipe (which includes potable water, reclaimed water, and forced-sewer IPS pipe) and PIP pipe collectively as "ASTM D2241 pipe." Although AWWA controls most new urban piping installations, ASTM D2241 pipe continues to be used in substantial amounts, especially in rural applications.

97. Like AWWA C900, ASTM D2241 sets minimal requirements for the physical and chemical properties of PVC pressure pipe for water transport (potable and reclaimed) and for forced-sewer applications. For all purposes relevant to this complaint, ASTM D2241 pipe is made with the same ingredients and processed in the same manner and on the same equipment as AWWA C900/C905 pipe. Moreover, the pertinent requirements of ASTM D2241 are substantively the same as the requirements of AWWA C900/C905, as further shown below. Therefore, the various J-M manufacturing practices that resulted in its failure to meet standards requirements apply equally to both AWWA C900/C905 and ASTM D2241 pipe. Relator has knowledge of J-M pipe manufacturing failures both in the field and in the laboratory for ASTM D2241 pipe as well as AWWA pipe.

98. At all times relevant to this Complaint, Real Parties, like other governmental entities with water and sewer systems, have required that PVC pressure pipe for use in their systems comply with or exceed the standards described in AWWA Standards C900/C905 or ASTM Standard D2241. See Exhibits 28, 29 & 51, incorporated herein. AWWA and ASTM D2241 Standards are the universal standards applied in the PVC pressure pipe industry. The

30

{00004910; 8}

standards organizations UL and FM (FM discussed infra) do not cover sewer and reclaimed-water pipe. J-M, therefore, does not mark its forced-sewer or reclaimed water pipe with UL or FM marks, but it does mark such pipe as compliant with AWWA C900, AWWA C905, or ASTM D2241. Compliance with the requirements of AWWA or ASTM D2241 is so consistent and widespread in this country that the requirement of compliance is understood by domestic purchasers and sellers of water works products regardless of whether it is stated expressly.

99. Relator is unaware of any domestic PVC pipe manufacturer or distributor who openly offers to sell PVC pressure pipe in the dimension ratios ("DR"s) and standard dimension ratios ("SDR"s) offered by J-M that does not claim to comply with AWWA Standards C900 or C905 or ASTM Standard D2241. Nor is Relator aware of any domestic water or forced-sewer system that knowingly permits the purchase of PVC pipe that does not comply with the tensile strength requirements of AWWA C900/C905 or ASTM D2241. Real Parties would never have knowingly purchased PVC pressure pipe for use in their water and sewer systems that did not comply with AWWA or ASTM D2241 standards.

100. To be compliant with the standards, PVC pressure pipe must satisfy certain strength and extrusion-quality tests set forth in AWWA C900/C905 and ASTM D2241, including without limitation (1) Cell Class Testing, (2) HDB Testing, (3) Sustained Pressure Testing, (4) Quick Burst Testing and (5) Acetone-Immersion Testing. For all purposes relevant to this complaint, the requirements of these tests are substantively identical for both AWWA C900/C905 and ASTM D2241. Broadly described, the purpose of these tests is to ensure PVC pipe will withstand varying pressures over both short and long periods without leaking. These tests are also meant to ensure that J-M's production pipe is representative of the pipe that originally qualified for the standards, as mandated within the requirements of AWWA C900/905 and ASTM D2241. However, because of its "cost cutting" and "productivity" measures described in section IV above, J-M has repeatedly failed each of these tensile strength tests from at least 1997 to the present.

A. **Cell Class Testing**

101. PVC compounds are identified by a numerical classification system in which each

number corresponds to a cell in a Table that identifies the particular property and the minimum required value for that property. AWWA C900/C905 and ASTM D2241 require that the compound from which PVC pipe is made shall equal or exceed "cell class 12454" as defined in ASTM D1784. Exhibits 12 & 45. In describing the classification system, ASTM D1784 states that the third number in the designation corresponds to the compound's tensile strength requirements. See Exhibit 30, incorporated herein. For cell class 12454, the third number of the designation is 4, which translates to a required tensile strength of 7,000 psi. Id.

102. In addition to providing the physical properties that each cell class must have, ASTM D1784 also prescribes the method by which the specimens for testing compliance with these requirements shall be prepared. Until February 1997, ASTM D1784 only provided one way of preparing the specimens and that was by compression molding. See Exhibit 31, incorporated herein. To prepare a sample by compression molding, separate sheets of PVC compound or pipe are pressed together between two metal drums to form a laminate.

103. However, beginning in February 1997, ASTM D1784 was revised to include two additional specimen preparation methods. Instead of just compression-molded specimens, ASTM D1784 provided that compliance with the cell classification requirements "shall be determined with compression-molded, extruded, or injection-molded test specimens for . . . tensile strength." Exhibit 32 at Section 10, incorporated herein.

104. In the Spring of 1997, Doug Boitz, J-M's former Product Assurance Manager, contacted members of ASTM D20.15, the Committee responsible for amending ASTM D1784, for guidance regarding the proper interpretation of the amendments to Section 10, the section on specimen preparation. Following his consultation with the Committee members, Mr. Boitz wrote an internal memorandum to Barry Lin, J-M's Director of Production, discussing what he had learned. See Exhibit 33, incorporated herein.

