Terry W. Bird - State Bar No. 49038
 twb@birdmarella.com
Ekwan E. Rhow - State Bar No. 174604
 eer@birdmarella.com
Paul S. Chan - State Bar No. 183406
 psc@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT,
 NESSIM, DROOKS & LINCENBERG, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant J-M
Manufacturing Company, Inc.
d/b/a JM Eagle

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES, THE STATES OF CALIFORNIA, DELAWARE, FLORIDA, ILLINOIS, INDIANA, NEVADA, NEW MEXICO, NEW YORK, and TENNESSEE, THE COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA, and THE DISTRICT OF COLUMBIA ex rel. JOHN HENDRIX,<br><br>        Plaintiffs,<br><br>        vs.<br><br>J-M MANUFACTURING COMPANY, INC. d/b/a JM EAGLE, a Delaware corporation, and FORMOSA PLASTICS CORPORATION, U.S.A., a Delaware corporation,<br><br>        Defendants. | CASE NO. ED CV 06-00055GW<br><br>Hon. George H. Wu<br><br>**J-M MANUFACTURING COMPANY, INC.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW TRIAL [F.R.C.P. RULES 50(b) & 59]; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**[Declaration of Paul S. Chan Filed Concurrently; Supplemental Declaration of Paul S. Chan Filed Under Seal]**<br><br>Date:    February 24, 2014<br>Time:   8:30 a.m.<br>Crtrm.: 10 |

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that defendant J-M Manufacturing Company, Inc. ("J-M") will and hereby does renew its motion for judgment as a matter of law, or alternatively, move for a new trial, pursuant to Federal Rules of Civil Procedure 50(b) and 59, on all claims asserted by plaintiffs City of Reno, Nevada ("Reno"), City of Norfolk, Virginia ("Norfolk"), Calleguas Municipal Water District ("Calleguas"), Palmdale Water District ("Palmdale") and South Tahoe Public Utility District ("South Tahoe") (collectively, "Plaintiffs") in this Phase One trial.

This motion is made on the grounds that Plaintiffs failed to submit substantial evidence of falsity, materiality, or scienter, as those elements are properly defined and understood in a conventional substandard-product case brought under the applicable False Claim Acts ("FCA"); and alternatively, (1) the Phase One verdict is unworkable and does nothing to streamline this litigation, including any Phase Two; (2) certain jury instructions were erroneous and insufficient; (3) the Phase One verdict is replete with factual inconsistencies and deficiencies; and (4) an enormous amount of irrelevant and prejudicial evidence was admitted in contravention of Federal Rules of Evidence 401-404.

This Motion is based on this notice, the attached memorandum of points and authorities, the Declaration of Paul S. Chan, the pleadings, records and files in this case, and such other matters that may be raised at the hearing.

DATED: January 14, 2014          Respectfully submitted,

BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS & LINCENBERG, P.C.

By:          /s/ Paul S. Chan
                    Paul S. Chan
          Attorneys for Defendant J-M Manufacturing
          Company, Inc. d/b/a JM Eagle

i

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION ............................................................................................... 1

II. PROCEDURAL HISTORY ............................................................................... 3

    A.    The Court bifurcated this case to allow the five representative Plaintiffs to attempt to prove certain FCA elements before proceeding with findings concerning "each individual Plaintiff." ............... 3

    B.    Plaintiffs subsequently proceeded on a "Conventional Substandard-Product" theory of liability, expressly disclaiming all other theories. ......... 3

    C.    The Court repeatedly warned Plaintiffs that any finding of "falsity" must be tied to the claims for payment and products that Plaintiffs received. ....................................................................................................... 6

    D.    The jury instructions insufficiently defined the "tying" aspect of falsity, allowing Plaintiffs to ditch their substandard-product theory and assert their "uniform compliance" theory ................................................. 8

    E.    At trial, Plaintiffs repeatedly admitted that they had no evidence that they had received non-compliant pipe—so they proposed a "uniform compliance" theory to mask their insufficient evidence .............. 9

    F.    The verdict reflected the jury's acceptance of Plaintiffs' abandonment of their substandard-products theory in favor of an unprecedented "uniform compliance" theory. ............................................. 13

III. MOTION FOR JUDGMENT AS A MATTER OF LAW ................................... 13

    B.    Standard of review ........................................................................................ 13

    C.    Plaintiffs failed to prove falsity .................................................................... 14

         1.    Plaintiffs conceded that they failed to prove the falsity element of their substandard-product FCA claim ............................ 14

         2.    Plaintiffs' "uniform compliance" theory is legally untenable, practically unworkable, and unsupported by substantial evidence ................................................................................. 17

              a.    Plaintiffs' "uniform compliance" theory transforms the FCA into a strict-liability statute—something that Congress never intended ............................................. 18

              b.    Plaintiffs' "uniform compliance" theory violates due process and casts constitutional doubt over the FCA. ........ 19

         3.    The jury's "uniform compliance" findings and verdict are factually unsupported because the industry standards that J-M promised to meet do *not* require perfect manufacturing consistency ............................................................................. 20

a.  A facial reading of the industry standards confirms J-M's reading of them and refutes Plaintiffs' misinterpretation. ........................................................ 21

b.  The trial testimony likewise supported J-M's reading of the industry standards and refuted Plaintiffs' reading. .......................................................................... 23

c.  Plaintiffs' "uniform compliance" theory is doomed by their concession that J-M's compound—the only arguably uniform part of the production process— was not substandard. .............................................. 25

D.  Plaintiffs failed to prove scienter. ........................................ 26

E.  Plaintiffs failed to prove materiality. .................................... 27

IV. MOTION FOR A NEW TRIAL .................................................... 28

A.  At a minimum, the Court should grant J-M a new trial ............... 28

B.  Standard of review ................................................................ 29

C.  The empty jury finding invited by Plaintiffs' counsel does not provide a factual basis for a Phase Two trial or achieve the goals of bifurcation. ........................................................................... 30

D.  A new trial is necessary to correct errors and insufficiencies in the jury instructions. .................................................................. 32

E.  A new trial also is necessary because the verdict suffers from glaring factual inconsistencies that render it legally erroneous. ................ 33

1.  The jury erroneously identified as "Claims For Payment" documents that simply are not claims for payment. ...................... 33

2.  The jury erroneously determined that J-M made "false representations of uniform compliance" in documents that do not contain any such representation. .................................... 34

3.  The jury erroneously found that J-M "knowingly" made false representations of uniform compliance to Plaintiffs based on documents and events unrelated to Plaintiffs or their projects. ........................................................................ 34

F.  A new trial is necessary because irrelevant and prejudicial evidence, including improper character/propensity evidence about J-M, was admitted and likely affected the verdict ................................. 35

1.  The Quick Burst 6400-psi requirement ............................... 35

2.  The pre-2008 UL 1285 tensile strength requirement ............. 36

3.  Quality control requirements ........................................... 38

ii

1

V. CONCLUSION..............................................................................................40

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW
TRIAL [F.R.C.P. RULES 50(b) & 59]

3077495.1

# TABLE OF AUTHORITIES

Page(s)

FEDERAL CASES

*Applied Med. Res. Corp. v. United States Surgical Corp.*,
549 F. Supp. 2d 1208 (C.D. Cal. 2008) ........................................................ 13

*Arthur Young & Co. v. U. S. Dist. Court*,
549 F.2d 686 (9th Cir. 1977) ...................................................................... 30

*Campbell v. Wood*,
18 F.3d 662 (9th Cir. 1994) ........................................................................ 38

*Cohn v. Papke*,
655 F.2d 191 (9th Cir. 1981) ...................................................................... 39

*Gasoline Prods. Co. v. Champlin Ref. Co.*,
283 U.S. 494 (1931) ................................................................................... 30

*Hagood v. Sonoma County Water Agency*,
81 F.3d 1465 (9th Cir. 1996) ..................................................................... 27

*Juneau Square Corp. v. First Wisconsin Nat'l Bank of Milwaukee*,
624 F.2d 798 (7th Cir. 1980) ........................................................ 14, 30, 32

*Lakeside-Scott v. Multnomah County*,
556 F.3d 797 (9th Cir. 2009) ..................................................................... 14

*Landes Const. Co., Inc. v. Royal Bank of Canada*,
833 F.2d 1365 (9th Cir. 1987) ................................................................... 29

*Murphy v. City of Long Beach*,
914 F.2d 183 (9th Cir. 1990) ..................................................................... 29

*Oregon v. Ashcroft*,
368 F.3d 1118 (9th Cir. 2004) ................................................................... 19

*Skilling v. United States*,
561 U.S. 358, 130 S. Ct. 2896 (2010) ....................................................... 19

*U.S. ex rel. Cericola v. Federal Nat'l Mortgage Ass'n*,
529 F. Supp. 2d 1139 (C.D. Cal. 2007) ..................................................... 17

*U.S. ex rel. Hendow v. Univ. of Phoenix*,
461 F.3d 1166 (9th Cir. 2006) ............................................................... 3, 4

iv

*U.S. ex rel. K&R Ltd. Partnership v. Mass. Housing Fin. Agency,*
   530 F.3d 980 (D.C. Cir. 2008) ................................................................... 27

*U.S. ex rel. Lusby v. Rolls-Royce Corp.,*
   No. 1:03-CV-680-SEB-WGH, 2012 WL 4357438
   (S.D. Ind. Sept. 24, 2012) ................................................................... 16, 17

*U.S. ex rel. McLean v. County of Santa Clara,*
   2011 WL 5223076 (N.D. Cal. Oct. 31, 2011) ........................................ 17

*U.S. ex. rel. Stebner v. Steward & Stevenson Services, Inc.,*
   305 F. Supp.2d 694 (S.D. Tex. 2004),
   *aff'd* 144 Fed. Appx. 389 (5th Cir. 2005) ...................................... 15, 16, 17

*United States ex rel. Aflatooni v. Kitsap Physicians Serv.,*
   314 F.3d 995 (9th Cir. 2002) .......................................................... 14, 15, 33

*United States ex rel. Cox v. General Dynamics Armament and Technical Products, Inc.,*
   No. 4:07CV3264, 2010 WL 2218614 (D. Neb. May 28, 2010) ................. 16

*United States ex rel. Crews v NCS Healthcare of Ill., Inc.,*
   460 F.3d 853 (7th Cir 2006) ..................................................................... 16

*United States ex rel. Klusmeier v. Bell Contractors, Inc.,*
   469 Fed. Appx. 718, 2012 WL 555736 (11th Cir. Feb. 21, 2012) ............ 16

*United States v. 4.0 Acres of Land,*
   175 F.3d 1133 (9th Cir. 1999) .................................................................. 29

*United States v. Banks,*
   556 F.3d 967 (9th Cir. 2009) .................................................................... 18

*United States v. Martinez,*
   182 F.3d 1107 (9th Cir. 1999) .................................................................. 39

*United States v. Williams,*
   553 U.S. 285, 128 S.Ct. 1830 (2008) ...................................................... 19

*Wang v. FMC Corp.,*
   975 F.2d 1412 (9th Cir. 1992) .................................................................. 18

**FEDERAL STATUTES**

18 U.S.C. § 1346 ......................................................................................... 19

31 U.S.C. § 3729(a)(1), (b)(1) .................................................................... 18

v

**RULES**

Fed. R. Civ. P. 50(a)(1) ................................................................. 13

Fed. R. Civ. P. 59 ........................................................................... 29

Fed R. Evid. 401-404............................................................29, 38, 39, 40

**CONSTITUTIONAL PROVISIONS**

Seventh Amendment...........................................................................2, 30

**OTHER AUTHORITIES**

11 Wright & Miller, Fed. Prac. & Proc. Civ. § 2805 (3d ed.) .......................... 29

11 Wright & Miller, Fed. Prac. & Proc. Civ. § 2801 (3d ed.) .......................... 29

John T. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 1.06 at 1-40 (4th ed. 2011) ...................................................................................3, 15

Merriam-Webster http://www.merriam-webster.com/dictionary/uniform................ 18

RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW TRIAL [F.R.C.P. RULES 50(b) & 59]

3077495.1

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The relevant False Claims Acts ("FCA") require (among other things) the presence of a false claim—a "call upon the government fisc"—for liability to attach. Substandard goods for which the defendant makes no "call upon the government fisc" are legally irrelevant because there is no false claim as to those goods. Over the course of these protracted proceedings, this Court repeatedly warned Plaintiffs that their failure to link any alleged misconduct by J-M to the claims for payment and products Plaintiffs actually received would prove fatal – because such misconduct "doesn't give rise to a False Claims Act claim unless there is something that really connects that conduct to a claim or to an invoice." Chan Decl., Ex. M (10/25/13 Tr. at 7556:22 – 7557:10).

