David Bernick (*Pro Hac Vice*)
  david.bernick@dechert.com
DECHERT LLP
1095 Avenue of the Americas
New York, New York  10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

Ekwan E. Rhow - State Bar No. 174604
  eer@birdmarella.com
Paul S. Chan - State Bar No. 183406
  psc@birdmarella.com
Marc E. Masters - State Bar No. 208375
  mem@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT,
  NESSIM, DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant J-M
Manufacturing Company, Inc.
d/b/a JM Eagle

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES, THE STATES OF CALIFORNIA, DELAWARE, FLORIDA, ILLINOIS, INDIANA, NEVADA, NEW MEXICO, NEW YORK, and TENNESSEE, THE COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA, and THE DISTRICT OF COLUMBIA ex rel. JOHN HENDRIX, <br><br> Plaintiffs, <br><br> vs. <br><br> J-M MANUFACTURING COMPANY, INC. d/b/a JM EAGLE, a Delaware corporation, and FORMOSA PLASTICS CORPORATION, U.S.A., a Delaware corporation, <br><br> Defendants. | CASE NO. ED CV 06-00055-GW(PJWx) <br><br> **DEFENDANT J-M'S COMBINED REPLY BRIEF REGARDING ISSUES 1-3 AND RULE 9(b)** <br><br> Assigned to Hon. George H. Wu |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ....................................................................................... 1

II.     ISSUE 1: THE PHASE I VERDICT IS UNUSABLE IN PHASE II
        FOR THE EXEMPLAR PLAINTIFFS ........................................................ 4

III.    ISSUE 2: NON-EXEMPLAR PLAINTIFFS CANNOT USE THE
        PHASE 1 VERDICT ................................................................................ 5

IV.     ISSUE 3: J-M'S PROFFER REGARDING THE SUFFICIENCY OF
        TRIAL EVIDENCE ON PHASE II LIABILITY THEORIES ...................... 6

V.      RULE 9(b) AND QUI TAM ....................................................................... 6

VI.     ISSUE I: THE PHASE I VERDICT IS UNUSABLE IN PHASE II
        FOR THE EXEMPLAR PLAINTIFFS. ....................................................... 7

        A.   Plaintiffs Cannot Adopt New Theories of Liability During and
             After Trial. ................................................................................... 7

             1.   There Can Be No Question But That Plaintiffs' Theory of
                  the Case Has Been and Still Is Changing. .............................. 7

             2.   Plaintiffs' Efforts to Cast J-M and the Court as Complicit
                  in Their Liability Maneuvers are Less than Candid. ............. 9

             3.   The Court Itself Has Stated That the Phase I Trial Was Not
                  a Full Trial. ........................................................................ 11

        B.   The Seventh Amendment: The Court Cannot Save the Verdict by
             Re-Writing It. .............................................................................. 12

             1.   The Phase I Verdict Is Facially Unintelligible and Fails to
                  Make Crucial Findings. ....................................................... 12

             2.   Plaintiffs Cannot Fabricate Jury "Findings" for Use in
                  Phase II. .............................................................................. 13

             3.   Plaintiffs' New Efforts to Have the Court Rewrite the
                  Verdict Are Factually and Legally Unsupportable. ............. 15

                  a.   Plaintiffs Propose That the Court Rewrite the
                       Verdict. ....................................................................... 15

                  b.   Any Rewrite of the Verdict Would Be Error. ............... 19

             4.   Plaintiffs Cannot Escape the Force of *Gasoline Products*
                  and the Other Precedents Set Forth in J-M's Initial Brief .......... 22

             5.   Re-Examination is Inescapable if the Phase I Verdict is
                  Used. .................................................................................. 25

VII.   ISSUE 2: DUE PROCESS AND THE SEVENTH AMENDMENT BAR THE CLAIMS OF NON-EXEMPLAR PLAINTIFFS FOR ADDITIONAL REASONS ...........................................................28

A.   The Constitutional Prohibitions on Exemplar Plaintiffs' Use of the Phase I Verdict Equally Apply to Non-Exemplar Plaintiffs...........28

B.   There is No Rule or Provision Allowing for a Post Hoc, De Facto Class Trial ............................................................................28

C.   Due Process Does Not Permit De Facto "Class" Treatment. ...............29

D.   The Exemplar Plaintiffs Are Certainly Not "Indistinguishable" Among Themselves...................................................................29

E.   The Evidence Relevant to Phase II Theories Is Not Common. ............31

F.   In the Context of Repeat Product Defect Cases, Seventh Amendment and Due Process Problems Have Been Found to Be Insuperable and an Agreement to be Bound Has Been Required; No Such Agreement Was Made Here...................................................32

VIII.   ISSUES 1 AND 2: INVOCATION OF ISSUE PRECLUSION, AND OTHER DOCTRINES MEANT TO ADDRESS REPEATED VEXATIOUS LITIGATION, ARE NOT SAFE PASSAGE AROUND THE CONSTITUTION .................................................................36

A.   Issue Preclusion, Whether Through Collateral Estoppel or Direct Estoppel, Cannot Override Insufficiencies in the Phase I Verdict or Constitutional Requirements ............................................37

B.   The Legal Prerequisites for Issue Preclusion Are Not Satisfied Here ............................................................................39

1.   False Certification and Fraudulent Inducement Were Not Actually Litigated ........................................................40

2.   The Inferences Plaintiffs Would Like to Draw From the Phase I Verdict Were Not Critical to the Jury's Determinations...............................................................41

3.   The Phase I Verdict Is Not Final. ..............................42

C.   The Discretionary Doctrine of Law of the Case Does Not Apply........44

D.   The Indicia of Unfairness Counsels Against Any Preclusion. .............45

IX.   ISSUE 3: THE PHASE I TRIAL IS NOT SUFFICIENT TO SUPPORT A VERDICT UNDER ANY THEORY AVAILABLE TO PLAINTIFFS IN PHASE II. ...................................................46

A.   On the Facts, Plaintiffs Simply Have Nothing to Say. ........................46

B.   Plaintiffs Continue to Cling to Their Elements Theory of Liability, Which Is Wrong. ..................................................47

ii

       1.     Plaintiffs' Expansion of False Certification Would Turn Every Breach of Contract Into a FCA Claim. ...........................47

       2.     J-M's Distance From the Contracts Refutes Each of the Specific Elements of False Certification and Fraudulent Inducement..................................................................51

X.     RULE 9(B) PLEADING MUST BE, BUT HAS NOT BEEN SATISFIED HERE AND HENDRIX'S STATUS AS A QUI TAM RELATOR DOES NOT CHANGE THAT REQUIREMENT.....................51

    A.    Rule 9(b) is not trumped by the FCA.....................................51

    B.    Hendrix Must Plead Specific Facts as to Every Real Party in Interest Plaintiff..........................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Acevedo-Garcia v. Monroig*,
   351 F.3d 547 (1st Cir. 2003) .......................................................... 41, 42

*Acosta v. City of Costa Mesa*,
   718 F.3d 800 (9th Cir. 2013) ................................................................ 22

*Act Up!/Portland v. Bagley*,
   988 F.2d 868 (9th Cir. 1993) ................................................................ 19

*United States v. Aerodex, Inc.*,
   469 F.2d 1003 (5th Cir. 1972) .............................................................. 49

*In re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colo., on
   Nov. 15, 1987*,
   720 F. Supp. 1505 (D. Colo. 1989) ...................................................... 38

*United States v. Alexander*,
   106 F.3d 874 (9th Cir. 1997) .......................................................... 37, 44

*Allison Engine Co., Inc. v. U.S. ex rel. Sanders*,
   553 U.S. 662 (2008) ....................................................................... 50, 51

*Amcast Indus. Corp. v. Detrex Corp.*,
   45 F.3d 155,160 (7th Cir. 1995) ........................................................... 42

*Amchem Products, Inc. v. Windsor*,
   521 U.S. 591 (1997) ............................................................................. 28

*Anderson v. Bungee Int'l Mfg. Corp.*,
   44 F.Supp.2d 534 (S.D.N.Y.1999) ....................................................... 41

*Ashe v. Swenson*,
   397 U.S. 436 (1970) ............................................................................. 20

*U.S. ex rel. Atkins v. McInteer*,
   470 F.3d 1350 (11th Cir. 2006) ............................................................ 56

*Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*,
   369 U.S. 355 (1962) ...................................................................................... 20, 21

*Becherer v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*,
   193 F.3d 415 (6th Cir. 1999) ................................................................................ 28

*In re Bendectin Prods. Liab. Litig.*,
   749 F.2d 300 (6th Cir. 1984) ................................................................................ 45

*Biancur v. Hickey*,
   221 F. App'x 546 (9th Cir. 2007) ........................................................................ 44

*Alabama v. Blue Bird Body Co.*,
   573 F.2d 309 (5th Cir. 1978) ................................................................................ 26

*Blyden v. Mancusi*,
   186 F.3d 252 (2d Cir. 1999) ................................................................... 24, 26, 28

*United States v. Bornstein*,
   423 U.S. 303 (1976) .................................................................................. 14, 48, 51

*Brown v. Parker Drilling Offshore Corp.*,
   410 F.3d 166 (5th Cir. 2005) ................................................................................ 21

*Arizona v. California*,
   530 U.S. 392 (2000) ............................................................................................. 40

*Calnetics Corp. v. Volkwagen of Am.*,
   532 F.2d 674 (1976) ............................................................................................. 43

*U.S. ex rel. Carpenter v. Abbott Labs., Inc.*,
   723 F. Supp. 2d 395 (D. Mass. 2010) ................................................................. 55

*Castano v. Am. Tobacco Co.*,
   84 F.3d 734 (5th Cir. 1996) .................................................................................. 33

*U.S. ex rel. Cericola v. Fed. Nat. Mortgage Assoc.*,
   529 F. Supp. 2d 1139 (C.D. Cal. 2007) .......................................................... 53, 55

*In re Chevron U.S.A., Inc.*,
   109 F.3d 1016 (5th Cir. 1997) ...................................................................*passim*

*Cimino v. Raymark Indus., Inc.*,
   151 F.3d 297 (5th Cir. 1998) ......................................................................... 28, 33

*Coburn v. Smithkline Beecham Corp.*,
    174 F. Supp. 2d 1235 (D. Utah 2001) ................................................................. 41

*Cook County, Ill. v. U.S. ex rel. Chandler*,
    538 U.S. 119 (2003) ............................................................................................. 9

*Cotton v. Heyman*,
    63 F.3d 1115 (D.C. Cir. 1995) ........................................................................... 43

*DePinto v. Provident Security Life Ins. Co.*,
    323 F.2d 826 (9th Cir.1963) .............................................................................. 19

*Deutsch v. Flannery*,
    823 F.2d 1361 (9th Cir. 1987) ........................................................................... 44

*Dodge v. Cotter Corp.*
    203 F.3d 1190 (2000) ................................................................................... 32, 41

*In re Duncan*,
    713 F.2d 538 (9th Cir. 1983) ....................................................................... 36, 40

*E.F. Hutton & Co. v. Arnebergh*,
    775 F.2d 1061 (9th Cir. 1985) ........................................................................... 19

*United States ex rel. Fallon v. Accudyne Corp.*,
    921 F. Supp. 611 (W.D. Wisc. 1995) ................................................................ 49

*In re Fibreboard Corp.*,
    893 F.2d 706 (1990) ........................................................................................... 33

*Foglia v. Renal Ventures Mgmt., LLC*,
    754 F.3d 153 (3d Cir. 2014) ............................................................................... 53

*Freeman v. Chicago Park Dist.*,
    189 F.3d 613 (7th Cir. 1999) ............................................................................. 22

*Gasoline Products Co. v. Champlin Refining Co.*,
    283 U.S. 494 (1931) ..................................................................................*passim*

*Gresham v. Philip Morris, Inc.*,
    670 F. Supp. 2d 1014 (C.D. Ca. 2009) .............................................................. 42

*Guild Wineries & Distilleries v. Whitehall Co., Ltd.*,
    853 F.2d 755 (9th Cir. 1988) ............................................................................. 46

*Hagood v. Sonoma County Water Agency*,
   81 F.3d 1465 (9th Cir. 1996) ............................................................... 15

*U.S., ex. rel. Hallstrom v. Aqua Flora, Inc.*,
   No. 10-civ-01459, 2010 WL 4054243 (E.D. Cal. Oct. 15, 2010) ....................... 52

*United States v. Hamaker*,
   455 F.3d 1316 (11th Cir. 2006) ............................................................ 24

*Hardy v. Johns-Manville Sales Corp.*,
   681 F.2d 334 (5th Cir. 1982) ............................................................... 38

*Hartnett v. Brown & Bigelow*,
   394 F.2d 438 (10th Cir. 1968) .............................................................. 19

*Held v. Mitsubishi Aircraft Int'l, Inc.*,
   672 F. Supp. 369 (D. Minn. 1987) ......................................................... 38

*U.S. ex rel. Hendow v. University of Phoenix*,
   461 F.3d 1166 (2006) ..................................................................... 10, 50

*Hodges v. Easton*,
   106 U.S. 408 (1882) ........................................................................ 19

*U.S. v. Howe*,
   590 F.3d 552 (8th Cir. 2009) ............................................................... 41

*Frazier ex rel. U.S. v. Iasis Healthcare Corp.*,
   392 F. App'x 535 (9th Cir. 2010) .......................................................... 47

*In re Innotron Diagnostics*,
   800 F.2d 1077 (Fed. Cir. 1986) ......................................................... 26, 45

*Johnson v. U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*,
   501 F.3d 493 (6th Cir. 2007) ............................................................... 55

*Kamilche Co. v. United States*,
   53 F.3d 1059 (9th Cir. 1995) ............................................................... 41

*United States ex rel. King v. DSE, Inc.*,
   2011 U.S. Dist. LEXIS 52830 (N.D. Fla. May 17, 2011) ................................. 49

*Kramer v. Showa Denko K.K.*,
   929 F. Supp. 733 (S.D.N.Y. 1996) .................................................. 38, 39, 41

DEFENDANT J-M'S COMBINED REPLY BRIEF REGARDING ISSUES 1-3 AND RULE 9(b)

*U.S. ex rel. Lee v. SmithKline Beecham, Inc.*,
   245 F.3d 1048 (9th Cir. 2001) ............................................................ 52

*Leslie Salt Co. v. United States*,
   55 F.3d 1388 (9th Cir. 1995) .............................................................. 44

*Little v. Shell Exploration & Prod. Co.*,
   690 F.3d 282 (5th Cir. 2012) .............................................................. 56

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
   998 F.2d 1144 (3rd Cir. 1993) ............................................................ 27

*Ebeid ex rel. U.S. v. Lungwitz*,
   616 F.3d 993 (9th Cir. 2010) ........................................................ *passim*

*Magnesystems, Inc. v. Nikken, Inc.*,
   933 F. Supp. 944 (C.D. Cal. 1996) ..................................................... 45

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) .......................................................................... 36

*Migra v. Warren City Sch. Dist. Bd. of Educ.*,
   465 U.S. 75 (1984) ............................................................................ 46

*Morgan v. Ford Motor Co.*,
   2007 WL 1456154 (D.N.J. May 17, 2007) ......................................... 39

*Mueller v. Auker*,
   700 F.3d 1180 (9th Cir. 2012) ...................................................... 43, 44

*U.S. v. Neifer-White Co.*,
   390 U.S. 228 (1968) ............................................................................ 9

*United States v. Northrop Corp.*,
   59 F.3d 953 (9th Cir. 1995) ............................................................... 56

*O'Hagan v. Soto*,
   565 F. Supp. 422 (S.D.N.Y. 1983) .................................................... 27

*Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*,
   585 F.2d 821 (1978) .......................................................................... 43

*In re Paine*,
   283 B.R. 33 (B.A.P. 9th Cir. 2002) .................................................... 40

*In re Paoli R.R. Yard PCB Litig.*,
   113 F.3d 444 (3rd Cir. 1997) ............................................................................ 26

*Pegram v. Herdrich*,
   530 U.S. 211 (2000) ........................................................................................ 36

