# EXHIBIT  A

Expert Report of Paul Braithwaite, FCAS, MAAA
FTI Consulting, Inc. (April 27, 2018)

*United States ex rel. Hendrix v. J-M Manufacturing Co., Inc.*
No. 5:06-cv-00055-GW-PJW (C.D. Cal.)



## TABLE OF CONTENTS

I.    INTRODUCTION AND BACKGROUND .................................................................1

II.   SUMMARY ...................................................................................................4

III.  MR. LEHMANN FAILED TO DEFINE ADEQUATELY
      THE INSURANCE COVERAGE HE HYPOTHESIZED ...........................................5

IV.   MR. LEHMANN HYPOTHESIZED A POLICY THAT IS
      UNREALISTIC AND INCONSISTENT WITH INDUSTRY PRACTICE.................7

V.    MR. LEHMANN FAILED TO CONSIDER RATEMAKING
      AND PRICING TECHNIQUES APPROPRIATE FOR THE
      TYPE OF RISK HE DESCRIBES .................................................................11

VI.   MR. LEHMANN FAILED TO ESTIMATE OR ESTABLISH
      A MARKET PRICE FOR THE POLICY HE HYPOTHESIZED..............................13

VII.  MR. LEHMANN MISAPPLIED TESTING DATA OUTSIDE
      HIS AREA OF EXPERTISE, CONTRARY TO ACTUARIAL
      STANDARD OF PRACTICE 38 ...................................................................15

VIII. MR. LEHMANN FAILED TO APPLY A CREDIBILITY
      PROCEDURE AS CALLED FOR BY ACTUARIAL STANDARD
      OF PRACTICE 25...................................................................................18

IX.   MR. LEHMANN DID NOT ADEQUATELY DOCUMENT
      IMPORTANT ASPECTS OF HIS APPROACH AS CALLED FOR
      BY ACTUARIAL STANDARD OF PRACTICE 41 .................................................21

X.    MR. LEHMANN'S HYPOTHETICAL INSURANCE POLICY
      IS NOT AN APPROPRIATE MEASURE OF DAMAGES AND
      IS MISALIGNED WITH ALLEGED DAMAGES IN THIS MATTER....................22

XI.   CLOSING...................................................................................................25

i



## I.  INTRODUCTION AND BACKGROUND

1. FTI Consulting, Inc. ("FTI") has been retained by Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss" or "Counsel") related to its representation of J-M Manufacturing Company now known as JM Eagle ("JM Eagle").

2. I understand that JM Eagle is now involved in the damages phase of a trial after the court found JM Eagle falsely represented its product uniformly complied with certain industry standards.

3. I have been asked by Paul Weiss to provide my opinions with respect to the August 26, 2016 Expert Report ("Lehmann Report") and February 6, 2017 Rebuttal Expert Report ("Lehmann Rebuttal Report") of Steven G. Lehmann of Abacus Actuarial Consulting LLC, in which he purports to determine the price of an insurance policy that would insure Plaintiffs for the damages they have suffered because of JM Eagle's false statements.

4. I have forty years' experience in the property and casualty insurance and reinsurance industry, including substantial experience with pricing and underwriting property and casualty insurance and reinsurance coverages.

5. A copy of my curriculum vitae ("CV") is attached as **Appendix A**.

6. I am practice co-leader of the Global Insurance Services team of FTI. FTI is a multi-disciplinary consulting firm with leading practices in economic, financial and litigation consulting services. FTI performs financial investigations and provides advice and expert testimony with respect to, among other things, insurance matters, accounting matters, securities matters, damages, fraud, solvency, intellectual property and valuation.

7. I received an M.B.A. in Finance from New York University Stern School of Business and a B.S. in Applied Mathematics from Brown University.

8. I began my insurance career at Insurance Services Office, Inc. ("ISO") in 1977 and advanced to lead the Actuarial Development Department. For ten years there, among other duties, I researched improved pricing approaches and analyzed data to develop benchmark insurance rates and rating factors. As Chair of ISO's Credibility Committee, for example, I interacted with actuaries from several leading commercial insurers who provided input to the development of improved credibility procedures.

9. I next joined the Home Insurance Company ("The Home") in 1987 as Vice President and over the course of six years held executive positions as head of the Actuarial Department, Assistant to the Chairman, and finally Vice President - Underwriting in the New Ventures Unit of the Commercial Lines Department. At the time, The Home was a leading U.S. insurer focused on commercial property and casualty lines of business. My role as



head of the Actuarial Department for about four years included responsibility for overseeing the pricing of all the company's insurance products. After that, I held positions as Assistant to the Chairman and as an underwriter in the Commercial Lines Department.

10. In 1993, I joined a major reinsurance company as a senior executive for eleven years (Zurich Reinsurance, an affiliated company of the Zurich Financial Service Group, and the successor company Converium Reinsurance). As a reinsurance professional, my responsibilities focused on pricing and underwriting reinsurance coverages, including both treaty and facultative reinsurances, and auditing client insurance companies' underwriting and pricing practices.

11. Finally, as a consultant first at Navigant Consulting and now FTI Consulting, my work involving insurance pricing has included expert and consulting roles on several disputes as well as insurance and reinsurance pricing analyses. As Appointed Actuary to insurance and reinsurance groups of companies, I have been responsible for providing an annual statement of opinion on each company's loss reserves and a report to its board of directors. In conducting this process and forming my opinions, I review information on the company's operations, including premium rates and rating plans.

12. In both industry and consulting roles, I have become familiar with commercial insurance products for businesses and the pricing and underwriting of those products, as well as self-insurance mechanisms. Likewise, I have had the opportunity to become familiar with insurance industry customs and practices.

13. I am a Fellow of the Casualty Actuarial Society ("CAS") and a Member of the American Academy of Actuaries ("AAA").I was President of the CAS in 2006 and chaired the CAS Board of Directors in 2007. I meet the qualification standards of the AAA[1] to issue this report and render the opinions contained herein. I am also a member of the Professional Liability Underwriting Society.

14. I am a member of the International Actuarial Association, have served as vice-chair of its Reinsurance Subcommittee and currently serve as vice-chair of its Enterprise and Financial Risks Subcommittee.

15. I served as a member of the General Committee of the Actuarial Standards Board ("ASB") from 2011 through 2014. The ASB promulgates standards of practice for U.S. actuaries and the General Committee develops and improves standards for all actuaries in the U.S. that cross areas of practice.

---

[1] American Academy of Actuaries, Qualification Standards for Actuaries Issuing Actuarial Statements of Opinion in the United States, effective January 1, 2008.



Among others, I was involved from 2011 to 2014 in writing and approving the current versions of Actuarial Standards of Practice No. 1 and No. 25. I was also involved with a review of scope questions regarding Actuarial Standard of Practice No. 38 and an update of the standard for deviation language effective May 1, 2011 to be consistent with the recently adopted version of Actuarial Standard of Practice No. 41.

