David Bernick *(admitted pro hac vice)*
    dbernick@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone: (212) 373-3000
Facsimile:  (212) 757-3990

Ekwan E. Rhow – State Bar No. 174604
    erhow@birdmarella.com
Paul S. Chan – State Bar No. 183406
    pchan@birdmarella.com
Marc E. Masters – State Bar No. 208375
    mmasters@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California  90067-2561
Telephone:  (310) 201-2100
Facsimile:   (310) 201-2110

Attorneys for Defendant J-M Manufacturing
Company, Inc. dba JM Eagle

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES *et al.*,<br><br>        Plaintiffs,<br><br>    vs.<br><br>J-M MANUFACTURING COMPANY, INC. dba JM EAGLE *et al.*,<br><br>        Defendants. | CASE NO. 5:06-cv-00055-GW-PJW<br><br>**J-M MANUFACTURING COMPANY, INC.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>*Filed concurrently with Declaration of Neil P. Kelly*<br><br>Date:  January 17, 2019<br>Time: 9:30 a.m.<br>Ctrm.: 9D<br><br>Assigned to Hon. George H. Wu, Courtroom 9D |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that Defendant J-M Manufacturing Company, Inc. ("J-M") will and hereby does renew its motion for judgment as a matter of law pursuant to Federal Rules of Civil Procedure 50(b) on all claims for damages asserted by plaintiffs City of Reno, Nevada ("Reno"), City of Norfolk, Virginia ("Norfolk"), Calleguas Municipal Water District ("Calleguas"), Palmdale Water District ("Palmdale") and South Tahoe Public Utility District ("South Tahoe") (collectively, "Plaintiffs") in this Phase 2 trial.  (*See* Dkt. 2729, Dkt. 2738.)

This motion is made on the grounds that the damages theory Plaintiffs presented during the Phase 2 trial—that Plaintiffs suffered damages because the pipe they received will fail earlier than the pipe they bargained for—fails as a matter of law because (1) the bargain on which damages must be predicated was set forth in written documents and the evidence at trial conclusively established that those written documents did not impose a longevity requirement; (2) the Phase 1 jury did not decide any longevity requirement; and (3) Plaintiffs failed to present legally sufficient evidence to support this damages theory.  The motion is also made on the grounds that the damages claim Plaintiffs made in closing—for the cost of replacing all pipe in all of the projects today—fails as a matter of law because (1) the Court ruled such a claim could not be made absent risk of imminent failure or a threat to public health, evidence of which Plaintiffs failed to present (and, in fact, presented evidence that the risk of failure was not imminent); and (2) Plaintiffs explicitly abandoned their claim for the cost of replacement of all pipe before trial.[1]  Finally, this motion is made on the grounds that Plaintiffs have made multiple, improper

---

[1]   The Court previously denied without prejudice J-M's motion for judgment as a matter of law.  Ex. 1, Trial Tr. 8015:21–25.  This motion does not address the issue of civil penalties, on which the parties agree the Court should defer decision until resolving the present motion.  Dkt. 2807.

changes to their legal and factual theories of the case, and must be precluded from prolonging this litigation any further.

This motion is based on this notice, the attached Memorandum of Points and Authorities, the Declaration of Neil P. Kelly, the pleadings, records, and files in this case, and such other matters that may be raised at the hearing.

DATED: December 12, 2018

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____
        */s/ David Bernick*
             David Bernick

DATED:  December 12, 2018

BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.

By: _____
        */s/ Paul S. Chan*
             Paul S. Chan

*Attorneys for Defendant*
*J-M Manufacturing Company, Inc.*
*dba JM Eagle*

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

# **TABLE OF CONTENTS**

<u>**Page**</u>

TABLE OF AUTHORITIES ...................................................................v

I.   INTRODUCTION ....................................................................1

II.  JUDGMENT AS A MATTER OF LAW CAN BE ENTERED FOLLOWING A MISTRIAL ...................................................2

III. THE COURT SHOULD ENTER JUDGMENT FOR J-M BECAUSE PLAINTIFFS' LONGEVITY THEORY OF DAMAGES WAS DEFECTIVE AS A MATTER OF LAW AND LACKED A SUFFICIENT EVIDENTIARY BASIS AT TRIAL.......................3

  A.  Plaintiffs Must Be Held to the Damages Theory They Chose To Try ...............................................................................3

  B.  Before Trial, Plaintiffs Abandoned All Claims for the Cost of Replacing All Their Pipe Now ................................................6

  C.  The Remaining Theories Plaintiffs Tried All Claimed Diminished Value Based upon Reduced Longevity .....................8

  D.  Plaintiffs' Damages Claim for Diminished Longevity Fails as a Matter of Law Because Longevity Was Not Part of the Parties' Bargain and Was Not Decided in Phase 1 .............................9

    1.  The bargain that controls Phase 2 damages is defined by the project specifications......................................10

    2.  It was undisputed at trial that the specified standards imposed no longevity requirement ...........................15

    3.  Plaintiffs have agreed that the Court should decide whether the specifications control as a matter of law ...............16

    4.  Plaintiffs' damages claim for reduced longevity also fails as a matter of law because longevity was not in the Phase 1 verdict ..........................................................18

  E.  Plaintiffs Failed To Provide a Legally Sufficient Evidentiary Basis for Their Longevity-Based Damages Claims ....................18

    1.  Mr. Lehmann's damages calculations were legally insufficient.................................................................19

    2.  Plaintiffs' engineering experts failed to prove the longevity of compliant pipe in use, of J-M pipe made from 1996-2006, or of Plaintiffs' pipe ...............................26

    3.  Plaintiffs failed to prove a mathematical relationship between short-term testing, long-term strength, and longevity..........................................................................33

IV.   THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF LAW NOTWITHSTANDING PLAINTIFFS' CLAIM DURING CLOSING FOR THE COST OF REPLACEMENT OF ALL THEIR PIPE TODAY ........................................................................... 37

    A.   Plaintiffs Abandoned Their Claim for the Present Cost of Replacement Pipe in the Face of the Court's Rulings, and It Conflicted with the Case Plaintiffs Tried ............................................. 39

    B.   Plaintiffs' Evidence Was Legally Insufficient To Support Their Claim for the Present Cost of Replacement Pipe ................................ 40

V.    PLAINTIFFS CANNOT BE PERMITTED TO CONTINUE THEIR CASE ON ANY GROUNDS ......................................................................... 41

VI.   CONCLUSION ............................................................................ 46

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.,*
    399 F. Supp. 2d 1064 (N.D. Cal. 2005) ............................................................25

*Ab-Tech Constr., Inc. v. U.S.,*
    31 Fed Cl. 429 (1994) .......................................................................................12

*Accrentra, Inc. v. Staples, Inc.,*
    851 F. Supp. 2d 1205 (C.D. Cal. 2011) ............................................................19

*Apple, Inc. v. Samsung Elec. Co., Ltd.,*
    No. 11–CV–01846 (LHK) ...................................................................................5

*Beck Park Apartments v. U.S. Dept. of Housing and Urban Dev.,*
    695 F.2d 366 (9th Cir. 1982) ............................................................................17

*BMY-Combat Sys. Div. of Harsco Corp. v. United States,*
    44 Fed. Cl. 141 (1998) .....................................................................................11

*United States v. Brooke,*
    4 F.3d 1480 (9th Cir. 1993) ................................................................................4

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993) ...................................................................................19, 25

*Browder v. General Motors Corp.,*
    5 F. Supp. 2d 1267 (M.D. Ala. 1998) ..............................................................38

*Chaffey Joint Union High School District v. FieldTurf USA, Inc.,*
    No. 16-cv-204 (JGB), 2017 WL 3048658 (C.D. Cal. Feb. 28, 2017) ................12

*U.S. ex rel. Chilcott v. KBR, Inc.,*
    No. 09-cv-4018, 2013 WL 5781660 (C.D. Ill. Oct. 25, 2013) ...........................17

*Commercial Contractors v. U.S.,*
    154 F.3d 1357 (Fed. Cir. 1998) ...................................................................11, 14

*Crescenta Valley Water District v. Exxon Mobile Corp.,*
    No. CV 07-2630-JST, 2013 WL 12116333 (C.D. Cal. Jan. 8, 2013) ................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Daff v. United States*,
  31 Fed. Cl. 682 (1994) ....................................................................................11

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)........................................................................................19

*Goebel v. Denver and Rio Grande W. R.R. Co.*,
  215 F.3d 1083 (10th Cir. 2000)......................................................................19

*State of Ca. ex rel. Grayson v. Pac. Bell. Tel.*,
  142 Cal. App. 4th 741 (2006)..........................................................................12

*ING Bank v. Am. Reporting Co., LLC*,
  859 F. Supp. 2d 700 (D. Del. 2012) ...............................................................38

*Int'l Game Tech., Inc. v. Sec. Judicial Dist. Ct. of Nev.*,
  127 P.3d 1088 (Nev. 2006) .............................................................................12

*Jones v. City of Oakland*,
  No. 11-cv-4725 (YGR), 2013 WL 1333933
  (N.D. Cal. March 29, 2013) ..............................................................................3

*Lewis v. City of Alexandria*,
  756 S.E.2d 465 (Va. 2014)..............................................................................12

*Lloyd v. Ashcroft*,
  208 F. Supp. 2d 8 (D.D.C. 2002) ......................................................................5

*United States v. Luce*,
  873 F.3d 999 (7th Cir. 2017)...........................................................................11

*M&G Polymers USA, LLC v. Tackett*,
  135 S. Ct. 926 (2015)......................................................................................10

*New Hampshire v. Maine*,
  532 U.S. 742 (2001)..........................................................................................5

*Marbled Murrelet v. Babbitt*,
  83 F.3d 1060 (9th Cir. 1996)...........................................................................19

*Mauro v. S. New Eng. Telecomms., Inc.*,
  208 F.3d 384 (2d Cir. 2000)............................................................................38

*Merchant Transaction Sys., Inc. v. Nelcela, Inc.*,
   No. CV 02-1954-PHX-MHM, 2009 WL 723001
   (D. Ariz. Mar. 18, 2009) .......................................................5

*United States ex rel. Nottingham v. Thomas*,
   No. 4:11cv99 (DEM), 2015 WL 7424738, at *6
   (E.D. Va. Oct. 26, 2015) ......................................................12

*PPM America, Inc. v. Marriott Corp.*,
   875 F. Supp. 289 (D. Md. 1995) ...........................................3

*Promega Corp. v. Life Tech. Corp.*,
   875 F.3d 651 (Fed. Cir. 2017) ...............................................4

*Roberts v. Ariz. Bd. of Regents*,
   661 F.2d 796 (9th Cir. 1981) ................................................38

*United States ex rel. Roby v. Boeing Co.*,
   302 F.3d 637 (6th Cir. 2002) ................................................11

*Rodriguez v. Cnty. of Stanislaus*,
   799 F. Supp. 2d 1131 (E.D. Cal. 2011) ..................................3

*United States v. Sci. App. Int'l Corp.*,
   626 F.3d 1257 (D.C. Cir. 2010) ..............................9, 10, 40

*Sharkey IRO/IRA v. Franklin Res.*,
   263 F.R.D. 298 (D. Md. 2009) .............................................38

*In re Silicone Breast Implants*,
   318 F. Supp. 2d 879 (C.D. Cal. 2004) ..................................26

*Simonian v. Univ. and Comm. College Sys. of Nev.*,
   128 P.3d 1057 (Nev. 2006) ..................................................12

*Summers v. Delta Air Lines, Inc.*,
   508 F.3d 923 (9th Cir. 2007)..................................................3

*Total Containment, Inc. v. Dayco Products, Inc.*,
   177 F. Supp. 2d 332 (E.D. Pa. 2001)......................................4

*Tyger Constr. Co. Inc. v. Pensacola Constr. Co.*,
   29 F.3d 137 (4th Cir. 1994)..................................................26

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
    856 F. Supp. 2d 1136 (C.D. Cal. 2012) .................................................3

*United States of Am. for the Use of Salinas Constr., Inc. v. Western*
    *Surety Company*,
    No. C14-1963 (JLR), 2016 WL 3632487 (W.D. Wash. 2016) ........................19

*Univ. Health Servs. v. United States ex rel. Escobar*,
    136 S. Ct. 1989 (2016)...............................................................10

*Wagner v. Prof. Eng'rs in Ca. Govt.*,
    354 F.3d 1036 (9th Cir. 2004).........................................................5

*United States ex rel. Wall v. Circle C. Constr., LLC*,
    813 F.3d 616 (6th Cir. 2016)......................................................12, 25

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2000).............................................................19, 25

*United States v. Woodbury*,
    359 F.2d 370 (9th Cir. 1966).........................................................9

**STATUTES**

31 U.S.C. § 231 (1976) ...............................................................11

31 U.S.C. § 3729(a)(1)(G) .............................................................11

**OTHER AUTHORITIES**

Fed. R. Civ. P. 50(b) ..............................................................2, 3

Fed. R. Evid. 702 ....................................................................19

Fed. R. Evid. 703 ....................................................................19

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

After eight years of litigation, the parties have explored every potentially relevant fact, briefed, re-briefed, and argued every imaginable legal issue, and tried every relevant issue before two juries.  Throughout, Plaintiffs have been given the latitude to explore every possible legal and factual theory they could dream of.  At the same time, they have been permitted to take advantage of the Phase 1 verdict, despite that fact that it resulted from a Phase 1 trial that the Court has accurately described as a "train wreck."  The table is now set for the Court to rule on the legal sufficiency of Plaintiffs' case.  J-M has repeatedly asked for such a ruling, and having been given every privilege that they have asked for, Plaintiffs have finally joined in the same request.

This brief respectfully requests three things.

The first request is for the Court to enter judgment in J-M's favor as a matter of law on the damages theory that Plaintiffs presented at the five-week trial that recently concluded.  That theory was that Plaintiffs suffered damages because the pipe they received will fail earlier than the pipe they bargained for.  That theory fails as a matter of law because the bargain on which damages must be predicated was set out in written specifications, which called for compliance with certain standards, but those standards disclaimed, rather than imposed, any requirement for pipe longevity.  Plaintiffs' theory also fails as a matter of law because the Phase 1 jury did not decide whether J-M falsely represented compliance with any longevity requirement.

The Court must also enter judgment as a matter of law based upon Plaintiffs' failure of proof at trial.  Plaintiffs failed to present sufficient proof of: (1) the predicted times and costs of failure and replacement, which were presented solely by Mr. Lehmann; (2) the longevity of compliant pipe, J-M pipe manufactured from 1996–2006, and Plaintiffs' pipe at issue; or (3) the mathematical relationship of three short-term tests with long-term strength and longevity, upon which both the

fact of lost value and all of Plaintiffs' damages calculations completely depended. Nor did Plaintiffs even attempt to bear their burden of proving the difference between the value they were promised and the benefits they unquestionably have received.

