ADAM PAUL LAXALT
Attorney General
SUSAN K. STEWART (State Bar No. 174985)
Deputy Attorney General
SStewart@ag.nv.gov
Attorney General's Office
100 North Carson Street
Carson City, Nevada  8972601-4717
Tel: (775) 684-4173
Fax: (775) 684-1108

**Attorneys for State of Nevada**
**(AND OTHER PLAINTIFFS/ATTORNEYS AS LISTED ON THE DOCKET)**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES, THE STATES OF CALIFORNIA, DELAWARE, FLORIDA, ILLINOIS, INDIANA, NEVADA, NEW MEXICO, NEW YORK, and TENNESSEE, THE COMMONWEALTHS OF MASSACHUSETTS AND VIRGINIA, and THE DISTRICT OF COLUMBIA <u>ex rel</u>. JOHN HENDRIX, <br><br> Plaintiffs, <br><br> v. <br><br> J-M MANUFACTURING COMPANY, INC., d/b/a JM Eagle, a Delaware corporation, and FORMOSA PLASTICS CORPORATION, U.S.A., a Delaware corporation, <br><br> Defendants. | Case No. ED CV-06-00055-GW(PJWx) <br><br> Hon. George H. Wu <br><br> **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO J-M'S MOTION FOR JUDGMENT AS A MATTER OF LAW** <br><br> Date:  February 20, 2019 <br> Time:  9:30 a.m. <br> Location:  Courtroom 9D |

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................1

II.    PLAINTIFFS' THEORY OF DAMAGES WAS SUFFICIENT AS A MATTER OF LAW .........................................................................2

     A.    Plaintiffs Did Not Abandon All Claims For The Cost Of Replacing All Pipe Now ......................................................2

     B.    J-M Continues to Confuse Defining the "Bargain" with Calculating the Loss of the "Benefit" ..................................4

     C.    Plaintiffs Presented Sufficient Evidence To The Jury To Support Their Claims Based On Diminished Pipe Lifespan ............6

         1.    Mr. Lehmann's Calculations Were Legally Sufficient............6

         2.    Plaintiffs' Experts Offered Sufficient Proof Of The Longevity Of Compliant And Non-Compliant J-M Pipe To Support Their Measures Of Damages ................................7

III.   IN LIGHT OF THE COURT'S RULINGS ON PLAINTIFFS' MEASURES OF DAMAGES, PLAINTIFFS ARE ENTITLED TO THE COST OF PIPE ......................................................................11

IV.   NEITHER THE DURATION NOR THE COMPLICATIONS OF THIS ACTION ARE PLAINTIFFS' FAULT AND WOULD NOT SUPPORT J-M'S REQUEST TO "PUT AN END" TO THIS ACTION EVEN IF THEY WERE ...............................................13

V.      CONCLUSION..................................................................................17

# TABLE OF AUTHORITIES

**CASES**                                                                                                           **Page(s)**

*Altanatural Corp. v. New Investments Inc.*,
      587 B.R. 119 (W.D. Wash. 2018)..........................................................................8

*Bigelow v. RKO Radio Pictures*,
      327 U.S. 251 (1946) ...........................................................................................7

*Ehrichs v. Kearney*,
      730 F.2d 1170 (8th Cir. 1984) ...........................................................................12

*In re Multidistrict Vehicle Air Pollution*,
      591 F.2d 68 (9th Cir. 1979) ................................................................................7

*Karlen v. Ray E. Friedman & Co.*
      688 F.2d 1193, 1197 n.3 (8th Cir. 1982)...........................................................12

*U.S. ex rel. Humane Soc'y of U.S. v. Hallmark Meat Packing Co.*,
      2013 WL 5753784 (C.D. Cal. Apr. 30, 2013).....................................................6

*U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*
      488 F. Supp. 2d 719, 738 (N.D. Ill. 2007) .....................................................7, 8

*United States v. Mackby*,
      339 F.3d 1013 (9th Cir. 2003) .............................................................................3

*United States v. Rogan*,
      459 F. Supp. 2d 692, 720 (N.D. Ill. 2006) *aff'd*, 517 F.3d 449
      (7th Cir. 2008).........................................................................................5, 8, 11

*United States v. Sci. Applications Int'l Corp.*,
      626 F.3d 1257 (D.C. Cir. 2010)...........................................................................3

*Washington State Bowling Proprietors Ass'n v. Pac. Lanes, Inc.*,
      356 F.2d 371 (9th Cir. 1966) ...............................................................................8

**RULES**

Federal Rules of Civil Procedure

15(b)....................................................................................................................12

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Amendment VII ......................................................................................3

PLAINTIFFS' OPP. TO J-M'S RENEWED MOTION FOR JMOL

# I.      INTRODUCTION

J-M's motion for Judgment as a Matter of Law consistently loses sight of its mooring.  The motion can be granted only if the single theory that the Court allowed Plaintiffs to present to the Jury – that the pipe Plaintiffs purchased had less value than the pipe they were promised – cannot be sustained as a matter of law.  In other words, J-M has the burden to prove that a reasonable jury could **only** find that Plaintiffs' pipe, which the first jury **found to be inferior with regard to long-term strength and durability**, is of **equal value** to compliant pipe.  But the claim of equal value was soundly refuted by Plaintiffs' witnesses.  In fact, the Phase 1 Jury's finding of materiality alone forecloses that argument.

Nor can J-M prevail by claiming that Plaintiffs failed to prove the amount of damages with pinpoint specificity.  It is settled that they need not do so.  Because it is beyond dispute that Plaintiffs proved the fact of damage, it was up to the jury, not the Court, to determine the amount, irrespective of whether that amount was identified specifically by Plaintiffs.

Rather than focus on its burden, J-M continues to fight the last war.  J-M attacks Plaintiffs' evidence as insufficient to support full replacement cost, when the Court has already excluded such replacement.  J-M excoriates Plaintiffs for "abandoning" theories, ignoring that the Court's rulings issued just before and in the midst of trial forced Plaintiffs to do so.  And, contrary to the applicable standard for JMOL, J-M's portrayal of Plaintiffs' evidence is a distorted and crabbed caricature.

