UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | EDCV 06-55-GW(PJWx) | Date | April 22, 2019 |
|---|---|---|---|
| Title | *United States of America, et al. v. J-M Manufacturing Company, Inc.* | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Katie E. Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Elizabeth J. Sher | David M. Bernick |
| Eric R. Havian | Paul S. Chen |
| Kirk D. Dillman | Jaren E. Janghorbani |
| Harry P. Litman | |
| Thomas Watson | |
| Emily Chaidez, by telephone | |
| Susan K. Stewart, by telephone | |

**PROCEEDINGS:**    **J-M MANUFACTURING COMPANY, INC.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW [2809]**

The Court's Tentative Ruling is circulated and attached hereto. Court hears oral argument. For reasons stated on the record, the Motion is TAKEN UNDER SUBMISSION. Court to issue ruling.

|  | 1 | : | 00 |
|---|---|---|---|
| | Initials of Preparer | JG | |

*United States, et al. v. J-M Mfg. Co., Inc., et al.*; Case No. 06-cv-0055-GW-(PJWx)
Tentative Ruling on J-M Manufacturing Company, Inc.'s Renewed Motion for Judgment as a Matter of Law

I. **Background**

The parties are generally familiar with the procedural history of this False Claims Act ("FCA") case and, as such, only a brief summary is provided here. The Court bifurcated the trial proceedings back on December 7, 2011, with the initial trial being limited to liability and to the claims of five Exemplar Plaintiffs.[1] *See* Order Addressing Bifurcation ("Bifurcation Order"), Docket No. 551. Pursuant to the Bifurcation Order, the parties tried three issues in "Phase One" of the trial: (1) falsity, (2) materiality, and (3) scienter.[2] *See id.* at 1. These three issues are sufficient to establish liability under the federal False Claims Act:

> To establish a cause of action under the False Claims Act (FCA), 31 U.S.C. § 3729(a)(1), the government must prove three elements: (1) a "false or fraudulent" claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with knowledge that the claim was false.

*United States v. Mackby*, 261 F.3d 821, 826 (9th Cir. 2001) (citing 31 U.S.C. § 3729(a)(1)); *see also U.S. v. Bourseau*, 531 F.3d 1159, 1171 (9th Cir. 2008) (recognizing a "materiality

---

[1] This action was brought by the qui tam plaintiff on behalf of the federal government and over 190 state, county and municipal entities. *See* Exhibit 1 to the Third Amended Complaint, Docket No. 277.

[2] As stated in the Bifurcation Order:

> Plaintiffs allege that J-M falsely represented that (a) **all** (not just some) J-M pipe satisfied the requirements, rules, and standards of the various standards bodies, which pipe and standards were identified with particularity in their November 30th submission; and (b) **all** (not just some) of the pipe was manufactured in a substantially identical manner to the pipe that was originally determined to comply with the standards. Plaintiffs allege that J-M's statements were false because J-M did not properly manufacture "all" its pipe as represented in (a) and (b) above. Plaintiffs further allege that J-M's statements were false because J-M did not uniformly test its pipe as represented in (a) and (b) above. Plaintiffs allege that instead, J-M manufactured or tested its pipe in a manner that did not comply with the foregoing industry standards. Plaintiffs allege that, as a result of JM's inconsistent and substandard manufacturing and testing, J-M's customers received a "lottery ticket," in which there was no assurance that the pipe was made and tested in the manner represented. The first jury will decide whether J-M's manufacturing and testing deficiencies deviated from its representations to such a degree as to render J-M's representations false.

*See* Docket No. 551 at 8 of 11 (emphasis in original).

1

requirement" for FCA claims)[3]; *but see Universal Health Servs. v. Escobar*, 136 S. Ct. 1989, 1999 n.2 (2016) ("The False Claims Act abrogates the common law in certain respects. For instance, the Act's scienter requirement 'require[s] no proof of specific intent to defraud.' 31 U. S. C. § 3729(b)(1)(B).").[4]

After a lengthy trial on liability in Phase One, on November 14, 2013, the Phase One jury found for the five Exemplar Plaintiffs[5] on all three issues and as to all of the 26 projects identified. *See generally* Verdict Form ("Verdict"), Docket No. 1794. The Court over time issued numerous rulings from the bench and in writing interpreting the Phase One verdict and the damages issues that were to be presented in the second phase of trial ("Phase Two"). The Phase Two trial on damages began on October 9, 2018. Docket No. 2689. The trial lasted multiple weeks, bleeding into November 2018; and, after the jury twice announced that it could not reach a verdict, the Court declared a mistrial on November 14, 2018. *See* Docket No. 2765.

