David Bernick *(admitted pro hac vice)*
   dbernick@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

Ekwan E. Rhow – State Bar No. 174604
   erhow@birdmarella.com
Paul S. Chan – State Bar No. 183406
   pchan@birdmarella.com
Marc E. Masters – State Bar No. 208375
   mmasters@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant J-M Manufacturing
Company, Inc. dba JM Eagle

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES, *et al.*,<br><br>            Plaintiffs,<br><br>     vs.<br><br>J-M MANUFACTURING COMPANY, INC. dba JM EAGLE, *et al.*,<br><br>            Defendants. | CASE NO. 5:06-cv-00055-GW-PJW<br><br>**DEFENDANT J-M MANUFACTURING COMPANY, INC.'S OPPOSITION TO PLAINTIFFS' REQUEST FOR MAXIMUM CIVIL PENALTIES**<br><br>*[Filed concurrently with Declaration of Chuck Clark]*<br><br>Date:   August 31, 2020<br>Time:   8:30 a.m.<br>Crtrm.: 9D<br><br>Assigned to Hon. George H. Wu |

3665595.4

J-M'S OPPOSITION TO PLAINTIFFS' REQUEST FOR MAXIMUM CIVIL PENALTIES

# TABLE OF CONTENTS

**Page**

I. Introduction ............................................................................................................ 1

II. There Is No Basis for *Any* Award of Civil Penalties in View of the Findings Contained in the Court's JMOL Ruling. ............................................... 2

III. The Record Facts Do Not Support Any Award of Penalties for the 22 California Claims. ................................................................................................. 3

    A. There Is No Evidence of Any J-M Intent to Defraud. ........................... 5

    B. The Number of Claims Is Modest and the Amount of the Claims Is Zero. ................................................................................................... 6

    C. Other Mitigating Factors ....................................................................... 6

        1. Because Plaintiffs suffered no damages, penalties are not warranted. ..................................................................................... 7

        2. J-M's conduct does not rise to the level of severity in maximum penalty cases. .............................................................. 10

        3. J-M accepted responsibility for any flaws in its pipe. ................ 12

        4. Principles of general fairness justify an award of no penalties. ...................................................................................... 14

IV. The Court Should Decline to Award Penalties in Connection with the Two Virginia Claims and Two Nevada Claims, or at Most Award the Statutory Minimum. ............................................................................................ 14

V. Conclusion ........................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bullard v. California State Auto. Assn.*
   129 Cal. App. 4th 211 (2005) ............................................................................. 3

*California Ins. Guar. Assn. v. Workers' Comp. Appeals Bd.*
   232 Cal. App. 4th 543 (2014) ............................................................................. 3

*Pena v. United States Dep't of Agriculture*
   811 F. Supp. 419 (E.D. Ark.) ............................................................................. 7

*U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*
   488 F. Supp. 2d 719 (N.D. Ill. 2007) .................................................................. 7

*United States ex rel. Landis v. Tailwind Sports Corp.*
   324 F. Supp. 3d 67 (D.D.C. 2018) .................................................................... 10

*United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*
   501 F. Supp. 2d 51 (D.D.C. 2007) ................................................................. 5, 7

*United States ex rel. Virgin Islands Hous. Auth. v. Coastal Gen. Const. Servs. Corp.*
   299 F. Supp. 2d 483 (D.V.I. 2004) ................................................................ 7, 9

*United States v. FastTrain II Corp.*
   No. 12-CV-21431, 2017 WL 606346 (Feb. 15, 2017) ..................................... 11

*United States v. Saavedra,*
   No. 15-2307-cv, 2016 WL 4626557 (2d Cir. Sept. 6, 2016) ............................ 12

*United States v. Speqtrum, Inc.*
   No. CV 10-2111 (JEB), 2016 WL 5349196 (D.D.C. Sept. 23, 2016) ............. 11

*Walt Rankin & Assocs., Inc. v. City of Murrieta*
   84 Cal. App. 4th 605 (2000) ............................................................................... 4

