David Bernick (*admitted pro hac vice*)
 dbernick@paulweiss.com
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

Ekwan E. Rhow – State Bar No. 174604
 erhow@birdmarella.com
Paul S. Chan – State Bar No. 183406
 pchan@birdmarella.com
Marc E. Masters – State Bar No. 208375
 mmasters@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California  90067-2561
Telephone:  (310) 201-2100
Facsimile:  (310) 201-2110

Attorneys for Defendant J-M Manufacturing
Company, Inc. dba JM Eagle

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES, *et al.*,<br><br>        Plaintiffs,<br><br>    vs.<br><br>J-M MANUFACTURING COMPANY, INC. dba JM EAGLE, *et al.*,<br><br>        Defendants. | CASE NO. 5:06-cv-00055-GW-PJW<br><br>**DEFENDANT J-M MANUFACTURING COMPANY, INC.'S OPPOSITION TO PLAINTIFFS' BRIEF IN SUPPORT OF ENTITLEMENT TO ATTORNEYS' FEES**<br><br>*[Concurrently filed with Declaration of Kate S. Shin]*<br><br>Date:   December 21, 2020<br>Time:  9:30 A.M.<br>Crtrm.: 9D<br><br>Assigned to Hon. George H. Wu |

3680929.5

## <u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

I.      INTRODUCTION ..................................................................................... 1

II.     OPERATIVE FACTS ............................................................................... 1

    A.      This litigation aggregates multiple separate claimants, many with multiple separate claims. ............................................................ 1

    B.      Plaintiffs' counsel decided to litigate this case on a massive scale, with the objective of obtaining billions of dollars in a single proceeding ..................................................................... 2

    C.      Plaintiffs failed to achieve their litigation objectives for everyone they have represented. .................................................................. 3

        1.      The 232 non-exemplars and real parties have absolutely nothing to show for 14 years of litigation. ................................. 3

        2.      The five exemplars were unable to obtain any damages award and were awarded only a small fraction of the penalties they sought. ............................................................. 6

        3.      The litigation has resulted in no non-monetary relief or benefit. ................................................................................ 8

        4.      The massive time spent by Plaintiffs' counsel pursuing this litigation resulted in fees and costs that cannot be justified by the results obtained. ......................................... 8

            a.      What Plaintiffs' counsel had to have known when they prepared and presented their Phase I case. ............... 9

            b.      How Plaintiffs pursued their Phase II case ..................... 10

III.    ARGUMENT .......................................................................................... 11

    A.      The Virginia statute does not provide for an award of attorneys' fees under any circumstances. ........................................................ 11

    B.      The California and Nevada statutes do not provide fees for recovery of "proceeds." ............................................................... 12

    C.      Plaintiffs cannot recover attorneys' fees under California law. ........... 14

        1.      Under California law, a party must succeeded on a practical level in achieving what it sought in order to be the "prevailing party." ................................................... 14

        2.      Under California law, Plaintiffs are not prevailing parties because they did not prevail as a practical matter in achieving what they sought. ................................................. 16

D.   Plaintiffs have no entitlement to attorneys' fees under Nevada
law. ................................................................................................. 17

1.   Under Nevada law, a plaintiff with a monetary judgment
that obtains no compensatory damages and no significant
public benefit is not entitled to attorneys' fees. .......................... 17

2.   Plaintiffs' counsel obtained a *de minimis* monetary
judgment but proved no injury, obtained no compensatory
damages and produced no significant public benefit and so
is not entitled to attorneys' fees under Nevada law. ................... 19

E.   Even if the Court awards attorneys' fees, under California and
Nevada law, such fees must be limited to a fraction of the
penalty award. ............................................................................... 19

1.   Comparing the amount of damages sought to what was
received reveals that Plaintiffs' case was not successful
because no damages have been awarded and the penalty
was a small fraction of what was requested. ............................ 21

2.   Comparing the relationship between damages awarded and
fees requested, it is clear that the fee award cannot exceed
the penalty award. ................................................................... 22

3.   The litigation has produced no non-pecuniary benefit. ............. 24

4.   The reasonableness of any fee award must be assessed in
the context of the waste and burden Plaintiffs' work
created. .................................................................................... 25

F.   Plaintiffs are not entitled to special enhanced rates nor current
market rates for work undertaken years ago. ................................. 25

G.   Plaintiffs are not entitled to discovery from J-M. ............................ 27

H.   Plaintiffs must disclose the attorneys' fees they have already
recovered from Defendant Formosa. ............................................... 30

IV.   CONCLUSION ......................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ackerly Commc'ns of Mass., Inc., v. Somerville*
901 F.2d 170 (1st Cir. 1990) ................................................................27

*Armenta v. Osmose, Inc.*
135 Cal. App. 4th 314 (2005) ...............................................................13

*Bagley v. Karatz*
No. CV 07-1754, 2010 WL 11519862 (C.D. Cal. Sept. 7, 2010) .....................26

*Benton v. Oregon Student Assistance Comm'n*
421 F.3d 901 (9th Cir. 2005) ................................................................18

*Blum v. Stevenson*
465 U.S. 886 (1984) .........................................................................26

*Briseno v. ConAgra Foods, Inc.*
844 F.3d 1121 (9th Cir. 2017) ..............................................................12

*Brunzell v. Golden Gate Nat. Bank*
455 P.2d 31 (Nev. 1969) ....................................................................20

*Castel v. Advantis Real Estate Servs.*
Co., No. 2:07-cv-00435, 2008 WL 3348774 (E.D. Va. Aug. 8, 2008) .............23

*Castillo v. Nationstar Mortg. LLC*
No. 15-CV-01743-BLF, 2017 WL 6513653 (N.D. Cal. Dec. 20, 2017) ...................................................................................................28

*Choate v. Cty of Orange*
86 Cal. App. 4th 312 ........................................................................18

*Chrapilwy v. Uniroyal, Inc.*
670 F.2d 760 (7th Cir 1982) ...............................................................27

*Citgo Petroleum Corp. v. Krystal Gas Mktg. Co.*
466 F. Supp. 2d 1263 (N.D. Okla. 2006) ................................................27

*City of Riverside v. Rivera*
    763 F.2d 1580 (9th Cir. 1985) ............................................................. 23

*Copeland v. Marshall*
    641 F.2d 880 (D.C. Cir. 1980) (en banc) ............................................ 23

*Corder v. Brown*
    25 F.3d 833 (9th Cir. 1994) ................................................................. 30

*Cummings v. Connell*
    402 F.3d 936 (9th Cir. 2005), amended, No. 03-17095, 2005 WL
    1154321 (9th Cir. May 17, 2005) ........................................................ 18

*Envtl. Prot. Info. Ctr. v. Dep't of Forestry & Fire Prot.*
    190 Cal. App. 4th 217 (2010) .............................................................. 20

*Estes v. Meridian One Corp.*
    77 F. Supp. 2d 722 (E.D. Va. 1999) .................................................... 24

*Evon v. Law Offices of Sidney Mickell*
    688 F.3d 1015 (9th Cir. 2012) ............................................................. 23

*Farrar v. Hobby*
    506 U.S. 103 (1992) ............................................................... 18, 19, 21

*Ferland v. Conrad Credit Corp.*
    244 F.3d 1145 (9th Cir. 2001) ............................................................. 28

*Galan v. Wolfriver Holding Corp.*
    80 Cal. App. 4th 1124 (2000) .............................................................. 15

*Gallegos v. State*
    123 Nev. 289 (2007) ............................................................................ 13

*Hensley v. Eckerhart*
    461 U.S. 424 (1983) ........................................................... 17, 20, 21, 22

*Henson v. Columbus Bank & Tr. Co.*
    770 F.2d 1566 (11th Cir. 1985) ........................................................... 27

*Hoffman v. Constr. Protective Servs., Inc.*
    *No.* EDCV03-01006VAPSGLX, 2006 WL 6105640 (C.D. Cal. Dec.
    21, 2006) .............................................................................................. 22

*Hotchkiss v. CSK Auto, Inc.*
   949 F. Supp. 2d 1040 (E.D. Wash. 2013) ...............................................20, 22, 23

*Hsu v. Abbara*
   9 Cal. 4th 863 (1995) .............................................................................................15

*In re Bluetooth Headset Products Liab. Litig.*
   654 F.3d 935 (9th Cir. 2011) ................................................................................20

*Independent Living Center of Southern California v. Kent*
   No. 2:08-CV-03315, 2020 WL 418947 (C.D. Cal. Jan. 24, 2020) ...................27

*Int'l Game Tech., Inc. v. Second Judicial Dist. Court of Nevada*
   122 Nev. 132 (2006).......................................................................5, 9, 10, 13

*Johnson v. Univ. Coll. of Univ. of Alabama in Birmingham*
   706 F.2d 1205 (11th Cir. 1983) ...........................................................................28

*LVMPD v. Blackjack Bonding*
   343 P.3d 608 (Nev. 2015).....................................................................................17

*Maughan v. Google Tech., Inc.*
   143 Cal. App. 4th 1242 (2006)............................................................................28

