# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | EDCV 06-55-GW-PJWx | Date | March 11, 2021 |
|---|---|---|---|
| Title | *United States of America, et al. v. J-M Manufacturing Company, Inc.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | Terri A. Hourigan | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Elizabeth J. Sher | David M. Bernick |
| Kirk Dillman | Paul S. Chan |
| Eric R. Havian | |
| Harry Litman | |
| Ellen Head | |
| Peter Broadbent | |
| Susan K. Stewart | |

**PROCEEDINGS:      HEARING ON PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

The Court's Tentative Ruling is circulated and attached hereto. Court hears argument. For reasons stated on the record, the hearing is continued to March 22, 2021 at 11:30 a.m. The parties are to file a joint status report by noon on March 18, 2021. Agreements are to the provided to the Court *in camera*.

| | : | 55 |
|---|---|---|
| Initials of Preparer | JG | |

_**United States et al v. J-M Manufacturing Company, Inc.**_; Case No. 5:06-cv-00055-GW
Tentative Ruling on Plaintiffs' Motion for Attorney Fees

## I. Background[1]

Before the Court are the parties' briefs on the scope of permissible attorney fees for portions of this long-running qui tam action brought under federal and various state False Claims Act ("FCA") statutes.  Although the Court intends to appoint a special master to handle the yet-to-be-filed fee petitions, it agreed to consider several preliminary issues about the appropriate fee award.  It does so herein, subject to the contingencies noted.

A. Case History

This FCA action was brought by John Hendrix[2] ("Relator") on behalf of over 190 federal, state, and local government entities against defendant J-M Manufacturing Company, Inc. ("J-M"), alleging that J-M falsely represented its PVC pipe as having met certain industry standards which the pipe in fact did not meet.  _See United States et al v. J-M Mfg. Co., Inc._, No. 5:06-cv-00055-GW, 2020 WL 4196880, at *1 (C.D. Cal. June 6, 2020).  Some of the governmental entities elected to intervene in the action (_e.g._, the State of Delaware, ECF No. 102), and others declined (_e.g._, the State of California, ECF No. 52).  Certain of the intervening governmental entities appeared to be represented entirely through their own legal departments.  _See, e.g.,_ the State of Nevada, ECF No. 82.  Other entities seemed to litigate entirely through the efforts of the Relator's (and/or other private) counsel.  _See, e.g.,_ Calleguas Municipal Water District, ECF No. 61.

J-M's parent entity for much of the damages period (_i.e._ Formosa Plastics Corporation, U.S.A. ("FPC-USA")) was also named as a defendant.  Just prior to the start of the Phase One jury trial, FPC-USA settled and paid Plaintiffs $22.5 million plus an addition $5.5 million in

---

[1] The following abbreviations are used for the filings: (1) Plaintiffs' Motion for Attorney Fees ("Mot."), ECF No. 2910; (2) Defendant's Opposition to Plaintiffs' Motion for Attorney Fees ("Opp."), ECF No. 2914; (3) Plaintiffs' Reply in Support of the Motion for Attorney Fees ("Reply"), ECF No. 2915; (4) Defendant's Sur-Reply ("Sur-Reply"), ECF No. 2916; (5) Plaintiffs' Response to Defendant's Sur-Reply ("Resp. to Sur-Reply"), ECF No. 2920; (6) Reporter's Transcript of Motion for Attorney Fees ("Hearing Tr."), ECF No. 2923; (7) Plaintiffs' Brief on Relator's Work ("Pl. Rel. Br."), ECF No. 2929; (8) J-M's Brief on Relator's Work ("J-M Rel. Br."), ECF No. 2931.

[2] Hendrix was initially represented by the law firm of Phillips & Cohen ("P&C").  _See_ Complaint, ECF No. 1. According to the Relator, he was represented by P&C "in January 2006; Day Pitney LLP, which has served as co-counsel since April 2009; McKool Smith, which has served as co-counsel since March 2012; and Constantine Cannon, which has served as lead counsel in the matter since April 2015.  P&C moved to withdraw from the matter in September 2016 and was permitted to withdraw by order dated October 27, 2016."  _See_ Mot. at 1 n.1.

1

attorney fees and costs.[3]  *See* ECF Nos. 1744, 1846.

Given the vast number of plaintiff entities and the rather novel and complex issues in the case, the Court decided to conduct the trial in stages.  Five governmental entities from California, Nevada, and Virginia were selected as "Exemplar Plaintiffs"[4] and a Phase One trial was conducted as to whether the Plaintiffs could prove the three elements required to establish a claim under the FCA statutes[5] (*i.e.* falsity, materiality, and scienter) as to the theories of liability they were proffering.  *See* Order Addressing Bifurcation, ECF No. 551.  The Phase One jury returned a verdict in favor of Exemplar Plaintiffs establishing J-M's liability under the applicable state FCA statutes.  *See* ECF No. 1794.  After much further litigation, a jury trial was commenced in regards to Phase Two to determine actual damages and civil penalties.[6]  At the conclusion of the Phase Two trial and after the jury reported that it could not reach a verdict, a mistrial was declared.  *See* ECF No. 2765.  Thereafter, on J-M's renewed motion for judgment as a matter of law, the Court concluded that "[the Exemplar] Plaintiffs failed to provide evidence at the Phase Two trial from which a reasonable jury could make a finding of an award of actual damages under the FCA that would not be erroneous as a matter of law, be totally unfounded and/or be purely speculative."  *J-M Mfg.*, 2020 WL 4196880, at *41.

After ruling that the Exemplar Plaintiffs had not shown they were entitled to any actual damages, the Court heard said Plaintiffs' motion for civil penalties under the state FCAs and awarded them a total of $162,000.

B.  <u>Some Broad Outlines of as to the Attorney Fees Currently Being Sought</u>

All of the relevant FCA statutes contain fee-shifting provisions that allow a prevailing qui

---

[3] Plaintiffs and FPC-USA reached the settlement on September 11, 2013 (*see* ECF No. 1744-1).  They moved for Court approval of the settlement as "fair, adequate and reasonable" (*see* ECF No. 1742), which the Court granted on January 29, 2014.  *See* ECF No. 1846.

[4] The Exemplar Plaintiffs are: (1) Calleguas Municipal Water District in California; (2) the Commonwealth of Virginia on behalf of the City of Norfolk, Virginia; (3) the State of Nevada on behalf of the City of Reno, Nevada; (4) Palmdale Water District in California; and (5) South Tahoe Public Utility District in California.

[5] Although the Exemplar Plaintiffs are all state governmental entities, reference throughout this action has often been to the federal FCA statute and concomitant case law.  This is because the relevant state FCA statutes were patterned after the federal law and, where there is a dearth of state authority for a proposition, the state courts have turned to federal cases for guidance.  *See J-M Mfg.*, 2020 WL 4196880, at *2 n.6.