105. In this memo, dated May 5, 1997, Mr. Boitz states that the Committee's intent for the change is "to create the ability for manufacturers of extruded or injection molded products to have samples of materials for testing that are representative of the products, which they are producing." Exhibit 33. In other words, the Committee intended that manufacturers of extruded

32

1  products use an extruded sample for testing, while manufacturers of compression-molded

2  products use a compression-molded test sample. The Committee's reasoning, Mr. Boitz said,

3  was "that the processing can greatly affect the properties and quality of the material or

4  compound." Id. Since J-M produces its PVC pipe by extrusion, Boitz concluded that ASTM

5  D1784 now required J-M also to prepare its specimens by extrusion "so that the results obtained

6  from finished products are not significantly different than the tested specimens." Id. At the end

7  of the memo, Mr. Boitz recommends to Mr. Lin that J-M's Research and Development Division

8  be notified of this issue so that it can amend J-M's sample preparation methods to include

9  extruded samples. Id.

10  106. Despite this clear statement from the ASTM Committee Members that J-M, as a

11  manufacturer of extruded pipe, must use extruded specimens for purposes of cell class testing,

12  Relator has information and believes that J-M has continued to use compression molding as one

13  of the primary means of sample preparation for its cell class testing from February 1997 through

14  the present. The reason for J-M's allegiance to the compression-molded specimens is that its J-

15  M 90 compound performs better and yields higher tensile strength results under the

16  compression-molding process than can be obtained via extrusion. With the use of compression-

17  molded samples, J-M was able to artificially boost its tensile strength results and thereby

18  conceal the fact that its actual tensile strengths are below the minimum 7,000 psi required by

19  AWWA C900/C905 and by ASTM D2241.

20  107. Two third-party certifiers, International Association of Plumbing and Mechanical

21  Officials ("IAPMO") and NSF International ("NSF"), require J-M to submit to annual cell class

22  testing, which includes tests to confirm that J-M's PVC pipe meets a minimum tensile strength

23  of 7,000 psi. By contrast, AWWA and ASTM, which operate on an honor system, do not

24  require manufacturers to submit to testing or audits. Relying on the good faith of the

25  manufacturers, AWWA and ASTM operate on the assumption that a manufacturer that

26  represents its parts as being compliant will have regularly performed the necessary tests listed in

27  the standards to ensure that its parts comply and will only sell compliant products.

28  108. In preparing its samples for the annual IAPMO and NSF cell class testing, J-M

FIRST AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS
{00004910; 8}

1  followed many of the same practices it had used in preparing samples for UL qualification of its

2  no-thickened-section pipe. That is, J-M followed a manufacturing process that was not

3  representative of the actual conditions under which its PVC pipe is ordinarily made. J-M had

4  Will Fassler, a senior engineer in its Research and Development Department, specially prepare

5  the samples using compression molding, as opposed to extrusion, with an extraordinary degree

6  of care and precision. As with its UL qualification testing of the no-thickened-section pipe, J-M

7  prepared multiple specimens from each lot and sent a subset of these samples to outside

8  laboratories to confirm that when IAPMO or NSF tested the other samples they would meet the

9  required minimum tensile strength of 7,000 psi.

10      109. Even with the advantages gained by special preparation and use of compression-

11  molded samples, J-M only barely met the minimum requirement of 7,000 psi in the 2005 annual

12  cell class test performed for IAMPO and had failed tensile strength in previous years' annual

13  IAMPO and NSF testing. Exhibit 34, incorporated herein, is a copy of a test report from CRT

14  Laboratories, Inc. describing cell class testing performed for IAPMO in June 2005 on J-M

15  compression-molded samples. While the samples were found to meet the minimum cell class

16  requirements of cell class 12464, the tensile strength results of 7,081 psi were only slightly

17  above the minimum requirement of 7,000 psi. Exhibit 34.

18      110. On multiple occasions, including as recently as September 13, 2005, K.C. Yang, J-

19  M's former Corporate Quality Control Supervisor, told Relator that, without the benefit of

20  compression molding and special preparation, J-M's PVC pipe compound actually has a

21  maximum tensile strength of approximately 6,700 psi. Yang cited "extrusion conditions" (i.e.,

22  J-M's accelerated production rate and improper tooling and maintenance of its extruders) as the

23  reason for J-M's inability to satisfy the tensile strength requirements of cell class 12454.

24  Exhibit 35 (Relator's notes dated 9/13/05), incorporated herein.

25  **B. HDB Testing**

26      111. As described herein at section V.B. (¶¶ 50-58), to qualify J-M's new, no-thickened-

27  section pipe for UL listing, UL required J-M to satisfy the hydrostatic design basis ("HDB")

28  requirements specified in Section 4.3.2.2(b) of AWWA C900 and C905. As described herein at

section V.B.1. (¶¶ 50-70) and section V.B.4 (¶¶ 84-88), J-M began producing no-thickened-section pipe on June 1, 2005 despite the fact that it had test results showing that the pipe failed the HDB testing required by AWWA C900 and C905 more than 50 percent of the time.  As a result, it is more likely than not purchasers of J-M's no-thickened-section Blue Brute PVC pipe, including Real Parties, have received pipe that fails to comply with the HDB requirements of AWWA C900 and C905.