But that is where this case ended up. After seven years of litigation and seven weeks of trial, Plaintiffs never proved that the goods that *they were asked to pay for* failed to comply with industry standards, either in terms of their physical properties or in the way they were manufactured or quality tested. Cross-examined under oath, Plaintiffs admitted that the pipe that J-M sold them might be fully compliant with industry standards; indeed, two of them continued to buy J-M pipe long after this suit. Thus, the link the Court repeatedly demanded that Plaintiffs establish was never shown. Their case ends here and now. The Court should grant judgment as a matter of law.

Recognizing that they could not prove the FCA substandard-goods case that they had promised, Plaintiffs, in closing, pulled out of their back pocket an unprecedented legal theory that they had been holding in reserve for such an eventuality. Their counsel cunningly exploited ambiguities in the jury instructions to argue that Plaintiffs had no burden to prove that the goods they were asked to pay for were noncompliant. Disclaiming any reliance upon the substandard-goods theory, counsel argued instead that J-M had sold Plaintiffs an iron-clad guarantee of absolute manufacturing consistency. Under this imaginary guarantee, J-M supposedly promises that every stick of pipe that it sells to everyone everywhere in the world complies with industry standards,

just as did the qualifying sample of pipe submitted to the standards agencies.  A product or testing failure anywhere in the world allegedly renders J-M strictly liable to every customer, including the vast majority who receive excellent and fully standards-compliant pipe.  This "uniform-compliance" theory conveniently solved Plaintiffs' evidentiary problem by relieving them of their burden to prove that J-M had falsely claimed payment *from them* for noncompliant pipe that *they* had purchased.

But Plaintiffs' uniform-compliance theory depends on an industry standard that does not exist, that no manufacturer could possibly meet or would ever agree to meet, that no public entity or other customer would ever expect, and that no industry testing agency has ever promulgated or enforced.  (Indeed, no such agency has ever delisted J-M.)  This fictitious industry standard also was completely at odds with the limited contractual warranty that J-M actually provides to its customers, including Plaintiffs.  The very existence of that warranty disproves any contention that Plaintiffs could have believed that they were purchasing a guarantee of absolute manufacturing consistency.

As explained below, Plaintiffs' uniform-compliance theory of FCA liability is both legally and factually untenable and must be rejected.  Accepting it would transform the statute into one imposing strict liability, deny defendants the fair notice that due process requires, distort industry standards (indeed, distort the very notion of industry standards), and unleash an unfair and unworkable new form of liability upon an already fragile national economy.

Although there is no likelihood that a retrial under any recognized FCA theory could result in liability, J-M also moves in the alternative for a new trial in which new jury instructions would categorically preclude the miscarriage of justice that occurred here.  At a bare minimum, retrial is necessary because the case was bifurcated so as to divide the unitary issue of falsity between two juries, a violation of the Seventh Amendment.  The bifurcation also resulted in an empty verdict that provides no factual basis sufficient to proceed with the damages phase of the trial.  If a retrial is deemed necessary, the Court also should exclude evidence of test results and product flaws that

1   have nothing to do with the pipe purchased by these Plaintiffs.

2       For all these reasons, as stated more fully below, the Court should grant judg-

3   ment as a matter of law in J-M's favor, or alternatively, grant J-M's new trial request.

## II.  PROCEDURAL HISTORY

**A.   The Court bifurcated this case to allow the five representative Plaintiffs to attempt to prove certain FCA elements before proceeding with findings concerning "each individual Plaintiff."**

At Plaintiffs' urging, and over J-M's objections, this Court bifurcated this case in December 2011.  Under the Bifurcation Order, the Phase One jury was to make certain findings as to the FCA elements of falsity, scienter, and materiality, so as to assist the Phase Two jury in making more specific findings "with respect to each individual Plain-tiff."  Chan Decl., Ex. A (Doc. No. 551 at 10 of 11).  The Bifurcation Order was prem-ised upon the Court's understanding (at the time) that Plaintiffs' "paradigm" was "basi-cally that ***all of the piping*** fails to meet these standards and requirements of the certi-fying agencies."  Chan Decl., Ex. B (9/26/11 Tr. at 6:1-3; emphasis added).  The Court cautioned that "if, in fact, the plaintiffs are wrong on their paradigm … their case is over."  Chan Decl., Ex. B (9/26/11 Tr. at 6:10-13).

**B.   Plaintiffs subsequently proceeded on a "Conventional Substandard-Product" theory of liability, expressly disclaiming all other theories.**

There are five recognized categories of FCA cases, each with its own require-ments for establishing liability.  John T. Boese, Civil False Claims and Qui Tam Actions § 1.06 at 1-40 (4th ed. 2011) ("Boese").[1]

---

[1] The five FCA liability theories are: (1) "substandard product or service" cases; (2) "false certification" cases; (3) "fraud-in-the-inducement" cases; (4) "mischarge" cases; and (5) "reverse false claim" cases.  Boese § 1.06 at 1-40.  Plaintiffs abandoned the "false certification" and "fraud-in-the-inducement" theories of FCA liability, presuma-bly to avoid meeting the additional evidentiary burdens that those theories entail. A "false certification" theory would have required proof that, among other things, J-M certified compliance with a statute or government regulation as a condition to govern-ment payment, and that such certification was a prerequisite to, and a *sine qua non* of, obtaining the government benefit.  *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166,

3

1    Among these is the so-called "substandard-product" case—a variant of the "ar-

2 chetypal" FCA case in which "a private company overcharges under a government

3 contract." *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006).

4 Such a case may be brought as a "Type 1" case (in which the claim for payment must

5 itself be false), or a "Type 2" case (in which the claim and a record or statement made

6 or used to get it paid must be false).  Chan Decl., Ex. C (Doc. No. 1792 (Court's Final

7 Jury Instructions) at 6-7 of 9).

8    After the case was bifurcated, Plaintiffs framed their Phase One case as a "con-

9 ventional" substandard-product claim, in which "the bills for payment were 'false

10 claims' because **the goods delivered** differed materially from what they were repre-

11 sented to be."  Chan Decl., Ex. D (Plaintiffs' 5/16/12 letter at 4; emphasis added).

12    One year before trial, Plaintiffs confirmed that their theory "is simply a conven-

13 tional False Claims Act claim **for delivery of 'substandard products**.'"  Chan Decl.,

14 Ex. E (Doc. No. 758-1 at 6-7 of 75; emphasis added); Ex. F (5/7/12 Tr. at 14:6-8;

15 14:25-15:5 (Plaintiffs' counsel: "This is a substandard product case …. If I tell you here

16 is this product and here is what it is, and I know it's not what I'm telling you it is, that's

17 just a substandard products case.")).  The day before trial, Plaintiffs reiterated that they

18 were not going to present a fraudulent-inducement theory in Phase One.  Chan Decl.,

19 Ex. G (9/16/13 Tr. at 26:22-23; 28:13-22 ("[W]e're not making that [fraudulent in-

20 ducement] argument here; we will make that argument in Phase 2.")).[2]

21    Plaintiffs thus committed themselves to a conventional substandard-product

22 1171-73 (9th Cir. 2006).   A "fraud-in-the-inducement" theory would have required

23 proof that, at the outset, the contract or extension of government benefit was originally

24 obtained by J-M through false statements or fraud, and that such false statements or

25 fraud were material to Plaintiffs at that time.  *Hendow*, 461 F.3d at 1173-74.  The "mis-

26 charge" and "reverse false claim" theories are inapplicable and were not pursued.

[2] Plaintiffs have never cited any support for their position that they can mix and match

27 theories of liability between Phases One and Two, such that they get the plaintiff-

28 friendly benefits of a given theory in one phase while evading the burdens of that theo-

ry in another phase.  J-M continues to object to Plaintiffs' inexcusable theory-switching.

4

1   theory.  As explained in Part III.C.1 below, that theory requires Plaintiffs to prove they
2   did not receive what they paid for—pipe that met the promised industry standards.

3       But Plaintiffs also tried to hedge their bets, articulating what they sometimes
4   called their "lottery ticket" theory, and by the end of trial were calling their "uniform
5   compliance" theory.  They invented this theory—unknown in the law books—to avoid
6   having to prove they had received non-compliant pipe.  Plaintiffs claimed that, because
7   J-M had promised to meet industry standards, and because those standards (supposed-
8   ly) required J-M to produce absolutely consistent pipe all the time, a failure to achieve
9   consistency in **any** pipe sold to ***anyone in the world*** rendered J-M's claims for pay-
10  ment to ***Plaintiffs*** false—even if the pipe that ***Plaintiffs*** had purchased was perfectly
11  fine.  In other words, if ***any one*** stick of J-M pipe ***anywhere*** failed to comply with in-
12  dustry standards, then ***all*** J-M pipe (not just the non-compliant stick) should be
13  deemed to be "falsely" marked / stamped because J-M had "falsely" represented that
14  "all" its pipe "uniformly complied" with industry standards.

15      On J-M's summary adjudication motion, the Court commented unfavorably on
16  this theory, warning Plaintiffs that the Court would hold them to the requirement that
17  they tie the alleged falsity to the products and claims for payment they had received:

18  - At the March 2013 hearing, the Court stated that: "[E]ven as to the [exemplar
19    Plaintiffs] in Phase 1, they have to establish that each plaintiff that's raising
20    that particular defect or manufacturing problem or false representation vis-à-
21    vis, you know, what's called for in the contract, that that particular plaintiff
22    has the standing to argue it by showing that, yes, we got this particular pipe
23    that we're complaining about or we got this pipe that was supposed to have
24    been manufactured in a particular way that was not manufactured in that par-
25    ticular way." Chan Decl., Ex. H (Doc. No. 851 at 13-14 of 33).

26  - In its March 2013 order, the Court similarly explained that: "Either each
27    plaintiff must demonstrate receipt (in connection with a claim) of an actually
28    defective product, or none of them do, but instead need only show it re-

5

1  ceived a product which was not subject to the quality testing as represented."

2  Chan Decl., Ex. I (Doc. No. 836 at 3 of 5 n.4).

3  Thus, while the Court recognized that a product may be "substandard" *either*

4  because it was itself defective *or* because it was not subjected to the required quality as-

5  surance testing (a point J-M does not dispute), the Court made clear that in order to tie

6  falsity to the claim, Plaintiffs would still need to show *actual receipt* of product that

7  did not comply with industry standards with respect to its manufacturing or testing.

8  **C.**  **The Court repeatedly warned Plaintiffs that any finding of "falsity" must be tied to the claims for payment and products that Plaintiffs received.**

9  Recognizing this legal tying requirement, and that this case is neither a false ad-

10  vertising nor a negligence case, the Court repeatedly warned Plaintiffs (both before and

11  during trial) that they would have to tie any alleged falsity to the particular claims for

12  payment and pipes they had received.  This included:

13  • **The day before trial started**: "[T]he F, M, and the S relate to the claim.

14  The F, M, and S aren't something that's separate. All those three concepts

15  relate to the claim; and if they're not related to the claim, then I would

16  think there would be a problem because, again, if that were the situation,

17  then it becomes some sort of *pseudo-strict liability requirement* which

18  is not required here … or something else." Chan Decl., Ex. G (9/16/13

19  Tr. at 39:7-16) (emphasis added).

20  • **The second day of trial:** "The problem is … that the falsity has to relate

21  to a claim and if the falsity is not related to a claim, what's the relevance

22  of that supposed falsity?" Chan Decl., Ex. J (9/18/13 Tr. at 513:1-5).