*U.S. ex rel. Perry v. Hooker Creek Asphalt & Paving, LLC*,
   565 F. App'x 669 (9th Cir. 2014) ........................................................... 53, 54, 55

*Pooshs v. Philip Morris USA, Inc.*,
   904 F. Supp. 2d 1009 (N.D. Cal. 2012) ............................................................ 38

*Resolution Trust Corp. v. Keating*,
   186 F.3d 1110 (9th Cir. 1999) .......................................................................... 42

*In re Rhone-Poulenc Rorer, Inc.*,
   51 F.3d 1293 (7th Cir. 1995) ............................................................................ 25

*U.S. ex rel. Rodriguez v. Weekly Publications*,
   9 F.R.D. 179 (1949) ......................................................................................... 25

*U.S. ex. Rel. Rost v. Pfizer, Inc.*,
   507 F.3d 720 (2007) .................................................................................... 53, 54

*Russell v. Place*,
   94 U.S. 606 (1877) ........................................................................................... 24

*Strom ex rel. U.S. v. Scios, Inc.*,
   676 F. Supp. 2d 884 (N.D. Cal. 2009) ........................................................... 52, 53

*United States v. Scott*,
   705 F.3d 410 (9th Cir. 2012) ............................................................................ 35

*Setter v. A.H. Robins Co.*,
   748 F.2d 1328 (8th Cir. 1984) .......................................................................... 41

*In re Simon II Litig.*,
   211 F.R.D. 86 (E.D.N.Y. 2002) ........................................................................ 23

*In re Simon II Litig.*,
   407 F.3d 125 (2d Cir. 2005) ............................................................................. 23

*Simon v. Philip Morris*,
   200 F.R.D. 21 (E.D.N.Y. 2001) ........................................................................ 23

ix

*Taylor v. Sturgell*,
    553 U.S. 880 (2008) .................................................................28, 37, 40

*Thomas v. Bible*,
    983 F.2d 152 (9th Cir. 1993) .........................................................37, 44

*Tice v. American Airlines, Inc.*,
    162 F.3d 966 (7th Cir. 1998) ...............................................................28

*Unit Drilling Co. v. Enron Oil & Gas Co.*,
    108 F.3d 1186 (10th Cir. 1997) ...........................................................19

*U.S. ex rel. UNITE HERE v. Cintas Corp.*,
    2008 WL 1767039 (2008) ....................................................................48

*Unitherm Food Sys. v. Swift-Eckrich, Inc.*,
    546 U.S. 394 (2006) ............................................................................24

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) ...............................................................25

*Venustas v. Venustas Intern., LLC*,
    2008 WL 619028 (S.D.N.Y. 2008) .....................................................42

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011).........................................................................31

*Wang Labs v. Mitsubishi Elec. Am.*,
    1998 U.S. Dist. LEXIS 21373 (C.D. Cal. July 20, 1993) ...................26

*Williams v. Commissioner*,
    1 F.3d 502 (7th Cir. 1993) ...................................................................37

*In re WorldCom, Inc. Sec. Litig.*,
    2005 WL 375315 (S.D.N.Y. Feb. 17, 2005) .......................................28

**State Cases**

*People v. Barragan*,
    32 Cal. 4th 236 (2004).........................................................................44

*Armenta ex rel. City of Burbank v. Mueller Co.*,
    142 Cal. App. 4th 636 (2006)...........................................................7, 54

x

*City of Ponoma v. Superior Court*,
    89 Cal. App. 4th 793 (2001) ....................................................................9, 50, 51

*San Francisco Unified School District ex rel. Contreras v. Laidlaw
    Transit, Inc.*,
    182 Cal. App. 4th 438 (2010) ...........................................................48, 49, 50, 51

*Goodson v. McDonough Power Equip., Inc.*,
    443 N.E.2d 978 (1983) ....................................................................................38, 41

*Sabek, Inc. v. Engelhard Corp.*,
    65 Cal. App. 4th 992 (1998) .................................................................................36

**Federal Statutes**

28 U.S.C. § 1291 ....................................................................................................43

35 U.S.C. § 292 ......................................................................................................52

Federal Rule of Civil Procedure 50 and 59 .........................................................23

Rule 9(b) .........................................................................................................*passim*

Rule 16 ..............................................................................................................3, 38

Rule 23 ...............................................................................................5, 28, 29, 31

Rule 42 ..........................................................................................1, 6, 31, 35, 42

Rule 50 ...................................................................................................................24

Rule 54(b) ..............................................................................................................40

**Other Authorities**

18A Fed. Prac. & Proc. Juris. § 4434 (2d ed.) .........................................................37

12 James Wm. Moore et al., Moore's Federal Practice
    § 59.06 (3d ed.2006) ...........................................................................................20

Judge Fallon, *Bellwether Trials in Multidistrict Litig.*, 82 Tul. L. Rev.
    2323, 2331, 2332 n.27 (2008) ...............................................................29, 30, 33

M. Stuart Madden, *Issue Preclusion in Products Liability* .......................................37

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Proceedings to Procure New Trial*,
    66 C.J.S. New Trial § 321 (2014).........................................................................19

Restatement (Second) of Judgments § 27 (1982)...................................................40

Restatement (Second) Judgments § 29, comment....................................................41

Restatement (Second) of Judgments § 40, cmt. ....................................................36

DEFENDANT J-M'S COMBINED REPLY BRIEF REGARDING ISSUES 1-3 AND RULE 9(b)

# I.     INTRODUCTION

Plaintiffs have now filed almost 100 pages of what can fairly be described as a welter of legal generalities and case citations in service of the same strategy they have pursued since the Court turned its attention to the relationship between Phases I and II – to insist that everything about that relationship was decided before trial or was waived, and the Court should simply get on with a truncated Phase II trial on damages. But the fact remains that (as was the case in *Gasoline Products Co. v. Champlin Refining Co.* ("*Gasoline Products*"), 283 U.S. 494, 499 (1931)) the stand alone viability of a first phase verdict does not pose the same question as whether it can be used in a subsequent trial. The Court has clearly directed that the latter question be addressed in these briefs. That question alone provides the prism through which the proceedings to date should be addressed. Plaintiffs are simply in denial about this specific focus.

Plaintiffs similarly fail to grapple with the case-specific facts on which that specific focus must be trained. The relationship between Phase I and Phase II in this case turns not upon generalities but the very distinctive mixture of decisions, which ultimately framed the Phase I trial verdict. These decisions are not difficult to list:

- **The Bifurcation Order:** (1) No Rule 42 motion or findings were made; (2) the portion of the order addressing Phase II was objected to in its entirety; (3) the selection of the exemplar Plaintiffs was objected to; (4) no theory of liability had been selected for trial; (5) the Court itself has said that the first phase trial was never intended to be binding with respect to the non-exemplar Plaintiffs and that any use of the result would be controlled by law – not by the order or by agreement.

- **The Pretrial and Trial Theories of Liability:** (1) In 2012, after entry of the Bifurcation Order, Plaintiffs relied upon the substandard product theory, disavowed false certification (as both they and the law defined it), and also

agreed that fraudulent inducement was not at issue in Phase I. (2) They chose this approach explicitly to avoid the materiality/causation requirements of false certification and the reliance element of fraudulent inducement. (3) Plaintiffs announced no change in their theory of liability all the way through the presentation of their evidence at trial. (4) J-M clearly relied on Plaintiffs' 2012 commitment, focusing all of its arguments about the facts, the sufficiency of the evidence, and the instructions on substandard products.

• **Impact of the Bifurcation Order and Plaintiffs' Prior Theory of Liability on Discovery and Admission of Evidence**: (1) The Bifurcation Order and Plaintiffs' prior substandard products theory limited discovery in Phase I. (2) In their motions *in limine*, Plaintiffs relied upon the Bifurcation Order to limit J-M's presentation of evidence, and they succeeded in this effort.

• **Instructions**: (1) The jury was not instructed on false certification because it was not Plaintiffs' theory of the case. Indeed, at the close of trial, the Court noted that Plaintiffs had not tried a false certification case.  (11/4/13 Tr. at 7744:7-13 ("I always thought this case was a false certification case. But you have not litigated it in that fashion.")) (2) The jury was not instructed on fraudulent inducement. (3) The jury was instructed on Plaintiffs' "Elements" theory of the case. (4) The instructions do not even contain the words "substandard product."

• **Verdict**: (1) Instructed to identify/describe why the claim was false and/or fraudulent, the jury answered that J-M falsely represented "uniform compliance with AWWA C905 and UL 1285." (2) This was a formula given to them in closing by Plaintiffs' counsel. (3) That formula does not exist in any brochure or statement made by J-M.  Nor did the verdict specify how J-M failed to "uniformly comply" with any specific provision of these standards, or with respect to what pipe.

- **<u>Post Trial Developments Regarding the Theory of Liability for Phase II</u>:** (1) On June 23, 2014, J-M filed its Rule 16 Brief, stating that (a) the relationship between Phases I and II required separate analysis and briefing and (b) Plaintiffs should be required to state their theory of the case for Phase II. (2) On June 30, 2014, at J-M's request, the Court confirmed that J-M's argument (i.e., that a new trial was required because the Phase I verdict was not useable in Phase II) was preserved for further briefing.  (6/30/14 Tr. at 69-70). (3) During the ensuing months, Plaintiffs were repeatedly told to specify their theory of liability for Phase II. Plaintiffs have now identified three purported theories for Phase II: (a) "Elements"; (b) false certification; (3) fraudulent inducement. (Joint Status Report at 11:10-12:22) [Dkt. 1973].

- **<u>Failure to Plead and Prove the Contract Specific Who, What, When</u>:** (1) Even today, none of the exemplar Plaintiffs have pled fraudulent inducement or false certification with particularity for any specific contract. (2) Notwithstanding the Court's instructions for this briefing, the exemplar Plaintiffs have not set forth the trial evidence rebutting J-M's proffer, made in its Initial Brief (J-M Initial Br. at 40-61 [Dkt. 1987]), that the requirements for these were not met in Phase I. (3) None of the non-exemplar Plaintiffs has ever pled false representations to it with particularity. None has pled fraudulent inducement or false certification; (4) None of the non-party non-exemplar Plaintiffs has provided any facts to the Court regarding the particulars of its claims, much less filed a pleading doing so.

It is these facts that drive the legal analysis set forth below. J-M's Initial Brief [Dkt. No. 1987] provides the details and citations of the history giving rise to these facts. For all of their volume, Plaintiffs' Initial Brief [Dkt No. 1988] ("Pls. Initial Br. [Dkt. 1988]") and Response Brief [Dkt No. 1990] ("Pls. Resp. Br. [Dkt. 1990]"), add very little and nothing material to the history. In what follows, J-M addresses, in

3

order, each of the issues framed by the Court.

## OVERVIEW OF THE COURT'S ISSUES

## II.   ISSUE 1: THE PHASE I VERDICT IS UNUSABLE IN PHASE II FOR THE EXEMPLAR PLAINTIFFS

The Due Process and Seventh Amendment obstacles to use of the Phase I verdict remain simple, fact-specific, and squarely supported by law which Plaintiffs cannot explain away.

The Due Process problem arises from the bait-and-switch routine that Plaintiffs have used for their theory of liability. Plaintiffs have no answer to the law which precludes changing theories of liability, during or after trial, and there can be no question but that Plaintiffs have done this. Not content even with seeking a new trial for the new theories, Plaintiffs are insisting that the **old** trial on the **old** theories should bind J-M in a second stage trial on **new** theories. This is bait-and-switch coupled with "no money back" from the first trial. Not one case is cited for the proposition that this is Due Process. Further, Plaintiffs add insult to injury in their terse refusal to engage on the issue of whether the Phase I trial evidence actually substantiates the elements required under the new Phase II theories of liability, despite the Court's order that they do so.

The Seventh Amendment problem is equally focused and fact specific. Plaintiffs asked the jury for an unusable, formulaic verdict, and they got one. The words the jury wrote down cannot be tortured either to become intelligible to a lay person or to yield the key findings of when, how, and to whom J-M represented "uniform compliance with AWWA C905 and UL 1285," and when and with respect to whom and what product it was false. That information is essential to determine, for example: (a) whether a particular historical representation that will predicate fraudulent inducement in Phase II has already been found to be FMS and how; (b) whether a particular historical representation of compliance with a law or

regulation that will predicate false certification in Phase II has already been found to be FMS and how; (c) the value of non-compliant vs. compliant pipe for damages purposes.

Not only do plaintiffs struggle in vain to deny the legal implications of these problems under *Gasoline Products*, 283 U.S. 494, but they concede the myriad problems with the verdict by proposing that the Court take the matter in hand and just rewrite it. This blatant invitation for court "reexamination" finds no support in the law and cannot even be grounded in trial evidence. The trial evidence does not even reflect the words the jury did use, much less extend to an altered verdict that the jury never reached.

## III.   ISSUE 2: NON-EXEMPLAR PLAINTIFFS CANNOT USE THE PHASE 1 VERDICT

All of these problems also foreclose the proposed use of the verdict by **non**-exemplar Plaintiffs, notwithstanding their most recent contention that non-parties to the first trial can somehow use a Constitutionally-deficient verdict because they were not there. Equally incredible is Plaintiffs' insistence that J-M had "fair warning" that the verdict would be binding, when this irreconcilably conflicts with the Court's own statements that it did not intend such a result. As to the established law that bellwether trials cannot be binding absent agreement, the lack of such an agreement here moves Plaintiffs to just say "it just ain't so" – that Phase I was not in fact a bellwether trial. But if it was not, how can Plaintiffs insist that it be given the effect of one? Finally, Plaintiffs' efforts to mimic compliance with Rule 23 by urging that all of the evidence is common and the plaintiffs are all the same is simply too little too late.

So, Plaintiffs must ultimately prevail on issue preclusion, the only legal doctrine that the Court has indicated might be invoked by non-exemplar Plaintiffs. Much of Plaintiffs' extended briefing on this issue addresses a proposition that is

irrelevant because it is not disputed – direct and collateral issue preclusion can apply to the *exemplar* Plaintiffs' use of the Phase I verdict, *if* use of the verdict complies with Rule 42 and the Constitution, which it does not here. The only relevant preclusion question concerns the *non-exemplar* Plaintiffs' use of the Phase I verdict. To get to this question, Rule 42 and the Constitution still must be satisfied, and they are no more met by the non-exemplar Plaintiffs than they are by the exemplar Plaintiffs. Nor do collateral estoppel or direct estoppel apply by their terms. None of the three requirements discussed in J-M's Initial Brief are satisfied, and nothing said in Plaintiffs' two briefs even changes the picture.

## IV.   ISSUE 3: J-M'S PROFFER REGARDING THE SUFFICIENCY OF TRIAL EVIDENCE ON PHASE II LIABILITY THEORIES

In addition to Issues 1 and 2, the Court directed J-M to make a "proffer" regarding the sufficiency of the Phase I trial evidence to satisfy the requirements for liability in Phase II. [Dkt 1983]. Plaintiffs were to respond, and J-M was then to reply. J-M made its proffer in its Initial Brief, setting out the liability theories of Phase II and the evidence relating to them, with specificity.

Plaintiffs devote two or so pages to their rebuttal. The reason for their brevity is clear – they simply demur on their obligation to respond. They say it is too late to address Phase I evidence and "premature" to address Phase II evidence. Pls. Resp. Br. at 50-53 [Dkt. 1990]. But the purpose of all of the briefing is to determine whether Phase I can be used in Phase II at all. If Phase I evidence does not establish liability for Phase II theories, this is another reason why the Phase I verdict cannot be used.

## V.   RULE 9(b) AND QUI TAM

Fraud must be pled and proven with particularity for each plaintiff and each cause of action. Fraud under the FCA is no different. *See, e.g.*, *Ebeid ex rel. U.S. v. Lungwitz* ("*Ebeid*"), 616 F.3d 993, 999 (9th Cir. 2010).

Years into this litigation, the exemplar Plaintiffs have never done this for the theories of liability they now want to pursue in Phase II. For months now they have fought to avoid committing to Phase II theories of liability and still are fighting having to provide a proffer with specificity. Even in this briefing, they refuse to respond substantively to J-M's proffer based upon the Phase I trial. *See, e.g.*, *Armenta ex rel. City of Burbank v. Mueller Co.* ("*Armenta*"), 142 Cal. App. 4th 636, 642 (2006). The non-exemplar Plaintiffs have done even less.