16. I am an ARIAS-U.S. certified reinsurance arbitrator and have served as an arbitrator in two proceedings, unrelated to this dispute, which reached final award.

17. My employer has been retained with me as the designated expert more than thirty times, including many instances as a damages expert. I have been accepted as an expert in four court-based and eight arbitration-based proceedings. I have never been excluded as an expert. Appendix A includes a listing of my expert testimony experience during the last four years.

18. FTI is compensated at a rate of $910 per hour for my time incurred in performing the work necessary to prepare this report and to testify as needed at the hearing. In addition, I have been assisted by others working under my direction and supervision at hourly rates ranging from $490 to $685.

19. In arriving at my opinions, I have considered the documents listed in **Appendix B** and performed such analyses of the materials and data received as I considered necessary.



## II.   SUMMARY

20.   Based upon my review and analysis of data and other information I considered, I have reached the following conclusions:

    a.   Mr. Lehmann failed to define adequately the insurance coverage he hypothesized (**Section III**).

    b.   Mr. Lehmann hypothesized a policy that is unrealistic and inconsistent with industry practice (**Section IV**).

    c.   Mr. Lehmann failed to consider ratemaking and pricing techniques appropriate for the type of risk he describes (**Section V**).

    d.   Mr. Lehmann failed to estimate or establish a market price for the policy he hypothesized (**Section VI**).

    e.   Mr. Lehmann misapplied testing data outside his area of expertise, contrary to Actuarial Standard of Practice No. 38 (**Section VII**).

    f.   Mr. Lehmann failed to apply a credibility procedure as called for by Actuarial Standard of Practice No. 25 (**Section VIII**).

    g.   Mr. Lehmann did not adequately document important aspects of his approach as called for by Actuarial Standard of Practice No. 41 (**Section IX**).

    h.   Mr. Lehmann's hypothetical insurance policy is not an appropriate measure of damages and is misaligned with the alleged damages in this matter (**Section X**).

21.   In consideration of conclusions *a* through *h* above, I conclude that Mr. Lehmann's calculations of indicated premiums are flawed and unreliable, and should not be relied upon as a measure of damages in this matter.

22.   The remainder of this report provides an explanation of my analysis and evidence supporting each of these conclusions.



## III.    MR. LEHMANN FAILED TO DEFINE ADEQUATELY THE INSURANCE COVERAGE HE HYPOTHESIZED

23.    Property and casualty insurance policies are detailed contracts with specific language granting coverage, defining the scope of coverage, and listing exclusions and limitations. [2] Underwriters and actuaries cannot properly determine a price for such a policy without considering its terms and conditions. Not only is this logical, but it is the custom and practice of the industry that actuaries and underwriters carefully consider policy wordings and terms and conditions.

24.    Fundamentally, the process of designing and pricing insurance coverage[3] begins with a precise definition of the risk being insured, including limits of coverage, limitations and exclusions, and premium determination and payment terms.

25.    However, despite purporting to calculate a premium for insurance against losses for failure of Plaintiffs' pipe, nowhere in the Lehmann Report or the Lehmann Rebuttal Report did Mr. Lehmann present the policy wording he considered or a summary of policy terms and conditions. He simply stated, "I was asked to determine a single premium for each of the five Plaintiffs that needs to be adequate to pay all losses from J-M pipe that fails prematurely over a 100-year period of time,"[4] and proceeded to his premium determination approach.

26.    This fundamental omission by Mr. Lehmann undermines his analysis. For example, some of the pipe at issue may fail at some point, but Mr. Lehmann provided no definition of which causes of failure would be covered by his hypothetical policy. Pipe may fail for reasons unrelated to the manufacturing of the pipe (i.e., the issue of the litigation), which this insurance policy would presumably not need to cover. Absent a definition

---

[2] "Every insurance policy is composed of numerous policy provisions. A policy provision is a contractual term included in an insurance policy that specifies requirements or clarifies intended meaning. Despite wide variation in property-casualty insurance policy provisions, each provision can typically be placed into one of six categories, depending on the purpose it serves. Comprehending the purpose(s) and characteristics of each of these categories of policy provisions assists insurance and risk management professionals in analyzing and interpreting insurance policies." The six categories are: Declarations, Definitions, Insuring Agreements, Conditions, Exclusions, and Miscellaneous Provisions. American Institute for Chartered Property and Casualty Underwriters, *Insurance Accounting, Coverage Analysis, Insurance Law, and Insurance Regulation*, 3rd Edition, pp. 2.16, 2.17.

[3] The Lehmann Report is inconsistent in referring to insurance premiums versus contributions to a self-insurance fund. Regardless of the approach, a precise definition of the risk being insured is needed. For simplicity, I refer to insurance premiums and a hypothetical policy throughout this report. However, my analysis and opinions apply equally to a self-insurance funding approach.

[4] Lehmann Report, p. 9.

5



of coverage, Mr. Lehmann has not specified an insurance policy (even a hypothetical one), and it is therefore improper to characterize his calculations as valid measures of insurance premiums.

FTI CONSULTING

## IV.   MR. LEHMANN HYPOTHESIZED A POLICY THAT IS UNREALISTIC AND INCONSISTENT WITH INDUSTRY PRACTICE

27.   Mr. Lehmann purported to opine on "the methodology for determining the price of an insurance policy that would insure Plaintiffs for the damages they have suffered because of the false claims J-M submitted or caused to be submitted."[5] In so doing, he vaguely hypothesized a 100-year insurance policy, but Mr. Lehmann has never encountered a property or casualty policy like this, which is inconsistent with industry and regulatory practice.

28.   In introducing his approach, Mr. Lehmann commented as follows on what is referred to in the industry as the policy term, or length of time during which covered claims can be triggered:

> "In property and casualty ratemaking, the length of time the policy covers can vary. Some can be for a relatively short period of time, for example one year or even less. Others may be longer."[6]

29.   I find Mr. Lehmann's characterization of coverage periods potentially misleading to those unfamiliar with the property and casualty insurance industry. In fact, it is well-known in the U.S. property and casualty insurance industry that coverage periods are *typically* either *six months or one year*, with relatively rare exceptions. *Longer coverage periods are generally unavailable* for several reasons, including concerns about riskiness and inability to price policies with longer periods of coverage. For example, there is enough concern by U.S. insurance regulators of the riskiness to insurers of issuing multi-year policies that such policies trigger special regulatory reporting requirements.[7]

30.   Moreover, Mr. Lehmann has provided no evidence that his hypothetical policy is realistic from a regulatory perspective. The insurance industry is

---

[5] Lehmann Report, p. 8.

[6] Lehmann Report, p. 9.

[7] Every property and casualty insurance company's annual statutory accounting statement, as required by state insurance statutes, Column 2 of Part 1A of the Underwriting and Investment Exhibit (page 7 of the Annual Statement) reports the Premium Amount Unearned (Running More than One Year from Date of Policy), and the Statement of Statutory Accounting Principles No. 65 contains special tests related to the recording of premiums for policies with terms of more than one year (paragraphs 23–33).