The second request is for the Court to enter judgment as a matter of law on the damages claim Plaintiffs chose to make in closing, in violation of the Court's instructions, the Court's clear rulings, the basic rules of trial procedure, and the bedrock principles of due process.  Plaintiffs' closing claim was for the cost of replacement pipe for all pipe in all of the projects today. The Court ruled before trial that such a claim could not be made absent risk of imminent failure or a threat to public health.  Plaintiffs responded by expressly abandoning any such claim, and their evidence at trial was that no such replacement was necessary because pipe was not expected to fail for some time into the future.  This is reflected in the jury instructions Plaintiffs proposed and the Court provided.  Plaintiffs urged the jury in closing to simply ignore all of this.

The third request is embedded in the first two, but based on an additional ground.  That request is to preclude Plaintiffs from continuing this case.  This case is exceptional in light of Plaintiffs' multiple, unilateral, and uniformly improper decisions to change their legal and factual theories of the case.  With the end of the evidence and trials, the Court must put an end to Plaintiffs' inappropriate tactics.

## II.   JUDGMENT AS A MATTER OF LAW CAN BE ENTERED FOLLOWING A MISTRIAL

Under Federal Rule of Civil Procedure 50, a party may renew its motion for judgment as a matter of law after a mistrial and discharge of the jury.[2]  "The same standard applies to a motion for judgment as a matter of law made after a mistrial

---

[2] Fed. R. Civ. P. 50(b).

because of jury deadlock."[3]  The standard for judgment as a matter of law after a mistrial is "no stricter than after a jury verdict."[4]  Judgment as a matter of law "should be entered notwithstanding the jury's failure to reach a verdict if insufficient evidence was presented to support a verdict for the nonmoving party."[5]

Judgment as a matter of law is warranted where, as here, "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue."[6]  Rule 50 "allows a court to remove . . . claims, defenses, or entire cases . . . from the jury" where the evidence cannot "support a particular outcome."[7]  In particular, judgment as a matter of law should be granted when the "evidence contains no proof beyond speculation to support a verdict."[8]

## III.  THE COURT SHOULD ENTER JUDGMENT FOR J-M BECAUSE PLAINTIFFS' LONGEVITY THEORY OF DAMAGES WAS DEFECTIVE AS A MATTER OF LAW AND LACKED A SUFFICIENT EVIDENTIARY BASIS AT TRIAL

### A.  Plaintiffs Must Be Held to the Damages Theory They Chose To Try

Plaintiffs are legally bound by their strategic decisions before and during

---

[3] *Rodriguez v. Cnty. of Stanislaus*, 799 F. Supp. 2d 1131, 1139 (E.D. Cal. 2011) (citing *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1197 (9th Cir. 2000), *cert. granted and vacated on other grounds by* 534 U.S. 801 (2001)).

[4] *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 856 F. Supp. 2d 1136, 1142 (C.D. Cal. 2012).

[5] *PPM America, Inc. v. Marriott Corp.*, 875 F. Supp. 289, 293 (D. Md. 1995) (citations omitted).

[6] *Summers v. Delta Air Lines, Inc.*, 508 F.3d 923, 926 (9th Cir. 2007) (quoting Fed. R. Civ. P. 50(a)).

[7] *Id.*

[8] *See, e.g.*, *Jones v. City of Oakland*, No. 11-cv-4725 (YGR), 2013 WL 1333933, at *2 (N.D. Cal. March 29, 2013) (citing *First Union Nat. Bank v. Benham*, 423 F.3d 855, 863 (8th Cir. 2005)).

trial.[9]  Whether grounded in the principles of waiver, fundamental due process/fairness to the parties, or judicial estoppel, the courts have been clear that a party cannot abandon legal theories to try to obtain a strategic advantage only to revive those theories after the theories the party chose to pursue instead failed.  As the Federal Circuit has said (reciting established law):  "*When a plaintiff deliberately takes a risk by relying at trial exclusively on a damages theory that ultimately proves unsuccessful* . . . *a district court does not abuse its discretion by declining to give that plaintiff multiple chances to correct deficiencies in its arguments or the record.*"[10]  In *Promega*, after a finding of patent infringement was made, the plaintiff disclaimed any demand for royalties, seeking only damages in the form of lost profits, arguing:  "Royalties?  Don't want them.  Wouldn't have taken them.  Don't expect them."[11]  The district court and Federal Circuit on appeal both found that the plaintiff had thus "expressly waived its right to any award based on a reasonable royalty," and entered judgment as a matter of law when the plaintiff could not sustain the one damages theory it pursued at trial.[12]

Similarly, in a retrial limited to the issue of damages, the court in *Total Containment, Inc. v. Dayco Products, Inc.* precluded the plaintiff from proffering "new theories after making a tactical decision not to do so at the prior trial," based on concerns of fairness to the parties.[13]  Specifically, to avoid "potential unfairness and prejudice to the parties," the court precluded plaintiff from "introduc[ing]

---

[9] *United States v. Brooke*, 4 F.3d 1480, 1485 n.6 (9th Cir. 1993) ("Like all litigants, the government must accept the consequences of its strategic decisions.").

[10] *Promega Corp. v. Life Tech. Corp.*, 875 F.3d 651, 666 (Fed. Cir. 2017) (emphasis added).

[11]  *Id.* at 660.

[12] *Id.*

[13] 177 F. Supp. 2d 332, 338–39 (E.D. Pa. 2001); *see id* (citing *Rochez Bros. v. Rhoades*, 527 F.2d 891, 894 (3d Cir. 1975), for the proposition that "retrials are not given to provide the plaintiff with an opportunity to improve its case").

1  evidence for costs associated with the development of its own brand of primary

2  pipe" when it had not pursued this theory at the first trial.[14]

3         This bedrock principle of litigation is also at the heart of judicial estoppel—

4  parties may not change their positions mid-proceedings simply because it suits their

5  current strategy, especially when they have used their prior positions to successfully

6  persuade the courts to rule in their favor.[15]  Nor can they oppose judgment as a

7  matter of law (let alone request another bite at the apple in a retrial), on the basis of

8  a theory of damages that they did not submit to the jury.[16]

---

[14] *Id.* (citing *Habecker v. Clark Equip. Co.*, 36 F.3d 278, 288 (3d Cir. 1994) (holding that district court did not abuse its discretion in precluding plaintiff from pursuing a new theory in a subsequent trial where "at the first trial, no evidence was admitted on the new theory, no argument was made to the jury, and no points for charge were requested on that point")); *see also Apple, Inc. v. Samsung Elec. Co., Ltd.*, No. 11–CV–01846 (LHK), Dkt. 2271 ("Order re: Damages") at 26 (N.D. Cal. March 1, 2013), Dkt. 2316 ("Case Management Order") at 3 (N.D. Cal. April 29, 2013) (granting in part Samsung's motion for judgment as a matter of law when damages award was based on improper notice dates and Apple had not presented sufficient evidence at trial to recalculate damages for some of the infringing sales using the proper dates, and limiting Apple in the retrial on damages to those sales and the same theory it had pursued at the first trial).

[15] *See New Hampshire v. Maine*, 532 U.S. 742, 742–43 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." (citations omitted)); *Wagner v. Prof. Eng'rs in Ca. Govt.*, 354 F.3d 1036, 1050 (9th Cir. 2004) (reversing, as an abuse of discretion, district court's granting of summary judgment based on "resurrected" theory because plaintiff was judicially estopped from pursuing position it had previously decided to abandon in order to "gain an advantage in the litigation").

[16] *See Merchant Transaction Sys., Inc. v. Nelcela, Inc.*, No. CV 02-1954-PHX-MHM, 2009 WL 723001, at *18 (D. Ariz. Mar. 18, 2009) (holding court need not consider new theories of the case after party was provided full and fair opportunity to present their claim at trial); *Lloyd v. Ashcroft*, 208 F. Supp. 2d 8, 11 (D.D.C. 2002) ("A plaintiff cannot change the theory of his case in his post-trial motion in order to survive a Rule 50 motion for judgment as a matter of law. He is bound by

In the present case, as discussed further below, Plaintiffs expressly waived any claim for the cost of replacing all their pipe today, only to assert precisely that claim in closing.  As the court in *Promega* made clear, such strategic decisions have consequences, and litigants must be held to them in further proceedings.  So too, as in *Total Containment* and *Habecker*, it would abrogate the most basic principles of fairness and due process to allow Plaintiffs to pursue damages based on *future* replacement at trial and then seek the cost of replacement *today* when the Court ruled out construction costs.  Plaintiffs are also judicially estopped from disclaiming any intent to pursue present replacement costs in order to avoid judicial rebuke for pursuing factually unsupported and fundamentally inconsistent theories,[17] only to present to the jury an inconsistent theory after the close of evidence.

**B.     Before Trial, Plaintiffs Abandoned All Claims for the Cost of Replacing All Their Pipe Now**

Plaintiffs spent four years preparing and arguing their theories of damages in this case.  Those theories were the basis for pretrial discovery and their legal sufficiency was briefed, re-briefed, and argued to the Court repeatedly by the parties.  One of Plaintiffs' theories was that they should recover damages based upon the cost of replacing all of their pipe within the next six months to two years, before it actually failed.[18]  J-M challenged this theory on multiple grounds, including that it conflicted with Plaintiffs' claim for insurance to cover future failures and that there was no evidence of a threat of imminent failure or danger to public safety justifying immediate replacement.[19]  After briefing and argument, the

---

what he pled and attempted to prove at trial.").

[17] *See* Dkt. 2494 at 19.

[18] Dkt. 2270 (Exemplar Pls.' Submission Stating Damages Theory) at 3 ("Plaintiffs will also seek the full cost of replacing the J-M pipe, which includes both the cost of the pipe itself and the expense associated with its replacement." (emphasis added)).

[19] Dkt. 2466 (J-M's *Daubert* Motion); Dkt. 2478 (J-M's *Daubert* Reply); Dkt. 2521

Court precluded Plaintiffs from seeking the full costs of replacing their pipe now—including the present cost of the pipe—absent evidence (which Plaintiffs did not have) "of a likelihood that Plaintiffs' J-M pipe would fail within six months to two years or posed a clear and *present* danger to health and safety, requiring replacement."[20]

In response, Plaintiffs represented to the Court and J-M that they would not seek damages based on immediate replacement.[21]  Plaintiffs proffered jury instructions for the damages trial were in accord.[22]

_____

(J-M'S MIL No. 3).

[20] Dkt. 2494 at 19 (quoting *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 277 F.R.D. 586, 607 (S.D. Cal. 2011), for the proposition that opinions of the party offering "varying opinions from [their] own experts also weigh in favor of a finding of unreliability")).

[21] *E.g.*, Ex. 9, Hr'g Tr. 39:21–40:20 (Sept. 11, 2018) ("THE COURT: Let me stop. Let me ask this question of both parties: Aside from the issue of replacement costs as, you know consequential damages, it seems to me this issue really goes toward the contract price. In other words, I can understand this stuff that you're arguing -- you know, the degree of something from the contract price, but *if we don't include the replacement costs of digging up the pipe and putting in new pipe and stuff of that sort, this is an approximation, I suppose, of some request for an amount of money that approaches the contract price, you know, because the more the pipe has been in the ground and been used, you know, this provides some value, and if the benefit of the bargain is defined as the contract price, then we're just arguing about some percent of the contract price*. MR. HAVIAN: ***Your Honor, that is a piece of it***, but it's also highly relevant to the replacement cost theory. . . . Your Honor, the -- one thing I should make clear: We've heard the court's rulings on full replacement costs, in other words, ***replacing all the pipe even not predicted to fail. We're not going to continue to pursue that***; we disagree with the court's ruling." (emphases added)).

[22] Dkt. 2645-1 (Proposed Jury Instructions) at 8:17–9:1 ("As to actual damages, Plaintiffs contend that, as a result of J-M's failure to manufacture and test its pipe in a manner that assured that it had the quality, strength and durability as required under the applicable industry standards, ***the pipe Plaintiffs purchased will fail sooner than pipe that conformed to the applicable industry standards and thus will have to be replaced sooner***." (emphasis added)).

### C.   The Remaining Theories Plaintiffs Tried All Claimed Diminished Value Based upon Reduced Longevity

Plaintiffs' remaining damages claims were all based on the contention that a portion of Plaintiffs' existing pipe had reduced longevity and would need to be replaced at specifically estimated times in the future. Tracking their proposed instructions, reduced longevity in fact predicated each of Plaintiffs' proffered damages proofs at trial, from Dr. Davis's opinions on the longevity of compliant pipe, to Mr. Paschal's calculations of reduced long-term strength (based on abbreviated HDB tests) and the precise impact on longevity, to Mr. Edwards's parallel calculations based upon Quick Burst tests, to Mr. Cathcart's replacement cost estimates, to Mr. Lehmann's calculations of reduced longevity and the present value of replacement.  All of this was in line with Plaintiffs' opening statement, which presented damages calculations premised on *future* failure.[23]  Each of these claims incorporated as one component the cost of buying new pipe to replace that proportion of pipe predicted to fail prematurely *in the future*.

At the conclusion of the trial, the Court held that the labor costs of removal

---

[23] *See* Ex. 23, Pls' Opening Slide titled "Actual Damages" ("Plaintiffs seek to be placed in the same position as if J-M had delivered pipe that complied with industry standards and would not fail prematurely. In order to be placed in the same position, Plaintiffs seek damages for: The Cost of Predicted Pipe Failures [$11 Million - $14 Million]; Insurance for Predicted Pipe Failures [$13 Million - $16 million]; Cost of Pipe [$1.1 Million].").  While the **contract** price was listed and subsequently included in Mr. Cathcart's testimony, what counts is that he used the different and much higher cost of **replacement pipe** as the basis for his opinions and those opinions went to the total cost of replacing Plaintiffs' pipe (the cost of pipe + removal and reinstallation costs).  And, to the essential point here, the only **damages** calculations Plaintiffs submitted were presented by **Mr. Lehmann**, who used the replacement pipe costs as an input to the calculation of the cost of replacing the portion of Plaintiffs' pipe that he predicted would fail **in the future**.  *See, e.g.*, Ex. 17, Trial Ex. 31281-C-7 (Arcadis Rpt. at App'x C); Ex. 1, Trial Tr. 6507:5–6508:7; Ex. 18, Trial Ex. 31293 (Lehmann's revised SGL-11 (Oct. 30, 2018)).

and reinstallation were impermissible consequential damages.[24]  But, Plaintiffs' evidence of (and claim for) reduced longevity and the cost of pipe upon premature future failure *remained undisturbed*.  Accordingly, the jury was instructed, just as Plaintiffs requested in their proposed instructions, that Plaintiffs' damages claim was based upon reduced longevity:

> As to actual damages, Plaintiffs contend that, as a result of J-M's failure to manufacture and test its pipe in a manner that assured that it had the quality, strength and durability as required under the applicable industry standards, *the pipe Plaintiffs purchased will fail sooner than pipe that conformed to the applicable industry standards and thus will have to be replaced sooner*." (emphasis added)).[25]

### D.    Plaintiffs' Damages Claim for Diminished Longevity Fails as a Matter of Law Because Longevity Was Not Part of the Parties' Bargain and Was Not Decided in Phase 1

The law requires, the Court has ruled, and Plaintiffs have long conceded that the "benefit of the bargain" is the proper measure of damages in this False Claims Act case.[26]  That the "bargain" in this case is reflected in Plaintiffs' specifications has taken much longer to establish, but it is equally clear on the law and undisputed on the facts.  Plaintiffs conceded at trial that the specifications and the standards they incorporated contain no longevity requirement.  It follows as a matter of clear False Claims Act law (under both the federal FCA and the state analogs that are interpreted consistent with the federal law) that damages for claimed reduced

---

[24] *See* Dkt. 2753.