J-M's blunderbuss attack on Plaintiffs' case widely misses the mark.  The 50-page morass has a common theme: None of it meets the narrow question of whether Plaintiffs failed as a matter of law to present sufficient evidence that they were damaged.  As a result, J-M's motion must be denied.

## II.   PLAINTIFFS' THEORY OF DAMAGES WAS SUFFICIENT AS A MATTER OF LAW

### A.   Plaintiffs Did Not Abandon All Claims For The Cost Of Replacing All Pipe Now

J-M claims that, on September 11, 2018, "Plaintiffs represented to the Court and J-M that they would not seek damages based on immediate replacement" and that as a result, Plaintiffs abandoned "all claims" for "the full cost of replacing their pipe now, including the present cost of the pipe." (J-M Mem. at 6:12-7:8.) J-M's claim is misleading and unsupported. Even J-M acknowledges that Plaintiffs pursued "the full cost of replacing the J-M pipe [now]…includ[ing] both *the cost of the pipe itself and the expense associated* with its replacement" for the last four years. (*Id.* at 6 n.18 (citing Exemplar Pls.' Submission Stating Damages Theory [Dkt. 2270]) (emphasis added).)

The history of Plaintiffs' efforts to obtain replacement costs is informative. In April 2018, the Court ruled that Plaintiffs' replacement cost theory would be presented to the jury with instructions thereafter "depending on the evidence presented at trial." (4/12/18 Civil Min. [Dkt. 2450] at 21.) Despite the clarity of that ruling, the Court issued subsequent rulings severely limiting Plaintiffs' ability to seek full replacement costs for all of the non-compliant J-M pipe, even though Plaintiffs' project specifications did not permit them to purchase or install non-compliant pipe. Nonetheless, in June 2018, the Court ruled, without support in any applicable False Claims Act case law and over Plaintiffs' objection, that Plaintiffs could not recover the cost to replace inferior, non-compliant pipe now unless they proved that "J-M pipe would fail within six months to two years or [that J-M pipe] posed a clear and *present* danger to health and safety, requiring replacement." (6/21/18 Civil Min. [Dkt. 2494] at 21 (emphasis in original); *see also* 09/7/18 Civil Min. [Dkt. 2628] at 12-13 (granting J-M's MIL No. 1 [Dkt 2530] and excluding

1   evidence of the consequences of pipe failures); *id.* at 13-14 (granting J-M's MIL No.

2   2 [Dkt. 2522] and excluding evidence of damage to property from pipe failure and

3   replacement); *id.* at 15 (granting J-M MIL No. 3 [Dkt. 2521] and excluding evidence

4   of imminent pipe failure and other evidence of clear and present danger to health and

5   safety from pipe failure).)  Accordingly, Plaintiffs had no choice but to limit the

6   replacement costs they were seeking to the "replacement cost for the pipe that is

7   predicted to fail."  (10/5/18 Hrg. Tr. at 66:14-16 (Sher Decl., Ex. D).)

8          Thereafter, on the eve of opening statements and once again over Plaintiffs'

9   objection, the Court ruled that Plaintiffs could seek replacement costs for pipe

10   predicted to fail *only if* they proved either that (i) replacement costs are not clearly

11   disproportionate to the loss in the value of Plaintiffs' pipelines caused by J-M's non-

12   compliant pipe, or (ii) even if disproportionate, J-M's non-compliant pipe

13   significantly affects the overall structural integrity of the pipelines.  (10/9/18 Civil

14   Min. [Dkt. 2688] at 5-6, citing *Commercial Contractors, Inc. v. United States*, 154

15   F.3d 1357 (Fed. Cir. 1998).)  But when Plaintiffs attempted to present evidence on

16   both proportionality and how J-M's non-compliant pipe impacts structural integrity,

17   the Court excluded it, again over Plaintiffs' objections.[1]  All this evidence was

18   competent and was directly relevant to the legal standard that the Court imposed.

19   By excluding it, the Court usurped the jury's role in determining whether Plaintiffs

20   had put forward sufficient evidence to meet the Court's legal requirements for

21   replacement costs.  *See* U.S. Const. amend. VII.

22   

23   [1] For example, after initially agreeing that such evidence could be presented, the Court precluded Plaintiffs from offering expert testimony regarding the potential impact of non-compliant pipe on structural integrity and that water pipelines are critical infrastructure for water service and fire protection.  (Trial Tr. at 3889:13-3891:7 (Sher Decl., Ex. E) (discussion regarding Cathcart testimony).)  Likewise, the Court excluded evidence of Calleguas's decision to replace an entire pipeline based on concern about the quality of the pipe and the impacts of a few breaks on the overall structural integrity of the line.  *See* Plaintiffs' Motion in Limine No. 5 [Dkt. 2517, 2608]; 9/7/18 Hrg. Tr. 59:18-25, 74:8-75:7 (Sher Decl., Ex. A); 9/21/18 Hrg. Tr. 40:3–11 (Sher Decl., Ex. B); 10/3/18 Hrg. Tr. 80:24– 81:4 (Sher. Decl., Ex. C) (Court denying motion).

28

3

1    The Court ultimately ruled that Plaintiffs were not entitled to seek

2  replacement costs for the pipe predicted by Plaintiffs' experts to fail or the cost to

3  insure against premature pipe failures because it was predicated on expected

4  premature failures.  (11/6/18 Notes on Damages [Dkt. 2753] at 3.)  Again, by

5  preventing the jury from deciding whether the evidence – even as dramatically

6  limited by the Court – met the Court's legal requirements for replacement costs, the

7  Court usurped the jury's role in determining factual questions.  *See* U.S. Const.

8  amend. VII.

9    Thus, at no time did Plaintiffs in any manner "abandon" replacement costs,

10  and J-M cites nothing in the record demonstrating otherwise.