About a month later, on December 12, 2018, Defendant filed this renewed motion for judgment as a matter of law.[6] *See* J-M Manufacturing Company, Inc.'s Renewed Motion for

---

[3] These are also essentially the elements required for a claim brought under 31 U.S.C. § 3729(a)(1)(B). *See* Claire M. Sylvia, The False Claims Act: Fraud Against the Government §§ 4:2, 4:3 (2015). The FCA was amended in 2009 to add language that directly addressed the materiality requirement that most circuits had already read into the statute. *See id.* § 4:57 (discussing 2009 Amendments to FCA).

[4] In the Phase One Trial, the issue of damages was not raised as the Plaintiffs argued and the Court agreed that no showing of injury or damages to the government was needed to establish liability under the FCA. *See* Plaintiffs' Proposed Jury Instruction No. 45 – No Need to Show Damage, Docket No. 1765; *see also Bly-Magee v. California*, 236 F.3d 1014, 1017 (9th Cir. 2001) ("[A] qui tam plaintiff need not prove that the federal government will suffer monetary harm to state a claim under the FCA.").

[5] The five Exemplar Plaintiffs are: (1) Calleguas Municipal Water District in California; (2) City of Norfolk, Virginia; (3) City of Reno, Nevada; (4) Palmdale Water District in California; and (5) South Tahoe Public Utility District in California. *See* Final Jury Instructions at 1, Docket No. 2756.
Although the Exemplar Plaintiffs are all state governmental entities, reference throughout this action has often been to the federal FCA statute and concomitant case law. This is because the relevant state FCA statutes were patterned after the federal law and, where there is a dearth of state authority for a proposition, the state courts have turned to federal cases for guidance. *See e.g. City of Pomona v. Superior Court*, 89 Cal. App. 4th 793, 801-02 (2001) ("California's False Claims Act is 'patterned on a similar federal statutory scheme (31 U.S.C. § 3729 et seq.).' . . . Given the lack of California authority and the very close similarity of California's act to the federal act, it is appropriate to turn to federal cases for guidance in interpreting the act."); *Simonian v. Univ. & Cmty. College Sys.*, 122 Nev. 187, 192 (2006) ("Nevada's FCA is modeled after the federal FCA . . . . in drafting Nevada's FCA the Nevada Legislature looked to the federal FCA"); *Commonwealth ex rel. Hunter Labs., LLC v. Quest Diagnostics Inc.*, 95 Va. Cir. 323, 326 (2017) ("the VFATA [Virginia Fraud Against Taxpayers Act which is that state's FCA] is based on the [federal] FCA and mirrors its provisions . . . . The General Assembly adopted the 'same substantive language' in the FCA when originally enacting the VFATA, indicating the legislature's intent for state courts to construe the state statute as the federal courts construe the federal statute.").

[6] Defendant filed its initial motion for judgment as a matter of law on October 31, 2018, during the Phase

2

Judgment as a Matter of Law ("JMOL Motion"), Docket No. 2809.  Plaintiffs filed an opposition.  *See* Plaintiffs' Memorandum of Law in Opposition to J-M's Motion for Judgment as a Matter of Law ("Opp'n"), Docket No. 2814.  Defendant filed a reply.  *See* J-M Manufacturing Company, Inc.'s Reply in Support of Its Renewed Motion for Judgment as a Matter of Law ("Reply"), Docket No. 2816.

At the February 20, 2019 hearing, the Court clarified certain issues pertaining to the JMOL Motion and sought elucidation on other issues from the parties.  *See generally* Feb. 20, 2019 Civil Minutes ("Clarification Order"), Docket No. 2820; *see also* Feb. 20, 2019 Hr. Tr.  The Court stated the following in the Clarification Order:

> In terms of the scope of the present review, the Court notes at the outset that it will not use the JMOL hearing or briefing to reconsider any prior rulings made during the pendency of this case.  This includes rulings regarding previously filed motions in limine, motions for summary judgment, *Daubert* motions, and rulings made prior to and during trial such as those regarding jury instructions, among others.  Of course, for disputes that the Court did not resolve during the pendency of trial because all evidence had not yet been presented, the Court would make such rulings as necessary in deciding the JMOL Motion.  In addition, the parties may not use the JMOL related briefing as a vehicle to attack the Phase One Jury's findings or rehash the liability phase of this case.  Consequently, the issue before the Court is limited to actual damages.[7]  To the extent that the JMOL-related briefing of either side rehashes already decided motions or arguments, the Court will simply ignore those arguments.  If the Court denies the JMOL Motion and allows the case to proceed to retrial, the Court will not reconsider any prior ruling (oral or written)

---

Two trial.  Docket No. 2729.  That motion was denied without prejudice.