**Statutes**

31 U.S.C. § 3729 ........................................................................................................ 10

Cal. Gov. Code § 12651 (1987) .............................................................................. 3, 4

Nev. Rev. Stat. Ann. § 357.040 (1999) ................................................................. 3, 14

VA Code Ann. § 8.01-216.3 (2004) ............................................................................ 3

**Other Authorities**

California Assembly Bill No. 1441 ......................................................................... 4, 5

1 John T. Boese, *Civil False Claims and Qui Tam Actions*, § 3.05(c)
(2019) ................................................................................................................... 12

## I. Introduction

Plaintiffs ask this Court to award the maximum civil penalties for the 26 claims for payment and projects at issue, or $260,000. The Court should decline to issue such a penalty award.

As set forth more fully in J-M's Opening Brief on Penalties, there is no basis for *any* award of statutory penalties in light of the Court's recent JMOL Ruling, which expressly rejects the theories and evidence proffered by Plaintiffs—about the purported correlation between the three "key" tests and long-term pipe strength and durability, and the import of the purported decline in J-M's test scores—undergirding the Phase One jury's findings as to "falsity." In light of the findings in the JMOL Ruling, there is no factual predicate for the Court to now conclude—as it must in order to award civil penalties—that J-M made "false" claims for payment in connection with each of the 26 projects.

In addition to the absence of any false claim for payment, the "totality of the circumstances" here do not support an award of penalties—and certainly not the maximum amounts proposed by Plaintiffs. The Court's decision to award penalties is fully discretionary with respect to the projects located in California, which account for the vast majority (22 of 26) of the claims for payment at issue in the case. The mitigating factors relevant to the Court's exercise of this discretion uniformly weigh *against* any award of penalties with respect to these projects, because:

- The Court has already found, as a matter of law, that Plaintiffs received value from their pipe, received the benefit of their bargain, and suffered no cognizable damages;
- There is no evidence that J-M specifically intended to defraud the five exemplar Plaintiffs;
- The number of alleged false claims for payment at issue is modest (26), and the dollar amount of these claims is zero; and

- J-M has accepted responsibility for any defects with its pipe, by offering its customers a retroactive 50-year warranty.

Principles of "general fairness" also militate strongly against any award of penalties. This is a case is about J-M pipe that is not defective and has not failed; brought by sophisticated Plaintiffs whose pipe is still in the ground, performing as promised; that culminated in a finding that no Plaintiff suffered any cognizable injury. But this 14-year litigation has inflicted serious harm on J-M. J-M has been forced to incur over $50 million in attorneys' fees and costs defending itself against the allegations in this case. Its reputation has been disparaged in the press. And it has been blocked from selling its pipe in certain jurisdictions until there is final disposition in the case. In view of the absence of harm to the government, on the one hand, and the substantial costs J-M has already incurred as a result of this litigation, on the other, there is no basis to support any further award of penalties against J-M.

## II. There Is No Basis for *Any* Award of Civil Penalties in View of the Findings Contained in the Court's JMOL Ruling.

As explained more fully in J-M's Opening Brief on Penalties (Dkt. 2886), the Phase One Verdict as to "falsity" was bottomed upon Plaintiffs' theory that there had been "a substantial decline in three key tests" (QB, LTS and HDB), which (1) "measure, directly or indirectly, the long term strength and durability" of J-M's pipe; and (2) the declines in these three tests demonstrated that J-M's pipe "did not uniformly have the same quality, strength, and durability" of standards-compliant pipe. The JMOL Ruling, however, expressly considered and rejected each of the factual predicates underlying the Phase One jury's finding of "falsity," finding that (1) the QB, LTS, and HDB tests measure the short-term strength of PVC materials, *not* the longevity of pipe made from those materials; and (2) either there was no decline in test results, or else it is impossible to discern whether the alleged declines resulted in any diminution in strength or longevity. (Dkt. 2880 at 33, 37-38 (June 5,

2020 JMOL Ruling).) In view of the Court's findings in the JMOL Ruling, there is no factual basis for the Court to now conclude that J-M submitted a "false" claim for payment. As such, no award of civil penalties is warranted under the operable California, Virginia, and Nevada statutes. Cal. Gov. Code § 12651 (1987); VA Code Ann. § 8.01-216.3 (2004); Nev. Rev. Stat. Ann. § 357.040 (1999).