*McCown v. City of Fontana*
   565 F.3d 1097 (9th Cir. 2009) ..............................................................20, 21, 22

*McGinnis v. Kentucky Fried Chicken of California*
   51 F.3d 805 (9th Cir. 1994) ...........................................................20, 22, 25, 29

*Morris v. Eversley*
   343 F. Supp. 2d 234 (S.D.N.Y. 2004) ................................................................24

*Olive v. Gen. Nutrition Centers, Inc.*
   30 Cal. App. 5th 804 (2018)................................................................15, 16, 17

*Quesada v. Thomason*
   850 F.2d 537 (9th Cir. 1988) ...............................................................................24

*Romano v. Mercury Ins. Co.*
   128 Cal. App. 4th 1333 (2005).............................................................................13

*Ruiz Fajardo Ingenieros Asociados S.A.S. v. Flow Int'l Corp., No. C16-1902 RAJ*
   2019 WL 2492218 (W.D. Wash. June 14, 2019)..............................................29

*State, Dep't of Bus. & Indus., Office of Labor Com'r v. Granite Const.*
*Co.*
118 Nev. 83 (2002) ................................................................................ 13

*Stathakos v. Columbia Sportswear Co.*
No. 15-CV-04543-YGR, 2018 WL 1710075 (N.D. Cal. Apr. 9,
2018) ..................................................................................................... 28

*U.S. ex rel. Bahrani v. Conagra, Inc.*
No. 00-CV-1077JLKKLM, 2009 WL 2766805 (D. Colo. Aug. 28,
2009) ..................................................................................................... 23

*United States ex rel. Christiansen v. Everglades College, Inc.*
855 F.3d 1279 (11th Cir. 2017) ............................................................ 19

*United States ex rel. Rai v. KS2 Tx*
2019 WL 1397290 (D. Conn. Mar. 27, 2019) ...................................... 27

*United States ex rel. Wall v Circle C Constr., LLC*
868 F.3d 466 (6th Cir. 2017) ................................................................ 14

*Women's Fed. Sav. & Loan Ass'n of Cleveland v. Nevada Nat. Bank*
623 F. Supp. 469 (D. Nev. 1985) .......................................................... 17

**Statutes**

28 U.S.C § 2412(d)(1)(D) ............................................................................ 14

31 U.S.C.
§§ 3729-3733 .............................................................................. *passim*
§ 3730(d) ............................................................................................... 12

40 U.S.C. § 3141 ........................................................................................... 13

Cal. Civ. Proc. Code
§ 1032 .................................................................................................... 15
§ 1717 .................................................................................................... 15

Cal. Gov. Code
§ 12652(e)(8) ........................................................................................ 12
§ 12652(g)(C)(7) .................................................................................. 14

VA Code Ann. § 8.01-216.3 ................................................................... 11, 12

## I.     __INTRODUCTION__

Plaintiffs' counsel are not entitled to *any* award of their grossly excessive attorneys' fees and costs in this litigation.  Plaintiffs rely on the wrong legal standard by citing language in the federal FCA that is inapplicable to their state FCA claims.  The Virginia FCA does not provide for any awards of attorneys' fees.  And under the California and Nevada Acts, fees cannot be sought merely because a plaintiff has obtained "proceeds"; fees may be awarded only to parties that "prevail" at "a practical level," by actually realizing their goals in the litigation. Plaintiffs here originally sought to obtain "billions" of dollars in damages on behalf of 47 intervenors and over 190 real parties in interest.  They ended up with a Phase 1 finding that cannot be used by any of the 237 parties in this litigation other than the five exemplars; zero damages; and a penalties award (of $162,000) that is less than 1% of the penalties originally sought by the five exemplars.  Plaintiffs are not the prevailing parties "on a practical level" under any rational construction of the outcome they achieved.

Plaintiffs' modest penalty recovery also operates as an effective cap on any potential fee award.  Under the applicable law, this Court may only award fees that are "reasonable in relation to the results obtained."  Any attorneys' fee award in excess of the $146,000 in penalties (obtained by the exemplars even theoretically eligible to recover fees) would be patently unreasonable.  A fee award greater than this amount would reward counsel for protracted and unbelievably wasteful and burdensome litigation that was far more costly than any conceivable benefit obtained.

## II.    __OPERATIVE FACTS__

### A.     __This litigation aggregates multiple separate claimants, many with multiple separate claims.__

As a *qui tam* action, this case effectively aggregates many claimants into one proceeding.  Each claimant is legally and factually separate.  On the facts of this

case, their claims arise from separate and distinct water system projects, each of which involved separate claims for payment.  Any one of these claims could comprise a separate case and be litigated separately (as the exemplar cases were in Phase 2).

## B. **Plaintiffs' counsel decided to litigate this case on a massive scale, with the objective of obtaining billions of dollars in a single proceeding.**

Plaintiffs control the breadth of the claims they pursue.  In a *qui tam* case, the plaintiff is nominal and it is plaintiffs' counsel that actually controls the scope of the litigation.  From the start, Plaintiffs' counsel here decided to litigate on a massive scale.  They worked to identify more than two hundred parties in interest and were able to get 47 of them to intervene.  By their own account, Plaintiffs sought "billions of dollars" in damages, based on $2.2 billion in total pipe purchased, plus significant replacement costs on behalf of these parties.[1]  To get to those numbers, they relied on information relating to more than 18,000 projects.  Dkt. 2090.

Plaintiffs have spent 14 years litigating in service of these ambitious goals.  103 depositions have been taken.  55,126 documents have been produced by J-M.  Countless briefs have been filed.  And two major trials have taken place, comprising 40 days of testimony.  Such an undertaking certainly is not justified by any one claim, or even all of the exemplar claims.  The full cost of replacement for the exemplar claims totaled $59.4 million.  *See, e.g.*, Dkt. 2415 at 5.  Plaintiffs' objective to recover billions for their hundreds of claims is the only way to explain the scale on which they litigated this case.

---

[1] https://www.wateronline.com/doc/jm-eagle-faces-billions-liable-fraud-faulty-water-system-pipes-0001; Shin Decl. Ex. A (9/1/11 Hr'g Tr.) at 21:1-25.

2

**C.** **Plaintiffs failed to achieve their litigation objectives for everyone they have represented.**

Plaintiffs' counsel fell woefully short of meeting their objectives. It is especially clear that Plaintiffs failed to achieve their litigation objectives when one disaggregates the claims. Plaintiffs failed to obtain a damages award for *any* of the 237 intervenors and real parties in interest in the case. They failed to obtain rulings on falsity, materiality, and scienter in Phase 1 that could be used by any of the 237 intervenors and real parties in interest other than the five exemplars. And as to those five exemplars, not only did Plaintiffs fail to obtain any damages, they also lost on 99% of the penalties they sought to recover.

**1.** **The 232 non-exemplars and real parties have absolutely nothing to show for 14 years of litigation.**

In December 2011—over J-M's objection—the case was bifurcated into two phases. Phase 1 was expected to resolve the issues of falsity, scienter, and materiality as to *all* of the intervenors and real parties in interest.[2] Phase 2 was expected to address the remaining questions of (1) "were J-M's false representations made to the individual Plaintiff?; (2) "How many false claims did the individual Plaintiff receive?" and (3) "What damage did the individual Plaintiff suffer as a result of the false claims."[3] That same month in 2011, Plaintiffs designated five exemplar plaintiffs to "provide testimony and evidence of 'false claims' at the first phase liability trial." Dkt. 566. Plaintiffs' ultimate goal for the first phase trial never changed. As Plaintiffs explained after the Phase 1 trial ended, "[i]n Phase 1, the parties would litigate the falsity, scienter, and materiality of the representations of compliance with industry standards that J-M made to *all the Plaintiffs* during the period of 1996-2006" and "if Plaintiffs prevailed on the three elements in Phase 1,

---

[2]   Dkt. 551 (Order on Bifurcation).

[3]   Dkt. 551 at 3.

they would not be re-litigated in Phase 2 for Plaintiffs similarly situated to the Phase 1 Exemplars."  Dkt. 1988 (emphasis added).  According to Plaintiffs themselves, the point of Phase 1 was not merely to establish liability as to the five exemplar plaintiffs but rather as to all intervenors and real parties in interest: "the whole point of the first phase is to ask the question: Did the defendants engage in this wrongful conduct and was it uniform?"  Dkt. 1988 at 6.

As Plaintiffs described it, the evidence they offered in Phase 1 was designed to be applicable to all parties:  "Although Plaintiffs selected the Exemplars to participate in Phase 1, that selection had no impact on the core issues because ***none of the evidence on falsity or scienter was specific to any Plaintiff***.  As this Court envisioned when it issued the Bifurcation Order, the evidence presented by both Plaintiffs and J-M on falsity and scienter focused entirely on J-M witnesses and documents.  There was no Plaintiff specific evidence on those points . . . Similarly, the primary evidence of materiality was expert testimony applicable to all government entities that operate water systems with pressurized PVC pipe, and was ***not specific to any Plaintiff***."  Dkt. 1988 at 8-9 (emphasis in original).