[6] Under most FCA statutes, the prevailing plaintiff is entitled to: (1) actual damages arising from the false claim (which is, in turn, subject to a multiplier), and (2) civil penalties in a set range as to each false claim.  *See e.g.* 31 U.S.C. § 3729(a)(1).  During the course of the Phase Two trial, it was agreed that the issue of civil penalties under the FCA would be tried to the Court.  *See* 2020 WL 4196880, at *2 n.8.

tam plaintiff (the "relator") to recover attorney fees.  As discussed below, most FCA statutes do not provide for the recovery of attorney fees for work done by counsel who are within the legal departments of the governmental entities.

In the present Motion, (1) only the Relator and the Commonwealth of Virginia are seeking attorney fees; (2) they are doing so only under the applicable state FCA statutes; (3) their requested attorney fees are limited to certain specified portions of the lawsuit (delineated, *infra*); and (4) they generally seek only those attorney fees incurred by the Relator and the Commonwealth of Virginia necessary to secure and defend the Phase One jury verdict.  *See* Mot. at 1-4; *but see* footnote 7, *infra*.  Given the Court's ruling that the Exemplar Plaintiffs had not shown they were entitled to any actual damages in Phase Two, Plaintiffs will not seek any fees incurred there.  *See* Reply at 1 ("Plaintiffs seek . . . nothing related to the Phase 2 damages trial.").  Some illustrative examples of other things Plaintiffs do not seek fees and costs for:

- Offensive and defensive discovery efforts in Phase One related solely to real parties other than the Exemplar Plaintiffs;
- Motion practice on the use of the Phase One verdict in future proceedings, including motion practice seeking interlocutory certification;
- Motion practice seeking to dismiss 38 intervenors' claims.

*See* Reply at 14.  The Court notes that some of the work necessary to secure and defend the Phase One jury verdict: (1) would have been compensated by the settlement with FPC-USA, and (2) would have inured (in certain respects) not only to the Exemplar Plaintiffs but also to all of the named plaintiffs in this action.  As to the former, hours billed and already compensated under that settlement may not be compensated again by an award paid for by J-M.[7]

C. Issues to be Resolved by the Court before the Petitions for Attorney Fees Are Submitted to the Special Master

The parties have raised the following threshold issues for the Court to resolve before Plaintiffs submit their fee petitions:

1. Is the Relator even entitled to any attorney fees under the relevant state FCA

---

[7] There are a number of other issues which the parties have not necessarily addressed but which probably should be discussed before the matter is sent to the special master.  For example, even though the Exemplar Plaintiffs appear to be limiting their attorney fees request to pre-Phase Two trial endeavors, the Court did award them civil penalties in that later stage of the case.  Are the Exemplar Plaintiffs seeking to recover for those endeavors?  If so, a large portion of that litigation by the Exemplar Plaintiffs was unsuccessful insofar as they sought such penalties for each C900/C905 stamp on a stick of pipe.  Those efforts should not generate a fee award.

statutes?

2.  If the Relator is entitled to attorney fees, do those fees extend to any of the work done after the governmental entity intervened in this action?

3.  Must those fees now sought by the Relator/Exemplar Plaintiffs be limited to some proportion of the monetary sums awarded at the Phase Two trial (here, only $162,000 in civil penalties)?

4.  What is the appropriate billing rate?

5.  What discovery, if any, are the parties entitled to during the process of determining an appropriate fee award?

*See generally* Mot., Opp.  The Court considers each of these issues in turn.

**II. Discussion**

    A.  <u>Is the Relator Even Entitled to Any Attorney Fees under the State FCA Statutes?</u>

The federal FCA, upon which the three state FCAs are modeled, mandates fee-shifting to the qui tam plaintiff/relator who initiates a FCA lawsuit, whether or not the government subsequently intervenes.  In both situations, the federal FCA provides that the relator "shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs."[8]  31 U.S.C. § 3730(d)(1)-(2).  This amount is paid by the defendant.  The fee-shifting in the federal FCA "aims at inducing whistleblowers to step forward and attorneys to pursue such actions."  *United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1035 (6th Cir. 1994).

Nonetheless, J-M offers several arguments for why in this case the Relator is not entitled to recover his attorney fees under the California, Nevada, and Virginia FCA statutes, which the Court now considers.

    1)  *California*

California's FCA statute is largely based on the federal FCA.  *See City of Pomona v.*

---

[8] An issue arises as to a relator's entitlement to attorney fees and costs after the governmental entity intervenes in the qui tam action.  As observed in John T. Boese, <u>Civil False Claims and Qui Tam Actions</u> § 3.09 (5th ed. 2020) "<u>Civil False Claims and Qui Tam Actions</u>"):

> However, when the government intervenes in a qui tam case and pursues the claims on its own, a defendant's obligation to pay a relator's post-intervention expenses, fees and costs should be reduced or eliminated, as the government's lead role in the matter from that point forward tends to undercut the necessary finding that a relator's post-intervention expenses, fees and costs are "necessarily incurred" or "reasonable."  The Act does not provide for any award of the government's attorneys' fees.

*Superior Court*, 89 Cal. App. 4th 793, 801-02 (2001) ("California's False Claims Act is 'patterned on a similar federal statutory scheme (31 U.S.C. § 3729 et seq.).'").  The federal FCA's fee-shifting applies to cases in which there are "proceeds of the action or settlement" where the lawsuit was initiated by the qui tam plaintiff. 31 U.S.C. § 3730(d)(1)-(2).  "Proceeds" include not only damages, but also civil penalties.  *See* 31 U.S.C. § 3730(d)(2) (providing that in cases where the government does not intervene, the relator "shall receive an amount which the court decides is reasonable for collecting the *civil penalties and damages*").  J-M does not dispute that if the federal FCA applied, the Relator would be entitled to attorney fees on the basis of having been awarded civil penalties.  *See* Opp. at 12.

California's FCA statutes contain the following provisions.  Cal. Gov't Code § 12651(a) identifies eight types of FCA violations which will give rise to liability for: (1) "three times the amount of damages that the state or political subdivision sustains because of the act of that person," (2) "a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) for each violation, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, Public Law 101–410 Section 5, 104 Stat. 891," and (3) "the costs of a civil action brought to recover any of those penalties or damages . . . ."[9]  Cal. Gov't Code § 12652[10] subsections (a), (b) and (c), respectively cover FCA actions initiated by (a) the state's Attorney General, (b) the prosecuting authority of a political subdivision within the state, or (c) a private "person."[11]   In that last situation, the state Attorney General or the prosecuting authority of a political subdivision (depending on whether state funds or political subdivision moneys are involved) can elect to intervene in the FCA lawsuit brought by the qui tam plaintiff.  *Id.* § 12652(c).  If the state or political subdivision intervenes, it has the "primary responsibility for prosecuting the action."  *Id.* § 12652(e)(1).  However, the "qui tam plaintiff shall have the right to continue as a full party to the action."[12]   *Id.*   "If the state or political

---

[9] Cal. Gov't Code § 12651 does not include any provision for an award of attorney fees.