112. As applied to J-M's PVC pressure pipe, AWWA C900/C905 and ASTM D2241 contain the same HDB requirement: that the pipe be manufactured to meet an HDB category of 4,000 psi.  See Ex. 45.  J-M's difficulties with satisfying the HDB requirements predate the production of its no-thickened-section AWWA C900 pipe.  J-M also has had difficulty satisfying the HDB requirements under J-M's original pipe design (i.e., J-M's thickened-section Blue Brute and Big Blue PVC pipe) and the HDB requirement of its ASTM D2241 pipe.  For instance, as discussed in paragraph 59, on November 14, 2003, Will Fassler cited as one of the impediments to the success of the No-Thickened-Section Project the fact that J-M had been experiencing failures in the HDB testing on its existing pipe.  See Exhibit 16.  Relator has information and believes that despite these failing test results, J-M has never rejected or scrapped a PVC pipe for having failed HDB testing.

113. In the 1980s, the Plastic Pipe Section of Johns-Manville, the predecessor company to J-M, promulgated a series of product specifications, many of which were more stringent than applicable industry standards and customer specifications.  Johns-Manville included assurances of adherence to these company specifications in its express warranty.  When it was founded in 1982, J-M continued to maintain the company specifications Johns-Manville had created and included them in its warranty.

114. One of these product specifications, J-M Specification No. PL-25 for 4-inch through 12-inch PVC Plastic Blue Brute pipe, required the pipe to meet a minimum quick burst stress of 7,200 psi, which was significantly higher than AWWA C900's requirement of 6,400 psi.  J-M had the same requirement -- a minimum quick burst stress of 7,200 -- for its ASTM D2241 pipe.  One of the primary reasons for the more stringent requirement was to ensure that

1    J-M's PVC pipe would meet the required HDB tensile strength category. In other words, if the

2    PVC pipe withstood a stress of 7,200 psi during the 60-second Quick Burst Test, it would be

3    more likely to pass the required HDB category of 4,000 psi during the subsequent HDB testing.

4    Conversely, if the PVC pipe failed below 7,200 psi during the Quick Burst Test, it would be at

5    risk of failing to meet the HDB category of 4,000 psi. If the pipe failed below 7,000 psi during

6    the Quick Burst Test, it probably would not meet the HDB category of 4,000 psi. As described

7    in paragraphs 60 through 61 above, since the Quick Burst testing always precedes the HDB

8    testing, the Quick Burst results can provide an early indication of whether the pipe will pass

9    HDB.

10   115. However, on November 19, 2004, J-M revised Specification No. PL-25 to lower

11   the short-term burst pressure requirement to the 6,400 psi required by AWWA C900 because it

12   could no longer meet the higher J-M pressure requirement of 7,200 psi. Exhibit 36,

13   incorporated herein, is a red-lined copy of Specification No. PL-25 reflecting the revision to the

14   lower 6,400 psi requirement. J-M also revised its quick-burst pressure requirement for ASTM

15   D2241 pipe. J-M made this revision knowing that by lowering the quick burst pressure

16   requirement it would no longer be able to meet the HDB test requirements of AWWA

17   C900/C905 and ASTM D2241. Despite this knowledge, before making this revision, J-M did

18   not perform any testing to determine its effect on HDB.

19   **C.  Sustained Pressure Testing**

20   116. As described herein at section V.B.2. (¶¶ 71-76), to qualify J-M's new, no-

21   thickened-section pipe for UL listing, UL required J-M to demonstrate the pipe could pass the

22   Sustained Pressure Test specified in Section 18 of UL 1285. As further described in section

23   V.B.2. ((¶¶ 71-76), J-M was only able to pass this test by resorting to the following fraudulent

24   practices: (1) preparing its samples using materials and processing conditions that were vastly

25   superior to those J-M actually used in its day-to-day manufacturing of pipe; (2) cherry picking

26   samples from lots that had produced passing HDB test results to increase the likelihood they

27   will pass in front of UL; and (3) concealing these facts from UL, other standards and certifying

28   organizations and J-M's distributors and customers. Despite the fact it had improperly

36

{00004910; 8}

1   manipulated the test materials and conditions of the Sustained Pressure Testing to mask the

2   underlying tensile strength problems with the pipe, J-M began producing no-thickened-section

3   pipe on June 1, 2005.

4       117. The Sustained Pressure Test contained in Section 18 of UL 1285 is substantively

5   identical to the Sustained Pressure Test required by sections 4.3.3.1 and 5.1.3 of AWWA C900.

6   See Exhibits 6 & 12. Accordingly, in addition to violating UL 1285, J-M also violated AWWA

7   C900 when it engaged in the three fraudulent practices described above while performing the

8   Sustained Pressure Test on its new, no-thickened-section pipe. As a result of these practices,

9   since June 1, 2005 (the date J-M began producing no-thickened-section pipe), it is more likely

10  than not purchasers of J-M's no-thickened-section Blue Brute PVC pipe, including Real Parties,

11  have received pipe that (when tested properly with representative samples) fails to comply with

12  the Sustained Pressure Test requirements of AWWA C900.

13      118. Over a year before it performed the Sustained Pressure Tests described above on its

14  no-thickened-section pipe, J-M had received reports of its existing PVC pipe failing Sustained

15  Pressure Testing performed for NSF. NSF's and AWWA's C900/C905 Sustained Pressure Test

16  requirement is substantively identical to the Sustained Pressure Test required by sections 6.2

17  and 8.4 of ASTM D2241. As discussed in paragraph 59, on November 14, 2003, Will Fassler

18  cited as one of the impediments to the success of the No-Thickened-Section Project the fact that

19  "[r]ecently, pipe from some facilities has failed sustained pressure testing at NSF." Exhibit 16.