23  • **Three weeks into trial**: "It can't be a basis for the false claim. I hope you

24  recognize that because *it's going to be based on what [Plaintiffs]*

25  *purchased*, not on everything.  It's the basis of those claims.  You guys

26  chose -- you guys got exemplar plaintiffs.  You guys got to choose which

27  claims you wanted.  Those are the claims that we are litigating. We are not

28

6

3077495.1

litigating everything. I hope you recognize that." Chan Decl., Ex. K (10/7/13 Tr. at 3634:24 – 3635:7) (emphasis added).

- **Four weeks into trial**: "[T]he problem here is that this case is somewhat unique because the -- normally, it is so readily apparent what the falsity is in regards to the claim that, you know, you don't need any really further articulation. This one, however, is kind of like a bank shot. It's stuff in steps. But there has to be this connection between the falsity and the claim. But the falsity has to be part of the claim in some way." Chan Decl., Ex. L (10/21/13 Tr. at 6256:10-17).

- **Five weeks into trial:** "Well, but let me just caution you. The fact that there is a noncompliance would not necessarily give rise to a false claim even under the lottery theory … Now, the fact that, for example, that there may have been, you know, rumblings amongst personnel at J-M about plant managers removing tags from pipe that was designated initially as scrap, that doesn't give rise to a False Claims Act claim ***unless there is something that really connects that conduct to a claim or to an invoice.***" Chan Decl., Ex. M (10/25/13 Tr. at 7556:22 – 7557:10) (emphasis added).

- **Shortly before closing argument:** "[Y]ou have to not only reference the standard, but you have to reference the way in which the standard is involved in a claim to make it false or a statement upon which the claim rests to make the claim false." Chan Decl., Ex. N (11/1/13 Tr. at 57:4-8).

Plaintiffs nevertheless ignored these admonitions and continued to promise the Court that their "lottery-ticket" or "uniform compliance" theory would demonstrate the necessary link between the alleged falsity and the claims for payment and products Plaintiffs received.

**D.    The jury instructions insufficiently defined the "tying" aspect of falsity, allowing Plaintiffs to ditch their substandard-product theory and assert their "uniform compliance" theory.**

Before trial, the Court recognized that it would be necessary to define falsity (and the other elements) in this sprawling, complicated FCA case.  Chan Decl., Ex. G (9/16/13 Tr. at 39:7-16).  J-M proposed an elements jury instruction that, by tying falsity to the products received by Plaintiffs, would have defined falsity in accordance with (a) clearly established law in conventional substandard-products cases (summarized in Part III.C.1 below), and (b) the Court's own articulation of that law in its summary-adjudication order and repeated admonitions to Plaintiffs' counsel throughout the course of these proceedings.  J-M's proposed instruction stated:

> The claim presented itself was false (for Type 1 FCA claims), or the record/statement were false (for Type 2 FCA claims), "in that the PVC pipe made by J-M and actually received by each plaintiff in connection with the claim was actually defective or was not actually subject to quality testing as represented by J-M."

Chan Decl., Ex. O (Doc. No. 1554-3 at 4-5 of 37).

But the Court declined to give J-M's proposed instruction and instead simply instructed the jury that the claim and supporting record or statement had to "contain or [be] based upon an assertion that [was] untrue when made or when used."  Chan Decl., Ex. C (Doc. No. 1792 at 7 of 9).

Additionally, at Plaintiffs' urging, the Court instructed the jury that "[n]o showing of actual damage is required to establish a false or fraudulent claim for payment."  Chan Decl., Ex. C (Doc. No. 1792 at 8 of 9).  At the charging conference, the Court made clear that this instruction was only meant to explain that the jurors did not need to find the existence or amount of monetary damages when completing the Phase One verdict form.  Chan Decl., Ex. P (11/4/13 Tr. at 7725:22 – 7726:6).  J-M agreed that monetary damages, if any, were not at issue in Phase One.  But J-M objected to this instruction, accurately foreseeing that Plaintiffs would seize upon it to argue that—contrary to the law governing substandard-product cases—they need not even show that the J-M pipes they received were noncompliant.  Chan Decl., Ex. Q (Doc. No.

8

1   1756 at 2-3 of 4); Ex. P (11/4/13 Tr. at 7725:11 – 7727:23).  Nevertheless, the Court

2   gave the instruction.[3]

3   **E.    At trial, Plaintiffs repeatedly admitted that they had no evidence that they**
        **had received non-compliant pipe—so they proposed a "uniform**
4       **compliance" theory to mask their insufficient evidence.**

5       At trial, Plaintiffs' witnesses uniformly admitted that they had no evidence that

6   the specific pipe they received violated any industry standards.  For example:

7       • The representative for Norfolk, David Speer, admitted that it was possible

8           that "100 percent" of Norfolk's J-M pipe is "good pipe."  Chan Decl., Ex. R

9           (10/9/13 Tr. at 4370:18-4371:9, 4406:20-23).

10      • The representative for Palmdale, Matthew Knudsen, admitted that there is

11          "[n]o way to verify" whether Palmdale's J-M pipe met industry standards.

12          Chan Decl., Ex. S (10/8/13 Tr. at 4224:3-21).

13      • The representative for Reno, Terry Svetich, could not say whether Reno's J-

14          M pipe "does or does not meet" industry standards.  Chan Decl., Ex. T

15          (10/2/13 Tr. at 3381:22- 3382:16).

16      • Plaintiffs' standards experts, James Paschal and Rafael Ortega, both admitted

17          that they did not know whether Plaintiffs received J-M pipe that failed to

18          meet industry standards.  Chan Decl., Ex. U (9/20/13 Tr. at 1230:25-1231:9,

19          1233:6-10); Ex. R (10/9/13 Tr. at 4494:16-22).

20      Plaintiffs needed to put distance between this evidence and their previous sub-

21  standard-product theory, which clearly was going to fail.  Accordingly, ignoring the

22  Court's repeated rulings and admonitions, they argued in closing that their case was

23  "not about substandard products."  Chan Decl., Ex. V (11/6/13 Tr. at 8136:2-20).  Ra-

24  ther, they claimed, it was based on a failure to meet an alleged industry standard of ab-

25  solute manufacturing consistency.

26  _____

27  [3]   With regard to all jury instructions, J-M stood on its pre-trial proposed instructions
    and associated briefing, and objected to the Court's decision not to include those in-
28  structions. Chan Decl., Ex. P (11/4/13 Tr. at 7725:11-7727:23).

3077495.1

Plaintiffs cynically exploited the absence of a specific "tying" instruction to mislead the jury into wrongly believing that Plaintiffs had no burden to prove that their pipes failed to conform to industry standards:

> [J-M's counsel] told you there's no evidence the plaintiffs here got substandard pipe so they shouldn't recover …. Ladies and gentlemen, look at the jury instructions. ***The court will never instruct you anywhere that we have to show we got substandard pipe.*** This is not a products liability case. This is a False Claims Act case. All we need to show is that J-M misrepresented its products to our clients or caused someone to misrepresent them, to cause a false statement. This is a False Claims Act case. It is about false statements. It is not, no matter how many times [J-M's counsel] would say it or want you to believe it, ***it is not about substandard products and we do not have to show that in this phase of this case in order to prevail. That is nowhere in the jury instructions.***

Chan Decl., Ex. V (11/6/13 Tr. at 8136:2-20) (emphasis added).

As J-M had predicted, Plaintiffs also exploited the "no damage" instruction to argue that the jurors need not even consider whether Plaintiffs' pipe was compliant:

> ***There's nothing that requires you to figure out if a particular stick of pipe that's in the ground was falsely marked or not falsely marked.*** …
>
> Now, of course, we don't know exactly what pipes from which plants went to the plaintiff because J-M mixes it up. They sometimes ship from one plant, sometimes ship from another. ***But as the jury instruction tells you … we don't have to prove actual damage. So we don't have to prove which plant shipped pipe to us.***

Chan Decl., Ex. W (11/5/13 Tr. at 7944:5-10) (emphasis added); Ex. V (11/6/13 Tr. at 8148:25 – 8149:6) (emphasis added).

Citing Note 10 of the PPI TR-3 standard, Plaintiffs' counsel argued instead that J-M had sold Plaintiffs a guarantee that J-M employs "a process that continually manufactures the pipe" so that "***all of it***"—"***not just most of it***"—has "***the same***" long-term strength and durability as the originally qualified pipe.  Chan Decl., Ex. V (11/6/13 Tr. at 8144:19 – 8145:9) (emphasis added).

But Plaintiffs had a problem.  A liability theory that requires perfect manufacturing consistency makes no sense and would repel any reasonable jury.  Plaintiffs' counsel took steps to inoculate against this problem by rhetorically disclaiming the unattractive aspects of his own theory.  His false reassurances to the jury took several forms.

10

1.     **Of course we're not demanding perfection!**  Plaintiffs' counsel disingenuously denied that this "uniform compliance" theory demanded perfect consistency in manufacturing.  In the same breath, however, he asserted that the phrase "continually manufactured" in Note 10 "means all the time, not just some of the time."  Chan Decl., Ex. V (11/6/13 Tr. at 8145:20-8146:24) (Plaintiffs' counsel: "The point is ***not just some of it is good*** …. [Plaintiffs] were told: We manufacture our pipe in a certain way and it's a way that ensures that ***it's all good")*** (emphasis added).

2.     **But . . . J-M promised perfection.**  In a further mischaracterization of the evidence, Plaintiffs' counsel argued that J-M sold Plaintiffs a ***guarantee*** of manufacturing perfection, rather than a contractually-warrantied product subject to unintentional mistakes and variations in the manufacturing process:

> And that's not what you're paying for.  ***You're not paying for luck of the draw.***  When these plaintiffs bought pipe, they're not paying for luck of the draw … .
>
> The point is ***you're buying that guarantee of consistency.  That's why it's a false statement if you say to people:  Our pipe is consistently made in this way, all of it.***

Chan Decl., Ex. V (11/6/13 Tr. at 8147:13-24) (emphasis added).

3.     **Don't worry—all a manufacturer has to do is "follow the rules."**  With equal lack of candor, Plaintiffs' counsel argued that all a manufacturer has to do to satisfy Plaintiffs' fictional standard of perfect manufacturing consistency is to just "follow the rules all of the time"—which was nothing more than another (disguised) way of demanding perfection.  Chan Decl., Ex. W (11/5/13 Tr. at 7816:19-7817:2); Ex. V (11/6/13 Tr. at 8087:17-19).

4.     **A manufacturer has nothing to fear as long as it doesn't pretend to be perfect.**  Plaintiffs' counsel conflated the falsity and scienter elements by arguing that J-M did not cross the line into falsity if its manufacturing was merely "subject to normal human error," but did cross that line if it committed a "reckless or knowing violation" – meaning if it ***knew*** it could not manufacture pipe with perfect consistency:

> The point is you're buying that guarantee of consistency.  That's why it's a

3077495.1

1    false statement if you say to people:  Our pipe is consistently made in this
2    way, all of it. And again, everybody understands it's subject to normal
     human error. What it's not subject to is recklessness or knowing violation.

3    Chan Decl., Ex. V (11/6/13 Tr. at 8147:21-8148:2).

4         Of course, no manufacturer's processes or outcomes are perfect, and every
5    manufacturer knows that.[4]

6         **5.    J-M made bad pipe.  For somebody.  Sometime.  Somewhere.**  Plain-
7    tiffs' counsel tried to support their "uniform compliance" theory by citing evidence of
8    internal J-M test results—***none*** of which linked a false statement by J-M to the specific
9    pipe for which J-M had sought payment.  Plaintiffs' primary argument was that J-M's
10   internal quick-burst, tensile-strength, and HDB test results had supposedly declined
11   over time.   Chan Decl., Ex. V (11/6/13 Tr. at 8162:24-8163:3).   As noted in Part
12   IV.F.1, however, Plaintiffs' evidence of a "decline" in quick burst results was based up-
13   on an artificial 7200-psi benchmark—not the industry standard 6400-psi requirement,
14   which J-M passed over 99% of the time.  And virtually all of Plaintiffs' evidence relat-
15   ing to tensile strength and HDB results stemmed from internal R&D and qualification
16   tests of pipe that was never commercialized or sold with agency markings / stamps.