Finally, the non-party non exemplars have done nothing at all. That is a luxury no one enjoys under the Federal Rules. *See, e.g.*, *Armenta ex rel. City of Burbank v. Mueller Co.* ("*Armenta*"), 142 Cal. App. 4th 636, 642 (2006). Their claims should be stricken.

## ARGUMENT

**VI.  ISSUE I: THE PHASE I VERDICT IS UNUSABLE IN PHASE II FOR THE EXEMPLAR PLAINTIFFS.**

**A.  Plaintiffs Cannot Adopt New Theories of Liability During and After Trial.**

J-M's Initial Brief established that Plaintiffs' shifting liability theories (together with truncated discovery and the limitations imposed on the Phase I trial) violate J-M's Due Process rights. J-M Initial Br. at 19-25 [Dkt. 1987]. The relevant case law is entirely undisputed. Instead, Plaintiffs' Response brief argues that J-M went along with the changing theories of liability and that the Court has already rejected J-M's arguments about new theories. Pls. Resp. Br. at 19-24 [Dkt No. 1990]. Neither of these assertions stand up to scrutiny.

**1.  There Can Be No Question But That Plaintiffs' Theory of the Case Has Been and Still Is Changing.**

For all of their efforts to muddy the detailed history set out in J-M's Initial Brief, the following dispositive facts are entirely undisputed: (1) At the May 7, 2012

7

hearing, Plaintiffs committed that the Phase I trial would not include either fraudulent inducement or false certification (defined to require certification of compliance with a "law or regulation"). In their follow-up letter, they did embrace substandard products. "Elements" was never stated as a theory of liability. (2) At trial, Plaintiffs did not prove a substandard products case. Nor did they prove or submit either a fraudulent inducement or a false certification case. Instead, they put their bets on the Elements. (3) The instructions given to the jury do not explain and properly direct the jury on fraudulent inducement, false certification or even, specifically, substandard products. The instructions were framed by the Elements theory, precisely to avoid the materiality and reliance requirements for fraudulent inducement and false certification and, as well, to avoid proving actual delivery of substandard products. (4) Post trial, Plaintiffs have stated their intent to pursue fraudulent inducement and false certification in Phase II. Plaintiffs say that the former should not have been a surprise. Pls. Resp. Br. at 20 [Dkt. 1990].

Against this backdrop, Plaintiffs have no alternative but to find some theory that will be common between Phase I and Phase II. They posit three theories, but none is a theory of FCA liability under the law.

The first candidate is the "Lottery Ticket" narrative. Pls. Resp. Br. at 19, 20-1, 23 [Dkt. 1990]. This is merely an argumentative statement of fact, not a theory of liability.

Their second candidate is the "Elements" theory, christened a "theory" long after the trial was over. On Plaintiffs' view, the established types of FCA liability and the wealth of cases concerning them can be rejected wholesale in favor of judicial application of the statutory "elements" without regard to how the courts have constrained their application. Were that view correct (and, as this Court has recognized, it is not), the relevant body of law about how to apply the FCA would be nugatory. That is not the law.

Plaintiffs rely on generalized statements about the broad reach of the FCA when urging this Court to abandon binding case law, without ever addressing how *Ebeid*, 616 F.3d 993, and other cases cited by J-M can be harmonized with Plaintiffs' view. The cases they cite are no help. Those cases do not abandon the FCA categories, but address other irrelevant issues. *See U.S. v. Neifer-White Co.*, 390 U.S. 228, 229-30, 233 (1968) (holding that facially false loan applications, and not just "claim[s] for payment of an obligation owed by the Government" may support FCA causes of action); *Cook County, Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 122, 124 (2003) (noting that county hospital allegedly falsely certified compliance with federal regulations that were conditions of grant funding and holding that FCA claim could be stated against county hospital). *City of Ponoma v. Superior Court* ("*Pomona*"), 89 Cal. App. 4th 793 (2001), which Plaintiffs argue is "factually identical" (Pls. Response Br. at 61 [Dkt. 1990]), affirms and applies one of the FCA "categories", fraudulent inducement (*Pomona*, 89 Cal. App. 4th at 803-05).[1]

## 2.   Plaintiffs' Efforts to Cast J-M and the Court as Complicit in Their Liability Maneuvers are Less than Candid.

In the end, the main thrust of the Plaintiffs' position is that they should be

---

[1] The fraudulent inducement findings in *Pomona* were based on the express terms of the purchase order contracts and history between the City of Pomona and Jones. 89 Cal. App. 4th at 799-800. *Pomona* does not support that any findings concerning the FCA elements can be made in a contextual and contractual vacuum. The additional holding in *Pomona* does not abandon the FCA categories, but holds that under the specific facts of that case, the complaint stated a traditional factually false FCA claim: the complaint alleged that Jones submitted invoices for "J-1500 corporation stops[,]" which by definition are made with "85 metal . . . ." *Id.* at 804-05. Jones' delivery of parts made with "81 metal" made its invoices facially false. *Id.* at 805. In the history of litigation in this case, Plaintiffs have not alleged or argued that J-M's invoices are factually false, and doing so now would be another impermissible change in the theory of the case.

allowed to get away with changing their theories of liability because J-M and the Court should have/did see it, did not stop it, and, in the Court's case, approved it post trial. This "gotcha" approach is both contrary to fact and the antithesis of showing Due Process.

Plaintiffs begin, as they must, with their worn out effort to extract themselves from the commitments that they made not once but twice in May 2012. But, as on prior occasions, they fail by reason of the very words plaintiffs used both in the May 7, 2012 hearing and the May 16 letter: The only theory they specifically embraced was Substandard Products. About their arguments to the contrary, the Court already has offered the understated observation that plaintiffs' May 16, 2012 letter did not exactly make the plaintiffs' intent "crystal clear." 3/17/14 Hrg. Tr. at 37:11-15 [Dkt. 1915].

What counts here is that Plaintiffs certainly fooled J-M. Plaintiffs' Response Brief cites a statement made by J-M's counsel in 2013. Pls. Resp. Br. at 22 [Dkt. 1990]. J-M's counsel did, in fact, remind the Court of Plaintiffs' May 16 letter, but only to respond to Plaintiffs' using their favorite extract from *U.S. ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166 (2006), to water down the requirements for FCA liability. There was no proposal on the table to litigate false certification or fraudulent inducement, much less any discussion about use of a verdict that had not even been rendered. The whole exchange proves rather than conflicts with J-M's actual reliance on the May 2012 proceedings, as does J-M's handling of the instruction conference. Pls. Resp. Br. at 22-24 [Dkt. 1990].

In the end, Plaintiffs' chastisement of J-M for not catching on earlier cannot, under any circumstances, be transformed into agreement, waiver or even going with the flow. The hallmark of Due Process is clear and timely notice, and the record shows no such notice of Plaintiffs' changing theories.

Plaintiffs therefore pursue the alternative and inconsistent tack of arguing that

the Court has already ruled on the issue in connection with the post-trial motions (Pls. Resp. Br. at 20 [Dkt. 1990]) or in remarks made in the May 2014 hearing [Pls. Resp. Br. at 23 [Dkt. 1990]). These contentions completely miss the issue before the Court. The Court's observation in May about Plaintiffs' counsel's "theory" related to the Lottery Theory, not a theory of legal liability at all. And it was made in the context of continued discussion of the post-trial motions. Those motions were not concerned with the matter at hand. The matter at hand is the use of the Phase I verdict to establish Phase II liability theories not litigated in Phase I. That is an entirely different issue, as it was in *Gasoline Products*. And, far from being decided in the post-trial motions, that issue was expressly preserved for the briefing that is now taking place. *See* 6/30/14 Hrg. Tr. at 46-9, 64, 78-9 [Dkt. 1961.]

### 3. The Court Itself Has Stated That the Phase I Trial Was Not a Full Trial.

The Court has been clear and emphatic about the limitations of the trial. *See, e.g.,* 9/29/14 Hrg. Tr. at 11:2-25, 12:6-11. [Dkt. 1984.] J-M Initial Br. at 2: 19-20]. Taking this assessment at face value, the Phase I verdict should not be used outside of Phase I.

The Court's acknowledgment of the limitations of Phase I also is an additional and crucial factor to the Due Process problem created by Plaintiffs' use of different theories of liability. Plaintiffs' Response brief completely misses this point. Instead, it argues that whatever limitations were set on the Phase I trial through the Court's rulings *in limine* were appropriate for that trial. The problem is that this is not the issue anymore. But Phase II is the issue here, not Phase I.

Nor are Plaintiffs correct that these trial limitations are irrelevant to the question of whether the Phase I verdict can be used in Phase II. For example, on Plaintiffs' *in limine* motion, the Court excluded evidence that the exemplar Plaintiffs had no current or future plans to replace their J-M pipe, despite their knowledge of

and participation in this lawsuit alleging that J-M made false representations concerning whether its pipe meets standards. Such evidence that Plaintiffs have no replacement plans is directly relevant to whether J-M's representations were a contractual condition of payment under a false certification theory, or had earlier induced entry into a contract.

### B.  The Seventh Amendment: The Court Cannot Save the Verdict by Re-Writing It.

J-M's Initial Brief identified three fundamental Seventh Amendment problems that preclude any use of the Phase I verdict in Phase II, by either the exemplar or the non-exemplar Plaintiffs. J-M Initial Br. at 25-30 [Dkt. 1987]. These problems include the unsolvable ambiguity of the verdict, the fact that the verdict does not contain the findings necessary to support use of the verdict in Phase II, and the fact that Phase II will require reexamination of evidence decided in Phase I (together, the *Gasoline Products* problems). Plaintiffs' various attempts to address these issues only serve to reinforce the constitutional barriers to using the jury verdict in Phase II. The real news in Plaintiffs' Response Brief is what can only be seen as the proposed metamorphosis of a verdict that is unusable on its face to one that does have a use, but a completely improper one: to turn the Phase I verdict into a "classwide" verdict for Phase II. This effort to re-tool the verdict substitutes legal maneuvering for jury rights. And even then, it does not solve the Seventh Amendment problems because it still does not provide the necessary predicates for Phase II issues of fraudulent inducement, false certification, or any recoverable damages.

### 1.  The Phase I Verdict Is Facially Unintelligible and Fails to Make Crucial Findings.

The jury's verdict that J-M "falsely represented uniform compliance with AWWA C900 and UL 1285" has no meaning to a layperson and therefore will have

---

12

to be reexamined by any Phase II jury. Special Verdict Form [Dkt. 1802]. Plaintiffs' Initial Brief plainly concedes this threshold fact because it proposes that the Court craft its own version of what the jury decided, as discussed immediately below. *See* Pls. Initial Br. at 2-3 [Dkt. 1988) (proposing "facts" "found" by the jury). Plaintiffs' Response Brief does the same thing. Nowhere do plaintiffs contend that the verdict itself could be used by a Phase II jury. Under these circumstances, using the verdict in Phase II would violate the Seventh Amendment. *See, e.g.*, *Gasoline Products.*, 283 U.S. at 500.

## 2. Plaintiffs Cannot Fabricate Jury "Findings" for Use in Phase II.

Plaintiffs cannot extract from the verdict findings that will be crucial to any Phase II jury.

**Deciding diminution in value in Phase II.** Plaintiffs concede that the determination of damages in Phase II will focus on determining diminution in value. Pls. Resp. Br. at 32-33 [Dkt. 1990]. This will be a comparative exercise: determining the value of the product supplied versus the value of the product promised. The problem is that the jury in Phase I never stated what the difference in the products was. Indeed, Plaintiffs actually assert that the first jury did not consider differences in properties. *Id.* True, indeed. More generally, the jury gave no explanation at all about why or how or in what respect there was less than "uniform" compliance. For this reason, there are no established differences that can be used to determine comparative values, thus requiring a second jury to define for itself, falsity and materiality at a minimum.

- **Who, What, and When of Falsity, Materiality, and Scienter.** Because the jury never defined what the non-compliance was in fact, it is also not possible to know why or how the alleged false representation was false, or when it was false, much less how it was intended to be false. All that is known is that the

jury found **some statement** at some time to be false. **Crucially**, Plaintiffs continue to insist that the representations **in the brochures** and **the stencils** were all found to be false. The glaring problem Plaintiffs never confront is that the brochures never represented "uniform compliance" but only compliance. Same for the stencils. What the jury meant by uniform compliance and when and how it became false are simply not known. In consequence, it will be impossible to say whether any representation that a Phase II plaintiff claims was made to it was one that was found to be false.

- **False Certification in Phase II.** Additional gaps in the verdict are obvious when it is tested against other requirements for liability and damages under specific Phase II legal theories. The prospect of litigating false certification reveals many such gaps. False certification liability turns on an agreement (in this case in project contracts) to comply with a law or regulation, which undertaking is causally linked to payment of a claim. As the Court has observed, the case law (prominently *United States v. Bornstein* ("*Bornstein*"), 423 U.S. 303 (1976)) reflects that such undertakings have specificity—there must be a specific requirement. THE COURT: There is a requirement of the obligation to be there. Let me put it this way: If, in fact, there was no reference in the specifications to UL or the C900 or the C905, I would agree with the defendant. Let me just put it that way. You can make all the arguments you want, but unless there is something that indicates it was required on the part of the particular governmental entity that is seeking the materials, to my mind, there is no basis for a False Claims Act claim if on the basis of it didn't meet this item. (5/12/14 Hearing Tr. at 52: 12-22).

By contrast, Plaintiffs' trial plan for Phase I avoided litigating the terms of specific contracts, which vary. The resulting verdict refers to no specific requirement of those standards, and the application of the verdict to false

14

certification in Phase II therefore is just not possible. As a consequence, what constitutes a false representation of compliance that is a condition of payment is not determinable from the verdict. Nor can it be determined whether any finding was made of a "palpable lie" regarding compliance , as required by the law. *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1478 (9th Cir. 1996). Finally, in false certification, the representation of compliance, must be made false by the delivery of product. Nothing about this was decided by the verdict or could be decided by a Phase II jury based upon it.

- **Fraudulent Inducement in Phase II.** Parallel problems arise in using the verdict to litigate this. Further, fraudulent inducement requires reliance. Of course, reliance must be tied to the falsity of the representation actually made to the Plaintiff. But how can a plaintiff testify that it did, or did not, rely upon a false representation of "uniform compliance" when (a) that representation was never made and (b) the meaning, much less reference point of "uniform" is unknown?

- **Substandard Product**. Again, the verdict references two standards, but does not say what provisions of the standards were violated. Nor does it say how any actual delivered pipe to any particular Plaintiff rendered the representation of "uniform compliance" false.

### 3. Plaintiffs' New Efforts to Have the Court Rewrite the Verdict Are Factually and Legally Unsupportable.

Plaintiffs now make the bold proposal that the Court intervene and rewrite the verdict, extensively. This effort both concedes the defects in the verdict and invites a clearly erroneous effort to cure them.

#### a. Plaintiffs Propose That the Court Rewrite the Verdict.

The differences between the verdict and Plaintiffs' proposal are easy to identify. On falsity, Plaintiffs argue that "[t]he Jury found the following facts, none

of which should be subject to further litigation:

    1.    From 1996-2006, J-M represented in a variety of ways, including in its sales and marketing materials and in the markings stamped on each of its sticks of pipe, that its Blue Brute and Big Blue PVC pressure pipe uniformly complied with AWWA C900 and C905 respectively, and that all such pipe under 30 inches in diameter uniformly complied with UL 1285."

Pls. Initial Br. at 2-3 [Dkt. 1988], hereinafter "Fact no. 1." This purported "fact" simply does not appear in the verdict and takes as decided matters that are simply unknowable:

    (1)    The time period reference is derived from language used by the jury in connection with questions 20: "Identify – by project title, claim number, or (if the claim document was admitted during the trial) by Exhibit Number – each false or fraudulent claim presented or caused to be presented to Palmdale by Defendant J-M on the verdict form." Special Verdict Form [Dkt. 1802]. Those questions do not ask for any date.  So, what fact, if any, is referenced by "1996-2006" is unknown. Of course, Plaintiffs would have the Court infer that it reflects the jury's adoption of some aspect of their closing.[2] But we will never know, and cannot make those assumptions.