Moreover, when preparing Statements of Actuarial Opinion on reserves, actuaries inquire about policies in force with coverage periods of thirteen months or greater that are non-cancellable and not subject to premium increase and are required to comment further if the unearned premium reserve for long duration contracts is material.  NAIC Actuarial Opinion Working Group of the Casualty Actuarial and Statistical Task Force, *Regulatory Guidance on Property and Casualty Statutory Statements of Actuarial Opinion, Actuarial Opinion Summaries, and Actuarial Reports for the Year 2017*, p.8 (Oct. 5, 2017).



highly regulated, including solvency regulation, risk management requirements, state laws and regulations on filing of rates, rules and policy forms, detailed examinations at least every five years and market conduct surveillance. Consistent with the special regulatory reporting requirements for policies with terms of more than one year and my experience, I believe that regulators would have significant concerns about a property and casualty insurance company proposing to offer 100-year coverage periods for a risk like the Plaintiffs' potential pipe failures.

31. In addition to the regulatory reporting requirements, in my extensive experience with drafting, reviewing and applying commercial lines underwriting guidelines—including my experience working at an insurance company, a reinsurance company and a consulting firm over the last thirty years—the issuance of multi-year policies is commonly addressed in, and forbidden by, commercial lines underwriting guidelines.

32. Although some multi-year policies do exist, in my forty years working in the property and casualty insurance industry I have never seen or heard of an insurance policy with a 100-year coverage period, or anything close to that. Such a policy, as imagined by Mr. Lehmann, is simply without precedent. Moreover, I am unaware of having ever in my entire career seen or heard of a policy even lasting more than ten years.

33. Nor has Mr. Lehmann ever priced a 100-year property and casualty policy, or anything remotely close to that. When questioned if he had priced such a policy before, Mr. Lehmann could only identify that he was involved with pricing whole life insurance policies that could, under certain circumstances for a newborn, provide coverage that long.[8] Moreover, Mr. Lehmann could not identify any other products or policies he was involved with pricing with terms of longer than three to five years.[9] Furthermore, Mr. Lehmann was unable to identify any other types of policies, besides whole life insurance, that can last more than 100 years.[10]

34. Whole life insurance covers one and only one claim that is known will occur for a predetermined, defined benefit amount. Accordingly, such a policy is priced to fund the predetermined death benefit over the course of the insured's lifetime. In contrast, the (ill-defined) property and casualty insurance policy Mr. Lehmann hypothesized would need to cover an uncertain number of potential claims for uncertain claims amounts.

---

[8] Deposition of Steven Lehmann (June 9, 2017) at 34:8–35:4.

[9] Deposition of Steven Lehmann (June 9, 2017) 35:12–38:4.

[10] Deposition of Steven Lehmann (June 9, 2017) 220:12–221:8.

FTI
CONSULTING

35.  Further discrediting the notion of a 100-year policy, Mr. Lehmann acknowledged in the Lehmann Rebuttal Report that no rates exist in the marketplace for any such insurance policies.[11]

36.  Finally, there are fundamental questions of whether Mr. Lehmann's hypothetical policy would even represent an insurable risk. Insurance professionals, including actuaries and underwriters, are trained to understand and recognize the characteristics of "insurable risk." For a risk to be insurable (among other things):

    a.  There must be a significantly large number of homogeneous exposure units to make the losses reasonably predictable;

    b.  The loss produced by the risk must be definite and measurable;

    c.  The loss must be fortuitous or accidental; and

    d.  The loss must not be catastrophic.[12]

37.  "If a given risk lacks one of these elements, the operation of the insurance mechanism is impeded."[13] Mr. Lehmann, however, has failed to satisfy each of these criteria:

    a.  Five Plaintiffs do not represent a sufficiently large number from an actuarial perspective. Even if five were enough, Mr. Lehmann did not at all consider what actuaries refer to as subject experience;

    b.  Without clearly defined coverage, covered losses for the hypothetical policy are not definite and measurable;

    c.  Without clearly defined coverage, it is unknown, for example, whether the policy would cover intentional damage or poor maintenance of the pipes; and

    d.  Absent analysis of the variability of losses and correlation among losses, and no details about the financial strength of the hypothetical insurer, losses have not been shown to be independent and not catastrophic.

---

[11] Lehmann Rebuttal Report, p.3 .

[12] Vaughan, Emmett J. and Vaughan, Therese M., *Fundamentals of Risk and Insurance*, 11th Edition, Ch. 3.

[13] Ibid.

FTI CONSULTING

38. I thus conclude that the 100-year coverage period hypothesized by Mr. Lehmann is not only unprecedented, but unrealistic and inconsistent with property and casualty insurance industry practice, including regulatory practice.

**FTI**
CONSULTING

## V.   MR. LEHMANN FAILED TO CONSIDER RATEMAKING AND PRICING TECHNIQUES APPROPRIATE FOR THE TYPE OF RISK HE DESCRIBES

39.   Premium determination for large, unique commercial risks, such as the one hypothesized by Mr. Lehmann, is a complex and multi-step process. However, Mr. Lehmann ignored several of the necessary steps and considerations.

40.   Mr. Lehmann bypassed the normal pricing process for a large commercial risk by simply asserting that for the purposes of his calculations, "the method that offers the most actuarially sound approach to determine the anticipated costs for this proposed policy is referred to as the 'pure premium method.'"[14] He offered no support or rationale for this assertion. He then proceeded to determine what he considered damages by calculating an *indicated* premium using this method.[15]

41.   Mr. Lehmann's approach is flawed. Even for small, homogeneous types of policies, the pure premium method as applied by Mr. Lehmann addressed only one element of manual ratemaking—to calculate overall rate indications for a group of many policies, not to determine an indicated rate for an individual policy.[16] Manual ratemaking is distinct from ratemaking for a large commercial policy such as the hypothetical one postulated by Mr. Lehmann. As Chapter 15 of the *Basic Ratemaking* text on commercial lines ratemaking explains: "Most of the text thus far has concentrated on manual ratemaking—in other words, determining what rate should be charged average members of homogeneous groups based on similar risk characteristics. . . . [C]ommercial lines ratemaking employs special techniques that address the heterogeneity and credibility of commercial risks."[17] The authors' statement aligns with my experience in pricing large commercial accounts, which routinely involve the use of special techniques and unique considerations.

42.   The Lehmann Report and the Lehmann Rebuttal Report made no effort to employ those "special techniques," and particularly to consider the "credibility of commercial risks." In contrast to the approach in the Lehmann Report, which merely consisted of one simple calculation of claim frequency and severity, several further steps are needed to determine a price for a policy like the one Mr. Lehmann hypothesized. Although those steps may vary somewhat based on the situation and the approach taken,

---

[14] Lehmann Report, p. 8.

[15] Lehmann Report, p. 19.