[25] Dkt. 2756 (Final Phase 2 Instructions) at 3.

[26] Dkt. 2688 (Oct. 9, 2018 Benefit of the Bargain ruling) at 1; *see United States v. Sci. App. Int'l Corp.*, 626 F.3d 1257, 1279 (D.C. Cir. 2010) (citing *United States v. Bornstein*, 423 U.S. 303, 316 n.13 (1976)); *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966); Dkt. 2647 (Pls.' Submission re. Damages for Anticipated Failures) at 1 (conceding applicability of "benefit of the bargain" measure).

longevity are not recoverable.  Plaintiffs will undoubtedly continue to fight this conclusion by citing irrelevant contract law.  But they have now agreed that the Court should decide the role of the specifications in defining the "benefit of the bargain."  Plaintiffs' claims for reduced longevity are also barred as a matter of law for the separate and independent reason that reduced longevity was not a predicate for the Phase 1 jury's verdict.[27]

### 1.     The bargain that controls Phase 2 damages is defined by the project specifications

False Claims Act law is clear that, where a written contract sets out the product or services to be supplied to the government, that contract defines the "bargain" the government has struck and, in turn, sets the bar for any claim for damages based upon the benefit of that bargain.[28]  The law is equally clear that the FCA does not displace the law of contracts and redefine the scope of the parties' agreement.[29]

---

[27] Ex. 1, Trial Tr. 325:11–13 ("MS. SHER: . . . *So for Mr. Bernick to say that the first trial didn't litigate longevity, I understand why he's saying that. We didn't litigate 100 years*, although actually it came up." (emphasis added)).

[28] *See, e.g.*, *Sci. App.*, 626 F.3d at 1278–79 (holding that jury could "award FCA damages for any loss in value to the NRC attributable to [defendant's] failure to provide completely impartial conflict-free services *required by the NRC contracts*" (emphasis added)).

[29] *See Univ. Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1999 (2016) ("It is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses" and that the FCA does not abrogate the common law absent "textual indicia to the contrary." (citations omitted)); *see also M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933, 935–37 (2015) (interpreting collective-bargaining agreement "according to ordinary principles of contract law," holding that "traditional rules of contractual interpretation require a clear manifestation of intent before conferring a benefit or obligation" and a "written agreement is presumed to encompass the whole agreement of the parties," and overruling the Sixth Circuit because it inferred benefits in the agreement, improperly "placing a thumb on the scale")).

Thus, in the most factually apposite FCA cases that the Court analyzed repeatedly and in-depth, the plaintiffs were able to recover damages for the benefit of the bargain for which they specifically contracted.  In *Roby*, the Sixth Circuit upheld a ruling applying the benefit of the bargain measure of damages and awarding as damages the cost of a helicopter where the parties had specifically contracted for "remanufactured helicopters as units, not as assemblages of assorted parts."[30]  Similarly, the Federal Circuit in *Commercial Contractors* upheld an award of the costs of remedying deficiencies in channel construction when the defendant had specifically contracted to provide construction services, but did not comply with quality control standards specified in the contract.[31]  The other cases Plaintiffs repeatedly cited are in accord.[32]

These cases also show courts giving meaning to the "by reason of/because of" language in the FCA, which reflects the FCA's incorporation of the common law proximate causation requirement that the only damages that are recoverable are those commensurate with the loss of benefits caused by the defendant's false statement or claim.[33]  Plaintiffs' eleventh-hour gambit to ground their damages

---

[30] *United States ex rel. Roby v. Boeing Co.*, 302 F.3d 637, 646–47 (6th Cir. 2002).

[31] *Commercial Contractors v. U.S.*, 154 F.3d 1357, 1373–74 (Fed. Cir. 1998).

[32] *See, e.g.*, *BMY-Combat Sys. Div. of Harsco Corp. v. United States*, 44 Fed. Cl. 141, 148–49 (1998) (awarding "[c]osts of inspection and repair incurred by the government" where the contractor failed to perform tests on every unit sold, as required by the contract); *Daff v. United States*, 31 Fed. Cl. 682, 695 (1994), *aff'd* 78 F.3d 1566 (Fed. Cir. 1996) (awarding costs of testing and repairing military equipment where defendant violated its contractual obligations to inspect equipment, record observations, and report any deficiencies).

[33] 31 U.S.C. § 3729(a)(1)(G) (providing for recovery of "damages which the Government sustains *because of* the act of" the defendant (emphasis added)); *see* 31 U.S.C. § 231 (1976) (providing for "damages which the United States may have sustained *by reason of* [the act of the defendant]" (emphasis added)); *United States v. Luce*, 873 F.3d 999, 1012 (7th Cir. 2017) (holding that FCA applies the common law proximate cause standard and explaining that "[t]he statutory language of the

---

claims in the (until then) barely mentioned state FCAs at issue does not affect this analysis because the equivalent California, Nevada, and Virginia False Claims Act statutes are interpreted consistently with the federal FCA, and Plaintiffs have identified no False Claims Act case that says otherwise.[34]

This is not surprising.  Before trial, Plaintiffs themselves relied upon the

---

FCA does not suggest that Congress sought to depart from the established common-law understanding of causation in fraud cases. The FCA simply allows the Government to recover damages which the Government sustains *because of* the act of that person."); *e.g.*, *United States ex rel. Wall v. Circle C. Constr., LLC*, 813 F.3d 616, 617 (6th Cir. 2016) (holding that where defendant violated FCA law by underpaying employees, damages were limited to difference between the wages the defendant should have paid and what it actually did pay because "the government bargained for two things: the buildings, and payments of Davis-Bacon wages. It got the buildings but not quite all of the wages."); *see also Ab-Tech Constr., Inc. v. U.S.*, 31 Fed Cl. 429, 434 (1994), *aff'd* 57 F.3d 1084 (Fed. Cir. 1995) (holding that because "no proof has been offered to show that [Plaintiffs] suffered any detriment to [their] **contract interest** because of [defendant's] falsehoods," Plaintiffs could claim no damages (emphasis added)); *id.* ("Damages represent compensation for a loss or injury sustained. . . . [T]he Government got essentially what it paid for.").

[34] *See State of Ca. ex rel. Grayson v. Pac. Bell. Tel.*, 142 Cal. App. 4th 741, 746 n.3 (2006) ("Given the very close similarity of California's act to the federal act, it is appropriate to turn to federal cases for guidance in interpreting the act." (citations omitted)); *Chaffey Joint Union High School District v. FieldTurf USA, Inc.*, No. 16-cv-204 (JGB), 2017 WL 3048658, at *4 (C.D. Cal. Feb. 28, 2017) (denying summary judgment and allowing plaintiff's claims under the CFCA for full replacement costs of synthetic field turf to proceed where plaintiff had contracted with defendants "for the purchase **and installation** of a synthetic turf field" (emphasis added)); *Simonian v. Univ. and Comm. College Sys. of Nev.*, 128 P.3d 1057, 1060 (Nev. 2006) (holding that "Nevada's FCA is modeled after the federal FCA"); *Int'l Game Tech., Inc. v. Sec. Judicial Dist. Ct. of Nev.*, 127 P.3d 1088, 1101 (Nev. 2006) ("Nevada's FCA was expressly modeled after the federal FCA."); *Lewis v. City of Alexandria*, 756 S.E.2d 465, 479 n.4 (Va. 2014) (noting that "[t]he VFATA is based on the federal civil False Claims Act (FCA)," and holding that "FCA cases thus provide guidance for our review"); *United States ex rel. Nottingham v. Thomas*, No. 4:11cv99 (DEM), 2015 WL 7424738, at *6 (E.D. Va. Oct. 26, 2015) ("The [VFATA] allows for damages identical to those set forth in the False Claims Act."), *adopted* 2015 WL 7430020 (E.D. Va. Nov. 20, 2015).

1   written contracts when it suited their purposes.[35]  But, at the same time, they

2   disingenuously searched in vain to find support in FCA law for the proposition that

3   damages could be awarded for a lost benefit that was ***not*** part of the parties' bargain.

4   As Plaintiffs ultimately admitted, all they could come up with were breach of

5   contract (and warranty) cases, which adopt a different standard based upon

6   foreseeability.[36]

7           At trial, Plaintiffs' representatives agreed that the specifications and

8   submittals defined the scope of the parties' obligations,[37] and the Court reiterated

9

10  [35] Dkt. 2515-1 at 6 (citing *Brotherson v. Professional Basketball Club*, 262 F.R.D.,

11  564, 571–72 (W.D. Wash. 2009) (quoted for the proposition that "[s]ubjective
    expectations do not govern the determination"; "[o]bjectively reasonable

12  expectations do" and "the objectively reasonable expectations of the parties" are
    "readily determinable" from the contract itself) and *Founding Mem. of the Newport*

13  *Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944,

14  956 (2003) (quoted for the proposition that "California recognizes the objective
    theory of contracts, under which it is the objective intent, as evidenced by the words

15  of the contract, rather than the subjective intent of one of the parties, that controls

16  interpretation . . . . The parties' undisclosed intent or understanding is irrelevant to
    contract interpretation.")).

17
    [36]  *See, e.g.*, Dkt. 2646 at 5:21–7:20; Dkt. 2436-1 at 68–69.  *See also* Ex. 12, Hr'g

18  Tr. 60:22–61:3, 62:2–5 (Oct. 5, 2018) ("THE COURT: . . . There's enough federal
    False Claims Act cases for me to figure out generally where the problems are, and

19  the questions or resolution. I'm looking for the state court to see if the state courts
    have resolved the issue. If they haven't resolved the issue under the False Claims

20  Act, I'm not going to look to their law insofar as breach of contract or for fraud

21  because, again, I'm not concerned -- that doesn't concern me. . . . MR. LITMAN:
    ***You are asking for the broom stick of the wicked witch of the west. The actual***

22  ***adjudication of state False Claims Act is fairly sparse, but the principle that it***

23  ***incorporates contract damages is robust and universal.***" (emphasis added)); *id.*

24  42:8–15.

25  [37] *E.g.*, Ex. 1, Trial Tr. 4313:7–16 (Calleguas) ("Q. . . . So the contracts, the

26  submittals, those set forth the obligations of the parties; correct? A. Yes. And the
    plans. Q. And the plans. And so those are the documents that at the end of the day it

27  is all written down in one place what everybody's obligations are; is that fair? A. As

28  to Graycon and Calleguas, yes. Q. As to? A. The parties to the contracts."); *id.*

that "the benefit of the bargain depends on what was in the contract."[38]

The parties' arguments regarding the final jury instructions again focused on whether the written specifications and submittals controlled the substance of the "bargain." After yet another round of briefing from the parties at Plaintiffs' insistence, Plaintiffs were still unable to find any law to the contrary, and unsuccessfully sought refuge in *Commercial Contractors*.[39] The Court ultimately instructed the jury that what Plaintiffs "contracted for" was the touchstone of the "value" Plaintiffs were entitled to as part of the parties' bargain.[40] The verdict form

---

1303:14–16 (Norfolk) ("Q. Is it your understanding that anything required by the contract is reflected in writing? A. Yes."); *id.* 1108:16–20 (South Tahoe); *id.* 1740:3–8 (Palmdale); *id.* 2053:10–2053:18 (Reno); *id.* 1086:18–1087:1 (South Tahoe).

[38] Ex. 1, Trial Tr. 1750:4–5.

[39] In *Commercial Contractors*, the defendant contractor submitted false claims for construction of a channel, and the court held that the government was entitled to the costs of remedying the deficiencies caused by improper construction that affected the structural integrity of the channel. 154 F.3d at 1373–74. ***However, J-M's sole contractual role was to supply pipe.*** J-M's role as a supplier thus distinguishes this case from *Commercial Contractors*, where the defendant was a general contractor providing both materials and construction services. *See* Ex. 1, Trial Tr. 260:24–261:4 ("THE COURT: *I agree. The reason why Commercial Contractors may not be applicable, even if one were to accept the approach of the Court in Commercial Contractors, is that there, you are right, it was the contractor, and here we have a supplier of pipe to a contractor. And so, therefore, the scenario is quite different.*") (emphasis added)).

[40] Dkt. 2756 (Updated Final Jury Instructions) at 8; *see* Ex. 1, Trial Tr. 6492:4–7 ("THE COURT: I will give you the one that you think is so important. The one on the bottom of page 8, 'would have expected based upon J-M's contractual representation of compliance.'"); *id.* 6493:19–21 ("THE COURT: I think Mr. Bernick is certainly right in terms of expected versus – it should be 'would have had' as opposed to 'expected.'"); *id.* 6495:6–9 ("THE COURT: *I will actually put in 'contracted' rather than 'paid' on the paragraph 8 of page 8, the one that begins, 'each plaintiff must prove,' because that is contracted.*") (emphasis added)).

---

14

similarly used the contracts to predicate each of the three questions put to the jury.[41]

### 2.   It was undisputed at trial that the specified standards imposed no longevity requirement

Plaintiffs' experts, as well as Plaintiffs' representatives and Plaintiffs' counsel, all conceded at trial that *the parties' contracts and the standards they incorporated did not include any longevity requirement that J-M pipe needed to meet*.[42]  Plaintiffs' counsel has explicitly conceded this:

> MR. HAVIAN: . . . We told the jury – we argued to the jury the standards don't address longevity. So, if the issue were just that, *if Mr. Bernick was right, that unless you see longevity in the standards or in the contracts, the case is over.  You might as well just give them a directed verdict if the Court agrees with that argument.*[43]

*     *     *

---

[41] Dkt. 2806, Special Verdict Form.