11    **B.    J-M Continues to Confuse Defining the "Bargain" with Calculating**

12    **the Loss of the "Benefit"**

13    The parties agree that (1) the proper measure of damages is the "benefit of the

14  bargain," (2) the terms of the "bargain" are recited in the contract documents, and

15  (3) the basic measure of damages is that amount necessary to return Plaintiffs to the

16  position they would have been in were J-M's claims not false.  *See United States v.*

17  *Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003) (quoting *United States v. Woodbury*,

18  359 F.2d 370, 379 (9th Cir. 1966)).  "In calculating FCA damages, the fact-finder

19  seeks to set an award that puts the government in the same position as it would have

20  been if the defendant's claims had not been false."  *United States v. Sci. Applications*

21  *Int'l Corp.*, 626 F.3d 1257, 1278 (D.C. Cir. 2010).

22    The parties differ, however, over how to perform that value calculus.  J-M

23  insists, without authority, that the elements of that equation must all be found within

24  the contract documents themselves.  According to J-M, because the contract

25  documents do not promise a specific lifetime, Plaintiffs may not seek damages even

26  if J-M's knowing non-compliance resulted in pipe with diminished lifetime.

27  Plaintiffs rely on basic FCA and contract law that instructs that the value of a

28    4

breached or broken promise may be shown by any competent evidence.  The resolution of this fundamental disagreement is determinative of J-M's Motion.

It is undisputed that the applicable contracts required compliant pipe and that J-M failed to deliver compliant pipe.  To determine how much less of a benefit Plaintiffs received, *i.e.*, how much money is needed to put them in the same position they would have been in had J-M's claims not been false, Plaintiffs are not limited to the four corners of the contract documents, which do not purport to recite all the characteristics of the product, including how long it should last, other than by reference to compliance with industry standards.

Case law supports Plaintiffs' position.  First, "[d]amages under the FCA, to quote the Senate "*should be liberally measured to effectuate the remedial purposes of the Act*, [and the government] should be afforded *a full and complete recovery of all its damages*."  S. Rep. No. 96-615 at 4 (1980) (reporting on S.1981, predecessor to S.1562); *see also United States v. Rogan*, No. 02 C 3310, 2006 WL 8427270, at *21 (N.D. Ill. Oct. 2, 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008).  Relatedly, any direct damages that would be awarded in contract are necessarily part of damages to be awarded under both the federal and state False Claims Acts.  (*See* discussion of cases in Exemplar Plaintiffs' Memorandum Regarding Benefit of the Bargain Damages and 100-Year Life [Dkt. 2646].)

Moreover, in that same Memorandum, Plaintiffs submitted an extensive discussion of both contract and FCA cases that permit damages for diminished lifespan even where lifespan is not mentioned in the contract.  (*See id.* [Dkt. 2646].) Such an outcome reflects the most basic principles of damages.  As Plaintiffs pointed out at trial, if a person bought a pair of shoes represented to be "hand-made" and was given machine-made shoes that fell apart after a week, the buyer would surely be entitled to recover for the diminished lifespan even if the contract never mentioned lifespan.

J-M struggles to distinguish this uniform body of case law, speaking from the other side of its mouth to declare that "contract" damage principles do not displace the FCA.[2]  *Where is a single case holding that the measure of damages must be specified in the contract?  Where is a single case, under the FCA or otherwise, holding that where a defendant falsely represents a product, and as a result the product has a diminished life, the government may not recover damages unless longevity is specifically promised?*  It is not Plaintiffs' burden to find a case that supports their position, although we have cited many.  It is J-M's burden to support its effort *to exclude* direct damages caused by J-M's knowing fraud.  Counsel's vigorous, repeated assertions are the only support that J-M provides.

### C.   Plaintiffs Presented Sufficient Evidence To The Jury To Support Their Claims Based On Diminished Pipe Lifespan

#### 1.   Mr. Lehmann's Calculations Were Legally Sufficient.

J-M's attack on the testimony of Plaintiffs' expert Steve Lehmann is almost entirely a rehash of Defendant's multiple *Daubert* attacks on Lehmann.  Then and now, J-M relies significantly on criticisms offered by its experts.  The Court ruled against J-M after each of these attempts and also denied J-M's summary judgment motion that raised similar issues to those J-M again raises here.  Nothing that occurred at trial changes the fact that Lehmann's work and testimony were legally sufficient to support replacement cost damages had the Court not erroneously excluded such damages after the close of evidence and on the eve of closing arguments.

J-M's Memorandum cites to certain trial testimony of Lehmann that is either

---

[2]  J-M's schizophrenic approach to contract law is evident yet again in its Memorandum.  While criticizing Plaintiffs for their anticipated citations to "irrelevant contract law," J-M insists that "the FCA does not displace the law of contracts and redefine the scope of the parties' agreement."  (J-M Mem. at 10:12-14.)  Plaintiffs agree:  Contract law principles apply to Plaintiffs' damages claims, as Plaintiffs have argued repeatedly.  *See, e.g.*, Exemplar Plaintiffs' Memorandum Regarding Benefit of the Bargain Damages and 100-Year Life [Dkt. 2646].

1  taken out of context or does not support the argument Defendant is making.

2  Because Mr. Lehmann's testimony was directed almost entirely to the issue of

3  replacement cost damages, which the Court did not permit Plaintiffs to seek, we do

4  not further discuss the adequacy of that evidence.  The testimony of Mr. Paschal and

5  Mr. Edwards, as well as the testimony of Plaintiffs' representatives, all of which J-M

6  ignores, is more than sufficient to support Plaintiffs' contention that they were

7  damaged by J-M's fraud.  Accordingly, J-M is not entitled to judgment on the issue

8  of damages.