[7] In the same vein, statutory damages (also referred to as civil penalties) under false claims act statutes are not the subject of this motion and, indeed, have still to be tried.  Thus, the JMOL Motion at most seeks partial judgment as a matter of law, without the issue of statutory damages/civil penalties.  Nevertheless, the Court would make two observations at this point in regards to the subject of civil penalties.

First, civil penalties themselves serve both deterrent and remedial purposes and, hence, a court may award such penalties even when the Government has not suffered, or cannot establish, actual damages.  *See San Francisco BART Dist. v. Spencer*, Case No. C-04-046323-SI, 2007 WL 911851 *1 (N.D. Cal. Mar. 23, 2007) ("Here, plaintiff failed to prove any actual damages.  However, despite an inability to establish injury, plaintiff may still receive the statutory penalty for each violation of the CFCA.").

Second, during the Phase Two trial, the parties agreed that the issue of statutory damages/civil penalties would be tried to the Court.  On that subject, the Court would also ask the parties to address whether the Court may decide statutory damages prior to a retrial of Phase Two, if it ultimately denies the JMOL Motion.  Though the parties have agreed that the Court should decide statutory damages after ruling on the JMOL Motion, they have not meaningfully addressed *when* the Court may elect to do so in relation to a retrial.  *See* JMOL Motion at i n.1 ("This motion does not address the issue of civil penalties, on which the parties agree the Court should defer [its] decision until resolving the present motion.").

3

> absent a formal written motion for reconsideration.[8]
>
> Narrowing the scope of the JMOL briefing in the foregoing manner, the only issue is whether Plaintiffs presented sufficient evidence for a reasonable juror to come out in their favor regarding the theory of damages presented at the end of trial.  In other words, the question is whether, *based on the evidence presented at trial and with all prior rulings taken into consideration*, a reasonable juror could award some amount of actual damages that would not be totally unfounded or purely speculative based on the liability found in Phase One.  This is the sole issue that the Court will address and would like the parties to address at the February 20, 2019 hearing.  Though the Court withholds ruling at this time, it does note that Defendant has made some initially persuasive arguments about a lack of evidence at trial.  Indeed, to survive the JMOL Motion, Plaintiffs will have to do more than merely establish the remote possibility of some amorphous amount of nominal damages.  Given its burden of proof, Plaintiffs had to have presented the jury with a basis to award some damages figure founded on more than pure speculation.  That is part of what separates recovery of actual damages from statutory damages.

*See* Clarification Order at 2-3 (emphasis and footnotes in original, but footnotes renumbered for this document).[9]

At that hearing, the Court requested additional materials from the parties, and Plaintiffs thereafter filed supplemental briefing along with evidence that they argue defeats the JMOL Motion.  *See* Plaintiffs' Supplemental Memorandum of Law in Opposition to J-M's Motion for

---

[8] The Court would highly discourage the filing of any motions for reconsideration if the JMOL Motion is denied.  The Court is inclined to believe, based on the history of this litigation, that any motion for reconsideration would likely constitute an opportunity to reargue previous motions or present evidence that was or should have been raised earlier.  That is not a basis for reconsideration and the Court would summarily deny any such motions that fall into those buckets.  *See Moore v. Grundman*, No. 11-CV-01570-DMS-(WMCx), 2012 WL 1252711, at *1 (S.D. Cal. Apr. 13, 2012) (citation and internal quotation marks omitted); *see also United States v. Westlands Water District*, 134 F.Supp.2d 1111, 1131 (E.D. Cal. 2001) (noting that "[a] motion for reconsideration is not a vehicle to reargue the motion or to present evidence which should have been raised before . . . . [and that a] party seeking reconsideration must show more than a disagreement with the Court's decision, and recapitulation . . . of that which was already considered by the Court in rendering its decision.").  The parties will have a chance to appeal and they are welcome to make any such arguments to the Ninth Circuit.  As to the local rules, Local Rule 7-8 provides:

> A motion for reconsideration . . . may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision.