### III. The Record Facts Do Not Support Any Award of Penalties for the 22 California Claims.

Separate and apart from the reasons set forth in the JMOL Ruling, the "totality of the circumstances" relevant to the Court's decision on penalties counsel strongly against any award of penalties in this case.

Preliminarily, the Court can and should exercise its discretion to decline to award *any* penalties with respect to the California projects, which account for the vast majority of the claims for payment at issue. Three of the five Plaintiffs (Calleguas, Palmdale, and South Tahoe) are located in California, and 22 of the 26 claims for payment relevant to this stage of the proceedings are associated with these three California Plaintiffs. In California, the imposition of civil penalties under the state FCA is *discretionary*. Under the governing version of the statute:[1]

> [a] person who commits any of the following acts . . . ***may*** be liable to the state or political subdivision for a civil penalty . . . : (1) Knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval. (2) Knowingly makes, uses, or causes to be

---

[1] Although Cal. Gov. Code § 12651 was subsequently amended, the parties agree that the operative version, embodied in the 1987 revision, applies in this case. *See* Dkt. 2888 at 3; *see also*, *Bullard v. California State Auto. Assn.*, 129 Cal. App. 4th 211, 229 (2005) ("A basic canon of statutory interpretation is that statutes do not operate retrospectively unless the Legislature plainly intended them to do so.") (citation omitted); *California Ins. Guar. Assn. v. Workers' Comp. Appeals Bd.*, 232 Cal. App. 4th 543, 561 (2014) (only an express legislative declaration of retroactivity or a clear and compelling implication of such will enable retroactive application).

3665595.4

3

J-M'S OPPOSITION TO PLAINTIFFS' REQUEST FOR MAXIMUM CIVIL PENALTIES

> made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision. (3) Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision . . . .

Cal. Gov. Code § 12651 (1987) (emphasis added). As a matter of law, the use of the word "may" means that the trial court has the discretion whether to award penalties at all. "[T]he usual rule with California codes is that 'shall' is mandatory and 'may' is permissive unless the context requires otherwise." *Walt Rankin & Assocs., Inc. v. City of Murrieta*, 84 Cal. App. 4th 605, 614 (2000).

The legislative history of the statute reveals that the use of the word "may" § 12651 was deliberate, was intended to provide the trial court with the discretion whether to award penalties at all, and, if so, to have complete discretion in fixing an amount (up to a maximum of $10,000). As originally introduced, this provision more closely tracked the federal penalty provision—stating that the court "shall" award a penalty and setting a range from $5,000 to $10,000. *See* Assembly Bill No. 1441 at 56-57, 64-65. But when the bill was introduced to the Senate, objections were raised based upon the "[l]ack of court discretion to determine civil penalty and treble damages based on the degree of knowledge (intent to defraud), number of false claims made, amount of false claims, and mitigating factors." *Id.* at 133. The Senate then proposed "Amendment 2" to insert: "may be liable to the state or political subdivisions for a civil penalty of up to ten thousand dollars." *Id.* at 524. The Senate Floor Amendments specifically stated that "Amendments 1 and 2 would retain the court's discretion to order a $10,000 civil penalty . . . The bill currently requires the ordering of the additional sanction without court discretion." *Id.* at 523. The Senate explained that the purpose of its amendment was to "[p]ermit, rather than require, the court to assess a civil penalty up to $10,000." *Id.* at 129.

This case presents precisely the situation that the California Legislature must have envisioned when it changed its language to make clear that a court could, but was not required, to assess any civil penalties in California false claims act cases.