Plaintiffs did not achieve their express goal of obtaining a verdict that would be applied to all intervenors and real parties in interest.  While the exemplars obtained a Phase 1 verdict for their exemplar projects, everyone else got nothing.  Indeed, after the Phase 1 trial concluded, this Court rejected Plaintiffs' request for such a broader order and ruled that ***the Phase 1 findings would bind only the five exemplar plaintiffs*** and would ***not*** be given any broader applicability or preclusive effect as to the remaining intervenors and real parties in interest.  Dkt. 1996.  Plaintiffs' counsel's have only themselves to blame for this failure.  As the Court described it at the time:

> Phase I, to my mind was just kind of like a qualification of
> a viability of a theory.  And, even then, it wasn't the full
> theory.  It was just as to certain elements of the theory,
> and, even then, the exact theory was more or less
> uncertain.  And one could make the argument it is still

4

> somewhat uncertain . . . So, therefore, there is, to my mind, not a collateral estoppel effect of Phase I as to Phase II . . . the only three issues that were litigated as to them were falsity, scienter and materiality but not across board but just as to those particular five exemplar plaintiffs . . . therefore, it really wasn't a situation where as to nonexemplar plaintiffs, the issue of their liability was fully litigated or adequately litigated such that the findings from Phase I could be utilized in Phase II as to the nonexemplar plaintiffs.[4]

Put simply—and accurately—the benefits to the non-exemplars and real parties of the years of litigation (and thousands of attorney hours) up through the Phase 1 trial, post-trial proceedings, and Plaintiffs' motion for collateral estoppel were exactly zero.

The four years of litigation by the exemplars since then not only has failed to benefit the non-exemplars, it has hurt them:

*First*, the representativeness theory which predicated the Phase 1 verdict proved inadequate to calculate damages and was abandoned in Phase II.  Shin Decl. Ex. C (10/5/18 H'rg Tr.) at 85:25-86:8 ("THE COURT:  . . . you guys indicated that the issue of representativeness is not going to be the subject of the Phase II damages issue -- damages portion of the trial; is that correct?  MR. HAVIAN: Your Honor, the issue here, I think -- it shouldn't be part of the trial as an issue[.]"); *id*. at 157:12-14 (granting J-M's motion in limine to exclude the concept of "representativeness").  Again, Plaintiffs' counsel have only themselves to blame for their choice to try Phase I on the basis of representativeness and produce a Phase I verdict that was inherently, legally disconnected from their Phase II case.

*Second*, key testimony by the Phase I experts on matters essential to all Plaintiffs both for their liability case and their proof of causation, injury, and damages liability case for all Plaintiffs has been stricken under *Daubert.*  Dkt. 2880 at 30-60 (6/5/20 Order granting J-M's JMOL).

---

[4]   Shin Decl. Ex. B (12/18/14 Hr'g Tr.) at 31:18-32:20.

*Third*, the Court has carefully parsed the applicable standards and found that they undercut Plaintiffs' theory of the case in Phase II.  Dkt. 2880 at 23-39.  The same analysis shows they undercut Plaintiffs' theory in Phase I, and indeed Plaintiffs' theory of the case as a whole.  *Id.*

*Fourth*, Plaintiffs' key witnesses in Phase I were recalled in Phase II and made key admissions undermining their testimony in Phase I.  *See, e.g.*, Shin Decl. Ex. F (10/18/18 Trial Tr.) at 2694:9–13 (Paschal) (no standard requiring longevity); Ex. H  (10/23/18 Trial Tr.) at 3669:22–3670:13 (K.C. Yang) (he, and J-M, believed that no quantitative relationship had been established between short term tests and long term strength, undermining any showing of intent).

## 2. The five exemplars were unable to obtain any damages award and were awarded only a small fraction of the penalties they sought.

The exemplar Plaintiffs were wholly unsuccessful in Phase 2.  Their claim that they were entitled to $59.4 million in damages was based on a faulty legal theory that they were entitled to consequential damages—namely the costs of replacing the J-M pipe.  But during the Phase 2 trial, this Court ruled that as a matter of law, Plaintiffs were not entitled to recover those costs.  Dkt. 2880 at 23.  Plaintiffs then went to the jury with their claim of just $2.1 million in damages for the cost of the pipe itself.  But the jury was unable to agree that Plaintiffs were entitled to damages of even this modest amount, and the Court declared a mistrial.  Shin Decl. Ex. J (11/14/18 Trial Tr.) at 8645:5-8.  As Plaintiffs' counsel put it at the time, "it's been the most expensive [mis]trial ever."  *Id.* at 8613:20-21.

After the mistrial and substantial briefing, this Court granted J-M's Motion for Judgment as a Matter of Law, finding Plaintiffs had failed to provide evidence sufficient to support an award of damages, because (among other things) "Plaintiffs have clearly and indisputably received value from the J-M pipe in the 26 projects" at issue; "[a]s to those projects, there has never been any failures of the pipe after

between 12 to 22 years since their installations"; "there is no 'real world' evidence of defects as to the pipe"; and "for every day that the J-M pipe is in the ground and functioning without incident, the Plaintiffs have gotten (and are continuing to get) the benefit of their bargain."[5]

Plaintiffs claim success because they focus on the fact the Court awarded Plaintiffs penalties. Dkt. 2910 at 4:12-13. But they clearly fell far short of their stated litigation goal even for the penalty claims.[6] Plaintiffs originally sought between $12,595,000 and $27,709,000 in penalties for Nevada and Virginia, plus $220,000 in penalties for California. Dkt. 2904 at 4 and n.6. The Court, however, rejected Plaintiffs' claim that stamps on pipe were the presentment of a false or fraudulent claim for payment or a false record or statement to get a payment of false claim sufficient to support a penalty award. Dkt. 2904 at 4-5. Plaintiffs then stipulated to one penalty per project and sought to obtain a total penalties award of $260,000. Dkt. 2888 at 7. Then once again, Plaintiffs fell short. The Court found that Plaintiffs were not entitled to the maximum penalty per claim given the fact they had not proven any damages. Dkt. 2904 at 8. The Court awarded only $162,000 in penalties. Dkt. 2904 at 8. And only $146,000 of those penalties are attributable to the Nevada and California exemplar plaintiffs, who are statutorily eligible to receive some fee award. ***In the end, Plaintiffs lost on 99% of their penalties claim—receiving an award of less than 1% of the penalties they sought for the five exemplar plaintiffs.***

---

[5]   Dkt. 2880 at 66.

[6]   As Plaintiffs themselves concede, "[t]he Fifth Amended Complaint sought statutory penalties against J-M on behalf of ***each of the plaintiffs***." However, the Court only awarded penalties "in favor of each Exemplar Plaintiff." *Id*. at 9:24-28. In other words, the penalties award was only a tiny fraction of the penalties Plaintiffs had anticipated on behalf of all Plaintiffs. They obtained no penalties award for the remaining 232 intervenors and real parties in the case.

### 3.     The litigation has resulted in no non-monetary relief or benefit.

Plaintiffs never sought, let alone obtained, any form of injunctive relief. Plaintiffs' counsel nonetheless argue they achieved "significant non-monetary results" and claim the 50-year warranty J-M offered counts as a significant non-monetary result that should offset their lack of success in obtaining monetary damages.  Dkt. 2910 at 8:12-24.  But Plaintiffs' claim that they should receive credit for the 50-year warranty is absurd.  J-M began offering a 50-year warranty on April 5, 2010[7]—a year-and-a-half before the bifurcation order, and long before the exemplar Plaintiffs had even been identified.  Moreover, during the litigation, Plaintiffs repeatedly ridiculed the idea the 50-year warranty was of any value to them.[8]  And none of them have ever sought to file a claim under the 50-year warranty.

### 4.     The massive time spent by Plaintiffs' counsel pursuing this litigation resulted in fees and costs that cannot be justified by the results obtained.

Plaintiffs' failure to succeed in their grand litigation plan bars their recovery of the associated fees *regardless of whether or not this litigation was warranted when it began*.  But we now know that the facts known by Plaintiffs—at least by the

---

[7]   https://www.plasticsnews.com/article/20100405/NEWS/304059964/jw-offering-50-year-warranty-on-its-pipe

[8]   *See, e.g.*, Shin Decl. Ex. E (10/16/18 Trial Tr.) at 1642:1-1643:7 (Scuito testifying that South Tahoe did not accept the J-M warranty, it was restrictive and in J-M's hands it was questionable whether a claim would have any merit whatsoever.); Shin Decl. Ex. I (11/6/18 Trial Tr.) at 6724:14-6726:21 (Plaintiffs' counsel arguing in closing the warranty is worthless because you have to give up your lawsuit to get the benefit of the warranty, J-M gets to decide whether the product was defective and whether they will replace it with more of the same pipe, which is like "First Prize a week in Philadelphia, Second Prize, two weeks," and J-M can pull that warranty at any time until it's accepted.)

8

time discovery in Phase I concluded—told them that the case was flawed and should not be pursued.  Not only did Plaintiffs' counsel press ahead anyhow, but they compounded the litigation burden by constantly changing their theory of the case.