[10] Gov't Code § 12652 was amended in 2009 effective 2010.  *See* footnote 15, *infra*.  However, the operative provisions referenced herein do not appear to have been substantively changed.

[11] "The person bringing the action shall be referred to as the qui tam plaintiff."  Cal. Gov't Code § 12652(c)(1).

[12] If the Attorney General or the prosecuting authority believes that the "unrestricted participation during the course of the litigation by the person initiating the action would interfere with or unduly delay the Attorney General's or local prosecuting authority's prosecution of the case, or would be repetitious, irrelevant, or for purposes of

subdivision elects not to proceed [intervene], the qui tam plaintiff shall have the same right to conduct the action as the Attorney General or prosecuting authority would have had if it had chosen to proceed under subdivision (c)." *Id.* § 12652(f)(1).

Cal. Gov't Code § 12652(g) deals with the division of the "proceeds" of the FCA action amongst the various potential parties including the state, the political subdivision and the qui tam plaintiff. "'[P]roceeds' include civil penalties as well as double or treble damages as provided in Section 12651." *Id.* § 12652(g)(7). The only statutory provision within California's FCA dealing specifically with the recovery of attorney fees *against* a defendant[13] is Cal. Gov't Code § 12652(g)(8) which provides: "If the state, political subdivision, or the qui tam plaintiff prevails in or settles any action under subdivision (c), the qui tam plaintiff shall receive an amount for reasonable expenses that the court finds to have been necessarily incurred, plus reasonable costs and attorney's fees."

J-M initially takes the position that the differences in the language of the federal FCA statute and its California counterpart evinces the California legislature's intent to limit the qui tam plaintiff's recovery to something less than what the federal FCA provides. In particular, J-M argues that where there is an award of only civil penalties and nothing in actual damages, the qui tam plaintiff has not "prevailed" and therefore is not entitled to attorney fees. *See* Opp. at 12-14. The Court finds that argument unpersuasive. It is true that "[w]here a statute referring to one subject contains a critical word or phrase, omission of that word or phrase from a similar statute on the same subject generally shows a different legislative intent." *Romano v. Mercury Ins. Co.*, 128 Cal. App. 4th 1333, 1343 (2005). J-M argues that "[i]t makes sense" the California legislature intended to deviate from the federal FCA's fee-shifting regime because the overall federal scheme – unlike the California one – "contains a failsafe to prevent plaintiffs from recovering attorneys' fees in situations like this one, where a plaintiff's recovery is grossly disproportionate to what they claimed was at stake in the litigation." Opp. at 14, n. 17. That failsafe is the Equal Access to Justice Act ("EAJA"), which provides that in a civil action (which

---

harassment, the court may, in its discretion, impose limitations on the person's participation . . . ." *See* Cal. Gov't Code § 12652(i).

[13] A defendant in a FCA lawsuit can recover costs and attorney fees from the qui tam plaintiff – "If the state or political subdivision does not proceed with the action and the qui tam plaintiff conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses against the party that proceeded with the action if the defendant prevails in the action and the court finds that the claim was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment." Cal. Gov't Code § 12652(g)(9)(A).

includes FCA lawsuits) where the United States makes a demand that is "substantially in excess of the judgment finally obtained . . . and is unreasonable when compared with such judgment," the *defendant* shall be awarded costs and fees incurred in defending against the government's lawsuit. 28 U.S.C. § 2412(d)(1)(D).   J-M suggests that because the California scheme does not have any EAJA-analogue, the California legislature intended to incorporate a comparable failsafe directly into the state FCA by intentionally using "prevailing parties" instead of "proceeds" to narrow fee-recovery.[14]   Unfortunately, J-M does not point to any legislative history supporting that speculative interpretation.   The argument is also undercut by the fact that the EAJA was designed to protect small businesses, not large multinational corporations such as J-M.   *See* 28 U.S.C. § 2412(d)(2)(B) (protections for corporations apply only to those "the net worth of which did not exceed $7,000,000 at the time the civil action was filed, and which had not more than 500 employees at the time the civil action was filed").

Furthermore, J-M's argument is contrary to the prevailing understanding of the applicable law.   The function of FCA statutes is to prevent governmental entities from being defrauded.   The way that goal is achieved is through the imposition of an award of a multiple of actual damages *and* through civil penalties.   As this Court has previously noted, "civil penalties themselves serve both deterrent and remedial purposes and, hence, a court may award such penalties even when the Government has not suffered, or cannot establish, actual damages. *See San Francisco BART Dist. v. Spencer*, Case No. C-04-046323-SI, 2007 WL 911851 *1 (N.D. Cal. Mar. 23, 2007) ('Here, plaintiff failed to prove any actual damages.   However, despite an inability to establish injury, plaintiff may still receive the statutory penalty for each violation of the CFCA.')."   *J-M Mfg. Co., Inc.*, 2020 WL 4196880, at *2 n.8.   Thus, even where a qui tam plaintiff is unable to demonstrate actual damages but does establish the basis for civil penalties, that plaintiff has clearly prevailed in the FCA lawsuit.

The evidence that the California legislature intended for its FCA to be as solicitous of qui tam plaintiffs as the federal FCA – including with respect to fee-shifting – is more persuasive. The federal government incentivizes states to adopt state FCAs that are as plaintiff-friendly as the federal FCA by offering a carrot in the Medicaid regime.   Normally, when a state prevails in

---

[14] The term "prevailing party" has not been interpreted as being as limiting as J-M herein contends.   As stated in *Farrar v. Hobby*, 506 U.S. 103, 109 (1992), "Under our 'generous formulation' of the term, '"plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Hensley v. Eckerhart*, 461 U.S. 424, 433 . . . (1983)."

a lawsuit under its FCA alleging that the defendant defrauded the state's Medicaid program, the state must pay a portion of the recovery to the federal government equal to the federal government's share of the state Medicaid program's funding obligations. However, if a state receives federal certification that its FCA "contains provisions that are at least as effective in rewarding and facilitating qui tam actions for false or fraudulent claims as those described in [the federal FCA]," the federal government's percentage share is reduced 10 points. 42 U.S.C. § 1396h(b)(2). California applied for and received that certification. *See* Reply at 4-6. It would be difficult to claim that California's FCA was "as effective in rewarding and facilitating" qui tam actions against large corporations such as J-M if a qui tam plaintiff who was awarded civil penalties but not damages could not recover attorney fees, but the plaintiff in an otherwise identical case brought under the federal FCA could.[15]

California's courts have held that the state's FCA should be given "the broadest possible construction consistent with [its] purpose" of "prevent[ing] fraud on the public treasury," and that it must be "construed broadly to give the widest possible coverage and effect to the prohibitions *and remedies* it provides." *S.F. Unified Sch. Dist. ex rel. Contreras v. First Student, Inc.*, 224 Cal. App. 4th 627, 638 (2014) (emphasis added). Indeed, California's FCA contains a provision stating so; expressly directing that "[t]his article shall be liberally construed and applied to promote the public interest." Cal. Gov't Code § 12655(c).