20  Relator has information and believes that despite these failing test results, J-M has never

21  rejected or scrapped a PVC pipe for having failed Sustained Pressure Testing.

22  **D.  Quick Burst Testing**

23      119. As described herein at section V.B.3. (¶¶ 77-83), to qualify J-M's new, no-

24  thickened-section pipe for UL listing, UL required J-M to demonstrate the pipe could pass the

25  Quick Burst Test specified in Section 4.3.3.2 of AWWA C900, which is substantively the same

26  as Section 8.5 of ASTM D2241. As further described in section V.B.2. ((¶¶ 71-76), J-M failed

27  several of the Quick Burst Tests and ultimately was only able to pass this test by resorting to the

28  following fraudulent practices: (1) preparing its samples using materials and processing

37

{00004910; 8}

1   conditions that were vastly superior to those J-M actually used in its day-to-day manufacturing

2   of pipe; (2) cherry picking samples from lots that had produced passing HDB and Sustained-

3   Pressure-Testing test results to increase the likelihood they will pass in front of UL; and (3)

4   concealing these facts from UL, other standards and certifying organizations and J-M's

5   distributors and customers. Despite the fact it had improperly manipulated the test materials and

6   conditions of the Quick Burst Test to mask the underlying tensile-strength problems with the

7   pipe, J-M began producing no-thickened-section pipe on June 1, 2005. As a result, it is more

8   likely than not purchasers of J-M's no-thickened-section Blue Brute PVC pipe, including Real

9   Parties, have received pipe that fails to comply with the Quick Burst requirements of AWWA

10  C900.

11         120. Well over a year before it performed the Quick Burst Tests described above on its

12  no-thickened-section pipe, J-M had knowledge that its existing PVC pipe was failing the Quick

13  Burst Tests performed daily for purposes of AWWA C900 and ASTM D2241 at each of its 11

14  PVC pipe plants. By at least early 2004, Relator, K.C. Yang, and Will Fassler began to receive

15  word from the Quality Control Supervisors at J-M's 11 Plants producing PVC pipe that their

16  respective Plant Managers were overriding reject tags and sending out PVC pipe that the

17  Quality Control Supervisors had rejected for failing the daily Quick Burst tests. Relator

18  personally had received three such complaints from Michael Henderson, the Quality Control

19  Supervisor at the Butner, North Carolina Plant, Armondo Martinez, the Quality Control

20  Supervisor at the Fontana, California Plant, and Joe Soliz, the Quality Control Supervisor at the

21  Wharton, Texas Plant.

22         121. To try and address this and other burgeoning quality-control problems, K.C. Yang,

23  at that time J-M's newly appointed Corporate Quality Control Supervisor, called a meeting of

24  all of the Quality Control Supervisors from each of J-M's 11 PVC-pipe Plants. In addition to

25  K.C. Yang and the 11 Quality Control Supervisors, the other attendees were Relator, Kaushal

26  Rao, Will Fassler, and Beryl Nadia and Lenor Chang, both of whom worked for Fassler. At this

27  meeting, which was held at J-M's Pueblo, Colorado Plant in the Spring of 2004, the Quality

28  Control Supervisors told stories of having rejected PVC pipe for failing daily Quick Burst Tests

{00004910; 8}

1   and then being instructed by their respective Plant Managers to continue to test the pipe until
2   they get a passing result. Since a pipe's tensile strength and other properties gradually increase
3   or stabilize as it is allowed to cool and harden, it often took the Quality Control Supervisors
4   several days and repeated testing to achieve a passing result. However, such repeated testing of
5   individual samples is expressly prohibited by Section 5.1.4 of AWWA C900, which provides
6   that specimens are to be tested "at the beginning of production of each specific material and
7   each size" and thereafter every 24 hours. Exhibit 12. ASTM D2241 permits certain retesting
8   only by agreement between the purchaser and seller of the pipe. Exhibit 45 at Section 9.1.

9       122. Once a passing result was obtained, the Quality Control Supervisors said the Plant
10  Managers would instruct them to release and ship the pipe despite the fact that it may have
11  failed four out of five Quick Burst Tests. J-M Plant Managers, whose bonuses are based on the
12  amount of pipe the plant produces, are loath to reject pipe since rejected pipe cannot be included
13  in the plant's production figures and thereby has the effect of taking money out of their pockets.

14      123. At the Pueblo meeting, K.C. Yang and Frank Padilla provided the Quality Control
15  Supervisors with a review of the proper test methods to be followed when performing the daily
16  Quick Burst Test contained in standards AWWA C900 and ASTM D2241. (The standards, in
17  turn, state that the testing must be performed in accordance with ASTM D1599.) This
18  presentation focused on the method prescribed in ASTM D1599 for determining the amount of
19  test pressure to apply to the pipe sample in order to achieve the required 6,400 psi of quick-burst
20  stress in the pipe wall (hereafter "Calculated Test Pressure"). To determine the Calculated Test
21  Pressure, Yang emphasized that ASTM D1599 required the Quality Control Supervisors to
22  measure the minimum wall thickness of the actual pipe sample. See Exhibit 37, incorporated
23  herein.