17        Plaintiffs presented zero evidence that any of these internal R&D or qualification
18   results—or any "declining" test results—were linked to any pipe actually purchased by
19   any Plaintiff or any claim for payment actually submitted to any Plaintiff.

20   / / /
21   / / /

22

23   _____
     [4] Plaintiffs' conflation of these two elements was disingenuous and prejudicial to J-M.
24   In a substandard-products case, a defendant makes a false statement if it delivers a sub-
     standard product (even through normal human error) but calls it standard compliant.
25   Concepts such as "recklessness" or "knowing" go only to the separate (and subse-
     quent) element of scienter, not to whether the statement was false in the first place.
26   But by intentionally confusing these two elements, Plaintiffs won an erroneous finding
     of falsity—despite the total absence of proof that they received noncompliant prod-
27   uct—just by acknowledging that they also had to prove scienter.
28
                                          12

**F.    The verdict reflected the jury's acceptance of Plaintiffs' abandonment of their substandard-products theory in favor of an unprecedented "uniform compliance" theory.**

Plaintiffs' counsel urged the jury to complete the verdict form by finding that J-M had in each instance made the same allegedly false representation: a representation of "uniform compliance" with industry standards.  The jury did as instructed and found a false representation of "uniform compliance" with respect to all five Plaintiffs, twenty-six projects, and the numerous alleged claims for payment on those projects.  This was the exclusive basis for the liability verdict.  Chan Decl., Ex. X (Doc. No. 1794).  The jury was not asked to, and did not, find that Plaintiffs had received something other than what J-M had asked them to pay for—pipe that met the promised standards.

## III.  MOTION FOR JUDGMENT AS A MATTER OF LAW

**A.    The Court should grant judgment for J-M as a matter of law because Plaintiffs submitted no substantial evidence of falsity, knowledge, or materiality under the FCA.**

Judgment as a matter of law is warranted because Plaintiffs did not and cannot prove any of the three elements tried in Phase One, as those elements are properly defined and understood in a conventional substandard-product case.

**B.    Standard of review.**

"If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 50(a)(1).  A court should "grant a JMOL motion when there is a 'complete absence of probative facts to support the conclusion reached so that no reasonable juror could have found for the nonmoving party.'" *Applied Med. Res. Corp. v. United States Surgical Corp.*, 549 F. Supp. 2d 1208, 1210 (C.D. Cal. 2008) (quoting *Eich v. Bd. of Regents for Cent. Mo. State Univ.*, 350 F.3d 752, 761 (8th Cir. 2003)). "[A] reasonable inference cannot be supported by only threadbare conclusory state-

13

3077495.1

1   ments instead of significant probative evidence." *Lakeside-Scott v. Multnomah County*, 556

2   F.3d 797, 802 (9th Cir. 2009) (quotation marks and citations omitted).  Further, "a mere

3   scintilla is not enough to sustain a verdict for the prevailing party."  *Id.* (citing *Willis v.*

4   *Marion County Auditor's Office*, 118 F.3d 542, 545 (7th Cir. 1997)).

5   **C.      Plaintiffs failed to prove falsity.**

6          As explained below, Plaintiffs failed to prove falsity—indeed, deliberately evaded

7   their burden of proof—in two ways.

8          **First**, Plaintiffs failed to submit any evidence that they did not receive the goods

9   that J-M asked them to pay for—namely, pipe that met the promised industry stand-

10  ards.  Even now, after **years** of litigation and **weeks** of trial, the actual condition and

11  quality of the pipe sold to Plaintiffs remains unproven.

12         **Second**, recognizing that their substandard-product case had failed, Plaintiffs as-

13  serted in closing that theirs was no longer a substandard-products case at all—even

14  though they had firmly committed themselves to that theory and had long ago disa-

15  vowed any other recognized FCA theory.  The replacement theory that Plaintiffs

16  cooked up was not only legally unsupportable, but also disastrous from the standpoint

17  of fairness and policy.  In essence, Plaintiffs urged the jury to believe that J-M had

18  made and broken a promise of absolute manufacturing perfection—a promise that no

19  manufacturer could ever keep.  This, in turn, required Plaintiffs to misrepresent what

20  the industry standards actually require.

21         **1.      Plaintiffs conceded that they failed to prove the falsity element of
              their substandard-product FCA claim.**

22

23         The FCA is a "false claim" statute that specifically "focuses on the submission of

24  a claim."  *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002-03

25  (9th Cir. 2002).  The plaintiff "must show an actual false claim for payment being made

26  to the Government"; and that false claim for payment is "the *sine qua non* of a False

27  Claims Act violation."  *Id.* at 1002 (internal quotation marks omitted).  As the Ninth

28  Circuit has explained, "the False Claims Act at least requires the presence of a claim—a

                                         14

call upon the government fisc—for liability to attach." *Id.* (citing *Harrison v. Westing-house Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999)).  Goods for which there was no "call upon the government fisc" are irrelevant.

Accordingly, the plaintiff in a substandard-product case must prove that "a supplier of goods or services provid[ed] an inferior substitute in place of the service or product contracted for."  Boese, §§ 1.06[D] at 1-48 (citing *United States v. Aerodex, Inc.*, 469 F.2d 1003 (5th Cir. 1972)).  Unlike the fraudulent-inducement theory of FCA liability, a substandard-product case **cannot** be based upon mere proof of an initial fraud in the inducement of the contract, which then renders all subsequent invoices actionable.  Rather, substandard-product cases require the actual delivery of a substandard product.

What makes the claim false is that the defendant represented that **the specific goods for which payment was claimed** met a given standard of quality when those goods actually were substandard.  *U.S. ex. rel. Stebner v. Steward & Stevenson Services, Inc.*, 305 F. Supp.2d 694, 698, 701 (S.D. Tex. 2004), *aff'd* 144 Fed. Appx. 389, 395 (5th Cir. 2005) ("[T]he first step in finding an FCA violation must be to establish whether the Government has received the benefit of its bargain.  If it has, then no false or fraudulent claim exists and summary judgment for the defendant is appropriate."); *Aflatooni*, 314 F.3d at 1002 (a "false claim" is "a claim for goods or services not provided").

In other words, a plaintiff proceeding on a substandard-product FCA claim must establish that the public entity that was asked to pay the false claim **did not receive what it was asked to pay for**—*i.e.*, a product that met a promised standard, either with respect to its manufacturing or testing.  There is no other legally correct way to conceive of the falsity in a substandard-product case.[5]

It is **not** enough to show merely "a limited probability that **some** [product] may

---

[5] Plaintiffs acknowledged this in May 2012 ("the bills for payment were 'false claims' because the goods delivered differed materially from what they were represented to be"), while inconsistently arguing (without support) that "plaintiffs need not prove under the False Claims Act that any particular product delivered to an exemplar plaintiff was 'substandard.'" Chan Decl., Ex. D (Plaintiffs' 5/16/12 letter at 4).

need repairs" in the future.  *Stebner,* 305 F. Supp.2d 694, 701 (emphasis added); *United States ex rel. Crews v NCS Healthcare of Ill., Inc.*, 460 F.3d 853 (7th Cir 2006) (rejecting relator's claim that proving a 6% to 12% probability that recycled medication was sold to Medicaid patients met her burden of alleging that defendant's resale of the medications constituted submitting false claims to Medicaid).  Rather than relying on a statistical possibility that Plaintiffs **may** have paid for substandard product—a possibility that Plaintiffs did not even try to quantify in this case[6]— a plaintiff must focus on "what the Government **actually received**"; and Plaintiffs' burden is to "demonstrate nonconformance that deprives the Government of its bargain." *Stebner*, 305 F. Supp. 2d at 700 (granting summary judgment because plaintiff produced "no evidence that any … invoice expressly claimed to deliver something more than what the Government actually received"); *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, No. 1:03-CV-680-SEB-WGH, 2012 WL 4357438, at *11 (S.D. Ind. Sept. 24, 2012) (granting defendant's motion for summary judgment in part because plaintiff was "unable to identify individual parts and transactions involving nonconforming goods sold to the government" and thus failed to "present evidence of at least one knowingly false claim that was actually submitted to the government") (internal quotation marks omitted).[7]

---

[6] Plaintiffs made no showing, for example, that the "possibility" they received substandard pipe exceeded 50% and thus satisfied the civil "more-likely-than-not" standard of proof (assuming, *arguendo*, that such a showing would suffice in an FCA case).

[7] *See also United States ex rel. Cox v. General Dynamics Armament and Technical Products, Inc.*, No. 4:07CV3264, 2010 WL 2218614 at *3-*10 (D. Neb. May 28, 2010) (holding that "[i]t is not enough for [relator] to describe manufacturing defects that he discovered while inspecting various products and parts.  [Relator] must provide details showing that **claims for payment were actually made with respect to the allegedly defective products and parts**" and that "the government **was actually billed for a product that failed to pass his inspection**.") (emphasis added); *United States ex rel. Klusmeier v. Bell Contractors, Inc.*, 469 Fed. Appx. 718, 2012 WL 555736 at *1, *3-*4  (11th Cir. Feb. 21, 2012) (affirming dismissal of FCA complaint despite detailed allegations of non-compliant work and contract violations; relators failed to allege that defendant's monthly invoices "**actually billed for the non-compliant work.**") (emphasis added).

16

Here, Plaintiffs repeatedly admitted at trial that they did **not** have evidence that the pipe they had paid for violated any industry standards.  As described above, their witnesses stated that, for all they knew, the J-M pipe that they had purchased was just fine. In closing, therefore, Plaintiffs' counsel switched theories and denied that Plaintiffs needed any evidence tying the allegedly false claims to pipe they had purchased.

Plaintiffs' conceded lack of tying evidence is fatal and requires that judgment be entered for J-M as a matter of law.  Just as in *Stebner* and *Lusby*, Plaintiffs cannot succeed where they managed to prove only "a limited probability that some [product] may need repairs [in the future]," but made no showing that the Government was actually invoiced for "something more than what the Government actually received."  *Stebner*, 305 F.Supp. at 698, 701; *see also U.S. ex rel. McLean v. County of Santa Clara*, 2011 WL 5223076 (N.D. Cal. Oct. 31, 2011) (stating that the "use of probability as a backbone to a False Claims Act suit has been denounced" by federal courts, including within the Ninth Circuit, and rejecting "anecdotal and highly speculative stories… coupled with complex, contrived comparative analyses of statistical data" as evidence of a false claim); *U.S. ex rel. Cericola v. Federal Nat'l Mortgage Ass'n,* 529 F. Supp. 2d 1139, 1145-46 (C.D. Cal. 2007) (rejecting allegation that seventy percent of 28,000 claims that defendant caused to be submitted were false).  And just as the *Stebner* and *Lusby* relators could not tie the alleged misconduct in those cases to the products or services actually delivered and the claims for payment actually submitted, so too Plaintiffs here failed to tie any evidence of alleged misconduct to the pipes for which they had paid.

The jury's determination that J-M told a falsehood is therefore deficient as a matter of law and judgment must be granted for J-M.

### 2.   Plaintiffs' "uniform compliance" theory is legally untenable, practically unworkable, and unsupported by substantial evidence.

Plaintiffs' "uniform compliance" theory requires that manufacturers such as J-M achieve perfect manufacturing consistency. Anything short of such perfection—even a single 20-foot stick of non-compliant pipe delivered to a **non-Plaintiff** as a result of

17

1    inadvertent error—constitutes falsity under this unprecedented theory.[8]

2        As discussed below, Plaintiffs' "uniform compliance" theory fails as a matter of

3    law and fact on multiple grounds.