    (2)    The statement that J-M "represented in a variety of ways, including in its sales and marketing materials and in the markings stamped on each of its sticks of pipe" (Pls. Initial Br. at 3 [Dkt. 1988]) also does not appear in the verdict. Moreover, it actually conflicts with

---

[2] Plaintiffs' reliance on their summation is misplaced. It is a bedrock rule of evidence that arguments during summation are just that, arguments. They may not be relied upon as evidence, and, in fact, the Court instructed the jury accordingly. Final Jury Instructions at 2 [Dkt. 1792].

1   the rest of Fact no. 1 (and the verdict) because none of the brochures

2   and stencils said anything about "uniform" compliance.

3   (3)   A false representation that "all such pipe" "complied" (*id.* [Dkt.

4   1988]) is not in the verdict.

5   (4)   "Uniformly complied" is in the verdict, but, significantly, not in

6   the brochures, stencils or any other evidence. Nor is that term ever

7   defined anywhere in the verdict.

8   Plaintiffs' purpose in taking these liberties is clear. Plaintiffs ask the Court to

9   provide its own judicial gloss in order to make the verdict more effective as a "class

10  wide" verdict in Phase II. Thus, dates are added to make the verdict usable for all

11  time periods and all projects. References to the brochures and stencils are added to

12  provide a nexus for subsequent adjudication of particular claims. The reference to

13  types of pipe and "all" pipe seeks to solve post-hoc another limitation of the

14  verdict—it relates only to certain projects and certain pipe. Plaintiffs repeatedly

15  insist that their evidence was not "specific to any plaintiff" (Pls. Initial Br. at 25

16  [Dkt. 1988]), but "all pipe" was not litigated in Phase I. Nor was the jury asked to

17  decide such a fact. This was not, in fact, a class action trial, although Plaintiffs try to

18  treat it as one.

19  Plaintiffs ask the Court to make additional findings about what the jury did in

20  order to build a specific contractual "requirement" into the verdict. The purported

21  requirement is "representativeness." Plaintiffs spend two pages laying the

22  groundwork for their ultimate assertion that "[t]he Jury . . . [found] that [J-M] had

23  misrepresented compliance with the representativeness requirement." Pls. Initial Br.

24  at 21-23 [Dkt. 1988.] This facile statement is a dramatic expansion of Fact no. 1. It

25  says that the jury not only found that J-M represented "uniform compliance" but

26  also found that J-M represented "representativeness," and that both of the

27  representations were false.

28

17

Three points about this "representative" argument are key here. The *first,* of course, is that "representativeness" or "representative" never appears anywhere in the verdict. It is simply a post-hoc engraftment by counsel. Its proffered connection to the verdict is Plaintiffs' closing argument. Perhaps Plaintiffs can also explain why the "uniform compliance" formula was adopted by the jury but the "representativeness" formula was not. *Second*, the injection of "representativeness" into the jury's verdict actually conflicts with the Plaintiffs' use of the brochures and stencils in Fact no. 1. Those documents say nothing whatsoever about "representativeness." *Third,* "representativeness" does not even appear in the standards that are referred to in the brochures and stencils. *See* J-M's Initial Br. at 54-56 [Dkt. 1987.]. In short, any contention that J-M "represented compliance with the representativeness requirement" is contrary to the fact of what actually appeared in the representations that were made. The representation of "representativeness" is the advocacy of Plaintiffs' counsel, not a fact, much less is it what the jury said in its verdict.[3]

In its Initial Brief, J-M demonstrated that the "representativeness" requirement was not only not in the standards, but the PPI TR-3 Note 10 upon which Plaintiffs rely was not even a part of the standards. *See* J-M Initial Br. at 52-56 [Dkt. 1987.] The contentions of Plaintiffs' counsel and expert cannot vary the terms of contracts which incorporate the standards, or brochures that reference the standards. The contract terms will be highly probative, if not determinative of several key issues in Phase II, including whether there is a certification or undertaking,

---

[3] Plaintiffs' attempt to muster other support for the contention does not advance their cause. Plaintiffs' footnote 8 cites their own words in closing (Pls. Initial Br. at 24 n.8 [Dkt. 1988]), which are not even evidence. Plaintiffs' footnote 9 cites closing slides (*Id.* at 24 n.9 [Dkt. 1988]), which are just demonstratives. The cited testimony of their expert Paschal [1220: 19-24] (where Plaintiffs' counsel leads his witness by using the term) does not even reflect a representation by J-MNor did KC Yang ever testify that J-M made any representations about "representativeness."

materiality, scienter, and whether there was any fraudulent inducement. *See id.* at 49-60 [Dkt. 1987.] The construction of these falls to the Court, not the jury in the Phase I trial. *See id.* at 42-44 [Dkt. 1987.] None of this is even addressed in Plaintiffs' Response Brief. *See generally* Pls. Resp. Br. at 28-31 [Dkt. 1990.]

### b.      Any Rewrite of the Verdict Would Be Error.

The threshold bar to the proposed rewrite is that the Court simply does not have power under the Federal Rules or the Constitution to amend the Phase I verdict. *See E.F. Hutton & Co. v. Arnebergh*, 775 F.2d 1061, 1063 (9th Cir. 1985) (the Ninth Circuit analogized the ambiguous verdict with that of "an inconsistent verdict," and held that in light of an ambiguous verdict the court's two choices are to either recall the jury or order a new trial); *Unit Drilling Co. v. Enron Oil & Gas Co.*, 108 F.3d 1186, 1193 (10th Cir. 1997) (failure to clarify the meaning of an ambiguous verdict before the jury is discharged "necessitates the granting of a new trial." ); *Hartnett v. Brown & Bigelow*, 394 F.2d 438, 441-43 (10th Cir. 1968) (ordering a new trial where damage awards were ambiguous and incomplete); Francis C. Amendola, et al., *Proceedings to Procure New Trial*, 66 C.J.S. New Trial § 321 (2014) ("As a general rule, the court on finding cause for setting aside a verdict or decision should order a new trial rather than change or modify the decision or render judgment for the movant . . . .").

The Constitution also bars any effort to rewrite the Phase I verdict in order to constrain or affect the issues to be decided in Phase II. *See, e.g.*, *Hodges v. Easton*, 106 U.S. 408, 412 (1882) ("The court could not, consistently with the constitutional right of trial by jury, submit a part of the facts to the jury, and, itself, determine the remainder without a waiver by the defendants of a verdict by the jury.") (cited by *Act Up!/Portland v. Bagley*, 988 F.2d 868, 876 (9th Cir. 1993)); *see also DePinto v. Provident Security Life Ins. Co.*, 323 F.2d 826, 838 (9th Cir.1963) (additur is not permitted where the amount of damages is contested because it would "terminate"

the parties' Constitutional right to a jury trial, however, "[t]he trial court does have power, where the record warrants, to set aside a jury verdict for plaintiff, on the ground that the jury award of damages is inadequate"); 12 James Wm. Moore et al., Moore's Federal Practice § 59.06 (3d ed.2006). ("When a judge is called on to modify a jury's verdict, the judge's power to do so is generally limited to modifications due to an internal inconsistency in the jury's verdict, or to the reduction of a verdict that is excessive as a matter of law."). Plaintiffs' proposed rewriting violates the Seventh Amendment's prohibition against reexamination of any fact tried by a jury and is a displacement of the jury by the Court.

Plaintiffs' cases regarding judicial efforts to interpret verdicts to make them useful post-trial do not justify this violation.[4] Plaintiffs also cite various cases for the proposition that the court has a Seventh Amendment obligation to preserve a jury's

_____

[4] The Plaintiffs cite *Ashe v. Swenson*, 397 U.S. 436 (1970) and *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.* ("*Atlantic & Gulf*"), 369 U.S. 355 (1962) for the proposition that the court must consult the record to determine the jury's fact-finding and render the verdict useable. Pls. Resp. Br. at 28 [Dkt. 1990]. Neither case involved bifurcation with a second jury nor addressed the Seventh Amendment concerns presented here. *Ashe* involved an individual who alleged a Double Jeopardy violation when he was acquitted of robbery, and was then brought to trial again for a related robbery based on similar evidence. 395 U.S. at 439-441. The court grappled with the question of how collateral estoppel should be applied in criminal cases. It stated that where a previous judgment of acquittal was based upon a general verdict, the court must examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration. *Id.* at 444. The opinion in *Atlantic & Gulf* states that where there is a view of a case that makes the jury's answers to special interrogatories consistent, they must be resolved that way. 369 U.S. at 364. The jury's answers in Atlantic & Gulf were clear, concise answers consisting only of a yes or no, or dollar amount. *Id.* at 357. That is not the situation here. Critically, those cases do not address or resolve the Seventh Amendment issues raised when asking a second jury to make rulings that will necessarily require an invasion of the first jury's verdict.

verdict whenever possible. Pls. Resp. Br. at 38 [Dkt. 1990]. Once again, those cases are factually distinguishable and do not address the fundamental Seventh Amendment problems raised in this case.[5] Plaintiffs reliance on issue preclusion to instruct the second jury on the four "findings" fares no better. Pls. Resp. Br. at 32, 40 [Dkt. 1990]. Of course, those "findings" were never made by the Phase I jury. *See* discussion *supra* at Part I.B.3. And issue preclusion is not a way around the Constitution; the Due Process and Seventh Amendment problems identified by J-M are equally fatal to J-M's collateral estoppel arguments.[6]

---

[5] In *Bangert Bros. Constr. Co. v. Kiewit W. Co.* ("*Bangert*"), a party challenged the district court's entry of judgment on one claim as inconsistent with the jury's verdict on another claim. 310 F.3d 1278; 1285-86; 1299 (10th Cir. 2002). The appellate court's discussion emphasized that the court may not substitute its judgment of the facts for that of a jury. *Id.* at 1299 (emphasis added) (citing *Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439, 1442-43 (10th Cir. 1988)). *Gasperini v. Center for Humanities* held that appellate courts' ability to review the size of jury verdicts and to order new trials for excessive verdicts under an abuse of discretion standard was compatible with the Seventh Amendment. 518 U.S. 415 (1996). Plaintiffs cite to Justice Scalia's dissenting opinion, which again was made in the context of discussing appellate review, not review by a second jury. *Id.* at 452-53. *Atlantic & Gulf*, as mentioned above, did not deal with a second jury, but with interpreting special interrogatories in an internally consistent manner. 369 U.S. at 364. *Matrix Grp. Ltd. v. Rawlings Sporting Goods Co.* ("*Matrix*") involved a contract dispute where the district court granted summary judgment to a party on one claim, and a jury returned verdicts in favor of that party on another claim. 477 F.3d 583, 585-86 (8th Cir. 2007). The case focused on a court's role in reconciling the two verdicts and "preserv[ing]" the jury verdict. *Id.* at 592 (internal citation omitted). Finally, *Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166 (5th Cir. 2005), also was not bifurcated with a second jury. Plaintiffs quote from an opinion concurring in part and dissenting in part, in the context of remarking that it was possible for the court of appeals to validate upholding the jury's verdict. *Id.* at 185. Again none of Plaintiffs' cases address bifurcated proceedings to be decided by different juries or the specific Seventh Amendment issues raised in the case and addressed in *Gasoline Products*.

[6] *See* discussion *infra* at Part III. *Petit v. City of Chicago* does not support that the Phase I verdict can have any issue preclusion effect, only that if issue preclusion

### 4. Plaintiffs Cannot Escape the Force of *Gasoline Products* and the Other Precedents Set Forth in J-M's Initial Brief

*Gasoline Products* is squarely on point and leads to the unavoidable conclusion that the Phase I verdict cannot be used in a Phase II. *Gasoline Products* involved post-trial review of a verdict for its useability in a second phase. Although the first verdict was found sufficient, nonetheless, the failure to make specific findings for issues in the next phase required a retrial. Importantly, the Court remarked "it is impossible from an inspection of the present record to say precisely" what the jury found on liability facts that were important to the assessment of damages. *Gasoline Products*, 283 U.S. at 499. The same is true here.

Plaintiffs' attempts to marginalize *Gasoline Products* fail. Plaintiffs argue that *Gasoline Products* "does not stand for any type of general prohibition or restriction on bifurcation . . . ." Pls. Resp. Br. at 27 [Dkt. 1990]. This is simply a strawman. The issue is not whether bifurcation can be ordered, but whether it was properly ordered and implemented in this case. It was not.

Plaintiffs seek to set this case apart from *Gasoline Products* by insisting that the verdict here did set forth the breach with particularity. As shown above (and below) this is not supported by the trial record and completely misses the problem both in *Gasoline Products* and here. The problem in *Gasoline Products*, 283 U.S. at 499-500, was that the jury did not provide *specific* factual findings necessary to decide damages, *i.e.*, the dates of formation and the breach. The same problem exists here. The jury's "uniform compliance" formula does not provide the specifics of

---

applied, the fully determined findings could be communicated to a second jury through a stipulation or jury instruction. 1999 U.S. Dist. LEXIS 6294, at *5 (N.D. Ill. Apr. 15, 1999). Plaintiffs' other cases, *Acosta v. City of Costa Mesa*, 718 F.3d 800, 829-30 (9th Cir. 2013), and *Freeman v. Chicago Park Dist.*, 189 F.3d 613, 618 (7th Cir. 1999), do not involve second juries at all and stand for the uncontroversial and uncontested proposition that a court may not displace a jury verdict with its own ruling.

"uniform" non-compliance, thereby precluding its use for the various Phase II determinations listed above. While the Plaintiffs submitted evidence of asserted non-compliance with standards, **this never was connected up to any Plaintiff, contract, or project to the who, what, when of falsity.** Even the concept used to capture non-compliance – lack of "representativeness" – was **not connected up to any Plaintiff or project.** It is non-compliance in the air.

Plaintiffs also argue that, since a verdict form was used and J-M contributed to drafting it, J-M is barred from challenging its use. Pls. Resp. Br. at 29-30 [Dkt. 1990]. Yet again, this misses the relevant point. The problem is not with the verdict form itself but with how it was exploited by Plaintiffs' counsel and filled out by the jury. While a special verdict form may be an effective trial management tool, it does not guarantee that the resulting verdict will be unambiguous and usable in subsequent trials. One of Plaintiffs' cited cases itself makes clear that the Seventh Amendment is implicated "where a severed issue is presented to a subsequent jury in a confusing or uncertain manner." *Simon v. Philip Morris*, 200 F.R.D. 21, 24 (E.D.N.Y. 2001).[7]

The effect of *Gasoline Products* on this case also cannot be avoided because it is being raised outside of post-trial briefing (*see* Pls. Resp. Br. at 41-42 [Dkt. 1990]), contrary to *Gasoline Products* which permitted just such a challenge. 283 U.S. at 497. Plaintiffs' cases, while acknowledging Federal Rule of Civil Procedure 50 and 59 as ways for a party to challenge a verdict post-trial, do not speak to *Gasoline Products* and do not provide a way to circumvent Seventh Amendment

---

[7] *Simon* was later consolidated with other cases and granted class certification, *In re Simon II Litig.*, 211 F.R.D. 86, 194 (E.D.N.Y. 2002), order confirmed (Oct. 15, 2002). Notably, the proposed class described in *Simon I* was abandoned in favor of a non-opt out punitive damages class. That class was vacated and remanded by the Second Circuit. *See In re Simon II Litig.*, 407 F.3d 125, 140 (2d Cir. 2005). The case was then dismissed. See 02/15/06 Docket Entry, *In Re Simon II Litig.*, No. 1:99-cv-01988, Doc. 170.

concerns.[8] Moreover, this Court specifically preserved the Seventh Amendment issue to be addressed in connection with the use of the Phase I verdict in Phase II, as it was in *Gasoline Products*. (2014-08-25 Hearing Tr. at 13:19-15:8)[9]

———————————

[8] In *Gasperini*, the Supreme Court acknowledged that that a Rule 50(b) motion for judgment as a matter of law is compatible with the Seventh Amendment. 518 U.S. at 436 n. 20. Similarly, the Ninth Circuit, in *Central Office Tel. v. AT&T*, observed that Rule 50 allows a court to set aside a jury verdict and enter judgment as a matter of law consistent with the Seventh Amendment. 108 F. 3d 981, 993 (9th Cir. 1997), rev'd on other grounds, 524 U.S. 214 (1998). Neither assertion is at issue in this case. And neither case addressed *Gasoline Products* concerns, nor were they in the same procedural posture as this case, being forced to grapple with an unusable jury verdict before a Phase II jury. *Unitherm Food Sys. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006), holding that failure to move for a new trial or judgment as a matter of law after jury verdict precludes a party from seeking a new trial on appeal on the basis of insufficiency of evidence, is also inapposite because here J-M did seek a new trial and judgment notwithstanding the verdict.