[16] "The manual rate is the rate calculated directly from the rate tables and factors in the manual." Werner and Modlin, *Basic Ratemaking*, 5th Edition, p. 16.

[17] Werner and Modlin, *Basic Ratemaking*, 5th Edition, p. 289.

**FTI**
CONSULTING

they would universally need to address certain fundamental elements that were ignored or inadequately considered by Mr. Lehmann, including:

    a.  Application of policy terms, as discussed in Section III;

    b.  Developing a market price, as discussed in Section VI; and

    c.  Credibility techniques, as discussed in Section VIII.

43.    However, Mr. Lehmann ignored these important steps and considerations and failed to consider ratemaking and pricing techniques that would be appropriate for the large and unique commercial policy he hypothesized. For this reason alone, the results of his calculations do not represent an appropriate price for his hypothetical insurance policy.

12



## VI.   MR. LEHMANN FAILED TO ESTIMATE OR ESTABLISH A MARKET PRICE FOR THE POLICY HE HYPOTHESIZED

44.   Particularly in the case of premiums in the millions of dollars, as Mr. Lehmann calculated, the process of determining a commercial insurance market price or premium is complex and multi-faceted.

45.   Even accepting Mr. Lehmann's methods and assumptions, which I do not, he simply prepared one calculation of actuarially *indicated* premium, which falls short of demonstrating what even one insurance company would quote.[18] By labelling it "indicated," Mr. Lehmann acknowledged he only attempted to calculate what he might recommend to an underwriter as an initial quote if he were an actuary at an insurance company asked to assist with this hypothetical and undefined policy. Moreover, Mr. Lehmann has not shown he has any significant experience with premium quotes by commercial lines insurance companies and market prices for commercial lines insurance. Consistent with his CV,[19] Mr. Lehmann testified he has background working at a life insurance company and a personal lines insurance company (State Farm),[20] but there is no evidence that he has ever held a position at a commercial lines insurance company, either as an underwriter or as a pricing actuary.

46.   The Lehmann Report and Lehmann Rebuttal Report made no attempt to arrive at market premiums. For example, Mr. Lehmann chose to ignore subject experience in all his calculations. Furthermore, the reports presented no evidence of even one insurance company willing to quote a premium for Mr. Lehmann's hypothetical and undefined policy, and they presented no evidence of market prices. Furthermore, Mr. Lehmann testified that he is unaware of any plaintiff that has purchased or attempted to purchase insurance to protect against the risk of its pipe failing.[21] Similarly, Mr. Lehmann testified that he is unaware of a plaintiff that has made any attempt to set up any type of self-insurance fund.[22]

47.   In conclusion, Mr. Lehmann failed to even attempt to estimate or establish a market price, further undermining the reliability of his analysis. Because Mr. Lehmann's calculations of damages ignore subject experience and are predicated on a hypothetical 100-year policy that he imagined, which does

---

[18] Lehmann Report, p. 19.

[19] Lehmann Report, Ex. SGL-1.

[20] Deposition of Steven Lehmann (June 9, 2017) at 13:3–14:24.

[21] Deposition of Steven Lehmann (June 9, 2017) at 222:24–223:4.

[22] Deposition of Steven Lehmann (June 9, 2017) at 223:5–8.



not correspond sufficiently to any actual policy with a market price, his calculations are not reliable for his stated purpose.



## VII.   MR. LEHMANN MISAPPLIED TESTING DATA OUTSIDE HIS AREA OF EXPERTISE, CONTRARY TO ACTUARIAL STANDARD OF PRACTICE 38

48.   Among other failings, Mr. Lehmann's indicated premiums would only be valid and unbiased estimates if the test data on which he relied—i.e., the percentages of tested J-M pipe that did not meet the applicable standards—were accurate and unbiased predictors of actual failure rates and the timing of failures. In this section, I address Mr. Lehmann's assumed equivalence in the proportion of tested pipe that did not meet the applicable standards and the proportion of pipe failures.[23]

49.   Actuarial Standard of Practice ("ASOP") 38 specifically addresses models that incorporate specialized knowledge outside of the actuary's own area of expertise. Section 3.1 provides an outline of much of the detailed guidance in the standard, specifying:

"When using such a model, the actuary *should* [emphasis added] do all of the following:

a. determine appropriate reliance on experts;

b. have a basic understanding of the model;

c. evaluate whether the model is appropriate for the intended application;

d. determine that appropriate validation has occurred; and

e. determine the appropriate use of the model.

The actuary's level of effort in understanding and evaluating a model should be consistent with the intended use of the model and its materiality to the results of the actuarial analysis."[24]

50.   Moreover, in the context of actuarial standards of practice, the word "should" has a strict meaning.[25] "Failure to follow a course of action

---

[23] Deposition of Steven Lehmann (June 9, 2017) at 85:5–23.

[24] ASOP38, June 2000, p. 2,.updated for Deviation Language Effective May 1, 2011.

[25] ASOP 1—Introductory Standard of Practice, which includes definitions of common terms used in the ASOPs, comments on the meaning to actuaries of the word should. ".. . the word "should" indicates what is normally the appropriate practice for an actuary to follow when rendering actuarial services. Situations may arise where the actuary applies professional judgment and concludes that complying with this practice would be inappropriate, given the nature and purpose of the assignment and the principal's needs, or that under the circumstances it would not be reasonable or practical to follow the practice. ASOP 1, March 2013, p. 2.

FTI
CONSULTING

denoted by either the term "must" or "should" constitutes a deviation from the guidance of the ASOP.[26]

51.   ASOP 38 in general places a strong burden on an actuary to understand and evaluate models created by other experts before using them and to document what the actuary did to understand and evaluate those models.[27] My knowledge of ASOP 38 includes my active participation in the ASB General Committee's discussions in 2012 of the scope of the standard, including: 1) the possibility of different standards for catastrophic versus non-catastrophic models; and 2) expanding ASOP 38 to all disciplines.

52.   Mr. Lehmann's assumption that the percentage of expected future pipe failures would be equivalent to the percentage of pipe that would meet certain test standards (according to Mr. Paschal's and Mr. Edwards' models) is not sensible, particularly without extensive investigation and documentation. Whether one is an expert on pipe failures or not, there is no reason to expect that every stick of pipe that does not meet certain test standards will fail, and Mr. Lehmann provided so such reason. Moreover, Mr. Lehmann provided no evidence, and I am aware of no evidence, that the test results Lehmann cited provided a statistically reliable basis to estimate actual future pipe failure rates.

53.   To the contrary, Mr. Paschal and Mr. Edwards both confirmed that their respective analyses were not intended to predict failure rates.

54.   Mr. Paschal testified that in his analysis (upon which Mr. Lehmann relied) he did not attempt to quantify predicted failure rates of the Plaintiffs' pipe:

> "Q: Did you look at that question, as to whether you could take the percentage of pipe, 44 pipe sets, we could take the percentage of those which you found were lower than 3916 and 3830 and use that as a rate of predictive failure for the pipe delivered to the Plaintiffs?
>
> A: I did not look at that question."[28]

---

[26] Ibid.