[42] *Id.* 4322:1–4 (Calleguas) ("Q. And you would agree with me that the contract has no specific longevity set forth in it; correct? A. It doesn't list a number of years."); *id.* 1308:12–15 (Norfolk) ("Q. And there's no mention anywhere in the contract or the standards that the pipe should last for any particular length of time, correct? A. Correct."); *id.* 1757:2–4 (Palmdale) ("Q. There is no representation about specific life span, correct?  A. Not that I'm aware of."); *id.* 2057:7–16 (Reno) ("Q. First of all, with respect to the specifications, there is nothing in Reno's specifications saying the pipe chosen for the project must have any specific life span or service life, correct? A. Correct.  Q. And there is no contract term in any of the contracts for these projects containing any promise or representation that the pipe must last a hundred years or at least a hundred years; that is not in the contract terms, correct? A. Correct."); *id.* 1108:5–14 (South Tahoe) ("Q. . . . . There's no requirement in any of the District's specifications that the pipe chosen must meet any particular pipe lifespan or service span, correct?  A. I don't recall any estimated lifespan in the contract documents.  Q. No term of the contract or any promise by anybody, including J-M, that the pipe must last exactly 100 years or at least 100 years.  That's not part anywhere in the contract, correct?  A. No."); *id.* 2694:9–13 (Paschal) ("Q. But in point of fact the standards themselves, there is no standard that requires a certain service life, right?  True or not?  A. Specifically within the standards we've been discussing today, that's correct.").

[43] Ex. 1, Trial Tr. 8419:20–8420:1 (emphasis added).

THE COURT: I mean, again, if we take out subjective – if we are saying that subjective intent is not to be determinative of the issue, if the contracts themselves do not specify longevity –

MR. HAVIAN: Well, they specify compliance with the standards.

THE COURT: Compliance with the standards, ***but the standards themselves do not indicate a period of time as to longevity***.

MR. HAVIAN: ***That's right***.[44]

As the Court indicated at the beginning of the trial, J-M is entitled to judgment as a matter of law on this basis alone:

THE COURT: Well, my indication is I will allow them to make the argument.  ***If at the end of the trial I conclude from all the evidence that has been presented that you are, in fact, right, that there is no connection between a hundred-year estimate and the damages which they can get under the False Claims Act, then I will have to give you a directed verdict.***"[45]

### 3.     Plaintiffs have agreed that the Court should decide whether the specifications control as a matter of law

When it became apparent that the jury would be hopelessly deadlocked absent further guidance from the Court on the scope of the parties' bargain, Plaintiffs finally conceded what J-M has long urged—that the Court should resolve as a matter of law the question of whether the parties' bargain was defined by the

---

[44] *Id.* 8431:11–20 (emphasis added); *see also* Ex. 8, Hr'g Tr. 10:5–6 (Sept. 7, 2018) ("***Nobody bargained for a particular life span of the pipe.***" (emphasis added)); *id.* 10:6–7 (MR. HAVIAN: "***Our clients don't say we bargained for a particular life span.***" (emphasis added)); *id.* 33:14–16 ("MR. HAVIAN: ***There is no agreement on the life span. And we don't argue that there is an agreement on the life span.***" (emphasis added)); Ex. 9, Hr'g Tr. 18:21–24 (Sept. 11, 2018) (MR. HAVIAN: "***[W]e are not seeking to sort of establish for purposes of the trial that 100 years was a promise that was made and that's part of the bargain. That's not our position, never has been.***" (emphasis added)).

[45] Ex. 1, Trial Tr. 329:10–16 (emphasis added).

specifications and standards at issue.[46]  Plaintiffs also conceded (because they believed it advantageous to do so) that the parties' subjective expectations of longevity were irrelevant.[47]  Plaintiffs further conceded that, if the Court determined that the contracts and standards defined the scope of the parties' bargain, the Court must direct judgment in J-M's favor as a matter of law because neither included a longevity requirement:

> MR. HAVIAN:  . . . [Y]our Honor, ***if it has to be in the contract and/or it has to be in the standards, then we are done. It is not – we are done. Just give a directed verdict***.  Don't send the jury out. Give a directed verdict on that basis. . . . But frankly, ***if the Court is now going to accept that it has to be either in the contract or the standards, then we lose.***[48]

The Court also brought home the absence of any ***evidence*** supporting a bargain on longevity:

> THE COURT: But let me just ask you, the problem I have with your argument is that you are attempting to argue some sort of damages that flow from some sort of loss of longevity because of the failure to produce compliant pipe.

---

[46] Ex. 1, Trial Tr. 8634:13–17 ("MR. HAVIAN: . . . So at some point, the court, I think, has to come to grips with whether it's going to either squarely accept or reject J-M's argument that unless longevity is in the contract or in the standards, which the parties agree it's not, then plaintiffs can't recover damages.").

[47] *Id.* 8414:2–3 ("MR. HAVIAN: . . . The parties' subjective expectations are irrelevant."); *id.* 8419:5–7 ("MR. HAVIAN: . . . What we do agree on is that evidence of the parties' subjective expectations of pipe longevity cannot be considered in determining any actual damages.").

[48] Ex. 1, Trial Tr. 8432:2–7 (emphasis added).  Moreover, the Court can and should interpret the plain language of the contractual documents.  *See Beck Park Apartments v. U.S. Dept. of Housing and Urban Dev.*, 695 F.2d 366, 369 (9th Cir. 1982) ("Interpretation of a contract is a matter of law."); *U.S. ex rel. Chilcott v. KBR, Inc.*, No. 09-cv-4018, 2013 WL 5781660, at *6 (C.D. Ill. Oct. 25, 2013) ("It is for the Court to determine the proper interpretation of the contract's terms.").

*And you don't have anything upon which to base that on.*

Supposedly you could try to base it on your clients' subjective expectations as a basis for that, but if you don't even have that, *I don't understand where you are getting any sort of figure from*.[49]

The Court should thus enter judgment as a matter of law because Plaintiffs did not establish either under FCA law or based on any evidence that the benefit of the bargain included pipe longevity.

### 4. Plaintiffs' damages claim for reduced longevity also fails as a matter of law because longevity was not in the Phase 1 verdict

Judgment should also be entered in J-M's favor as a matter of law for the separate and independent reason that the Phase 1 jury was not asked to and did not decide whether J-M falsely represented uniform compliance with a longevity requirement in the standards.  There is no question that the longevity of J-M's pipe in use was not litigated or decided in Phase 1.  While Plaintiffs have pointed to the word "durability" in the description of their claim in the Phase 1 instructions, and to representations of longevity in certain Phase 1 evidence, there was no evidence or contention that longevity was required by any standard, Plaintiffs never argued in Phase 1 that it was, and today they concede that it is not.  No longevity requirement in the standards means that longevity was not in the verdict and does not belong anywhere in this standards-based case.

### E. Plaintiffs Failed To Provide a Legally Sufficient Evidentiary Basis for Their Longevity-Based Damages Claims

The Court should enter judgment in J-M's favor as a matter of law on Plaintiffs' longevity-based damages claims for the additional reason that Plaintiffs failed to provide a sufficient evidentiary basis to establish several factual predicates,

---

[49] Ex. 1, Trial Tr. 8445:10–20 (emphasis added).

1    each of which was essential to their damages case.

2    ### 1.   Mr. Lehmann's damages calculations were legally
3    insufficient

4    The only longevity-based damages calculations Plaintiffs proffered at trial

5    came in through Mr. Lehmann.  All of the evidence Mr. Lehmann presented was

6    based upon his actuarial methodology.  That methodology, as well as the inputs to

7    its application in this case, was unreliable under *Daubert* and Rules 702 and 703,

8    and thus legally insufficient to support any verdict as a matter of law.[50]

9    *First*, while Plaintiffs had argued there were two longevity-based damages

10   theories, the first based upon a hypothetical insurance premium and the second

11   based upon the present value of certain pipe that was predicted to fail prematurely in

12

13   _____

[50] Evidence that fails to meet *Daubert* standards is insufficient under Rule 50.  *See*
14   *Weisgram v. Marley Co.*, 528 U.S. 440, 456 (2000) (holding that lower court
15   properly granted judgment as a matter of law under Rule 50 where it deemed expert
     evidence introduced at trial was unreliable and therefore inadmissible, and the
16   remaining properly admitted evidence was insufficient to support a verdict); *Brooke
17   Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)
     (affirming judgment as a matter of law in favor of defendant and noting that "[w]hen
18   an expert opinion is not supported by sufficient facts to validate it in the eyes of the
19   law, or when indisputable record facts contradict or otherwise render the opinion
     unreasonable, it cannot support a jury's verdict"); *Goebel v. Denver and Rio Grande
20   W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000) ("The district court may also
21   satisfy its gatekeeper role when asked to rule on a . . . post-trial motion." (citing
     *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993))); *United States of
22   Am. for the Use of Salinas Constr., Inc. v. Western Surety Company*, No. C14-1963
23   (JLR), 2016 WL 3632487, at *6, 9 (W.D. Wash. 2016) (holding that expert's
     damages calculations were inadmissible expert testimony pursuant to Rules 701 and
24   702, and that such objection was properly raised on Rule 50(b) motion); *Accrentra,
25   Inc. v. Staples, Inc.*, 851 F. Supp. 2d 1205, 1226–28 (C.D. Cal. 2011) (considering
     previously raised *Daubert* challenges in ruling on a Rule 50(b) motion), *vacated on
26   other grounds*, 500 F. App'x 922 (Fed. Cir. 2013); *see also Marbled Murrelet v.
27   Babbitt*, 83 F.3d 1060, 1066 (9th Cir. 1996) ("[E]vidence which is unreliable is
     necessarily insufficient.").

28

the future,[51] Mr. Lehmann's **only** task was to estimate the **premium** that would apply to an insurance policy covering the cost of premature failure of Plaintiffs' pipe.[52]  It was solely for this task that Mr. Lehmann claimed expertise.  In determining whether such an insurance policy might be obtained in the marketplace, Mr. Lehmann relied entirely on general principles of commercial insurance.[53]  He made no effort to go out into the marketplace to look for one.[54]  Nor did Plaintiffs.[55]  Mr.

---

[51] Dkt. 2645-1 (Proposed Jury Instructions) at 9:2–9 (Pls.' proposed instruction).

[52] Ex. 1, Trial Tr. 5232:23–5233:9 ("Q All right. And briefly, what were you asked to do in this particular case? A. Yes. I was retained by plaintiffs to determine a rate-making method that would compensate plaintiffs and insure them for the cost of premature failing of the [PVC] pipe that they bought from J-M, and based on the fact that the pipe was not in uniform compliance with standards. And then, secondly, I was asked to apply that rate-making method to the facts of this case and determine an appropriate premium in total for all five plaintiffs and for each of the five plaintiffs.").

[53] Ex. 1, Trial Tr. 5482:18–5483:3 ("Q. . . . Your approach in this case has been an insurance approach, right? A. Yes. . . . I determine the premium. Q. . . . And the premium is for a commercial policy, right? A. Yes.").

[54] *Id.* 5487:11–15 ("Q. But on this policy, you didn't go out to the marketplace to see whether this policy, whether any insurance policy would issue this policy did you? A. I couldn't approach the market because we have confidentiality limits on what we can say about this case.").

[55] *See, e.g., id.* 4330:15–20 (Calleguas) ("Q. And you haven't looked into any sort of insurance or self-insurance specifically with respect  to the Lake Bard project; correct? A.  We have not.  I know that our own insurer doesn't carry that type of coverage, but we haven't investigated other types of insurance."); *id.* 1315:10–15, 1319:19–25 (Norfolk) (Q. You've never consulted an insurer to try to insure against the possibility of any of your J-M pile failed, correct? A. Norfolk is self-insured. We don't have an insurance policy or insurer. Q.  'No' is the answer, correct? A. No insurance. . . . Q. It doesn't say that you could spend the money in that account on any sort of insurance policy, correct? A. Like I said, we don't have any insurance policy because we're self-insured.  You're right. Q. Right. You wouldn't spend the money on an insurance policy, correct? A.  No."); ; *id.* 1817:12–18 (Palmdale). ("Q. . . . The district has not bought any insurance to cover potential future problems with J-M pipe; correct? A.  Independent insurance to cover replacement?  Is that the

Lehmann admitted outright that his insurance policy does not exist in the real world, and that it was speculative.[56]

    *Second*, the entirety of Mr. Lehmann's work was based upon actuarial *standards*, *methods*, and *practices*. He expressly disclaimed expertise in the underlying engineering and pipe science.[57] As a consequence, it was through actuarial standards, methods, and practices that Mr. Lehmann purported to have a basis for relying upon the engineering models of Mr. Paschal and Mr. Edwards.[58] The actuarial standards called for him to perform a "credibility" assessment of both

─────────────────

question? Q. Yes. A. Correct.").

[56] *Id.* 5483:5–10 ("Q. Now, isn't it true that the policy that you're describing and have described to the jury is a policy that *does not exist today*? A. That's correct. Q. Anywhere, right? A. Not that I'm aware of." (emphasis added)); *id.* 5653:20–24 ("Q. You said that 100-year policy is *hypothetical*, remember? A. Yes, I mean, we don't have such a policy in existence today, I was pricing one. Q. *You said it does not exist. It's hypothetical*, correct? A. That's what I said yesterday, yeah, *I agree with that.*" (emphasis added)).

[57] Ex. 21, Lehmann Dep. 23:8–10 ("Q. But you're not an expert in engineering? A. No."); Ex. 1, Trial Tr. 5248:22–25 ("Q. Was it important for you in your work as an actuary to understand the technical and engineering aspects of the product that you were being asked to price? A. I didn't need to become an engineer."); *see also id.* 5249:17–19 ("Q. But you are not holding yourself out as an expert in PVC pipe or PVC pipe standards, are you? A. I am not."); *id.* 5620:11–12 ("A. Yeah, I'm really not an expert on PVC pipe, and I haven't read, you know, all the studies.").

[58] Trial Tr. 5248:22–5249:19 ("Q. Was it important for you in your work as an actuary to understand the technical and engineering aspects of the product that you were being asked to price? A. *I didn't need to become an engineer. That is not – that was not necessary. But the actuarial, we talked earlier about actuarial standards of practice. And actuarial standards of practice, there is an actuarial standard of practice dealing with actuaries who are working with models that are basically nonactuarial in nature. You know, engineering. . . . I had to become at least enough understanding about the models that I could assess the models, as to whether or not they were reasonable or not and whether or not the experts who had developed the models were experts in their fields.* Q. But you are not holding yourself out as an expert in PVC pipe or PVC pipe standards, are you? A. I am not." (emphasis added)).