9          **2.    Plaintiffs' Experts Offered Sufficient Proof Of The Longevity**

10                **Of Compliant And Non-Compliant J-M Pipe To Support**

11                **Their Measures Of Damages**

12        J-M's arguments that Plaintiffs failed to prove precisely the longevity of

13  compliant pipe or J-M's substandard pipe, and also failed to establish a precise

14  relationship between Quick Burst tests and longevity, suffer from the same legal

15  flaw.[3]  J-M offers no authority for the suggestion that a plaintiff's evidence must be

16  so precise or that a jury is obligated to award precisely the damages calculated by an

17  expert or requested by a party no matter how "precise" the calculation.  Rather, a

18  jury is free to award damages within the range supported by the evidence, even if

19  their award does not match one of the calculations proffered.[4]

20        J-M offered the same arguments in insisting that the jury be instructed to

21  disregard Plaintiffs' damages calculations unless it believed "that the J-M pipe for

22

23  ───────────
    [3] J-M's argument further misconstrues the burden here.  Where it is not possible to
24  know how much pipe is bad, the burden properly shifts to J-M to prove how much is
    good.  *See U.S. ex rel. Humane Soc'y of U.S. v. Hallmark Meat Packing Co.*, 2013
25  WL 5753784, at *16 (C.D. Cal. Apr. 30, 2013); *see also* 4/12/18 Civil Min. [Dkt.
    2450] at 13-14 (denying J-M's motion for summary judgment).
    [4] Plaintiffs note that J-M also wrongly sought—and the Court agreed—to exclude
26  some of the evidence about Plaintiffs' own views about how they have been
    damaged.  There is no rule or case that says that a plaintiff cannot testify about how
27  it believes it has been damaged, and in this case Plaintiffs' improperly truncated
    testimony was still sufficient to sustain their burden.

28                                        7
    ───────────

1  that project was required to last exactly 100 years."  (Proposed Jury Instructions

2  [Dkt. 2645-1] at 69), and again in a proposed supplemental jury instruction.  (J-M's

3  Corrected Supplemental Jury Instructions [Dkt. 2712] at 4-5.)  The Court correctly

4  rejected both, and, in any event, J-M ignores that the 100-year figure was necessary

5  only for Plaintiffs' replacement cost theory, which the Court ultimately precluded.

6       The computation of damages **does not have to be done with mathematical**

7  **precision** but, rather, **may be based** upon **a reasonable estimate of the loss**.

8  *United States v. Rogan*, No. 02 C 3310, 2006 WL 8427270, at *21 (N.D. Ill. Oct. 2,

9  2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008). "[T]he jury may not render a verdict

10  based on speculation or guesswork.  But the jury may make **a just and reasonable**

11  **estimate** of the damage based on relevant data, **and render its verdict accordingly**.

12  In such circumstances '**juries are allowed to act on probable and inferential as**

13  **well as (upon) direct and positive proof**.'" *Bigelow v. RKO Radio Pictures*, 327

14  U.S. 251, 264 (1946) (emphasis added).  "[W]hen the defendant's wrong has been

15  proven, 'the jury may make a just and reasonable estimate of the damage'" *In re*

16  *Multidistrict Vehicle Air Pollution*, 591 F.2d 68, 73 (9th Cir. 1979).

17       For example, in *U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, a suit against

18  an HMO for discriminatory pricing, the plaintiffs' damages expert offered eight

19  different calculations:  $10 million, $16 million, $20 million, $38 million, $58

20  million, $62 million, $78 million, and $96 million, based on various methodologies

21  including comparison to peer HMO costs and estimates of costs avoided through the

22  prohibited practices; the defendant's expert utilized a different methodology that set

23  damages at $45 million. 488 F. Supp. 2d 719, 738 (N.D. Ill. 2007).  The jury rejected

24  each of the specific proffers and awarded $48 million in damages.  *Id.* at 724.  The

25  court concluded that the award was supported by competent evidence because

26  "**while this Court cannot know exactly how the jury reached its verdict**, the verdict

27  falls in the **middle of the range of possible damage estimates** presented, and closely

28

1    lines up with the estimate espoused by the defense expert." *Id.* at 739.

2        *Tyson* is consistent with the vast weight of authority across a variety of

3    contexts.  *See*, *e.g.*, *Washington State Bowling Proprietors Ass'n v. Pac. Lanes, Inc.*,

4    356 F.2d 371, 379 (9th Cir. 1966) (direct evidence of $17,611 along with

5    "estimated" damages of additional $50,000; jury awarded $35,000 and Ninth Circuit

6    concluded that "a factual question was presented to the jury for its determination

7    which we are without power to change."); *Altanatural Corp. v. New Investments*

8    *Inc.*, 587 B.R. 119, 127 (W.D. Wash. 2018) ("[T]he evidence presented included

9    damages calculated on the high side at $775,000 and on the low side between

10   $41,000 and $50,000.  The Bankruptcy Court chose a middle ground at $350,000,

11   based largely on New Investments' cross-examination of Altanatural's expert

12   witness.").

13       So long as the fact-finder's award is a reasonable estimate grounded in the

14   range of damages supported by the evidence, there is no error.  The jury's award

15   must be based on the evidence and not speculation, but it need not conform to any

16   specific damages calculation espoused by the litigants.