*See* Local Rule 7-8.  If the parties would like earlier rulings reconsidered after the Court's hypothetical denial of the JMOL Motion, the Court would require two-page briefs for each motion for reconsideration invoking one of the enumerated bases for reconsideration.

[9] J-M appears to be seeking a *Daubert* review on Plaintiffs' expert Steven Lehmann, but in the context of his actual testimony at trial versus the offer of proof that was made during the pre-trial *Daubert* motions.

Judgment as a Matter of Law ("Pl.'s Supp."), Docket No. 2821.  J-M filed its own supplemental briefing a week later.  *See* J-M Manufacturing Company, Inc.'s Submission in Support of Its Renewed Motion for Judgment as a Matter of Law ("Def.' Supp."), Docket No. 2822.

## II. **Legal Standard**

"A jury's inability to reach a verdict does not necessarily preclude a judgment as a matter of law."  *Headwaters Forest Def. v. Cty. of Humboldt*, 240 F.3d 1185, 1197 (9th Cir. 2000), *vacated on other grounds*, 534 U.S. 801 (2001).  Ninth Circuit precedent dictates that "[t]he same standard applies to a motion for judgment as a matter of law made after a mistrial because of jury deadlock."  *Nichols v. City of San Jose*, No. 14-CV-03383-BLF, 2017 WL 3007072, at *1 (N.D. Cal. July 14, 2017) (citing *Headwaters*, 240 F.3d at 1197 n. 4 ("The fact that the motion was granted after a mistrial was declared because of jury deadlock does not alter the standard to be applied on appeal.")).

When deciding a motion for judgment as a matter of law, the district court must determine whether − based on the evidence presented at trial − "no reasonable juror could find in the non-moving party's favor."  *Torres v. City of Los Angeles*, 548 F.3d 1197, 1205 (9th Cir. 2008) (internal quotation marks omitted and citation omitted); *see also* Fed. R. Civ. P. 50(a)-(b).  "The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party.  If conflicting inferences may be drawn from the facts, the case must go to the jury."  *Torres*, 548 F.3d at 1205-06 (citation and internal quotation marks omitted).  "[T]he court should review all of the evidence in the record. In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).  Indeed, the Court must look at the record "as it existed when the trial was closed."  *Elbert v. Howmedica, Inc.*, 143 F.3d 1208, 1209 (9th Cir. 1998).

To successfully move for judgment as a matter of law, the moving party must satisfy the aforementioned "very high" standard.  *Costa v. Desert Palace*, 299 F.3d 838, 859 (9th Cir. 2002). The reason for such a high standard is that courts should ordinarily not impinge upon the province of the jury.  *Id.* at 859 ("This high hurdle recognizes that credibility, inferences, and fact finding are the province of the jury, not this court.").  "Judgment as a matter of law is appropriate when the *evidence presented at trial* permits only one reasonable conclusion."  *See Torres*, 548 F.3d at 1205 (citation and internal quotation marks omitted) (emphasis added).

### III. Background on FCA Damages Law

#### A. Applicable law

Typically, damages awarded under the False Claims Act ("FCA") are liberally calculated to ensure that they "afford the government complete indemnity for the injuries done it." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 549 (1943) (cited in *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 304 (6th Cir. 1998)).  Generally, the measure of the government's damages is "the amount that it paid out by reason of the false statements over and above what it would have paid if the claim had been truthful." *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966).  Simple as it may sound, "[p]roper application of this benefit-of-the-bargain measure depends on the particular circumstances of the case." *United States v. Sci. Applications Int'l Corp. ("SAIC III")*, 625 F.3d 1257, 1278 (D.C. Cir. 2010).  For example, "[w]here a contractor's fraud consists of knowingly submitting nonconforming goods with ascertainable market value, the Supreme Court has instructed that '[t]he Government's actual damages are equal to the difference between the market value of the [product] it received and retained and the market value that the [product] would have had if [it] had been of the specified quality.'" *Id.* at 1279 (quoting *United States v. Bornstein*, 423 U.S. 303, 316 n.13 (1976)). Alternatively, in certain cases where the market value of the conforming goods or services is impossible to determine, courts have calculated damages as "the amount the government actually paid minus the value of the goods or services the government received or used." *Id.*; *see also*, Joel M. Androphy, Federal False Claims Act & Qui Tam Litigation § 11.03[2] (2009).