The Legislature intended that courts be able to take into account "degree of knowledge (intent to defraud)," the "number of false claims made, amount of false claims" and "mitigating factors" in deciding whether to award penalties. *Id.* at 133. As discussed below, there is no evidence of any intent to defraud here and, taking into account the totality of the circumstances, all "mitigating factors" weigh in J-M's favor and counsel against any award of penalties.

### A. There Is No Evidence of Any J-M Intent to Defraud.

As noted above, because the JMOL Ruling specifically rejects each of the factual predicates underlying the Phase One jury's finding of "falsity," there is no factual predicate for the Court to now conclude that J-M submitted a "false" claim for payment. (Dkt. 2886 at 20-24.) Not only does this ruling eliminate the prerequisite for awarding penalties in the first place, it also demonstrates lack of intent to defraud. After all, if the claims are not false in the first instance, there can be no intent to defraud by submitting false claims.

Even if the lack of falsity could be set aside, there has been no finding in this case of the type of enhanced scienter that would merit the imposition of a penalty in a case where the government suffered no damages. Cases in which penalties are awarded typically involve situations where there is a specific finding that the defendant acted with an intent to defraud. *See, United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 501 F. Supp. 2d 51, 56 (D.D.C. 2007) (awarding maximum civil penalty because the defendant engaged in "a deliberate attempt to rig bids on USAID contracts" "combined with intricate steps taken to cover up the scheme" including "constant name changing of corporate entities" and "suspect financial transactions" "to avoid detection" which showed "actual knowledge – far greater than a mere reckless disregard of the wrongdoing"). By contrast, in this case there was no "deliberate intent" to defraud, no intricate scheme, no cover-up. The allegedly false statements were general statements of compliance with industry standards (similar to statements issued by every PVC pipe manufacturer) published

in product brochures and other generic printed material. There was no targeted effort to deceive the five exemplar Plaintiffs. There was no evidence that anyone from J-M even spoke with anyone at any of the exemplar Plaintiffs prior to their decision to purchase J-M pipe. And there has never been any allegations of cover-ups, siphoning of assets, or other egregious conduct demonstrating actual knowledge of wrongdoing.

In short, there was no *evidence* of any deliberate intent to defraud. And there was no certainly no *finding* of any deliberate intent to defraud. The Phase 1 Jury found only that J-M acted "knowingly"[2] based on a jury instruction that broadly defined "knowingly" to mean that a person: "(a) has actual knowledge of the information, or (b) acts with deliberate ignorance of the truth or falsity of the information, or (c) acts in reckless disregard of the truth or falsity of the information." (Dkt. 1792 at 6.) There was no specific finding that J-M acted with intent to defraud or even actual knowledge of the alleged falsity.

### B. The Number of Claims Is Modest and the Amount of the Claims Is Zero.

There are a grand total of 26 claims for payment (one for each project) at issue in this stage of the proceedings. By definition, in light of the findings contained in the JMOL Ruling, the dollar value of these alleged "false" claims for payment is zero. Both these factors weigh against any award of civil penalties.

### C. Other Mitigating Factors

The California Legislature did not delineate what it meant by other "mitigating factors" that should be taken into account when determining penalties. Federal case law on this point provides guidance. Federal courts have fashioned "ad hoc rationales" in determining penalties. In general, courts look to the "totality of the circumstances" and consider "egregiousness of the conduct, the government's

---

[2] Dkt. 1794.

monetary damages, any other damages that the government might have incurred, the right of the government to be made completely whole, and general fairness." *U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719, 741–42 (N.D. Ill. 2007); *see also, e.g.*, *Miller*, 501 F. Supp. 2d at 56 (considering totality of circumstances, including "seriousness of the misconduct, the scienter of the defendants and the amount of damages suffered by the United States as a result of the misconduct"). Less common factors sometimes considered by courts include "a defendant's acceptance of responsibility or lack of remorse, the need for deterrence, and possible recidivism." *Tyson*, 488 F. Supp. 2d at 741-42.