### a.   What Plaintiffs' counsel had to have known when they prepared and presented their Phase I case.

The full record in this case following the completion of the Phase II trial and the Court's order finding no damages as a matter of law reveals the following facts that destroy the predicates of Plaintiffs' claim to have suffered any cognizable injury.  All were known or should have been known to Plaintiffs' counsel during Phase I:

*First*, Plaintiffs' contention in Phase I that J-M knew there was a quantitative relationship between short term tests and long term strength but concealed it was false.  Plaintiffs' key witness K.C. Yang admitted this on cross in the Phase II trial. It further emerged that, far from establishing such a relationship, Johns Manville had earlier shown that it was wrong.  Shin Decl. Ex. H (10/23/18 Trial Tr.) at 3669:22– 3670:13.  Not only was Yang's historical knowledge available to the Plaintiffs in Phase I, he worked closely with Plaintiffs and was their star witness in Phase I.

*Second*, Plaintiffs' contention that the standards required J-M pipe to maintain such a quantitative relationship was also false.  As laid out in scrupulous detail in the JMOL opinion, the standards explicitly disclaim such a relationship.  Dkt. 2880 at 26, 28-49.  Each and all of the relevant provisions of the standards were known to the plaintiffs and their experts in Phase I.

*Third*, Plaintiffs' Phase I claim that J-M's testing showed non-compliance with the standards also was false.  As shown in Phase II, the testing that J-M did was the testing required by the standards and showed compliance.  *See, e.g.*, Dkt. 2880 at 53-55, 63-64.

*Fourth*, Plaintiffs deliberately shifted away from a substandard pipe theory of liability in Phase I—without telling anyone.  This became a part of the Phase I train

wreck that was the Phase I trial.[9] The result: The verdict could not be used by non-exemplar Plaintiffs, was a bullseye for the ultimate appeal, and then proved equally unusable by the Phase II jury.  The enormous expenditure of time spent on the Phase I trial (and the correspondingly enormous fees) were a waste.

### b.    How Plaintiffs pursued their Phase II case

Undeterred, Plaintiffs charged on to Phase II, again knowing that the predicates for their case were flawed.

*First*, Plaintiffs abandoned representativeness as the foundation of their case.  The reason is obvious—the mere fact of non-uniformity does not establish a change in material properties of delivered pipe, as measured under the standards.  No change meant no ability to show reduced longevity.  No reduced longevity meant no damages.  So, Plaintiffs did another bait and switch.  Out goes the Phase I theory, in comes a new statistical model.

*Second*, once again, Plaintiffs knew that the model misrepresented the standards.  Their own experts admitted this.[10] And their testimony was eviscerated by the JMOL.[11]

*Third*, Plaintiffs' counsel himself admitted that the standards made no requirement of longevity, indeed, they disclaimed such a requirement.  Shin Decl., Ex. J (11/14/18 Tr. Trans.) at 8431:11-24, 8634:13-17.  If this admission had been

---

[9] Shin Decl. Ex. B (12/18/14 Hr'g Tr.) at 35:2-20 ("THE COURT: Let me put it this way, it was my understanding – and obviously I was wrong – that you were proceeding on a false certification claim. And now, you have since told me that wasn't what you tried even though, even during the trial, that is what I thought you were trying. So I was under a misunderstanding as to what the plaintiffs were doing. MR. HAVIAN: But, your Honor, it doesn't change – THE COURT: It does insofar as my jury instructions, how I perceived the jury instructions.")

[10]  Shin Decl. Ex. D (10/12/18 Trial Tr.) at 1496:1-4 (Davis); Ex. F (10/18/18 Trial Tr.) at 2694:9–13 (Paschal); Ex. G (10/19/18 Trial Tr.) at 3087:1-6 (Edwards).

[11]  Dkt. 2880 at 18-19, 24-28 of 68 (6/5/20 Order Granting JMOL).

1  made at the outset of Phase II, there would have been no Phase II.  If this had been

2  made at the outset of Phase I, there would have been no case.

3  **III.   ARGUMENT**

4       Plaintiffs brought their claims under the California, Virginia, and Nevada

5  state false claims acts.  Improperly relying on language in the federal False Claims

6  Act ("FCA"), Plaintiffs argue they are entitled to attorneys' fees because the federal

7  statute "impos[es] mandatory fee-shifting if a relator collects 'proceeds' of any kind

8  in the action" and the relevant state FCA statutes contain "near-identical language."

9  Mot. at 2 and n.3.  Plaintiffs are wrong on both the law and its application to this

10 case.  The governing Virginia statute does not provide for attorneys' fees under any

11 circumstances, and neither the California nor the Nevada attorneys' fees provisions

12 award fees to a relator who simply collects "proceeds."  To the contrary, under

13 California and Nevada law, Plaintiffs are not entitled to attorneys' fees because they

14 are not the prevailing party and their requested fees are patently unreasonable.

15       **A.   The Virginia statute does not provide for an award of attorneys'**

16            **fees under any circumstances.**

17       Plaintiffs' claim that the text of the Virginia Fraud Against Taxpayers Act

18 (Virginia "FATA") is nearly identical to the federal FCA is disingenuous.  In fact,

19 *there is no right to attorneys' fees under any circumstances in the governing*

20 *version of the Virginia FATA*.  The parties and this Court previously agreed the

21 2004 Virginia FATA is the version of the statute that applies in this case.[12]  The

22 2004 Virginia FATA *only provides for recovery of "costs"*: "A person violating this

23 section shall also be liable to the Commonwealth for the *costs* of a civil action

24 brought to recover any such penalty or damages."  2004 VA Code Ann. § 8.01-

25 216.3 (emphasis added).  There is no provision whatsoever for recovery of

26 attorneys' fees.  "Traditional canons of statutory construction suggest that this

27 _____

[12]  Dkt. 2888 at 3:24-25; Dkt. 2904 at 3-4.

28

omission was meaningful." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1125 (9th Cir. 2017).  Going further, the fact FATA was later amended to provide for recovery of fees confirms that the applicable version did not.  The same statute now reads "A person violating this section shall be liable to the Commonwealth for ***reasonable attorney fees and costs*** of a civil action brought to recover any such penalties or damages."  2020 VA Code Ann. § 8.01-216.3 (emphasis added). Consistent with the plain text of the statute, ***there are no cases awarding attorneys' fees under the applicable 2004 version of the Virginia FATA***.  Plaintiffs are not entitled to attorneys' fees for the two Virginia projects at issue.

**B.**     **The California and Nevada statutes do not provide fees for recovery of "proceeds."**

The federal FCA does provide for fees based on recovery of "proceeds."  It states that "[i]f the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the ***proceeds*** of the action or settlement of the claim."  31 U.S.C. § 3730(d) (emphasis added).  It goes on to provide that "[a]ny such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, ***plus reasonable attorneys' fees and costs***."  *Id.*

***But the language of the California and Nevada statutes is very different***. Unlike the federal FCA, the California and Nevada FCAs do not provide for attorneys' fees for anyone that recovers proceeds.  Attorneys' fees are instead awarded where the plaintiff "***prevails in or settles***" a case under the False Claims Act.[13]  While the California and Nevada FCAs refer to "proceeds" in other places,

---

[13]   The California FCA provides that "[i]f the state, political subdivision, or the qui tam plaintiff ***prevails in or settles*** any action under subdivision (c), the qui tam plaintiff shall receive an amount for reasonable expenses that the court finds to have been necessarily incurred, plus reasonable costs and attorney's fees."  Cal. Gov.

the California and Nevada ***attorneys' fees provision***s nowhere mention "proceeds." Where, as here, the state FCAs are modeled after the federal FCA scheme, a departure from the federal statute is deemed to reflect a contrary legislative intent. *See, e.g.*, *Int'l Game Tech., Inc. v. Second Judicial Dist. Court of Nevada*, 122 Nev. 132, 154 (2006) ("[T]he presumption that the Legislature, in enacting a state statute similar to a federal statute, intended to adopt the federal courts' construction of that statute, is rebutted when the state statute clearly reflects a contrary legislative intent.");[14] *Romano v. Mercury Ins. Co*., 128 Cal. App. 4th 1333, 1343 (2005) ("Where a statute referring to one subject contains a critical word or phrase, omission of that word or phrase from a similar statute on the same subject generally shows a different legislative intent.").[15] If California and Nevada had intended to

_____

Code § 12652(e)(8) (emphasis added). The Nevada FCA provides that "[i]f the Attorney General, a designee of the Attorney General pursuant to NRS 357.070 or a private plaintiff ***prevails in or settles*** an action pursuant to NRS 357.080, the private plaintiff is entitled to a reasonable amount for expenses that the court finds were necessarily incurred, including reasonable costs, attorney's fees and the fees of expert consultants and expert witnesses. Those expenses must be awarded against the defendant, and may not be allowed against the State or a political subdivision." NRS 357.180 (emphasis added).