J-M nonetheless argues that attorney fees should not be awarded because Plaintiffs did not prevail "on a practical level." Opp. at 14-15. J-M focuses on the fact that Plaintiffs initially sought "billions of dollars on behalf of all 47 intervenors and 190 real parties in interest" but ended up with just a Phase One liability finding applicable to only themselves (the Exemplar Plaintiffs) in addition to a paltry $162,000 civil penalty award. Opp. at 16-17. However, J-M

---

[15] The version of the fee-shifting statute in California's FCA – Cal. Gov't Code § 12652 – that is applicable here was effective from January 1, 2000 through December 31, 2009. J-M argues that because California did not receive DRA certification until 2008 – two years after the complaint in this case was filed – that the Court should not read any "intent" surrounding California's decision to seek DRA certification into the California legislature's *earlier* enactment of § 12652, requiring that "the state, political subdivision, or the qui tam plaintiff *prevails in* or settles any action." Cal. Gov't Code § 12652(e)(8) (emphasis added). *See* Sur-Reply at 3-4. As the Court sees it, the question is not (as J-M suggests) whether the DRA is retroactive, but whether the fact that California believed in 2008 that its FCA was "as effective in rewarding and facilitating" qui tam actions as the federal FCA says anything about what the California legislature thought when it enacted the 2000 version of § 12652. The Court believes the answer is "yes," notwithstanding the fact that there are some minor differences between California's FCA and the federal one (*e.g.*, the money penalties are different amounts). The fact that the "prevails in" language has remained unchanged throughout the statute's history is, in the Court's view, persuasive evidence (or at least more persuasive than J-M's counter arguments) that the California legislature that enacted the 2000 version of § 12652 would have wanted its FCA to closely track the federal one, in particular with respect to shifting attorney fees.

conveniently ignores that Plaintiffs were successful in obtaining a jury verdict finding it liable for violations of the states' various FCA statutes which gave rise to the *possibility* of an extremely high damages award and the *certainty* of some imposition of civil penalties.

The Court finds that the Relator is entitled to attorney fees.  Part of the gulf J-M identifies between hopes and outcomes is due to framing.  Under the Court's bifurcation order, Plaintiffs were instructed to choose five exemplar plaintiffs and therefore dramatically narrowed the scope of the Phase One and Two trials.  *See* ECF No. 551.  It is true that even as to the Exemplar Plaintiffs, who sought nearly $60 million in replacement costs in Phase Two, the monetary award of zero dollars was a disappointment.  However, that does not erase the fact that the Phase One jury found liability and in any event is mitigated by the fact that the Exemplar Plaintiffs for the most part do not seek fees connected to Phase Two.  The Court does not disagree with J-M that a court must make "a comparison of the extent to which each party has succeeded and failed to succeed in its contentions."  Opp. at 15 (citing *Olive v. Gen. Nutrition Centers, Inc.*, 30 Cal. App. 5th 804, 824 (2018)).  However, this case is unlike those cited to by J-M involving general contract-law causes of action.  There, the legislature is indifferent to the status of the party as plaintiff or defendant.  Here, however, the legislature has put its thumb on the scale in favor of qui tam plaintiffs, stating that the state's FCA "shall be liberally construed and applied to promote the public interest."  Cal. Gov't Code § 12655(c).  Not allowing a qui tam plaintiff to recover attorney fees herein − where liability was established and civil penalties were awarded − just because no actual damages were proven would not, in the Court's view, be consistent with that instruction.

### 2) *Nevada*

J-M's argument that Plaintiffs are not entitled to attorney fees under Nevada's FCA statutes largely parallels the argument it made for California's FCA.

Nevada's FCA enactments are substantially similar to California's and the federal FCA statutes.[16]  A FCA action may be brought by a private plaintiff on behalf of the state or a political subdivision.  Nev. Rev. Stat. § 357.080.  The state's Attorney General or designee may intervene (*Id.* § 357.110); and if there is intervention, "the private plaintiff remains a party to an action

---

[16] As noted in <u>Civil False Claims and Qui Tam Actions</u> § 6.02(A)(18): "The Nevada False Claims was enacted in 1999.  After amendments that took effect July 1, 2007 were adopted, Nevada's FCA conformed more closely to the federal statute, with the same basic conduct giving rise to liability as under the federal law at that time. [Footnotes omitted.]."

pursuant to [§] 357.080." *Id.* § 357.120.   The Nevada FCA statute governing the award of expenses and attorney fees states: "If the Attorney General, a designee of the Attorney General pursuant to NRS 357.070 or a private plaintiff prevails in or settles an action pursuant to NRS 357.080, the private plaintiff is entitled to a reasonable amount for expenses that the court finds were necessarily incurred, including reasonable costs, attorney's fees and the fees of expert consultants and expert witnesses." *Id.* § 357.180(1).

The Court's reasons for finding that attorney fees are appropriate under California's FCA in this litigation apply to Nevada's FCA as well.   Under Nevada law, "the presumption that the Legislature, in enacting a state statute similar to a federal statute, intended to adopt the federal courts' construction of that statute, is rebutted when the state statute clearly reflects a contrary legislative intent."   *See Int'l Game Tech., Inc. v. Second Judicial Dist. Court of Nev.*, 122 Nev. 132, 154 (2006).   There does not appear to be any such contrary legislative intent.   Moreover, like California, Nevada received federal certification that its state FCA "contains provisions that are at least as effective in rewarding and facilitating qui tam actions for false or fraudulent claims as those described in [the federal FCA]."   42 U.S.C. § 1396h(b)(2); *see* Reply at 4-6.   Again, it would be difficult to claim that Nevada's FCA was "as effective in rewarding and facilitating" qui tam actions as the federal FCA if recovery of attorney fees was not allowed in cases such as this one.

Nevada's FCA "must be broadly construed" to "promote recovery of the maximum amount of fraudulently withheld or claimed state funds possible."   *Int'l Game Tech., Inc. v. District Court*, 127 P.3d 1088, 1104-05 (Nev. 2006).   J-M argues that Nevada law follows federal law in defining "prevailing party," and then cites to several authorities interpreting that term to support its claim that Plaintiffs were not the prevailing party here.   *See* Opp. at 17-18 (citing *Farrar v. Hobby*, 506 U.S. 103, 115 (1992) (observing that "in some circumstances, even a plaintiff who formally 'prevails' [] should receive no attorneys' fees at all")).   However, with one exception, all of those cases concerned Section 1983 actions, not federal FCA lawsuits.[17] This is not a surprise given that the federal FCA fee-shifting provision does not turn on whether there is a "prevailing party" (or even contain those words), but rather applies whenever there is

_____

[17] *See* Opp. at 17-18 (citing *Farrar v. Hobby*, 506 U.S. 103, 115 (1992); *Choate v. Cty. Of Orange*, 86 Cal. App. 4th 312 (2000); *Cummings v. Connell*, 402 F.3d 936 (9th Cir. 2005); *Benson v. Oregon Student Assistance Comm'n*, 421 F.3d 901 (9th Cir. 2005)).

any recovery of proceeds.  One case − which considered this general area and analyzed the meaning of "prevailing party" in a federal FCA case − actually affirmed an award of attorney fees where the plaintiffs won civil penalties but nothing in damages (although the court did reduce the amount of attorney fees).  *See United States v. Everglades College, Inc.*, 855 F.3d 1279 (11th Cir. 2017).[18]

Accordingly, the Court finds that Plaintiffs are entitled to attorney fees under Nevada's FCA.