24      124. After setting out these requirements, Yang quickly learned that except for Frank
25  Padilla, Quality Control Supervisor at the Pueblo, Colorado Plant, the Quality Control
26  Supervisors at the remaining 10 Plants were all doing the calculation wrong. Instead of
27  measuring the wall thickness of the actual pipe sample, the Quality Control Supervisors at the
28  other 10 plants were simply relying on the minimum wall thicknesses listed in Table 1 of

AWWA C900 and Table 2 of ASTM D2241 (collectively, "the Tables") for a generic pipe of the same size and pressure class as the sample. However, the wall of the pipe J-M produces invariably is thicker than that of a generic pipe listed in the Tables. Therefore, by relying on the measurement supplied in the Tables instead of actually measuring the wall thickness of the pipe sample, the Quality Control Supervisors of the 10 plants were subjecting the samples to a smaller Calculated Test Pressure than what is required by ASTM D1599.

125. When K.C. Yang informed the Quality Control Supervisors that they could no longer rely on the minimum wall thicknesses supplied in the Tables and had to measure the actual pipe samples being tested, they strenuously objected. The Quality Control Supervisors admitted they had enough trouble achieving the required 6,400 psi of stress in the pipe wall even with the benefit gained from the smaller Calculated Test Pressure. If they performed the tests correctly (i.e., and measured the minimum wall thickness of the actual pipe samples), the Quality Control Supervisors complained, they would stand little to no chance of achieving 6,400 psi and passing the Quick Burst Tests. As the comments of the Quality Control Supervisors make clear, J-M routinely caused PVC pipe to be shipped to its customers, including Real Parties, that failed to meet the requirements of the Quick Burst Testing specified in AWWA C900 and ASTM D2241.

126. Following this meeting, K.C. Yang sought to change the management structure to have the Quality Control Supervisors report to the Corporate Quality Control Supervisor instead of their respective Plant Managers. By so doing, Yang hoped to make it less likely that the Plant Managers would be able to override decisions by the Quality Control Supervisors to reject non-conforming pipe. Yang's request was denied. Despite the considerable problems raised by the Quality Control Supervisors at the Pueblo meeting regarding the short-term tensile strength of its PVC pipe, J-M did not take any steps to address the root cause of the problem and curb the "cost cutting" measures described herein at section IV. Yang left J-M in October 2005 out of frustration for repeatedly being stymied in his efforts to improve the quality of J-M's products.

## E. Acetone Immersion Testing

127. AWWA C900/C905 and ASTM D2241 require manufacturers to subject their PVC

1   pipe to routine acetone-immersion testing as specified in ASTM D2152. Exhibits 12 & 45.

2   Broadly described, Acetone-Immersion Testing measures "extrusion quality," i.e., how well the

3   extruder processed the PVC compound in forming the pipe. Id. Under ASTM D2152, the pipe

4   sample is required to be immersed in acetone that is at least 99.8 percent pure. See Exhibit 38,

5   incorporated herein. If the sample has been processed well, the acetone will not attack it.

6   However, if the sample has been processed poorly, the acetone will cause it to flake. A sample

7   that shows at least 50 percent attack of the inside, outside, or mid-wall surface of the sample or

8   at least 10 percent attack on more than one surface of the sample has failed the test. Id.

9       128. Because it rapidly absorbs moisture from the air, acetone can quickly become

10  diluted if it is left out in an unsealed container and exposed to air. As acetone is diluted, its

11  ability to attack pipe samples decreases. ASTM D2152 requires that the acetone used for testing

12  contains no more than 0.2 percent water by mass. Exhibit 38. If a particular container of

13  acetone has more than 0.2 percent water, the excess water can be removed with a drying agent.

14      129. J-M did not take adequate safeguards to ensure the integrity of the acetone used in

15  its routine Acetone-Immersion Tests. For instance, J-M regularly stored its acetone in drums

16  with the lids off. Instead of having no more than two percent water, the acetone J-M regularly

17  used for its testing contained an excessive percentage of water. Although J-M easily could have

18  used a drying agent to remove the excess water, the Plant Managers typically did not want to

19  spend the money for such reagents. Instead, by testing with diluted acetone, J-M was able to

20  obtain passing test results for specimens that would have failed had they been tested using

21  undiluted acetone.

22      130. Even with the benefit gained by using diluted acetone, J-M routinely failed its

23  Acetone-Immersion Tests. At the Pueblo meeting described above, many of the Quality Control

24  Supervisors reported repeated instances of their Plant Managers overriding reject tags and

25  sending out PVC pipe that the Quality Control Supervisors had rejected for failing the routine

26  Acetone-Immersion Tests required by the standards. Relator has information and believes that

27  despite these failing test results, J-M has never rejected or scrapped a PVC pipe for having

28  failed Acetone Immersion Testing.