4            a.    **Plaintiffs' "uniform compliance" theory transforms the FCA**

5                  **into a strict-liability statute—something that Congress never intended.**

6        A statute should be interpreted so as to give effect to all of its terms.  *United*

7    *States v. Banks*, 556 F.3d 967, 978 (9th Cir. 2009) ("Definitions should be adopted that

8    'give effect, if possible, to every word of the statute'" (quoting *Bowsher v. Merck & Co.,*

9    460 U.S. 824, 833 (1983)). The relevant FCA provisions contain scienter requirements

10   denoted by the term "knowingly."  31 U.S.C. § 3729(a)(1), (b)(1).  That term means that

11   a person has actual knowledge of information, or acts in deliberate ignorance or reck-

12   less disregard of the truth or falsity of the information.  *Wang v. FMC Corp.*, 975 F.2d

13   1412, 1420 (9th Cir. 1992). To read that element out of the statute would transform the

14   FCA into a strict-liability statute.  But that is exactly what happened here.

15       Before trial started, the Court foresaw that some kind of impermissible "pseudo-

16   strict liability" would result if Plaintiffs were not required to tie falsity (and also the

17   other FCA elements) to the claim for payment. Chan Decl., Ex. G (9/16/13 Tr. at

18   39:7-16).  What the Court feared has come to pass.  Plaintiffs' "uniform compliance"

19   theory makes J-M strictly liable not only to a customer who receives a single stick of

20   non-compliant pipe, but also to all of its customers who received ***compliant*** pipe if

21   even just one non-compliant stick is sold to a single customer.  Such a standard effec-

22   tively eliminates the FCA's falsity element.

23       Because Plaintiffs' "uniform compliance" theory fundamentally rewrites the

24

---

25   [8]   The plain meaning of the term "uniform" shows that "uniform compliance" means

26   unvarying, constant compliance. *See* "Uniform," *Merriam-Webster.com*, Merriam-Webster

     http://www.merriam-webster.com/dictionary/uniform ("**uni·form** *adjective*: not vary-

27   ing or changing : staying the same at all times, in all places, or for all parts or mem-

28   bers") (January 14, 2014).

FCA, no verdict founded upon that theory can stand.

### b.   Plaintiffs' "uniform compliance" theory violates due process and casts constitutional doubt over the FCA.

Like all other statutes, the FCA must be interpreted, if possible, to comply with constitutional requirements. *See, e.g., Oregon v. Ashcroft*, 368 F.3d 1118, 1125 (9th Cir. 2004) ("[I]t is a 'cardinal principle' of statutory interpretation that 'where an otherwise acceptable construction of a statute would raise serious constitutional problems, [federal courts shall] construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.'") (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)).  But Plaintiffs' "uniform compliance" theory is incompatible with the most elementary notions of due process, which requires that statutes give citizens fair notice of what the law prohibits. *United States v. Williams*, 553 U.S. 285, 304, 128 S.Ct. 1830, 1845 (2008).  Accepting that theory would violate the rule of constitutional avoidance.  *See Skilling v. United States*, 561 U.S. 358, 130 S. Ct. 2896, 2929-33 (2010) (limiting reach of 18 U.S.C. § 1346 to bribery/kickback schemes, in order to "avoid constitutional difficulties"; as so limited, statute was not unconstitutionally vague because it gave "fair notice" of what constitutes prohibited conduct).

Due process in the form of fair notice is wholly lacking under Plaintiffs' "uniform compliance" theory.  Under that theory, a manufacturer seeking to avoid running afoul of the FCA knows only this:

(1) even selling standards-compliant product to a customer who later sues will not absolve the manufacturer of liability to that customer for making a false statement;

(2) the manufacturer will be liable to that customer merely by virtue of producing some unknown quantity of substandard product (perhaps no more than one unit), even though he never sold that product to that customer;

(3) any customer who sues the manufacturer will have the power to decide how much substandard product constitutes a false statement, without ever having to quanti-

19

fy or prove that amount (or even disclose what the amount is), and will be able to avoid answering that legitimate question by dismissively telling the manufacturer to "just follow the rules, all of the time"; and

(4) at trial, the customer will be able to obscure the limitless ramifications of his misinterpretation of the falsity element by conflating that element with scienter.

These are the consequences of Plaintiffs' "uniform compliance" theory, which snubs the law's simple but critical requirement that the plaintiff prove receipt of a substandard product. Properly interpreted to avoid constitutional doubt, the FCA cannot countenance this.

### 3. The jury's "uniform compliance" findings and verdict are factually unsupported because the industry standards that J-M promised to meet do _not_ require perfect manufacturing consistency.

As the basis for their "uniform compliance" theory, Plaintiffs cited J-M sales brochures stating that J-M C900 pipe "Meets AWWA C900," and noted that the C900 standard incorporates Note 10 of PPI TR-3. First, the phrase "uniform compliance" is found nowhere in, nor can it reasonably be inferred from, the brochures. Moreover, C900 and PPI TR-3 do **not** require perfect manufacturing consistency—an impossibility—and J-M's generalized statement that it met those standards did not make or imply any such promise.[9]

---

[9] Importantly, the claims that J-M submitted to Plaintiffs billed them only for the particular pipe that they received and made no representations whatsoever with respect to any other pipe. For example, the first alleged claim for payment specified in the verdict form relates to Calleguas' Lake Bard Oxygenation Project. Chan Decl., Ex. Y (Trial Exhibit 7758). That document clearly states that what was sold to Calleguas was "1300 LF [linear feet] of PVC Piping" for that particular project. _Id._ (Trial Exhibit 7758 at 65253). No statements – and certainly no "guarantees" – about any J-M pipe other than those 1300 linear feet were ever made to Calleguas in that document or in any associated documents. **The same is true for all alleged claims for payment and associated documents that Plaintiffs presented at trial**.

20

### a.   A facial reading of the industry standards confirms J-M's reading of them and refutes Plaintiffs' misinterpretation.

At trial, J-M submitted overwhelming evidence that pipe manufacturing is always and inevitably subject to variation due to conditions beyond the manufacturer's control. *See* Part III.C.3.b below.  Like all other pipe manufacturers, J-M recognizes and provides for this reality by giving customers a contractual warranty.  The very existence of that warranty belies any assertion that J-M or its customers expect perfect manufacturing consistency.[10]

Given the inevitability of variation, it comes as no surprise that neither C900 nor PPI TR-3 requires perfect manufacturing consistency.  As noted in Part III.C.3.b below, the certification system expressly contemplates a lack of "uniform compliance" by allowing variances and notices of correction.  C900's "Quality Control" provisions merely require that the manufacturer take "adequate measures" in the production of its pipe products to "assure product compliance with the requirements of this standard."[11] Chan Decl., Ex. AA (Trial Exhibit AWWA 4 at Section 5.1).  And Note 10 to PPI TR-3 simply states that the manufacturer is "responsible to insure that his product is continually manufactured in such a manner as to maintain the long-term strength and durability consistent with the long-term data supplied to the HSB [Hydrostatic Stress

---

[10]   The warranty provides: "The limited and exclusive remedy for breach of the above warranty by J-M shall be the resupply of a like quantity of non-defective product." Chan Decl., Ex. Z (Trial Ex. 7976 at RENO-0003404).  In other words, rather than promising uniform compliance, J-M expressly accounts for the possibility that it has not achieved manufacturing perfection, and defines the remedy it will offer should a buyer receive non-compliant pipe.

[11]   Likewise, the "Pipe Requirements" section merely requires that "[w]hen manufactured, pipe shall be homogeneous throughout; free from voids, cracks, inclusions, and other defects; and ***as uniform as commercially practical*** in color, density and other physical properties." Chan Decl., Ex. AA (Trial Exhibit AWWA 4 at Section 4.3.1) ("Workmanship") (emphasis added). Thus, to the extent that any "uniformity" concept exists in C900 at all, the standard qualifies that concept with the common-sense principle that uniformity is only required to the extent that it is "commercially practical." Plaintiffs' theory, on the other hand, admits of no such common-sense limitation.

21

1   Board].” Chan Decl., Ex. BB (Trial Exhibit PPI-033 at p. iv).

2        But everyone in the real world understands that a manufacturer may take “ade-
3   quate measures” to “assure product compliance” or to “insure that his product is con-
4   tinually manufactured” in a particular manner, and nevertheless manufacture some
5   product that does not comply with each and every aspect of those two standards.  For
6   instance, if a manufacturer produces 10,000,000 sticks of pipe, and of those, one hun-
7   dred sticks (1 out of every 100,000) are non-compliant, are the manufacturer’s
8   measures still deemed “adequate”?  Of course they are.  But if that amount of non-
9   compliant manufacturing does not prove that a manufacturer is “uniformly” violating
10  the standards, what amount does?  Plaintiffs cleverly avoided answering this pivotal
11  question, and introduced no expert evidence on it.

12       Plaintiffs avoided the issue because, in fact, the standards do not require such
13  perfection – nor do they deem an entire manufacturer’s inventory “non-compliant”
14  simply because certain sticks or batches of pipe do not comply.  For example, C900 is
15  clear that when non-compliant pipe is manufactured, the manufacturer must identify it
16  and remove it from inventory – but the manufacturer may release and sell the remain-
17  ing compliant lots.  Chan Decl., Ex. AA (Trial Exhibit AWWA 4 at Section 5.1.11).
18  Likewise, with respect to quality assurance testing, sampling tests are to be performed
19  periodically to maintain general compliance – such as once every 24 hours for Pipe
20  Burst Strength.  *Id.* (Trial Exhibit AWWA 4 at Section 5.1.4).  If perfect consistency
21  were required, simply testing once every 24 hours could never suffice.

22       In short, the plain text of the standards themselves lends no support to Plain-
23  tiffs’ theory that ***all*** of the manufacturer’s production inventory (hundreds of millions
24  of pieces of pipe in J-M’s case) must be considered “non-compliant” simply because
25  individual pieces or lots of pipe fail to conform.[12]

26  _____

27  [12]  Moreover, although Plaintiffs claimed that variations and lapses in J-M’s manufac-
28  turing process constituted a failure to meet their imaginary “uniform compliance”

22

**b.  The trial testimony likewise supported J-M's reading of the industry standards and refuted Plaintiffs' reading.**

J-M's reading of the standards was confirmed at trial by standards-agency witnesses who explained that occasional instances of non-compliance are a reality of modern manufacturing and in no way rendered J-M's continued use of the agency marks on conforming products "false" or "fraudulent."  In hundreds of audits over the course of nearly two decades, and knowing that J-M was representing that it "met" AWWA, NSF, and UL standards, both agencies found instances of J-M non-compliance—but they never concluded that J-M was violating the standards to anywhere near a degree that would warrant delisting.  Thus, the most authoritative arbiters of the standards knew that J-M was not achieving "uniform compliance," but nevertheless allowed J-M to state that it "met" standards anyway.  Specifically:

(1)  The NSF witness, Tim Haenftling, testified that in the context of NSF's compliance audits, notices of "variation" (or failures to comply with NSF standards and procedures) were "not uncommon"; that no manufacturers "pass all audits all the

---

standard, the industry standards at issue do not regulate the extrusion process at all. These standards are concerned only with the ***outcome*** of the pipe-manufacturing process (*i.e.*, whether the finished pipes meet the standards), not with the processes used to get there. Plaintiffs' expert Jim Paschal made this clear, acknowledging that UL and NSF do not regulate the process used to extrude pipe; that the agencies do not set forth what speed, temperature, torque, or equipment must be used to make pipe; and, when discussing C900 § 5.1, that not every change in manufacturing process or equipment will violate an alleged "representativeness" requirement or result in decreased long-term strength.  Chan Decl., Ex. U (9/20/13 Tr. at 1389:19–1394:14).  J-M's expert, Gene Palermo, corroborated Paschal, noting that the AWWA and ASTM standards, as well as Note 10 to PPI TR-3, "don't tell the manufacturer how to make the pipe" and that "the important point is that the pipe that is produced has to meet the requirements of the standard."  He added that PPI TR-3 does not establish manufacturing parameters.  Chan Decl., Ex. CC (10/17/13 Tr. at 5776:3-20).  As such, J-M's representation that it "met" certain standards was not a representation that it made everywhere the same way.  J-M could not have violated, and did not violate, any standard by failing to "uniformly comply" with any given manufacturing methodology—because the standards require no such compliance in the first place.