[9] Plaintiffs also attempt to cast doubt on *Gasoline Products* because it is an 85-year-old case. That is true, but of no moment. It is still good Supreme Court law that must be followed. Plaintiffs also fail to distinguish additional cases dealing with unclear verdicts. Pls. Resp. Br. at 30-31 [Dkt. 1990]. Plaintiffs concede that *Russell v. Place*, 94 U.S. 606 (1877), stands for the proposition that if upon the face of a record anything is left to conjecture, estoppel will not apply. Pls. Resp. Br. at 30 [Dkt. 1990]. Of course, that is J-M's argument—that Phase I verdict lacks critical findings that will force a Phase II jury to reconsider issues decided in Phase I. In addition, Russell held that where there is any uncertainty as to what the jury found that cannot be resolved on the face of the record or extrinsic evidence, then the "whole subject-matter of the action will be at large and open to a new contention." *Russell*, 94 U.S. at 606.

Plaintiffs attempt to dismiss *United States v. Hamaker*, 455 F.3d 1316, 1337 (11th Cir. 2006), by saying it concerns a general verdict, not a special verdict such as is at issue here. However, the key in *Hamaker* is that the basis for the verdict was unknown, with the judge impermissibly speculating as to what the jury's verdict implied. *Id.* at 1337. Similarly, in *Blyden v. Mancusi*, 186 F.3d 252 (2d Cir. 1999), bifurcation in particular, not just "poor trial management" in general (Pls. Resp. Br. at 30 [Dkt. 1990]), violated the Seventh Amendment where the verdict sheet did not specify which acts were found to be "reprisals" and which were not. *Id.* at 268. In this case, there simply is no way to use the Phase I verdict without violating the

**5.      Re-Examination is Inescapable if the Phase I Verdict is Used.**

There are significant areas of overlap between Phase I and Phase II. *See* discussion *supra* at Part I.B.1. The guidance of *In re Rhone-Poulenc Rorer, Inc.* ("*Rhone-Poulenc*"), 51 F.3d 1293, 1302 (7th Cir. 1995), that issues must be "carved at the joint" for bifurcation. applies with full force here. Plaintiffs do not and cannot contest that the legal principle in *Rhone-Poulenc* is sound and required by the Seventh Amendment—"the judge must not divide issues between separate trials in such a way that the same issue is reexamined by different juries." *Rhone-Poulenc*, 51 F.3d at 1303.[10] Plaintiffs argue that so long as the "issue" is defined differently, all is well. Pls. Resp. Br. at 31 [Dkt. 1990]. In this case, however, as demonstrated above, issue overlap is unavoidable if the jury is permitted to use the first verdict.

Plaintiffs' effort to distinguish J-M's cases on the facts (Pls. Resp. Br. at 34-35 [Dkt. 1990] also are unpersuasive. In *U.S. ex rel. Rodriguez v. Weekly Publications*, 9 F.R.D. 179, 180 (1949), the second jury's determinations of what damages were caused by defendant's alleged fraud would invade the first jury's determination of whether the government was damaged. In this case, a second jury's reconsideration of falsity, materiality, and scienter to determine diminution in value (*see* discussion *supra* at Part I.B.1) is perfectly analogous.

Plaintiffs seek to distinguish J-M's cases that took up the reexamination issue before trial. Pls. Resp. Br. at 37 [Dkt. 1990]. However, the issue and subsequent analysis is the same, even though it is being anticipated by those courts rather than analyzed after the first trial has taken place. Indeed, those cases cite to *Gasoline*

---

Seventh Amendment.

[10] The Ninth Circuit case Plaintiffs cite to cast doubt on *Rhone-Poulenc*'s applicability held only that class action certification in products liability cases is possible. *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1230, 1233 (9th Cir. 1996). The court discussed the constitutional concerns in *Rhone-Poulenc* only in dicta as those issues were never presented to the lower court. *Id.* at 1232.

*Products*. *See Alabama v. Blue Bird Body Co.* ("*Blue Bird Body*"), 573 F.2d 309, 318 (5th Cir. 1978); *Blyden*, 186 F.3d at 268, In *Blue Bird Body*, the court emphasized the importance of ensuring issues of liability and damages are not interwoven, lest bifurcation run afoul of the Seventh Amendment, 573 F.2d at 328, a concern of equal importance here.

Plaintiffs' cases on bifurcation do not involve overlapping issues to be decided by two juries and thus are inapposite and unpersuasive. *Houseman v. U.S. Aviation Underwriters*, involved bifurcating claims against two separate defendants. 171 F.3d 1117 (7th Cir. 1999). "The claims against each defendant [were] based on different legal theories and involve[d] distinct inquiries." *Id.* at 1127. This meant that each jury would separately assess the causal link (if any) between only one defendant's conduct and an airplane crash. *Id.* at 11127-28. Importantly, the first jury in *Houseman* found that the pilot did not cause the crash. *Id.* at 1128 n.16. Had the first jury found otherwise, however, a second jury may have been asked to reexamine the pilot's liability to address comparative fault between the first and second defendant, which would have run afoul of the Seventh Amendment. *Id.* at 1128 n.16.[11]

There simply is no case law support for Plaintiffs' remarkable assertion that the Court can simply ignore Seventh Amendment reexamination concerns by "counterbalanc[ing] . . . its constitutional obligation to preserve a jury's verdict

---

[11] *See also In re Innotron Diagnostics*, 800 F.2d 1077, 1086 (Fed. Cir. 1986) (issues tried in a patent case would not be tried again in an antitrust case; "there is no danger . . . of inconsistent jury verdicts and . . . the potential for jury confusion would be lessened, not increased, by separate trials on the patent and antitrust issues"); *Wang Labs v. Mitsubishi Elec. Am.*, 1998 U.S. Dist. LEXIS 21373 (C.D. Cal. July 20, 1993) (same); *In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444, 452 n.5 (3rd Cir. 1997) (phase one issue, whether plaintiffs were exposed to a chemical, would not have overlapped with phase two causation issues, forseeability and who caused the exposure).

whenever possible." Pls. Resp. Br. at 37-39 [Dkt. 1990]. *Houseman*, which Plaintiffs characterize as the leading case on post-trial application of the Seventh Amendment (Pls. Resp. Br. at 39 [Dkt.. 1990]), involved trials bifurcated by defendant, not by distinct issues in the same legal claim. *See Houseman*, 171 F.3d at 1120.[12] There were no Seventh Amendment reexamination issues arising from overlapping issue determinations to overcome in that case.[13] *Gasoline Products*, in which the court found the first verdict unuseable, and the many mass tort cases cited by Defendants (*see* discussion *infra* at Part II.F), refutes that the Seventh Amendment requires the Court to give effect to the Phase I verdict regardless of its problems.[14]

---

[12] There was also no assertion in *Houseman* that the verdict was unclear or too opaque to understand, a key difference from this case animating J-M's Seventh Amendment and Due Process arguments. *See generally Houseman*, 171 F.3d at 1126-27.

[13] There was also no assertion in *Houseman* that the verdict was unclear or too opaque to understand, a key difference from this case animating J-M's Seventh Amendment and Due Process arguments. *See generally Houseman*, 171 F.3d at 1126-27.

[14] Yet other cases cited by Plaintiffs reinforce the importance of requiring a re-trial where such a re-examination is threatened. *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (3rd Cir. 1993), found a Seventh Amendment reexamination violation when a second jury considered damages. *Id.* at 1183. The second jury was presented with liability-type evidence and confusing jury instructions, which may have caused the second jury to not only determine the amount of damages but to reconsider causation. *Id.* at 1184; *see also O'Hagan v. Soto*, 565 F. Supp. 422, 429 (S.D.N.Y. 1983) (second jury impermissibly reexamined first jury verdict by returning an inconsistent verdict: that Seventh Amendment prohibits a second jury from "acting beyond the limited purpose for which it was convened, [to] invade[ ] the findings of a first jury.")

27

## VII.  ISSUE 2: DUE PROCESS AND THE SEVENTH AMENDMENT BAR THE CLAIMS OF NON-EXEMPLAR PLAINTIFFS FOR ADDITIONAL REASONS

### A.  The Constitutional Prohibitions on Exemplar Plaintiffs' Use of the Phase I Verdict Equally Apply to Non-Exemplar Plaintiffs.

Of course, non-exemplar Plaintiffs cannot take advantage of a Phase I verdict that fails to satisfy the Constitutional scrutiny discussed above in Issue 1. Those fundamental problems, including the problems addressed in *Gasoline Products* equally affect non-exemplar Plaintiffs. *See Blyden, 186 F.3d at 268* ("In all cases . . . the Seventh Amendment right to trial by jury must be observed."); *In re WorldCom, Inc. Sec. Litig.*, 2005 WL 375315, at *2 (S.D.N.Y. Feb. 17, 2005) (same); *see also Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 311 (5th Cir. 1998) (observing that application of the Seventh Amendment does not turn "upon the form of the action or the procedural devices by which the parties happen to come before the court.") (citing *Ross v. Bernhard*, 396 U.S. 531, 540 (1970)).

### B.  There is No Rule or Provision Allowing for a Post Hoc, De Facto Class Trial

To be considered a class, and to have a verdict that is all encompassing, plaintiffs must satisfy Rule 23's requirements. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 592 (1997). Courts recognize that in the absence of a "properly certified class action, handled with the procedural safeguards both state [procedure] and [the] Federal Rules afford, normal privity analysis must govern whether nonparties to an earlier case can be bound by the result. There would be little point in having Rule 23 if courts could ignore its careful structure and create de facto class actions at will." *Tice v. American Airlines, Inc.*, 162 F.3d 966, 972-73 (7th Cir. 1998); *Taylor v. Sturgell*, 553 U.S. 880, 900 (2008) (rejecting the creation of "de facto class actions at will"); *Becherer v. Merrill Lynch, Pierce, Fenner and*

*Smith, Inc.*, 193 F.3d 415 (6th Cir. 1999) (finding that putative class members are not part of an action prior to class certification, nor are they bound by any decision before a class is certified). Absent compliance with Rule 23, agreement is required. *See* Judge Fallon, *Bellwether Trials in Multidistrict Litig.*, 82 Tul. L. Rev. 2323, 2331 n.27 (2008); J-M Initial Br. at 32 [Dkt. 1987]. That most certainly did not occur here.

### C.     Due Process Does Not Permit De Facto "Class" Treatment.

J-M's Initial Brief showed that Plaintiffs have tried to transform this case into an unauthorized, de facto class action. JM's Initial Br. at 37-40 [Dkt. 1987.] Plaintiffs' Initial Brief does not even contest this. Instead, Plaintiffs seek to have the Court make Phase I binding against J-M with respect to all plaintiffs and potential plaintiffs without adhering to the necessary Rule 23 requirements – it is essentially an end run around the Federal Rules. Thus, Plaintiffs would have the Court believe that the self-selected exemplar Plaintiffs are actually fine representatives of the non-exemplar Plaintiffs because the non-exemplar Plaintiffs are "indistinguishable" from the exemplar Plaintiffs with respect to falsity (Pls. Initial Br. at 3 [Dkt. 1988]), and the evidence in the case is all "non-specific" to any plaintiff (*id.* at 9, 11, 25, 30, 32, 35) *i.e.*, "common," because that is how they decided to try their "[E]lements" case (*id.* at 1, 7-8). These arguments are belied by Plaintiffs' own conduct of the case. As shown below, Plaintiffs' contentions are further belied by the wide array of differences between the Plaintiffs on the facts, differences that make a difference under FCA requirements.

### D.     The Exemplar Plaintiffs Are Certainly Not "Indistinguishable" Among Themselves.

Once again, it was Plaintiffs who insisted that they make the selection in the first instance and went so far as to oppose all discovery of any other parties in interest. The paths to a "representative" plaintiff were obvious but were never

pursued. There could have been random selection, agreed selection, selection according to criteria. All of these paths have been used historically and are reported in the cases J-M has cited in earlier briefs[15], albeit the only one that has proven to comport with the law is agreed selection. None were pursued here.

Following the bifurcation order, Plaintiffs took full advantage of their selection, successfully limiting discovery of non-exemplar Plaintiffs, and seeking in limine to preclude use at trial of J-M's experience with claims over the totality of its customers. While Plaintiffs say now that the exemplar Plaintiffs merely provided "minimal background" at trial, they know far better. Each exemplar Plaintiff testified live and vouched for the importance of the standards to their public trust.

As to whether the non-exemplar Plaintiffs are truly "indistinguishable" from the exemplar Plaintiffs, the answer is that we do not know precisely because Plaintiffs did not want to go down that road. There has been "very limited" discovery of five intervening parties and none of the other intervenors. The "non-party" parties in interest are in the case only by proclamation of the Plaintiffs.

Nonetheless, it is easy to demonstrate the many differences even among the exemplar Plaintiffs themselves. For example:

- Specification of UL Standards: Only one exemplar Plaintiff, Calleguas, even mentioned UL 1285 in its specifications for a single project, and made compliance with UL 1285 discretionary rather than required by allowing for compliance with FM instead. Calleguas withdrew its other projects – none of which required UL 1285 compliance – from the trial before verdict. None of the other four exemplar Plaintiffs' twenty-five projects in Phase I specified UL. Yet, UL was one of two major falsity contentions put to the jury at trial.

- Contract documents and specifications: Each set of contract documents and

---

[15] *In re Chevron U.S.A., Inc.,* 109 F.3d 1016 (5th Cir. 1997); Judge Fallon, *Bellwether Trials in Multidistrict Litig.*, 82 Tul. L. Rev. 2323, 2332 n.27 (2008).

specifications for each of the twenty-six distinct projects in Phase I had its own particular terms and was drafted by different individuals within the governmental entities and by different consultants hired by each exemplar Plaintiff.

- Timing of the projects at issue: The twenty-six different projects at issue took place at different times throughout the 1996-2006 time period. Each therefore implicated different evidence of J-M's practices and knowledge, and therefore different evidence of falsity and scienter.

Other facts regarding whether the exemplar Plaintiffs were "representative" also matter. A representative must be approved by the Court as such pursuant to Rule 23, or a representative must be agreed to by the defendants. *See* JM's Initial Br. Part III.D.2-3; discussion *infra* at Part II.F. In the Phase I trial neither occurred.

### E.    The Evidence Relevant to Phase II Theories Is Not Common.

Plaintiffs err when they argue that, because their evidence was not plaintiff-specific, the Phase I verdict can be adopted by non-exemplar Plaintiffs in Phase II without violating Due Process.

First, the determination of whether evidence is sufficiently "common" to satisfy the Due Process concerns addressed in Rule 23 is made in advance, not post-hoc. No such determination was made here. The same applies to consolidation under Rule 42.

Second, it is black letter law that commonality under Rule 23 and consolidation under Rule 42 are not merely a function of how the plaintiff wants to proceed. The defendants' Due Process right to present evidence is just as important and substantive law controls the commonality of the issues that have to be determined. *See In re Chevron U.S.A., Inc.*, 109 F.3d at 1022 (observing that a "common issue trial is presented through or along with selected individuals' cases"); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (Rule 23 ensures that

DEFENDANT J-M'S COMBINED REPLY BRIEF REGARDING ISSUES 1-3 AND RULE 9(b)

the Due Process rights of absent class members are satisfied). Here, important defense evidence was excluded, the jury was told that the exemplar Plaintiffs were there only as "representatives" and the instructions adopted the "Elements" theory, which made the "who what when" differences in the claims of the different exemplar Plaintiffs irrelevant.