[27] Although ASOP 38 provides in Section 3.7 that an actuary may with some restrictions "rely on another actuary who has, for a particular model, conducted some or all of the evaluations and processes described in this standard," that provision does not relieve Mr. Lehmann of his responsibilities here for reviewing compliance with the standard and documenting such review, because Mr. Paschal and Mr. Edwards are not actuaries. Section 3.1.c is reinforced by Section 3.3.3 of ASOP 38, which states "[t]he actuary should determine that the model output is consistent with the actuary's intended use of the model."

[28] Deposition of James Paschal (June 1, 2017) at 206:3–9.



55. Mr. Paschal further testified that additional information would be needed to project the rate of failure for the Plaintiffs' pipe:

> "Q: If you wanted to take the percentage of the results the 44 that were below 3916 and 3830, if you wanted to potentially use those numbers to project the rate of failure for the pipe of these five plaintiffs, what information about that pipe would you need to have?
>
> A: I'd say there would be a laundry list of items and information that I'd request, but I've not been asked to do that."[29]

56. Similarly, Mr. Edwards stated that he did not make predictions with respect to the Plaintiffs' pipe failures:

> "Q: I don't see anything in your report that makes any predictions with respect to the pipe these plaintiffs have. Am I right about that?
>
> A: Yes."[30]

57. I conclude that Mr. Lehmann's indicated premiums are unreliable and biased estimates because his assumed equivalence of rates of non-compliant tests and pipe failures was unsupported and inconsistent with the opinions of the experts he relied upon. The tests by Mr. Paschal and Mr. Edwards were not even designed to predict failure rates, and Mr. Lehmann should not have relied upon such testing data from outside his area of expertise without further investigation and analysis. As such, Mr. Lehmann's approach constitutes a deviation from ASOP 38.[31]

---

[29] Deposition of James Paschal (June 1, 2017) at 208:21–209:4.

[30] Deposition of Dale Edwards (June 1, 2017) at 48:19–22.

[31] I note that Section 4.4 of ASOP 41 states: "If, in the actuary's professional judgment, the actuary has deviated materially from the guidance set forth in an applicable ASOP, other than as covered under sections 4.2 or 4.3 of this standard, the actuary can still comply with that ASOP by providing an appropriate statement in the actuarial communication with respect to the nature, rationale, and effect of such deviation." However, the Lehmann Report and the Lehmann Rebuttal Report provided no such disclosure of the nature, rationale, and effect of a deviation.

17

FTI CONSULTING

## VIII.   MR. LEHMANN FAILED TO APPLY A CREDIBILITY PROCEDURE AS CALLED FOR BY ACTUARIAL STANDARD OF PRACTICE 25

58. Credibility measures the relative predictive value of a set of historical claim data. A credibility procedure is designed to *objectively* measure how much credibility to assign a particular set of historical claim data as compared to other information, such as a broader set of data. Actuaries routinely apply credibility procedures in ratemaking. Reflecting the importance of credibility procedures, the leading CAS textbook on actuarial science devoted more than one hundred pages to credibility theory and practice as applied by casualty actuaries.[32] I served on the "ad hoc panel of experts" who reviewed the chapter on credibility.[33]

59. The principal guidance on credibility methods and considerations for U.S. actuaries is provided by ASOP 25,[34] which defines a **credibility procedure** as:

"A process that involves the following:

a. the evaluation of **subject experience** for potential use in setting assumptions without reference to other data; or

b. the identification of **relevant experience** and the selection and implementation of a method for blending the **relevant experience** with the **subject experience**."

Where "subject experience" is defined as "[a] specific set of data drawn from the experience under consideration for the purpose of predicting the parameter under study," and "relevant experience" is defined as "[s]ets of data, that include data other than the **subject experience**, that, in the actuary's judgment, are predictive of the parameter under study (including but not limited to loss ratios, claims,

---

[32] Casualty Actuarial Society, *Foundations of Casualty Actuarial Science*, Second Edition, 1990, Chapter 7.

[33] Ibid, Preface, page 2.

[34] The Applicability Guidelines for Actuarial Standards of Practice list ASOP 25 for each of the common Product Development/Ratemaking/Pricing tasks. Applicability Guidelines for Actuarial Standards of Practice, revised November 2015. As stated in the American Academy of Actuaries website: "The Applicability Guidelines (AGs) are intended to suggest to actuaries which ASOPs might provide guidance to them on more common assignments." American Academy of Actuaries, Introduction to the Applicability Guidelines, http://www.actuary.org/content/applicability-guidelines-actuarial-standards-practice-0, as accessed (Apr. 23, 2018).

FTI CONSULTING

mortality, payment patterns, persistency, or expenses). **Relevant experience** may include **subject experience** as a subset."[35]

60.   In Section 3.2, ASOP 25 provides that:

"The actuary *should* [emphasis added] use an appropriate **credibility procedure** when determining if the **subject experience** has **full credibility** or when blending the **subject experience** with the **relevant experience**."[36]

61.   My knowledge of ASOP 25 includes my active participation over the course of about two years as a member of the ASB General Committee in the development of the current version of ASOP 25.

62.   Nowhere in the Lehmann Report does Mr. Lehmann ever consider a credibility procedure. Not only are the words "credibility procedure" completely absent, the word "credibility" does not appear at all in the body of the Lehmann Report or in any of the exhibits that he prepared.[37] Moreover, Mr. Lehmann did not identify ASOP 25 in the materials he relied upon, and he testified that there was no documentation outside his two reports of a credibility assessment.[38] In the Lehmann Rebuttal Report, Mr. Lehmann attempted to excuse not applying a credibility procedure by saying, "[t]he subject experience is so immature relative to the 100-year policy term that it should be given no credibility, or very limited credibility, in pricing this product."[39] But an actuary could only properly make that determination, and distinguish between the choices of "no credibility" and "very limited credibility," by specifying and applying a credibility procedure. Rather, Mr. Lehmann's report reflect a total absence of any "subject experience," i.e., data of reflecting Plaintiffs' experience.

63.   Mr. Lehmann's approach of not using a credibility procedure constitutes a deviation from ASOP 25.[40]

64.   Instead of using a credibility procedure, Mr. Lehmann *subjectively* decided to fully rely on Messrs. Paschal and Edwards' test information. Had Mr. Lehmann properly considered ASOP 25, such information would represent the "relevant experience." However, Mr. Lehmann failed to

---

[35] ASOP 25, December 2013, p. 2–3.

[36] ASOP 25, December 2013, p. 3.

[37] The word "credibility" only appears in Ex. SGL-2, the Statement of Principles Regarding Property and Casualty Insurance Ratemaking.

[38] Deposition of Steven Lehmann (June 9, 2017) at 210:7–17.

[39] Lehmann Rebuttal Report, p.1 2.

[40] *See* n.3 1.