─────────────────

21

the historical data (*i.e.*, the actual performance of the pipe at issue) and the non-historical data (*i.e.*, test data on other pipe),[59] and to develop a correct understanding of and properly apply models outside Mr. Lehmann's area of expertise.[60]  Mr. Lehmann failed to meet these basic standards.

Thus, as to the credibility assessment, Mr. Lehmann assigned 0% credibility to the historical data of Plaintiffs' pipe in service, despite admitting that he had ***never before*** assigned 0% credibility to the actual experience and 100% credibility to a predictive model.[61]  Moreover, his "first time" work was done only for and in the courtroom; Mr. Lehmann had never even heard of someone else doing so before.[62]  In addition, Mr. Lehmann incorrectly premised his entire analysis on the

---

[59] Ex. 15, Trial Ex. 20183 (Actuarial Standard of Practice No. 25 "Credibility Procedures") §§ 3.1, 3.2.

[60]  Ex. 16, Trial Ex. 20184 (Actuarial Standard of Practice No. 38 "Using Models Outside the Actuary's Area of Expertise") § 3.1.

[61] Ex. 1, Trial Tr. 5501:13–5502:10 ("Q. . . . Twenty-two years of experience – up to 22 years of experience, zero failures of pipe. You gave that zero weight, true or not? A. I've already answered that I gave it zero weight . . . . Q. Isn't it a fact that this is the first time in your entire career where you have, assigned all of the weight to predicted models, first time in your career? A. This is a very unique – and it's a – in a sense, it's a new product, and so in a new product, you have no subject experience so you have to apply 100 percent predictability [*sic*] to your other data. Q. . . . Isn't it a fact that this is the first time in your career of over 40 years that you've made a prediction -- made a prediction solely on the basis of predictive models? A. I've made predictions based on other data, but it's – I just haven't worked on that many new products that I would have had the occasion to base 100 percent. I know that others have, but I haven't. Q. So the answer to my question is this is the first time. A. It's the first time that I have relied on this . . . .").

[62] *Id.* 5502:19–5503:2 ("Q. Models that have been created ***solely for purposes of litigation***, not published in the open literature, but made solely for litigation. Are you aware of anybody who ever heard somebody who made predictions going out for decades solely based upon litigation models? . . . ***That's certainly something you've never heard of before. A. I just indicated that I haven't.***" (emphasis added)).

idea that Messrs. Paschal and Edwards's models predicted a rate of failure of J-M pipe, when they specifically disclaimed any such prediction.[63]

*Third*, the inputs in Mr. Lehmann's model were flawed assumptions, rendering his calculations unusable.  Mr. Lehmann admitted that he relied on the **assumption** that compliant pipe would last exactly 100 years and the assertion that J-M pipe would fail earlier.[64]  But, as Plaintiffs' experts acknowledged, there was **no data** to support a precise 100-year longevity for compliant pipe.[65]  Moreover, Mr. Lehmann stated that he had not been informed—and thus, his expert opinions failed to consider—what Plaintiffs' engineering experts admitted about 100 years.[66]

_____

[63] *See infra* n.73.

[64] Ex. 1, Trial Tr. 5614:6–15 ("Q. Based upon this assumption that 3830 compliant pipe will fail on average in 100 years, at that point in time, based upon that, given Paschal and Edwards' calculations for the strength of the J-M pipe, on average all of that pipe will necessarily fail in less than a hundred years. A. Yes. Q. Okay. So this assumption that all – all pipe, compliant pipe at 3830 will fail in a hundred years drives the fact of there being lesser lifetime for the J-M pipe, correct? A. Yes.").

[65] *Id.* 2699:23–25 (Paschal) ("Q. There's no data that even goes to 100 years, PVC pipe hadn't been around that long, correct? A. That's what I said, yes."); *id.* 1517:10–20 (Davis) ("Q. I want to ask you about a hundred years exactly, 100 years exactly. Is there anything in your report – is there anything in your report that points to research which shows that pipe, normal pipe, compliant pipe, standard pipe, is expected to fail at 100 years exactly? A. No. Q. In fact, in your deposition you said that is too fine a point. You can't say that there is data to say it is going to fail in a given year or after a given duration; correct? A. Correct."); *id.* 5514:7–11 (Lehmann) ("Q. . . . Tell me a single study, Dr. Folkman or anybody else, that says the average actual lifetime of compliant pipe is 100 years, no more, no less. Is there such a study? A. I'm not familiar with studies that say one way or the other."); *id.* 5617:21–5618:4 (Lehmann) ("Q. . . . I'm asking whether you can say that that is actually the correct number, 100 years? A. I don't think anyone can say with certainty about something that far in the future. Q. Did you get that down right? No one can say with certainty that far in the future; is that correct? Is that your testimony? A. That's my testimony.").

[66] *Id.* 5515:14–16 (Lehmann) ("Q. Do you know what these experts, Paschal, Edwards, and Davis, told this jury about 100 years? A. No.").

*Fourth*, Mr. Lehmann's predictions based upon the engineering models were **contradicted** by real-world experience.  Pursuant to Mr. Lehmann's model, Plaintiffs should have experienced multiple pipe failures by now.[67]  But Plaintiffs' representatives testified that they experienced **no failures** of the pipe at issue to date.[68]  Mr. Lehmann had no answer to this problem, and so, he retreated to the position that it was "too early" to validate his longevity predictions.[69]  Of course, this effectively abandoned the data and the models that were the sole support for his

---

[67] *Id.* 5642:9–17 (Lehmann) ("Q. In the case of Mr. Paschal's 3830 average failure 22 years, isn't it a fact that, roughly, according to his data, 18 percent of plaintiff's pipe should already have failed by today? . . . A. My recollection was it was 14 percent."); *id.* 5643:17–22 ("Q. And you've told us that if you take a look at the test data and you – all that test data for Mr. Paschal you determined for each data point or the data, how long the pipe would actually last, the answer is that 14 percent of it should have failed by today, right? Based on his data. A. Right.").

[68] *Id.* 4287:25–4288:2 (Calleguas) ("Q. . . . Has Calleguas experienced any failure in the Lake Bard project to date since 2003? A. No."); *id.* 1315:17–20 (Norfolk) ("Q. And there have been no failures of any of the sticks of any of the pipe in these projects at issue in this case, correct, Mr. Speer? A. There have been no failures. That's correct."); *id.* 1818:11–14 (Palmdale) ("Q. And in all that time since the J-M pipe was first installed in 1998, there have not been any failures of the J-M pipe in these eight projects; correct? A. Not to date."); *id.* 2066:8–11 (Reno) ("Q. And Reno has never experienced any failures in either of these two projects, once they have been placed in service, correct? A. Yes."); *id.* 1924:3–6 (Reno) ("Q. There have been no failures of the pipe since it was replaced and placed in service; correct? A. Correct."); *id.* 1133:9–12 (South Tahoe) ("Q. With respect to the J-M pipe in these 13 projects, the district has not experienced any failures, correct? A. In reference to the 13 projects, to my knowledge, no, there's been no leaks or failures in the pipe.").

[69] *Id.* 5650:18–20 ("Q. There's no data in the real world of the plaintiff's pipe that validates the prediction, correct? A. It's too early."); *id.* 5454:16–19, 5455:6–10 ("A. . . . And it's very premature to estimate what these will be, but this is the best estimate based on the information that I got from Mr. Paschal and Mr. Edwards. . . . Q. You just said – it's a fair statement to say that these estimates – very premature to be making these statements does [*sic*] you don't have enough data or experience, true? A. I don't have enough data or experience with the plaintiffs.").

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

calculations and opinions, which ran contrary to the real-world results.[70]  Mr. Lehmann's damages proofs were thus untethered to reality, rendering the calculation unusable as a matter of law.[71]  Because an expert "model is helpful only if it is predictive; if it cannot be predictive . . . then it fails in its purpose," this unreliable expert evidence is insufficient to support any verdict for Plaintiffs as a matter of law.[72]

*Fifth*, while Mr. Lehmann purported to rely upon the engineers' work to predict the longevity of Plaintiffs' pipe, ***those same engineers testified that they could make no predictions or analysis as to Plaintiffs' pipe***, as described further below.  Thus, there was a complete lack of evidence regarding the physical

---

[70] *Id.* 5647:4–11 ("Q. As we sit here today, what kind of credibility did you give to the actual experience of this pipe in the first 16 years of use? Based upon your data, do you give it zero credibility or do you give it 100 percent credibility? A. As I explained, I considered that data, and I didn't give it any numerical percentage because it's way too early to be – way too early to be using that subject experience to make an estimate.").

[71] *See Crescenta Valley Water District v. Exxon Mobile Corp.*, No. CV 07-2630-JST (ANx), 2013 WL 12116333, at *4 (C.D. Cal. Jan. 8, 2013); *see also Circle C Const.*, 813 F.3d at 617 ("Actual damages by definition are damages grounded in reality.").

[72] *See Weisgram*, 528 U.S. at 454 (holding that "inadmissible evidence contributes nothing to a legally sufficient evidentiary basis," and affirming judgment as a matter of law under Rule 50 because expert evidence introduced at trial was unreliable and therefore inadmissible, and the remaining properly admitted evidence was insufficient to support a verdict (quotations omitted)); *Brooke Grp.*, 509 U.S. at 242 (affirming judgment as a matter of law in favor of defendant and noting that "[w]hen an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."); *Crescenta Valley*, 2013 WL 12116333, at *4 (holding that expert model that is not predictive must be excluded under *Daubert* as unreliable); *02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1076–77 (N.D. Cal. 2005) (holding that "[d]amages do, however, need to rest on a 'reasonable basis,'" and granting judgment as a matter of law when jury's award of unjust enrichment damages had no reasonable basis in light of the trial evidence (quoting *Tri-Tron Int'l v. Velto*, 525 F.2d 432, 436 (9th Cir. 1975)).

1  properties of Plaintiffs' pipe or the conditions of its use that would impact longevity,

2  rendering Mr. Lehmann's analysis entirely unsupported.[73]

3      Each of the foregoing failures are classic, fatal *Daubert* problems that render

4  Plaintiffs' expert case entirely unreliable as a matter of law.[74]

5      *Finally*, Plaintiffs disclaimed all of Mr. Lehmann's evidence in closing:

6      MR. HAVIAN: . . . Mr. Lehmann's report was about insurance,
       doesn't have anything to and [sic] the present value of replacing pipe
7      in the future.  The question before you is what is the value of the pipe
       we got? . . . *[T]he experts who testified here, it's true they made*
8      *predictions about when the pipe would fail.  You can set those to one*
       *side if you like, and certainly Mr. Lehmann had nothing to do with*
9      *any of these* . . . .[75]
10

11          **2.    Plaintiffs' engineering experts failed to prove the longevity of**

12              **compliant pipe in use, of J-M pipe made from 1996-2006, or**

13              **of Plaintiffs' pipe**

14      *First*, it was undisputed that predicting pipe longevity in service requires

15

16  _____

[73] Ex. 1, Trial Tr. 2424:18–24 (Paschal) ("Q. Well, to be clear, you have not done
17  a specific analysis of plaintiffs' pipe; correct? A. That's correct."); *id.* 3092:7–10,
18  13–18 (Edwards) ("Q. I don't see anything in your report that makes any predictions
    with respect to the pipe these—these plaintiffs have. Am I right about that? A. Yes,
19  there are no specific predictions. . . . Q. Mr. Paschal told us that you would need an
20  awful lot more information to predict rates of failure for actual pipe in use. Do you
    disagree with that? A. No, I agree with that. Q. That's true of your work, too,
21  correct?  A. Yes.").

22  [74] *See Tyger Constr. Co. Inc. v. Pensacola Constr. Co.,* 29 F.3d 137, 142 (4th Cir.
23  1994) ("An expert's opinion should be excluded when it is based on assumptions
    which are speculative and are not supported by the record."); *In re Silicone Breast*
24  *Implants*, 318 F. Supp. 2d 879, 889–90 (C.D. Cal. 2004) ("[A]ny step that renders
    the expert's analysis unreliable renders the expert's testimony inadmissible. This is
25  true whether the step completely changes a reliable methodology or merely
26  misapplies that methodology." (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d
    717, 745 (3d Cir. 1994))).
27
    [75] Ex. 1, Trial Tr. 6714:5–8, 6715:13–17.
28

analysis of field conditions affecting pipe after installation.[76]  The applicable standards make it equally clear that long-term strength does not predict actual lifetime in the field.[77]

Second, Plaintiffs nowhere proved the actual lifetime of compliant pipe.  Dr. Davis initially said in his report that it was 100 years, but his testimony at trial was far less definite: "at least" 50 years, but it "could easily be a hundred or more."[78]

_____

[76] Ex. 14, Trial Ex. 20170 at § 5.5 (ASTM D2837) ("*Hydrostatic Design Stress*— Obtain the hydrostatic design stress by multiplying the hydrostatic design basis by a service (design) factor selected for the application on the basis of two general groups of conditions.  The first group considers the manufacturing and testing variables, specifically normal variations in the material, manufacture, dimensions, good handling techniques, and in the evaluation procedures in this test method and in Test Method D 1598 (Note 8). ***The second group considers the application or use, specifically installation, environment, temperature, hazard involved, life expectancy desires, and the degree of reliability selected*** (Note 9)." (emphasis added)); Ex. 1, Trial Tr. 1490:3–14 (Davis) (Q. "Okay. ***Operational stresses***. So, now we are not just dealing with the pipe in the laboratory under controlled conditions. We are doing pipe that is outside of the laboratory. It is being moved to the site. It is being installed in the ground. It is being covered over, and then it is subjected to whatever kinds of stresses it may see during the course of it lifetime; correct? A. Correct. Q. It is a much more complicated – it is a much more complicated thing to analyze; correct? A. ***The stress field is more complicated than a single source from internal pressure.***" (emphasis added)); *id.* 2916:15–18 (Edwards) ("Q. . . .  [N]ow, do you know exactly how long, without any more information, this pipe will last? A. No, you would need to know the stresses that it's under during its time in service.").

[77] Ex. 14, Trial Ex. 20170 at §§ 1.6, 7.1 (ASTM D2837); Ex. 20, Trial Ex. UL-21 (PPI TR-3, Note 5) at 4 of 92 ("The performance of a material (or a piping product made with that material) under actual conditions of installation and use is dependent upon a number of other factors and conditions which are not addressed in this report.").

[78] Ex. 1, Trial Tr. 1499:24–1500:5 ("Q. Now, this [50] to 200, can you state to a reasonable degree of certainty today – let's just take J-M pipe from 1996 to 2006. Can you state to a reasonable degree of certainty when that will – what its estimated lifetime is? A. No. Beyond the – I expect at least 50 years. Could very easily be a hundred or more.").