17       In this case, all that would be required to sustain a verdict for damages above

18   the cost of the pipe itself, which as discussed above is recoverable simply based on

19   the fact no Plaintiff would have bought non-compliant pipe and it has zero value, is

20   evidence that J-M pipe does not last as long as compliant pipe.  J-M does not even

21   attempt to argue that there was no evidence in the record from which the jury could

22   have made that finding.  Instead J-M proffers an irrelevant series of "precise"

23   findings that it alleges Plaintiffs didn't "prove."  The jury instructions themselves,

24   however, instructed the jury that there was a relationship between short-term tests

25   and long-term strength.  (Updated Final Jury Instructions [Dkt. 2756] at 2 ("In

26   reaching their decision, the Phase 1 Jury found… [t]hat the QB, Abbreviated HDB,

27   and the LTS short term tests bear a relationship with the long-term strength of JM's

28

pipe.").)  Plaintiffs' expert Dale Edwards calculated the amount by which J-M pipe fell short of "compliant" pipe by relying on J-M's own Quick Burst test results. (Trial Tr. at 2870:3-19; 2913:15-2916:24 (Sher Decl., Ex. E).)  That alone is sufficient to sustain a jury verdict, but Plaintiffs also offered Jim Paschal's analysis of J-M's failing HDB results and LTS results, both of which offer evidence that would support a finding that J-M pipe suffered from reduced longevity.  (*Id.* at 2232:20-2233:8, 2233:23-2234:6, 2263:10-2264:19, 2298:3-20 (HDB); 2267-69; 2293-97 (LTS)) (Sher Decl., Ex. E).)  Plaintiffs also presented evidence in the form of J-M's own statements,[5] third-party studies,[6] and trial testimony from both sides.[7]

[5] *See* Trial Exs. 244 (Sher Decl., Ex. 244) (J-M Website FAQs stating J-M pipe will last 100 years); 31150 (*id.*, Ex. 31150) [website screenshot saying the same]; 7690-18A (*id.*, Ex. 7690-18A) [J-M Brochure]; 31149 (*id.*, Ex. 31149) [same]; 31148 (*id.*, Ex. 31148) [letter to customer].

[6] *See* Trial Exs. 31151 (Sher Decl., Ex. 31151) [Excerpts from article by Burn *et al.*, Long-Term Performance Prediction for PVC Pipes (AwwaRF 2005)]; 31152 (*id.*, Ex. 31152) [Excerpt from the article by Walker, AwwaRF Looks At PVC Pipes' Long-Term Performance, PVC Pipe News (PVC Pipe News Summer 2007)]; 31153 (*id.*, Ex. 31153) [Excerpt from the article by Folkman, Water Main Break Rates in the USA and Canada: A Comprehensive Study (USU April 2012)]; 31154 (*id.*, Ex. 31154) [Excerpt from the presentation by Folkman, Validation of PVC Pipe's Long Life Performance and Recent Developments Regarding Utah State University (USU) 2012 Water Main Break Rates Study (April 2013 Presentation)]; 31155 (*id.*, Ex. 31155) [Excerpt from the article by Folkman, PVC Pipe Longevity Report – Affordability and the 100+ Year Benchmark Standard: A Comprehensive Study on PVC Pipe Excavations, Testing and Life Cycle Analysis (USU May 2014)]; 31156 (*id.*, Ex. 31156) [Excerpt from the article by Folkman, Validation of the Long Life of PVC Pipes (PPCA 2014)); 31157 (*id.*, Ex. 31157) [Excerpt from the article by Sustainable Solutions Corp., Life Cycle Assessment of PVC Water and Sewer Pipe and Comparative Sustainability Analysis of Pipe Materials (April 2017)]; 31158 (*id.*, Ex. 31158) [Excerpt from the article by Breen, Expected lifetime of existing PVC water distribution systems (May 15, 2006)]; 31159 (*id.*, Ex. 31159) [Excerpt from the article by Hulsmann and Reinhard, 70 years of experience with PVC pipes (European Vinyl Corp. (Deutschland) GmBH)]; 31160 (*id.*, Ex. 31160) ([Excerpt from the article by Boersma and Breen, Long term performance prediction of existing PVC water distribution systems (TNO Science and Industry 2005].)

[7] Trial Tr. at 2333:16-2334:24 (Sher Decl., Ex. E) (Paschal: studies cited above "supported the use of a hundred years"); 3008:16-3009:12 (Edwards: "The industry, including J-M, claims a hundred years life for their pipe, at a minimum.  The Uni-Bell PVC Pipe Association very clearly claims 100 years.  It's pretty widespread in Europe, as well, a claim of at least a hundred years lifetime for PVC pipe that is compliant.  And our analysis and my analysis of the Quick Burst data and all of the information that we have here" is consistent with "a hundred years for that calculation."); 3837:5-3838:1 (Chuck Clark:  Q: Talking about your pipe [lifespan], it is a hundred years?  A: Yes.  Yes."); 3835:18-3836:19 (Chuck Clark reading

10

1    To be sure, J-M disputed this evidence and a reasonable jury could have
2 concluded that Plaintiffs' position was incorrect (so long as the jury did not
3 conclude, for example, that J-M's non-compliance was so minimal as to be in
4 conflict with the Phase 1 Jury's finding of materiality), but that is no basis for
5 judgment as a matter of law.  Plaintiffs undeniably offered evidence that would
6 ground a damages award for full pipe value (and for the replacement costs had the
7 Court permitted them), and that is sufficient to permit a jury verdict. *See United*
8 *States v. Rogan*, 2006 WL 8427270 at \*21.

9 **III.   IN LIGHT OF THE COURT'S RULINGS ON PLAINTIFFS'**
10      **MEASURES OF DAMAGES, PLAINTIFFS ARE ENTITLED TO THE**
11      **COST OF PIPE**

12    J-M argues that Plaintiffs should not be allowed to recover the cost of
13 "replacing" substandard pipe because they "abandoned" their claim for replacement
14 cost before trial.  Plaintiffs did no such thing.

15    In February 2018, long before trial, Plaintiffs proffered three measures of
16 damages (as J-M itself has admitted many times).  (*See* Pls.' Preliminary Trial Brief
17 [Dkt. 2415].)  One measure was the cost of replacing all J-M pipe, ***including the***
18 ***labor and other expense*** required to do so.  A second measure was the premium for
19 an insurance policy to cover the cost, ***including the labor and other expense***, for
20 pipe predicted to fail.  Plaintiffs' third measure of damages was the cost of the ***pipe***
21 ***alone, without*** the added labor and expense of replacing that pipe.