Despite the emergence of certain patterns as to FCA damage determinations in the case law, there is substantial variance depending on the facts of each case.  For example, some courts follow the approach described in *SAIC III* and determine the government's actual damages by deducting the value of nonconforming goods from the contract price paid by the government, while others do not. *See, e.g.*, *United States ex rel. Longhi v. United States*, 575 F.3d 458, 473 (5th Cir. 2009); *United States v. United Techs. Corp.*, 626 F.3d 313 (6th Cir. 2010) (as amended).  On the other hand, "some courts find where it is impossible to determine the value of the nonconforming goods, the court must award the full amount of the Government's payments for the goods as the appropriate measure of the Government's damages." *See United States ex rel. Humane Society of the United States ("Humane Society")*, No. EDCV 08-00221-VAP-(OPx), 2013 WL 5753784, at *8 (C.D. Cal. Apr. 30, 2013) (citing *United States ex rel. Feldman v. van Gorp*, 697 F.3d 78 (2nd

6

Cir. 2012); *United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008)).[10]

### B.  Relevant Jury Instructions

As to the 26 projects at issue in Phase One, the jury found that J-M had "falsely represented uniform compliance with AWWA [American Water Works Association standards C900 or] C905 and [Underwriters Laboratory, Inc.'s standard] UL 1285" or that the "IRA's testing tensil [sic] strength average PSI fails to meet UL requirements."  *See* Verdict at 2 *et seq*., Docket No. 1794. In Phase Two, the jury was instructed that in the Phase One trial:

> Plaintiffs claimed that there had been a substantial decline in three key tests that are part of these industry standards. Those three tests are: (1) abbreviated Hydrostatic Design Basis testing, referred to by shorthand as "HDB" testing; (2) Longitudinal Tensile Strength testing, referred to by shorthand as "LTS" testing; and (3) "Quick Burst" Testing, referred to by shorthand as "QB" testing.  Plaintiffs claimed that each of these tests measure, directly or indirectly, the longterm strength and durability of the PVC pipe. Plaintiffs further claimed that the substantial declines in these tests demonstrated that the pipe that J-M manufactured during the period of time Plaintiffs acquired J-M pipe for their 26 projects did not uniformly have the same quality, strength, and durability of the PVC pipe that was initially qualified as complying with the industry standards.

*See* Phase Two Jury Instructions at 2, Docket No. 2756.  Additionally, in the Phase One trial, the jury was informed that in FCA cases "No showing of actual damage is required to establish a false or fraudulent claim for payment."  *See* Phase One Jury Instructions at 7, Docket No. 1792. Thus, the Phase Two jury was instructed that:

> While the Phase 1 Jury found J-M to be liable under the relevant False Claims Act statutes, the Phase 1 Jury was not asked to decide and did not determine: (1) what, if any, actual damages resulted from J-M's violations of the statutes, and (2) the amount of Plaintiffs' damages, if any, caused by J-M's violations of those statutes. Those determinations were left to you as the "Phase 2 Jury" to decide in this trial. * * * *
>
> Under the False Claims Act statutes involved in Phase 2, a Plaintiff can seek recovery of: (1) the amount of actual damages that it sustained because of the false claims submitted by J-M; and (2) civil penalties as provided in the statute for each false claim submitted by J-M. * * * *
>
> As to actual damages, Plaintiffs contend that, as a result of J-M's failure to manufacture and test its pipe in a manner that assured that it had the quality, strength and durability as required under the applicable industry standards, the pipe Plaintiffs purchased will fail sooner than pipe that conformed to the applicable

---

[10] The Court recognizes that there are many other cases that discuss and address damages in the context of the FCA.  This section is merely for context and does not encompass the entirety of law in this area.

7

industry standards and thus will have to be replaced sooner. Plaintiffs seek damages for the difference between the value of the pipe Plaintiffs received and the value the pipe would have had if it had been as represented by J-M.

*See* Phase Two Jury Instructions at 3.

## IV. Analysis

The question here is whether – based upon the Phase One jury's verdict, the Court's prior rulings, the evidence proffered at the Phase Two trial (and drawing all reasonable inferences in Plaintiffs' favor from that evidence), and the Plaintiffs' litigation positions stated in the Phase Two trial and therafter – a reasonable jury could award some amount of money that could constitute an award of actual damages that would not be erroneous as a matter of law, be totally unfounded and/or be purely speculative.