Consideration of these factors and the totality of the circumstances here weigh heavily against any award of penalties for the twenty-two California claims.

### 1. Because Plaintiffs suffered no damages, penalties are not warranted.

In cases involving no damages (or extremely low damages), courts typically exercise their discretion in favor of defendants. *See, e.g.*, *United States ex rel. Virgin Islands Hous. Auth. v. Coastal Gen. Const. Servs. Corp.*, 299 F. Supp. 2d 483, 489 (D.V.I. 2004) (awarding statutory minimum based on the fact that government suffered no monetary damages); *Pena v. United States Dep't of Agriculture*, 811 F. Supp. 419 (E.D. Ark.) (where actual damages were only $122.73, rejecting government's request for maximum statutory penalty and awarding minimum); *Tyson*, 488 F. Supp. 2d at 741-42 (awarding statutory minimum penalties despite the seriousness of the misconduct, which involved defendants that "pilfered money from Medicaid coffers to pad its own pockets" and discriminated against "women and unhealthies" where "civil penalties (even if fixed at the minimum allowable) grossly outrun any damages estimate").

Here, penalties are not warranted because ***J-M's conduct did not cause any harm to the Plaintiffs***. In the JMOL Ruling this Court found that, as a matter of law, Plaintiffs failed to provide evidence sufficient to support any actual award of

damages. Plaintiffs suggest that this was some sort of a technicality—that the Court found only that damages had "not been quantified."[3] This characterization improperly minimizes the Court's findings. The Court's ruling actually found that "Plaintiffs have clearly and indisputably received value from the J-M pipe in the 26 projects" at issue in this case: "[a]s to those projects, there has never been any failure of the pipe after between 12 to 22 years since their installations"; "there is no 'real world' evidence of defects as to the pipe"; and "for every day that the J-M pipe is in the ground and functioning without incident, the Plaintiffs have gotten (and are continuing to get) the benefit of their bargain."[4]

Bafflingly, Plaintiffs argue that their failure to prove that they were damaged *supports* their request for maximum penalties. Specifically, Plaintiffs argue that because they received no damages as a result of the Court's ruling, Plaintiffs have not been made whole for J-M's fraud.[5] Plaintiffs' argument is backwards—Plaintiffs received no damages here because there is no evidence that they were harmed or even that they received noncompliant pipe. Plaintiffs have been pursuing these claims against J-M for over 14 years, even though it was clear from the outset that, regardless of any issues at J-M plants, Plaintiffs received the functioning pipe they bargained for. Indeed, at trial, each of the Plaintiffs candidly conceded that their J-M pipe has performed as expected and they have received the expected value from the pipe.[6] Under these circumstances, there is simply nothing to make whole.[7]

---

[3] Dkt. 2888 at 7.

[4] Dkt. 2880 at 66 (June 5, 2020 JMOL Ruling).

[5] Dkt. 2888 at 7:6-10.

[6] Dkt. 2843 at 4334:2–5 (Calleguas) ("Q. Right. So the part of the lifetime of the pipe you have already gotten. You have already gotten 16 years of the lifetime of the pipe; right? A. The pipe has performed for 16 years."); Dkt. 2848 at 1317:14–17 (Norfolk) ("Q. And so up until today, Norfolk's gotten the value it would have expected from that pipe, correct? A. It continues to function to carry the water like

Plaintiffs also argue (without support) that despite the lack of damages, J-M's conduct "caused serious harm" because "numerous witnesses testified about the harm caused by the uncertainty surrounding the longevity of J-M pipe, including the loss of confidence of Plaintiffs' customers."[8] But Plaintiffs cite absolutely no evidence for this point and it is squarely refuted by their own admissions, as well as the Court's findings, that Plaintiffs received value from their J-M pipe and received the benefit of their bargain. Moreover, each of the Plaintiffs admitted that they had never done any inspection or testing of the J-M pipe[9]—hardly the behavior one