[14]  *See also, Gallegos v. State*, 123 Nev. 289, 295 (2007) ("[T]he fact that the Legislature modeled NRS 202.360(1)(b) after a federal statute and excluded from its provisions the definition contained in that federal statute indicates to us that the Legislature intended another meaning—a meaning it failed to define."); *State, Dep't of Bus. & Indus., Office of Labor Com'r v. Granite Const. Co.*, 118 Nev. 83, 88-90 (2002) (in adopting the language of the federal wage law, the Davis-Bacon Act, the Nevada Legislature intended the scope of its state wage law, NRS 338.040, to be broader than that of the Davis-Bacon Act by omitting the words "directly upon" used in the federal wage law, and instead adopting the phrase "at the site of the work" to describe coverage under NRS 338.040. The omission of the words "directly upon" leads to the conclusion that the Nevada Legislature did not intend geographic proximity to be determinative of coverage under Nevada's prevailing wage law).

[15]  *See also Armenta v. Osmose, Inc*., 135 Cal. App. 4th 314, 323 (2005) ("where the language or intent of state and federal [] laws substantially differs, reliance

award attorneys' fees based on recovery of penalties alone, the legislatures would have followed the federal scheme.[16]  That they did not do so compels the conclusion that attorneys' fees are not available based on recovery of penalties alone.  Consistent with this analysis, ***Plaintiffs are unable to point to a single case awarding attorneys' fees under the California or Nevada FCAs to a plaintiff that has recovered only penalties***.[17]

> ### C.   <u>Plaintiffs cannot recover attorneys' fees under California law.</u>
>
> > **1.   Under California law, a party must succeeded on a practical level in achieving what it sought in order to be the "prevailing party."**

California law on "prevailing party" ***independently*** compels a finding that Plaintiffs are not entitled to attorneys' fees for the 22 California projects.  Under California law, where a statute provides attorneys' fees to the prevailing party but

_____

on federal regulations or interpretations to construe state regulations is misplaced").

[16]   *See* California Government Code § 12652(g)(C)(7) (defining "proceeds" as used in other sections to include civil penalties").

[17]   It makes sense that the California and Nevada state legislatures would decide to deviate from the federal scheme in order to assure that plaintiffs who are awarded only penalties do not *automatically* get to recover attorneys' fees.  The federal legislative scheme contains a failsafe to prevent plaintiffs from recovering attorneys' fees in situations like this one, where a plaintiff's recovery is grossly disproportionate to what they claimed was at stake in the litigation.  Under the Equal Access to Justice Act (EAJA), 28 U.S.C § 2412(d)(1)(D), when the United States makes a demand substantially in excess of the judgment finally obtained and that demand is unreasonable when compared with such judgment under the facts and circumstances of the case, it is ***the defendant***—and not the prevailing plaintiff—that recovers its fees and other expenses related to defending against the excessive demand.  *See, e.g.*, *United States ex rel. Wall v Circle C Constr., LLC*, 868 F.3d 466 (6th Cir. 2017) (finding that district court abused its discretion when it failed to award attorneys fees to *defendant* under the EAJA in an FCA case where plaintiff sought $1.66 million and recovered only $14,748).  But the California and Nevada statutes do not have such EAJA provisions.

does not define what a prevailing party is, "the courts have concluded that a rigid

definition of prevailing party should not be used.  Rather, prevailing party status

should be determined by the trial court based on an evaluation of whether a party

prevailed '*on a practical level*,' and the trial court's decision should be affirmed on

appeal absent an abuse of discretion.'  Among the factors the trial court must

consider in determining whether a party prevailed is *the extent to which each party*

*has realized its litigation objectives."*  *Olive v. Gen. Nutrition Centers, Inc*., 30 Cal.

App. 5th 804, 824 (2018), review denied (Apr. 17, 2019) (emphasis added).[18]

In *Olive*, the court adopted guidance from "the somewhat analogous context

of contractual attorney fee awards under Civil Code section 1717, which allows

a trial court to determine that neither party has prevailed on a contract cause of

action," as set forth in *Hsu v. Abbara*, 9 Cal. 4th 863 (1995).  *Hsu* explained that

"parties whose litigation success is not fairly disputable [may] claim attorney fees as

a matter of right, while reserving for the trial court a measure of discretion to find no

prevailing party when the results of the litigation are mixed.  Accordingly, *we hold*

*that in deciding whether there is 'a party prevailing on the contract,' the trial court*

*is to compare the relief awarded on the contract claim or claims with the parties'*

*demands on those same claims and their litigation objectives as disclosed by the*

*pleadings, trial briefs, opening statements, and similar sources.  The prevailing*

*party determination is to be made only by 'a comparison of the extent to which*

*each party has succeeded and failed to succeed in its contentions.'"*  *Olive*, 30 Cal.

App. 5th at 826 (quoting *Hsu*, 9 Cal. 4th at 876) (emphasis added).  "Finally, when

determining litigation success, the courts "should respect substance rather than

---

[18]   While under Cal. Civ. Proc. Code § 1032 (the costs provision), prevailing party
is defined as the party with a net monetary recovery, statutory provisions
authorizing attorneys' fees to the "prevailing party" are not subject to the definition
of "prevailing party" in the general costs statute.  *See, e.g., Galan v. Wolfriver*
*Holding Corp*., 80 Cal. App. 4th 1124, 1129-30 (2000).

1  form." *Id.*  The *Olive* court found this guidance to be substantially similar to the

2  "practical level" test.  *Id.* at 827.[19]

3          **2.**      **Under California law, Plaintiffs are not prevailing parties**

4                     **because they did not prevail as a practical matter in**

5                     **achieving what they sought.**

6        Plaintiffs argue that they are prevailing parties entitled to attorneys' fees

7  based chiefly on the fact that they obtained an award of $162,000 in penalties.

8  Dkt. at 4:11-14.[20]  But this argument fails to address the legal standard under

9  California law—and, under that standard, as a practical matter, Plaintiffs did ***not***

10  achieve their litigation objectives and therefore are not entitled to fees.

11        As described above, Plaintiffs' counsel vigorously litigated this case for 14

12  years of litigation in service of their objective of a massive recovery of "billions of

13  dollars" on behalf of all 47 intervenors and 190 real parties in interest.  By any

14  measure, their objective has not been met.  They failed to obtain a damages award

15  for any of the 42 non-exemplar intervenors or any of the 190 real parties-in-interest.

16  They failed to obtain rulings on falsity, materiality, and scienter in Phase I that could

---

17  [19]  In *Olive*, the court applied this guidance to find the trial court did not abuse its

18  discretion in finding ***no*** prevailing party where "neither party obtained an

19  unqualified win.  Olive initially sought $1.5 million in actual damages, $2 million for his emotional distress, restitution of GNC's profits in a range that exceeded

20  $100 million, and five times the total of those sums as punitive damages.  Instead, he obtained $213,000 in actual damages, $910,000 for his emotional distress, and

21  nothing in terms of restitution or punitive damages.  GNC contended that Olive was entitled to nothing more than $4,800 in actual damages, but ended up with an

22  adverse verdict of more than $1.1 million.  Accordingly, the trial court was free to

23  view this as a mixed result and then exercise its discretion to determine whether one party prevailed, or whether neither party prevailed because neither achieved its

24  practical litigation objectives."  *Id*. at 827.

25  [20]  "There is no question that Plaintiffs 'prevailed'.  The Phase 1 Jury rendered

26  a liability verdict in favor of Plaintiffs, the Court denied J-M's motion to set aside that verdict, and the Court awarded Plaintiffs penalties, which constitute 'proceeds'.

27  Accordingly, the plain statutory language ends the inquiry."

28

---

be used by any of these non-exemplar intervenors or real parties-in-interest. Plaintiffs failed even as to the exemplar plaintiffs. They sought nearly $60 million in full replacement costs in Phase II, recovered no damages and had their damages claims dismissed as a matter of law post-trial. They obtained a jury verdict on falsity, materiality and scienter solely by litigating a theory of the case that was inadequate and unable to support a claim for damages. And even looking solely at their penalty claims, Plaintiffs failed to achieve what they sought. Plaintiffs lost on 99% of the penalties they sought to recover for those five exemplars. Given the vast disparity between what was sought and what was obtained, Plaintiffs are not the prevailing party. *See Olive*, 30 Cal. App. 5th at 827 (affirming finding that plaintiff was not the prevailing party under California law where the plaintiff sought compensatory damages, restitution and punitive damages of $500 million and received approximately $1.1 million).