### 3)  *Virginia*

Under the current Virginia FCA statutes, the relator, contrary to J-M's argument (*see* Opp. at 11-12), is entitled to attorney fees – both in cases when the Commonwealth intervenes and when it does not.  *See* VA Code Ann. § 8.01-216.7(A) (providing that in cases where the Commonwealth intervenes, the qui tam plaintiff "shall also receive an amount for reasonable expenses that the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs" and that "[a]ll such expenses, fees, and costs shall be awarded against the defendant"); *see also* § 8.01-216.7(B) (providing the same in cases where the Commonwealth does not intervene).[19]

Additionally, unlike with the California and Nevada state FCA statutes, attorney fees are presently provided in the Virginia FCA statute not only for qui tam plaintiffs, but also an intervening governmental entity such as the Commonwealth of Virginia.  *See* Pl. Rel. Br. at 1-3 (". . . all work that Relator's counsel performed that benefited Virginia was either done exclusively on behalf of Relator prior to counsel's retention by the Commonwealth, or thereafter for both parties.  In either case such work is compensable under the 2007 amendment.").  When this lawsuit was filed in 2006, under the then-applicable version of Virginia's FCA, the Commonwealth was *not* entitled to attorney fees for cases – such as this one – into which it

---

[18] The facts of the *Everglades College* case are somewhat unique.  In a bench trial on the FCA cause of action litigated exclusively by the qui tam plaintiffs, the court: (1) found that the relators had established that the defendant had violated Title IV of the Higher Education Act of 1965; (2) but rejected the relators' contention that each of the thousands of student financial-aid requests constituted an actionable FCA claim; (3) found that only two false certifications had been knowingly submitted to the government for which it awarded $11,000 total in civil penalties; and (4) held that those false certifications had not caused the government to suffer any financial damages at all.  *See* 855 F.3d at 1283-84.  The relators sought attorney fees in excess of one million dollars which the court reduced to $60,000 based upon the relators' limited success.  *Id.* at 1292.  The relators took an appeal.  While the matter was on appeal, the United States intervened and settled the case for $335,000.

[19] Section 8.01-216.7 has not been amended since it went into effect in 2003.

intervened.  The statute provided that a "person violating [the Virginia FCA] shall also be liable to the Commonwealth for the *costs* of a civil action brought to recover any such penalty or damages."  2004 VA Code Ann. § 8.01-216.3(B) (emphasis added).  It did not mention attorney fees.  However, by the time the Commonwealth intervened in this case in February 2010 (*see* ECF No. 104), Virginia's FCA had been amended to allow it to recover attorney fees.  Effective beginning in 2007, the statute was amended to provide that "[a] person violating this section shall be liable to the Commonwealth for *reasonable attorney fees* and costs of a civil action brought to recover any such penalties or damages."  2007 VA Code Ann. § 8.01-216.3(A) (emphasis added); *see* 2007 Virginia Laws Ch. 569 (S.B. 1183).[20]

Whether the Commonwealth is entitled to attorney fees turns on whether the 2007 amendment should apply to cases pending when it became effective.  The Court could not find any Virginian authorities dealing with the question of the application of the 2007 amendment to pending FCA cases.  Generally, "Virginia law does not favor retroactive application of statutes . . . we interpret statutes to apply prospectively 'unless a contrary legislative intent is manifest.'"  *See Bailey v. Spangler*, 289 Va. 353, 358-59 (2015).  However, because the Virginia FCA statutes were modeled on the federal one, the Court approaches this question considering the analysis applicable to the federal FCA statutes.

Like Virginia, the federal courts have a "presumption against statutory retroactivity."  *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 277 (1994).  However, that presumption is merely one factor in the analysis.  For example, the case law discussing the attorney fees provisions of the federal Prison Litigation Reform Act ("PLRA") is instructive.  As with the Virginia FCA, the attorney-fee provisions of the PLRA "contains no express command about its temporal scope."  *Martin v. Hadix*, 527 U.S. 343, 361 (1999).  Given that, the Supreme Court analyzed whether applying PLRA's fee-shifting provisions – specifically those placing limits on a plaintiff's attorney fees – to cases pending when it became effective "would result in a retroactive effect."  *Id.* at 353.[21]  The Supreme Court concluded that at least with post-judgment monitoring by

---

[20] For reasons the Court cannot figure out, the old language stating that "[a] person violating [the Virginia FCA] shall also be liable to the Commonwealth for the costs of a civil action brought to recover any such penalty or damages" was kept in place.  2004 VA Code Ann. § 8.01-216.3(B).

[21] Courts follow a two-step analysis to determine whether a new federal statute should be applied to pending cases.  First, courts ask "whether Congress has expressly prescribed the statute's proper reach."  *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994).  "If there is no congressional directive on the temporal reach of a statute, [courts] determine whether the application of the statute to the conduct at issue would result in a retroactive effect.

plaintiffs' counsel of the defendants' compliance with remedial decrees, the answer was "no." It reasoned that beginning on the PLRA's effective date, "the plaintiffs' attorneys were on notice that their hourly rate had been adjusted," and that "[i]f the attorney does not wish to perform services at this new, lower pay rate, she can choose not to work." *Id.* at 360. In *Martin*, the plaintiffs' attorneys could have decided to stop their involvement once the judgment issued.[22]

Additionally, the Supreme Court in *Landgraf* observed that − aside from the anti-retroactivity presumption − the case also involved another seemingly opposite long-held presumption, *i.e.* "a court is to apply the law in effect at the time it renders its decision," *see Bradley v. Richmond Sch. Bd.*, 416 U.S. 696, 711 (1974). *See* 511 U.S. at 264-65. In *Bradley,* it was held that a statute allowing the award of attorney fees to successful civil rights plaintiffs applied in a class action case that was pending on appeal even though the statute was not passed until after the lawsuit was on appeal and even though the statute contained no language that it was to be applied retroactively. In so doing, the Court stated: "We anchor our holding in this case on the principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *See* 416 U.S. at 711.

The Supreme Court in *Landgraf* considered the "apparent tension" between "the two canons." *See* 511 U.S. at 265. In addressing that tension, the Court stated:

> . . . the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted. For that reason, the "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal." *Kaiser*, 494 U.S. at 855 (SCALIA, J., concurring).