{00004910; 8}

**F. J-M's False Representations Regarding AWWA and ASTM D2241 Compliance**

131. As the world's leading supplier of PVC pipe, J-M is acutely aware of the importance of AWWA and ASTM D2241 compliance to its customers, including Real Parties. In its product catalogs and sales literature and on its website, J-M repeatedly describes its PVC pipe as meeting AWWA and ASTM D2241 requirements and a longitudinal tensile strength of 7,000 psi. For example, in the section of its catalog dedicated to its Blue Brute PVC pipe, J-M references Blue Brute's compliance with AWWA C900 four times. On the cover page for this section, beside the words Blue Brute, J-M states "Meets AWWA C900." Exhibit 23. The first line of the first page states "J-M's Blue Brute Pipe conforms to the AWWA C900 specification . . ." Id. That same page has a box that prominently states "MEETS AWWA C900." Finally, in a table entitled "Typical Physical and Chemical Properties and Capacities," J-M cites AWWA C900 as the standard governing its Blue Brute PVC Pipe and notes AWWA C900's tensile strength requirement of 7,000 psi. The section of J-M's catalog relating to its Big Blue PVC pipe follow an identical format to Blue Brute's except that it references Big Blue's conformance with AWWA C905 as opposed to C900.

132. Similarly, in its catalogs for PVC IPS Pressure Rated Pipe, J-M references its claimed compliance with ASTM D2241 several times. On the cover page for this pipe, beside the words "I.P.S. Pressure," J-M states "MEETS ASTM D2241." Exhibit 46. The first line of the first page describing the pipe states "J-M Manufacturing's (J-MM) I.P.S. Pressure PVC Pipe conforms to ASTM D 2241." Id. In the catalog's Short Form Specification, J-M again states that the "pipe shall meet the requirements of ATSM D 2241." Id. In a table entitled "Typical Physical and Chemical Properties and Capacities," J-M cites ASTM D2241 as the government standard and notes the tensile strength requirement of 7,000 psi. Id. J-M's catalog for Irrigation PIP Pipe makes similar representations, including claimed compliance with ASTM D2241 and the 7,000 psi tensile strength requirement. Exhibit 47.

133. As alleged in detail above, the statements in J-M's catalogs, websites and sales literature regarding compliance with AWWA and ASTM D2241 standards and the tensile strength requirement of 7,000 psi were patently false. At no time did J-M ever distribute a

42

{00004910; 8}

1  catalog or sales or advertising literature that revealed its substandard tensile strength results in

2  over half of the tensile strength tests performed since 1997.  Nor did J-M otherwise inform its

3  customers, including Real Parties, of its substandard tensile strength.

4  **VII.  J-M'S SALE OF SUBSTANDARD PVC PIPE BEARING FM MARK DESPITE**

5       **KNOWLEDGE THAT PIPE DOES NOT QUALIFY FOR FM LISTING**

6       134.  FM Approvals, a division of FM Global (formerly Factory Mutual) ("FM"),

7  certifies a range of products that meet its approval standards for, inter alia, fire protection and

8  loss prevention.  Once a product is tested and found to conform to FM's requirements, FM

9  issues the "FM APPROVED" mark for the product, signifying that it meets certain performance

10  requirements.  Entities that use FM-approved goods rely on the representation that the products

11  and manufacturing practices conform to the standards and specification-testing required.

12       135.  FM has promulgated a standard governing PVC pipe for use in underground fire

13  service water mains.  Until 1999, the pertinent FM Standard was FM 1610.  Ex. 48.  In 1999,

14  FM updated the applicable standard, providing more detail and segregation of the various

15  standards for underground plastic pipe; the updated standard was renumbered FM 1612.  Ex. 49.

16  Because the pertinent requirements are substantially the same, FM 1610 and FM 1612 will be

17  referred to collectively as "FM 1612."  FM Standard 1612 (effective date April 30, 2000 for full

18  compliance), "Approval Standard for Polyvinyl Chloride (PVC) Pipe and Fittings for

19  Underground Fire Protection Service," governs FM approval and listing of PVC pipe for fire

20  service.

21       136.  FM 1612 lists a variety of requirements that must be met for PVC pipe to be FM

22  Approved, including initial qualification testing and ongoing manufacturing testing.  Its

23  requirements are categorized as General Requirements, Performance Requirements, and

24  Operations Requirements.  The standard requires that "[a]ll FM Approval testing is to be

25  conducted on production samples," and "[i]t is the manufacturer's responsibility to submit

26  samples representative of production."  Ex. 49 at Sections 1.2.3. & 2.3; *see also* Section 3.2.8

27  ("Testing shall use production pipe and fittings assembled according to the manufacturer's

28  published instructions.").

43

{00004910; 8}

1     137. One of FM's Performance Requirements is that the product in fact meet the criteria

2     of any other standards the product purports to satisfy, whether in "design, manufacture, or

3     performance." Ex. 49 at Section 4.2.1. A manufacturer must "submit to FM Approvals a copy

4     of the relevant standard(s), along with drawings, specifications, and other documents necessary

5     to confirm compliance [with the other standard(s)]. FM Approvals shall verify that all

6     requirements of that standard are met." Ex. 49 at Section 4.2.2. FM explains that "[t]he intent

7     of the requirement is that PVC pipe and fittings conform to any recognized standard to which

8     they are manufactured." Id. at Section 4.2.1. In this way, FM incorporates the pertinent

9     requirements of AWWA, UL, and ASTM, and J-M's failures and deceptions with respect to

10    those standards also constitute failures and deceptions with respect to FM. In addition to failing

11    to comply with FM requirements through its other industry standard failures, as discussed below

12    J-M independently fails the substantive requirements of FM. During time periods pertinent to

13    this complaint, J-M represented that certain of its AWWA C900 and C905 pipe were

14    legitimately FM approved (as further detailed below).