23

1  time"; and that J-M and other PVC pipe manufacturers received notices of variation.

2  But NSF never determined that J-M was receiving an unacceptably high level of varia-

3  tion notices; and in fact, J-M never lost any NSF certification for the products at issue.

4  Chan Decl., Ex. DD (10/16/13 Tr. at 5414:5-5415:19; 5418:4-7).

5      (2)    Haenftling further testified that, in circumstances where certain lots of J-

6  M pipe were found to be out of compliance (as was the case with the A28 product hold

7  at the McNary, Oregon plant), the non-compliant pipe was required to be destroyed,

8  while pipe that passed NSF's tests was cleared for sale to customers. Chan Decl., Ex.

9  DD (10/16/13 Tr. at 5449:5-5450:4).

10      (3)    The UL witness, George Laverick, similarly testified that it "occur[s] in

11  production commonly that the production doesn't quite meet" UL standards; that the

12  extent of non-compliance could vary depending on whether "it's one psi off or if it's

13  hundreds of psi off"; and that in such situations, it is simply up to the manufacturer to

14  "rectify the situation." Chan Decl., Ex. EE (10/23/13 Tr. at 6941:6-21). Laverick too

15  confirmed that J-M had never lost a UL 1285 certification for any listed product despite

16  occasional non-compliance.  Chan Decl., Ex. EE (10/23/13 Tr. at 6915:10-13).

17      Neither Haenftling nor Laverick testified that these isolated instances of non-

18  compliance would automatically cause a manufacturer's entire inventory to be deemed

19  "non-compliant" due to some imagined failure to "uniformly comply" with all industry

20  standards across all products at all times. Both witnesses repeatedly confirmed that

21  their agencies never found that J-M had intentionally violated any NSF or UL standards

22  or policies, nor attempted to mislead or cheat the agencies in any context. Chan Decl.,

23  Ex. DD (10/16/13 Tr. at  5420:1-21, 5411:10-5412:12); Ex. EE (10/23/13 Tr. at

24  6898:21-24).  In the absence of such findings, the handful of examples of non-

25  compliance discussed at trial – whether to do with specific plant audits or specific test

26  results – are simply insufficient to support a conclusion that J-M made false representa-

27  tions of "guaranteed" standards compliance to "all" customers including Plaintiffs.

28

### c. Plaintiffs' "uniform compliance" theory is doomed by their concession that J-M's compound—the only arguably uniform part of the production process—was not substandard.

Until closing argument, Plaintiffs asserted that pipe manufactured with the J-M PVC compound JM-90 did not meet the 4000 psi HDB standard.  But in closing argument, Plaintiffs turned 180 degrees and claimed that they never had challenged J-M compound's compliance with industry requirements:

> Was J-M's material or compound good? This is not about compound. … We have never claimed that the JM-90 compound is bad. It certainly was possible to make good pipe with J-M's compound.
>
> So when you hear talk about compound test, we are not challenging the compound. It's possible to make good pipe with that compound. …We are challenging how they made the pipe, not what they made it with.

Chan Decl., Ex. W (11/5/13 Tr. at 7811:6-16).

Plaintiffs thereby admitted that there was nothing substandard – *i.e.*, no false statement was made – about the one and only thing that is even arguably "uniform" in the pipe manufacturing process: the compound from which that pipe was made.

Since there was nothing wrong (and J-M did not lie) about the compound, the only issue left was whether any given pipe ***made from*** that compound was substandard (either with respect to its manufacturing or testing), and if so, whether that pipe was falsely represented to be standards-compliant. As explained above, however, in a substandard-products case that issue can only be analyzed on a product-by-product (here, pipe-by-pipe) basis.  The evidence on which Plaintiffs fixated—such as isolated R&D test failures, or the pipe placed on hold at the McNary plant—at most showed that the particular pipe tested or placed on hold at a particular plant was substandard. That evidence did not and could not show anything about any other pipe, including Plaintiffs' pipe. Plaintiffs' acknowledgment that J-M made no false statements about its compound guts their "uniform compliance" theory and requires reversal.

Plaintiffs promised the Court and J-M that they would "identify every industry standard, every subpart of every industry standard that was violated." Chan Decl., Ex. M (10/25/13 Tr. at 7556:3-5).  But Plaintiffs did no such thing. Instead, they resorted

25

1  to their "uniform compliance" theory, which was nothing more than an end-run

2  around the FCA's falsity requirement.  Their failure to prove falsity under any cogniza-

3  ble FCA theory requires that judgment as a matter of law be granted for J-M.

4  **D.      Plaintiffs failed to prove scienter.**

5        The jury instructions defined scienter to mean "that a person, with regard to in-

6  formation: (a) has actual knowledge of the true information, or (b) acts with deliberate

7  ignorance of the truth or falsity of the information, or (c) acts in reckless disregard of

8  the truth or falsity of the information." Chan Decl., Ex. C (Doc No. 1792 at 7 of 9).

9        The only "information" that Plaintiffs persuaded the jury to find J-M knew was

10  that J-M was not perfect – *i.e.*, at some time in its history J-M had produced some un-

11  determined amount of substandard pipe.  But every manufacturer knows that, because

12  no manufacturer is perfect, and J-M never represented that it was perfect.  This shows

13  how Plaintiffs' "uniform compliance" theory effectively swallows the scienter require-

14  ment and turns the FCA into a strict-liability statute.  Any plaintiff allowed to pursue

15  that theory would automatically establish scienter just by proving non-uniform (*i.e.*,

16  less-than-perfect) compliance with complex industrial-manufacturing standards.

17        To help guard against this result, the Court instructed the jury that "[i]nnocent

18  mistakes, mere negligent misrepresentations, and good faith differences in interpreta-

19  tions do not constitute knowingly false statements under a False Claims Act statute."

20  Chan Decl., Ex. C (Doc. No. 1792 at 8 of 9).  And the Court cautioned Plaintiffs that it

21  would grant judgment or at least a new trial for J-M if the jury returned any verdict in-

22  consistent with this "innocent mistake" instruction:

23         … I mean, that is, I think, established law that is applicable to this case
           …. The question is if the jury were not so informed and if the jury some-
24         how reaches a determination that is contrary to that, that would, to my
           mind, be a basis to reverse the jury verdict. And we could possibly get that
25         in this situation because, as envisioned, the jury is going to be asked to
           specify the basis for its findings as to false and fraudulent. And so if the
26         jury comes back and does something of this sort with the verdict, I would
           be required, I feel, to either grant a judgment notwithstanding the verdict
27         or at least setting aside the jury verdict.

28  Chan Decl., Ex. P (11/4/13 Tr. at 7720:25 – 7721:23).

26

3077495.1

The "uniform compliance" verdict procured by Plaintiffs flaunts the Court's instruction and eviscerates the FCA's scienter requirement – by allowing liability to be based even upon substandard pipe made inadvertently (*i.e.*, through "innocent mistake" or "mere negligence"). The "uniform compliance" finding established at most an inadvertent failure to achieve absolute manufacturing consistency, but it did not establish any knowledge with respect to Plaintiffs' claims for payment and pipe. As the Court foresaw, this contradicts the jury instruction and the verdict must be overturned.

Moreover, Plaintiffs' contention that the standards require "uniform compliance" is based solely upon Plaintiffs' own (incorrect) interpretation of those standards. As explained in Part III.C.3 above, it is far more reasonable to interpret the standards as allowing a manufacturer to say that it continues to "meet" standards, notwithstanding the occasional inadvertent production of non-compliant pipe. Given that it is at least equally plausible to interpret the standards (as J-M does) as ***not*** requiring "uniform compliance," in the sense of absolute manufacturing consistency, there can be no finding that J-M made any ***intentionally*** false or reckless representations regarding its compliance. *See, e.g., Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1477-78 (9th Cir. 1996) (where regulations contained "imprecise and discretionary language" and there were "disputed questions" as to how to comply with them, plaintiff could not establish that defendant made a knowingly false claim); *U.S. ex rel. Ke&R Ltd. Partnership v. Mass. Housing Fin. Agency*, 530 F.3d 980, 983 (D.C. Cir. 2008) (where both relator's and defendant's "interpretations" of the operative contract requirements "are plausible," the relator could not show that defendant "knowingly" submitted false claims).

**E.    Plaintiffs failed to prove materiality.**

The alleged "uniform compliance" representation cannot be material to Plaintiffs, as it means nothing more than that J-M was not perfect. The jury instructions define materiality as follows: "A false statement is 'material' if it has a natural tendency to influence, or is capable of influencing, the decision of the government's decision-making body to which it is addressed." Chan Decl., Ex. C (Doc. No. 1792 at 7 of 9).

27

As the Court recognized, the fact that some unknown amount of non-compliant pipe may have been inadvertently delivered to other customers does not constitute materiality to these Plaintiffs because other customers' pipe was not included in any claims for payment that J-M arguably submitted to these Plaintiffs:

> THE COURT:  … It can't be a basis for the false claim. I hope you recognize that because it's going to be based on what [Plaintiffs] purchased, not on everything. It's the basis of those claims. You guys chose -- you guys got exemplar plaintiffs. You guys got to choose which claims you wanted. Those are the claims that we are litigating. We are not litigating everything. I hope you recognize that.
>
> [PLAINTIFFS' COUNSEL]:  Your Honor, we do recognize that.
>
> THE COURT:  Okay. …
>
> THE COURT:  But it has to be material. And if they have no consideration of it because it's not included in the claim, then it can't be material, can it?

Chan Decl., Ex. K (10/7/13 Tr. at 3634:24–3636:4).

Indeed, Palmdale and South Tahoe both conceded that the supposed lack of "uniform compliance" was immaterial to them, as they continued to purchase significant quantities of J-M pipe long after learning that J-M pipe purportedly does not "uniformly comply" with industry standards. Chan Decl., Ex. S (10/8/13 Tr. at 4177:14–4180:19); Ex. FF (9/19/13 Tr. at 851:20– 853:22). What Palmdale and South Tahoe recognized—namely, that occasional deviations from standards are an unavoidable fact of manufacturing—is understood by every purchaser, including the other Plaintiffs.

## IV.  MOTION FOR A NEW TRIAL

**A.    At a minimum, the Court should grant J-M a new trial.**[13]

After seven years of litigation and seven weeks of trial produced only a meaningless "uniform compliance" finding, it is inconceivable that Plaintiffs could muster on retrial any different or better evidence that could establish falsity, scienter, or materiality

---

[13]   In this section concerning grounds for a new trial, J-M incorporates by reference all of the preceding discussion.

3077495.1

as properly defined under the FCA. But even if that were possible, a new trial still would be necessary for at least four reasons: (1) the Phase One verdict is unworkable and does nothing to streamline Phase Two of this litigation; (2) certain jury instructions were erroneous or insufficient; (3) the Phase One verdict is replete with factual inconsistencies and deficiencies; and (4) an enormous amount of irrelevant and prejudicial evidence was admitted in contravention of Federal Rules of Evidence 401-404.

**B.      Standard of review.**

"Rule 59 recognizes the common-law principle that it is the duty of a judge who is not satisfied with the verdict of a jury to set the verdict aside and grant a new trial." 11 Wright & Miller, Fed. Prac. & Proc. Civ. § 2801 (3d ed.). "Rule 59 gives the trial judge ample power to prevent what the judge considers to be a miscarriage of justice. It is the judge's right, and indeed duty, to order a new trial if it is deemed in the interest of justice to do so." *Id.*, § 2803.