Third and relatedly, it is the use of Phase I in Phase II that is now at issue. There is no question but that they will turn on evidence that is plaintiff-specific rather than "common." *See* J-M Initial Br. at 42-44 [Dkt. 1987.]

**F.    In the Context of Repeat Product Defect Cases, Seventh Amendment and Due Process Problems Have Been Found to Be Insuperable and an Agreement to be Bound Has Been Required; No Such Agreement Was Made Here.**

Where a plaintiff attempts to use a trial to bind defendant in future litigation by the use of preclusion or estoppel, they are essentially trying a bellwether case, and cannot bind the defendant without prior consent. *See* Susan R. Johnson, *CIVIL PROCEDURE: The Use of Collateral Estoppel and the Implications on the Multiple Trials Flowing from a Denial of Class Certification-Dodge v. Cotter Corporation*, 32 N.M.L. Rev. 409, 413 (2002). As a result of due process concerns, bellwether trials may not be binding upon a party unless they expressly consent to it. *See Dodge v. Cotter Corp.* 203 F.3d 1190, 1198 (2000) (additional plaintiffs could not rely on results of first trial because the the parties never agreed "to be bound for all future proceedings")*; see also* J-M Initial Br. at 31-32 [Dkt. 1987]. As on commentary has explained:

> Appellate courts have been skeptical of [use representative claims to bind other claimant], and for good reason . . . . [T]he results of bellwether trials are not properly binding on related claimants unless those claimants expressly agree to be bound by the bellwether

1   proceedings.

2   Judge Fallon, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323,

3   2331 n.27 (2008) (citing cases from the Second, Third, Fifth, Ninth, and Tenth

4   Circuits).

5   Cases routinely follow this guidance. *See, e.g.*, *Cimino*, 151 F.3d at 311

6   ("Although we do not separately address the due process contention as such, we

7   conclude that the *Cimino* trial plan is invalid in these respects, necessitating reversal

8   of all the phase III sample case judgments as well as the five extrapolation case

9   judgments before us."); *In re Chevron U.S.A., Inc.*, 109 F.3d at 1020 ("We,

10   therefore, hold that before a trial court may utilize results from a bellwether trial for

11   a purpose that extends beyond the individual cases tried, it must, prior to any

12   extrapolation, find that the cases tried are representative of the larger group of cases

13   or claims from which they are selected."); *Castano v. Am. Tobacco Co.*, 84 F.3d

14   734, 750-51 (5th Cir. 1996) (class certification in error where Seventh Amendment

15   would prevent bifurcated aggregate trials); *In re Fibreboard Corp.*, 893 F.2d 706,

16   708-12, (1990) (finding that a phase II trial plan to decide "classwide damages"

17   violated Due Process).

18   The pre-trial history relating to the effect of the Phase I trial is contentious, at

19   best. It reflects the opposite of agreement. Once again, Plaintiffs would have the

20   Court find that J-M actually acquiesced to the proposition that a trial of the claims of

21   self selected plaintiffs, under the unsupportable (and unannounced "Elements"

22   theory of liability) in a trial that involved no findings with concerning the pipe

23   actually delivered and in which important evidence could not be presented should be

24   binding for theories that were not even tried. Of course, such a finding is

25   unsupportable.

26   Plaintiffs' handful of citations to the record do not come close. Plaintiffs cite

27   excerpts from the hearing just prior to the entry of the December 7, 2011 Bifurcation

28

DEFENDANT J-M'S COMBINED REPLY BRIEF REGARDING ISSUES 1-3 AND RULE 9(b)

Order and one held just before the May, 2012 hearing where Plaintiffs embraced the substandard products theory liability. *See* Pls. Initial Br. at 5-8, 18-21 [Dkt. 1988]. Three points are dispositive in assessing the contention that J-M undertook in these hearings to be bound by Phase I with respect to all parties in interest and all theories of liability, or the contention that it waived anything:

First, the Bifurcation Order actually entered after the December 1, 2011 Hearing was just the beginning of a process that evolved all the way through the Phase I trial. The order bifurcated the case, identified in a few words the issues that would be addressed in the two Phases, and limited discovery in Phase I. The Order said nothing about the theories of liability, what the elements of the theories were, and when and how they would be litigated. All of this was to be defined at some point in the future. J-M had repeatedly objected to the selection of the Phase I exemplar Plaintiffs and the limitations on discovery. It also inquired as to whether the Phase I trial would be binding in Phase II. This question was not answered in the order or by the Court. In the end, J-M objected to everything the Order had to say about Phase II. It therefore objected to the Order and the Order was entered over its objection. Should J-M have objected then that the Order violated the Seventh Amendment? How could it have done so, when none of the details necessary to determine whether the Order properly "cut at the joint" had even been defined, much less ordered, much less tried, much less resulted in an opaque verdict (just like the one found to be unuseable post-trial in *Gasoline Products*, 283 U.S. at 499-500).

Nor can Plaintiffs make anything out the April 2012 hearing. During the hearing, counsel for J-M again inquired as to whether the Phase I trial would be binding in Phase II. 4/5/12 Hrg. Tr. 24:20-25 [Dkt. 632.] The very fact that the question was posed is clear evidence that it had not been resolved in the Bifurcation Order and that there was no agreement. All that the hearing produced was a discussion. No order was entered. The most that the Court would say is that the

effect of Phase I on Phase II would be controlled by a legal doctrine. 4/5/12 Hrg. Tr. at 24:2-16 [Dkt 632.]

Importantly, at the time of the April 2012 hearing, the Plaintiffs' failure to state their theory of liability was coming to a head, but it had not been resolved. That was to occur in the May 2012 hearing. During that hearing, the Plaintiffs adopted the substandard theory of liability. 4/7/12 Hrg. Tr. at 23:25–24:1 [Dkt. 1927-1] ("MR. HAVIAN: We are only going to be talking about the substandard products theory."). J-M took this at face value. Its focus became what factual contention Plaintiffs could support to pursue that theory.

Subsequent to the May 2012 hearing, J-M believed that substandard products liability was what the case was about. Plaintiffs made no motion under Rule 42 or raised any other matter that required revisiting the Bifurcation Order in light of Due Process, prejudice or the Seventh Amendment. The details that were crucial to those concerns had yet to be defined, in particular: (1) what evidence would be heard and decided in Phase I?; (2) How would the jury be instructed on substandard products? (3) How would the verdict read? And, of course (4) what use of the verdict would be made in Phase II. At each point these details came into place, J-M explicitly and vigorously objected. And at each point the problems with the Plaintiffs approach grew: (1) Exclusion of evidence relating to overall customer claims; (2) Plaintiffs' abandonment of substandard products liability; (3) Instructions which adopted their "Elements" theory; (4) A verdict which recited an unuseable formula; (5) Plaintiffs' proposal to apply the verdict in Phase II for the benefit of all parties in interest; and finally (6) Plaintiffs' slow motion adoption of new theories of liability for Phase II.

Given this history and context, it is clear that there was no agreement by J-M as to the effect of the Phase I trial findings on Phase II, much less for a Phase II predicated on theories of liability not tried in Phase II. Given J-M's continuous objections to the bifurcations process, waiver also has no application here. *United*

*States v. Scott*, 705 F.3d 410, 415 (9th Cir. 2012) ("[w]aiver is the intentional relinquishment or abandonment of a known right"). The lack of any position advocated by J-M actually adopted by the Court makes judicial estoppel inapplicable as well. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *Pegram v. Herdrich*, 530 U.S. 211, 228 n.8 (2000). Finally, Plaintiffs' citation to the standard for when non-parties may be bound by a judicial decision (Pls. Br. at 20 [Dkt. 1988]) is entirely inapposite. That doctrine does not apply because J-M is a party. To the extent Plaintiffs are attempting to argue that nonparty governmental entities somehow agreed to be bound by the Phase I jury verdict, there is no evidence of such agreement and J-M certainly could not have made that agreement for those potentially adverse nonparties. Even if that doctrine somehow applied (it does not), J-M's objections to the bifurcation procedure refutes that there was any agreement to use the Phase I trial results in the way Plaintiff suggests. *See* Restatement (Second) of Judgments § 40, cmt. b (an agreement to be bound by a judicial decision should not "be inferred except upon the plainest circumstance").

## VIII. ISSUES 1 AND 2: INVOCATION OF ISSUE PRECLUSION, AND OTHER DOCTRINES MEANT TO ADDRESS REPEATED VEXATIOUS LITIGATION, ARE NOT SAFE PASSAGE AROUND THE CONSTITUTION

Plaintiffs' extended discussion of issue preclusion (collateral estoppel and direct estoppel) and law of the case borrows liberally and incorrectly from those different doctrines, conflating them with regularity.[16] All of those doctrines presume

---

[16] Collateral estoppel, direct estoppel, and law of the case are three independent preclusion doctrines. Direct estoppel precludes relitigation of an identical finally-determined issue in an action on the same claim. *See In re Duncan*, 713 F.2d 538, 541 (9th Cir. 1983); *Sabek, Inc. v. Engelhard Corp.*, 65 Cal. App. 4th 992, 997 (1998). Collateral estoppel precludes relitigation of an identical finally-determined issue in an action on a different claim. *See In re Duncan*, 713 F.2d at 541. Both doctrines fall under the umbrella of "issue preclusion." *See id.* Final determinations

compliance with the Seventh Amendment, Due Process, and the Federal Rules, which is missing here (*see* discussion *supra* at Parts I-II). As to the exemplar Plaintiffs (as well as non-exemplar Plaintiffs and the non-party governmental entities) none of the preclusion doctrines correct the deficiencies in the Phase I trial or dictate how this Court should use the Phase I findings in Phase II. To be clear, J-M does not contest that issue preclusion would apply as to the exemplar Plaintiffs *if* the Phase I verdict were constitutional. But issue preclusion cannot arise if use of the verdict in Phase II is not constitutional.

### A. Issue Preclusion, Whether Through Collateral Estoppel or Direct Estoppel, Cannot Override Insufficiencies in the Phase I Verdict or Constitutional Requirements

Issue preclusion is a creature of judicial efficiency and cannot override J-M's constitutional rights. *See, e.g.*, *Taylor*, 553 U.S. at 891 (2008); M. Stuart Madden, *Issue Preclusion in Products Liability*, 11 Pace L.R. 87, 88 (1990) (Issue preclusion's "axial coordinates are judicial economy and fairness, against the backdrop of the due process clauses of the fifth and fourteenth amendments, and the seventh amendment."). Inherent in Plaintiffs' brief is an assumption that the application of issue preclusion to the Phase I verdict complies with Due Process and

---

may be direct estoppel as to issues pending in the same lawsuit, but only if the finality requirement has been met through partial summary judgment and the like. *See Williams v. Commissioner*, 1 F.3d 502, 504 (7th Cir. 1993) ("Within the limits of a single case, law-of-the-case doctrine, not preclusion, is the source of whatever limits may apply to reconsideration of an earlier summary judgment ruling.") (citing Wright, Miller & Cooper § 4434 Finality—Practical Finality and 18A Fed. Prac. & Proc. Juris. § 4434 (2d ed.). Law of the case, on the other hand, operates to prevent relitigation of a legal issue before any judgment is reached. *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993), cert. denied 508 U.S. 951 (1993). Law of the case is discretionary and need not be applied if it would result in injustice. *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997). Neither collateral estoppel, direct estoppel, nor law of the case apply here, especially as to non-exemplar Plaintiffs and non-party governmental entities..

---

37

Seventh Amendment rights. However, as discussed above, Parts I-II, Due Process and the Seventh Amendment make the Phase I verdict unuseable in Phase II as to any Plaintiff. This Court already has recognized that the Phase I verdict cannot be used for the non-exemplar Plaintiffs in any way. 4/5/12 Hrg. Tr. at 24:2-16 [Dkt 632].

Plaintiffs wholly ignore the case law, laid out in J-M's briefs, which documents the failed attempts to tackle products liability cases in one fell swoop by using issue preclusion and other means. Rule 16 Br. at 7-8 [Dkt. 1957. Indeed, courts across the country consistently have declined to apply issue preclusion to a "class" of plaintiffs in complex, mass-tort cases. *See, e.g.*, *Goodson v. McDonough Power Equip., Inc.*, 443 N.E.2d 978, 987-88 (1983) ("[W]e hold that nonmutual collateral estoppel may not be used to preclude the relitigation of design issues relating to mass-produced products when the injuries arise out of distinct underlying incidents."); *Pooshs v. Philip Morris USA, Inc.*, 904 F. Supp. 2d 1009, 1033-34 (N.D. Cal. 2012); *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 336-37 (5th Cir. 1982) (declining to apply collateral estoppel in an asbestos case); *In re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colo., on Nov. 15, 1987*, 720 F. Supp. 1505, 1519-20 (D. Colo. 1989), rev'd sub nom. on other grounds, *Johnson v. Cont'l Airlines Corp.*, 964 F.2d 1059 (10th Cir. 1992) (declining to apply collateral estoppel in a mass tort case); *Kramer v. Showa Denko K.K.*, 929 F. Supp. 733, 749-51 (S.D.N.Y. 1996) (products liability pharmaceutical case); *Held v. Mitsubishi Aircraft Int'l, Inc.*, 672 F. Supp. 369, 387 (D. Minn. 1987) (product defect case). As one court has cautioned:

> This Court is cognizant that a single products liability case typically involves individualized circumstances peculiar to that case alone, such as the age and health of the plaintiff, the conditions under which the product was used, or the precise circumstances surrounding plaintiff's

DEFENDANT J-M'S COMBINED REPLY BRIEF REGARDING ISSUES 1-3 AND RULE 9(b)

injury. Such factual idiosyncracies necessarily prevent a single finding from one such case to be applied to all other cases in cookie-cutter fashion. To find otherwise could distort a jury's decision on the remaining, open questions, prejudice a defendant's ability to litigate case-specific issues, and insulate a plaintiff from the burden of having to prove his case. This Court finds that applying offensive collateral estoppel in the instant case would subject the Kramer litigation to these very evils.

*Kramer*, 929 F. Supp. at 750-51.

Additionally, "common issue trials" can run afoul of due process if the procedure is not designed to ensure "that the claims against [a defendant] of the non-represented plaintiffs as they relate to liability or causation are determined in a proceeding that is reasonably calculated to reflect the results that would be obtained if those claims were actually tried." *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1020 (5th Cir. 1997). The failure to use a "randomly selected, statistically significant sample" in the test cases in *In re Chevron U.S.A., Inc.*, prevented any use of collateral estoppel as "[t]he elements of basic fairness contained in . . . due process" were not met. 109 F.3d at 1021; *see Morgan v. Ford Motor Co.*, 2007 WL 1456154, at *7 (D.N.J. May 17, 2007) (requiring that representative plaintiffs, randomly selected and of sufficient size, be chosen so as to maintain the parties' due process rights in mass toxic tort litigation). Those cautions are equally apt in this case, whether the contract- and project-specific nature of the claims requires individualized consideration of the essential elements, including falsity and materiality.

### B.   The Legal Prerequisites for Issue Preclusion Are Not Satisfied Here

Courts routinely hold that the factual variability and plaintiff-specific nature

of mass tort cases preclude some or all of the issue preclusion requirements, i.e., that issues of fact of law were not (1) actually litigated; (2) essential to the prior judgment; nor (3) determined by a valid and final judgment. *Taylor*, 553 U.S. at 892; *Arizona v. California*, 530 U.S. 392, 414 (2000); Restatement (Second) of Judgments § 27 (1982). Plaintiffs cannot meet their burden of proving that the Phase I verdict meets any of the issue preclusion requirements, let alone all of them. And Plaintiffs cannot avoid the requirement by invoking the doctrine of "direct estoppel." The same foundational requirements apply equally to direct estoppel and collateral estoppel versions of issue preclusion.[17] *See Taylor*, 553 U.S. at 892 & n.5 (direct estoppel issue preclusion "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment'") (quoting *New Hampshire,* 532 U.S. at 748); *In re Paine*, 283 B.R. 33, 39 (B.A.P. 9th Cir. 2002) (same); *see also* Wright & Miller § 4418 (pursuant to Rule 54(b), "[s]o long as the trial court has failed to enter final judgment as to pat of the action, it retains power to reopen free of any preclusion constraints.")