**FTI** CONSULTING

support that such relevant experience was appropriate. Section 3.3 of ASOP
25 states:

> "The actuary should exercise professional judgment and use care in
> selecting and using **relevant experience**. Such **relevant experience**
> should have characteristics similar to the **subject experience**.
> Characteristics to consider include items such as demographics,
> coverages, frequency, severity, or other determinable **risk
> characteristics** that the actuary expects to be similar to the **subject
> experience**. If the proposed **relevant experience** does not meet and
> cannot be adjusted to meet such criteria, it should not be used."[41]

65. Mr. Lehmann did not establish that the criteria listed above were satisfied.
Importantly, among other issues, as discussed in Section VII,
Messrs. Paschal and Edwards' models were only intended to measure rates
of non-compliance with tests; the data were never intended to measure pipe
failure rates. Therefore, in accordance with ASOP 25, the Paschal and
Edwards models should only be used as relevant experience *if* they can be
adjusted in some manner to have the same risk characteristics as failure
rates. As Mr. Lehmann did not even attempt such an adjustment, he made
an improper use of relevant experience, constituting another deviation from
ASOP 25.

66. I consider Mr. Lehmann's failure to apply a credibility procedure in
accordance with ASOP 25 a significant deficiency in his analysis that
undermines the reliability of his conclusions.

---

[41] ASOP 25, December 2013, p. 3.



## IX.   MR. LEHMANN DID NOT ADEQUATELY DOCUMENT IMPORTANT ASPECTS OF HIS APPROACH AS CALLED FOR BY ACTUARIAL STANDARD OF PRACTICE 41

67.   ASOP 41 states that "the actuary should state the actuarial findings, and identify the methods, procedures, assumptions, and data used by the actuary with sufficient clarity that another actuary qualified in the same practice area could make an objective appraisal of the reasonableness of the actuary's work as presented in the actuarial report."[42]

68.   Many assumptions and methods in Mr. Lehmann's report, however, were not documented such that I, or another qualified actuary, could evaluate their reasonableness, including (but not limited to) the following items:

    i.   Data, assumptions, and methods related to Mr. Lehmann's warranty subrogation analysis in the Lehmann Rebuttal Report were not fully documented. I understand that JM Eagle provided a 50 Year Limited Warranty and Retroactive Extension ("Warranty") that applies to pipe failures in the first 50 years from installation.[43] Mr. Lehmann presented a list of claims against the Warranty, and appears to have assumed that all claims were directly related to the pipe at issue in the instant case and that all denied or likely denied claims were actually valid and covered claims. He also assumed that JM Eagle would improperly deny the same proportion of future claims related to his hypothetical policy.[44] However, Mr. Lehmann did not state his assumptions or provide any details supporting the reasoning behind these assumptions and methodology.

    ii.   Mr. Lehmann did not define the terms of his hypothetical policy.[45]

    iii.   Mr. Lehmann asserted with no support or explanation of his reasoning that "the method that offers the most actuarially sound approach to determine the anticipated costs for this proposed policy is referred to as the 'pure premium method.'"[46]

69.   These failures run contrary to the full documentation called for by ASOP 41.

---

[42] ASOP 41,D ecember 2010, Section 3.2.

[43] JMM2000065–96.

[44] Further discussed in Section X.

[45] *See* Section III.

[46] Lehmann Report, p. 8.

**FTI**
CONSULTING

## X.   MR. LEHMANN'S HYPOTHETICAL INSURANCE POLICY IS NOT AN APPROPRIATE MEASURE OF DAMAGES AND IS MISALIGNED WITH ALLEGED DAMAGES IN THIS MATTER

70.   Mr. Lehmann offered no precedent for using the cost of an insurance policy as a measure of damages, nor am I aware of any precedent. I have never been asked to consider such an approach, nor have I seen any other expert do so. Simply put, the cost of a policy for insuring against a future risk is not the same as the actual cost of that risk materializing.

71.   Among other issues, I believe that any measure of damages should not be inflated by an insurance company's or self-insurer's profit/contingency and expense provisions. The Lehmann Report and the Lehmann Rebuttal Report added approximately 15% (by dividing by 0.85) to Mr. Lehmann's projected costs to account for administrative costs and a contingency provision of a hypothetical self-insurance fund.[47] Mr. Lehmann provided no justification for why these 15% additions represent damages, and Plaintiffs have not claimed any harm that corresponds to these hypothetical expenses and contingency provisions.

72.   Even accepting using the cost of insurance coverages to derive damages, which I do not, there is no logic to support the notion that the cost of an insurance policy providing replacement cost coverage for pipe failures for the five Plaintiffs would represent damages by itself. At a minimum, among other issues, one would need to *subtract* the cost of an insurance policy providing replacement cost coverage for pipe failures for the five Plaintiffs *had the J-M Eagle products they purchased fully complied with test standards.* To make Plaintiffs whole for their alleged injuries, they should only be compensated for the *difference* between pipe that complies 100% with applicable standards ("Compliant Pipe")[48] and the pipe they purchased that did not comply with standards ("Purchased Pipe").

73.   In my experience, from an insurance perspective, there is always risk. Mr. Lehmann, however, has not shown that Compliant Pipe has no risk of failure. Perhaps Compliant Pipe would have a lower risk of failure than the Purchased Pipe, but Mr. Lehmann has not shown this to be the case.

74.   Even assuming that Compliant Pipe did have a lower risk of failure than the Purchased Pipe, the market premium for a policy covering Compliant

---

[47] As opposed to the stated purpose in the Lehmann Report, the Lehmann Rebuttal Report said on page 5 that the factor of 0.85 was to "account for anticipated administrative and loss adjustment expense costs."

[48] By 100% compliance with applicable standards, I am referring to what I understand were the claims at issue in the liability phase of this case, i.e., uniform compliance with AWWA C900 or C905 and UL 1285.

Pipe for the risk of failure may be the same as the market premium for a policy covering Purchased Pipe for the risk of failure, should such hypothetical policies exist. In my experience, market premiums for esoteric policies such as the one Mr. Lehmann hypothesized are commonly determined as rates on line,[49] influenced by minimum premiums and other factors that can cause certain differences in perceived risk to not translate into differences in premium. Therefore, had Mr. Lehmann more properly calculated the difference in market premium for a policy covering Compliant Pipe for the risk of failure and the market premium for a policy covering Purchased Pipe for the risk of failure, the calculated damages may be zero dollars. Because of his failure to take an incremental premium approach, Mr. Lehmann's analysis failed to demonstrate there is more than zero dollars of damages to Plaintiffs.

75. Moreover, even accepting Mr. Lehmann's implied damages theory that Plaintiffs would have had serviceable pipe with no failures for 100 years *but for* the misrepresentations, his use of replacement costs goes beyond these damages. The concept of replacement cost implies that Plaintiffs would receive pipe that would now last longer than the Compliant Pipe they should have received originally.