Mr. Paschal and Mr. Edwards made no estimate.[79]  Dr. Folkman's testimony, based on his actual testing experience, that pipe in the field may last up to 200 years went unrebutted.[80]  By closing, Plaintiffs had abandoned hope of proving a lifetime for compliant pipe, telling the jury they could just pick one.[81]

*Third,* in place of actual data and expert opinions on actual lifetime, all of Plaintiffs' experts who sought to prove the reduced lifetime of J-M pipe simply assumed 100 years exactly as the lifetime of compliant pipe.  This was an explicit "assumption."[82]  Mr. Paschal acknowledged that his calculation required him to pick a number,[83] that industry expectations varied,[84] and that he did not consider

---

[79] *Id.* 2700:7–17 (Paschal) ("Q. . . . You don't actually express an opinion on the question of how long pipe that complies to standards actually will last, ***there is no such opinion in your report, true? A. I don't believe so, no.***" (emphasis added)); *id.* 3008:16–21 (Edwards) ("Q. Do you also need to ***assume***, or did you in this case ***assume*** a benchmark level of how long compliant pipe would last? Yes." (emphasis added)).

[80] *Id.* 4628:10–14 ("A. How long a pipe is going to last is really difficult to estimate because of the many variables involved; however, my personal opinion is a properly manufactured and properly installed pipe, based on what we know, could easily reach 200 years of life.").

[81] *Id.* 6715:21–23 ("MR. HAVIAN: . . . Now, you can quarrel with a hundred years and say, Well, maybe they were wrong; maybe normal pipe will last 125 years or 150 years.").

[82] *Id.* 2688:22–2689:7 (Paschal) ("Q. . . . [I]n your analysis of service life, your benchmark for what was required of the pipe was that with an HDB of 4,000 psi is pipe . . . would have 100 – a 100-year service life, right? A. ***That was the assumption I made, yes***. Q. Okay.  Come back to that word. It's a pretty important word. ***That was an assumption, right? A. Yes, the basis for the – the basis for the requirement for the service life calculation, yes***." (emphasis added)); *id.* 3008:16–21 (Edwards) ("Q. Do you also need to ***assume***, or did you in this case ***assume*** a benchmark level of how long compliant pipe would last? A. Yes. Q. What was that? A. 100 years.").

[83] *Id.* 2689:8–12 ("Q. And am I right that it was the HDB pipe with an HDB that met the requirement of 4,000 psi would have a 100-year service life exactly? A. ***Yes, as far as the calculations, it requires a fixed number so that was 100 years, yes.***"

---

Plaintiffs' expectations.[85]  Dr. Davis also testified that there was no support for this assumption.[86]  Mr. Edwards pointed to no data of 100 years—he simply assumed this number based on "industry claims" of 100 years at a minimum, and ***disclaimed*** any support for 100 years exactly.[87]  Mr. Lehmann could not support 100-year longevity with any data either.[88]

*Fourth,* both Mr. Paschal and Mr. Edwards further "assumed" that an HDB

_____

(emphasis added)).

[84] *Id.* 2693:5–13 ("Q. Okay. Now, let's go back to the question of HDB equals 100-year service life. Recognizing that it's difficult, is it true that if you look through different sources of information, people have different opinions on how long compliant pipe should last? A. As I mentioned, the ones we looked at yesterday, there were quite a few that used the 100-year figure; I'm sure there are other people that might have other opinions.").

[85] *Id.* 2693:21–23 ("Q. Did you make any effort to find out what the plaintiffs in this case actually thought the expected life would be? A. No, I did not.").

[86] *Id.* 1517:10–20 ("Q. I want to ask you about a hundred years exactly, 100 years exactly. Is there anything in your report – is there anything in your report that points to research which shows that pipe, normal pipe, compliant pipe, standard pipe, is expected to fail at 100 years exactly? A. No. Q. In fact, in your deposition you said that is too fine a point. You can't say that there is data to say it is going to fail in a given year or after a given duration; correct? A. Correct.").

[87] *Id.* 3008:16–3009:2 ("Q. Do you also need to ***assume***, or did you in this case assume a benchmark level of how long compliant pipe would last? A. Yes. Q. What was that? A. 100 years. Q. Why did you choose that number? A. The industry . . . claims a hundred years life for their pipe, ***at a minimum***. . . . It's pretty widespread in Europe, as well, a claim of at least a hundred years lifetime for PVC pipe that is compliant." (emphasis added)); *see also id.* 3009:10–12 (Edwards) ("***Q. Now, are you asserting that it will be a hundred years on the money? A. No.***" (emphasis added)).

[88] *Id.* 5514:7–11 ("Q. . . . Tell me a single study, Dr. Folkman or anybody else, that says the average actual lifetime of compliant pipe is 100 years, no more, no less. Is there such a study? A. ***I'm not familiar with studies that say one way or the other.***" (emphasis added)).

rating of 4000 psi (3830 psi minimum) equated to a service life of 100 years.[89]  They admitted that this too was not in any standard or method, and that the Plastic Pipe Institute (PPI) (which certifies compliance with the applicable standard) disagreed with their approach.[90]  Indeed, it was undisputed that their approach conflicted outright with the express terms of AWWA C900/905 and ASTM D2837, as described in the unrebutted testimony of Mr. Ferry.  Mr. Ferry explained that an HDB of 4000 psi, coupled with the safety factor incorporated in D2837, contradicts any notion that pipe with an HDB of 4000 psi is expected to fail in 100 years.[91]

---

[89] *Id.* 3086:16–21 (Edwards) ("Q. And now on the service life side, you have the further opinion that the strength required for pipe or the strength of the pipe if it has an HDB of 4,000 PSI is a hundred years, right? A. Yes, that if it has an HDB of 4,000, it would last a hundred years reasonably."); *id.* 2689:8–12 (Paschal) ("Q. And am I right that it was the HDB pipe with an HDB that met the requirement of 4,000 psi would have a 100-year service life exactly? A. Yes, as far as the calculations, it requires a fixed number so that was 100 years, yes.").

[90] Ex. 20, Trial Ex. UL-21 (PPI TR-3) at 4 of 92 ("The term '50-year strength value,' as used in ASTM D2837, is a mathematical extrapolation that is useful in the context of developing an HDS or HDB.  *It does not constitute a representation that any material with such a value will perform under actual use conditions for that period of time.*" (emphasis added)); Ex. 1, Trial Tr. 2694:9–2695:6 (Paschal) ("Q. But in point of fact the standards themselves, there is no standard that requires a certain service life, right? True or not? A. Specifically within the standards we've been discussing today, that's correct. . . . Q. . . . . [B]ut there is no statement in the standard that says 50 years, 100 years, 200 years, 75 years, correct? A. I think the only statement in the standards would be in reference to doing the extrapolation to 50 years in P[P]I TR-3 where it says that is not necessarily intended to mean that's the useful life of the pipe."); *id.* 3087:1–6 (Edwards) ("*Q. Okay. Now, in point of fact, is it true that according to PPI TR3, that is according to the PPI technical guidance that is used to certify an HDB of 4,000 PSI, according to them, long-term HDB values are not an actual prediction of actual longevity, correct? A. Yes, that's in the TR3.*" (emphasis added)).

[91] Ex. 1, Trial Tr. 5910:9–13 ("Q. In a hundred years, would the rupture stress at operating pressure -- would the operating pressure or the stress rupture number, the LTHS, would they be at all close together or -- if you still have safety factor? A. There is an abundant safety factor there.").

1  Assuming such a short lifetime requires sharply "bending" the regression line down
2  to produce a grossly premature failure.[92]

3      *Fifth*, Plaintiffs' experts admitted that they could not even state the longevity
4  of J-M pipe made from 1996–2006 with a reasonable degree of certainty.  Thus, Dr.
5  Davis admitted that the estimated lifetime of J-M pipe from 1996–2006 could not be
6  stated with a "reasonable degree of certainty," and Plaintiffs' expert engineers
7  agreed with this.[93] Instead, Plaintiffs' experts simply assumed that compliant pipe
8  would fail in 100 years and sought to show only that the reduced strength of J-M
9  pipe would translate directly into reduced longevity.  No account was taken of other
10  potential causes of future failure arising from stresses in use.[94]  Mr. Edwards in his

11  _____

12  [92] *Id.* 5913:3–10 ("Q. . . . *I will take it from a hundred thousand hours to 150*
13  *years*. Is there any way you could get to a must fail during that period of time and
   remain consistent with the ASTM method and the AWWA standard? . . . [A.] You
14  can't. *You can't get there. You have to ignore the safety factor.*" (emphasis
   added)).

15  [93] *Id.* 1499:24–1500:5 (Davis) ("Q. Now, this [50] to 200, can you state to a
16  reasonable degree of certainty today – let's just take J-M pipe from 1996 to 2006.
   Can you state to a reasonable degree of certainty when that will – what its estimated
17  lifetime is? A. No. Beyond the – I expect at least 50 years. Could very easily be a
   hundred or more."); *id.* 2701:2–16 (Paschal) ("Q. . . . Taking J-M pipe from 1996 to
18  2006, [Mr. Davis] was asked whether he could state to a reasonable degree of
   certainty when that will – what its estimated lifetime is. 'Can you state to a
19  reasonable degree of certainty what its estimated lifetime is?' His answer was, 'No,
20  I expect at least 50 years, could very easily be 100 or more. 'But when failures
   would start to occur, you would see a distribution of failures, a rate increase.' Do
21  you agree with him that you cannot state to a reasonable degree of certainty when J-
22  M pipe will fail beyond his expecting at least 150 – 100 to 100-plus years? A. Well,
   based on the variability of the test data in that time period I don't think we can state
23  that because was there a high degree of variability.").
24

25  [94] *Id.* 2692:24–2693:4 ("Q. . . . In fact, isn't it true that your analysis, this analysis
26  here, where you say all of these numbers come down, all these numbers, none of
   this, none of these estimates, all is based on pipe and water pressure. None of it
27  considers all the other factors that are involved in service life, correct? A. *That's*
   *correct.*" (emphasis added)).
28

report looked at post-installation stresses generally, but his report did not quantify any reduction of longevity for J-M pipe, and he was not permitted to introduce such new analysis at trial.[95]  He too simply assumed that compliant pipe would fail in 100 years, and that J-M pipe would fail sooner due to lower strength.[96]

*Sixth,* as to Plaintiffs' pipe specifically, Mr. Lehmann alone opined on shortened longevity, relying solely on the work of the engineers.[97]  But those same engineers disclaimed any opinion on Plaintiffs' pipe because they had not done any work with respect to Plaintiffs' pipe.[98]

At bottom, Plaintiffs' damages calculations were a classic shell game, except there was no pea after all the maneuvering.

---

[95] S*ee id.* 3009:13–23 ("Q. You mentioned in-service stresses. Just can you explain a little bit more how the in-service stresses that you talked about before relate to the hundred-year benchmark that you selected.  A. Well, the range of stresses that I have in my report, the middle range is like 3,420 PSI. Actually, if you look at -- MR. BERNICK: Objection. This is the issue, Your Honor. It's a hundred years, but now we are getting numbers assigned -- we are building up to a percentage that is represented by those stresses. THE COURT: I'll sustain the objection."); *see also id.* 2937:2–10.

[96] *Id.* 3017:9–19 ("Q. . . . Okay. So back here in your estimation, pipe that – from J-M – from J-M that has this 7068 number will not meet HDB, correct? A. Correct. Q. All right. Is such pipe at a much greater risk of failure? A. Yes. Q. Can it reasonably be anticipated that such pipe will exhibit lifetimes under 100 years when exposed to normal in-service stresses? A. Yes.").

[97] *Id.* 5446:11–19 (Lehmann) ("Q. They were not asked to issue an opinion on plaintiff's pipe specifically, correct? A. I don't think they were asked that directly, no. Q. So they provided a lot of information to you and analysis, but they didn't actually do this work; you did this work on plaintiff's pipe, correct? You used what they did to look at plaintiff's pipe, right? A. It's correct.  I used their work and applied it to the plaintiff's pipe, yes.").

[98] *Supra* n.73.

### 3.   Plaintiffs failed to prove a mathematical relationship between short-term testing, long-term strength, and longevity

Per the Court's Phase 2 jury instructions, the Phase 1 jury found that the three short-term tests addressed in Phase 1—Quick Burst, Abbreviated HDB, and Longitudinal Tensile Strength—"bear a relationship" to the long-term strength of pipe generally.[99]  Plaintiffs' damages proofs, however, were premised on a more specific and demanding connection, *i.e.*, that short-term strength tests can actually be used to calculate long-term strength (as defined by ASTM D2837) and then longevity.  Plaintiffs failed to prove such a relationship with reliable evidence under *Daubert*, and their damages model failed as a result.

Plaintiffs' lengthy re-litigation of J-M's historical views on the relationship between Quick Burst test results and HDB turned out to be entirely irrelevant.  Each of the J-M witnesses Plaintiffs called did testify to a "general" relationship, but also testified that no "correlation" or mathematical relationship of the kind Plaintiffs' damages model required had ever been found.  Lenor Jang admitted that there was insufficient data and it was an open question.[100]  Will Fassler said the same thing.[101]

---

[99] Dkt. 2756 (Updated Final Jury Instructions) at 2.

[100] Ex. 1, Trial Tr. 3158:16–20 ("Q. And as you said earlier, that study was never done, or at least it was never completed in order to get that proof confirming there was some correlation between Quick Burst and HDB, correct? A. As far as I know."); *id.* 3161:12–15 ("Q. So it's fair to say as of this time, whether the higher 7200 Quick Burst number was actually required in order to pass HDB, was ***still an open question, still unresolved? A. Yes.***" (emphasis added)).

[101] *Id.* 4223:13–15, 4224:1–8 ("Q. . . . [D]id you at this point in time believe that there was data that actually demonstrated this correlation that you were looking for? . . . [A]. ***There was no systematic data to provide a basis for that.***  [Q]. Could you tell us whether there was any disagreement – as you understood it in your internal R&D group, did you understand that there was any disagreement on that point? A. No. There was no disagreement on that that deserved further study.").

1   Even K.C. Yang ultimately conceded the same.[102]

2          Plaintiffs' experts similarly failed to establish a mathematical relationship

3   between Quick Burst and HDB.  Dr. Davis admitted he was unaware of any such

4   correlation.[103]  Mr. Paschal acknowledged his Phase 1 testimony that the

5   relationship between Quick Burst and HDB was general and that there was no

6   mathematical calculation linking the two.[104]  The only evidence of such a

7   relationship came from Mr. Edwards, but he admitted that: (1) he too was unaware

8   of any mathematical relationship before his work on Phase 2;[105] (2) his methodology

[102] *Id.* 3669:22–3670:13 ("Q. Would you agree with me, Mr. Yang, that you cannot use Quick Burst to mathematically predict long-term strength? A. ***In general I agree with that, yes.*** Q. And you are not here to tell the jury that you know how to do that, are you? A. ***Mathematically, no.*** Q. You are not here to tell the jury that you can take a regression line from Quick Burst in some way and calculate an HDB or a long-term strength, right? A. ***No, you cannot.*** Q. You haven't seen anything, you haven't seen anything in all of the work that you've done over the years with the lawyers and with everybody else, and at JM, you've not seen anything that enables somebody to take Quick Burst tests and mathematically predict long-term strength, fair? A. ***That is a fair statement, it's not mathematically relationship.***" (emphasis added)).