22    Before trial, Plaintiffs stated that, given the Court's rulings, they could not
23 continue the first of those theories and at the end of the trial the Court precluded the

24
25 interrogatory 72, "assuming that the pipe in question was properly handled, installed
and maintained, and that the relevant systems are properly operated, J-M states that
26 its PVC pipe should last for a hundred years or more consistent with numerous
published studies."); 4698:5-4699:4 (Dr. Folkman "Q: there's a consensus opinion
27 about a minimum life of 100 years? A:  That is true. …").

28

1    second.  As a result, Plaintiffs presented only the third theory to the jury, limited to

2    pipe cost without the labor and other expense needed to replace the pipe.  Plaintiffs

3    argued to the Jury that the pipe itself had no value, based on extensive,

4    uncontradicted testimony from their representatives.

5        Plainly, Plaintiffs did not abandon that theory before trial.  First, the "pipe-

6    only" theory was not often discussed after Plaintiffs' initial identification of it, since

7    J-M never challenged it.  Second, J-M points to no evidence that Plaintiffs ever

8    abandoned the theory.  Tellingly, the only record quotation J-M provides to support

9    its baseless claim of abandonment makes clear that Plaintiffs ***did not*** abandon any

10   theory that was limited to the ***pipe***.  (J-M Mem. at 7 n.21 (referring to the aspects of

11   damages that Plaintiffs no longer sought: "THE COURT: . . . 'but if we don't include

12   the replacement ***costs of digging up the pipe and putting in new pipe and stuff of***

13   ***that sort***, this is an approximation, I suppose, of some request for an amount of

14   money that approaches the contract price'") (emphasis added).)

15       Even if, contrary to the record, Plaintiffs had indicated that they did not intend

16   to pursue the theory, it is settled that Plaintiffs may raise theories of damages even

17   during trial.  Indeed, "Rule 15(b) of the Federal Rules of Civil Procedure permits

18   any theory of liability to be considered that is tried and argued by the parties,

19   regardless of whether or not [it] is included in the pleadings." *Karlen v. Ray E.*

20   *Friedman & Co. Commodities*, 688 F.2d 1193, 1197 n.3 (8th Cir. 1982).  This is true

21   even where the theory on which judgment was granted was not the focus of the

22   lawsuit.  *Ehrichs v. Kearney,* 730 F.2d 1170, 1174 (8th Cir. 1984) ("a court may

23   grant recovery on a theory not pled but fairly tried by both parties").   No authority

24   allows the Court to preclude damage theories raised months before trial, as J-M

25   seeks to do here.  The only cases J-M cites to support its argument involved a

26   plaintiff trying to invoke a new theory to salvage a trial that had already resulted in a

27   verdict under a different theory.  None involved a plaintiff seeking to withdraw a

28

1   purported "theory waiver" – which did not happen here in any event – before trial

2   has even begun.

3          Moreover, J-M concedes that Plaintiffs presented exactly this theory to the

4   first jury.  (J-M Mem. at 2:8-9 ("Plaintiffs' closing claim was for the cost of

5   replacement pipe for all pipe in all of the projects today").)[8]  That was not the case

6   *in any of the decisions that J-M relies upon*.

7          Finally, J-M identifies no prejudice that it would suffer if Plaintiffs continue to

8   pursue the same theory it presented to the first jury.  J-M cannot preclude Plaintiffs

9   from presenting that same theory again.[9]

10  **IV.   NEITHER THE DURATION NOR THE COMPLICATIONS OF THIS**

11        **ACTION ARE PLAINTIFFS' FAULT AND WOULD NOT SUPPORT**

12        **J-M'S REQUEST TO "PUT AN END" TO THIS ACTION EVEN IF**

13        **THEY WERE**

14         J-M asserts in its final, catch-all section that the Court should "put an end" to

15  this matter because Plaintiffs "have now had the opportunity to litigate this

16  bifurcated case over a period of eight years," during which they "conducted massive

17  discovery" and "tested out multiple, conflicting legal and factual theories of their

18  case."  (J-M Mem. at 41:4-8.)  Preliminarily, J-M, not Plaintiffs, was the primary

19  cause of the extraordinary delays in this action through its extended and repetitive

20  briefing on meritless or previously adjudicated issues; indeed J-M conducted the

21  majority of discovery in this action;[10] and Plaintiffs' legal and factual theories have

22

23  _____

    [8] Trying to have it both ways, J-M later argues that Plaintiffs cannot recover "on the
    basis of a theory of damages that they did not submit to the jury."  (J-M Mem. 5:7-

24  8.)

    [9] J-M offers no authority to preclude Plaintiffs from presenting to the jury the full

25  cost of all pipe.  Plaintiffs introduced evidence that, notwithstanding the "use" they
    received, the pipe still had a net value of *zero* because of the increased risk of failure

26  and the disruption that failure would cause.  This is a classic "benefit of the
    bargain/diminished value" measure of damages.

27  [10] For example, J-M took nearly 60% of the total depositions and 70% of the Phase 2
    depositions.

28
    _____

remained essentially the same throughout.  Indeed, only J-M, having been found to have violated FCAs, stands to benefit from delay.  Even if it were otherwise, however, J-M cites no authority permitting the termination of an action because of delays, extensive discovery, and/or changing theories, either individually or collectively.

J-M begins its revisionist history with Phase 1, citing out-of-context musings by this Court that Phase 1 was a "train wreck" because Plaintiffs allegedly changed their theory of liability.  (J-M Mem. at 41:11-42:5.)  The Court made it clear that its offhand comment was neither directed at Plaintiffs nor a challenge to the Phase 1 Verdict:  "I am not saying a train wreck as to one side or the other. … It wasn't so much of a train wreck that I overturned the verdict."  (9/7/18 Hrg. Tr. at 119:15-22 (Sher Decl. Ex., A).)  Indeed, J-M repeatedly raised this same argument in its unsuccessful efforts to overturn the Phase 1 Verdict, and this Court repeatedly rejected it.[11]  In any event, even if this argument had any merit, J-M's remedy would not be a judgment but a new trial, which is exactly what it got with the Court's declaration of a mistrial.