During the consideration of J-M's renewed JMOL motion, there was comment on Plaintiffs' ever-morphing theories[11] as to actual damages and, as such, the Court required Plaintiffs to proffer a supplemental brief as to precisely Plaintiffs' contentions as to the bases for their recovery of actual damages and reference to the evidence proffered at the Phase Two trial that supported their claims. *See* February 20, 2019 Minute Order, Docket No. 2820; *see also* Feb. 20, 2019 Hr. Transcript attached as Exhibit 28 to Def.' Supp., Docket No. 2822-2. In that submission, Plaintiffs state:

> At trial Plaintiffs' damage theory was benefit of the bargain, meaning the difference between the price Plaintiffs paid for the pipe, which was undisputed at trial, and the value of the pipe they received. As a result of rulings following the close of evidence, Plaintiffs proffered two methods of quantifying the value of the pipe they received: (1) that because the pipe would fail early and need to be replaced at great expense, it had little to no value; and (2) that because no reasonable municipality would purchase noncompliant pipe, it had little to no market value.

*See* Pl.'s Supp. at 1, Docket No. 2821. If those in fact are Plaintiffs' actual damages theories, then it is readily apparent that the JMOL Motion should be granted.

### A. "Little to No Value" Because No Reasonable Municipality Would Purchase

Addressing Plaintiffs' latter argument first, the fact that no reasonable municipality would ever purchase non-conforming goods does not mean that those goods have "little or no value." As this Court has already observed, the fact that a government entity would not knowingly purchase

---

[11] In using the term "ever-morphing," the Court does not mean to imply that the Plaintiffs were games-playing and/or improperly litigating the issue. It is merely recognizing that Plaintiffs' theories as to actual damages evolved during the litigation, sometimes in response to particular rulings of the Court.

a particular item knowing that it did not conform to required specifications does not mean that the item has "little to no value." *See* Feb. 20, 2019 Hr. Transcript at 20-21, Docket No. 2822-2. Rather, the issue of the government entity's not purchasing a non-compliant good goes to the materiality element of the FCA claim, not to actual damages element once the purchase has been made.

Plaintiffs have argued that there are relevant cases which stand for the proposition that materially non-conforming goods can have zero value. However, none of those cases rests that conclusion merely on the notion that because the government purchaser would not knowingly buy non-conforming goods the value of those items must be set at zero for purposes of calculating actual damages. More importantly, the finding of zero value in those cases is based on entirely dissimilar facts than involved in this FCA case and also upon very different theories of damages.

For example, in the *Roby* and *Compton* cases (oft cited by the Plaintiffs in their damages discussions), it was held that zero dollars was the appropriate figure to attach to the nonconforming goods that the government received. In *U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 298 (6th Cir. 1998), the government contracted with defendant to supply brake shoes for over 34,000 jeep vehicles where the brake shoes had to meet *inter alia* certain quality standards and where the defendant was obligated to test a varying number of the manufactured shoe kits. *Id.* at 297-98. The delivered brakes began malfunctioning and samples of 18 and 54 brake kits were evaluated by the government and found to have a failure rate of respectively 78 and 60 percent; plus it was discovered that defendant had not conducted the required testing of one out of every 250 brake shoe kits. Upon that discovery, the government ordered every jeep vehicle "deadlined" until the brake shoes were removed and replaced as the defective brake shoes at issue posed an imminent safety hazard to occupants of the vehicles rendering them unusable. In *Compton*, it was held that the government had established that the value goods received by it was zero (and hence it could recover the entire contract price) because immediately after discovery of the failures and the lack of testing, the government ceased all use of the brake shoe kits and had them removed from the vehicles.[12] *Id.* at 304-05.

In *U.S. ex rel. Roby v. Boeing*, 302 F.3d 637, 647-48 (6th Cir. 2002), the government sought damages of $13 million for a new helicopter to replace a "remanufactured" helicopter it purchased

---

[12] In *Compton*, there was no provision for an inclusion in the damages award for the labor and concomitant costs expended to effectuate the actual replacement of the brake shoes for the affected vehicles.