---

it was intended to do, yes."); Dkt. 2838 at 1820:10–14 (Palmdale) ("Q. And because the J-M pipe has not failed, continued to deliver water continuously, some cases up to 20 years, the J-M pipe has met the district's expectations at least to date; correct? A. I would say that's correct."); Dkt 2299 at 2067:20–22 (Reno) ("Q. To date, the pipe has delivered value to Reno by continuously conveying water to these two projects, correct? A. Yes."); Dkt. 2847 at 1137:16–21 (South Tahoe) ("Q. Provided value by continuously delivering water, in some cases up to 22 years, correct? A. That's part of the value. Q. In fact, the district treats the J-M pipe as an asset on its financial documents, correct? A. Yes.").

[7] While Plaintiffs refer in passing to costs of detection, investigation, and prosecution, they provide no evidence of such costs, and therefore they cannot be considered in awarding penalties. *See, e.g.*, *Virgin Islands*, 299 F. Supp. 2d at 489 (declining to award maximum penalties to make the government whole where the government "has not documented any of these costs).

[8] Dkt. 2888 at 7.

[9] Dkt. 2843 at 4325:19–25 (Calleguas) ("Q. . . . And when you decided to join the lawsuit, at that point you had done no inspection of the pipe at Lake Bard; correct? A. No. Not the pipe at Lake Bard. Q. And you had done no testing of the pipe at Lake Bard? A. That's correct."); Dkt. 2848 at 1312:19–21 (Norfolk) ("Q. Right. So since installation you've never done any testing of the pipes in your project, correct? A. Right, none of those other types of tests."); Dkt. 2838 at 1814:4–8 (Palmdale) ("Q. The district did not inspect its J-M pipe before deciding to join the lawsuit? A. No."); Dkt. 2699 at 2061:1–5 (Reno) ("Q. At the time you joined the lawsuit, Reno had performed no inspection or testing of its J-M pipe in the ground, correct, after it was placed in service? A. Um, correct. We had been just providing typical maintenance."); Dkt. 2847 at 1119:8–17, 1120:9–16 (South Tahoe) ("Q. . . . With

would expect if there were substantial harm being caused by uncertainty about the pipe.  In any event, J-M expressly assumed the risk of any uncertainty regarding the longevity of the pipe by providing its customers with a 50-year warranty, as explained more fully in Part B.3 below.

### 2. J-M's conduct does not rise to the level of severity in maximum penalty cases.

Turning to egregiousness of conduct, even accepting the Phase 1 verdict at face value, J-M's conduct does not come close to the level of the most serious violations of the False Claims Act.  As interpreted by this Court, the Phase 1 jury found only that J-M represented that *all of its pipe* was in "uniform compliance" with the standards, and that representation was false because some undefined proportion of J-M pipe was not manufactured or tested in a manner that assured that it uniformly had the quality, strength, and durability required by the standards. These allegedly "false" representations about compliance with standards—that the Court has already concluded (in the JMOL Ruling) *do not impact pipe performance in any appreciable way*—are not the type of abhorrent behavior that requires punitive measures, let alone the most severe punitive measures.  This is especially true given that the state and local governments here are not vulnerable "victims" and J-M did not engage in any kind of intricate cover-up.  *Accord United States ex rel. Landis v. Tailwind Sports Corp.*, 324 F. Supp. 3d 67, 74 (D.D.C. 2018) (declining to award maximum penalties because conduct did not rise to level of severity found in

---

respect to the pipe in the 13 projects, once placed in service since that time, South Tahoe had done no testing of that pipe, correct?  A. Until 2010, you said?  Q. As of 2010, yes.  A. That's correct.  Q. And South Tahoe specifically had not done any testing to make sure or to try and discern whether the pipe met industry standards like AWWA, C-900 or 905, correct?  A. That's correct. . . .  Q. Again, since joining the lawsuit in 2010, there's been no testing of J-M pipe on the projects at issue once they've been placed in service, correct?  A. So on the pipe that's in the ground is what you're asking?  No, we have not.  Q. No, we have not tested –  A. We have not tested the pipe that's in the ground in these 13 projects.")

maximum penalty cases involving vulnerable victims or substantial damages without receiving benefit, and while the defendants took steps to conceal their conduct, they did not engage in the kind of intricate cover up found in other cases).