**D.   Plaintiffs have no entitlement to attorneys' fees under Nevada law.**

**1.   Under Nevada law, a plaintiff with a monetary judgment that obtains no compensatory damages and no significant public benefit is not entitled to attorneys' fees.**

Nevada law, too, bars any award of fees here independent of its failure to provide fees for recovery of "proceeds." In contrast to California, Nevada follows federal law with respect to defining "prevailing party." *LVMPD v. Blackjack Bonding*, 343 P.3d 608, 615 (Nev. 2015) (relying on *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983); *Women's Fed. Sav. & Loan Ass'n of Cleveland v. Nevada Nat. Bank*, 623 F. Supp. 469, 470 (D. Nev. 1985) (noting that this was a diversity case and that Nevada law must be applied, and relying on *Hensley*). Under *Hensley*, plaintiffs may be considered "'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley*, 461 U.S. at 433. However, the U.S. Supreme Court has also instructed that, consistent with *Hensley*, "***in some***

***circumstances, even a plaintiff who formally "prevails" [ ] should receive no attorneys' fees at all***." *Farrar v. Hobby*, 506 U.S. 103, 115 (1992) (emphasis added). A plaintiff that fails to prove injury or seeks — but fails to obtain— compensatory damages, but nevertheless obtains a monetary judgment, is one such plaintiff. *Id.*

In *Farrar*, the U.S. Supreme Court held that a plaintiff who recovered nominal damages of only one dollar after seeking $17 million in compensatory damages was not entitled to any attorneys' fee award. *Id*. The Supreme Court reasoned that, even though the nominal damages award does render a plaintiff a prevailing party "by allowing him to vindicate his 'absolute' right to procedural due process through enforcement of a judgment against the defendant," the court must take into account the "failure to prove actual, compensable injury." *Id*. Thus, "[h]aving considered the amount and nature of damages awarded, the court may lawfully award low fees or no fees without reciting the 12 factors bearing on reasonableness or multiplying the number of hours reasonably expended . . . by a reasonable hourly rate." *Farrar*, 506 U.S. at 115 (internal citation and quotation omitted); *see also Choate v. Cty of Orange*, 86 Cal. App. 4th 312 (based on *Farrar*, denying plaintiffs' request for $248,647 in fees where plaintiffs recovered $5,719 in compensatory and punitive damages because recovery was "de minimis" when compared to the millions plaintiffs sought").

Ninth Circuit decisions are in accord. Where a plaintiff is not able to prove any damages, "the guiding consideration for the district court" in whether to award attorneys' fees is the difference between the damages sought and the amount recovered. *Cummings v. Connell*, 402 F.3d 936, 947 (9th Cir. 2005), amended, No. 03-17095, 2005 WL 1154321 (9th Cir. May 17, 2005). *See also Benton v. Oregon Student Assistance Comm'n*, 421 F.3d 901, 908 (9th Cir. 2005) (reversing award of attorneys' fees to plaintiff that obtained only nominal damages because "a finding that plaintiff's rights were violated was a prerequisite to the award of

nominal damages; in fact, a finding of a constitutional violation will always be present in a civil rights case where nominal damages have been awarded. Moreover, every plaintiff who receives a nominal damages judgment will necessarily have a 'judgment to point to' that shows that the plaintiff was in the right and the defendant in the wrong.  Thus, the finding that plaintiff's rights were violated and the accompanying judgment cannot be the "something more" required for an award of attorney's fees and costs here").[21]

> **2.**  **Plaintiffs' counsel obtained a *de minimis* monetary judgment but proved no injury, obtained no compensatory damages and produced no significant public benefit and so is not entitled to attorneys' fees under Nevada law.**

Here, given that the Plaintiffs sought billions of dollars in damages yet obtained no compensable damages, and no significant public benefit, the de minimis penalty award does not support an award of attorneys' fees under the Nevada FCA. *Farrar v. Hobby*, 506 U.S. 103, 115 (1992) (no entitlement to fees where plaintiff sought $17 million in compensatory damages, obtained a favorable verdict, but were awarded only $1 in nominal damages).

> **E.**  **Even if the Court awards attorneys' fees, under California and Nevada law, such fees must be limited to a fraction of the penalty award.**

Even if the Court were inclined to make some award of attorneys' fees, Plaintiffs' attorneys fees must be evaluated in light of their limited success and cannot exceed what Plaintiffs' actually recovered.

---

[21]  Courts can and do apply *Farrar* to False Claims Act cases, like this one, where a plaintiff obtains no compensatory damages. *See, United States ex rel. Christiansen v. Everglades College, Inc.*, 855 F.3d 1279 (11th Cir. 2017) (after a bench trial in which Relators were awarded penalties only, no damages *but the government settled the case for more money than the penalties awarded*, the Court relied on Farrar in upholding a 95% reduction to the attorneys fee award).

Plaintiffs argue that "[w]here the action results in some significant relief for the plaintiff, all hours reasonably necessary to obtain the relief are compensable, even if the actual relief is less than what the plaintiff originally sought or the fees are a large multiple of the damages awarded." Dkt. 2910 at 6:26-7:1. But that is not the law. In reality, "*[i]t is an abuse of discretion for the district court to award attorneys' fees without considering the relationship between the 'extent of success' and the amount of the fee award*." *McGinnis v. Kentucky Fried Chicken of California*, 51 F.3d 805, 810 (9th Cir. 1994) (citations omitted); see also *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) (stating that the benefit obtained for a plaintiff is the most important factor in considering a reasonable fee). "[W]here the plaintiff has achieved 'only limited success,' counting all hours expended on the litigation—even those reasonably spent—may produce an 'excessive amount.'" *Id.* (citing *Hensley*, 461 U.S. at 436). **The Supreme Court has thus instructed district courts to "award only that amount of fees that is reasonable in relation to the results obtained."** *Id.*; see also *Envtl. Prot. Info. Ctr. v. Dep't of Forestry & Fire Prot.*, 190 Cal. App. 4th 217, 239 (2010), as modified on denial of reh'g (Dec. 15, 2010) (In cases of limited success, California has adopted the *Hensley* approach to evaluating reasonableness of fees); *Brunzell v. Golden Gate Nat. Bank*, 455 P.2d 31, 33 (Nev. 1969) (holding that a court must consider whether the attorney was successful and what benefits were derived in determining reasonable attorneys' fees).

"There are three main factors relevant to evaluating the reasonableness of a requested fee award under *Hensley*: (1) the relationship between damages awarded and damages requested; (2) the relationship between damages awarded and attorneys' fees requested; and (3) whether the outcome of the lawsuit conferred a significant non-pecuniary benefit upon the plaintiff or the general public." *Hotchkiss v. CSK Auto, Inc.*, 949 F. Supp. 2d 1040, 1050 (E.D. Wash. 2013) (citing *McCown v. City of Fontana*, 565 F.3d 1097, 1104-05 (9th Cir. 2009) and *McGinnis*,

51 F.3d at 809-10).  Applying this analysis, Plaintiffs' counsel can only reasonably be awarded fees in some fraction of the penalty award.

> **1.    Comparing the amount of damages sought to what was received reveals that Plaintiffs' case was not successful because no damages have been awarded and the penalty was a small fraction of what was requested.**

"[I]n judging a plaintiff's level of success and the reasonableness of the hours spent in achieving that success, a district court should give primary consideration to the amount of damages awarded as compared to [the] amount sought." *McCown*, 565 F.3d at 1104 (quoting *Farrar*, 506 U.S. at 114).  In *McCown*, the amount plaintiff received in settlement was roughly one-fourth of damages pled in complaint and less than one-tenth of damages requested in settlement.  *Id.*  The Ninth Circuit found that the plaintiff's "victory fell far short of his goal" and "therefore it [was] "unreasonable to grant his attorneys more than a comparable portion of the fees and costs they requested").[22]

Here, as in *McCown*, there is no question that the results obtained by the non-exemplars fell far short of Plaintiffs' goal.  The non-exemplar plaintiffs did not obtain a favorable outcome by any measure.  They cannot make use of the Phase I verdict on falsity, scienter or materiality (the goal of the Phase I trial).  Nor would

---

[22]   Plaintiffs bizarrely claim that consideration of extent of success is limited to "when Plaintiffs have brought multiple claims and succeed on only some of their claims" and that here there are no unsuccessful claims.  As an initial matter, there is no support for the claim that this analysis only applies where there are "multiple claims."  *Hensley* itself demonstrates that this is not the case when it says that the analysis is "particularly crucial" where a plaintiff is deemed "'prevailing' even though he succeeded on only some of his claims for relief."  In any event, a "claim" is not coextensive with "cause of action" as Plaintiffs seem to believe.  Here, up until Phase 2, Plaintiffs were trying to obtain results for 47 Intervenors and 190 Real Parties in Interest.  All of their claims (but for the five exemplars) were plainly unsuccessful.

they want to at this point, given that the verdict was founded on grounds unable to sustain a damages case.  And of course, no damages or penalties has been awarded on behalf of any non-exemplar plaintiffs despite the fact that it was Plaintiffs' counsel's goal to obtain billions of dollars of damages on their behalf.

Nor are the California and Nevada exemplars entitled to an any award of attorney's fees (beyond some fraction of their modest penalty award) under a reasonableness standard.  While the non-exemplars have not won anything, the exemplars have lost virtually everything.  The exemplar plaintiffs requested tens of millions of dollars in damages (before trebling) and none were awarded.  And even if the penalty constitutes a pecuniary benefit resulting from success on the issues tried in Phase II, only a fraction of the penalties sought—less than 1%—were awarded.  Any fee award must be adjusted downward so that is "commensurate with [this limited] extent of success.  *See, e.g.*, *McCown*, 565 F. 3d at 1104; *Hotchkiss*, 949 F. Supp. 2d at 1050 (finding the plaintiff was dealt "a very significant defeat" where plaintiff recovered only $55,000 in compensatory damages despite requesting over $11 million in non-economic damages").