---

If so, then in keeping with [the] "traditional presumption" against retroactivity, [courts] presume that the statute does not apply to that conduct." *Martin v. Hadix*, 527 U.S. 343, 352 (1999) (internal citations omitted).

[22] Based on the Court's first read of the case, it does not agree with Plaintiffs that *Martin* broadly held that "fee-shifting statutes apply to all work performed after enactment, even if the case was filed pre-enactment." Pl. Rel. Br. at 1, n. 1. *Martin* was concerned with a provision *limiting* fees, so the reference point (the "retroactivity event", *Martin*, 527 U.S. at 363 (Scalia, J., concurring)) was from the perspective of the plaintiffs' attorneys (the defendants were obviously happy with a provision limiting fees that plaintiffs' attorneys could recover). With the 2007 amendment, the Exemplar Plaintiffs are clearly happy with the Commonwealth's ability to recover fees. It is the defendant's (*i.e.* J-M's) expectations that are potentially disrupted and its perspective that the retroactivity analysis might have to consider.

* * * *

Absent a violation of one of those specific [constitutional] provisions, the
potential unfairness of retroactive civil legislation is not a sufficient reason for a
court to fail to give a statute its intended scope.  Retroactivity provisions often
serve entirely benign and legitimate purposes, whether to respond to emergencies,
to correct mistakes, to prevent circumvention of a new statute in the interval
immediately preceding its passage, or simply to give comprehensive effect to a
new law Congress considers salutary.  However, a requirement that Congress first
make its intention clear helps ensure that Congress itself has determined that the
benefits of retroactivity outweigh the potential for disruption or unfairness.

* * * *

    A statute does not operate "retrospectively" merely because it is applied in
a case arising from conduct antedating the statute's enactment . . . or upsets
expectations based in prior law.  Rather, the court must ask whether the new
provision attaches new legal consequences to events completed before its
enactment.  The conclusion that a particular rule operates "retroactively" comes at
the end of a process of judgment concerning the nature and extent of the change
in the law and the degree of connection between the operation of the new rule and
a relevant past event.  Any test of retroactivity will leave room for disagreement
in hard cases, and is unlikely to classify the enormous variety of legal changes
with perfect philosophical clarity. However, retroactivity is a matter on which
judges tend to have "sound . . . instinct[s]," . . . and familiar considerations of fair
notice, reasonable reliance, and settled expectations offer sound guidance.

    Since the early days of this Court, we have declined to give retroactive
effect to statutes burdening private rights unless Congress had made clear its
intent. * * * * The largest category of cases in which we have applied the presumption
against statutory retroactivity has involved new provisions affecting contractual or
property rights, matters in which predictability and stability are of prime
importance.

* * * *

    Although we have long embraced a presumption against statutory
retroactivity, for just as long we have recognized that, in many situations, a court
should "apply the law in effect at the time it renders its decision," *Bradley*, 416
U.S. at 711, even though that law was enacted after the events that gave rise to the
suit.  There is, of course, no conflict between that principle and a presumption
against retroactivity when the statute in question is unambiguous. * * * *

    Even absent specific legislative authorization, application of new statutes
passed after the events in suit is unquestionably proper in many situations.

* * * *

    Our holding in *Bradley* is similarly compatible with the line of decisions
disfavoring "retroactive" application of statutes . . . . We concluded that the
private parties could rely on § 718 to support their claim for attorney's fees,
resting our decision "on the principle that a court is to apply the law in effect at

the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." 416 U.S. at 711.

Although that language suggests a categorical presumption in favor of application of all new rules of law, we now make it clear that *Bradley* did not alter the well-settled presumption against application of the class of new statutes that would have genuinely "retroactive" effect.  Like the new hearing requirement in *Thorpe*, the attorney's fee provision at issue in *Bradley* did not resemble the cases in which we have invoked the presumption against statutory retroactivity. Attorney's fee determinations, we have observed, are "collateral to the main cause of action" and "uniquely separable from the cause of action to be proved at trial." *White v. New Hampshire Dept. of Employment Security*, 455 U.S. 445, 451-452 (1982) . . . . Moreover, even before the enactment of § 718, federal courts had authority (which the District Court in *Bradley* had exercised) to award fees based upon equitable principles . . . . In light of the prior availability of a fee award, and the likelihood that fees would be assessed under pre-existing theories, we concluded that the new fee statute simply "did not impose an additional or unforeseeable obligation" upon the school board.  *Bradley*, 416 U.S. at 721.
* * * *

When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach.  If Congress has done so, of course, there is no need to resort to judicial default rules.   When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i. e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.   If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*See* 511 U.S. at 265-80.

As with the PLRA, the Court sees no "express command about its temporal scope" in the Virginia FCA's mandate that "[a] person violating this section shall be liable to the Commonwealth for reasonable attorney fees and costs of a civil action brought to recover any such penalties or damages."   2007 VA Code Ann. § 8.01-216.3(A).   It therefore must ask whether applying the 2007 amendment to this case would operate retroactively.   This inquiry "demands a commonsense, functional judgment about whether the new provision attaches new legal consequences to events completed before its enactment."  *Martin*, 527 U.S. at 357-58.

The parties are expected to offer further briefing on the retroactivity issue.

B. Is the Relator Entitled to Attorney Fees for Any of the Work Done after a Governmental Entity Intervened?

No one disputes that, under the various FCA statutes, the relator in a prevailing FCA

lawsuit is entitled to attorney fees that he/she incurred in contributing to the prosecution of the action.  Reimbursing the relator for those attorney fees serves to "increase the financial and other incentives for private individuals to bring suits under the [federal FCA] and thereby to enlist the aid of the citizenry."  *U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d  743, 745 (9th Cir. 1993).

That is true even if those fees are incurred after a government entity intervenes.  As one court observed, "the [federal FCA] clearly contemplates the continued participation by a relator after the government intervenes in a qui tam action."  *United States ex rel. Abbott-Burdick v. Univ. Med. Assocs.*, 2002 WL 34236685, at *15 (D.S.C. May 23, 2002); *see also United States ex rel. Cretney-Tsosie v. Creekside Hospice*, No. 2:13-cv-00167-APG-PAL, 2018 WL 4409367, at *5-6 (D. Nev. Sept. 17, 2018).  The state FCA statutes all explicitly state that the relator remains as a party in the FCA action even after the government entity intervenes.  *See* Cal. Gov't Code § 12652(e)(1), Nev. Rev. Stat. § 357.120(1), VA Code Ann. § 8.01-216.6(A).   The relator's continued participation and right to object to a dismissal or settlement by the intervenor "giv[e] a relator the incentive to act as a check that the Government does not neglect evidence, cause undue delay, or drop the false claims case without legitimate reasons."  *U.S. v. Northrop Corp.*, 59 F.3d 953, 964 n. 8 (9th Cir. 1995) (internal quotations and alterations omitted).  None of the state FCA statutes contain any provision suggesting that attorney fees incurred by the relator as part of this continued participation are not recoverable.  *See, e.g.*, 31 U.S.C. § 3730(d)(1) (the award to the relator depends upon "the extent to which the person substantially contributed to the prosecution of the action"); Cal. Gov't Code § 12652(e)(8) ("the qui tam plaintiff shall receive an amount for reasonable expenses that the court finds to have been necessarily incurred, plus reasonable costs and attorney's fees"); VA Code Ann. § 8.01-216.7(A) (providing that in cases where the Commonwealth intervenes, the qui tam plaintiff "shall also receive an amount for reasonable expenses that the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs").