15    138. FM's Operations Requirements include a demonstrated Quality Control Program

16    and Manufacturing and Production Tests which must be run at manufacturing sites. Ex. 49 at

17    Sections 5, 5.1, & 5.4. The manufacturer is also required to "notify FM Approvals of changes

18    in product construction, design, components, raw materials, physical characteristics, coatings,

19    component formulation or quality assurance procedures prior to implementation of such

20    changes." Ex. 49 at Section 5.3. Three of the quality-control manufacturing tests that FM

21    requires are Extrusion Quality, Quick Burst, and Sustained Pressure, which are substantively

22    identical to the tests described elsewhere in this Complaint. Id. at Sections 5.4.4., 5.4.5 & 5.4.6.

23    **A.  Cell Class Testing**

24    141. Among the "General Requirements" for PVC pipe to be FM Approved is the

25    requirement that the pipe "be Class 12454 A or B as defined in ASTM D1784." Ex. 49 at

26    Section 3.2.4. Class 12454 as so defined imposes a tensile strength requirement of 7,000 psi, as

27    more fully described herein at Paragraph 99. As fully described herein at Sections V.A. (¶¶ 31-

28    49) and VI.A. (¶¶ 102-111), J-M's manufacturing practices were such that its actual tensile

{00004910; 8}

1  strengths were below the minimum 7,000 psi required to qualify as Class 12454 and required to

2  comply with UL 1285 (which requirements are incorporated into FM 1612), therefore violating

3  FM Standard 1612. Despite its knowledge of these manufacturing failures, J-M continued to

4  produce its pipe under these conditions.

## B. HDB Testing

6      142. Another FM 1612 General Requirement is that the pipe be assigned a certain

7  Hydrostatic Design Basis (HDB) value as derived from tests conducted per ASTM D1598, and

8  evaluated per ASTM D2837. Ex. 49 at Section 3.2.3.   FM's HDB requirements incorporate

9  the HDB requirements contained in Section 4.3.2.2(b) of AWWA C900 and C905, described

10  herein at Section V.B.1. (¶¶ 56-58). Ex. 49 at Sections 1.2.3 & 4.2. As described fully herein at

11  Section V.B (¶¶ 112-116), J-M's manufacturing practices resulted in numerous repeated failures

12  of HDB testing. Relator has information about the failed HDB testing, including knowledge of

13  failures during the time period in which J-M was attempting to obtain FM Approval, and

14  believes that despite these failing test results, J-M continued to release its pipe for sale and

15  distribution.

## C. Sustained Pressure Testing

17      143. FM requires the Sustained Pressure Test to be run on C900 products, per ASTM

18  D1598, at pressures substantively identical to both UL's Sustained Pressure Test requirements

19  (Section 18 of UL 1285) and AWWA's requirements (Sections 4.3.3.1 and 5.1.3 of AWWA

20  C900). *See* Exhs. 6, 12 & 49 at Section 5.4.6. As explained more fully herein at Sections V.B.2

21  (¶¶ 71 -76) and VI.C. (¶¶ 117 – 119), J-M was only able to pass the Sustained Pressure Test to

22  meet AWWA and UL requirements by resorting to fraudulent practices such as using materials

23  and processes vastly superior to their day-to-day manufacturing counterparts, cherry picking

24  samples from certain pre-tested production lots, and concealing these facts from standards

25  organizations, distributors and other customers. *See* ¶ 117, herein. Thus, in addition to

26  violating UL 1285 and AWWA C900, J-M also violated FM 1612 when engaging in these

27  fraudulent practices while performing the Sustained Pressure Test on its new, no-thickened-

28  section pipe. *See* ¶ 118, herein. J-M also failed the Sustained Pressure Test for its earlier,

45

{00004910; 8}

1   thickened-section pipe, but as described herein at Paragraph 116, despite these failing test

2   results, J-M has never rejected or scrapped a PVC pipe for having failed Sustained Pressure

3   Testing.

4   **D.  Quick Burst Testing**

5           144. FM 1612's Performance Requirements include the Quick-Burst Strength Test.

6   FM's Quick Burst Strength Test (described in Section 4.3 of Ex. 49) for AWWA C900 product

7   is substantively identical to the Quick Burst Test requirements contained in AWWA's C900

8   Standard, Section 4.3.3.2. J-M long has had knowledge (at least since 1997 or 1998) that its

9   pipe (both pre- and post-No Thickened Section project) was regularly failing the daily Quick

10  Burst Tests required by AWWA C900 and FM 1612.

11          145. As described herein at Section V.B.3 (¶¶ 77-83), well after it knew of the

12  continuing failures to pass the daily Quick Burst Tests, J-M resorted to fraudulent acts to

13  manipulate a passing Quick Burst Test under UL observation for its no-thickened-section pipe;

14  such acts included substituting thicker pipe for the test, manipulating test pressure, pre-testing

15  pipe, and selecting pipe from lots which had already passed other strength tests. Those lots,

16  however, had produced passing results on other tests only because J-M fashioned "special run"

17  conditions for optimal processing: slowing regular production rates and adjusting typical

18  temperatures and torque. *See supra* ¶¶ 68, 74, 80. J-M engaged in similar activity to "pass"

19  FM's Quick Burst Tests from approximately 1997 through November 2000, when FM withdrew

20  approval of J-M products.