In ruling on a motion for a new trial, the district judge has the right, and indeed the duty, to weigh the evidence as he saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in his conscientious opinion, the verdict is contrary to the clear weight of the evidence, or to prevent, in the sound discretion of the trial judge, a miscarriage of justice. *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990) (citation omitted). The district judge may also grant a new trial if it is based upon evidence which is false. *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1139 (9th Cir. 1999) (citation omitted). If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial. *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371-72 (9th Cir. 1987) (citing 11 Wright & Miller, *Federal Prac. and Proc. Civ.* § 2806 at 48-49 (1973); *see also* 11 Wright & Miller, Fed. Prac. & Proc. Civ. § 2805 (3d ed.) (discussing district court's broad discretion to grant new trial "to prevent injustice"). The Court may determine that a combination of factors—ranging from the erroneous admission of evi-

dence, to faulty jury instructions, to juror confusion resulting in a verdict against the weight of the evidence—requires a new trial in the interest of justice.  *See, e.g., Juneau Square Corp. v. First Wisconsin Nat'l Bank of Milwaukee*, 624 F.2d 798, 806 (7th Cir. 1980).

### C.     The empty jury finding invited by Plaintiffs' counsel does not provide a factual basis for a Phase Two trial or achieve the goals of bifurcation.

In urging this Court to bifurcate this case (over J-M's repeated objections), Plaintiffs claimed that the Phase One jury verdict would streamline this litigation and facilitate the necessary Phase Two adjudications "with respect to each individual plaintiff."

But the jury finding that Plaintiffs ultimately asked for and received—that J-M falsely represented "uniform compliance"—does no such thing. At Plaintiffs' urging, the Phase One jury reached a finding that says nothing more about J-M or its products than can be said of every major manufacturer in the world: that J-M is not perfect and occasionally in its decades-long history produced some non-conforming product.  Virtually nothing from this Phase One verdict can be used to guide the Phase Two determinations of FCA liability and damages "with respect to each individual plaintiff."

Based upon the Phase One findings, the Phase Two jury is supposed to determine (among other things): (1) whether false representations were made to "each individual plaintiff"; (2) how many "false claims" each individual plaintiff received; and (3) "[w]hat damage did the individual plaintiff suffer as a result of the false claims?"  Chan Decl., Ex. A (Doc. No. 551 at 10 of 11).

But the case never should have been bifurcated along those lines.  Where the issues sought to be bifurcated are "'(s)o interwoven . . . that the [one] cannot be submitted to the jury independently of the (other) without confusion and uncertainty which would amount to a denial of a fair trial . . . ,' the bifurcation [is] unconstitutional" under the Seventh Amendment to the U.S. Constitution.  *Arthur Young & Co. v. U. S. Dist. Court*, 549 F.2d 686, 693 (9th Cir. 1977) (quoting *United Air Lines, Inc. v. Wiener*, 286 F.2d 302, 306 (9th Cir. 1961)); *see also Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500 (1931).  Here, the bifurcation order and jury verdict in Phase One divided the

30

adjudication of a single liability element—falsity—between two juries.  This occurred because, among other reasons, the Phase One jury was asked to adjudicate the falsity element in the abstract (which cannot properly be done in an FCA substandard-product case), while the Phase Two jury purportedly will re-adjudicate falsity all over again, this time with specific reference to "each individual plaintiff."  Even with the Phase One jury's verdict that J-M falsely represented "uniform compliance," the Phase Two jury cannot possibly "independently" adjudicate the questions of whether and how many false representations were made to each individual Plaintiff.

Indeed, the Phase One jury's verdict is completely insufficient to support a Phase Two trial of these and many other FCA issues. Even if the Phase One verdict were accepted, many foundational questions would remain unanswered, including: (1) To which, if any, customers was any non-compliant pipe sold, including – critically – was any non-compliant pipe sold to any Plaintiff that claims damages in Phase Two? (2) How much of J-M's billions of pounds of pipe was not in "uniform compliance"? (3) To what extent was any such pipe not in "uniform compliance"? (4) With which sections of the AWWA and UL standards at issue was any such pipe not in "uniform compliance" – the sections pertaining to Quick Burst testing, HDB testing, tensile testing, or something else? (5) How was such pipe not in "uniform compliance" with such standards?  For example, did the Phase One jury believe that some undefined amount of J-M pipe from some unidentified plants had a substandard tensile strength and, if so, by how much was the tensile strength substandard – 1 psi, 10 psi, 100 psi, etc.? (6) When and how often was any non-compliant pipe manufactured?

Because such basic questions have been left totally unanswered, the Phase Two jury cannot make individualized determinations even as to the five Phase One Plaintiffs, let alone the dozens of additional Plaintiffs and hundreds of Real Parties who were not at trial. For example, because the Phase One jury did not even determine whether any Phase One Plaintiff actually received pipe that did not comply with standards, the verdict provides no guidance to the Phase Two jury in deciding whether false

31

representations were made to any "individual plaintiff." If the Phase One verdict is left undisturbed, the parties will simply be required to re-litigate in Phase Two the same underlying issues as to FCA falsity, scienter, and materiality—but this time "with respect to each individual plaintiff."

The Phase One verdict is also insufficient to support any meaningful determination of causation or damages. Because the Phase One jury made no determination as to how much J-M pipe is non-compliant, to what extent such pipe was non-compliant, or whether any Plaintiffs even received any non-compliant pipe, there can be no meaningful assessment of what, if any, compensable damages Plaintiffs suffered. These factual issues will also have to be re-litigated with a second jury in Phase Two.

Plaintiffs persuaded the Court to bifurcate this case by selling the Court a "paradigm" under which "all of the piping fails to meet these standards and requirements of the certifying agencies."  Chan Decl., Ex. B (9/26/11 Tr. at 6:1-3).  But at the end of the day, Plaintiffs gave up on this paradigm (because they could never get close), and instead tried to make this trial about whether *any* J-M pipe ever failed to comply with standards, as opposed to whether *all* of it, or even the small amount *they* purchased, complies.  Proof that Plaintiffs' pipe or that all J-M pipe was non-compliant might have had some significance, but a finding that some J-M pipe somewhere may have been non-compliant (which is at most what the Phase One jury's verdict says) is so narrow and limited as to be meaningless.  That J-M may have on occasion and inadvertently produced some non-conforming pipe even though its brochures contain the words "Meets AWWA" is not a point that needed to be litigated over a seven-week trial.  The verdict is not enough to support a finding of FCA liability, let alone individualized findings of causation or damages "with respect to each individual plaintiff."

**D.    A new trial is necessary to correct errors and insufficiencies in the jury instructions.**

Two key errors and insufficiencies in the jury instructions require a new trial.

***First***, the elements instruction did not tie the alleged falsity to the pipe or claims

32

received by Plaintiffs.  Indeed, that instruction did not define falsity in any case-specific way at all; it merely informed the jury that a claim is false "if it contains or is based upon an assertion that is untrue when made or when used."  In a case as scattershot and untethered as Plaintiffs' case was, that generic definition did not adequately convey the FCA requirement for tying falsity to the claim in substandard-product cases.

**Second**, although the Court never intended it this way, Plaintiffs' exploitation of the "no damage" instruction took the jury's focus completely away from whether the pipe sold to Plaintiffs was noncompliant, and therefore whether any false statements were made to Plaintiffs.

Plaintiffs seized on these errors and deficiencies to secure a legally invalid verdict from the jury.  A new trial must be granted to correct this.

**E.    A new trial also is necessary because the verdict suffers from glaring factual inconsistencies that render it legally erroneous.**

Type 1 FCA claims require a falsity in the claim for payment itself, as opposed to a falsity in an accompanying statement or record.  Chan Decl., Ex. C (Doc. No. 1792 at 6-7 of 9).  Type 2 FCA claims require a falsity in a claim for payment and also in a statement or record that accompanies and relates to the claim.  *Id.*  Virtually none of the exhibits identified by the jury as claims for payment, or the exhibits that supposedly demonstrate falsity, knowledge, and materiality, support the jury's findings.

**1.    The jury erroneously identified as "Claims For Payment" documents that simply are not claims for payment.**

"It seems to be a fairly obvious notion that a False Claims Act suit ought to require a false claim."  *Aflatooni,* 314 F.3d at 997.  But many of the "claims for payment" identified by the jury simply are not claims for payment. Some of the documents are in fact project specifications and contract documents generated by Plaintiffs themselves (not J-M) in order to solicit bids, and do not make any demand for payment – let alone a demand by J-M. Chan Decl., Ex. GG (Chart re: Trial Exhibits cited in Verdict

RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW TRIAL [F.R.C.P. RULES 50(b) & 59]

3077495.1

Form).[14] Other documents identified as "claims for payment" include submittals containing J-M brochures, but these generic brochures are not invoices, bills, or other requests for payment. *Id.*

### 2. The jury erroneously determined that J-M made "false representations of uniform compliance" in documents that do not contain any such representation.

None of the documents that the jury erroneously identified as "claims for payment" mentions "uniform compliance" –the only alleged falsity identified by the jury— and thus do not contain the alleged false representation.  Nor do any of the submittals containing J-M brochures promise uniform compliance, as explained above.

Moreover, the jury somehow concluded that, for the twenty-six projects at issue, J-M "falsely represented uniform compliance with UL 1285," even though: (1) the claims for payment cited in the verdict form as support for this determination never even mention UL 1285; (2) Plaintiffs did not require compliance with UL 1285 on any of the projects at issue;[15] and (3) Plaintiffs uniformly testified that UL 1285 was irrelevant to them at the times and for the projects in question.[16]

### 3. The jury erroneously found that J-M "knowingly" made false representations of uniform compliance to Plaintiffs based on documents and events unrelated to Plaintiffs or their projects.

The jury identified a list of exhibits that supposedly prove J-M knew that the alleged "claims for payment" were false. But none of those exhibits relate to any pipes

---

[14]  Such trial exhibits are attached to the under seal Supplemental Chan Declaration for the Court's reference.

[15]  Chan Decl., Ex. FF (09/19/13 Tr. at 840:3-15, 841:1-3, 841:18-21) (South Tahoe); Ex. R (10/9/13 Tr. at  4283:22-4284:2, 4364:10-21) (Norfolk); Ex. S (10/8/13 Tr. at 4201:6-22) (Palmdale); Ex. T (10/2/13 Tr. at 3392:5-15) (Reno); Ex. J (9/18/13 Tr. at 663:1-20, 666:22-667:21) (Calleguas).

[16]  Chan Decl., Ex. FF (09/19/13 Tr. at 840:20-25) (South Tahoe); Ex. R (10/9/13 Tr. at 4364:12-21) (Norfolk); Ex. S (10/8/13 Tr. at 4201:23-4202:11) (Palmdale); Ex. T (10/2/13  Tr.  at  3392:16-3395:12)  (Reno);  Ex. J  (9/18/13 Tr. at  663:5-672:5) (Calleguas).

1  actually sold to Plaintiffs, and none establishes that any production pipe sold to Plain-

2  tiffs was noncompliant.  Chan Decl., Ex. GG.  Instead, these exhibits consist of a grab-

3  bag of documents—R&D tests, scrap rates, reject tags, production goals, diary entries

4  regarding types and sizes of pipe never purchased by Plaintiffs – unconnected to the

5  claims for payment and pipes Plaintiffs actually received.  Notably, many of these ex-

6  hibits communicate information about events that occurred **after** Plaintiffs received

7  particular claims for payment for the twenty-six projects, and therefore do not and

8  cannot speak to J-M's knowledge at the times in question. Chan Decl., Ex. GG. One

9  exhibit identified by the jury – 1535 – does not even exist.

10  **F.    A new trial is necessary because irrelevant and prejudicial evidence,**
**including improper character/propensity evidence about J-M, was**
11  **admitted and likely affected the verdict.[17]**

12       **1.      The Quick Burst 6400-psi requirement.**

13       Plaintiffs spent a vast amount of time at trial attempting to prove that Quick

14  Burst test results for J-M pipe that were below 7,200 psi somehow indicated that J-M

15  pipe was substandard, even if those results were higher than 6,400 psi.  But the undis-

16  puted evidence at trial was that the industry standard is and always has been 6,400 psi

17  and no higher. Chan Decl., Ex. AA (Trial Exhibit AWWA 4 at AWWA-000049 (Table

18  3, Note)); Ex. CC (10/17/13 Tr. at 5753:10-14 (Palermo: "[T]here is absolutely no ba-

19  sis at all for questioning a quick burst value less than 7200 psi" but above 6400 psi)),

20  Ex. U (9/20/13 Tr. at 1244:5-1245:1 (Paschal never believed that industry standard of

21  6,400 psi for Quick Burst Test should be increased)).