### 1.     False Certification and Fraudulent Inducement Were Not Actually Litigated

The theories Plaintiffs would like to rely upon in Phase II, fraudulent inducement and false certification, as the Court has recognized, were never litigated at all in Phase I, and may not now be treated as such. June 30, 2014 Tr. at 16:2-3 [Dkt. 1962.]

The ambiguity of the verdict here compels the same conclusion. Courts in products liability cases routinely "refuse[] to apply collateral estoppel when there was any ambiguity in discerning precisely what the jury actually and necessarily

---

[17] Direct estoppel precludes relitigation of an identical finally-determined issue in an action on the same claim and collateral estoppel precludes relitigation of an identical finally-determined issue in an action on a different claim. *See In re Duncan*, 713 F.2d at 541. *See discussion supra.*

decided." *Coburn v. Smithkline Beecham Corp.*, 174 F. Supp. 2d 1235, 1238 (D. Utah 2001); *see also Anderson v. Bungee Int'l Mfg. Corp.*, 44 F.Supp.2d 534, 539 (S.D.N.Y.1999); *Setter v. A.H. Robins Co.*, 748 F.2d 1328, 1331 (8th Cir. 1984); *Kramer,* 929 F. Supp. at 750; *Goodson*, 443 N.E.2d **at** 998 (Non-mutual issue preclusion cannot apply to a mass-produced product.); *Dodge v. Cotter Corp.* 203 F.3d at 1198 (additional plaintiffs could not use negligence finding from first trial through issue preclusion because the verdict failed to specify what act or acts formed the basis of the first jury's finding). Restatement (Second of Judgments) further makes it clear that collateral estoppel should not be applied where the prior judgment is ambiguous. Restatement (Second) Judgments § 29, comment g (1982) (Where the basis for the first judgment is unclear, it may not be used as the basis for collateral estoppel in a later judgment)[18].

### 2.   The Inferences Plaintiffs Would Like to Draw From the Phase I Verdict Were Not Critical to the Jury's Determinations.

Plaintiffs cannot show that the elements and issues they now wish to preclude were essential to the verdict. *See Kamilche Co. v. United States*, 53 F.3d 1059, 1062

---

[18] *See, e.g.*, *U.S. v. Howe,* 590 F.3d 552, 556-58 (8th Cir. 2009) (finding, based on court's review of the record, that it could not express with any particularity what the jury decided and therefore collateral estoppel could not apply). In *US v. Costanza*, the Eight Circuit denied issue preclusion because a number of communications were made to a number of plaintiffs, and the mere fact that some of them were actionable does not mean that they all were. 549 F.2d 1126, 1135 (1977); *accord Acevedo-Garcia v. Monroig*, 351 F.3d 547 (1st Cir. 2003) (Where there are facts unique to each Plaintiff, as here, issue preclusion does not apply.). Similarly, here, different representations were made to different plaintiffs precluding the use of issue preclusion with respect to any fraudulent inducement or false certification elements moving forward. *See Acevedo-Garcia*, 351 F.3d at 572 (finding that where the issues litigated are "necessarily unique to the circumstances of the particular plaintiffs," any application of issue preclusion will likely "run[ ] afoul of the actual litigation requirement").

(9th Cir. 1995) (The moving party bears the burden of establishing the necessary elements of issue preclusion, including the element that the issues and facts were essential to the judgment). The Ninth Circuit requires a showing that the preclusive issues "were *necessary* to support the court's judgment in first action," and not "merely *incidental* to the judgment in the prior action." *Resolution Trust Corp. v. Keating*, 186 F.3d 1110, 1115 (9th Cir. 1999) (emphasis added); *see also Gresham v. Philip Morris, Inc.*, 670 F. Supp. 2d 1014, 1032 (C.D. Ca. 2009) (Plaintiff must also show how each of the findings it seeks to be precluded was outcome determinative). As discussed above, it is not clear from the verdict sheet what the jury relied upon to reach its determination.

### 3.    The Phase I Verdict Is Not Final.

The finality requirement is not satisfied in this case where, not only has a judgment has never been entered with respect to Phase I, but such a judgment may never be entered because another trial is required. *See Acevedo-Garcia*, 351 F.3d at 560 ("[S]ince separate trials do not individually produce final judgments, any attempt to apply collateral estoppel to the remaining three trials would be invalid under a Rule 42(b) regime."); *Venustas v. Venustas Intern., LLC*, 2008 WL 619028 (S.D.N.Y. 2008) (finding that issue preclusion does not apply to subsequent phases of the "*same* litigation") (emphasis original). Moreover, the elements of Plaintiffs' new theories, false certification and fraudulent inducement, were never determined and so there can be no finality with respect to those theories. Significantly, issue preclusion applies almost exclusively based on decisions made in "other suits, or of specific issues in other suits," not the same suit. *Amcast Indus. Corp. v. Detrex Corp.*, 45 F.3d 155,160 (7th Cir. 1995); *accord* discussion *infra* at Part III.A. In fact, use of issue preclusion in the way Plaintiffs advocate – where "separation of proceedings within a single suit may lead to final rulings on issues that are common both to a concluded portion of the proceedings and to the remaining proceedings"

(Wright & Miller § 4418) – should be done rarely with great caution.

Plaintiffs have presented no authority to support that such an extraordinary measure is appropriate in this case, nor can Plaintiffs make such a showing given the fundamental Seventh Amendment and Due Process issues in this case.

Plaintiffs rely upon case law based on procedural facts that are not present this case, such as when one party fails to appeal a final interlocutory ruling or when legal claims are tried to a jury before equitable claims are determined by a court. *See, e.g.*, *Cotton v. Heyman*, 63 F.3d 1115, 1118-19 (D.C. Cir. 1995) (the unappealed finding that the Smithsonian Institute was a government agency in the "merits proceedings" of a Freedom of Information Act case precluded argument that the Smithsonian Institute was not a government agency in subsequent proceedings regarding fees); *see also Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 844 (1978) (recognizing that under the Seventh Amendment, legal claims must be tried to the jury before equitable claims are tried to a court and that "[a]ny actual issues necessarily and actually decided by the jury are foreclosed under settled principles of collateral estoppel from subsequent reconsideration by the district court"); *Calnetics Corp. v. Volkswagen of Am.*, 532 F.2d 674, 690 (1976) (same).

The facts in *Mueller v. Auker*, 700 F.3d 1180, 1192-93 (9th Cir. 2012), cited by Plaintiffs, contrasts starkly with the facts of this case. *See* Pls. Initial Br. at 17 [Dkt. 1988.] In *Mueller*, the Ninth Circuit affirmed the district court's dismissal, based on collateral estoppel, of plaintiff's civil battery claim after jury findings on related claims negated an element of civil battery. 700 F.3d at 1192-93. There was no question that the jury findings were "final" in that case as there were no issues of bifurcation or use of multiple juries. Indeed, the Ninth Circuit considered the ruling pursuant to 28 U.S.C. § 1291, appeal of "final" decisions. *Id.* at 1185. There were also no questions about the scope of the issue determined by the jury and to which parties the determination applied. In that case, the jury found that one defendant, a

43

doctor, did not make a false statement. *Id.* at 1192. The lack of falsity negated civil battery, which would require a finding that the doctor defendant treated a minor child pursuant to "consent to treatment . . . obtained by fraud or misrepresentation." *Id.* Unlike the cases relied upon by Plaintiffs, no claim has yet been decided in this case[19].

### C.   The Discretionary Doctrine of Law of the Case Does Not Apply.

Law of the case, which "preclude[s]" a court "from reconsidering" a "[legal] issue that has already been decided by the same court, or a higher court in the identical case" (*Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993), *cert. denied* 508 U.S. 951 (1993)), also does not work here for several reasons. Law of the case applies only to legal conclusion, and therefore has no bearing on what the importance of the jury's factual findings in the Phase I trial. *See Biancur v. Hickey*, 221 F. App'x 546, 547 (9th Cir. 2007) ("The law of the case doctrine states that the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case.") (quoting *In re Rainbow Magazine, Inc.,* 77 F.3d 278, 281 (9th Cir.1996)); *People v. Barragan*, 32 Cal. 4th 236, 246-47 (2004).

Even as to legal issues, "law of the case doctrine is not an absolute bar to reconsideration of matters previously decided." *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1393 (9th Cir. 1995). Law of the case is subject to judicial discretion and need not be applied where there are changed circumstances or "a manifest injustice would otherwise result." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir.

---

[19] The direct estoppel issue preclusion decision in *Deutsch v. Flannery*, 823 F.2d 1361, 1364-65 (9th Cir. 1987), also is instructive. A dismissal on the pleadings precluded a subsequent case based on *identical* allegations. However, to the extent new factual allegations were asserted, the subsequent case was unaffected by the prior decision. *Id.* at 1365. This Court already has acknowledged that Plaintiffs may be pursuing legal theories that were not tried in the Phase I trial and requested briefing regarding the theory of the case. *See* 6/30/14 Hrg. Tr. at 46-9, 64, 78-9 [Dkt. 1961]; J-M Initial Br. at 18-19 [Dkt. 1987.]

1997). "Because a court has the inherent power to alter its own prior rulings, the doctrine is merely an expression of good sense and wise judicial practice." *Magnesystems, Inc. v. Nikken, Inc.*, 933 F. Supp. 944, 949 (C.D. Cal. 1996) (internal quotation marks omitted).

The case cited by Plaintiffs, *In re Innotron Diagnostics*, 800 F.2d at 1085, states the requirements of law of the case, but provide no guidance as to when exercise of that discretionary doctrine is appropriate. Like Plaintiffs' direct estoppel and collateral estoppel cases, *In re Innotron Diagonostics*, arises from distinct and much more straightforward facts. *See id.* (in a patent cases between two parties, bifurcation might be economical as determination of patent validity and defenses could be law of the case as to related antitrust issues).

### D.    The Indicia of Unfairness Counsels Against Any Preclusion.

Given the varying outcomes in mass tort litigation, courts have suggested that where there are many plaintiffs "offensive collateral estoppel could not be used." *In re Bendectin Prods. Liab. Litig.*, 749 F.2d 300, 305, n.11 (6th Cir. 1984). As set forth by the Fifth Circuit in *In re Chevron U.S.A., Inc.*, preclusion could not be used in a mass tort case where there was no assurance that the plaintiffs were a representative sample of the 3,000 cases. The court reasoned that:

> "[Our] substantive Due Process concerns are based on the lack of fundamental fairness contained in a system that permits the extinguishment of claims or the imposition of liability in nearly 3,000 cases based upon results of a trial of a non-representative sample of plaintiffs. Such a procedure is inherently unfair when the substantive rights of both plaintiffs and the defendant are resolved in a manner that lacks the requisite level of confidence in the reliability of its result."

*Id.* at 1020-21.

Plaintiffs' final suggestion, that in the Ninth Circuit application of preclusion

is untethered from formal requirements and instead "appl[ies] broadly wherever a party would be inappropriately forced to re-litigate an issue (Pls.' Initial Br. at 18 [Dkt. 1988])," is incorrect and unsupported by the Tessera's case law. *Guild Wineries & Distilleries v. Whitehall Co., Ltd.*, 853 F.2d 755 (9th Cir. 1988), adopted use of the terms "claim preclusion" and "issue preclusion" over the terms "merger," "bar," and "collateral estoppel," but in no way held or even suggested any change to the substance of the underlying preclusive doctrines or a movement towards unprincipled application of preclusion. Similarly, the United States Supreme Court, in *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984), adopted the terms "claim preclusion" and "issue preclusion" in order to "avoid confusion resulting from the two uses of 'res judicata,'" not to abrogate the legal principles underlying those doctrines. *Id.*

## IX.    ISSUE 3: THE PHASE I TRIAL IS NOT SUFFICIENT TO SUPPORT A VERDICT UNDER ANY THEORY AVAILABLE TO PLAINTIFFS IN PHASE II.

Plaintiffs mistake this issue entirely. *See* Pls. Resp. Br. at 50-53 [Dkt. 1990]. The salient question is not whether the evidence presented at the Phase I trial supported the Phase I verdict, but whether the Phase I verdict can be used to support a Phase II verdict such that the issues need not be retried in Phase II. The Court has made this clear repeatedly. (9/24/14 Hearing Tr. at 10:1-10 (Court: "I thought Phase I was just to see if the theories that the plaintiffs had would fly, and if they decided they would fly, then it would be Phase II would be the case").

### A.    On the Facts, Plaintiffs Simply Have Nothing to Say.

Plaintiffs provide no argument or suggestion for how the findings from the Phase I trial can be used to prove either false certification or fraudulent inducement in Phase II. As J-M argued in detail before, those theories embrace the specific terms of the contract, which create the contractors' rights to be paid, the basis for

46

any false "claim." *See* J-M Initial Br. at 42-49 [Dkt. 1987.]. The contracts and projects at issue are not "common" and necessary determinations about whether certifications were a condition of payment (false certification) or whether Plaintiffs relied on J-M's representations to enter the contracts (fraudulent inducement), to name only two, cannot be made for all plaintiffs in a contractual vacuum. Plaintiffs' list of supposedly determined issues (Pls. Resp. Br. at 51-53 [Dkt. 1990] does not address this problem or help this Court administer the next phase of litigation.

## B.   Plaintiffs Continue to Cling to Their Elements Theory of Liability, Which Is Wrong.

Despite the wealth of case law adopting and affirming FCA requirements specific to recognized categories of FCA violations, including false certification and fraudulent inducement, Plaintiffs continue to argue that those requirements have no application to this case. *See* Appellants' Consolidated Br. at 53-54. Plaintiffs are not free to reject the law, including the Ninth Circuit's ruling in *Ebeid*, because they find the law inconvenient. Circuit court adoption of these standards is dispositive of this issue. *See, e.g.*, *Ebeid*, 616 F.3d at 996-98; *Frazier ex rel. U.S. v. Iasis Healthcare Corp.*, 392 F. App'x 535, 538 n.1 (9th Cir. 2010); *see also* discussion *supra* at Part I.A.1.

### 1.   Plaintiffs' Expansion of False Certification Would Turn Every Breach of Contract Into a FCA Claim.

Plaintiffs' alarmist argument that J-M's reliance on established case law "would exempt from FCA liability "paradigmatic" false claims (Appellants' Consolidated Br. at 55) is pure hyperbole unsupported by case law. Tellingly, Plaintiffs cite no specific examples to support their hypothesis that government entities will be unable to assert FCA claims against contractors who falsely certify compliance with "quality assurance procedures." *Id.* In fact, case law is replete with examples of false certification FCA claims based on failure to comply with statutory

or regulatory quality assurance standards made conditions of payment through the relevant contracts. *See, e.g. San Francisco Unified School District ex rel. Contreras v. Laidlaw Transit, Inc.* ("*Contreras I*"), 182 Cal. App. 4th 438 (2010); *U.S. ex rel. UNITE HERE v. Cintas Corp.*, 2008 WL 1767039, at **3-4 (2008); *see also* J-M's Initial Br. at Part III.E.4.a. That theory of recovery would encompass Plaintiffs' other examples, contractors who use less qualified workers, when the qualification requirements are set out by law and made a condition of payment through the contract.

Plaintiffs' argument that *Bornstein* involved only breaches of contract, easily is refuted by the text of the opinion. The contracts at issue in that case specified that the radio kits

> were to contain new 4X150G electron tubes bearing markings that, *pursuant to the underlying military procurement specifications*, showed they were manufactured in a plant whose quality-control standard measured up to certain *Government requirement* and were 'source' inspected and approved by a *Government inspector*, at the plant during manufacturing. As far as the military was concerned (as opposed to commercial buyers), [non-party] Eimac was the only authorized manufacturer, Tubes made by Eimac at its designated plant, accompanied by the proper 'source' inspection and stamped accordingly, were the only ones qualified to receive genuine affixations.