76. For example, within Mr. Lehmann's damages construct in which Plaintiffs are entitled to 100 years of serviceable pipe, if a pipe fails after 50 years and the Plaintiffs are indemnified the replacement cost of new pipe that will last 100 years, they benefit from an extra 50 years of serviceable pipe.

77. The Warranty raises other issues. Although the Lehmann Report did not address the Warranty, the Lehmann Rebuttal Report concluded that an insurance policy "would be unlikely to provide a reduction in the premium charged under the policy."[50]

78. However, Mr. Lehmann oddly viewed the Warranty as a subrogation right, even though he argued extensively that it is "a very atypical subrogation situation,"[51] failing to consider the more obvious and logical treatment of the Warranty from an insurance perspective. In my opinion, if an insurance company were to design an insurance policy to provide Mr. Lehmann's hypothetical coverage, as unlikely as I consider that to be, the policy would apply excess of the Warranty, therefore only insuring failures that occur after the first 50 years. Designing coverage which includes the same pipe

---

[49] A rate on line is the premium amount divided by the limit of coverage, normally expressed as a percentage.

[50] Lehmann Rebuttal Report, p.2 1.

[51] Lehmann Rebuttal Report, p.1 7.

**FTI**
CONSULTING

failures that are addressed by the Warranty would afford duplicate coverage, thereby insuring events that are not a risk to the Plaintiffs.[52]

79. Mr. Lehmann calculated the value of the Warranty as 53% of the expected claims within the first 50 years after installation, thereby reducing the value of the Warranty by 47%.He derived the 53% factor as the ratio of the total amount of claims approved and paid against the warranty to the total amount of all claims submitted against the Warranty, including denied claims.[53] In so doing, Mr. Lehmann assumed all the "denied" and "likely denied" claims were both valid claims and claims that would never be paid under the Warranty, but he provided no evidence to support these assumptions. Because Mr. Lehmann has provided no evidence of J-M Eagle denying valid claims against its Warranty,I disagree with Mr. Lehmann's 47% reduction to the value of the Warranty.

80. Considering that Mr. Lehmann projects most failures will occur within the first 50 years, correctly removing the 47% reduction would by itself materially reduce damages under Mr. Lehmann's construct, setting aside the other issues with his approach.[54] Among other reasons, Mr. Lehmann's conclusions are incorrect and unreliable because of his failure to properly consider the Warranty.

81. Thus, even accepting Mr. Lehmann's damages construct, which I do not, the scope of Mr. Lehmann's hypothetical insurance policy, and therefore its purported cost, is vastly broader than the scope of damages claimed by the Plaintiffs.

---

[52] One of the characteristics of an ideally insurable risk is that it is associated with pure risk, or the risk of a loss. American Institute for Chartered Property and Casualty Underwriters and the Institutes, *Risk Management and Insurance Operations*, 2nd Edition, p. 5.12.

[53] Lehmann Rebuttal Report, Ex. SGL-12.

[54] Ibid.

24



## XI.   CLOSING

82.   The opinions reflected in this report are based upon information available to me as of the date of this report. I will supplement or amend this report as I consider appropriate, including if additional information should become available to me.

Executed on April 27, 2018 in New York, NY

Paul Braithwaite, FCAS, MAAA

25

**FTI**
CONSULTING

## **APPENDIX A**

# Paul Braithwaite, FCAS, MAAA
## Senior Managing Director — Global Insurance Services

Paul Braithwaite@fticonsulting.com

**Three Times Square**
**9th Floor**
**New York, NY 10036**
Tel: +1 212 499 3659

**PROFESSIONAL AFFILIATIONS**

ARIAS Certified Reinsurance Arbitrator

Fellow, Casualty Actuarial Society

Member, American Academy of Actuaries

Member, International Actuarial Association / ASTIN

Member, Professional Liability Underwriting Society

**EDUCATION**

M.B.A, Finance, New York University Stern School of Business

B.S., Applied Mathematics, Brown University

Paul Braithwaite is a Senior Managing Director at FTI Consulting and is based in New York. He is Co-Leader of the Global Insurance Services practice and also leads FTI Consulting's global actuarial practice. As a past President of the Casualty Actuarial Society with more than 30 years of industry experience, he brings a deep knowledge and understanding of actuarial science, underwriting, insurance and reinsurance company management to the practice.

Mr. Braithwaite serves as Appointed Actuary to insurance companies, provides expert testimony/dispute resolution support, loss reserve reviews, reinsurance commutations/reserve reviews, liability estimation and allocations of asbestos & environmental and other mass tort claims, underwriting audits, due diligence, finite risk/structured product pricing analysis and regulatory services. He has extensive reinsurance pricing and underwriting experience including the specialty areas of professional liability, workers compensation, umbrella liability, accident & health, agriculture, surety and various other lines of property-casualty business. He consults with companies on capital standards for life, health and property-casualty business and has advised both potential buyers and sellers on strategic acquisitions and divestitures.

Prior to joining FTI Consulting, Mr. Braithwaite was the leader of the insurance services team of a major consulting company, where he also served as the Global Actuarial Practice Leader. Mr. Braithwaite has also held high level executive roles in the industry. He has both testified as an expert and served as an arbitrator in insurance and reinsurance disputes, and he provides expert advice to insurance companies, captives, self-insureds, brokers, and investment firms. He brings more than a decade of executive and operational experience within the reinsurance industry, playing such critical roles as Chief Actuary as well as senior vice president & chief underwriting officer across several global specialty business lines.

Mr. Braithwaite is well respected in the insurance / reinsurance industry, holding prominent positions with the Casualty Actuarial Society and other actuarial organizations. He is an oft-requested speaker at industry events and conferences on topics including actuarial professional standards of practice, Solvency II, Capital Requirements and Capital Modeling, Reinsurance Risk-Transfer, Reinsurance Pricing and Reinsurance Arbitrations. He has also published several articles on these topics.

Notable Professional Activities

- President, Casualty Actuarial Society (CAS), 2006
- CAS Board of Directors, 1998-2000, 2005-2007; Chair, 2007
- CAS Audit Committee, Chair, 1999-2000; Member, 1998-1999
- IAA Reinsurance Subcommittee, Vice-Chair, 2011-2014; Member, 2005-2010

A-i



## Paul Braithwaite

- IAA Enterprise and Financial Risks Committee, Vice-Chair 2017; Member, 2007-present
- Board of Trustees, Actuarial Foundation, 2009-2011
- American Academy of Actuaries Board of Directors, 2005-2006
- Actuarial Standards Board, General Committee, 2011-2014
- Advisory Committee to NAIC on Risk-Based Capital, 1991-1997
- Committee on Property & Liability Financial Reporting, 1988-1993
- Committee on Financial Analysis, Chair, 1988-1991; Member, 1986-1988,1992