[103] *Id.* 1472:8–12 ("Q. As a polymer scientist, is there a mathematical correlation between the change in the Quick Burst test and the level or the number of the amount of the HDB, mathematical correlation? A. I don't know as we sit here right now.").

[104] *Id.* 2365:23–2366:9 ("'Q. And you have never seen any sort of mathematical correlation between the Quick Burst value of pipe and its HDB; correct? 'A. It is more of a general relationship. There is not a direct mathematical equation that you use.' Next question: 'Q. You are not aware of any mathematical correlation between Quick Burst value of pipe and HDB; correct? 'A. As I said, it is more general than that in terms of running the Quick Burst and using that to determine your HDB as you start the testing, but it is not a direct mathematical formulation.'"); *id.* 2364:12–14 ("A. . . . [I]n the absence of any other information then there would not be a direct mathematical relationship.").

[105] *Id.* 3023:14–18 ("Q. Well, isn't it true that in this case, you just told on direct examination that all you knew about the relationship between Quick Burst and HDB before was that there was a general relationship, right? A. Yes.").

was done solely for the courtroom;[106] (3) his methodology could not be found in any publication;[107] and (4) both the ASTM and the AWWA had rejected such a relationship.[108]  Mr. Edwards also admitted that the Miner's Rule conversion of Quick Burst results to sustained pressure ruptures, which was central to his analysis, was not in the ASTM methods for PVC,[109] and he pointed to no other support.

---

[106] *Id.* 3078:4–8, 3078:17–20 ("Q. And the idea that you could take a twice-borrowed slope, extend it in both directions, attach it to a Miner's Rule converted Quick Burst result, and come up with a reduced HDB, that is the calculation that no one ever has done before, to your knowledge, correct? . . . *[M]y question really is: That is something you can't find anywhere outside of this courtroom, correct? A. That's correct.*" (emphasis added)).

[107] *Id.* 3023:3–6 ("Q. And, again, the calculation was a calculation that you had never done before; it wasn't published anywhere, it wasn't in any standard; it was new, right, Mr. Edwards? A. *Yes, I believe so.*" (emphasis added)); *id.* 3022:1–6 ("Q. . . . With all of the steps that you did an presented to the jury, you can't find it in any – published – published anywhere? A. *Well, it's true that you wouldn't find all of those steps put together for a particular analysis in any publication, yes.*" (emphasis added)).

[108] *Id.* 3038:22–3039:2 ("Q. Actually, there is an ASTM Standard 1599 that specifically talks about . . . the relationship between Quick Burst and HDB, correct? A. There is a statement in that standard, yes. Q. And it says "Generally not indicative," right? A. Yes."); *id.* 3045:20–23 ("Q. . . . Your testimony about the relationship or what you do in relating Quick Burst to HDB is not in AWWA C900, right? A. That's correct."); *id.* 3050:24–3051:11 ("Q. . . . Your calculation of Quick Burst for HDB is not accepted, right? A. It's not in the standard. Q. It's not accepted, right? A. Yes, it's not accepted as part of the standard. Q. It's not accepted by any organization, any standards organization, correct? A.  It's not in any standard. Q. It's not accepted by any methods organization, right? . . . [A]ny organization like ASTM that does methods, your method is not accepted by them, correct? A. My method in total is not, yes."); Ex. 13, Trial Ex. 6708 (ASTM D1599) at § 4.1 ("They are generally not indicative of the long-term strength of thermoplastic or reinforced thermosetting resin pipe, tubing, and fittings."); Ex. 19, Trial Ex. 33024 (AWWA Manual M23, PVC Pipe—Design and Installation) at 66 of 181 ("Design for long-term, stead-state operating conditions based upon the short-term strength of PVC pipe would be inappropriate.").

[109] Ex. 1, Trial Tr. 3065:21–23 ("Q. Miner's Rule has never been adopted for PVC

---

35

Plaintiffs' evidence regarding Longitudinal Tensile Strength (LTS) and HDB failed to even address, much less prove, any calculational relationship.  Dr. Davis said that he would expect some relationship, but he did nothing to prove one existed, let alone show that it was calculational.[110]  Mr. Edwards acknowledged merely a "general" relationship.[111]  Unsurprisingly, Plaintiffs' own models confirmed that no calculational relationship exists—their experts did not rely on LTS tests to generate any damages number whatsoever.[112]

Absent legally sufficient proof of a calculational relationship between Quick Burst or LTS test results and the HDB of pipe, the damages theories Plaintiffs pursued at trial failed as a matter of law.

The same failure of proof extends to the ultimate question of reduced longevity in the field.  Plaintiffs' engineers did not even proffer a reliable method

_____

pipe by either ASTM or AWWA, is that true or not? A. That's true. It's not been adopted by them."); *id.* 3077:7–9 ("Q. Except that this, too, is something that you can't find in the ASTM methodology, correct? A. That's right.").

[110] *Id.* 1442:8–11, 19–22 ("Q. . . . [I]s there a relationship between the diminution in the longitudinal tensile strength test and long-term strength and durability? A. . . . If you have a decrease in one, the longitudinal tensile strength, I would expect a corresponding decrease in the long-term properties as well.").

[111] *Id.* 2911:10–13 ("Q. . . . What is your understanding of the relationship between longitudinal tensile strength and long-term strength and durability? A. Well, I think there's still a general relationship . . . .").

[112] *Id.* 2360:14–18 (Paschal) ("Q. And the longitudinal tensile strength that you focused on with the jury, that is not part of that calculation, is it? A. . . . It is not directly used in the calculation."); *id.* 2360:5–8 (Paschal) ("Q. In your calculations of reduced strength. You calculate reduced strength, and in doing so you do not use longitudinal tensile strength; correct? A. For the HDB analysis, no, I did not."); *see also id.* 1467:12–14 (Davis) ("Q. You are not an expert in UL 1285? A. I don't consider myself an expert of standards in general, that's correct."); *id.* 5660:20–23 (Lehmann) ("Q. Am I correct that none of your calculations are based upon longitudinal tensile strength tests, true? A. My calculations are based on the HDB tests and the quick-burst tests.").

for predicting actual longevity in the field from any of the short-term strength tests (including abbreviated HDB).  Mr. Paschal admitted that the abbreviated HDB tests he used could not be used to establish a final HDB under the standards, and that the standards regarding HDB did not tie out to a specific longevity.[113]  Neither Mr. Paschal nor Mr. Edwards tied the tests to the longevity of Plaintiffs' pipe at all. The only witness who purported to do any of that was Mr. Lehmann.

## IV.   THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF LAW NOTWITHSTANDING PLAINTIFFS' CLAIM DURING CLOSING FOR THE COST OF REPLACEMENT OF ALL THEIR PIPE TODAY

After four years of litigating their damages claims based upon reduced longevity and pursuing those claims for more than four weeks at trial, Plaintiffs abruptly abandoned these theories in their closing and asked the jury to award damages based on a theory of recovery the Court had previously foreclosed—*i.e.*, *the pipe costs associated with replacing all of Plaintiffs' pipe now*.[114]  In doing so,

---

[113] *Id.* 2747:7–13 ("Q. All the data that you're talking here, let's be real clear -- you are talking solely -- you are relying solely on tests that never ran as long as they had to in order to produce the E-10 rating which was necessary for permanent certification, correct? These are all abbreviated, abbreviated tests; they are not E-10, true or not? A. That's correct."); *id.* 2694:9–13 ("***Q. But in point of fact the standards themselves, there is no standard that requires a certain service life, right? True or not? A. Specifically within the standards we've been discussing today, that's correct.***" (emphasis added)).

[114] Ex. 1, Trial Tr. 6639:9–6640:7 ("MR. HAVIAN: . . . [W]e want the money back. How much is that? . . . $2.1 million, 2.171.  You can write that down if you like, you can write these numbers down. This document won't go into the jury room with you, but there will be a document that will show you project by project, but ***this is in 2016 dollars.*** The numbers you'll see in the jury room are 2000 -- 1996 to 2007, that's that one point, like a $1.2 million figure, that's the original price when they bought the pipe over a decade ago. ***These are the numbers that reflect the -- what it would cost in 2016 to buy that pipe.***  We're now in 2018, so we've got a couple years even on that. ***But at a minimum, at a minimum, we should get the 2016***

Plaintiffs brazenly disregarded their own evidence (that only a proportion of Plaintiffs' pipe would fail prematurely), the jury instructions, and the Court's rulings.  And they went further, asking the jury to award, without regard to the benefits Plaintiffs had received, the full cost of replacing all the pipe immediately.[115] J-M did not even have adequate opportunity to address in discovery Plaintiffs' revived and revised theory.[116]

_____

*price of that pipe back.  We should get our money back.*" (emphasis added)); *id.* 6712:6–10 ("MR. HAVIAN: . . . So when you go to -- we don't know yet what your verdict form will look like, but just in case it requires you to put in the dollar value for each project you're awarding damages on, this is the document you'll be looking for, Exhibit 31281-E.").

[115] *E.g.*, *id.* 6431:12–24 ("MR. HAVIAN:  Your Honor, I want to make sure that we are not being unclear about something. ***We are going to argue for the full contract price and present dollars based upon the fact that it has no value to us.  And their burden is to show offset.  THE COURT: Well, no.  Actually that is not their burden to show offset.  It is the burden on the government to show damages.***" (emphasis added)).

[116] This was a clear violation of J-M's due process rights.  *See, e.g.*, *Roberts v. Ariz. Bd. of Regents*, 661 F.2d 796, 798 (9th Cir. 1981) (affirming the district court's "specific finding of prejudice to the opposing party, noting that the [new theory] was raised at the eleventh hour, after discovery was virtually complete"); *Mauro v. S. New Eng. Telecomms., Inc.*, 208 F.3d 384, 386 n.1 (2d Cir. 2000) (affirming the district court's preclusion of a new theory of liability raised for the first time during summary judgment briefing); *ING Bank v. Am. Reporting Co., LLC*, 859 F. Supp. 2d 700, 704 (D. Del. 2012) ("To allow plaintiff to alter its theory of the case [two weeks before trial] would unduly prejudice the defendant by forcing it to prepare to defend against a new theory of the case after discovery has been completed."); *Sharkey IRO/IRA v. Franklin Res.*, 263 F.R.D. 298, 302 (D. Md. 2009) (denying plaintiffs' motion to add a new theory of the case after discovery was essentially complete because it resulted in prejudice to the defendants); *Browder v. General Motors Corp.*, 5 F. Supp. 2d 1267, 1274 (M.D. Ala. 1998) (granting motion to strike new theories where new theory not disclosed until fifteen days before discovery deadline and defendant could not "possible [*sic*] prepare to defend these new theories in such a short time frame").

### A.  Plaintiffs Abandoned Their Claim for the Present Cost of Replacement Pipe in the Face of the Court's Rulings, and It Conflicted with the Case Plaintiffs Tried

As discussed above, the Court ruled before trial that Plaintiffs could not recover the cost of replacing all of Plaintiffs' pipe today where there was no threat of imminent failure or other hazard to public health.[117]  Plaintiffs responded by abandoning that claim.[118]  At trial, Plaintiffs presented no such evidence.  Indeed, Plaintiffs' evidence said the opposite—that only a proportion of Plaintiffs' pipe was predicted to fail, years in the future.  The jury instructions regarding their claims were in accord:  Plaintiffs' claim was solely for damages based upon reduced

---

[117] *See* Dkt. 2494 (June 21, 2018 *Daubert* Ruling) at 19 ("Though Plaintiffs can only receive damages under this damages theory [i.e., replacement costs] if they can prove to the jury that these costs are a reasonable means of placing Plaintiffs in the position they would have been in but for Defendant's misrepresentations, the court does not see a reliability issue in Cathcart's opinion meriting exclusion vis-à-vis *Daubert assuming Plaintiffs can show a likelihood of failure between six months to two years.*" (emphasis added)); Dkt. 2538 (Aug. 2, 2018 Tentative) at 8 (adopting as final relevant section of June 21 Order); Ex. 10, Hr'g Tr. 68:22–69:6 (Sept. 21, 2018) ("THE COURT: . . . Because, again, in those situations where you have extraordinary amounts that are charged against the defendant, it is because of the *situations where it is, you know, life-threatening*. But you guys do not have any, that I see, actual statements of danger -- an imminent danger of a failure." (emphasis added)); Ex. 11, Hr'g Tr. 166:12–21 (Oct. 3, 2018) ("THE COURT: . . . Again, I have indicated that under the benefit of the bargain theory, the type of situation where the person gets over and above the contract price of the item and treble damages from that, there are no cases that talk about other types of tangential situations, with the exceptions of where it is a *threat to life and limb* or something of that sort. And so, again -- and *we obviously don't have that here*." (emphasis added)); *see also* Dkt. 2688 (Oct. 9 Benefit of the Bargain Ruling) at 3.

[118] *E.g.*, Ex. 9, Hr'g Tr. 40:16–20 (Sept. 11, 2018) ("MR. [HAVIAN]: Your Honor, the – one thing I should make clear: We've heard the court's rulings on full replacement costs, in other words, *replacing all the pipe even not predicted to fail. We're not going to continue to pursue that*; we disagree with the court's ruling." (emphasis added)).

longevity.[119]  Plaintiffs' demand for the pipe costs associated with replacing all the pipe today was thus barred by the law and the Court's rulings, and entirely unsupported by the trial record.

### B.   Plaintiffs' Evidence Was Legally Insufficient To Support Their Claim for the Present Cost of Replacement Pipe

Plaintiffs also failed to satisfy their burden of proving that the benefit they received from their pipe was less than what they bargained for.  The law and the Court's instructions were clear that Plaintiffs had the burden to prove both the benefit promised and the difference (if any) between that and the value of the pipe Plaintiffs received.[120]  Plaintiffs boldly told the Court they were going to ignore this law, despite the Court's repeated rulings that it was Plaintiffs' burden to prove the value received, not J-M's.[121]  It is perhaps no surprise that Plaintiffs blatantly disregarded the Court's rulings—the trial record was undisputed that Plaintiffs have received value from their J-M pipe to date.[122]  Plaintiffs' damages calculations

---

[119] Dkt. 2756 (Final Phase 2 Instructions) at 3.