J-M next complains that Plaintiffs "shifted theories" after the Phase 1 Trial by "asserting that their damages should be measured not by 'representativeness' but by the reduced physical properties (and thus longevity) of their pipe."  (J-M Mem. at 43:2-4.)  Damages, of course, were not a part of Phase 1, and thus there was no "shift" by Plaintiffs in how damages should be measured.  But whether Plaintiffs "shifted theories" or not, J-M has neither argued nor cited any supporting authority for the proposition that damage measures are immutable, much less that a plaintiff's modification of damages supports "putting an end" to an action, whatever that means.

---

[11] *See*, *e.g.*, J-M Renewed Phase 1 JMOL [Dkt. 1833] at 3-6 ("Section II.B"); 06/30/2014 Civil Min. [Dkt. 1960] at 1 (denying J-M's JMOL in its entirety).

14

1    In terms of the only matter actually before the Court on J-M's Motion, the

2    Phase 2 Trial, J-M cites a goulash of alleged transgressions, none of which would

3    support a mistrial, much less judgment as a matter of law.

4    *First*, J-M contends that, after initially identifying their damage theories,

5    Plaintiffs "unilaterally added a new 'present value' theory." (J-M Mem. at 43:5-7.)

6    That is not true.  The present value calculation of which J-M complains was always

7    part of Mr. Lehmann's analysis (*see* Trial Ex. 31293 (Sher Decl., Ex. 31293) at lines

8    6 and 8).  Plaintiffs were entitled to offer it as an alternative measure of damages.

9    *Second*, J-M contends that Plaintiffs "repeatedly revised their damages case at

10   trial." (J-M Mem. at 43:8-12.)  According to J-M, Paschal "unilaterally abandoned

11   his 3830 UCL calculation of pipe longevity"; Cathcart "re-did the entirety of his

12   replacement cost analysis"; and Lehmann "revised his damages calculations based

13   upon both Mr. Paschal and Mr. Cathcart's changes."  But Paschal never "abandoned"

14   the 3830 UCL calculation in his report, precisely because he never adopted it.  As

15   thoroughly briefed at trial, Paschal only ever ran the calculation because he was

16   requested to do so by counsel, and he never purported to rely upon it for any

17   purpose.[12]  Nor did Lehmann.[13]  And while Cathcart revised his analysis to correct

18

---

19   [12] *See* Plaintiffs' Opposition to J-M's Motion for Relief re Plaintiffs' Mid-Trial
20   Change in Damages Theory and Plaintiffs' Expert Steven Lehmann's Apparent Mid-
     Trial Change of Testimony [Dkt. 2728]; *see also* Trial Tr. at 2264:20-2265:21 (Sher
21   Decl., Ex. E) ("Q:  Now, Mr. Lehmann, who we will hear from later, who did the
     insurance calculations and replacement cost calculations, do you know which of
22   those three he used?  A:  I believe he used the middle one, the 3830 minimum.  Q:
     Okay.  Which one do you personally feel is the most representative of what the pipe
23   really is?  Or let me strike that, I will withdraw that question.  This one that shows
     an 18 percent failure rate, why did you do that calculation?  A:  I believe I was asked
     to by counsel.  Q:  And did you -- in terms of your feeling about the validity of that
24   calculation, what is your reaction to that?  A:  I don't think it would be
     representative at all.  Q:  Why not?  A:  Because I think that is giving it an overly
25   generous -- because you are already dropping down to the 3830 minimum.  You are
     not using the 4000, which is the true requirement in the standard.  You are dropping
26   it to 3830.  And then by using this upper confidence value, you are assuming that --
     you are being overly generous in terms of assuming how the pipe is actually going to
27   perform.  You are assuming that the best 1 percent really represents all of the
     production.  And that is not the case.").

28

15

errors he discovered in preparation for his trial testimony, these changes largely benefited J-M.  To the extent they did not, the Court precluded Cathcart from presenting them.[14]  Lehmann's incorporation of the allowed revisions thus benefited, not prejudiced, J-M.

*Third*, J-M asserts that "Plaintiffs abandoned their claims for the lost value of their pipe based upon reduced longevity, disclaimed their expert proofs of premature failure and the resulting shortened service life, and disregarded the corresponding diminution in value their experts calculated."  (J-M Mem. at 44:2-5.)  If J-M is asserting that Plaintiffs did not pursue replacement cost damages in closing, it is correct:  the Court rejected replacement costs at the close of evidence.  If J-M is asserting that Plaintiffs abandoned the fact that J-M's pipe had a reduced lifespan, it is incorrect:  Plaintiffs expressly argued reduced lifespan in connection with the (negative) value of the pipe that Plaintiffs received.[15]

*Fourth*, J-M complains that Plaintiffs asked in closing for "the current cost of replacing all pipe."  (J-M Mem. at 45:1-2.)  But Plaintiffs did not ask for the cost of replacing pipe, current or otherwise, precisely because the Court took replacement cost damages away.  Instead, Plaintiffs sought only the cost of the pipe it had purchased from J-M, valued in 2016 dollars.

---

[13] *See* Plaintiffs' Opposition to J-M's Motion for Relief re Plaintiffs' Mid-Trial Change in Damages Theory and Plaintiffs' Expert Steven Lehmann's Apparent Mid-Trial Change of Testimony [Dkt. 2728].

[14] Trial Tr. at 3211:6-22 (Sher Decl., Ex. E) (ruling on Appendix E – Cost of Pipe); 3891:12-14, 3892:3-8, 3922:1-24 (Cathcart's ultimate replacement cost opinions offered at trial).

[15] *See, e.g.*, Trial Tr. at 6638:6-18 (Sher Decl., Ex. E) ("The real answer is it's a negative value and why is that?  Well, J-M made a point of the fact that water's flowing through the pipe and that's true.  And you get some value out of that and that's true.  But let's say instead of the 43 percent failures within 100 years that Mr. Edwards predicted and the 27 percent that Mr. Paschal suggested, some lesser amount fails.  I don't know.  Ten percent, 15 percent, maybe you're skeptical of those numbers.  But the cost of the pipe compared to the huge expense of digging it up, even if it's a small amount is going to dwarf the cost the pipe; the cost of the pipe is a tiny fraction of what it costs to replace the pipe.  So on balance is that pipe worth anything to us?  No, no.").

16

*Finally*, J-M complains that "Plaintiffs' counsel told the Phase 2 jury that the Phase 1 jury had found that J-M pipe—including Plaintiffs' pipe—was 'inferior.'" (J-M Mem. at 45:7-8.)   Of course he did.  The Phase 1 Jury necessarily found that J-M's pipe was inferior when it concluded, as this Court instructed the Phase 2 Jury, that "J-M did not manufacture or test its pipe in a manner that assured that it uniformly had the quality, strength and durability required by the industry standards."[16]  Pipe that is not uniformly manufactured to standards regarding "quality, strength and durability" is, by definition, inferior to compliant pipe.  And even if it were not, the Court instructed the Phase 2 Jury that "statements by lawyers are not evidence" and that it was bound by the Court's description of the "decisions and factual findings of the Phase 1 Jury,"[17] thus eliminating any potential prejudice.

## V.     CONCLUSION

Based on the foregoing, Exemplar Plaintiffs respectfully request that the Court deny J-M's Renewed Motion for Judgment as a Matter of Law.

**Local Rule 5-4.3.4(a)(2)(i) Compliance:  Filer attests that all other signatories listed concur in the filing's content and have authorized this filing.**

Respectfully submitted,

DATED:  1/14/2019                    By: /s/ Susan K. Stewart

---

[16] Updated Final Jury Instructions [Dkt. 2756] at 2.
[17] Updated Final Jury Instructions [Dkt. 2756] at 3.

1

2

3

4

5

6

ADAM PAUL LAXALT
Attorney General
SUSAN K. STEWART (State Bar No. 174985)
Deputy Attorney General
SStewart@ag.nv.gov
Attorney General's Office
100 North Carson Street
Carson City, Nevada  89701-4717
Tel: (775) 684-4173
Fax: (775) 684-1108
Attorneys for State of Nevada

7

DATED:  1/14/2019

By: /s/ Elizabeth J. Sher

8

9

10

11

ELIZABETH J. SHER (Admitted Pro Hac Vice)
esher@daypitney.com
DAY PITNEY LLP
1 Jefferson Road
Parsippany, New Jersey  07054
Tel: (973) 966-6300
Fax: (973) 966-1015

12

13

14

15

16

17

CYNTHIA E. HUDSON
Chief Deputy Attorney General of Virginia
PETER BROADBENT
Assistant Attorney General
PBroadbent@oag.state.va.us
OFFICE OF THE ATTORNEY GENERAL
COMMONWEALTH OF VIRGINIA
202 North Ninth Street
Richmond, VA 23219
Tel: (804) 786-6055
Fax: (804) 786-1991

18

19

20

21

22

ERIC R. HAVIAN (State Bar No. 102295)
ehavian@constantinecannon.com
HARRY P. LITMAN (State Bar No. 127202)
hlitman@verizon.net
CONSTANTINE CANNON LLP
150 California Street, Suite 1600
San Francisco, California 94111
Tel:  (415) 639-4001
Fax:  (415) 639-4002

23

24

25

26

STUART RENNERT (Admitted Pro Hac Vice)
srennert@mckoolsmith.com
McKOOL SMITH HENNIGAN P.C.
1999 K. Street, N.W. Suite 600
Washington, D.C. 20006
Tel: (202) 370-8300
Fax: (202) 370-8344

27

28

18

1  
2  
3  
4  
5  
6  

THOMAS B. WATSON (State Bar No. 181546)  
KIRK DILLMAN (State Bar No. 110486)  
twatson@mckoolsmithhennigan.com  
kdillman@mckoolsmithhennigan.com  
McKOOL SMITH HENNIGAN P.C.  
One California Plaza  
300 South Grand Avenue, Suite 2900  
Los Angeles, CA 90071  
Tel: (213) 694-1200  
Fax: (213) 694-1234  
Attorneys for Commonwealth of Virginia  

7  DATED:  1/14/2019  

By: /s/  Elizabeth J. Sher  

8  
9  
10  
11  

ELIZABETH J. SHER (Admitted Pro Hac Vice)  
esher@daypitney.com  
DAY PITNEY LLP  
1 Jefferson Road  
Parsippany, New Jersey  07054  
Tel: (973) 966-6300  
Fax: (973) 966-1015  

12  
13  
14  
15  
16  

ERIC R. HAVIAN (State Bar No. 102295)  
ehavian@constantinecannon.com  
HARRY P. LITMAN (State Bar No. 127202)  
hlitman@verizon.net  
CONSTANTINE CANNON LLP  
150 California Street, Suite 1600  
San Francisco, California 94111  
Tel:  (415) 639-4001  
Fax:  (415) 639-4002  

17  
18  
19  
20  

STUART RENNERT (Admitted Pro Hac Vice)  
srennert@mckoolsmith.com  
McKOOL SMITH HENNIGAN P.C.  
1999 K. Street, N.W. Suite 600  
Washington, D.C. 20006  
Tel: (202) 370-8300  
Fax: (202) 370-8344  

21  
22  
23  
24  
25  
26  
27  

THOMAS B. WATSON (State Bar No. 181546)  
KIRK DILLMAN (State Bar No. 110486)  
twatson@mckoolsmithhennigan.com  
kdillman@mckoolsmithhennigan.com  
McKOOL SMITH HENNIGAN P.C.  
One California Plaza  
300 South Grand Avenue, Suite 2900  
Los Angeles, CA 90071  
Tel: (213) 694-1200  
Fax: (213) 694-1234  
Attorneys for Calleguas Municipal Water District, Palmdale Water District, and South Tahoe Public Utility District  

28  

19