9

for $4.1 million, which crashed (causing a total loss in excess of $10 million from the destruction of the helicopter and its contents) after 56 hours of flight time (but warranted for 200 hours of flight time) due to the inclusion of a "defective flight critical transmission gear." *Id.* at 639-40. The parties reached a settlement of most of the issues, but on appeal reserved the question as to "Whether the [Government] can recover damages under the [FCA] for loss of a helicopter resulting from the failure of a defective flight-critical component part." *Id.* at 640. The *Roby* court held: (1) that the correct measure of actual damages therein was "the 'diminished value' or 'benefit of the bargain' test [where] we subtract the market value of what the Government received from what it was promised" (*id.* at 647); (2) damages in *Roby* were not limited to the value of the defective gear alone (*id.* at 646-48); (3) because the defective component posed an imminent danger to the lives of American service personnel, the fact that the Government did receive 56 hours of flight time before the actual crash would not used to find that the remanufactured helicopter had any value other than zero (*id.* at 647-48); (4) where the government's damages consist of difference between the market value of the item it received (even when that value is zero) and the market value of the item as promised, those damages would include the replacement costs (in *Roby*, the $13 million for a new helicopter).

The situation here contrasts sharply with *Roby* and *Compton* where the falsely claimed products were found to have zero value. Plaintiffs have presented no evidence that they have removed or contracted for the replacement of all J-M pipe in the ground; and it is undisputed that they have not ceased use of the pipe in the ground and thereby have retained (for years) value from it. Nor have Plaintiffs presented any sufficient evidence of any actual or threatened loss of life or limb from the use or presence of the J-M pipes in the decades since their installation in the water-related governmental facilities.

Similarly, *United States ex rel. Humane Society of the United States v. Hallmark Meat Packing Co.*, No. EDCV 08-00221-VAP-(OPx), 2013 WL 5753784 (C.D. Cal. Apr. 30, 2013), provides no haven for Plaintiffs' argument. In *Humane Society*, the court denied defendant's motion for summary judgment. In that case, there were two bases for the FCA claims: (1) that the defendant had contracted to provide the government with meat from cattle that were "handled humanely" but failed to do so; and (2) that the defendant had hired a known felon at its facility which would have rendered the facility ineligible to obtain any of the government contracts. *Id.* at *1, 6. As to the first basis, the court rejected the government's contention that the failure to

comply with the humane treatment contract provision rendered the meat valueless; rather – in reliance on the decisions in *United States v. Bornstein*, 423 U.S. 303 (1976), and *United States v. Woodbury*, 359 F.2d 370 (9th Cir. 1966), the court held that "the appropriate damages calculation under the United States' first theory for FCA damages is as follows: the full contract price it paid for the beef products it received from the Facility minus the value of the beef it received from humanely treated cattle." 2013 WL 5753784 at *9. However, the court shifted the burden to the defendant to demonstrate the value of the compliant beef products given that such evidence was completely under its control.[13] *Id*. at *16. As to the second basis, relying on a line of cases that where a defendant is totally ineligible to receive a government contract but nevertheless fraudulent obtains one, the court held that the damages was the entire amount paid by the government with no offset. The court cited to the following language from *United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 90 (2nd Cir. 2012), in that regard:

> In short, in each of the cases cited by the defendants, the government paid for a contracted service with a tangible benefit − whether it be medical care, security on mortgages, or subsidized housing − but paid too much. The government in these cases got what it bargained for, but it did not get all that it bargained for. Thus, courts treated the difference between what the government bargained for and what it actually received as the measure of damages. Here, by contrast, the government bargained for something qualitatively, but not quantifiably, different from what it received.

The present case is not one where J-M was ineligible to obtain the piping subcontracts for which it was awarded.

### B. Early Failure and the Need to Be Replaced at Great Expense

Plaintiffs contend that in the Phase Two trial they proffered a method of quantifying the value of the J-M pipe they received by establishing that "the pipe would fail early and need to be replaced at great expense," from which the jury could conclude that the pipe had "little to no value." *See* Pl.'s Supp. at 1, Docket No. 2821. A number of insurmountable problems arise as to that contention. First, it is unclear what is meant by "fail early." Second, assuming *arguendo* that early failure is a reference as to the differences in longevity as between compliant and non-compliant J-M pipe (with compliance in reference to the three tests/standards litigated in Phase

---

[13] Here, the situation is not one where the evidence is solely within the control of Defendant. Indeed, it was within Plaintiffs' control (as much as, or if not more so than, Defendant's) to dig up and test at least some of Plaintiffs' J-M pipe; but that was never done.

One), Plaintiffs failed to present evidence at the Phase Two trial as to a usable longevity figure for compliant pipe.[14]  Third, the Plaintiffs failed to present evidence as to any calculable amount of reduced longevity as to non-compliant J-M pipe in comparison compliant pipe.  Fourth, Plaintiffs have conceded that "nobody was able to quantify the value." *See* Feb. 20, 2019 Hr. Transcript at 11, Docket No. 2822-2.  Fifth, it is unclear what is meant by the word "need" in Plaintiffs' contention − *i.e.* is it an immediate need, an eventual need, a theoretical need, is the need dependent upon a showing of a date for an expected failure, etc.  Sixth, while there is no dispute that an effort to replace all of the J-M pipe in the 26 projects would entail great expense,[15] this Court has already held that, barring a showing of imminent structural calamity or immediate danger to health (which Plaintiffs did not proffer), replacement costs are not part of actual damages as to the FCA cases involved herein.  Seventh, Plaintiffs appear to be continually arguing that the Plaintiffs have received absolutely no value as to the J-M pipe at issue when this Court has continually held that, as a matter of law, the Plaintiffs have clearly received value from the pipes since they have been in the ground since between 1996 and 2006 up and to the present date without failure, and that Plaintiffs have not presented evidence of any non-speculative date in the future when such failure might reasonably be expected.

Additionally, it appears to the Court that in J-M's briefing there appears to be a request for a post-trial *Daubert* review as to parts of Lehmann's and Edwards' testimony.  Conceptually, that can be done.  In *Goebel v. Denver & Rio Grande Western R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000), it was observed that: "The district court may also satisfy its gatekeeper role when asked to rule on a motion in limine, on an objection during trial, or on a post-trial motion so long as the court has sufficient evidence to perform 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' *Daubert*, 509 U.S. at 597."  Likewise,

---

[14] There was testimony as to *expectations* as to the longevity of compliant pipe.  However, those expectations varied from 50 years to 100 years and up to 200 years.  Additionally, the evidence at trial did not show that compliance with the three tests/standards at issue in this case would guarantee or even necessarily translate into any particular longevity figure.  Indeed, certain of the industry testing/standards organizations themselves disclaimed any such correlation.  Also, Plaintiffs' counsel conceded that "we argued to the jury the standards don't address longevity." *See* Trial Transcript 8419:20-8420:1.  Also, in its brochures and contracts, while J-M did agree to comply with and/or meet industry standards, none of three industry standards herein guarantee longevity.  Indeed, J-M's warranty for its pipe during the 1996-2006 period was only one year.

[15] There was testimony at the Phase Two trial that the cost of replacing the J-M pipe in certain of the projects would be about 8 times the cost that Plaintiffs paid for the project at the time of their installation and between 40 to 50 times what J-M was paid for the pipe.

12

in *Drake v. Delta Air Lines, Inc.*, No. 94-CV-5944(FB)(RML), 2005 WL 1743816 at *8 (E.D.N.Y., July 21, 2005), it was observed that:

> [A]s the Eighth Circuit has appropriately advised:
>
>> It is far better where, in the mind of the district court, there exists a close case on relevancy of the expert testimony in light of the plaintiff's testimony to allow the expert opinion and if the court remains unconvinced, allow the jury to pass on the evidence. Depending on the verdict, the trial court can always refer to Federal Rule of Civil Procedure 50(b) and grant a judgment as a matter of law or a new trial.
>
> *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 695-96 (8th Cir. 2001).

Accordingly, although prior to trial the Court ruled that Drake could introduce Dr. Mann's expert testimony, *see* September 3, 2002, Tr. at 22-23 ("It may be a thin case ... but I do think that if I were to preclude the plaintiff from going forward and striking the expert's testimony that there would be a significant risk of having to try this case in the future ...."), the Court now reevaluates whether Dr. Mann's testimony should have been excluded under *Daubert. See Goebel v. Denver & Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir.2000) ("The district court may also satisfy its gatekeeper role [under *Daubert* ] when asked to rule ... on a post-trial motion ...." (citing *Daubert*, 509 U.S. at 597)). In so doing, the Court reviews not only the evidence adduced at trial but also the underlying expert report, which was not admitted at trial. [Footnote omitted].