The types of cases where courts find that the conduct is egregious typically involves blatant lies, significant damage, vulnerable victims and cover-ups. *See United States v. Speqtrum, Inc.*, No. CV 10-2111 (JEB), 2016 WL 5349196, at *4 (D.D.C. Sept. 23, 2016) (awarding maximum penalties because defendant's conduct "was egregious and willful in its cooking [of] the books: overbilling for hours not worked, charging the District for clients it did not service, and forging physician signatures on its paperwork"); *United States v. FastTrain II Corp.*, No. 12-CV-21431 (Cooke/Torres), 2017 WL 606346, at *10 (Feb. 15, 2017) (awarding maximum penalty based on egregiousness of conduct where defendant's victims "were especially vulnerable" young people that had not graduated college that, as a result of the fraud, "now carry debt that will be "enormously difficult to pay off with what they can earn working the low-level jobs for which they are qualified" and the defendant "bilked the Government out of millions of dollars, most of which ended up in [the] pockets" of defendant's CEO).

J-M's conduct here does not resemble these egregious examples in any way whatsoever. The challenged representations here were generic statements of compliance in product brochures (similar to statements made by every PVC pipe manufacturer). J-M was a stranger to four of the five exemplar Plaintiffs prior to the filing of this lawsuit. As to the fifth (Reno), when its pipe experienced issues prior to being placed in service, J-M voluntarily replaced the entire line with new pipe pursuant to J-M's product warranty. To this day, all five Plaintiffs continue to use their J-M pipe, without incident, and this Court concluded as a matter of law that all Plaintiffs received the value they bargained for from their J-M pipe. This is the opposite of conduct warranting the imposition of any penalties.

### 3. J-M accepted responsibility for any flaws in its pipe.

Plaintiffs' primary argument in favor of the maximum penalty is that J-M issued a post-Phase 1-verdict press release stating that it intended to appeal, and issued a press release after the Phase 2 jury hung, indicating that it was pleased with the result and reminding the public that none of the pipe in service that was at issue in the litigation had failed. There were truthful statements contained in standard, run-of-the-mill press releases that parties involved in litigation routinely issue. There is nothing objectionable, let alone egregious, about these statements. Indeed, after the first trial, Plaintiffs issued their own press releases, in which their counsel stated (incorrectly) that as a result of the Phase 1 verdict, J-M faced "billions of dollars in damages"; Plaintiffs also made public comments after the JMOL decision, indicating that now Plaintiffs intended to appeal. Plaintiffs are hardly in any position to argue that J-M's routine press releases show that J-M has refused to accept responsibility for its actions, or that "maximum penalties" are justified as a result.[10]

Indeed, J-M's routine press releases say far less about J-M's willingness to accept responsibility than the fact that J-M has issued a 50-year retroactive warranty to its customers. Through this extended warranty, J-M is taking responsibility for any bad pipe that may have been sold.[11] This J-M warranty far exceeds the industry

---

[10] Plaintiffs rely exclusively on a single, inapt unpublished out-of-circuit case, to argue that these routine press releases alone justify imposition of maximum penalties. But that case, *United States v. Saavedra*, involves very different facts because there was an award of damages and actual harm to the government. No. 15-2307-cv, 2016 WL 4626557 (2d Cir. Sept. 6, 2016). And Saavedra has been criticized for using post-verdict conduct as a rationale for assessing maximum penalties under the FCA. 1 John T. Boese, *Civil False Claims and Qui Tam Actions*, § 3.05(c), n.455 (2019).

[11] Dkt. 2842 at 3811:9-3812:1.

standard one-year warranty.[12]

This extraordinary 50-year retroactive warranty is consistent with J-M's long history of standing behind the quality of its pipe—a practice Plaintiffs previously conceded that they were satisfied with. Of the five exemplar plaintiffs, only Reno contacted J-M about any problems with pipe before filing this lawsuit. Reno informed J-M that it was having problems with J-M pipe in water pressure tests being conducted before the pipe was placed in service.[13] In response, J-M assigned a quality assurance representative to help investigate the problems.[14] When a single piece of pipe was discovered to be noncompliant, J-M "accepted responsibility" and pursuant to its warranty, replaced the *entire line* with new JM pipe.[15] Afterwards, the Reno representative admitted that "J-M did everything Reno asked of it" in connection with the testing failures[16] and "Reno was satisfied with how J-M handled this issue."[17] Reno then nominated its water system for (and received) a design award, complimenting J-M's pipe as the "backbone" of the system.[18]

In short, J-M's actions speak louder than its words. Because J-M is standing behind its pipe and assuming any risk that the pipe will turn out to be bad pipe, there is simply no basis for Plaintiffs to now say that J-M has refused to accept responsibility for its actions.

---

[12] Dkt. 2838 at 1921:10-1922:10.

[13] *Id.* at 1875:16-1873:17.

[14] *Id.* at 1919:25-1920:4.

[15] *Id.* at 1920:13-25; 1925:24-1926:11.

[16] *Id.* at 1922:2-7.

[17] *Id.* at 1922:8-10.

[18] *Id.* at 1925:9-23.

### 4. Principles of general fairness justify an award of no penalties.

Finally, under principles of "general fairness," J-M has already been punished enough as a result of this case. J-M provided Plaintiffs with pipe that has worked for the last 12-22 years and continues to work today, and not a single Plaintiff has ever been able to show that it got noncompliant pipe. But J-M has been tied up in litigation over this fully-functioning pipe for the past 14 years. During that time, J-M has incurred over $50 million in attorneys' fees and costs, has been unfairly disparaged in the press, and has been barred from selling additional pipe to a number of public agencies or municipalities that are intervenors or real parties in interest in the *qui tam* litigation (until there has been a final disposition in the *qui tam* action, including the exhaustion of appeals).[19] Given the lack of harm to the government on the one hand, and the substantial costs J-M has already incurred, there is simply no further punitive purpose that would be served in awarding penalties.

## IV. The Court Should Decline to Award Penalties in Connection with the Two Virginia Claims and Two Nevada Claims, or at Most Award the Statutory Minimum.

Two of the four remaining claims for payment are subject to Nevada's False Claims Act, which requires a civil penalty of not less than $2,000 or more than $10,000.

The two remaining claims for payment are subject to Virginia's FCA, which requires a penalty of not less than $5,000 or more than $10,000.

For the reasons set forth in J-M's Opening Brief on Penalties, there is no factual predicate to support the finding that any of these four claims involved "false

---

[19] Declaration of Chuck Clark in Support of J-M's Opposition to Plaintiffs' Request for Maximum Civil Penalties, ¶¶ 3, 4.

claims for payment." As such, no penalties are warranted.

In the alternative, and for all the reasons set forth above, the Court should exercise its discretion to award the statutory minimum amount of penalties in connection with each of these four claims for payment.

## V. Conclusion

For the reasons discussed in J-M's Opening Brief on Penalties, the Court should decline to award any penalties on the grounds that there are no false claims to support penalties. In the alternative, for the reasons stated above, the Court should exercise its discretion: (1) under California law and decline to award any penalties for the 22 California claims; (2) under Virginia law, and award the statutory minimum of $5,000 for each of the two Virginia claims; and (3) under Nevada law and award the statutory minimum of $2,000 for each of the two Nevada claims.

DATED: August 17, 2020            Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:   */s/ David Bernick*
          David Bernick


BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.

By:   */s/ Paul S. Chan*
          Paul S. Chan

*Attorneys for Defendant J-M Manufacturing Company, Inc. dba JM Eagle*