> **2.      Comparing the relationship between damages awarded and fees requested, it is clear that the fee award cannot exceed the penalty award.**

Under the second *Hensley* factor, this Court must consider the relationship between the damages awarded and the fees requested.  The amount of the successful recovery is the touchstone for any fee award, not the amount of time spent.

Thus, in *McGinnis*, the district court awarded plaintiff $148,000 in attorneys' fees.  After plaintiff's damages were reduced from $234,000 to $34,000, the Ninth Circuit reversed and remanded to the district court to take into account the level of success.  As the Ninth Circuit explained, "[l]awyers might reasonably spend $148,000 worth of time to win $234,000.  ***But no reasonable person would pay lawyers $148,000 to win $34,000***."  *Id.* (emphasis added).  *See, e.g.*, *Hoffman v.*

*Constr. Protective Servs., Inc., No*. EDCV03-01006VAPSGLX, 2006 WL 6105640, at *4 (C.D. Cal. Dec. 21, 2006) (finding that "the lodestar figure of $215,545.74 is grossly disproportionate to the award of $3,718.12" and that the court must adjust the lodestar figure downward to account for the fact that the lodestar figure here is approximately fifty-eight times the amount Plaintiffs recovered); *Hotchkiss v. CSK Auto, Inc*., 949 F. Supp. 2d 1040, 1050 (E.D. Wash. 2013) (Plaintiff's requested award of $471,085.50 in attorney's fees is plainly disproportionate to the $55,000 damages award).

   *U.S. ex rel. Bahrani v. Conagra, Inc*., No. 00-CV-1077JLKKLM, 2009 WL 2766805 (D. Colo. Aug. 28, 2009), reversed on other grounds, 624 F.3d 1275 (10th Cir. 2010), applies this principle in the FCA context.  The relator there had initially sought between $57 million and $115 million in damages and penalties.  But the relator recovered damages of just $107.50 and was awarded $27,822.50 on its behalf after the district court trebled damages and added penalties.  Given this limited degree of success, the district court reduced the requested $3.49 million in attorneys' fees to $9,274, which was one-third of the total recovery.  *Id.* at *6.

   The cases cited by Plaintiffs that purport to show disproportionate fee awards are inapt because the plaintiffs in those cases either won substantial equitable relief or other important non-pecuniary benefits;[23] the cases involved statutory schemes with very low anticipated recoveries where the plaintiffs were fully successful;[24] or

---

[23]   *Copeland v. Marshall*, 641 F.2d 880, 907 (D.C. Cir. 1980) (en banc) (award of $160,000 in fees on $33,000 judgment appropriate because "this litigation sought and obtained substantial equitable relief"); *City of Riverside v. Rivera*, 763 F.2d 1580, 1581-82 (9th Cir. 1985) (case involved substantial rights of a non-pecuniary in nature because it was a civil rights case regarding arrests without probable cause made with tear gas and unnecessary physical force); *Castel v. Advantis Real Estate Servs*. Co., No. 2:07-cv-00435, 2008 WL 3348774, at *5 (E.D. Va. Aug. 8, 2008) (in this FSLA case, award encouraged vindication of employees' rights).

[24]   *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1033 (9th Cir. 2012) (plaintiff settled for "the full amount of allowable statutory damages" which

there were other unique factors that made such disproportionate awards appropriate.[25]

Here, no reasonable person would pay lawyers upwards of $100 million (or even $10 million or $20 million) to win $162,000.[26]  Any fee award must be bound by the amount Plaintiffs actually recovered.

### 3.    The litigation has produced no non-pecuniary benefit.

Finally, Plaintiffs cannot escape the import of their *de minimus* pecuniary recovery because there has been no equitable relief or other benefit to Plaintiffs. Plaintiffs here never sought let alone obtained any form of injunctive relief.  Where, as here "the relief sought and obtained is limited to money, the terms "extent of success" and "level of success" are "euphemistic ways of referring to money."

---

"represents complete recovery under the statutory scheme").

[25]  *Estes v. Meridian One Corp.*, 77 F. Supp. 2d 722, 728-29 (E.D. Va. 1999) (reduced fee award by 20% but took into account that FMLA was a new statute making damages less predictable and made it more challenging to litigate); *Quesada v. Thomason*, 850 F.2d 537, 539 (9th Cir. 1988) (defendant obtained "a very favorable result . . . he managed to settle for nearly half of his original request and a full seventy percent of the amount he sought at trial.").  As another example, Plaintiffs contend that *Morris v. Eversley*, 343 F. Supp. 2d 234 (S.D.N.Y. 2004), supports this Court awarding Plaintiffs tens of millions of dollars of fees on a recovery of no damages and less than $200,000 in penalties because the *Morris* court awarded attorneys' fees of $154,900 on $16,000 in compensatory and punitive damages.  But *Morris* involved an attempted rape by a correctional officer and the *Morris* court specifically stated that it was "baffled" by the low damage award and awarded disproportionate fees because "[t]he fact that a prisoner, even a former prisoner is unable to recover a fair measure of damages from a jury is not a basis for reducing a fee award." *Id.* at 248.  This case provides no support for allowing Plaintiffs a full award of attorneys' fees where it was the Court that decided Plaintiffs had not presented sufficient evidence to support a damages award and it was the Court that decided only the five exemplar plaintiffs would be bound by the Phase 1 verdict.

[26]  While J-M does not know exactly how much money Plaintiffs spent in Phase I, as of March 13, 2013 (before the Phase 1 trial) Plaintiffs claimed to have incurred fees and costs of $50 million.  Shin Decl., Ex. L.

*McGinnis*, 51 F.3d at 810.  Plaintiffs point to the extended warranty.  But Plaintiffs' counsel derided the warranty at trial, and none of the plaintiffs have sought to benefit from it.  In any event, J-M began offering a 50-year warranty on April 5, 2010.[27]  If this was the substantial benefit obtained by the litigation, Plaintiffs could have stopped litigating this case as of April 5, 2010.  Any attorneys' fees incurred after that date would therefore be patently unreasonable on their face.  In short, Plaintiffs cannot now claim that the 50-year warranty justifies a multi-million attorney-fee award.

> **4.** **The reasonableness of any fee award must be assessed in the context of the waste and burden Plaintiffs' work created.**

The reasonableness of fees requested also clearly calls for the assessment of whether the work in question was efficient or instead added a burden to the litigation.  As described at the outset, Plaintiffs' prosecution of this litigation not only was unsuccessful, it was wasteful and affirmatively burdensome to the Court and J-M.  Not only should the Court eschew rewarding that work, but its negative impact on the case should be reflected in by reducing any award to a fraction of the one benefit Plaintiffs have obtained , the penalties award.

> **F.** **Plaintiffs are not entitled to special enhanced rates nor current market rates for work undertaken years ago.**

Plaintiffs ask this Court for a variety of rulings as to the parameters for establishing a reasonable hourly rate.  There is no need for the Court to wade into this sort of minutia at this time.  A magistrate judge could capably decide such routine issues during the next phase of briefing (if any is appropriate).  For example, the parties may agree on a reasonable hourly rate, rendering any ruling now unnecessary.

---

[27]  https://www.plasticsnews.com/article/20100405/NEWS/304059964/jw-offering-50-year-warranty-on-its-pipe

In an abundance of caution, J-M responds to certain of these issues here in case the Court decides to rule on such issues. First, Plaintiffs argue the "reasonable hourly rate must reflect the market treatment for experienced attorneys with specialized skills necessary to litigate a *qui tam* case." But Plaintiffs offer only platitudes regarding the complexity of *qui tam* cases. They do not point to any specific, special skills held by Plaintiffs' counsel or any specific benefit derived from these purportedly special skills. Indeed, Plaintiffs' counsel rang up tens of millions of dollars in fees and costs and recovered only $162,000. This strongly suggests Plaintiffs did not obtain benefits from their lawyers that justifies a special enhanced rate. Indeed, this Court has stated on the record that if the case had been tried differently, that it may not have been impossible for Plaintiffs to establish actual damages.

Moreover, Plaintiffs cite no case suggesting a higher hourly rate is appropriate for *qui tam* cases. In fact, the only case they do cite, *Blum v. Stevenson*, 465 U.S. 886 (1984), suggests no special rate should be allowed. In *Blum*, the Supreme Court found an upward adjustment was not warranted. As the Court explained, "[t]he novelty and complexity of the issues presumably were fully reflected in the number of billable hours recorded by counsel and thus do not warrant an upward adjustment in a fee. There may be cases, of course, where the experience and special skill of the attorney will require the expenditure of fewer hours than counsel normally would be expected to spend on a particularly novel or complex issue." *Id.* at 898. Plaintiffs here have not established they were able to bill reduced hours due to any skill set, and as such, a higher hourly fee is not warranted.

Plaintiffs next argue counsel is entitled to use current, rather than historical market rates, to compensate for delay in payment. But courts are allowed to choose between current and historical rates (with a prime rate adjustment) and do so in such a way as to avoid a windfall payment. *See, e.g., Bagley v. Karatz*, No. CV 07-1754,

2010 WL 11519862, at *1 (C.D. Cal. Sept. 7, 2010) ("[T]he Court finds it is not appropriate to calculate the lodestar based on current rates for all time billed . . . the Ninth Circuit offers district courts two alternatives: application of current rates or use of historical rates adding a prime rate enhancement.  Calculating the difference between actual rates and current rates attributed to just a single timekeeper resulted in a difference of nearly $35,000.  A prime rate enhancement would not have come close to this amount."); *Independent Living Center of Southern California v. Kent*, No. 2:08-CV-03315, 2020 WL 418947, at *4 (C.D. Cal. Jan. 24, 2020) (applying blended rate based on historic attorney rates between 2008 and 2019).  Any decision on whether to use current market rates or historical rates with a prime interest adjustment should not be made until all of the relevant information is before the court to determine which method is most appropriate to avoid a windfall to Plaintiffs' counsel.

### G.      Plaintiffs are not entitled to discovery from J-M.

Plaintiffs' request to take discovery into J-M's attorneys' fees if J-M challenges the reasonableness of their fees is contrary to well-established law.[28]

---

[28]  Plaintiffs' cases are all inapt.  In *United States ex rel. Rai v. KS2 Tx*, 2019 WL 1397290, at *5 (D. Conn. Mar. 27, 2019), no discovery into opposing counsel's fees were permitted; the court got its information about opposing counsel from "a review of the docket."  *Ackerly Commc'ns of Mass., Inc., v. Somerville*, 901 F.2d 170, 172 n.5 (1st Cir. 1990) is a case about fees on appeal and it is not clear that the information obtained regarding the losing party's fees was through discovery); *Chrapilwy v. Uniroyal, Inc.*, 670 F.2d 760 (7th Cir 1982) dealt only with hourly rates, not reasonableness of hours billed.  *Henson v. Columbus Bank & Tr. Co.*, 770 F.2d 1566, 1575 (11th Cir. 1985) is inapplicable because the court explicitly acknowledged that discovery into opposing counsel's hours may be inappropriate but in this case there was the need for such discovery because there was insufficient evidence from which the trial court could ascertain reasonableness of fees, especially as to the claim of duplication of multiple attorneys' billing entries.  *Citgo Petroleum Corp. v. Krystal Gas Mktg. Co.*, 466 F. Supp. 2d 1263 (N.D. Okla. 2006) is merely a Northern District of Oklahoma case awarding fees after a summary judgment win—it tells this Court nothing about whether opposing counsel's fees are

Courts routinely reject requests for discovery into opposing counsel's billing information on the grounds such information is irrelevant to determine the reasonableness of requested fees.  *See, e.g.*, *Johnson v. Univ. Coll. of Univ. of Alabama in Birmingham*, 706 F.2d 1205, 1208 (11th Cir. 1983) (quashing plaintiff's subpoena seeking defendants' attorney billing records because such information "was irrelevant to the reasonable fees and hours of plaintiffs' counsel" given that "[t]he amount of hours that is needed by one side to prepare adequately may differ substantially from that for opposing counsel, since the nature of the work may vary dramatically.  The case may have far greater precedential value to one side than the other."); *Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1151 (9th Cir. 2001) ("opposing parties do not always have the same responsibilities under the applicable rules, nor are they necessarily similarly situated with respect to their access to necessary facts, the need to do original legal research to make out their case, and so on.  Comparison of the hours spent in particular tasks by the attorney for the party seeking fees and by the attorney for the opposing party, therefore, does not necessarily indicate whether the hours expended by the party seeking fees were excessive."); *Stathakos v. Columbia Sportswear Co.*, No. 15-CV-04543-YGR, 2018 WL 1710075, at *5 (N.D. Cal. Apr. 9, 2018) ("the Ninth Circuit has recognized that comparing the numbers of hours spent by opposing parties may not be an appropriate metric for assessing the reasonableness of hours billed"); *Castillo v. Nationstar Mortg. LLC*, No. 15-CV-01743-BLF, 2017 WL 6513653, at *10 (N.D. Cal. Dec. 20, 2017) (comparison of the hours billed by the plaintiff's counsel with the hours billed by defense counsel is not particularly helpful); *Maughan v. Google Tech., Inc.*, 143 Cal. App. 4th 1242, 1262 (2006) ("it certainly was not enough to say that, because Girardi & Keese purportedly spent less time, so too should have

relevant to determining the reasonableness of attorneys fees in a case where a party sought billions of dollars in damages and tens of millions of dollars in penalties and recovered less than $200,000 in penalties.

1    Quinn Emmanuel").

2        *Ruiz Fajardo Ingenieros Asociados S.A.S. v. Flow Int'l Corp.*, No. C16-1902

3    *RAJ*, 2019 WL 2492218 (W.D. Wash. June 14, 2019), is instructive.  Following

4    a jury verdict for plaintiff, the court quashed plaintiff's request for billing

5    information from defendant's counsel because it was "overboard, burdensome, and

6    of minimal relevance." *Id.* at *1.  The court reasoned the requested time records

7    likely implicate information protected by the attorney-client privilege, and redacting

8    privileged information for the entirety of the billing records in a long-running case

9    "would impose a substantial burden, to limited benefit." *Id.* (citations omitted).

10   Moreover, the court held defense counsel's billing information was not necessary to

11   establish the reasonableness of plaintiff's requested fees, because the court is

12   "adequately prepared to use its own familiarity with the case, law, and applicable

13   billing rates" in its locality, to rule on reasonableness of plaintiff's claimed fees.  *Id.*

14   at *2.  ***Significantly, the court recognized the defense argued plaintiff's fees***

15   ***should be reduced because "it was substantially larger than the jury verdict" and***

16   ***the court does not require additional evidence from [defense counsel] to consider***

17   ***these arguments." Id.***

18       Plaintiffs' own case—*McGinnis v. Kentucky Fried Chicken of California*, 51

19   F.3d 805, 809 (9th Cir. 1994)—reinforces the notion that opposing counsel's billing

20   records are irrelevant where the plaintiffs' fee request greatly exceeds any recovery.

21   In *McGinnis*, the Ninth Circuit held that, even though defendants incurred more in

22   attorneys' fees than plaintiffs, the district court must reduce the attorneys' fees

23   award because the plaintiff sought $148,000 in damages and only recovered

24   $34,000.  As the Ninth Circuit explained, "no reasonable person would pay lawyers

25   $148,000 to win $34,000." *Id.* at 810.  Likewise, here, J-M's attorneys' fees are

26   irrelevant to whether Plaintiffs' attorneys' fees are reasonable, considering they

27   recovered less than $200,000 in penalties.  No reasonable person would pay lawyers

28   $50 million, let alone more, to recover such de minimis amounts.  There is no need

1   to see what J-M spent in response to the all-out litigation warfare waged by

2   Plaintiffs.  Plaintiffs are simply trying to extort J-M with the threat of having to

3   redact ten years of billing records from multiple firms in order to prevent J-M from

4   arguing Plaintiffs' patently unreasonable attorneys' fees are unreasonable.

5       **H.**    **Plaintiffs must disclose the attorneys' fees they have already**

6           **recovered from Defendant Formosa.**

7         For all of the reasons discussed above, Plaintiffs are not the prevailing parties

8   in this case and are not entitled to attorneys' fees.  If, however, the Court deems

9   Plaintiffs the prevailing party for any portion of this case, the Court must order

10  Plaintiffs to produce information relating to the attorneys' fees they recovered from

11  their settlement with Defendant Formosa Plastics prior to the Phase 1 trial.

12  Plaintiffs' counsel should not be entitled to receive a windfall and have its fees paid

13  twice.  *See Corder v. Brown*, 25 F.3d 833, 840 (9th Cir. 1994) (holding that a non-

14  settling defendant is entitled to offset attorney's fees owed by the amount already

15  paid by settling defendants).

16  **IV.**   **CONCLUSION**

17        For all of the foregoing reasons, this Court should find Plaintiffs are not

18  entitled to any award of attorneys' fees.  In the alternative, the Court should find

19  Plaintiffs are not entitled to attorneys' fees for the Virginia projects and should take

20  into account Plaintiffs' extremely limited recovery compared to what Plaintiffs

21  sought, and award a very small fraction of the recovery as the fee award.

22

23

24

25

26

27

28

1    DATED: December 2, 2020          Respectfully submitted,

2                                      PAUL, WEISS, RIFKIND, WHARTON

3                                      & GARRISON LLP

4                                      By:    /s/ David Bernick

5                                                David Bernick

6

7    DATED:  December 2, 2020          BIRD, MARELLA, BOXER, WOLPERT,

8                                      NESSIM, DROOKS, LINCENBERG &
                                       RHOW, P.C.
9

10                                     By:    /s/ Paul S. Chan

11                                             Paul S. Chan

12                                     *Attorneys for Defendant J-M Manufacturing*

13                                     *Company, Inc. dba JM Eagle*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

J-M'S OPPOSITION TO PLAINTIFFS' BRIEF IN SUPPORT OF ENTITLEMENT TO ATTORNEYS' FEES