Normally under the federal, California, Nevada and the pre-2007 Virginia FCA statutes, attorney fees for work performed by government lawyers are not recoverable.  In a situation where the relator and the intervening entity have different lawyers, the issue of what post-intervention attorney fees the relator is entitled to is straightforward.  Fees incurred by the relator's lawyers after the intervention would still be recoverable by the relator.  And fees incurred by the intervening governmental entity would not be recoverable by the *relator*.

This case presents a wrinkle, because it has been asserted that the lawyers for the Relator – the law firms Constantine Cannon; Day Pitney; McKool Smith Hennigan; Best Best & Krieger; and Phillips & Cohen (collectively, "Private Counsel") – performed a large portion of the legal work for four of the five Exemplar Plaintiffs – *i.e.* the Commonwealth of Virginia and the three California water/utility districts – even after they intervened in this action. The question arises as to whether attorney fees for work performed by Private Counsel for the intervening governmental plaintiffs should be recoverable under the state FCA statutes. None of the parties herein have provided caselaw which considers the issue. The Court will make a few comments on the matter but wait for further briefing by the parties.

Initially, J-M argues that, under the California and Virginia FCA statutes, once a governmental entity intervenes, it has "the primary responsibility for prosecuting the action." Cal. Gov't Code §12652(e)(1); *accord* VA Code Ann. § 8.01-216.6(A). While J-M is correct as to what those provisions say, J-M has not presented any applicable law or persuasive argument that, once the government entity intervenes, any work done by the relator's counsel that inures to the benefit of the governmental entity cannot be the basis for an award of attorney fees. First, it is observed that, if the governmental entity had not intervened, the relator's performance of that work would be compensable under the FCA so long as the court found it to have been necessarily incurred. The fact that a governmental entity intervenes does not alter the legal matters that must be accomplished in prosecuting a FCA lawsuit. Whether the work is performed by private lawyers or government counsel makes no difference in terms of necessity. Second, it is recognized that, even after the government intervenes in the FCA action, the qui tam plaintiff is allowed to actively participate as a party to the action to make sure that the government does not neglect evidence or otherwise drop the ball. *See Northrop Corp.*, 59 F.3d at 963-64 n.8; *Creekside Hospice*, 2018 WL 4409367, at *6. While perhaps J-M could have grounds for complaint if the Relator's lawyers and the government counsel were engaged in duplicative endeavors or if the Relator's counsel was performing unnecessary tasks or otherwise delaying the lawsuit or over-litigating it; but J-M has not demonstrated that Relator's counsel has been guilty of any of those faults herein. Third, for the most part, the relator's interests and the intervening governmental entity's interests are substantially the same. As observed in *Creekside Hospice*:

> the FCA does not relegate the relator to a spectator's role upon Government

> intervention. While the Government has the "primary responsibility for
> prosecuting the action," the relator has "the right to continue as a party to the
> action," subject to certain restrictions. The statute also incentivizes the relator's
> participation by considering the extent to which the relator "substantially
> contributed to the prosecution of the action" in determining the percentage share
> of the recovery the relator receives.

2018 WL 4409367, at *5 (footnotes omitted). Fourth, it has not been shown that the FCA

statutes would forbid an intervening governmental entity from agreeing with the qui tam plaintiff

for the latter's counsel to perform certain litigation tasks. Here, Relator's counsel have made

certain representations as to such arrangements but have not, as of yet, produced actual evidence

of such agreements and their specific terms. It is expected that such evidence will be proffered.

C. Must the Attorney Fees be Limited to a Fraction of the Monetary Award Earned
   (Here, only $162,000 in Civil Penalties)?

Ordinarily, the most useful starting point for determining a reasonable award of attorney

fees in an FCA case is through the lodestar method. *See United States ex rel. Begole v. Trenkle*,

No. EDCV- 06-01104-VAP-(OPx), 2012 WL 13071028, at *5 (C.D. Cal. Jan. 26, 2012); *United

States v. Patrols Servs., Inc*., 202 F. Appx. 357, 358-59 (11th Cir. 2006) (noting in passing that

the lodestar formula applies to attorneys fee calculations under the False Claims Act); *see United

States v. $186,416.00 in U.S. Currency*, 642 F.3d 753, 755 (9th Cir. 2011) ("The lodestar

approach is the method customarily used to determine attorney fees under fee-shifting statutes.").

Under that method, the court initially considers number of hours reasonably spent on the

litigation and multiplies that figure by a reasonable hourly rate. *See Caudle v. Bristow Optical

Co., Inc.*, 224 F.3d 1014, 1028 (9th Cir. 2000). After making that computation, the court then

assesses whether it is necessary to adjust the presumptively reasonable lodestar figure on the

basis of factors delineated in *Kerr v. Screen Guild Extras, Inc*., 526 F.2d 67, 70 (9th Cir.1975),[23]

that are not already subsumed in the initial lodestar calculation.

It has been noted that: "The Supreme Court teaches that the degree of success obtained is

---

[23] The twelve *Kerr* factors bearing on the reasonableness are:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the
> skill requisite to perform the legal service properly, (4) the preclusion of other employment by the
> attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or
> contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount
> involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10)
> the "undesirability" of the case, (11) the nature and length of the professional relationship with the
> client, and (12) awards in similar cases.

*Kerr*, 526 F.2d at 70.

the most critical factor in determining the reasonableness of a fee award. *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)." *Bravo v. City of Santa Maria*, 810 F.3d 659, 666 (9th Cir. 2016). However, the amount of damages obtained by a plaintiff is not the sole indicator of success. *See Morales v. City of San Rafael*, 96 F.3d 359, 364 (9th Cir. 1996); *Riverside v. Rivera*, 477 U.S. 561, 574 (1986) (plurality opinion) ("[A] civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms.").

This lengthy litigation presents an unusual case. The outcome was decidedly mixed. While the Phase One jury found J-M liable under the state FCAs, after fourteen years of litigation the Exemplar Plaintiffs won only $162,000 in civil penalties. It is a certainty that the lodestar figure[24] will be much larger than the $162,000 which the Exemplar Plaintiffs recovered.[25] However, looking only at the monetary results ignores the complexity of the issues (including legal, factual, and technological matters) that were raised in the litigation.[26]

In the civil rights context, while "the Supreme Court has disavowed a test of strict proportionality, it also suggested that a comparison of damages awarded to damages sought is required." *McCown v. City of Fontana*, 565 F.3d 1097, 1104 (9th Cir. 2009) (citing *City of Riverside*, 477 U.S. 561, 576 (1986) (Powell, J., concurring)) (discussing awarding of attorney fees under 42 U.S.C. § 1988). A rule of strict proportionality "would make it difficult, if not impossible, for individuals with meritorious civil rights claims but relatively small potential

---

[24] Earlier in the litigation, Plaintiffs claimed that as of March 13, 2013 (before the Phase One trial, which ended with a jury verdict in November 2013) they had incurred fees and costs totaling $50 million. *See* Opp. at 24, n. 26. It is unclear how much of this was purportedly compensated by the settlement Plaintiffs reached with FPC-USA.

[25] Plaintiffs argue that the lodestar figure is appropriate here because "adjustment applies only when Plaintiffs have brought multiple claims and succeed on only some of their claims." Opp. at 9. This rule is not only unintuitive, but also unsupported by any case law. It would be very strange for a FCA claim – which is largely driven to protect against "fraud on the public treasury" – to say that the "degree of success obtained" does not take into consideration the monetary relief awarded. The fact that a plaintiff may have a perfect record of establishing the defendant's liability on all the claims it brought does not mean that "all hours reasonably necessary to obtain the relief are compensable." In the case Plaintiffs rely on, the Supreme Court considered the general question of what an appropriate fee award would be for civil rights cases where a plaintiff has achieved only "partial or limited success." *Hensley*, 461 U.S. at 436. While the Supreme Court was focused on how to handle situations where there are multiple claims, some of which were clearly unsuccessful, nothing in the opinion suggested that those situations are the *only* time an adjustment to the lodestar is required.

[26] While not in any way controlling on the issue, it is interesting to observe that the co-defendant Formosa Plastics Corporation settled its liability in this case (which by any evaluation was less than J-M's) for 22.5 million dollars in 2013. Therefore, to assert that Plaintiffs should have known that their case against J-M was worth only some low figure is not persuasive. Moreover, to characterize the case as only producing an award of $162,000 ignores the 22.5 million dollar settlement with the co-defendant.

damages to obtain redress from the courts." *Riverside*, 477 U.S. at 578.  But at the same time, "the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees." *Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983).

The argument for a proportionality rule in FCA cases might be marginally stronger than it is in civil rights cases.  It is true, as Plaintiffs argue, that both the federal FCA and state FCAs are intended to encourage and facilitate the filing of qui tam lawsuits.  In establishing the FCA's fee-shifting provision, Congress was specifically concerned that the "[u]navailability of attorneys' fees inhibits and precludes many private individuals, as well as their attorneys, from bringing civil fraud suits."  S. Rep. 99-345 at 29; *cf. Riverside*, 477 U.S. at 576 (observing that "[i]n many cases arising under our civil rights laws, the citizen who must sue to enforce the law has little or no money with which to hire a lawyer").  However, FCA cases generally have a greater financial character and are more lucrative than civil rights cases.  *See, e.g.*, *S.F. Unified Sch. Dist. ex rel. Contreras v. First Student, Inc.*, 224 Cal. App. 4th 627, 638 (2014) (observing that the purpose of California's FCA was "to prevent fraud on the *public treasury*"); S. Rep. 94-1011 at *6 (observing Congress's intent that attorney fees awarded under 42 U.S.C. § 1988 "not be reduced because the rights involved may be nonpecuniary in nature"); *Riverside*, 477 U.S. at 577 (observing that "civil rights cases . . . frequently involve substantial expenditures of time and effort but produce only small monetary recoveries).

Having said that, the Court sees no compelling reason to adopt a strict proportionality rule at this stage (after the special master completes his work, J-M will have an opportunity to object to any fee award as unreasonable).  What Plaintiffs accomplished was substantial.  While the Court ultimately found that Exemplar Plaintiffs failed to establish any actual damages, that does not change the fact that J-M was found liable for having knowingly made "false or fraudulent" claim that its pipe met certain industry standards when it did not.  J-M cites to no binding authority establishing a strict proportionality rule.  In FCA cases, some courts have reduced fee awards that were originally larger than the damages/penalties recovered.  *See, e.g.*, *U.S. ex rel. Bahrani v. Conagra, Inc.*, No. 00-cv-01077, 2009 WL 2766805 (D. Colo. Aug. 28, 2009) (reducing fee award from the requested $3.5 million to $9,000 – one-third of the $27,000 awarded in damages and penalties – because plaintiff "proved only that Defendants materially altered a total of five hide export certificates out of the more than ten thousand certificates which remained at issue").  Others have not.  *See, e.g.*, *United States ex rel. Shepard v. Grand Junction*

*Regional Airport Auth.*, No. 13-cv-00736, 2017 WL 11556405 (D. Colo. July 24, 2017) (awarding $109,000 in attorney fees and costs where the case settled for $16,500).

       D.  <u>What Is the Appropriate Billing Rate and What Discovery Are the Parties Entitled to?</u>

       The appropriate billing rates are not a particularly complicated matter and the Court would expect that the special master could provide an initial determination, subject to this Court's review.

       As to discovery, the Court does not expect there to be much discovery and this court is ready to resolve any such disputes as they would arise during that process.

       The Court expects that there may arise certain disputes where it might be more advantageous to have the special master initially address. For example, as to the treatment of the $5.5 million in attorney fees received from FPC-USA, it be preferable for the special master to make a determination as to the legal work performed by relator's counsel which would be compensable, perform a lodestar analysis, and thereafter attempt to resolve how the moneys received from FPC-USA should be treated vis-à-vis that determination.

## III. Conclusion

       In sum, the Court's tentative rulings as to fees and costs would be:

1. The Relator is entitled to attorney fees under all of the state FCAs. Those fees would include necessary work performed for the Relator by his counsel for his benefit even after intervention by a governmental entity. The Court expects further briefing as to: (1) whether attorney fees can be awarded for work performed by Relator's counsel for the benefit of an intervening governmental entity, and (2) whether Virginia's 2007 amendments to its FCA statute allowing attorney fees to be awarded for work performed by its government counsel can be applied to this litigation.

2. Plaintiffs may, subject to the limitation in the preceding point, seek only those fees necessary to secure and defend the Phase One jury verdict, although there is a question as to whether the efforts in securing the $162,000 civil penalty award can also be sought at this time.

3. In their fee applications, Plaintiffs must provide enough information for the special master to verify the preceding points. Limited discovery would be allowed and, if the parties cannot agree on the scope/timing of that discovery, this

Court would resolve the matter.

4.  Before the Court appoints a special master to handle Plaintiffs' fee applications consistent with these findings, Plaintiffs will provide documentation about the compensation agreements between the Relator, Private Counsel, and the Exemplar Plaintiffs.