21          146. FM 1612 also has a stand-alone Quick Burst Test for C905 pipe, which is larger in

22  diameter than C900. The test for C905 pipe is very similar to the test for C900 pipe, but adjusts

23  the hydrostatic pressure values required during the 60 to 70 seconds of the test. Ex. 49 at

24  Section 4.3.1 (Table 4.3.2b). J-M C905 pipe could not withstand the pressures required by the

25  FM Quick Burst Test. For example, during the time J-M employed Relator, AWWA standards

26  required J-M pipe to pass certain pressure tests on its C905 pipe joints per ASTM 3139,

27  including subjecting the joints to pressures at the "quick burst" levels reflected in Table 4.3.2b

28  of the FM requirements. Ex. 49 at Section 4.3.1. The C905 joints shattered at these quick burst

FIRST AMENDED COMPLAINT FOR VIOLATION OF FEDERAL
& STATE FALSE CLAIMS ACTS

{00004910; 8}

1    levels at least two times before J-M was able to obtain a passing result, which it obtained only

2    through deviating production variables (extrusion conditions, materials), as fully explained

3    above. The manufacturing problems that pertain to J-M's C900 product are even more

4    pronounced in its larger-diameter C905 products. The larger diameter products require thicker

5    walls, and the thicker the pipe, the more difficult it is to form the melted PVC compound and

6    cool the pipe in the water tanks. As more fully described herein at Section IV.C. (¶¶ 21 – 25),

7    J-M's accelerated production rates resulted in less processing time in the extruder and die while

8    the pipe was hot, and inappropriate duration in the cooling baths to form and strengthen. The

9    result, in combination with J-M's additional "cost-cutting" measures (see ¶¶ 18 – 31), was to

10   further weaken the pipe and create locked-in stresses. *See* ¶ 25 herein. Where these processing

11   deficiencies resulted in substandard C900 product, they resulted even more so in substandard

12   C905 product.

13          147. Additionally, FM's quality control testing requirements demand the Quick Burst

14   test to be conducted per ASTM D1599 on AWWA C900 pipe, including the bell, at the

15   beginning of production of each size and class of pipe, and thereafter every 24 hours. Ex. 49 at

16   Section 5.4.5. As described more fully herein at Sections V.B.3 (¶¶ 77 - 83) and VI.D. (¶¶ 120

17   – 127), rather than adjust manufacturing practices to meet the Quick Burst Test requirements,

18   J-M violated the standards by, *inter alia*, knowingly continuing to miscalculate the test pressure

19   required, repeatedly testing the same product over time, or overriding reject tags and releasing

20   the non-conforming pipe (¶¶ 121-127). J-M regularly failed properly to administer the routine

21   Quick Burst tests, had knowledge of such failures, and nonetheless released such product for

22   sale.

23   **E.   Acetone Immersion Testing**

24          148. FM 1612's Extrusion Quality test is the acetone-immersion test that must be

25   conducted as specified in ASTM D2152. FM requires this test to be run at the beginning of

26   production of each size and class of pipe, and thereafter every 8 hours. Ex. 49 at Section 5.4.4.

27   For the reasons stated fully herein at Section VI.E. (¶¶ 128 – 131), J-M inadequately

28   safeguarded the integrity of the acetone and regularly tested its C900 and C905 products with

47

1   diluted acetone. J-M was thus able to "pass" specimens that would have failed had they been

2   tested using undiluted acetone. *See* ¶ 130 herein. Even with diluted acetone, J-M routinely

3   failed the acetone-immersion (Extrusion Quality) tests, overrode reject tags, and sent out the

4   non-conforming pipe. *See* ¶ 131 herein.

5         149. For these reasons, J-M violated various FM's 1612 manufacturing requirements for

6   both AWWA C900 and C905 products. Despite its knowledge of the repeated manufacturing

7   failures resulting in these violations, J-M continued to release such product for sale and

8   distribution.

9   **F.  J-M's False Representations Regarding FM Listing and FM Compliance**

10         150. Despite its knowledge (beginning at least in 1997) that much of its PVC pipe

11   regularly failed to meet the various requirements of FM Standard 1612, and its knowledge (as of

12   at least June 1, 2005) that its new no-thickened-section pipe had a similar failure rate, J-M

13   represented to its distributors and other customers, including Real Parties, that its PVC pipe met

14   FM requirements. J-M represented that its AWWA C900 pipe (DR 14 and DR 18) and C905

15   pipe (14- & 16-inch DR 18) met FM approval standards from at least 1997 until November

16   2000, when J-M withdrew from the FM approval listing for all of its PVC products. Further, in

17   mid-2005, when its products were not listed as FM-approved, J-M represented on its website

18   that some of its products were FM-approved; even after this misrepresentation was brought to J-

19   M management's attention, J-M knowingly continued this false representation. When J-M

20   obtained reinstatement of FM Approval for some of its products in or around December 2006, J-

21   M began again to represent that its AWWA C900 (DR 14) PVC pipe was legitimately

22   FM-compliant. See Ex. 50. J-M used the "FM APPROVED" mark on the pipe that it claimed

23   complied with the FM standards. J-M also provided certifications to its individual customers

24   that its Blue Brute and Big Blue PVC pipe has been manufactured in accordance with the

25   requirements of FM 1612.

26         151. At times relevant to this Complaint, Real Parties, like other governmental entities

27   and water distribution systems, have required that pipes for use in underground fire protection

28   service systems be FM Approved pursuant to the requirements of FM 1610 (prior to 1999)

{00004910; 8}