22       Moreover, the trial exhibit derived from Plaintiffs' own compilation of J-M's

23  Quick Burst test records showed that, among the thousands of tests compiled, J-M

24  pipe met or exceeded the 6,400 psi standard more than 99% of the time. Chan Decl.,

25  _____

26  [17]   J-M objected to the evidence discussed in this section (as well as the Javete log) and
moved to exclude such evidence prior to trial on various grounds, including the
27  grounds identified here. *See* J-M's Motions in Limine Nos. 1, 3, 13, 20, and 29. Those
motions were denied.

28

3077495.1

1   Ex. HH (Trial Exhibit 7596-D).

2          In light of what the Quick Burst standard **actually** requires (6,400 psi), the evi-

3   dence and argument about Quick Burst test results less than 7,200 psi were irrelevant,

4   misleading, and prejudicial to J-M, and should not have been admitted.  The likelihood

5   of prejudice was extremely high, as Plaintiffs' counsel chose to highlight this "evi-

6   dence" in his closing argument.  *See, e.g.*, Chan Decl., Ex. W (11/5/13 Tr. at 7850:7-15

7   (Plaintiffs' counsel: "So let's look at the next set of tests that went over the cliff.  Quick

8   burst test results … The quick burst failure is below 7200.  7200 is the benchmark

9   we're using now … This just shows you the quick burst results by themselves going

10  over a cliff.")); Chan Decl., Ex. V (11/6/13 Tr. at 8153:17-21 (Plaintiffs' counsel: "[The

11  defense's point that J-M] still passed 6400 … misses the point, doesn't it?")).[18]

12         **2.       The pre-2008 UL 1285 tensile strength requirement.**

13         Plaintiffs presented evidence of R&D tensile strength test failures relating to J-

14  M's unsuccessful attempts to qualify large-diameter pipe with UL.  Plaintiffs also

15  stressed this evidence heavily.  *See, e.g.*, Chan Decl., Ex. W (11/5/2013 Tr. at 7854:12-

16  20) (Plaintiffs' closing argument: "The third thing that goes through the floor are the

17  UL 1285 tensile strength tests… It goes from a hundred percent passing to zero.  They

18

_____

19  [18]  Plaintiffs also attempted to prove that the Quick Burst test, which is a test of short-

20  term pipe strength, is somehow linked to the long-term HDB test of PVC compound.

    But the overwhelming weight of the evidence at trial demonstrated that there is no

21  such link, and Plaintiffs provided no competent evidence establishing otherwise. Chan

    Decl., Ex. II (Trial Exhibit 6708 (ASTM D1599 at Section 4.1: Data obtained by Quick

22  Burst Test "are generally not indicative of the long-term strength of thermoplastic or

23  reinforced thermosetting resin pipe, tubing, and fittings.")); Ex. CC (10/17/13 Tr. at

    5753:9-17 (Palermo: "there is absolutely no relationship between the short-term quick

24  burst test and the long term LTHS test")); Ex. DD (10/16/13 Tr. at 5603:25-5604:5

    (Haenftling: NSF's view is that the Quick Burst Test is not a test of long term

25  strength); Ex. T (10/2/13 Tr. at 3568:2-3569:1 (William Fassler: original hypothesis

26  linking Quick Burst to HDB was later proved wrong)). Plaintiffs ultimately abandoned

    their argument that Quick Burst results relate to HDB results, and made no reference

27  to such theory in closing argument.  But the damage was done.

28                                         36

3077495.1

1    cannot pass that UL 1285 test where you take the section from the finished pipe."); Ex.

2    W (11/5/2013 Tr. at 7860:12-24) (citing R&D UL 1285 test failures).

3          But the large-diameter sizes were never qualified and therefore were never UL-

4    listed or marketed as UL-compliant. As Plaintiffs' own expert James Paschal conceded,

5    pipe that is not UL-listed carries no representation of UL compliance, so there can be

6    no "false" representation or "false" claims associated with such pipe. Chan Decl., Ex.

7    U (9/20/13 Tr. at 1306:13-15) (Paschal: "if you are not stating that a product complies

8    with the standard and it's not marked as complying, then none of the requirements ap-

9    ply."). Plaintiffs presented no evidence that any of them even purchased unlisted pipe

10   in these large-diameter sizes from J-M, let alone UL-listed pipe in those sizes.[19]

11         Moreover, the so-called "failing" tensile results stemmed from tensile samples

12   cut directly from pipe pursuant to a flawed, pre-2008 version of the UL 1285 standard

13   that was changed (to eliminate any requirement that samples be cut from pipe) after UL

14   recognized that the prior version was "problematic" and "had issues with repeatability

15   of the results." Chan Decl., Ex. EE (10/23/13 Tr. at 6870:21-6871:7). The old lan-

16   guage in the standard about taking samples from pipe was so flawed that the UL wit-

17   ness himself candidly noted, "I wanted to get rid of it." Chan Decl., Ex. EE (10/23/13

18   Tr. at 7038:16-24).

19         J-M's compliance with UL 1285 was demonstrated by Laverick, who testified

20

21   [19]   Plaintiffs mischaracterized as a "failing" tensile test a January 2006 R&D report, the

22   only R&D tensile test concerning UL-listed sizes (4 inch DR18 and DR25 pipe). Alt-

23   hough the report does state that the "apparent" tensile strength of the samples was be-

24   low the desired level, the evidence was undisputed that the results were based on "non-

     standard" test specimens that had not been prepared in conformance with testing

25   standards. Accordingly, both the test report's author (Fassler) and the UL witness con-

26   firmed that the test results revealed nothing about the actual tensile strength values of

27   J-M's UL-listed pipe. Chan Decl., Ex. EE (10/23/13 Tr. at 7064:11-23 (Laverick:

     "There is no way to determine compliance with UL 1285 if the samples were not made

     to the specification.")); Ex. T (10/2/13 Tr. at 3574:15-3575:6 (Fassler: results of testing

28   on non-standard specimens did not show actual tensile strength of tested samples).

37

3077495.1

1   that UL conducted a special investigation of J-M in 2010 (after the lawsuit's allegations

2   were unsealed), involving a comprehensive surprise audit and testing of pipe and com-

3   pound from seven different J-M locations.  The results of that special 2010 investiga-

4   tion found that "everything complied with the standards," and UL "did not find any

5   evidence" –through this 2010 investigation or at any other time—that J-M was "inten-

6   tionally violating UL 1285 or any other UL rules." Chan Decl., Ex. EE (10/23/13 Tr.

7   at 6898:17-24). Laverick further confirmed that J-M had never lost any UL 1285 listing

8   due to an intentional failure to follow UL standards. Chan Decl., Ex. EE (10/23/13 Tr.

9   at 6915:10-13). Thus, evidence about J-M's purported "failures" – which occurred in

10   R&D experiments, pursuant to a flawed and superseded standard, on pipe sizes that

11   Plaintiffs never bought and that J-M never represented to comply with UL 1285 –

12   lacked any probative value, was confusing, and should not have been admitted.  Plain-

13   tiffs' improper emphasis on this evidence was prejudicial.

14        **3.     Quality control requirements.**

15        Plaintiffs also presented evidence of supposedly "improper" or "insufficient"

16   quality-control practices at certain J-M plants at certain points in time—such as the al-

17   leged removal of QC tags from specific lots of pipes at the Stockton and McNary

18   plants, and the malfunctioning quick-burst machinery at the McNary and Butner plants.

19        As a general matter, this evidence was irrelevant because (as this Court correctly

20   noted) the mere fact that QC tags were removed at certain plants, or that a testing ma-

21   chine was out of order at a plant for some period of time, "doesn't give rise to a False

22   Claims Act claim unless there is something that really connects that conduct to a claim

23   or to an invoice." Chan Decl., Ex. M (10/25/13 Tr. at 7557:8-10.  In other words, be-

24   cause this evidence was utterly untethered to Plaintiffs' pipe, it had no probative value

25   in this FCA substandard-products case. *See Campbell v. Wood*, 18 F.3d 662, 685 (9th Cir.

26   1994) (noting that Rule 401 "defines relevant evidence as that which tends to make the

27   existence of a fact of consequence more or less probable than it would be without the

28   evidence").

3077495.1

Furthermore, admission of this evidence violated Federal Rule of Evidence 404(a). The only inference that Plaintiffs derived from it was that J-M had shoddy manufacturing and QC practices, with which it must have acted in accordance when it manufactured and sold pipe to plaintiffs. That inference is exactly the one forbidden by Rule 404(a). *See, e.g., United States v. Martinez*, 182 F.3d 1107, 1111 (9th Cir. 1999) (noting that evidence of an individual's "bad character from which the government hopes for an inference of conduct consistent with bad character" is inadmissible); *Cohn v. Papke*, 655 F.2d 191, 193-194 (9th Cir. 1981) (discussing Rule 404).

In any event, any occasional failures to meet QC standards were not widespread and never even rose to a level of concern within the auditing agencies themselves. For example, Haentfling explained that NSF conducted hundreds of audits of J-M plants over the relevant time period, which specifically checked for a vast array of quality-control requirements including whether quality-control records were in place and quick-burst machinery was working.  These audits sometimes uncovered instances of malfunctioning or non-functioning test equipment.  But NSF never determined that J-M had followed a policy of maintaining "inaccurate, incomplete or false quality control testing or records," and NSF never determined that J-M was attempting to mislead NSF or violate NSF rules.  Chan Decl., Ex. DD (10/16/13 Tr. at 5408:22–5409:16, 5411:25–5413:2, 5469:22–5470:20). Laverick similarly testified that UL's 2010 special investigation "went beyond the normal audit inspection-type tests," and still determined that "everything complie[d] with the requirements." Chan Decl., Ex. EE (10/23/13 Tr. at 6892:11-6894:22, 6896:8-15, 6898:1-20).

Plaintiffs' own witnesses corroborated this. Plaintiffs' expert Jim Paschal, the head of NSF's testing lab from 1988-2002, testified that he personally tested samples of J-M pipe collected from dozens of surprise NSF plant audits, and did not believe J-M "cheated or did something improper" to pass those tests during that entire 14-year time period. Chan Decl., Ex. U (9/20/13 Tr. at 1299:13-16). Likewise, KC Yang admitted that J-M's CEO Walter Wang was "focused on producing quality pipe" and told Yang

39

1  to "be tougher [on quality] than anyone else in the company"; Yang was consistently
2  instructed "to make sure the quality control equipment was working properly" in the
3  plants.   Chan Decl., Ex. JJ (9/24/13 Tr. at 1897:17-20, 1898:20-1899:3); Ex. KK
4  (9/25/13 Tr. at 2036:4-14).

5      In sum, taken in context, the admission of evidence about J-M's QC practices,
6  which plaintiffs never connected to the pipe they received, was in error because it con-
7  travened Federal Rules of Evidence 401-404.

8                              **V.  CONCLUSION**

9      For the reasons set forth above, the Court should grant J-M's motion for judg-
10  ment as a matter of law. Alternatively, the Court should grant J-M a new trial.

11  DATED: January 14, 2014              Respectfully submitted,

12                                       BIRD, MARELLA, BOXER, WOLPERT,
13                                        NESSIM, DROOKS & LINCENBERG, P.C.

14                                       By:  _____/s/ Paul S. Chan_____
15                                                Paul S. Chan
16                                       Attorneys for Defendant J-M Manufacturing
                                         Company, Inc. d/b/a JM Eagle
17
18
19
20
21
22
23
24
25
26
27
28

RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW
TRIAL [F.R.C.P. RULES 50(b) & 59]

3077495.1