423 U.S. at 319 (Rehnquist, J., concurring) (emphases added). The required markings, some of which were registered with the Patent & Trademark Office, required rigorous qualifying tests and government inspection. *Id.* at 319 n.1. The purely private industry standards that Plaintiffs rely on in this case are nothing like the government and military standards expressly incorporated into the *Bornstein*

1  contracts.

2      Plaintiffs' argument that the sole barrier between breach of contract and FCA

3  liability is scienter is not supported by its citations. *See* Pls. Resp. Br. at 56 [Dkt

4  No. 1990]. Indeed several of those cases involve a knowing breach of a statutory or

5  regulatory requirement incorporated by contract. *See United States ex rel. Fallon v.*

6  *Accudyne Corp.* ("*Fallon*"), 921 F. Supp. 611, 616, 627 (W.D. Wisc. 1995); *United*

7  *Sates ex rel. Main* ("*Main*"), 426 F.3d 914, 916-17 (7th Cir. 2005). In the quoted

8  language from *Fallon*, that court affirmed that an FCA violation can be stated based

9  on an implied, as opposed to express, false certification. 921 F. Supp. at 627. That

10 case did not extend FCA liability to breaches of purely contractual provisions. *Id.*

11 ("the environmental compliance provisions [from the Clean Air Act and Clean

12 Water Act] in the contracts were a material part of those contracts and Accudyne

13 knowingly failed to perform that aspect of the contract"). The court in *Main*

14 affirmed that "violation[s] of federal regulations in a [college] funding program"

15 may be actionable under the FCA, but only if the college also made "a false

16 representation . . . ." 426 F.3d at 916. The FCA finding in *United States v. Aerodex,*

17 *Inc.* ("*Aerodex*"), 469 F.2d 1003, 1007-08 (5th Cir. 1972), and *United States ex rel.*

18 *King v. DSE, Inc.* ("*King*"), 2011 U.S. Dist. LEXIS 52830, at *9-10 (N.D. Fla. May

19 17, 2011), were not based solely on "breach of contract" (Pls. Resp. Br. at 56

20 [Dkt. 1990]). The mis-labeled parts delivered in *Aerodex* were substandard (469

21 F.2d at 1005, 1007-08) and the discussion of the contract in that case focused on

22 whether *the government* had conducted a "100% final inspection" as required by the

23 contract (i*d.* at 1006 1009-10). The finding that a FCA claim was stated in *King*

24 focused on the particular safety concerns raised by supplying substandard grenades

25 for use by U.S. military personnel in combat. 2011 U.S. Dist. LEXIS 52830, at *9-

26 10.

27      Plaintiffs pull out snippets of the 2010 opinion in *San Francisco Unified*

28

*School District ex rel. Contreras v. Laidlaw Transit, Inc.* ("*Contreras I*"), 182 Cal. App. 4th 438 (2010), to suggest that that case rejected "condition of payment" whole cloth. Pls. Resp. Br. at 56-57 [Dkt No. 1990]. In fact, that decision addressed whether and under what circumstances, a request for payment can give rise to an implied false certification claim. *Id.* at 448. In declining to adopt a standard requiring the contract to expressly state that certification is a condition of payment,[20] the court affirmed that in the implied certification context, "'compliance with federal regulations [or other law or regulation] was the *sine qua non* of payment [when] the contract specifically requires compliance.'" *Id.* at 452 (quoting *U.S. ex rel. Holder v. Special Devices, Inc.*, 296 F. Supp. 2d 1167, 1175 (C.D. Cal. 2003)). *Contreras I* also adopts the categories of FCA violations that Plaintiffs work so hard to avoid. 182 Cal. App. 4th at 449-454. The entire analysis in *Contreras I* is specific to the implied false certification context, not a vague "elements" theory. *See*

---

[20] Plaintiffs put heavy stock in the adoption in *Contreras I*, 182 Cal. App. 4th at 454, of the "natural tendency" materiality standard, ignoring the binding pre-2009 amendment case law employing condition of payment in the false certification context. *See Ebeid*, 616 F.3d at 996-98; *Hendow*, 461 F.3d at 1172-73. In allowing FCA claims to proceed in the false certification context, as opposed to requiring a factually false invoice, *Ebeid* and *Hendow* wisely applied a heightened materiality standard. *See id.* Those rulings were consistent with the U.S. Supreme Court's ruling in *Allison Engine* that the FCA requires proof that an FCA defendant, and in particular subcontractors, specifically intend that a false claim be submitted to the government. *Allison Engine Co., Inc. v. U.S. ex rel. Sanders*, 553 U.S. 662, 670-71 (2008). That was the law prior to the 2009 FCA amendment and there is no argument that that amendment is retroactive. *Contreras I*,182 Cal. App. 4th at 454, which considered certifications related to school bus safety, noted that natural tendency was adopted in *Pomona*, 89 Cal. App. 4th at 802. *Pomona*, however, is not a false certification case. *See id.* at 804-05. To the extent Plaintiffs rely on *Contreras I* and *Pomona* to establish the law regarding false certification materiality prior to the 2009 amendment, that flies in the face of California Supreme Court guidance that "it is appropriate to turn to federal cases for guidance in interpreting the [CFCA and FCA]." *Pomona*, 89 Cal. App. 4th at 802.

DEFENDANT J-M'S COMBINED REPLY BRIEF REGARDING ISSUES 1-3 AND RULE 9(b)

*generally id.* Finally, the court in *Contreras* expressly considered the terms of the specific contract at issue when determining whether materiality was satisfied at the demurrer stage. *Id.* at 455. In contrast, Plaintiffs propose making sweeping materiality rulings binding uncounted real parties in interest with no reference to any contract.

> ## 2. J-M's Distance From the Contracts Refutes Each of the Specific Elements of False Certification and Fraudulent Inducement.

In its Initial Brief, J-M thoroughly analyzed case law how its role as a pipe manufacturer that was not a party to any government contract effects a false certification or fraudulent inducement analysis. J-M Initial Br. at 44-48 [1987]; *see Bornstein*, 423 U.S. at 304, 308-09; *Pomona*, 89 Cal. App. 4th at 798-99; *Allison Engine*, 553 U.S. at 670-71. The cases cited by J-M, the importance of which has been recognized by this Court, teach that unless a parts supplier induces the government to enter into the contract or becomes a part of the government payment process, the supplier is too distant from the claims the process (the heart of any FCA case) to be liable. Plaintiffs ignore this case law and J-M's analysis relying on the conclusory assertion that the FCA requires "causal" connection between the fraud and payment. Pls. Response Br. at 52 [Dkt. 1990] (internal quotations omitted). The assertion, without more, sheds no light on what level of involvement would be a legally recognized "causal" connection.

## X. RULE 9(B) PLEADING MUST BE, BUT HAS NOT BEEN SATISFIED HERE AND HENDRIX'S STATUS AS A QUI TAM RELATOR DOES NOT CHANGE THAT REQUIREMENT.

### A. Rule 9(b) is not trumped by the FCA.

Plaintiffs concede that FCA claims must be pled with Rule 9(b) specificity, yet continue to argue that Hendrix's status as a partial assignee of real parties in

interest erodes the specificity requirement. *See* Pls. Resp. Br. at 45-46 [Dkt No. 1990]. Plaintiffs are incorrect. Even in FCA cases, where plaintiff is not required to allege "all facts supporting each and every instance of [fraudulent] billing[,]" Rule 9(b) "still requires [plaintiff] to plead the fraud with some level of specificity." *Ebeid*, 616 F.3d at 999. At a bare minimum, Hendrix must allege with specificity the identities of the supposedly defrauded real parties in interest and the projects and contracts forming the basis of the alleged fraud.

This is not a case where plaintiff has not identified in the complaint each and every fraudulent invoice but otherwise has alleged the fraud in detail. *See, e.g.*, *Strom ex rel. U.S. v. Scios, Inc.*, 676 F. Supp. 2d 884, 893 (N.D. Cal. 2009) (plaintiff did not allege every claim for payment submitted to Medicare); *U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051-52 (9th Cir. 2001) (Lee's complaint was not "require[d] . . . to allege, in detail, all facts supporting each and every instance of false testing over a multi-year period[,]" but nonetheless was "not specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.") (internal quotations omitted). Instead, Hendrix has failed to allege the factual basics of each project- and contract-specific fraudulent scheme and in some cases, even failed to allege the identity of the real party in interest.

Hendrix is required to allege the "'"who, what, when, where, and how" for each of the hundreds of [alleged] victims of J-M's fraud." Pls. Resp. Br. at 49 [Dkt No. 1990]. Plaintiffs' citation to *U.S., ex rel. Hallstrom v. Aqua Flora, Inc.*, No. 10-civ-01459, 2010 WL 4054243, at *1 (E.D. Cal. Oct. 15, 2010), is revealing. That case was brought under 35 U.S.C. § 292, the false marking statute, not under the FCA. *Id.* Allegations that "defendants manufacture, advertise, distribute, and sell [certain] products[,]" therefore, was adequate to satisfy Rule 9(b). *Id.* at *5.

Generalized allegations of fraud on the market are insufficient in an FCA case; there must be fraudulent claims for payment. *See U.S. ex rel. Cericola v. Fed. Nat. Mortgage Assoc.* ("*Cericola*"), 529 F. Supp. 2d 1139, 1146 (C.D. Cal. 2007) ("alleg[ing] a general fraud scheme[ ] in the hope [of] . . . develop[ing] actual evidence of fraud" is not "sanctioned under either the FCA or the pleading requirements set forth in the Federal Rules of Civil Procedure"); *U.S. ex rel. Perry v. Hooker Creek Asphalt & Paving, LLC* ("*Perry*"), 565 F. App'x 669, 670 (9th Cir. 2014); *Rost*, 507 F.3d at 732-33. Plaintiffs cannot avoid the contract- and project-specific examinations necessary to state an FCA claim. *See* J-M's Initial Br. at Part III.E.2. Those facts must be pled with specificity.

*Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 157 (3d Cir. 2014), a "factually false" case, in which "claimant misrepresents what goods or services that it provided to the Government[,]" is not all on point. (internal quotations omitted). Foglia alleged that a single defendant overcharged Medicare for a single drug. *Id.* at157. Similarly in *Strom ex rel. U.S. v. Scios, Inc.*, 676 F. Supp. 2d at 885, the real party in interest, Medicare, was expressly alleged). Hendrix has not provided even the most basic information – identification of the real parties in interest who were alleged defrauded. None of the cases cited by Plaintiffs in any way establish that an FCA pleading may satisfy Rule 9(b) without identifying all real parties in interest. Hendrix has not provided even the most basic information – identification of the real parties in interest who were alleged defrauded. None of the cases cited by Plaintiffs in any way establish that an FCA pleading may satisfy Rule 9(b) without identifying all real parties in interest.

### B.   Hendrix Must Plead Specific Facts as to Every Real Party in Interest Plaintiff.

As to non-parties, Plaintiffs completely miss the legal issue – assignment of partial standing does nothing to alter the plaintiffs' burden under the Federal Rules.

Case law is clear that identifying real parties in interest through discovery, instead of pleading, does not comply with Rule 9(b) and is not allowed. *See Armenta*, 142 Cal. App. 4th at 642; J-M Initial Br. at 38-39 [Dkt. 1987]. Although Hendrix attempts to distinguish *Armenta*, 142 Cal. App. 4th at 642, they cannot deny that the 130 additional real parties in interest were added to the case through an amended complaint, not discovery responses. *Id.* at 642. In addition to alleging the identity of each real party in interest, the amended complaint identified as to real party in interest:

> It identifies every false representation (specific metal-composition catalogue or sales literature assertions, or invoices averring the parts described conform to metal-composition contractual specifications) and every contract at issue (each purchase of Jones water works parts made of substandard metal). It also states when (within the specified 10–year period), where (at the entities' or Jones's distributors' premises) and how (via catalogue, sales literature, or invoice purporting to comply with contract specifications) Jones made the false statements to the governmental entities.

*Id.* at 645. Plaintiffs must make similar allegations in this case.

*U.S. ex. Rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 732-33 (2007), is instructive. Qui tam plaintiff in that case alleged that certain drug makers defrauded the government by encouraging doctors to use Genotropin, and thus bill the government, for off-label use. Having failed to allege the specifics of how defendants' fraud connected the claims process (*e.g.* specifics regarding the submission of claims to specific government entities). *Id. Perry*, 565 F. App'x at 669-70, did not approve the use "representative examples" in FCA pleading and held that plaintiff's reliance on representative examples in that case did not satisfy

Rule 9(b).[21] J-M's pleading argument is not surprising given the requirement that every qui tam plaintiff must have knowledge of the alleged fraud. As one Central District court has described:

> Indeed, [Rule 9(b)] should easily be met in qui tam actions because insiders who are privy to fraud, which is the group that the statute encourages to bring these FCA lawsuits, should have adequate knowledge of the wrongdoing at issue. The Rule 9(b) obligation of stating the "who, what, when and where" of the alleged fraud should therefore present less of a barrier in qui tam actions than might exist in other kinds of fraud cases.

*Cericola*, 529 F. Supp. 2d at 1144.

In every qui tam FCA action the relator must have sufficient knowledge of the alleged fraud to meet basic pleading standards. *See, e.g.*, *Johnson v. U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 512 (6th Cir. 2007) (dismissing complaint where relator's allegation of fraud were not based on facts within his or her knowledge); *U.S. ex rel. Carpenter v. Abbott Labs., Inc.*, 723 F. Supp. 2d 395, 404 (D. Mass. 2010) ("It is settled law that the strict pleading requirements of Rule 9(b) apply to an FCA qui tam action. Moreover, a relator may not circumvent Rule 9(b) with the promise that discovery will eventually fill in the missing gaps.") (citations omitted); *Univ. of Rochester Med. Ctr.*, 686 F. Supp. 2d 259, 266

---

[21] In *Perry*, the Night Circuit affirmed the pleading standard adopted in *Ebeid*, requiring specific allegations of "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid*, 16 F.3d at 998-99 (internal quotations omitted); *see Perry*, 565 F. App'x at 670 (quoting *Ebeid*). As argued above, the "particular details of a scheme to submit false claims" (*Ebeid*, 16 F.3d at 998-99) is plaintiff-, contract-, and project-specific. Pleading of "'each and every instance' of fraudulent billing" within such scheme (*Perry*, 565 F. App'x at 670 (quoting *Ebeid*, 616 F.3d at 999)), however, is not required.

(W.D.N.Y. 2010) (holding in an FCA case that pursuant to Rule 9(b) "a plaintiff must still set forth the factual basis for that belief [that fraud occurred], and that basis must arise from the plaintiff's *direct, independent, firsthand* knowledge") (emphasis added). To hold otherwise would exempt qui tam FCA actions from the Constitutional standing requirements and federal procedural rules propounded pursuant to the Rule Enabling Act and would inconsistent with the purpose of the FCA to provide "incentives for those with relevant information of fraud to come forward" while "precluding suits by opportunists who lack first-hand knowledge of the fraud." *United States v. Northrop Corp.*, 59 F.3d 953, 966 n.11, 967 (9th Cir. 1995). The fact that direct and independent only "becomes *relevant*" in public disclosure cases does not exempt other qui tam relators from basic pleading requirements. *Little v. Shell Exploration & Prod. Co.*, 690 F.3d 282, 294 (5th Cir. 2012) (emphasis added). In fact, independent knowledge is a requirement in every qui tam FCA case, but satisfying the Rule 9(b) pleading standard demonstrates independent knowledge. *See U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (in qui tam case with no public disclosure, complaint was dismissed where relator lacked "firsthand knowledge of the defendants' submission of false claims"). Thus, independent knowledge generally is litigated only when the basic facts of any case have been publically disclosed. *Accord Little*, 690 F.3d at 294.

DATED:  December 5, 2014          DECHERT LLP

By:  ____/s/ David Bernick____

David Bernick
Attorneys for Defendant J-M
Manufacturing Company, Inc. d/b/a JM Eagle

DATED:  December 5, 2014

Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.

By: _____/s/ Paul S. Chan_____

Paul S. Chan
Attorneys for Defendant J-M
Manufacturing Company, Inc. d/b/a JM Eagle