### Recent Publications (10 years)

- FTI Consulting Solutions Paper, 2012, "U.S. NAIC ORSA - Guidance for Implementation and Creation of Optimal Value", with A. Kaufman and S. Sumner
- Andrew's Bank & Lender Liability Litigation Reporter, 2009, "The Cost of the Subprime Crisis on the Property and Casualty Insurance Industry", with C. Nelson
- Bermuda Re, 2008, "CEO Survey: Economic Downturn", contributing panelist

### Recent Arbitration and Expert Testimony Experience (4 years)

- Carrier Corporation and Elliott Company v. Allstate Insurance Company, et al, in the Supreme Court County of Onondaga, New York (2017). Deposition testimony.
- Arbitration to address the appropriateness of retrospectively-rated premium adjustment calculations (2017). Deposition and hearing testimony.
- Arbitration to resolve coverage and contract interpretations under property catastrophe reinsurance agreements (2017). Deposition testimony.
- Sandy Travis, et al. v. Allstate Insurance Company, in the Circuit Court, St. Clair County, Illinois (2016). Deposition testimony.
- The Marley-Wylain Company v. AIU Insurance Company, et al., in the Laporte Circuit Court, County of Laporte, Indiana (2016). Deposition testimony.
- Headington Oil Company, LLC v. HealthSmart Benefit Solutions, Inc. et al., District Court of the 191st Judicial District, Dallas County, Texas (2015). Deposition testimony.
- Arbitration to address the appropriateness of letter of credit amounts held by an insurance company with respect to loss-sensitive insurance contracts (2015). Deposition and hearing testimony.
- London arbitration to determine the amount of additional premium due under a construction insurance contract extension (2015). Testimony at hearing.
- Medtronic, Inc. & Consolidated Subsidiaries v. Commissioner of Internal Revenue (2015). Trial testimony.
- Arbitration related to appointed actuaries' responsibilities and whether their analyses and reports complied with the Code of Conduct and the Actuarial Standards of Practice (2014). Testimony at hearing.
- Garden City Employees' Retirement System, et al v. Psychiatric Solutions, Inc., et al., in The United States District Court for The Middle District of Tennessee Nashville Division (2014). Deposition testimony.



## Paul Braithwaite

- Arbitration to resolve coverage and contract interpretations under casualty reinsurance agreements (2014). Deposition and hearing testimony.

- Fort Benning Family Communities LLC, et al v. American Management Services East LLC, et al, In The Superior Court of Muscogee County State of Georgia (2014). Deposition testimony.

- Ikenaga et al. v. ACCC Holding Corp. et al., Probate Court No. Two of Bexar County, Texas (2014). Deposition testimony.

- Instituto Nacional de Seguros v. Hemispheric Reinsurance Group, L.L.C. and Howden Insurance Brokers Limited, Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida (2013-14). Deposition and trial testimony.



## APPENDIX B

American Academy of Actuaries, Applicability Guidelines for Actuarial Standards of Practice, November 2015.

American Academy of Actuaries, Code of Professional Conduct, January 1, 2001.

American Academy of Actuaries, Introduction to the Applicability Guidelines, http://www.actuary.org/content/applicability-guidelines-actuarial-standards-practice-0, as accessed (Apr. 23, 2018).

American Academy of Actuaries, Qualification Standards for Actuaries Issuing Actuarial Statements of Opinion in the United States, January 1, 2008.

American Institute for Chartered Property and Casualty Underwriters, *Insurance Accounting, Coverage Analysis, Insurance Law, and Insurance Regulation*, 3rd Edition.

American Institute for Chartered Property and Casualty Underwriters and the Institutes, *Risk Management and Insurance Operations*, 2nd Edition.

Actuarial Standard of Practice 1, March 2013.

Actuarial Standard of Practice 25, December 2013.

Actuarial Standard of Practice 38, June 2000.

Actuarial Standard of Practice 41, December 2010.

Casualty Actuarial Society, *Foundations of Casualty Actuarial Science*, Second Edition, 1990.

Casualty Actuarial Society Statement of Principles, https://www.casact.org/professionalism/standards/princip/, as accessed April 22, 2018.

Defendants' Amended Notice of Motion and Omnibus Motion to Exclude the Testimony of the Plaintiffs' Expert Witnesses, filed October 10, 2017.

Deposition of Dale B. Edwards, June 1, 2017.

Deposition of James R. Paschal, June 1, 2017.

Deposition of Matthew Knudson, July 29, 2016.

Deposition of Susan Mulligan, July 19, 2016.

Deposition of Paul Sciuto, July 27, 2016.

Deposition of David Speer, August 9, 2016.

Deposition of Steven Lehmann, June 9, 2017.

Deposition of Terri Svetich, December 19, 2012.

Deposition of Terri Svetich, August 3, 2016.

Expert Report of Bruce Davis, August 26, 2016.

Expert Report of Bruce Davis, February 3, 2017.

Expert Report of Charles Letourneau, November 18, 2016.



Expert Report of Dale Edwards, August 26, 2016.

Expert Report of Daniel R. Fischel, November 18, 2016.

Expert Report of Gene Palermo, May 31, 2013.

Expert Report of Jim Cathcart and David Hudd of Arcadis, August 26, 2016.

Expert Report of Jim Paschal, August 26, 2016.

Expert Report of Jim Paschal, May 31, 2013.

Expert Report of M. Laurentius Marais, November 18, 2016.

Expert Report of Philip Stark, February 2, 2017.

Expert Report of Rafael Ortega, August 26, 2016.

Expert Report of Richard Brady, November 18, 2016.

Expert Report of Steven Folkman, November 18, 2016.

Expert Report of Steven G. Lehmann, August 26, 2016.

Expert Reports of Steve Ferry, November 30, 2016.

JMM2000065 - JMM2000096.

NAIC Actuarial Opinion Working Group of the Casualty Actuarial and Statistical Task
Force, *Regulatory Guidance on Property and Casualty Statutory Statements of Actuarial
Opinion, Actuarial Opinion Summaries, and Actuarial Reports for the Year 2017* (Oct. 5,
2017).

Rebuttal Expert Report of Dale Edwards, February 3, 2017.

Rebuttal Expert Report of Gene Palermo, June 14, 2013.

Rebuttal Expert Report of Jim Paschal, February 3, 2017.

Rebuttal Expert Report of Jim Paschal, June 14, 2013.

Rebuttal Expert Report of Steven G. Lehmann,Februar y 6, 2017.

Reply in Support of Defendants' Amended Omnibus Motion to Exclude the Testimony of
the Plaintiffs' Expert Witnesses, filed November 27, 2017.

Statement of Principles Regarding Property and Casualty Insurance Ratemaking, CAS
Board of Directors, May 1988.

Statutory Issue Paper No. 65, National Association of Insurance Commissioners, March 16,
1998.

Sur-Rebuttal Expert Report of Charles Letourneau, April 14, 2017.

Vaughan, Emmett J. and Vaughan, Therese M., *Fundamentals of Risk and Insurance*, 11th
Edition.

Werner, Geoff and Modlin, Claudine, *Basic Ratemaking*, 5th Edition.