[120] *See Sci. App.*, 626 F.3d at 1279; Dkt. 2756 (Final Phase 2 Instructions) at 8 ("I have told you that each Plaintiff must prove that the pipe it received was worth less than what it was promised.  This requires you to compare two values: the value of the pipe received and the value of the pipe each Plaintiff was promised and paid for. In considering whether each Plaintiff received the benefit of its bargain, you must determine the value the Plaintiff has obtained from the pipe since it was delivered and installed.").

[121] *E.g.*, Ex. 1, Trial Tr. 6431:12–24 ("MR. HAVIAN:  Your Honor, I want to make sure that we are not being unclear about something.  ***We are going to argue for the full contract price and present dollars based upon the fact that it has no value to us. And their burden is to show offset.***  THE COURT:  ***Well, no.  Actually that is not their burden to show offset.  It is the burden on the government to show damages.***  MR. HAVIAN:  Well, we will show the difference between the value of what we paid and the value of what we got.  And Mr. Bernick is trying to further restrict that.  ***He can argue whatever he wants to argue, but that is the argument we are going to make to the jury.***" (emphasis added)).

1    ignored that value.[123]

2    **V.     PLAINTIFFS CANNOT BE PERMITTED TO CONTINUE THEIR**

3    **        CASE ON ANY GROUNDS**

4         Plaintiffs have now had the opportunity to litigate this bifurcated case over a

5    period of eight years, and the Court has given them the flexibility to take that

6    opportunity to the limit.  Not only have they conducted massive discovery and put

7    on months of evidence at trial, but they have tested out multiple, conflicting legal

8    and factual theories of their case.  And they have done so unlawfully, by unilaterally

9    changing their legal and factual theories during trial, between trials, and even during

10   closing.

11        This pattern goes back to Phase 1, where this conduct produced a result the

12   Court has accurately described as a "train wreck."[124]  As the Court has observed,[125]

13   _____

14   [122] *Id.* 4334:2–5 (Calleguas) ("Q. Right. So the part of the lifetime of the pipe you
     have already gotten. You have already gotten 16 years of the lifetime of the pipe;

15   right? A. The pipe has performed for 16 years."); *id.* 1317:14–17 (Norfolk) ("Q.
     And so up until today, Norfolk's gotten the value it would have expected from that

16   pipe, correct? A. It continues to function to carry the water like it was intended to

17   do, yes."); *id.* 1820:10–14 (Palmdale) ("Q. And because the J-M pipe has not failed,
     continued to deliver water continuously, some cases up to 20 years, the J-M pipe has

18   met the district's expectations at least to date; correct? A. I would say that's

19   correct[.]"); *id.* 2067:20–22 (Reno) ("Q. To date, the pipe has delivered value to
     Reno by continuously conveying water to these two projects, correct? A. Yes."); *id.*

20   1137:16–21 (South Tahoe) ("Q. Provided value by continuously delivering water, in

21   some cases up to 22 years, correct? A. That's part of the value. Q. In fact, the district

22   treats the J-M pipe as an asset on its financial documents, correct? A. Yes.").

23   [123] *Id.* 6638:19–6639:11 ("MR HAVIAN: . . . What's the difference in value -- that's
     the question the court has asked you to answer -- what is the difference in value

24   between what we paid and what we got? . . . So what we urge you to decide is the

25   value we got was nothing. . . . So even if we'd gotten 16 years ago of value, J-M's

26   gotten 16 years' worth of value of our money, and we want the money back.").

27   [124] Ex. 8, Hr'g Tr. 119:12–14 (Sept. 7, 2018) ("THE COURT: No. I am trying to --
     we don't have the train wreck that Phase I was."); *see also* Ex. 7, Hr'g Tr. 39:8–17

28   (Aug. 2, 2018) ("THE COURT: My problem with the Phase I trial, it was unclear

Plaintiffs changed their theory of liability mid-trial in Phase 1, abandoning their proffered theory that they received substandard pipe,[126] and instead arguing that the jury could find liability under the vague "elements" theory of FCA law,[127] and the concept of "representativeness"/"uniform compliance," *i.e.*, if it found ***any false statement*** made about ***any pipe at any time***.[128]  To this end, Plaintiffs told the Phase 1 jury that it need not find that any of Plaintiffs' pipe had reduced physical

_____

during major portions of the trial what exactly was being litigated. . . . I have consistently said that, and that is the reason why I said Phase I would have no res judicata effect as to the later -- the non-exemplary plaintiffs because I had a question as to what exactly was the nature and what was being litigated."); Ex. 5, Hr'g Tr. 23:11–14, (Jan. 12, 2015) ("THE COURT: [B]ut the only problem is that given what happened in the first phase of the [trial], it is – you know, the dust settled, but I don't know what happened in Phase 1.").

[125] Ex. 3, Hr'g Tr. 27:5–7 (Feb. 24, 2014) ("THE COURT: . . . I must agree with defense counsel that the plaintiff's theory, for lack of a better term, evolved.").

[126] *E.g.*, Ex. 2, Hr'g Tr. 23:25–24:1 (May 7, 2012) ("MR. HAVIAN: We are only going to be talking about the substandard products theory.").

[127] Ex. 4, Hr'g Tr. 28:23–29:4 (Dec. 18, 2014) ("THE COURT: But the problem here is that it is really kind of unclear. That is one of the complaints of the defense is that the plaintiffs kind of, I don't want to say shifted because that is their characterization. I would just say quick footed insofar as whether or not it is fraudulent inducement, whether or not it is substandard product, whether or not it is false certification.").

[128] Ex. 22, Trial Tr. 7941:2–21 (Nov. 5, 2013) ("MR. HAVIAN: . . . Here plaintiffs have shown you that J-M falsely represented uniform compliance with AWWA C905. That's why this claim was false. J-M falsely represented uniform compliance with UL 1285. So that's what you have to decide. You are back there in the jury room. Sit down. ***You say, do we agree that J-M was uniformly promising compliance with C905 and was that true?*** So it's actually fairly straightforward . . . ***[I]n terms of the claim that we are presenting to you today, there is only two kinds. . . . Did they falsely represent that their pipe uniformly complied with C900 and C905, yes or no? Did they uniformly represent that their UL pipe complied with UL, yes or no?*** . . . And you will go through that same exercise for each of the projects." (emphasis added)).

1  properties.[129]

2      Between the Phase 1 trial and Phase 2, Plaintiffs shifted theories again,

3  asserting that their damages should be measured not by "representativeness," but by

4  the reduced physical properties (and thus longevity) of their pipe.[130]

5      Plaintiffs moved dervish-like through the Phase 2 trial.  On the eve of trial,

6  Plaintiffs unilaterally decided to add a new "present value" theory of recovery

7  nowhere set out in their Court-ordered enumeration of Phase 2 damages theories.[131]

8  During the trial itself, Plaintiffs repeatedly revised their damages case:  Mr. Paschal

9  unilaterally abandoned his 3830 psi UCL calculation of pipe longevity on the

10  witness stand,[132] Mr. Cathcart re-did the entirety of his replacement cost analysis

11  mid-trial,[133] and Mr. Lehmann revised his damages calculations based upon both

12  Mr. Paschal and Mr. Cathcart's changes.[134]

13

14  [129] Ex. 22, Trial Tr. 8136:8–20 (Nov. 6, 2013) ("MR. HAVIAN: . . . The court will
never instruct you anywhere that we have to show we got substandard pipe. . . . [I]t
15  is not about substandard products and we do not have to show that in this phase of
this case in order to prevail.  That is nowhere in the jury instructions.").

16

17  [130] Ex. 1, Trial Tr. 8061:15–20 ("THE COURT: No. No. I am not talking about your
presentation. I am talking about your theory of damages. In other words, even way
18  before this case -- the Phase II portion of the trial ever started, you guys selected a
basis upon which the plaintiffs would establish damages, which was this reduction
19  in lifespan.").

20  [131] *See* Ex. 6, Hr'g Tr. 7:16–25 (Dec. 12, 2016) (ordering Plaintiffs to identify the
21  damages theories they would pursue at the Phase 2 trial); Dkt. 2270 (Exemplar Pls.'
Submission Stating Damages Theory).
22

23  [132] *See* Ex. 1, Trial Tr. 2265:6–18 ("Q. [I]n terms of your feeling about the validity
of that calculation, what is your reaction to that? A. I don't think it would be
24  representative at all. . . . [Y]ou are being overly generous in terms of assuming how
the pipe is actually going to perform.").

25
[133] *See* Dkt. 2705 (J-M's Submission re: Revised Arcadis Expert Rpt.); Dkt. 2711 (J-
26  M's Reply to Pls.' Submission re: Revised Arcadis Rpt.).

27  [134] *See* Ex. 18, Trial Ex. 31293 (Lehmann's revised SGL-11 (Oct. 30, 2018)); Dkt.
28  2727 (J-M's Mot. for Relief re: Pls.' Mid-Trial Change in Damages Theory and

Plaintiffs' closing was their notion of a bravura performance.  They abandoned their claims for the lost value of their pipe based upon reduced longevity, disclaimed their expert proofs of premature failure and the resulting shortened service life, and disregarded the corresponding diminution in value their experts calculated.[135]  All of Plaintiffs' own testimony as to why suit was brought (*i.e.*, to address "concerns," "doubts," and "speculation" about ***future failure***) and the purpose of the funds that they had just resolved to create (*i.e.*, for ***future repairs and replacement***)[136] now meant nothing at all.  Instead (contrary to the Court's rulings

---

Lehmann Testimony).

[135] Ex. 1, Trial Tr. 6522:23–6523:11 ("MR. HAVIAN: . . . [T]he only thing we are seeking is the difference between the value of the pipe as promised and the value of the pipe as delivered.  ***It has nothing to do with future replacement.***  It has to do with what value have we gotten from this pipe, and is it different from the value we were promised.  ***So these present value calculations that I agree are completely relevant if you are going to replace pipe in the future have no relevance*** to the question of when they charged us X dollars for this pipe, were we overcharged.  What was the difference in value between what we were charged and what we got.  So this argument is no longer even relevant." (emphasis added)); *id.* 6637:18–25 ("MR. HAVIAN: . . . So what do we do? We use the test results we had.  ***We created some predicted times to failure.  Our experts worked with the -- all of the data that we had from J-M on the three tests that the jury said were the relevant, three just those three, all the data we had from those, and they created some predicted times to failure.  At this point, those don't matter, doesn't matter*** when the pipe -- because that's not the question we have anymore is what will it cost to replace the J-M pipe." (emphasis added)).

[136] *E.g.*, *id.* 1819:21–24 (Palmdale) ("Q. So the district's claim for damages is actually based on ***financial harm that it speculates it might incur in the future***; right?  A. ***Correct***." (emphasis added)); *id.* 4335:23–24 (Calleguas) ("We are just looking to recover costs that ***we are expected to incur***." (emphasis added)); *id.* 1071:24–1072:5 (South Tahoe) ("Q.  [W]hat are you asking for in terms of how much they should give you?  A. . . . . [T]he damages to make the district whole is to be able to replace that pipe ***when it fails early for our customers***." (emphasis added)). *id.* 1291:21–1292:3 (Norfolk) ("Q.  [W]hat is Norfolk's plan for the money that it receives?  A. City council recently passed a resolution where we're going to set aside an escrow fund . . . to put the money in there to save it for ***when the pipe***

---

and jury instructions), Plaintiffs asked the jury to award as damages the current cost of replacing all pipe instead.[137]

Plaintiffs' counsel even took it upon himself to tell the jury that they were just there to say "amen" to the Phase 1 verdict, thereby countermanding the Court's instruction to the jury that it alone was to decide whether Plaintiffs' pipe had reduced strength and longevity compared to what was required by the standards. Plaintiffs' counsel told the Phase 2 jury that the Phase 1 jury already found that J-M pipe—including Plaintiffs' pipe—was "inferior."[138]  Plaintiffs' counsel made this representation, despite having explicitly told the Phase 1 jury *not* to determine the physical properties of Plaintiffs' pipe, and despite the Court's January 31, 2018 ruling that upheld the Phase 1 verdict and determined that the Phase 1 jury *did not* make any findings with respect to Plaintiffs' pipe,[139] the Court's June 21, 2018 ruling that "[t]he Phase One Jury *did not determine that non-compliant pipe was physically inferior to compliant pipe*,"[140] and Plaintiffs' prior arguments and

---

*starts failing* and when we need to start replacing it." (emphasis added)).

[137] *Id.* 6639:24–25 ("MR HAVIAN: . . . But at a minimum, at a minimum, we should get the 2016 price of that pipe back.").

[138] *Id.* 6616:22–6617:3 ("MR. HAVIAN: . . . It is undisputed that J-M pipe is inferior to standards-compliant pipe; that's really important.  You heard a lot of testimony from experts brought in here by J-M, and if you sort of listen to the higher level, sort of sounds like, Wow, it sounds like they're saying the pipe is okay, but of course we know that's not true because of the first jury's finding."); *id.* 6615:25–6616:4 ("MR. HAVIAN: . . . If you hear an argument or you see some evidence and you start to think, Well, maybe they didn't get bad pipe on that project, maybe there was no fraud in connection with that project, think again.  The jury said there was, the first jury.").

[139] Dkt. 2414 at 14 ("As Plaintiffs point out, the fact *the Phase One jury did not render findings with respect to the physical properties of the pipe actually received* by [Plaintiffs] means that the second jury may do so *without* disturbing the Phase One findings." (emphasis added)).

[140] Dkt. 2494 at 11.

1  representations to the Court and Phase 1 jury.

2        The predictable result of Plaintiffs' ever-shifting theories and evidence was a

3  hopelessly confused jury that understandably could not figure out how the Phase 1

4  verdict related to Plaintiffs' Phase 2 damages proofs, or how Plaintiffs' Phase 2

5  damages proofs related to their claim for damages or the questions the jury was

6  asked to decide.  The Court should put an end to Plaintiffs' improper marathon quest

7  to create a viable case and should enter judgment in J-M's favor as a matter of law.

8  **VI.  CONCLUSION**

9        For the foregoing reasons, the Court should enter judgment in J-M's favor as

10  a matter of law.

11  DATED:  December 12, 2018      PAUL, WEISS, RIFKIND, WHARTON
      & GARRISON LLP

12

13        By:    */s/ David Bernick*

14        David Bernick

15  DATED:  December 12, 2018      BIRD, MARELLA, BOXER, WOLPERT,
      NESSIM, DROOKS, LINCENBERG &

16        RHOW, P.C.

17

18        By:    */s/ Paul S. Chan*

19        Paul S. Chan

20        *Attorneys for Defendant*

21        *J-M Manufacturing Company, Inc.*
      *dba JM Eagle*

22

23

24

25

26

27

28

J-M'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW